# EXHIBIT A

012
本材料仅供参考，未经同意，不得自行
翻印、公布、出版。
上海法院档案材料证明专用章

关于执行《股份重组初步协议》的
协 议 书

本协议由以下各方于 2010 年 4 月 28 日签订：

(A) 绿洲投资集团有限公司，一家注册于英属维尔京群岛的股份有限公司，注册地址位于【 】（以下称："绿洲投资"）；

(B) 俞乃奋女士，美国公民，美国护照号码 710714118，通讯地址为上海市中山西路 555 号绿洲大厦 419 室，邮政编码：200051；

(C) 俞乃雯女士，中国公民，中国身份证号码 310101196304040864，通讯地址为上海市中山西路 555 号绿洲大厦 419 室，邮政编码：200051；

(D) 俞乃筠女士，中国公民，中国身份证号码 310106197207062822，通讯地址为上海市中山西路 555 号绿洲大厦 419 室，邮政编码：200051；

(E) 柯铮光先生，中国公民，中国身份证号码 310109195601033237，通讯地址为上海市中山西路 555 号绿洲大厦 419 室，邮政编码：200051；

(F) 徐宏标先生，中国公民，中国身份证号码 310104196403192854，通讯地址为上海市中山西路 555 号绿洲大厦 419 室，邮政编码：200051；

(G) 喜盈国际集团有限公司，一家注册于英属维尔京群岛的股份有限公司，注册地址位于【 】；

(H) Focus Town Limited，一家注册于英属维尔京群岛的股份有限公司，注册地址位于【 】；

(I) 绿庭置业有限公司，一家注册于香港的股份有限公司，注册地址位于【 】（以下称："绿庭置业"）；

(J) 上海绿洲科创生态科技有限公司，一家注册于中国上海奉贤区的股份有限公司，注册地址位于【 】（以下称："绿洲科创"）。

012
本材料仅供参考，未经同意，不得自行翻印、公布、出版。
上海法院档案材料证明专用章



58

俞乃奋女士、俞乃雯女士和俞乃筠女士合称为绿洲投资"控股股东"，柯铮光先生（或其拥有的喜盈国际集团有限公司）和徐宏标先生（或其拥有的 Focus Town Limited）合称为绿洲投资"参股股东"。绿洲投资、控股股东、参股股东及单称为"一方"，合称时为"各方"。

鉴于

1.　控股股东和参股股东已于 2009 年 3 月 24 日作出股份重组的《股东会决议》，并于 2009 年 9 月 4 日签署了《会议纪要》，2009 年 11 月 9 日签署了《股份重组初步协议》（"《重组协议》"）。上述三份文件就绿洲投资回购参股股东持有的公司股份事宜确定了基本原则及交易架构；

2.　根据《重组协议》第 2.1 及 2.2 款之规定，绿洲投资为回购股份应支付的对价应为相当于人民币 2.5 亿元等额外汇及上海四季花城房地产开发有限公司（"四季花城"）100%股权，回购价格支付的期限及支付方式等由各方另行协商；

3.　为解决股份回购中的具体问题，尽快完成《重组协议》所约定的各项交易，降低各方的交易成本和时间成本，各方一致同意签署本协议，以明确回购价格、支付期限、支付方式及与此相关的其他问题。

据此，各方经友好协商，一致同意达成如下协议：

第一条　绿洲投资回购前股权重组

1.1　根据商业需要，柯铮光先生决定将其持有的绿洲投资股权转让予喜盈国际集团有限公司，徐宏标先生决定将其持有的绿洲投资股权转让予 Focus Town Limited，在该等转让完成后再由绿洲投资回购喜盈国际集团有限公司及 Focus Town Limited 分别持有的绿洲投资股权（上述安排以下简称为"回购前股权转让"）。绿洲投资和控股股东对上述安排表示同意并愿意提供必要的配合。

1.2　上述回购前股权转让的税收及其费用由参股股东承担。

2

012
本材料仅供参考，未经同意，不得自行
翻印、公布、出版。
上海法院档案材料证明专用章



59

第二条　绿洲投资回购对价

2.1　现金对价及其支付安排。根据《重组协议》，绿洲投资回购对价的现金
　　　支付部分为相当于人民币 2.5 亿元的等额外汇（"现金对价"）。各方同意，
　　　在实际支付时，现金对价的金额应作如下调整：

2.1.1　现金对价中应扣除应由参股股东承担的历史遗留往来款人民币 4100 余
　　　万元；

2.1.2　现金对价中应增加绿洲投资及控股股东愿意有条件支付的一次性额外
　　　补偿人民币 3000 万元（"额外补偿"）。该项额外补偿的支付条件为《重
　　　组协议》及本补充协议项下的绿洲投资股份回购及对价支付已经完成，
　　　双方对此无重大争议。

2.1.3　各方同意，在本协议签署后，涉及相关股权对价支付等相关事宜，需要
　　　调整现金对价的支付金额时，各方将另行签署补充协议。

2.1.4　各方同意，回购对价之现金部分应在香港以港币分成二等份并按下款确
　　　定之时间，及时足额分别支付予参股股东所提供之喜盈国际集团有限公
　　　司和 Focus Town Limited 的银行账户。

2.2　现金对价的支付条件和支付期限

2.2.1　各方同意，回购对价现金部分支付时间如下：

（1）　相当于人民币 8 千万元的港币（"第一期付款"），于下列先决条件全部满
　　　足后十日内支付：

　　（a）本补充协议已经各方签署；

　　（b）参股股东已经签署了绿洲投资有关回购参股股东股权的股东会决
　　　　议。

（2）　相当于人民币 2 千万元的港币（"第二期付款"），于 2011 年 6 月 30 日前
　　　支付。

3

0 1 2
本材料仅供参考，未经同意，不得自行
翻印、公布、出版。
上海法院档案材料证明专用章



（3） 余款相当于人民币 1 亿 5 千万元的港币（"第三期付款"，最终金额为根据下述第（4）项之规定，由各方另行同意或确认的调整后金额为准），在下列先决条件获得满足的前提下于 2012 年 12 月 31 日前支付：

(a) 四季花城股权转让的政府审批及登记手续已经完成；

(b) 绿洲投资已经完成回购参股股东股权所必需的股东变更登记手续；

(c) 参股股东与控股股东已经就前述第 2.1 款规定的现金对价支付安排及各项调整金额达成协议；

(d) 参股股东确认下述第 2.3.5 款规定的股权对价支付已经完成且各方对此无争议；

(e) 第 3.1 款所述之《上海市房地产买卖合同》及第 3.2 款所述之《上海市房地产预售合同》已经签署并完成在房地产登记机关的过户或预售登记手续。

（4） 现金对价之金额调整。

各方同意，在支付第三期付款前，各方应根据如下各款之约定，计算并确定现金对价的调整金额，并以调整后之金额作为第三期付款的最终金额：

(a) 按照《重组协议》及本协议的约定，绿洲投资及控股股东应以四季花城 100%的股权作为股份回购的对价的一部分（"股权对价"）。如因任何法律法规要求该等股权转让必须标明股权转让价款并且须实际支付时，则参股股东因此向绿洲投资及控股股东实际支付的股权转让价款（扣除税费后的净额）部分应增加至现金对价中；

(b) 上述第 2.1.1 及 2.1.2 款所约定之款项分担应反映在第三期付款的最终金额中；

(c) 根据本协议其他条款约定应由相关各方承担的税费分担应反映在第三期付款的最终金额中。

4

012
本材料仅供参考，未经同意，不得自行
翻印、公布、出版。
上海法院档案材料证明专用章

61 

2.3 **股权对价的支付方式。**根据《重组协议》，绿洲投资回购对价中股权部分以上海四季花城房地产开发有限公司 100%的股权计付（"股权对价"）。该等股权对价应通过如下方式支付：

2.3.1 绿洲投资已在香港新设立了世邦有限公司（"世邦公司"），并已经安排世邦公司收购了绿洲投资香港子公司绿庭置业有限公司所持有之上海绿庭四季花城房地产开发有限公司（以下称："四季花城"）80%的股权。该等股权收购完成后，绿洲投资应与喜盈国际集团和 Focus Town Limited 签署一份《股权购买权协议》，约定在下述第 2.3.2 款约定的托管期限届满后，将 世邦公司 100%的股权以港币一元对价转让给喜盈国际集团有限公司和 Focus Town Limited。

2.3.2 各方约定：绿洲投资在世邦公司股权转让给喜盈国际集团有限公司和 Focus Town Limited 的《股权购买权协议》签署后，由绿庭置业与喜盈国际集团有限公司和 Focus Town Limited 签署相关托管协议，该协议约定：(1)喜盈国际集团有限公司和 Focus Town Limited 受绿庭置业委托管理世邦公司并代为行使股东权利三年（"托管期限"）；(2)托管期限内世邦公司及四季花城的所有债权债务、责任与风险均由参股股东承担。如因任何原因导致控股股东、绿洲投资或绿庭置业需承担世邦公司或四季花城在托管期间的债权债务、风险或责任时，参股股东需向控股股东、绿洲投资或绿庭置业提供全额补偿。

2.3.3 四季花城公司目前由绿洲投资下属绿洲科创生态有限公司持有的另外 20%股权转让予参股股东指定的一家中国国内企业（"境内股权对价支付"）。如按照中国法律规定，该等股权转让需实际支付对价时，按照前述第 2.2.1(4)(a)款的规定处理。

2.3.4 各方同意：因境内股权对价支付所产生的税收、费用，以及境外世邦公司托管安排及股权转让给喜盈国际集团有限公司和 Focus Town Limited 的税收、费用由参股股东承担。除此之外的与股权对价支付有关的税收、费用的分担问题，由各方届时另行协商。因境内及境外股权对价支付相关的股权转让手续，即申请、登记、政府手续等项事宜均由参股股东负责办理，控股股东、绿洲投资提供必要的协助。

(2015) 奉民二(商)初字第3476号  2018年8月8日

0 1 2
本材料仅供参考，未经同意，不得自行
翻印、公布、出版。
上海法院档案材料证明专用章

62



2.3.5 鉴于绿洲投资及控股股东已经在本协议签署前将四季花城的实际控制
权移交给了参股股东，各方同意，一旦绿洲投资及控股股东签署了前述
第2.3.1款所述的《股权购买权协议》及第2.3.2款所述的《托管协议》，
股权对价的支付即视为已经完成。

第三条 与绿洲投资回购及回购对价相关的其他约定

3.1 本协议签署后 30 日内，绿洲投资和控股股东应指定其子公司上海绿庭
房地产开发有限公司与参股股东或其指定第三方签署《上海市房地产买
卖合同》，约定由绿庭房地产公司将已达到交房条件的松江区九亭绿庭
尚诚房产项目商业用房约 8000 平方米（具体包括绿庭尚诚一期沿街三
层商业用房约6000平方米和二期中心广场西侧全部商业用房约2000平
方米。）转让给参股股东或其指定的第三方。为避免歧义，(1)在《上海
市房地产买卖合同》签署的同时，绿洲投资及控股股东应将该等商业用
房的使用权交付给参股股东或其指定的第三方，交付使用后的租金或其
他收益归参股股东或其指定的第三方；(2)2011年6月30日之前，绿洲
投资及控股股东应将该等商业用房的所有权转移给参股股东或其指定
的第三方。

3.2 在上述第 3.1 款所述之《上海市房地产买卖合同》签署同时，四季花城
将与绿洲投资或控股股东指定的第三方签署《别墅定制合同》，将其开
发的、位于上海奉贤区奉浦工业区半岛名墅项目的中心岛 A2 型别墅 2
幢（图纸建筑面积各约 1200 平方米，绿洲投资和控股股东已收到该图
纸并知晓其交房标准，确认其实际价格为下述价格）在达到交房标准后
转让与绿洲投资或控股股东指定的第三方。为避免歧义，参股股东应促
使四季花城于 2011 年 6 月 30 日与绿洲投资或控股股东指定的第三方签
订《上海市房地产预售合同》并完成该等别墅的预售登记手续；

3.3 各方确认：上述《上海市房地产买卖合同》及《别墅定制合同》（或《上
海市房地产预售合同》）所涉之房屋的价值均作价为人民币 7200 万元。
由于两者价格相等，为本协议之目的，此项对价视为相互抵消（无论其
财务方面是否能做抵消处，但双方约定不再实际支付）。

3.4 品牌：自本协议签订之日起，除参股股东根据本协议获得的四季花城及
其资产的名称权、标识、注册商标等不作变动（但仅限于在经营四季花

6

本材料仅供参考，未经同意，不得自行
翻印、公布、出版。

上海法院档案材料证明专用章

0 1 2



城现有业务中使用，不得用于任何新业务）外，绿洲投资及其下属公司的所有品牌及其他知识产权均归控股股东实际拥有。未经控股股东许可，参股股东不得继续使用该等品牌及其他知识产权。

3.5　任职：各方同意，自第一期付款支付之日起，参股股东应被视为已经辞去其在绿洲投资及其下属公司所担任的任何职务（在四季花城的职务除外），而控股股东应被视为已经辞去其在四季花城所承担之任何职务。绿洲投资及其下属公司可以根据本款规定办理相关董事、监事或其他职务的变更手续。

3.6　关联交易：本协议签订之日起，四季花城与绿洲投资及其下属公司之间的关联交易应予终止；所有债权债务应在一个月内予以清结。本协议另有约定的除外。

3.7　承诺：参股股东承诺在本协议得到全面及时履行的情况下，在全球范围内不再向绿洲投资、控股股东及其旗下公司主张任何权利。

3.8　四季花城的营业证件、执照和公章等应在第一期付款同时移交予参股股东。

第四条　其他

4.1　本协议未涉及事项，以《重组协议》的约定为准。《重组协议》及本协议均未涉及的，由各方通过友好协商另行签订补充协议，补充协议与本协议有同等效力。

4.2　因本协议或与本协议有关的争议、争执和索偿，违约终止或合同无效等（以下称"争议"）各方应友好协商解决。协商不成时，任何一方均有权将争议提交香港国际仲裁中心以仲裁解决，由该中心按照其届时有效的仲裁规则在香港进行仲裁。仲裁以中文进行。仲裁庭由三名仲裁员组成，绿洲投资及控股股东有权指定一名仲裁员，参股股东有权指定一名仲裁员，第三名及首席仲裁员由香港国际仲裁中心主席指定。仲裁结果是终局的，对各方均有约束力。

4.3　本协议自签署之日起生效。

7

012
本材料仅供参考，未经同意，不得自行
翻印、公布、出版。
上海法院档案材料证明专用章

4.4    本协议以中文写成，一式十份，各方各执一份。

签署：

绿洲投资集团有限公司

俞乃奋                                          柯铮光

俞乃雯                                          喜盈国际集团有限公司

俞乃筠                                          徐宏标

绿庭置业有限公司                                Focus Town Limited

上海绿洲科创生态科技有限公司

For and on behalf of
Oasis Investment Group Limited

Authorised Signature(s)

8



**EXHIBIT B**

[Original handwritten text is indicated in italics]

*Document Evidence 1*                                   *Fen Ke Wen Jun*

⑤

Agreement on the Implementation of

"The Preliminary Share Restructuring Agreement"

This agreement is entered into by the following parties on 28 April 2010:

(A) Oasis Investment Group Limited, a company limited by shares incorporated in the British Virgin Islands, with registered address at [    ] (hereafter referred to as "Oasis Investment");

(B) Ms Naifen YU, an American citizen; USA passport number: 710714118 and mailing address at Room 419, Oasis Building, 555 West Zhongshan Road, Shanghai, postcode: 200051;

(C) Ms Naiwen YU, a Chinese citizen; Chinese ID card number: 310101196304040864 and mailing address at Room 419, Oasis Building, 555 West Zhongshan Road, Shanghai, postcode: 200051;

(D) Ms Naijun YU, a Chinese citizen; Chinese ID card number: 310106197207062822 and mailing address at Room 419, Oasis Building, 555 West Zhongshan Road, Shanghai, postcode: 200051;

(E) Mr Zhengguang KE, a Chinese citizen; Chinese ID card number: 310109195601033237 and mailing address at Room 419, Oasis Building, 555 West Zhongshan Road, Shanghai, postcode: 200051;

(F) Mr Hongbiao XU, a Chinese citizen; Chinese ID card number: 310104196403192854 and mailing address at Room 419, Oasis Building, 555 West Zhongshan Road, Shanghai, postcode: 200051;

(G) Cheergain International Group Limited, a company limited by shares incorporated in the British Virgin Islands with its registered address at [   ];

(H) Focus Town Limited, a company limited by shares incorporated in the British Virgin Islands with its registered address at [   ];

(I) Greencourt Properties Limited, a company limited by shares incorporated in Hong Kong with its registered address at [    ] (hereafter referred to as "Greencourt Properties");

(J) Shanghai Oasis Kechuang Shengtai Keji Limited, a company limited by shares incorporated in Fengxian District, Shanghai with its registered address is [    ] (hereafter referred to as "Oasis Kechuang").

1

Ms Naifen YU, Ms Naiwen YU and Ms Naijun YU are collectively referred to as the "Controlling Shareholders" of Oasis Investment; Mr Zhengguang KE (or Cheergain International Group Limited owned by him) and Mr Hongbiao XU (or Focus Town Limited owned by him) are collectively referred to as the "Non-controlling Shareholders" of Oasis Investment. Oasis Investment, the Controlling Shareholders and the Non-controlling Shareholders, when they are addressed individually each is referred to as a "Party", and collectively as the "Parties".

Whereas :

1. The Controlling Shareholders and the Non-controlling Shareholders had adopted the "Shareholder Resolutions" regarding share restructuring on 24 March 2009, and signed the "Meeting Minutes" on 4 September 2009 and the "Preliminary Share Restructuring Agreement" (the "Restructuring Agreement") on 9 November 2009. The above three documents set out the basic principles and transaction framework for Oasis Investment's repurchase of shares held by the Non-controlling Shareholders.

2. Under clauses 2.1 and 2.2 of the Restructuring Agreement, Oasis Investment is to pay repurchase consideration that shall consist of an amount in foreign currency which amount shall be equivalent to RMB 250 million, plus 100% of the equity in Shanghai [Greencourt] Four-Season-Flower-City Property Development Co., Limited (hereafter referred to as "SJHC"). Issues relating to the repurchase payment schedule and payment method were agreed to be negotiated separately by the Parties.

3. In order to address the issues relating specifically to the repurchase, complete all the transactions specified in the Restructuring Agreement as soon as possible, and to reduce the transaction cost as well as time cost for all the Parties involved, the Parties agree to sign this agreement to specify the repurchase price, the payment schedule, the payment method and any other issues involved.

After amicable negotiations, all Parties unanimously reached the following decisions:

Article 1          Equity Transfer Prior to the Repurchase by Oasis Investment

1.1          Due to commercial needs, Mr Zhengguang KE decided to transfer his equity in Oasis Investment to Cheergain International Group Limited, and Mr Hongbiao XU to transfer his equity in Oasis Investment to Focus Town Limited. After the completion of the aforementioned transfer, Oasis Investment is to repurchase its shares held by Cheergain International Group Limited and Focus Town Limited (hereafter, the aforementioned arrangement is to be referred to as the "Equity Transfer Prior to the Repurchase"). Oasis Investment and the Controlling Shareholders agreed to the aforementioned arrangement and are willing to provide the necessary assistance.

1.2          Non-controlling Shareholders are responsible for the tax and expenses associated with the aforementioned Equity Transfer Prior to the Repurchase.

*Fen Ke Wen Jun*

Article 2        Oasis Investment's Repurchase Consideration

2.1        Cash Consideration and its Payment Arrangement. Under the Restructuring Agreement, the cash component of Oasis Investment's repurchase consideration is an amount of foreign currency which is equivalent to RMB 250 million ("Cash Consideration"). All parties agree that when the actual payment is made, the amount of Cash Consideration is to be adjusted according to the following:

2.1.1        An amount of approximately RMB 41 million resulting from previous transactions for which the Non-controlling Shareholders shall be held liable shall be deducted from the Cash Consideration;

2.1.2        A conditional payment of a one-off additional compensation in the amount of RMB 30 million ("Additional Compensation") that Oasis Investment and the Controlling Shareholders are willing to pay shall be added to the Cash Consideration. The condition for this Additional Compensation is that Oasis Investment's share repurchase and payment of consideration will be completed pursuant to the provisions of the Restructuring Agreement and this ~~supplemental~~ agreement, and there is no major dispute between the Parties.

2.1.3        All parties agreed that, following the signing of this Agreement, when the payment of the relevant equity consideration is to be made and when the amount of Cash Consideration is to adjusted, the parties would then sign a supplementary agreement.

2.1.4        All parties agreed that the cash portion of the repurchase consideration shall be divided into two equal portions in Hong Kong dollars in Hong Kong and paid in full and on time to the bank accounts of Cheergain International and Focus Town Limited provided by the Non-controlling Shareholders at the time as determined in the article below.

2.2        Conditions and Schedule for the Payment of Cash Consideration

2.2.1        All Parties agree that the cash component of the repurchase is to be paid according to the following schedule:

(1)        Hong Kong dollars equivalent to RMB 80 million ("1st Payment") is to be paid within 10 days once the following prerequisites are met:

      (a)        All Parties have signed this ~~supplemental~~ agreement;

      (b)        Non-controlling Shareholders have signed the Resolution of Oasis Investment Shareholders' Meeting on the repurchase of the Non-controlling Shareholders' equity.

(2)        Hong Kong dollars equivalent to RMB 20 million ("2nd Payment") should be paid before 30 June 2011.

(3) The remaining amount equivalent to RMB 150 million in Hong Kong dollars ("3rd Payment"), being the final payment subject to those adjustments agreed to or confirmed by all Parties under provisions of Article (4) below) is to be paid by 31 December 2012 once the following prerequisites are met:

    (a) SJHC's equity transfer being approved by the government and the registration of the transfer being completed;

    (b) Oasis Investment completing the registration of the change of shareholders that is necessary for the repurchase of the Non-controlling Shareholders' equity;

    (c) Non-controlling Shareholders and Controlling Shareholders reaching an agreement on the payment arrangement in respect of the Cash Consideration and various adjustments to the amount specified in the aforementioned Article 2.1;

    (d) Non-controlling Shareholders confirming that the payment of equity consideration specified in Article 2.3.5 below being completed and there being no dispute among all parties;

    (e) Both of the Shanghai Real Estate Sale and Purchase Contract mentioned in Article 3.1 and the Shanghai Real Estate Presale Contract mentioned in Article 3.2 being signed and the registration of transfer [of ownership] or the registration of presale with the Real Estate Registration Authority being completed.

(4) Adjustments to the Amount of Cash Consideration

All Parties agree that, before the payment of the 3rd Payment, under provisions of the following Articles, all parties shall calculate and determine the adjustments to the amount of Cash Consideration, and take the adjusted amount as the final amount for purposes of the 3rd Payment.

    (a) Under the provisions of the Restructuring Agreement and this agreement, Oasis Investment and Controlling Shareholders shall use 100% of SJHC's equity as part of the share repurchase consideration ("Equity Consideration"). If under any laws and regulations, such equity transfer must indicate a price and that this price must actually be paid, the actual amount (net amount after deduction of tax and fees) paid by the Non-Controlling Shareholders to Oasis Investment and the Controlling Shareholders for the equity transfer shall be added to the Cash Consideration;

    (b) The sharing of the amount stipulated in Articles 2.1.1 and 2.1.2 above shall be reflected in the final amount of the 3rd Payment;

    (c) Under provisions of other Articles of this agreement, all tax and expenses that shall be paid by the parties shall be reflected in the final amount of the 3rd Payment.

*Fen Ke Wen Jun*

2.3     Payment Method of Equity Consideration. According to the Restructuring Agreement, the equity portion of Oasis Investment's repurchase consideration is calculated as 100% equity of Shanghai Greencourt Four-Season-Flower-City Property Development Co., Limited ("Equity Consideration"). Such Equity Consideration shall be paid in the following methods:

2.3.1   Oasis Investment has newly incorporated Shibang Company Ltd ("Shibang Company") in Hong Kong and has arranged for Shibang Company to acquire 80% of the equity interest in Shanghai Greencourt Four-Season-Flower-City Property Development Co., Limited (hereafter referred to as "SJHC") held by Greencourt Properties Limited, a subsidiary of Oasis Investment in Hong Kong. After the completion of the said equity acquisition, Oasis Investment shall sign the "Equity Purchase Option Agreement" with Cheergain International Group [Limited] and Focus Town Limited and agree that upon the expiration of the entrustment period mentioned in Article 2.3.2 below, 100% of the equity of Shibang Company shall be transferred to Cheergain International Group [Limited] and Focus Town Limited at a consideration of HKD 1.

2.3.2   All Parties Agree That:  After Oasis Investment's signing of the Equity Purchase Option Agreement for the equity transfer of Shibang Company to Cheergain International Group Limited and Focus Town Limited, Greencourt Properties is to sign the relevant Entrustment Agreement with Cheergain International Group Limited and Focus Town Limited. This agreement shall stipulate that: (1) Cheergain International Group Limited and Focus Town Limited are entrusted by Greencourt Properties to manage Shibang Company and to exercise the shareholders' rights on its behalf for three years (the "entrustment period"); (2) during the entrustment period, the Non-controlling Shareholders are responsible for all the debts and claims, risks and liabilities of Shibang Company and SJHC. If for any reason the Controlling Shareholders, Oasis Investment or Greencourt Properties are required to bear the debts and claims, risks and liabilities of Shibang Company or SJHC during the entrustment term, the Non-controlling Shareholders are required to fully compensate the Controlling Shareholders, Oasis Investment and Greencourt Properties.

2.3.3   The remaining 20% of the equity of SJHC currently held by Oasis Kechuang Shengtai Limited, a subsidiary of Oasis Investment, is to be transferred to a domestic company in China appointed by the Non-controlling Shareholders ("Onshore Payment of Equity Consideration"). If under the laws of the People's Republic of China, an actual payment of consideration is required to be made for such equity transfer, the provisions of the abovementioned Article 2.2.1(4)(a) shall apply.

2.3.4   All Parties Agree That:  The Non-controlling Shareholders shall be responsible for all the tax and expenses incurred due to the Onshore Payment of Equity Consideration, as well as the tax and expenses incurred offshore due to the entrustment arrangement made by Shibang Company and the equity transfer of Shibang Company to Cheergain International Group Limited and Focus Town Limited. Apart from this, the sharing of the tax and expenses relating to the payment of Equity Consideration is to be negotiated by all the Parties in due course. All procedures relating to the onshore and offshore payment of Equity Consideration, such as applications, registrations and government procedures, etc. are to be

[Original handwritten text is indicated in italics]

undertaken by the Non-controlling Shareholders while the Controlling Shareholders and Oasis Investment are to provide the necessary assistance.

2.3.5    As a result of Oasis Investment and the Controlling Shareholders having already transferred the management rights of SJHC to the Non-controlling Shareholders before this agreement is signed, all Parties agree that, upon Oasis Investment and the Controlling Shareholders having signed the Equity Purchase Option Agreement specified in the aforementioned Article 2.3.1 and the Entrustment Agreement specified in Article 2.3.2, the payment of Equity Consideration is to be deemed as complete.

Article 3  Other Agreements Relating to Oasis Investment's Repurchase and Repurchase Consideration

3.1    Within 30 days of the signing of this agreement, Oasis Investment and the Controlling Shareholders shall procure a subsidiary, namely, Shanghai Greencourt Real Estate Development Limited to sign the "Shanghai Real Estate Sale and Purchase Contract" with the Non-controlling Shareholders or their nominated third party, and undertake to transfer approximate 8000 m$^2$ of commercial space which shall meet the appropriate delivery standards (specifically, the property includes approximately 6000 m$^2$ of commercial space on the third level along the streetside of Phase 1 of Greencourt Sun City Commercial Building, and all the commercial space of approximately 2000 m$^2$ of the west side of the Central Plaza of Phase 2 of Greencourt Sun City) at the Jiuting Greencourt Sun City Real Estate Project in Songjiang District, to the Non-controlling Shareholders or their nominated third party. For the avoidance of doubt, (1) when the Shanghai Real Estate Sale and Purchase Contract is signed, Oasis Investment and the Controlling Shareholders shall transfer the right to use such commercial space to the Non-controlling Shareholders or their nominated third party, and the Non-controlling Shareholders or their nominated third party are to receive rental income and other earnings after the transfer; and (2) by 30 June 2011, Oasis Investment and the Controlling Shareholders shall transfer the ownership of such commercial space to the Non-controlling Shareholders or their nominated third party.

3.2    At the time of signing the aforementioned "Shanghai Real Estate Sale and Purchase Contract", SJHC shall sign the "Villa Order Contract" with Oasis Investment and the Controlling Shareholders, to transfer the SJHC-developed two A2-type villas (building area of approximately 1200 m$^2$ each as set out on a building plan, which building plan Oasis Investment and the Controlling Shareholders have received and have been notified of the delivery standards, and both confirmed the actual price as stated below) located on the Central Island, Peninsula Villa Project, Fengpu Industrial Area, Fengxian District, Shanghai City, to Oasis Investment or their nominated third party once the villas meet the delivery standards. For the avoidance of doubt, the Non-controlling Shareholders shall procure SJHC to sign the "Shanghai Real Estate Presale Contract" with Oasis Investment or the third party nominated by the Controlling Shareholders on 30 June 2011 and to complete the presale registration of such villas.

3.3    All Parties Confirm: the properties involved in the aforementioned "Shanghai Real Estate Sale and Purchase Contract" and the "Villa Order Contract" (or the Shanghai Real Estate Presale Contract) are all priced at RMB 72 million. Because the prices of the properties involved are equal, for the purposes of this agreement, the considerations under the contracts are to be set off against each other (whether or not such offset is plausible from an accounting perspective, and that the Parties agree that no actual payment is to be made).

7

3.4 Brand Name: From the date when this agreement is signed, all the brand names and other intellectual property of Oasis Investment and its subsidiaries are to be owned by the Controlling Shareholders, except with respect to SJHC and its property naming rights, logo, trade mark which have been obtained by the Non-controlling Shareholders under this agreement (and only to be used within the current business scope of SJHC, and not to be used for any new business). Without the approval of the Controlling Shareholders, the Non-controlling Shareholders shall not continue to use such brand names and other intellectual property.

3.5 Appointments: The Parties agree that from the date when the 1st Payment is paid, the Non-controlling Shareholders shall be considered to have resigned from all the positions they hold in Oasis Investment and its subsidiaries (except the positions they hold in SJHC), and the Controlling Shareholders shall be considered to have resigned from all the positions they hold in SJHC. Under provisions of this Article, Oasis Investment and its subsidiaries may complete procedures relating to the change of directors, supervisors and other posts.

3.6 Related party transactions: With effect from the signing of this agreement, the related party transactions between SJHC and Oasis Investment and their subsidiaries shall be terminated; all pre-existing debts and claims shall be settled within one month. This excludes situations that are otherwise stipulated in this agreement.

3.7 Promise: The Non-controlling Shareholders promise not to make any claims against Oasis Investment, the Controlling Shareholders and their subsidiaries worldwide on the condition that this agreement is fully and timely fulfilled.

3.8 SJHC's business documents, license and company seal shall be transferred to the Non-controlling Shareholders once the 1st Payment is paid.

Article 4 Miscellaneous

4.1 For matters not addressed in this Agreement, the stipulations of the Restructuring Agreement shall prevail. For matters not addressed in the Restructuring Agreement and this Agreement, the parties concerned shall enter into supplementary agreements through friendly negotiations, and those supplementary agreements and this Agreement shall have the same effect.

4.2 Any conflicts, disputes and claims resulting from this agreement or related to this agreement, breach of contract, termination of contract and void of contract (hereafter referred to as "disputes") shall be dealt with through amicable negotiations by all Parties. If the negotiation fails, any Party is entitled to submit the dispute to the Hong Kong International Arbitration Centre for arbitration. The arbitration is to be conducted in Chinese. The arbitration tribunal is to consist of three arbitrators. Oasis Investment and the Controlling Shareholders are entitled to nominate one arbitrator, the Non-controlling Shareholders are entitled to nominate another arbitrator, and the third arbitrator, who will be the chief arbitrator, is to be nominated by the Chairperson of the Hong Kong International Arbitration Centre. The outcome of arbitration is final and binding on all Parties.

4.3 This agreement is to take effect on the date when it is signed.

8

4.4     This agreement is written in Chinese and has ten copies; each Party holds one copy.

Signed by:

Oasis Investment Group Limited

[signature]                                                    [signature]

Naifen YU                                                   Zhengguang KE

[signature]                                                    [signature]

Naiwen YU                                                  Cheergain International Group Limited

[signature]                                                    [signature]

Naijun YU                                                   Hongbiao XU

[signature]                                                    [signature]

Greencourt Properties Limited                    Focus Town Limited

_____

Shanghai Oasis Kechuang Shengtai Keji Limited (seal)

[illegible seal]

For and on behalf of Oasis Investment Group Limited

[signature]

Authorised Signature(s)

AP_Legal – 104479225.1


TRANSPERFECT

# **CERTIFICATION**

TransPerfect is globally certified under the standards ISO 9001:2015 and ISO 17100:2015. This Translation Certificate confirms the included documents have been completed in conformance with the Quality Management System documented in its ISO process maps and are, to the best knowledge and belief of all TransPerfect employees engaged on the project, full and accurate translations of the source material.

File Name(s):          Agreement dated 28 April 2010 - "The Preliminary Share Restructuring
                       Agreement"

Source Language(s)     Simplified Chinese

Target Language(s)     English

*Authorized Signature:*

*Name:*     *Maggie Cheng*

*Title:*    *Project Coordinator*

*Date:*     *Sept. 17th, 2018*

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS

TRANSPERFECT TRANSLATIONS LIMITED    UNITS 1704-5, 17F, UNIVERSAL TRADE CENTRE, 3-5A ARBUTHNOT ROAD, CENTRAL, HONG KONG
T +852 2292.9900  F +852 2545.7781    WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE



**EXHIBIT C**



香港欧华律师事务所
香港中环皇后大道中十五号
置地广场公爵大厦 17 楼
致：杨大明 / 陈启源 / 姚其昕
仅手递

敬启者，

| | |
|---|---|
| **案件编号：** | **HKIAC/A13028** |
| **申请人：** | **(1) 徐宏标 （中国大陆）** |
| | **(2) 柯铮光之遗产（中国大陆）** |
| **被申请人：** | **(1) 绿洲投资集团有限公司（英属维京群岛）** |
| | **(2) 俞乃奋（美国）** |
| | **(3) 俞乃雯（中国大陆）** |
| | **(4) 俞乃筠（中国大陆）** |
| **有关：** | **2010 年 4 月 28 日关于执行《股份重组初步协议》的协议书的争议** |

题述案件。

我们确认本函所附仲裁裁决为本案仲裁庭（即杨炎龙律师为首席仲裁员，郑若骅资深大律师和黄旭伦资深大律师各作为边裁）按照 2008 年版《香港国际仲裁中心机构仲裁规则》在香港作出的日期为 2018 年 2 月 28 日的《最终裁决（利息与仲裁费除外）》的真实副本。

谢谢垂注。

香港国际仲裁中心

谨启
黄子宜，法律顾问
2018 年 6 月 27 日

附件：日期为 2018 年 2 月 28 日的《最终裁决（利息与仲裁费除外）》的真实副本

JL/ZH

38/F Two Exchange Square 8 Connaught Place Hong Kong
香港中环交易广场第二座 38 楼

T 電話 (852) 2525 2381E 電郵 adr@hkiac.org
F 傳真 (852) 2524 2171    www.hkiac.org

HKIAC is a charitable institution limited by guarantee

在香港国际仲裁中心（"HKIAC"）

依据香港国际仲裁中心规则（2008 年 9 月 1 日生效）

（"《HKIAC 规则》"）仲裁之案件

HKIAC/A13028


徐宏标

第一申请人

柯铮光之遗产

第二申请人

和


绿洲投资集团有限公司

第一被申请人

俞乃奋

第二被申请人

俞乃雯

第三被申请人

俞乃筠

第四被申请人


---

**最终裁决 （利息与仲裁费除外）**

---

# 目录

章节                                                                  页码

I.　　当事人 ...................................................................................1

II.　　仲裁协议和适用法律 ...........................................................2

III.　 仲裁庭 ...................................................................................2

IV.　　事实背景 ............................................................................24

V.　　争议事项及双方立场 ..........................................................26

VI.　　申请人和被申请人的请求 ..................................................34

VII.　 仲裁庭的分析和理由 ..........................................................37

VIII.　仲裁庭的裁决和命令 ..........................................................58

IX.　　仲裁费 ................................................................................59

**最终裁决**
**(仲裁费用和利息除外)**

**I.    当事人**

1.    本案申请人是:

**第一申请人: 徐宏标**先生, 中国公民, 中国身份证号码 310104196403192854, 通讯地址为中国上海市中山西路 555 号绿洲大厦 419 室, 邮政编码: 200051。

**第二申请人: 柯铮光之遗产**, 2013 年 12 月 15 日前为**柯铮光**先生(以下简称"**柯先生**"或"**第二申请人**")。柯先生生前为中国公民, 中国身份证号码 310109195601033237。2013 年 12 月 15 日, 柯先生逝世。之后, 本案第二申请人变更为柯先生之遗产。柯先生之遗产管理人为: (1)张跃进女士(柯先生的遗孀, 以下简称"**张女士**"); 及(2)柯烨颖女士(柯先生的女儿, 以下简称"**柯女士**")。通讯地址为中国上海市中山西路 555 号绿洲大厦 419 室, 邮政编码: 200051。

以下合称为"**申请人**"。

2.    本案中, 申请人的授权代理律师原为周卓立 陈启球 陈一理律师事务所, 地址: 香港干诺道中 130-136 号诚信大厦 3 楼。2013 年 12 月 15 日, 柯先生逝世。2015 年 12 月 28 日, 香港高等法院签发遗产管理委任书(Letters of Administration), 委任张女士及柯女士为柯先生之遗产管理人。2016 年 1 月 12 日, 贝克•麦坚时国际律师事务所上海代表处(后其香港办公室亦有参与本案, 与其上海代表处合称"**贝克**")(地址: 中国上海浦东新区世纪大道 88 号金茂大厦 1601 室/香港中环夏悫道 10 号和记大厦 14 楼)作为张女士及柯女士的代表律师致函仲裁庭, 正式代表第二申请人参与本案。第一申请人的授权代理律师则仍为周卓立 陈启球 陈一理律师事务所。

3.    本案被申请人是:

**第一被申请人: 绿洲投资集团有限公司**(以下简称"**绿洲投资**"), 一家注册于英属维京群岛的股份有限公司, 通讯地址为中国上海市中山西路 555 号绿洲大厦 12 楼, 邮政编码: 200051

**第二被申请人: 俞乃奋**女士, 美国公民, 美国护照号码 710714118, 通讯地址为中国上海市中山西路 555 号绿洲大厦 12 楼, 邮政编码: 200051

第三被申请人：**俞乃雯**女士，中国公民，中国身份证号码310101196304040864，通讯地址为中国上海市中山西路 555 号绿洲大厦12楼，邮政编码：200051

第四被申请人：**俞乃筠**女士，中国公民，中国身份证号码310106197207062822，通讯地址为中国上海市中山西路 555 号绿洲大厦12楼，邮政编码：200051

以下合称为"**被申请人**"。

4.　被申请人的授权代理律师原为美迈斯律师事务所，地址：香港中环干诺道中 1 号友邦金融中心 31 楼。2016 年 10 月 12 日后，被申请人的代表律师团队成员加入盛德律师事务所（Sidley Austin LLP）（地址：香港中环国际金融中心二期三十九楼），盛德律师事务所被申请人指示在本案中继续代理被申请人。

5.　以下申请人和被申请人一方各称为"**当事人**"，双方称为"**各方当事人**"。

## II.　仲裁协议和适用法律

6.　本仲裁涉及各方当事人为对第一被申请人及其下属子公司进行拆分，于2010 年 4 月 28 日签订的《关于执行<股份重组初步协议>的协议书》（以下简称"**《4.28 协议》**"）。本仲裁之提起依据为《4.28 协议》第 4.2 条，该条约定：

*"4.2 因本协议或与本协议有关的争议、争执和索偿，违约终止或合同无效等（以下称"争议"）各方应友好协商解决。协商不成时，任何一方均有权将争议提交香港国际仲裁中心以仲裁解决，由该中心按照其届时有效的仲裁规则在香港进行仲裁。仲裁以中文进行。仲裁庭由三名仲裁员组成，绿洲投资及控股股东有权指定一名仲裁员，参股股东有权指定一名仲裁员，第三名及首席仲裁员由香港国际仲裁中心主席指定。仲裁结果是终局的，对各方均有约束力。"*

7.　以上仲裁条款所述"参股股东"为本案申请人，绿洲投资及"控股股东"（即第二、第三及第四被申请人）为本案被申请人。

8.　依据上述援引的《4.28 协议》第 4.2 条，本仲裁程序须由 HKIAC 管理并依照《HKIAC 规则》进行。仲裁地为香港，仲裁语言为中文。

9.　《4.28 协议》第 4.1 条约定协议受香港法律管辖。

## III.　仲裁庭

2

10.　本案仲裁庭由以下仲裁员组成:

　　(1)　黄旭伦资深大律师,地址:香港中环雪厂街十号新显利大厦十楼,由申请人提名;

　　(2)　郑若骅资深大律师,地址:香港中环置地广场告罗士打大厦 38 楼,由被申请人提名;及

　　(3)　杨炎龙先生(以下简称"首仲"),地址:香港中环康诺广场 8 号交易广场一座 18 楼,由 HKIAC 理事会依据各方当事人之间仲裁协议规定指定为本案第三位及首席仲裁员。

11.　仲裁庭于 2013 年 6 月 4 日正式组成,且各方当事人于同日被通知仲裁庭组成。

**仲裁程序**

12.　仲裁庭认为没有必要在此列出双方当事人的代理人在本案过程中的所有往来信函。仲裁庭的所有程序指令均已通过书面形式作出,在此不另赘述。需要强调的是,仲裁庭作出指令前均全面考虑了各方当事人在其书面陈述、证人证言和开庭审理时提出的主张,且所有指示、命令和决定是由三位仲裁员商议后作出的。因此,本单元仅就本案的关键程序事项作一概述。

13.　2013 年 2 月 22 日,申请人针对被申请人在香港向 HKIAC 提交了《仲裁通知》(案号 HKIAC/A13028),以解决《4.28 协议》项下的争议。

14.　2013 年 4 月 12 日,被申请人提交了《对仲裁通知的答复》。

15.　2013 年 4 月 8 日,HKIAC 出函确认指定申请人提名的黄旭伦资深大律师为本案仲裁员。2013 年 4 月 22 日,被申请人通知 HKIAC 提名郑若骅资深大律师为本案仲裁员。次日,即 2013 年 4 月 23 日,HKIAC 通知郑若骅女士其被提名,同日,郑若骅女士通知 HKIAC 接受该提名。2013 年 4 月 30 日,HKIAC 出函确认指定郑若骅女士为本案仲裁员。

16.　2013 年 6 月 4 日,HKIAC 通过信函确认指定杨炎龙先生为本案首席仲裁员。2013 年 6 月 4 日,仲裁庭正式组成。

17.　2013 年 6 月 4 日,HKIAC 出函通知各方当事人,仲裁庭已依据《HKIAC 规则》组成。

18.  2013 年 6 月 7 日，首仲代表仲裁庭出函通知各方当事人仲裁庭已组成，并请各方当事人确认其对仲裁庭的组成不持异议、仲裁规则、仲裁语言和适用管辖法律等事项。仲裁庭同时提供了一份其草拟的暂行时间表（后续将化为程序令），请各方当事人商议并（在可能的情况下）就相关文件的提交日期达成共识，并于 2013 年 6 月 14 日下午 6 时前回复仲裁庭。

19.  2013 年 6 月 14 日，申请人致函首仲，确认上述 18 段提到的相关事项，并提交了申请人建议之程序指令草稿。同日，被申请人亦向仲裁庭提交了被申请人的时间表建议及根据该时间表补充完整的仲裁庭程序令草稿，并确认上述 18 段提到的相关事项。

20.  考虑了各方当事人的书面意见后，首仲代表仲裁庭于 2013 年 6 月 25 日作出程序指令（一）（以下简称"**指令（一）**"），内附一份经修改后的程序时间表。

21.  2013 年 8 月 30 日，被申请人通过电邮及专人快递向 HKIAC 提交了其《答辩及反诉书》及附件清单。仲裁庭于同日以电邮确认收悉电子版本。

22.  2013 年 10 月 8 日，申请人通过电邮向仲裁庭提交其《回复及反诉答辩书》。

23.  2013 年 11 月 12 日，被申请人致函仲裁庭，向仲裁庭提交其《对申请人的回复及反诉答辩书的进一步答复书》。仲裁庭于同日以电邮确认收悉。

24.  2013 年 11 月 22 日，申请人致函仲裁庭，指称被申请人 2013 年 11 月 12 日向仲裁庭提交《对申请人的回复及反诉答辩书的进一步答复书》的行为严重违反了指令（一），理由是指令（一）并未允许被申请人可就申请人的回复作进一步的答复。申请人要求仲裁庭下达命令撤销被申请人进一步答复书中的第 1 段至第 32 段（即对申请人的回复作进一步的答复之内容），并要求被申请人向申请人支付因其提交该进一步答复而引致之律师费。

25.  同日，即 2013 年 11 月 22 日，被申请人致函仲裁庭，否认其向仲裁庭提交《对申请人的回复及反诉答辩书的进一步答复书》的行为违反了指令（一），理由是该进一步答复书的内容仅限于对申请人反诉答辩的回复，但鉴于申请人"反诉答辩"部分与其他部分的内容紧密相连且交叉重叠，故其对申请人"反诉答辩"部分的回应涉及到其他部分的内容且格式上是按照申请人《回复及反诉答辩书》的段落顺序逐一回复，故要求仲裁庭对申请人的要求予以驳回。

26. 2013 年 11 月 25 日，仲裁庭通过电邮回复各方当事人，称经仲裁庭考虑，不予以命令被申请人撤销其《对申请人的回复及反诉答辩书的进一步答复书》之第 1 段至第 32 段。但是，仲裁庭允许申请人在一周内（即 11 月 30 日或之前）针对该些段落作出进一步书面陈述。仲裁庭同时询问各方是否需要延缓指令（一）规定的各当事人提交其文件出示请求的期限（即 11 月 26 日）。

27. 同日，即 2013 年 11 月 25 日，申请人通过电邮回复仲裁庭，鉴于被申请人确认其进一步答复书的内容仅限于对申请人反诉答辩的回复，申请人将不再作出进一步书面陈述，故 11 月 26 日的期限亦无须延缓。

28. 2013 年 11 月 26 日，被申请人向仲裁庭呈交《被申请人的文件出示请求》。

29. 同日，即 2013 年 11 月 26 日，申请人向仲裁庭呈交《申请人之文件清单》。

30. 2013 年 12 月 5 日，仲裁庭通过电邮确认收到被申请人和申请人分别于 2013 年 11 月 26 日提交的《被申请人的文件出示请求》和《申请人之文件清单》。仲裁庭同时提醒申请人其似乎没有提交指令（一）第 7 段提到的文件出示请求，并要求申请人于 2013 年 12 月 6 日下午 6 时之前澄清其是否会向被申请人提出任何文件出示请求。

31. 2013 年 12 月 6 日，申请人通过电邮向仲裁庭确认现阶段其没有文件出示请求。

32. 2013 年 12 月 17 日，申请人通过电邮向仲裁庭提交了申请人对被申请人文件出示请求的合理异议，并通知各方当事人，柯先生日前突然不幸病逝。申请人表示其将尽快与柯先生之亲属商讨关于第二申请人继承本案之相关法律程序事宜，并将在获取柯先生亲属的有关指示后尽快向仲裁庭作出建议。

33. 2013 年 12 月 20 日，仲裁庭通过电邮要求被申请人在 2013 年 12 月 27 日针对申请人对被申请人文件出示请求的合理异议作出回应，并允许申请人对被申请人的回应在 2014 年 1 月 7 日作出最后答复。仲裁庭同时指出虽然指令（一）没有明示，但为了仲裁庭更好地作出决定而增加了该环节。此外，仲裁庭表示等待申请人就第二申请人继续本案之相关法律程序事宜的建议。

34. 2013 年 12 月 27 日，被申请人向仲裁庭呈交《被申请人对文件出示请求之反对意见的反驳理由/更新立场》（以下简称"《反驳理由/更新立场》"）。

35. 2014 年 1 月 9 日，仲裁庭通过电邮确认收到被申请人递交的《<被申请人的文件出示请求>包含申请人的反对意见及被申请人的反驳理由/更新立场》。鉴于申请人对该文件的最后答复期限（2014 年 1 月 7 日）已过，仲裁庭要求申请人于当日下午 6 时前确认其对该文件是否会作出答复。同时，仲裁庭亦请申请人就第二申请人继续本案之相关法律程序事宜作出陈述或建议。

36. 同日，即 2014 年 1 月 9 日，申请人通过电邮向仲裁庭申请，将仲裁程序暂缓至 2014 年 1 月 15 日，并将申请人答复被申请人《反驳理由/更新立场》的最后期限延至 2014 年 1 月 15 日。申请人表示其将在该日前向仲裁庭提交申请人对被申请人《反驳理由/更新立场》的答复及对柯先生逝世对此案的影响作出进一步的陈述或建议。

37. 2014 年 1 月 10 日，仲裁庭通过电邮批准申请人上述延期申请，即暂缓仲裁程序至 2014 年 1 月 15 日，将申请人对被申请人《反驳理由/更新立场》的答复最后答复期限延至 2014 年 1 月 15 日，同意让申请人代表律师在该日对柯先生逝世对此案的影响作出进一步的陈述或建议，并也保留权利让被申请人对该陈述或建议作出回复。

38. 2014 年 1 月 15 日，申请人致函仲裁庭，附上申请人对被申请人《反驳理由/更新立场》的答复，并基于柯先生之妻子及其家属的实际困难，申请将柯先生逝世对此案的影响作出进一步的陈述或建议的时间再次延期至 2014 年 1 月 30 日。

39. 2014 年 1 月 16 日，仲裁庭通过电邮同意将仲裁程序暂缓至 2014 年 1 月 30 日。

40. 2014 年 1 月 24 日，申请人代表律师（周卓立陈启球陈一理律师事务所）通过电邮向仲裁庭详细说明了柯先生的家庭情况并主张仲裁可以推进。申请人代表律师表示其已接受柯先生之妻张女士及女柯女士的共同委托，已开始办理向香港高等法院申请准许张女士及其指定人柯烨乐以柯先生遗产管理人之身份代表柯先生之遗产继续进行本案的法律手续，并代表第一申请人及柯先生之妻张女士及女柯女士向仲裁庭申请准许张女士或其指定人柯烨乐在前述香港高等法院之准许未下达前，可以以柯先生遗产管理人身份继续进行本案所有程序而无须中止本案程序，同时其将于香港高等法院之准许正式下达后立即通知仲裁庭。

41. 同日，即 2014 年 1 月 24 日，仲裁庭通过电邮要求被申请人在 2014 年 1 月 29 日或之前针对申请人作出的上述请求作出回复。

42. 2014 年 1 月 29 日，被申请人致函仲裁庭，表示其原则上不反对申请人代表律师的请求，即柯先生的合法继承人继续进行本案而无须中止本案程

6

序，但需要申请人提供相关信息/澄清若干问题，包括柯烨乐、张女士与柯的身份以及提供相关文件，并请仲裁庭允许被申请人在收到所寻求信息后的一定时间内有机会发表最终意见。

43. 2014 年 1 月 30 日，仲裁庭通过电邮告知各当事方，其对于申请人代表律师在其 2014 年 1 月 24 日邮件中所主张的观点，即在香港高等法院未批准柯先生遗产管理人之前推进本案程序，在法律上有所顾虑。仲裁庭同时邀请申请人代表律师于 2014 年 2 月 14 日或之前对被申请人律师 2014 年 1 月 29 日的函作出回复。

44. 2014 年 2 月 11 日，被申请人致函仲裁庭，请求确认本案程序（含《指令（一）》第 10 项及其后的所有程序）仍处于暂缓阶段，直至仲裁庭作出进一步指示。仲裁庭于 2014 年 2 月 12 日致函各方当事人，确认暂时中止，表示将在收到第二申请人的进一步回复后（2014 年 2 月 14 日为限）后再作出进一步的指示。

45. 2014 年 2 月 14 日，申请人致函仲裁庭，回复被申请人 2014 年 1 月 29 日的函及仲裁庭 2014 年 1 月 30 日的电邮内的意见，主张鉴于香港附属法例第 4A 章高等法院规则内的第 15 号命令第 15 条规则及香港高院的判例 (Lily Cheung v. The Official Solicitor and Another, [2008] 5 HKLRD 743 一案)，仲裁庭可以委任张女士于本案程序作为柯先生遗产的代表继续本案程序。申请人随函附上张女士身份证明文件、与第二申请人的婚姻证明文件、第二申请人的死亡证明文件 1 及身份证明文件、及所引用案例的判决书。

46. 2014 年 2 月 25 日，被申请人致函仲裁庭，要求申请人澄清是否不再要求指定柯烨乐为遗产管理人。被申请人也对申请人要求仲裁庭委任张女士于本案程序作为第二申请人遗产的代表继续本案程序的请求表示反对，主张仲裁庭应等到香港高等法院就第二申请人的遗产管理人的最终准许正式下达后再继续本案程序。

47. 2014 年 2 月 26 日，申请人通过电邮向仲裁庭申请于 2014 年 2 月 28 日或之前就被申请人 2014 年 2 月 25 日函作出回应。同日，仲裁庭通过电邮准予申请人的该等申请。

48. 2014 年 2 月 27 日，仲裁庭通过电邮通知各方当事人，仲裁庭拟于 2014 年 4 月 2 日下午于 HKIAC 召开半天的开庭，主要目的为：让各方当事人

---

1 死亡证书显示第二申请人于 2013 年 12 月 15 日 22 时 20 分在上海逝世。

7

针对柯先生不幸身故一事对于仲裁程序的影响充分表达其法律意见以及可行的方案，以便仲裁程序可以往前推进。

49. 2014 年 2 月 27 日，申请人就被申请人 2014 年 2 月 25 日函作出回应，并澄清张女士和柯女士愿意并希望仲裁庭委任张女士为柯先生的遗产管理人。

50. 2014 年 3 月 11 日，在考虑了各方当事人就开庭的往来邮件之后，仲裁庭制定时间表让双方当事人就柯先生不幸身故一事对于仲裁程序的影响问题提交法律意见。

51. 2014 年 3 月 25 日，就上述问题，各方当事人向仲裁庭分别提交了书面意见。就开庭日期，各方当事人表示尚未达成一致，并请仲裁庭考虑，是否在审阅各方本轮提交的书面材料后再决定是否需要开庭。

52. 2014 年 4 月 1 日，各方当事人分别向仲裁庭提交了对对方书面意见的反驳法律意见。

53. 2014 年 4 月 9 日，被申请人通过电邮致函仲裁庭，提议仲裁给予各方当事人两周时间，以协商委任张女士作为第二申请人代表参与本案而可能产生的法律风险向被申请人提出赔偿(indemnification)建议一事。同日，申请人通过电邮致函仲裁庭，表示被申请人对申请人提议的解读有不准确之处，同时向仲裁庭建议（并同时确认愿意无条件接受），如仲裁庭在考虑了各方当事人所提供的陈词及相关文件后认同被申请人所提出的潜在风险，在此情况下请仲裁庭直接作出以下具约束力的命令：

"第一申请人须因张女士在本仲裁程序中的行为影响了被申请人的权利及其第二申请人的遗产管理人申请被高等法院驳回因而令被申请人遭受的全部损失，个人承担支付全部被申请人合理赔偿的弥偿担保责任。"

54. 同日，即 2014 年 4 月 9 日，被申请人对申请人的回应表示遗憾，并请仲裁庭就申请人的相关申请作出决定。

55. 2014 年 4 月 29 日，仲裁庭通过电邮指示各方当事人，鉴于各方当事人递交的法律意见以及书面材料充足，仲裁认为没有开庭的必要。

56. 2014 年 5 月 30 日，仲裁庭作出《第二申请人不幸身故一事对于仲裁程序的影响的决定》（"《决定（一）》"），仲裁庭裁决如下：（1）仲裁庭不具有委任第二申请人的遗产管理人的管辖权；（2）由于仲裁庭不具有上述管辖权，因此第二申请人的案子必须等到香港高等法院委任第二申请人的遗产管理人之后才能进行；（3）有鉴于此，仲裁庭目前唯一合理的处理方式是实时中止仲裁案直至香港高等法院委任第二申请人的遗

产管理人之后；（4）仲裁庭决定保留对此次申请的律师费的分配的决定。

57. 2014 年 6 月 4 日，HKIAC 将《决定（一）》原件发送各方当事人。在此之后直至 2015 年 4 月 2 日以前，本案无新进展。

58. 2015 年 4 月 2 日，申请人代理律师代表第一申请人通过电邮向仲裁庭提出以下申请（以下简称"**撤销/追加申请**"）：（1）要求仲裁庭下达命令撤销本仲裁程序中的第二申请人，并将第二申请人之遗产加入作为本仲裁程序中的第五被申请人；（2）准许申请人修订仲裁申请书反映撤销第二申请人，及加入第二申请人之遗产为第五被申请人；（3）恢复本仲裁程序。申请人随电邮附上：第一申请人的简短陈述书，第一申请人之非宗教形式誓章和草拟之修订仲裁申请书。同日，仲裁庭要求被申请人于 2015 年 4 月 10 日下午 6 时之前向仲裁庭提交其针对申请人申请之法律意见。

59. 2015 年 4 月 9 日，被申请人通过电邮向仲裁庭申请，将其提交法律意见的期限延长至 2015 年 4 月 30 日。同日，申请人通过电邮向仲裁庭建议，鉴于本案程序自第二申请人过世后已中止超过 15 个月，故仅将宽限期延至 2015 年 4 月 17 日。

60. 2015 年 4 月 10 日，经慎重考虑，仲裁庭决定把被申请人的回复期限延至 2015 年 4 月 23 日（下午 6 时以前）。

61. 2015 年 4 月 20 日，贝克作为张女士和柯女士的代理律师致函仲裁庭，主张第一申请人在张女士和柯女士不知情的情况下，向仲裁庭提出将第二申请人之遗产从本案的申请人变更为第五被申请人的申请，此举严重损害了第二申请人及/或其法定继承人的合法权益。贝克主张仲裁庭尚未充分听取其意见之前，不应就上述申请作出任何决定。贝克同时表示，张女士和柯女士正在办理相关手续，以获取香港高等法院对其作为第二申请人之遗产管理人的委任，并请仲裁庭向其提供第一申请人上述申请之副本及相关文件。

62. 2015 年 4 月 23 日，被申请人致函仲裁庭，主张第二申请人的遗产管理人应当有权利对申请人"撤销本仲裁程序中的第二申请人，并将第二申请人之遗产加入作为本仲裁程序中的第五被申请人"的申请表达意见，而在第二申请人的遗产管理人尚未被指定或确认前，仲裁庭不应当就上述事宜作出决定。被申请人同时主张，第一申请人的申请缺乏必要依据，鉴于各方关系的变化，仲裁庭应以更加审慎的态度处理程序，暂不应就该申请作出支持的决定。就被申请人是否可以要求第一申请人共同及连带承担履行《4.28 协议》下申请人的全部义务的责任，被申请人提出若

干具体问题，要求申请人作出答复。同日，申请人通过电邮向仲裁庭申请在 14 日内（即 2015 年 5 月 7 日或之前）就被申请人的上述函件向仲裁庭提交书面回应。仲裁庭于同日通过电邮批准申请人的该等时限申请。

63. 同日，即 2015 年 4 月 23 日，仲裁庭通过电邮回复贝克，表示鉴于张女士和柯女士尚未经法庭委任为本案之第二申请人的遗产管理人，因此其二人并非本案的当事人，也不具条件向仲裁庭作出任何申请。若柯女士和张女士将来正式经法庭委任为第二申请人的合法遗产管理人，则其可以再向仲裁庭另作申请。

64. 2015 年 5 月 6 日，申请人申请将上述第 62 段提及的提交书面回应的时限延至 2015 年 5 月 21 日或之前。仲裁庭于 2015 年 5 月 7 日批准该延期申请。

65. 2015 年 5 月 21 日，申请人向仲裁庭提交了《第一申请人的书面回复》。申请人主张鉴于张女士和柯女士不愿继续委托申请人的代理律师承办遗产手续，申请人代理律师在法理上根本不能继续代表第二申请人。而张女士和柯女士向香港高等法院申请委任第二申请人的遗产管理人一事经过一年多仍无结果，令第一申请人相信张女士和柯女士受到被申请人影响而故意不办理遗产或拖延办理，故仲裁庭及各方当事人不应无限期等待第二申请人的遗产继承。因此，第一申请人建议仲裁庭撤销第二被申请人，并加入第二申请人为第五被申请人，或若仲裁庭认为不能或不应加入第五被申请人，请仲裁庭考虑单独继续第一申请人的仲裁。

66. 2015 年 6 月 16 日，贝克致函向仲裁庭，表示其已于 2015 年 6 月 12 日代表柯女士和张女士向香港高等法院提交了有关委任第二申请人之遗产管理人的申请。2015 年 6 月 19 日，仲裁庭将此函转发各方当事人，指示其针对委任第二申请人之遗产管理人申请已提交一事于 2015 年 6 月 25 日或之前提交书面意见，尤其是仲裁庭还有没有必要考虑第一申请人作出的申请。

67. 2015 年 6 月 25 日，各方当事人依从仲裁庭 2015 年 6 月 16 日之指示，向仲裁庭提交了书面意见。

68. 2015 年 6 月 26 日，仲裁庭通过电邮指示各方当事人，仲裁庭经审阅各方当事人就第一申请人提出的撤销/追加申请所做的书面陈词/意见后，认为该申请相对复杂，有必要对该申请开一次庭，听取并澄清各方的观点及立场。

69. 2015 年 6 月 29 日，第一申请人通过电邮答复仲裁庭，其已与被申请人商定双方适合的开庭日期及地点。

70. 2015 年 7 月 13 日，仲裁庭就第一申请人提出的撤销/追加申请开庭审理。同日开庭后，仲裁庭通过电子邮件询问各方当事人是否同意将三个附件（即贝克日期为 2015 年 7 月 10 日致仲裁庭的函，日期为 2009 年 11 月 9 日的《绿洲投资集团有限公司股权重组初步协议》及关于 Warwick Film Productions Ltd and Another v. Eisinger and Others 的案例材料）加入申请人方提交的聆讯文件夹（并列为文件编号 24、25、26，页数为 207 至 218）。第一申请人及被申请人同日分别通过电子邮件确认同意。

71. 2015 年 8 月 6 日，仲裁庭通过电子邮件告知各方当事人，其已就第一申请人于 2015 年 4 月 2 日之申请作出决定（该邮件内附决定之电子版本），HKIAC 会把原件寄给各方当事人。仲裁庭同时要求各方律师尽快协商制定一份仲裁程序时间表供仲裁庭参考。

72. 2015 年 8 月 26 日，第一申请人以电子邮件向仲裁庭建议，仲裁程序按 2013 年 6 月 25 日的程序指令（一）继续推进，有关仲裁程序时间表应延续该指令并调整相应时间段（具体调整列于邮件中）。第一申请人请求仲裁庭能采纳上述时间表并作出相应指令。

73. 2015 年 8 月 27 日，被申请人以电子邮件向仲裁庭表示，第一申请人前日提议的程序时间表并非与被申请人协商后的建议。被申请人建议仲裁庭给予各方当事人七天时间就第一申请人的提议进行协商并尽量达成共识，因此，请求仲裁庭暂缓就仲裁程序时间表作出指示。

74. 2015 年 8 月 29 日，仲裁庭指令各方当事人于 2015 年 9 月 3 日或之前呈交一个经各方协商后达成共识的程序时间表。若各方不能达成共识，仲裁庭要求其各自提出意见，供仲裁庭参考。

75. 2015 年 9 月 1 日，第一申请人以电子邮件向仲裁庭表示其因被申请人于 2015 年 8 月 27 日建议的程序时间表，并请仲裁庭能采纳上述经各方当事人达成共识的时间表并作出相应之指令。

76. 2015 年 9 月 14 日，仲裁庭以电子邮件表示同意被申请人建议的程序时间表。鉴于第二申请人的遗孀张女士和女儿柯女士是由贝克代表，仲裁庭请第一申请人律师和被申请人律师确认他们已把仲裁庭于 2015 年 8 月 6 日作出的决定已经以注册函的方式通知了贝克。同日，第一申请人以电子邮件向仲裁庭确认，其已于当日（即 2015 年 9 月 14 日）把仲裁庭于 2015 年 8 月 6 日作出的决定以注册函的方式向贝克发出。2015 年 10 月 8 日，被申请人向仲裁庭表示，有鉴于第一申请人已将决定发送贝克，被申请人未向贝克重复发送该决定，但被申请人确定第一申请人 2015 年 9 月 1 日发送的程序时间表反映了各方当事人达成的共识，并请仲裁庭发出新的程序指令。

11

77. 2015 年 12 月 21 日，仲裁庭以电邮指示各方当事人，鉴于申请人已于 2015 年 9 月 14 日将仲裁庭 2015 年 8 月 6 日作出的决定以挂号函的方式寄送贝克，因此被申请人无需向贝克再发送该决定。同时，仲裁庭作出程序指令（二）（以下简称"**指令（二）**"），内附一份经修改后的程序时间表。

78. 2015 年 12 月 24 日，贝克致函仲裁庭，称香港高等法院于 2015 年 11 月 6 日初步决定授予柯女士及张女士成为第二申请人之遗产管理人之委任，并期待于近日收到香港高等法院的正式决定。

79. 2016 年 1 月 12 日，贝克致函仲裁庭，称香港高等法院于 2015 年 12 月 28 日签发遗产管理委任书（Letters of Administration），委任张女士及柯女士为第二申请人之遗产管理人。该函同时附上该遗产管理委任书之复印件。在该函中，贝克同时请求仲裁庭向其提供第二申请人过世后仲裁庭向各方当事人发送的本案的卷宗材料。同日，仲裁庭将该函转发第一申请人及被申请人，并指示其于 2016 年 1 月 15 日下午六时或之前就贝克提出反对或不反对的意见。

80. 2016 年 1 月 14 日，第一申请人通过电邮向仲裁庭表示，贝克向仲裁庭提供的遗产管理委任书之复印件不完整，但如果贝克能提供完整复印件表明有关遗产管理人根据该遗产管理委任书在法律上有权代表第二申请人管理或处理其在 4.28 协议及/或本案中之具法权产（choses in action）及法律责任（liabilities），则第一申请人将不反对贝克 2016 年 1 月 12 日函之要求。

81. 2016 年 1 月 15 日，仲裁庭以电邮方式向各方当事人发出《<被申请人的文件出示请求>仲裁庭决定》（"**决定（二）**"）。

82. 2016 年 1 月 15 日，被申请人通过电邮向仲裁庭确认，其不反对贝克在 2016 年 1 月 12 日信函中的请求。

83. 2016 年 1 月 18 日，贝克致函仲裁庭，请求仲裁庭告知本案的最新进展，下一步的程序和时间安排及提供其在 2016 年 1 月 12 日函中请求提供的文件。

84. 2016 年 1 月 19 日，仲裁庭以信函方式回复贝克，要求其提供遗产管理委任书之完整复印件，以便仲裁庭全面考虑贝克的要求。同日，第一申请人致函仲裁庭，就贝克 2016 年 1 月 12 日函之事宜，提交进一步之补充书面意见。

85. 2016 年 1 月 27 日，第一申请人通过电邮向仲裁庭确认，与仲裁庭决定（二）中的相关文件出示请求有关的文件并不存在。

86. 2016 年 1 月 29 日，贝克致函仲裁庭，因遗产管理委任书之完整复印件涉及第二申请人之私人信息，柯女士及张女士就向仲裁庭提供完整复印件有顾虑，并请仲裁庭谅解或释明需要披露之原因。

87. 2016 年 2 月 2 日，仲裁庭致函贝克，表明其之前提供之文件未能表明有关遗产管理人根据该遗产管理书在法律上是否有权代表第二申请人管理或处理其在 4.28 协议及/或本案中之具法权产（choses in action）及法律责任（liabilities），并要求其提供该遗产管理书所附之日期为 2015 年 5 月 25 日的资产及负债清单（Schedule of Assets and Liabilities）以确定上述问题。

88. 2016 年 2 月 17 日，贝克致函仲裁庭，就香港高等法院出具的遗产管理书的附件清单不会对该域外具法产权予以披露的原因作出说明。

89. 2016 年 2 月 17 日，仲裁庭通过电邮向各方当事人宣布，依据仲裁庭于 2015 年 12 月 21 日所定的指令（二），文件出示阶段结束。不过，仲裁庭保留其在 2013 机构仲裁规则下第 22.3 条的权利。

90. 2016 年 2 月 19 日，第一申请人通过电邮向仲裁庭提交第一申请人之传召专家证人申请，第一申请人之专家证人名单及第一申请人之事实证人名单的电子版。同日，被申请人向仲裁庭申请将提交人申请和名单的期限延长至 2016 年 3 月 4 日。随后亦于同日，第一申请人就该延期请求，向仲裁庭提出回复意见，表示其反对将期限延长至 2016 年 3 月 4 日，但同意延至 2016 年 2 月 26 日。2016 年 2 月 20 日，仲裁庭以电子邮件批准将被申请人的提期限延至 2016 年 2 月 26 日下午 6 时。

91. 2016 年 2 月 25 日，仲裁庭致电邮给第一申请人和被申请人，附上了仲裁庭与贝克所有的往来邮件/信函，并邀请第一申请人和被申请人就柯女士和张女士是否可以在本案中代表第二申请人最迟于 2016 年 3 月 11 日提交最终的书面意见。

92. 2016 年 2 月 26 日，被申请人以信函向仲裁庭提交被申请人拟传召的事实证人名单及被申请人拟传召的专家证人名单和相关申请。

93. 2016 年 3 月 4 日，被申请人致函仲裁庭，表示鉴于第一申请人尚未提交被申请人寻求的有关专家证人的相关信息，故其保留对第一申请人拟传召证人提出意见的权利及提名一名中国建筑测量师作为专家证人的权利。被申请人同时表示就专家证人事宜，各方应遵循指令（二）相关项的安排。

94. 同日，即 2016 年 3 月 4 日，第一申请人就被申请人于 2016 年 2 月 26 日信函内提交的证人的必要性，提出书面意见。

13

95. 2016 年 3 月 9 日，贝克致函仲裁庭，请求仲裁庭就第二申请人之遗产管理委任书附件清单中有关具体产权和法律责任的信息，及其 2016 年 1 月 12 日、2016 年 1 月 18 日函中提出的请求作出答复。

96. 2016 年 3 月 10 日，第一申请人就柯女士和张女士是否可以在本案中代表第二申请人提交《第一申请人的补充书面意见和相关案例书面意见》。第一申请人认为鉴于贝克已确定的遗产管理委任书不包含第二申请人于 4.28 协议中之具产产权及法律责任，柯女士和张女士欠缺法律权限在本案中代表第二申请人。

97. 2016 年 3 月 11 日，被申请人以电邮向仲裁庭重申其在 2016 年 1 月 15 日函件中的意见，即不反对仲裁庭将本案的卷宗材料提供给柯女士和张女士阅览，亦不反对柯女士和张女士在本案中代表第二申请人。同日，即 2016 年 3 月 11 日，被申请人在另封电邮中，向仲裁庭提交其对第一申请人 2016 年 3 月 4 日提交的有关证人必要性异议的回复。

98. 2016 年 3 月 24 日，贝克致函仲裁庭，重申其立场，即柯女士和张女士有权在本案中代表第二申请人参加本案，并认为仲裁庭在有关第二申请人之遗产管理人委任的问题尚未作出正式决定前，应即时中止本案的进行。

99. 2016 年 3 月 29 日，被申请人通过电邮向仲裁庭表示，其与第一申请人达成共识，将各方当事人交换其证人证词的期限（即指令(二)第 15 项）延长至 2016 年 4 月 15 日，请仲裁庭批准。同日，即 2016 年 3 月 29 日，仲裁庭以电邮批准该申请。

100. 2016 年 4 月 6 日，HKIAC 向各方当事人以电邮附件方式发送了仲裁庭日期为 2016 年 4 月 6 日的《关于第二申请人柯铮光先生之女儿柯烨颖女士及遗孀张跃进女士作为柯铮光先生之遗产管理人代表第二申请人之遗产参加仲裁案审理的决定》（"**决定（三）**"），仲裁庭裁定：（1）作为第二申请人之遗产管理人的柯女士及张女士有权代表第二申请人之遗产参加本案审理；（2）HKIAC 即时将第二申请人过世后有关本案发送给各方当事人的卷宗材料提供给该两位遗产管理人的代表律师贝克；（3）本案继续推进。次日，即 2016 年 4 月 7 日，仲裁庭亦将该决定（三）以电邮附件方式发送各方当事人。

101. 2016 年 4 月 14 日，贝克致函仲裁庭，请求鉴于其尚未收到本案的有关卷宗材料，在其有机会充分阅读和分析案件卷宗材料前，暂停当前仲裁程序的推进。

14

102. 2016 年 4 月 15 日，第一申请人致电邮给仲裁庭，内附第一申请人两位证人陈述书之电子版。同日，被申请人亦致电邮给仲裁庭，内附被申请人四位证人证言。

103. 2016 年 4 月 19 日，HKIAC 以快运方式向贝克提供了仲裁庭于决定（三）中指示提供的本案卷宗材料。

104. 2016 年 4 月 28 日，仲裁庭致电邮给各方当事人，要求贝克作为第二申请人的代理律师告知仲裁庭其当事人需要多少额外时间准备参加本案的审理。并签于贝克的加入，（1）建议与各方当事人召开案件管理会议，请各方当事人确定协商时间；（2）暂停 2015 年 12 月 21 日的程序时间表，以便让第二申请人有机会提交其证人证词（如有）。

105. 2016 年 5 月 3 日，仲裁庭致函各当事人，指示贝克清楚表明其当事人是否要求参加本案的审理的立场。

106. 2016 年 5 月 4 日，第一申请人致电邮仲裁庭，确定案件管理会议召开时间。同日，第二申请人致电邮仲裁庭，确认柯女士和张女士将以第二申请人之遗产管理人的身份，参加本案的审理。

107. 2016 年 5 月 6 日，仲裁庭致电邮给各方当事人，指示案件管理会议以面对面方式进行，并请各方当事人预订会议地点。

108. 2016 年 5 月 10 日，第一申请人致电邮给仲裁庭，请求仲裁庭指令第二申请人遗产方须在 2016 年 6 月 2 日或之前，向仲裁庭及本案各方当事人就以下问题，确认其立场 (1) 第二申请人遗产方在本案中会否向第一申请人，及/或被申请人提出索赔；(2) 第二申请人遗产方在本案中会否采纳现有之由第一申请人及第二申请人共同提交之仲裁申请书，作为其在本案中索赔之立场；(3) 第二申请人遗产方在本案中会否提交其新的仲裁申请书/答辩书/回复书；(4) 第二申请人遗产方是否只以旁听形式参与本案。同日，即 2016 年 5 月 10 日，仲裁庭致电邮给各方当事人，指示第二申请人不晚于 2016 年 5 月 12 日下午 6 时对第一申请人的申请提供其意见。

109. 2016 年 5 月 11 日，第二申请人致电邮给仲裁庭，请求将其答复第一申请人上述申请的时间延期至 2016 年 5 月 20 日。

110. 2016 年 5 月 12 日，被申请人致电邮仲裁庭，认为就第一申请人 2016 年 5 月 10 日邮件之要求，第一申请人应当首先表明其是否继续要求将第二申请人的遗产管理人转为被申请人或向第二申请人的遗产管理人提出索赔。

15

111. 2016 年 5 月 13 日，仲裁庭致电邮各方当事人，批准第二申请人 2016 年 5 月 11 日邮件中之延期申请。

112. 2016 年 5 月 17 日，仲裁庭致电邮各方当事人，指示仲裁庭将等第二申请人在 2016 年 5 月 20 日的期限内回复了第一申请人的询问以后，再听取第一申请人的意见。

113. 2016 年 5 月 20 日，第二申请人致电邮仲裁庭，对第一申请人 2016 年 5 月 10 日邮件之询问作出答复，确认（1）第二申请人遗产方会以第二申请人的身份参加本案，且第二申请人不会在仲裁协议范围内对第一申请人提出任何申索；（2）第二申请人会采纳根据第二申请人之指示所提交的仲裁申请书，但第二申请人对第一申请人提交的修订仲裁申请书（即将第二申请人撤销并追加为第五申请人）表示反对；（3）第二申请人不会提交任何新的答辩书；（4）第二申请人会采纳旁听形式，但受限于邮件中列明的条件。

114. 2016 年 5 月 22 日，仲裁庭致电邮各方当事人，允许第一申请人于晚于 2016 年 5 月 27 日下午 6 时对第二申请人 2016 年 5 月 20 日的邮件作出回复。

115. 2016 年 6 月 3 日，仲裁庭致电邮各方当事人，提醒第一申请人其对第二申请人 2016 年 5 月 20 日的邮件作出回复的时限已过，指示其表明立场。2016 年 6 月 6 日，第一申请人致电邮仲裁庭，表示其将不迟于案件管理会 5 天前，提交第一申请人立场之书面陈词。2016 年 6 月 8 日，第二申请人致电邮仲裁庭，反对第一申请人的上述延期之举，并请求仲裁庭下令第一申请人不晚于 2016 年 6 月 13 日提交其回复。

116. 2016 年 6 月 14 日，第一申请人致电邮仲裁庭，内附其提交的回复第二申请人遗产方 2016 年 5 月 20 日之邮件《第一申请人的书面回复》。该回复中，第一申请人表示基于第二申请人遗产方 2016 年 5 月 20 日邮件之立场，第一申请人现时无需提出将第二申请人遗产方转为第五被申请人及对仲裁申请书做相应修订的申请。但鉴于第二申请人遗产方保留将来可能提出意见或进行补充等权利，如第二申请人遗产方提出与第一申请人不同或对其不利之立场，则第一申请人保留再次向仲裁庭申请将第二申请人遗产方转为被申请人之权利。第一申请人同时提议仲裁庭命令第二申请人遗产方作为本案"新增"的一方以状书及／或证人供词方式就其上述对于本案现有的立场及取态提交正式的书面陈述（包括对于现时本案已呈交的状书及／或证人供词确认没有意见及补充）。同时，第一申请人要求把现时的时间表的指引基于第二申请人遗产方的加入作相应的顺延。

16

117. 2016 年 6 月 21 日，仲裁庭致电邮各方当事人，指示第二申请人于 2016 年 6 月 23 日下午 6 点时前对第一申请人的书面回复提出其意见，尤其是以下两个问题：（1）第二申请人是否会在仲裁过程中采纳与第一申请人不一样的立场？（2）第二申请人是否会传召任何事实证人或专家证人？

118. 2016 年 6 月 23 日，仲裁庭致电邮各方当事人，指示被申请人尽快确认其是否会提名一名中国建筑测量师作为专家证人。

119. 同日，即 2016 年 6 月 23 日，贝克致电邮仲裁庭，内附《第二申请人之书面陈词大纲》及其《附件目录》。

120. 2016 年 6 月 24 日，仲裁庭与各方当事人召开案件管理会议。

121. 2016 年 6 月 28 日，仲裁庭致电邮各方当事人，内附日期为 2016 年 6 月 28 日的程序指令和庭审时间表（"**指令（三）**"）。指令（三）中，仲裁庭批准了第一申请人和被申请人分别传召的专家证人名单，并制定了庭审时间表。

122. 2016 年 6 月 29 日，被申请人致函仲裁庭，提交了被申请人之三位证人的证言。同日，第一申请人致电邮仲裁庭，确认其已于同日将第一申请人的事实证人陈述书连同附件的纸质版送达第二申请人代表律师。

123. 2016 年 7 月 21 日，贝克致电邮 HKIAC，确认其已收悉根据指令（三）的要求提供给其的，本案截至 2013 年 12 月 5 日第二申请人过世前提交给仲裁庭的所有文件（"**卷宗文件**"）。次日，即 2016 年 7 月 22 日，贝克致电邮仲裁庭，鉴于其实际收到上述卷宗文件的日期晚于指令（三）规定的截至日期，申请仲裁庭延长指令（三）庭审时间表中相关程序行动的截止日期。

124. 2016 年 7 月 26 日，贝克致电邮仲裁庭，称其注意到 HKIAC 提供给其的卷宗文件中尚缺被申请人《答辩及反诉书》之部分附件，并在此请求仲裁庭批准其于 2016 年 7 月 22 日提出的延时申请。

125. 2016 年 7 月 28 日，仲裁庭致电邮各方当事人，指示第一申请人和被申请人就第二申请人的延时申请提供意见。

126. 2016 年 7 月 29 日，第一申请人致电邮仲裁庭，表示第二申请人迟延收到卷宗文件系第二申请人自身原因所致，但在第二申请人向仲裁庭保证不会作出进一步的延期申请的前提下，不反对第二申请人所要求的延时申请。同日，被申请人致电邮仲裁庭，表示其不反对第二申请人的延时申请，并建议对庭审时间表中第 9-11 项的截止日期依国庆节假期相应顺延。

127. 2016 年 7 月 30 日，第二申请人致电邮仲裁庭，反驳第一申请人提出的第二申请人迟延收到卷宗文件系第二申请人自身原因所致的立场，并请仲裁庭作出下列指令：（1）批准第二申请人的延时申请；（2）被申请人在 7 天之内向第二申请人提供第二申请人尚未收悉的《答辩及反诉书》之附件（即附件 B46, C1－C30 及 D1－D30）；（3）第二申请人向被申请人支付上述《答辩及反诉书》之附件的合理影印费用；（4）第二申请人保留向第一申请人中索上述费用的权力；（5）各方当事人均有自由提出其它申请。

128. 2016 年 8 月 1 日，仲裁庭致电邮各方当事人，基于庭审时间保持不变的前提下，仲裁庭同意修改 指令（三），并颁布了新的程序指令及庭审时间表（"指令（四）"）。

129. 同日，即 2016 年 8 月 1 日，第二申请人致电邮仲裁庭，请求仲裁庭就其2016 年 7 月 30 日邮件中的其他请求作出指令。

130. 2016 年 8 月 2 日，被申请人致电邮仲裁庭，同意有条件的提供第二申请人要求之《答辩及反诉书》之相关附件。

131. 2016 年 8 月 5 日，仲裁庭致电邮各方当事人，指示第二申请人与被申请人在就《答辩及反诉书》之相关附件的提供进行沟通后，告知仲裁庭结果。同日，第二申请人致电邮仲裁庭，确认以收到相关附件，并保留向第一申请人中索跟 HKIAC 和被申请人年取中索文件所产生的费用的权力。同日，第一申请人致电邮仲裁庭，否认第二申请人提出的"第一申请人从第二申请人处非法取走了文件"的指控，并附相关律师函。

132. 2016 年 8 月 15 日，第二申请人以邮件向仲裁庭提交柯女士的事实证人证词。同日，仲裁庭致电邮各方当事人，批准第二申请人传召叶永青先生作为专家证人的申请。

133. 2016 年 9 月 3 日，第一申请人致电邮仲裁庭，申请根据《香港国际仲裁中心机构仲裁规则 2013》2 第 18.1 条申请修改其《回复及反诉辩书》（"修订申请"），并附其《修订回复及反诉辩书》的草本。第一申请人同时申请仲裁庭在仲裁庭及第二申请人及被申请人不反对第一申请人提交的《修订回复及反诉答辩书》的情况下，指示被申请人于第一申请人提交《修订回复及反诉辩书》的 7 天内提交其《修改对申请人的回复及反诉辩书的进一步答复书》。

---

2 仲裁庭注意到第一申请人援引了《香港国际仲裁中心机构仲裁规则 2013》，而本案应适用《香港国际仲裁中心机构仲裁规则 2008》。鉴于就一方当事人变更或补充其请求或答辩，两套规则中相关规定的差异对仲裁庭批准第一申请人修订申请无实质性影响，仲裁庭将视第一申请人的上述对《香港国际仲裁中心机构仲裁规则 2013》的援引为笔误。

134. 2016 年 9 月 8 日，被申请人致电邮仲裁庭，反对第一申请人提交《修订回复及反诉答辩书》。次日，即 2016 年 9 月 9 日，第一申请人致电邮仲裁庭，对被申请人的反对理由作出回复。

135. 2016 年 9 月 12 日，第二申请人致电邮仲裁庭，就第一申请人的修订申请表示同意，并恳请仲裁庭批准该申请。

136. 同日，即 2016 年 9 月 12 日，被申请人致电邮仲裁庭，表示各方当事人就指令（四）第 8、9 项的截止日期延期一周达成一致请仲裁庭批准。同日，仲裁庭致电邮各方当事人，批准该延期申请。

137. 2016 年 9 月 13 日，仲裁庭致电邮各方当事人，指示仲裁庭一致同意批准第一申请人的修订申请，但第一申请人必须支付各方当事人就此修订申请所产生的相关费用。仲裁庭同时要求第一申请人于 2016 年 9 月 15 日正式提交经修改的《回复及反诉答辩书》，并批准被申请人不晚于 2016 年 9 月 29 日提交其经修改的《对申请人的回复及反诉答辩书的进一步答复书》。

138. 同日，即 2016 年 9 月 13 日，第二申请人致电邮仲裁庭，请求仲裁庭给予其机会，就第一申请人对于《回复及反诉答辩书》的修改向仲裁庭提交回应。2016 年 9 月 21 日，仲裁庭致电邮各方当事人，表示不支持第二申请人就第一申请人对于《回复及反诉答辩书》的修改向仲裁庭提交回应书的申请。

139. 2016 年 9 月 14 日，第一申请人致电邮仲裁庭，正式提交其附件《修改回复及反诉答辩书》。

140. 2016 年 9 月 21 日，第一申请人致电邮仲裁庭，内附第一申请人的反驳事实证人陈述书两份。同日，第二申请人致电邮仲裁庭，内附柯女士的反驳证人证词及附件证据。同日，被申请人亦致函仲裁庭，内附被申请人之三位证人即第二申请人、顾勇及刘毓平之补充证人证言共三份。

141. 2016 年 9 月 29 日，被申请人致函仲裁庭，内附被申请人之《修订对申请人的回复及反诉答辩书的进一步答复书》。

142. 2016 年 10 月 12 日，被申请人的代表律师致电邮仲裁庭，其团队成员已加入盛德律师事务所（Sidley Austin LLP）并受被申请人指示在本案中继续代理被申请人。

143. 2016 年 10 月 14 日，被申请人致电邮仲裁庭表示，经各方当事人达成一致，申请将仲裁庭指令（四）第 9 项中各方交换专家证人报告的期限由 2016 年 10 月 17 日延长 7 天至 2016 年 10 月 24 日，但这将不影响指令

（四）第 10 项及后续项目的截止日期。同日，仲裁庭致电邮各方当事人，在各方当事人达成一致的前提下，批准上述申请。

144. 2016 年 10 月 24 日，第二申请人致电邮仲裁庭，申请在不影响仲裁时间表中下一个截止日期（即 2016 年 11 月 28 日召开专家会）的前提下，将各方交换专家证人报告的时限延期至 2016 年 10 月 28 日。第二申请人表示其已就本申请征求第一申请人及申请人之代理律师的的意见，且被申请人代理律师已表示同意。但第一申请人律师尚未作出任何回复。同日，即 2016 年 10 月 24 日，第一申请人致电邮仲裁庭，表示不反对第二申请人的上述申请，但希望仲裁庭就为次延期申请下达"除非"命令（"unless order"）。仲裁庭于同日致电邮各方当事人，批准第二申请人的上述延期申请，并表示除非有异常特殊的原因，仲裁庭将不会再允许任何延期申请，以免影响开庭日期。

145. 2016 年 10 月 28 日，第二申请人致电邮仲裁庭，申请各方当事人当天在不影响权利的基础上提供未经签署的第一轮专家报告。同日，第一申请人致电邮仲裁庭，反对第二申请人提交未经签署的第一轮专家报告。之后，仲裁庭于同日致电邮各方当事人，请第二申请人澄清其专家报告未经签署的原因，何时能签署；及签署过的专家报告的内容是否与未经签署报告的内容完全一致。随后，第二申请人致电邮仲裁庭，解释其申请的原因，并请仲裁庭下令第一轮的专家证人报告是否能在不影响权力的前提下交换。

146. 同日，即 2016 年 10 月 28 日，第一申请人致电邮仲裁庭，内附第一申请人的专家报告两份。同日，第二申请人和被申请人亦分别致电邮仲裁庭，表示其已在无损权益的前提下，将其经签署的专家证人报告送达其他各方当事人。

147. 2016 年 11 月 15 日，第二申请人致电邮仲裁庭，表示基于该邮件所述理由，第二申请人及被申请人一致认为专家讨论会应在无损权益 (without prejudice) 的基础上召开，且无须各当事人的代理律师参加。第二申请人请仲裁庭就此作出指示。

148. 2016 年 11 月 21 日，仲裁庭致电邮各方当事人，批准专家讨论会应在无损权益 (without prejudice) 的基础上召开。

149. 2016 年 12 月 13 日，被申请人致函仲裁庭，表示签于其收到第一申请人和第二申请人分别向被申请人作出的不同甚至相反的指示和/或要求，请求仲裁庭作出以下指令：（1）指示第二申请人（通过其遗产管理人）对于第一申请人 2016 年 12 月 9 日信函中的两项要求发表意见；（2）指示第一申请人对于张女士近期的要求发表意见；及（3）除非申请人达成一

致并共同给予被申请人要求，被申请人将不予接受第一申请人和第二申请人任何一边的单方指示。

150. 2016 年 12 月 21 日，被申请人致电邮仲裁庭，表示经各方当事人达成一致，申请将提交专家证人一致同意的观点陈述及不同意的观点陈述的联合报告的期限延长至 2017 年 1 月 4 日。

151. 2016 年 12 月 30 日，第二申请人致电邮仲裁庭，内附其对被申请人 2016 年 12 月 13 日信函的回复。

152. 2016 年 12 月 31 日，第一申请人致电邮仲裁庭，就被申请人 2016 年 12 月 13 日函及第二申请人 2016 年 12 月 30 日函，作出回复。

153. 2017 年 1 月 11 日，仲裁庭致电邮各方当事人。仲裁庭表示其认为各方当事人的相互指责或指控与此案无关，故不予以考虑或裁断。就被申请人提交第一申请人方 12 月 9 日的无损权利信函，仲裁庭请各方当事人确认尽管该信函有抄送仲裁庭，仲裁庭可以继续审理本案，并提醒各方当事人提交专家联合报告。

154. 2017 年 1 月 12- 13 日间，各方当事人致电邮仲裁庭，确认仲裁庭可以继续审理本案。

155. 2017 年 1 月 13 日，被申请人致电邮仲裁庭，表示经各方当事人达成一致，申请将提交专家联合报告的期限延长至 2017 年 1 月 25 日。仲裁庭于 2017 年 1 月 19 日致电邮各方当事人，不影响整体庭审时间表的情况下，批准该延期申请。

156. 2017 年 2 月 16 日，第一申请人致电邮仲裁庭，建议仲裁庭就庭审前程序会议的时间作出指示。

157. 2017 年 2 月 21 日，被申请人致函仲裁庭，内附其 (1) 代表申请人与被申请人共同提交的《关于股权转让问题、税费问题的联合专家意见》；及 (2) 代表第一申请人与被申请人共同提交的《关于房地产问题的联合专家意见》。

158. 2017 年 2 月 27 日，仲裁庭致电邮各方当事人，通知将于 2017 年 4 月 3 日召开的庭审前程序会议的具体时间，并告知各方，由于其中一名仲裁员有时间冲突，仲裁庭同意由首仲单独主持庭审前程序会议，请各方当事人确认。各方当事人于 2017 年 2 月 27-28 日，分别致电邮仲裁庭，确定同意上述安排。

159. 2017 年 3 月 1 日，被申请人致电邮仲裁庭，内附（1）余健女士的半岛君望项目评估顾问报告；（2）余健女士的绿庭尚城项目评估顾问报告；（3）季诺先生的专家意见书及援引法律法规摘要。

160. 2017 年 3 月 6 日，第一申请人致建议仲裁庭，投诉被申请人于 2017 年 3 月 1 日提交的"季诺先生的专家意见书及援引法律法规摘要"，相较 2016 年 10 月 28 日交换及提交的季诺先生的专家意见书，内容有重大添加或更改。第一申请人要求仲裁庭下达指示，不予接纳被申请人在 2017 年 3 月 1 日电邮所提交的所有专家报告，并不准许任何一方当事人提交任何新的或有改动的专家报告。

161. 同日，即 2017 年 3 月 6 日，第二申请人亦致电邮仲裁庭，亦反对被申请人提交与其于 2017 年 2 月 21 日交换之版本的专家报告内容不同的新专家报告，并请求仲裁庭驳回被申请人于 2017 年 3 月 1 日提交的专家报告。

162. 2017 年 3 月 7 日，仲裁庭致电邮各方当事人，指示被申请人于 2017 年 3 月 9 日下午 6 时前就第一申请人和第二申请人的上述观点和建议作出回复。

163. 2017 年 3 月 9 日，仲裁庭致电邮各方当事人，建议将原定在 2017 年 5 月 15 日至 26 日（十个工作日）的开庭时间因一位仲裁员的临时紧急安排调整到 2017 年 5 月 16 日开始，并致需要的情况下，延长每日开庭时间。仲裁庭请各方当事人于 2017 年 4 月 3 日的庭审前程序会议之前确认以上仲裁庭建议的安排。各方当事人于 2017 年 3 月 9 日-10 日间，分别致电邮仲裁庭，确认同意上述安排。

164. 2017 年 3 月 9 日，被申请人致电邮仲裁庭，回复申请人 2017 年 3 月 6 日邮件中的驳回申请，并请仲裁庭驳回申请人的驳回请求。2017 年 3 月 10 日，仲裁庭致电邮各方当事人，指示第一申请人和第二申请人如拟对被申请人的邮件作出回复，需于 2017 年 3 月 14 日前作出。

165. 2017 年 3 月 13 日及 14 日，第一申请人和第二申请人分别致函仲裁庭，就被申请人的 2017 年 3 月 9 日的邮件作出回复。

166. 2017 年 3 月 29 日，第一申请人致电邮仲裁庭，内附各方当事人共同草拟的一份庭审前程序会议的议程。

167. 2017 年 3 月 30 日，被申请人致电邮仲裁庭，表示其愿意在 "de bene esse"（有条件的）的基础上 提供一份季诺先生的最终专家意见书与 2016 年 10 月 28 日版本的比较版（"**比较版**"），以证明最终版本并非如第一申请人所述"内容有重大添加或更改"。仲裁庭于同日以邮件指

22

示被申请人在此基础上，提供比较版，供仲裁庭与第一和第二申请人审核。

168. 2017 年 3 月 31 日，第二申请人致电邮仲裁庭，表示反对被申请人在 "de bene esse"（有条件的）的基础上提供比较版，亦反对被申请人正式提交比较版，并请求仲裁庭驳回被申请人提交比较版的请求，或不予考虑该比较版。同日，2017 年 3 月 31 日，被申请人致电邮仲裁庭，向各方当事人提供比较版。第一申请人亦于同日，对被申请人提交比较版的邮件作出回复。

169. 2017 年 4 月 2 日，仲裁庭致电邮各方当事人，总结各方当事人就比较版的往来邮件及主要立场，并表示将在庭审前程序会议上与各方当事人做进一步沟通。

170. 2017 年 4 月 3 日，仲裁庭与各方当事人在 HKIAC 召开了庭审前程序会议。

171. 2017 年 4 月 4 日，仲裁庭致电邮各方当事人，指示：（1）允许被申请人提交 2016 年 10 月 28 日季诺先生的专家意见书；（2）驳回被申请人 2017 年 3 月 1 日提交的季诺先生的专家意见书及援引法律法规摘要内对第 8 段、第 9 段和第 32 段的修改；（3）驳回被申请人 2017 年 3 月 1 日提交的季诺先生的专家意见书附件二中的注 3、注 7、注 22、注 23、注 24，以及删除掉的注 5（同时参照下面第 4 点指示）；（4）允许被申请人 2017 年 3 月 1 日提交的季诺先生的专家意见书附件二中的所有"参见法律法规摘要第[x]页"字句和《援引法律法规摘要》（注 3、注 7、注 22、注 23、注 24，以及删除掉的注 5 除外）；（5）允许被申请人 2017 年 3 月 1 日提交的《援引法律法规摘》；（6）不支持作出任何费用指令。

172. 2017 年 4 月 5 日，仲裁庭以邮件向各方当事人就庭审安排的细节作出程序指令（"**指令（五）**"）。

173. 2017 年 4 月 11、19 日，仲裁庭致电邮各方当事人，就庭审卷宗的有关问题作出补充指示。

174. 2017 年 5 月 5 日，第一申请人和第二申请人分别致电邮仲裁庭，内附其各自提交的庭审前的书面陈述（包括《法据典章》）的电子版。

175. 2017 年 5 月 5-6 日，各方当事人分别致电邮仲裁庭，表示因各方当事人未就大事记及涉案的人物介绍之内容达成一致，未能在指令（五）规定的限期前提交有关大事记和涉案的人物介绍。同时，被申请人建议将提交该等文件的期限延长至 2017 年 5 月 9 日下午 6 时。仲裁庭 2017 年 5 月 7 日，仲裁庭批准将该期限延至 2017 年 5 月 8 日下午 2 时。

23

176. 2017 年 5 月 8 日，被申请人致电邮仲裁庭，表示经与申请人两方达成共识，申请将被申请人提交庭审前的书面陈述的期限延长至 2017 年 5 月 9 日下午 6 时。仲裁庭于同即 2017 年 5 月 8 日批准该申请。2017 年 5 月 9 日，被申请人致电邮仲裁庭，内附其提交的庭审前的书面陈述及《法据典章》的电子版。次日，即 2017 年 5 月 9 日，被申请人因《法据典章》的电子版有缺失页，重新以电邮向仲裁庭发送《法据典章》的电子版。

177. 2017 年 5 月 9 日，第二申请人致电邮仲裁庭，内附现附上各方当事人的：（1）大事记；及（2）涉案的人物介绍和关系图。第二申请人表示以上文件涵盖了各方当事人的立场，但由于各方当事人无法在指定期限内就该等文件内容完全达成共识，申请人方在文件中各方当事人意见不一致处已另加标注及评论，供仲裁庭参考。

178. 2017 年 5 月 14 日，仲裁庭致电邮各方当事人，指示各方于 2017 年 5 月 15 日下午 3 时之前通知仲裁庭证人出庭的时间和顺序，并指示届时仲裁庭希望收到一份各方达成一致的时间表。

179. 2017 年 5 月 15 日，第一申请人致电邮仲裁庭，内附申请人庭审前的书面陈述之第一申请人的补充法律法规列表的电子版。同日，2017 年 5 月 15 日，被申请人致电邮仲裁庭，内附（1）修订后的被申请人方庭审前的书面陈述之《法据典章》3；（2）股权转让相关结构示意图和步骤总结表。

180. 2017 年 5 月 16 日，第一申请人致电邮仲裁庭，内附各方当事人共同磋商的证人出庭的时间和顺序。

181. 2017 年 5 月 16 日，仲裁庭与各方当事人开始庭审。庭审于 2017 年 5 月 16 日至 2017 年 5 月 25 日之间连续进行，并于 2017 年 5 月 25 日结束。2017 年 8 月 8 日，仲裁庭开庭，听取各方当事人的结案陈词。

182. 2017 年 5 月 16 日庭审第一天，各方当事人同意为庭审之目的，删除以下段落：即（a）徐宏标证词陈述书的第 56-65 段（B 卷宗的第 24-27 页）；(b)徐宏标反驳事实证人陈述书的第 23-24 段（B 卷宗的第 104 页）；(c)柯烨颖反驳证人证词的第 5-6 段（B 卷宗的第 134 页）、第 19-31 段（B 卷宗的第 135-137 页）和第 39-59 段（B 卷宗的第 138-142 页）。

## IV. 事实背景

---

3 被申请人的邮件及其附件中使用的原文为"法律典章"。

183. 绿洲投资（第一被申请人）是一家于 2001 年 7 月 26 日在英属维京群岛注册成立的公司。其亦是以下三家公司的母公司：上海绿庭房地产开发有限公司（"**绿庭地产**"）、绿洲置业有限公司（"**绿洲置业**"）及上海绿洲科创生态科技有限公司（"**绿洲科创**"）。除绿庭置业于香港成立外，绿庭地产和绿洲科创皆于中国境内成立。

184. 绿洲投资总发行股份共 48,000 股，原本的股权分布如下：徐宏标（第一申请人）持 8,000 股（占 16.6%）、柯铮光（已逝，其遗产为本案的第二申请人）持 8,000 股（占 16.6%）、俞乃奋（第二被申请人）持 23,520 股（占 49%）、俞乃雯（第三被申请人）持 8,000 股（占 16.6%）及俞乃筠（第四被申请人）持 480 股（占 1%）。由于俞乃奋、俞乃雯及俞乃筠三人的总持股量占 66.6%，故在 4.28 协议下被称为"**控股股东**"，而徐宏标和柯铮光则在 4.28 协议下被称为"**参股股东**"。

185. 自 2009 年初，参股股东与控股股东开始就绿洲投资的股权重组问题进行磋商。磋商经过及内容于下列文件可见：2009 年 3 月 24 日的《绿庭股东会、董事会关于资产拆分及其他相关事宜的决议》[D2/61/607]、2009 年 9 月 4 日的《绿庭 2009 年 8 月 20 日召开股东会会议纪要》（也称为"8.20 纪要"）[D2/63/615]、2009 年 11 月 9 日的《绿洲投资集团有限公司股权重组初步协议》（"**重组协议**"）[D2/68/622] 及 2010 年 2 月 3 日的《会议纪要》[D2/96/718]。

186. 最终，双方及相关公司于 2010 年 4 月 28 日签订了《4.28 协议》[^4]，其主要内容如下：

    (1) 柯铮光及徐宏标将其各自持有的绿洲投资股权分别转让予喜盈国际集团有限公司（"**喜盈国际**"）及 Focus Town Limited（"**Focus Town**"），在该等转让完成后，再由绿洲投资回购喜盈国际及 Focus Town 分别持有的绿洲投资股权（"**回购前股权转让**"）。被申请人同意以上安排并愿意提供必要的配合：见第 1.1 条 [D2/100/751]。

    (2) 绿洲投资须就回购前股权转让向参股股东支付三部分对价，包括现金对价、股权对价及物业互换对价：

    (3) **现金对价**部分合共人民币 2.5 亿元，分三期支付，分别为：8 千万元、2 千万元及 1.5 亿元；每一期付款均需满足一定先决条件：见第 2.1 及 2.2 条 [D2/100/752]。

[^4]: 4.28 协议有 10 个签署方，即(i) 绿洲投资；(ii) 俞乃奋；(iii) 俞乃雯；(iv) 俞乃筠；(v) 柯铮光；(vi) 徐宏标；(vii) 喜盈国际集团有限公司；(viii) Focus Town Limited；(ix) 绿庭置业；和 (x) 绿洲科创。

(4) **股权对价**部分以上海绿庭四季花城房地产开发有限公司（"**四季**
**花城**"）100%的股权计付：见第2.3条[D2/100/754]。4.28协议下
的安排旨在让参股股东全权拥有及控制四季花城。

(5) **物业互换对价**部分则是指绿洲投资及控股股东须指定绿庭地产与
参股股东(或其指定第三方)签署《上海市房地产买卖合同》，将
绿庭地产持有的上海市松江区九亭绿庭尚城房产项目物业 商业用
房约8000平方米（"**九亭商铺**"）转让给参股股东(或其指定的
第三方)。与此同时，四季花城将与绿洲投资或控股股东指定的第
三方签署《别墅定制合同》，将其开发的、位于上海市奉贤区奉
浦工业区半岛名墅项目的中心岛A2型别墅2幢（"**A2型别墅**"）
转让给绿洲投资或控股股东指定的第三方。各方确认上述《上海
市房地产买卖合同》及《别墅定制合同》所涉及房屋的价值均作
价人民币7,200万元。由于两者价格相等，此项对价视为相互抵
消：见第3.1至3.3条[D2/100/755]。

(6) 自协议签订之日起，四季花城与绿洲投资及其下属公司之间的关
联交易应予终止；所有债权债务应在一个月内予以清理结算：见
3.6条[D2/100/756]。

187. 4.28协议签订后，喜盈国际及Focus Town的回购前股权转让均于2010年
5月4日完成[D2/110 – 114/791 – 799]，即参股股东已及时履行了4.28协
议下的部分义务。然而，参股股东与控股股东之间就股权回购的现金对
价、股权对价、物业互换对价与债权债务的清结问题均产生了争议，并
最终引发本次仲裁。

## V. 争议事项及双方立场

### A. 现金对价

188. 就现金对价部分，绿洲投资已按4.28协议规定支付第一及第二期（总额
为人民币1亿元）的款项予参股股东。

189. 然而，绿洲投资至今尚未支付第三期款项(计人民币1.5亿元，最终金额应
按4.28协议第2.2.1（4）条的规定调整)。根据第2.2.1（3）条，第三期
款项须在下列先决条件获得满足的前提下，于2012年12月31日前支
付：

(1) 四季花城股权转让的政府审批及登记手续已经完成；

(2) 绿洲投资已经完成回购参股股东股权所必需的股东变更登记手
续；

26

(3) 参股股东与控股股东已经就第 2.1 条规定的现金对价支付安排及各项调整金额达成协议；

(4) 参股股东确认 4.28 协议第 2.3.5 款规定的股权对价支付已经完成且各方对此无争议；

(5) 4.28 协议第 3.1 款所述之关于九亭商铺的《上海市房地产买卖合同》及 4.28 协议第 3.2 款所述之关于 A2 型别墅的《上海市房地产预售合同》已经签署并完成在房地产登记机关的过户或预售登记手续。

190. 参股股东及控股股东均指称因对方违约导致上述先决条件第（1）、（3）、（4）及（5）项至今均未完全获得满足。双方无争议的是先决条件第(2)项已完成。

**B. 股权对价**

**股权转让架构**

191. 4.28 协议第 2.3.1 条约定：

*"绿洲投资已在香港新设立了世邦有限公司（"**世邦公司**"），并已经安排世邦公司收购了绿洲投资香港子公司[绿庭置业]所持有之[四季花城] 80%的股权。该等股权收购完成后，绿洲投资应与[喜盈国际]和[Focus Town]签署一份《股权购买权协议》，约定在下述第 2.3.2 款约定的托管期限届满后，将世邦公司 100%的股权以港币一元对价转让给[喜盈国际]和[Focus Town]。"*

192. 4.28 协议第 2.3.2 条进一步规定：

*"各方约定：绿洲投资在世邦公司股权转让给[喜盈国际]和[Focus Town]的《股权购买权协议》签署后，由绿庭置业与[喜盈国际]和[Focus Town]签署相关托管协议，该协议约定：（1）[喜盈国际]和[Focus Town]受绿庭置业委托管理世邦公司并代为行使股东权利三年（"**托管期限**"）；（2）托管期限内世邦公司及四季花城的所有债权债务、责任与风险均由参股股东承担。如因任何原因导致控股股东、绿洲投资或绿庭置业需承担世邦公司或四季花城在托管期间的债权债务、风险或责任时，参股股东需向控股股东、绿洲投资或绿庭置业提供全额赔偿。"*

193. 4.28 协议第 2.3.3 条则规定：

*"[四季花城]目前由绿洲投资下属[绿洲科创]持有的另外 20%股权转让予参股股东指定的一家中国国内企业（"**境内股权对价支付**"）。如按照*

27

中国法律规定，该等股权转让需实际支付对价时，按照前述第 2.2.1
(4) (a)款的规定处理。"

194. 4.28 协议第 2.3.4 条规定：

"各方同意：因*境内*股权对价支付所产生的税收、费用，以及*境外世邦公*
*司托管安排及股权转让给[焘盈国际]和[Focus Town]*的税收、费用由参股
股东承担。除此之外的与股权对价支付有关的税收、费用的分担问题，
由各方届时另行协商。因境内及境外股权对价支付相关的股权转让手
续，即申请、登记、政府手续等项事宜均由参股股东负责办理，*控股股*
*东、绿洲投资提供必要的协助*。"（下划线后加）

### C.   物业互换对价

195. 4.28 协议规定的是双方的物业互换，即：以九亭商铺与 A2 型别墅互换且
互为对价。申请人的立场为：4.28 协议确认了九亭商铺及 A2 型别墅价值
均作价人民币 7,200 万元，相互抵清，双方不再实际支付物业价值，所以
不存在九亭商铺与 A2 型别墅实际上是否等值的问题。而且，协议第 3.2
条亦订明两幢 A2 型别墅的"图纸面积各约 1200 平方米"，但协议从未
提及或暗示人民币 7,200 万元的价值是以可销售建筑面积为基础计算的。

196. 被申请人则声称A2 型别墅作价人民币 7,200 万元的计算是根据（1）两幢
别墅共 2400 平方米的可销售建筑面积，及（2）每平方米建筑面积平均
均价不低于人民币 31,500 元计算而来，被申请人声称这是双方同意 4.28
协议第 3.3 条的基础。

197. 以下，仲裁庭逐一概述各方对现金对价、股权对价、物业互换未能如约
完成的主张。如仲裁庭没有在此裁决书中特别指明某一方当事人的陈述
或观点，这不代表仲裁庭疏于考虑该部分陈述。鉴于各方当事人在本案
的陈述之广，仲裁庭认为没有必要列明当事人的每一项陈述，而在本裁
决中列明当事人的每一项陈述也是不现实的。仲裁庭已详细审阅并仔细
考虑了各方当事人的陈述。仲裁庭成员也就各方当事人的陈述进行了讨
论。

### 现金对价的支付

198. 申请人认为，根据4.28 协议第 2.2.1(3)(d)条，控股股东支付现金对价中第
三期款项的其中一个先决条件是参股股东确认 4.28 协议第 2.3.5 款规定的
股权对价支付已经完成且各方对此无争议，而"仲裁双方就以下每个股
权转让步骤均有争议：（1）世邦公司收购绿庭置业所持的 80%四季花城
股权；（2）绿洲投资把世邦公司的股权转让给参股股东的 Focus Town

28

Limited 和喜盈国际；（3）绿洲科创把其持有的[20%]5四季花城股权转让给参股股东制定的一家中国国内企业（即上海绿泰贸易有限公司（以下简称 "**绿泰贸易**"））。"且这三项股权转让未获完成的原因应归责于被申请人。

199. 被申请人认同先决条件未获完成的主张，但认为第 2.2.1（3）条第（B）段至第（D）段规定的先决条件不成就的责任在于申请人。

200. 如上文第189至190段所述，因支付该笔款项的某些先决条件未获满足，故绿洲投资未将该笔款项支付参股股东。而先决条件未获满足的原因与股权对价的支付未获完成相关，故仲裁庭将在下文涉及股权对价部分概述各方立场。

**股权对价的支付**

201. 就股权对价的支付，4.28 协议第 2.3.5 款规定，股权对价在以下两份协议获签署后即视为已经完成：（1）第 2.3.1 款所述的《股权购买权协议》，及（2）第 2.3.2 款所述的《托管协议》。根据 4.28 协议规定，绿洲投资及控股股东应与喜盈国际和 Focus Town 签署《股权购买权协议》，在该协议下，由绿洲投资将其在世邦公司 100%的股权以港币一元为对价转让给参股股东所设立的喜盈国际和 Focus Town。在上述世邦《股权购买权协议》签署后，由绿庭置业与喜盈国际和 Focus Town 签署《托管协议》，在该协议中各方会约定（a）喜盈国际和 Focus Town 受绿庭置业委托管理世邦公司并代为行使股东权利三年，（b）该三年托管期内，世邦公司及四季花城的所有债权债务、责任和风险由参股股东承，且参股股东对控股股东就控股股东实际承担的此等债权债务、责任和风险对控股股东承担全额补偿责任。

202. 申请人主张，四季花城的转让有三个步骤：（1）绿洲投资完成世邦公司收购绿庭置业所持的 80%四季花城股权（"世邦收购"，即四季花城80%股权转让的第一步）；（2）三年托管期满后，绿洲投资把世邦公司的股权转让给参股股东设立的 Focus Town 和喜盈国际（即四季花城80%股权转让的第二步）；（3）绿洲科创把其持有的[20%]6四季花城股权转让给参股股东指定的一家中国国内企业（即绿泰贸易）。申请人主张，对以上每个股权转让步骤，仲裁双方均有争议。但四季花城的股权转让未获完成的根本原因是控股股东违反其在 4.28 协议下的合同责任、严重拖延所致。

---

5 申请人总结陈词中此处笔误写为 80%。
6 申请人总结陈词中此处笔误写为 80%。

203. 就第一步世邦收购未获完成，被申请人主张原因有三：（1）签署 4.28 协议时，绿庭置业在四季花城的股权仅为 69%，不能享受 2009 年 4 月 30 日财政部和国家税务总局下发的《关于企业重组业务企业所得税处理若干问题的通知》（下称"**59 号文**"）的优惠税务处理待遇（最少 75%方可），故需先增资最少到 75%，此增资 2011 年 7 月才完成（增到 80%）；（2）控股股东在第 2.3.1 条下只有"安排"世邦收购的义务，其设立世邦已经履行了该义务；（3）参股股东彼时对四季花城已有实际控制权，而其未提供四季花城的审计报告及/或评估报告，从而令控股股东无法向相关政府机构提交"合理的股权转让价格"，而导致世邦收购未完成。

204. 申请人则主张：

第一，世邦收购未获完成的根本原因是控股股东违反 4.28 协议第 2.3.1 条的规定，连绿庭置业与世邦之间就四季花城的 80%股权转让这个最基本的股权转让协议（"**80%股转协议**"）都不提供，导致转让手续无法开展（更无论完成）；

第二，根据 4.28 协议第 2.3.1 条的明确条文表述，世邦收购在 4.28 协议签署时已经进行，基于合约不容反悔的原则(contractual estoppel)和协定不容反悔原则（estoppel by convention），控股股东不能反悔称其在该条下仅有"安排"世邦收购的义务，而无视"收购"本身的重要性，也不能反称世邦收购尚未完成。即使在 4.28 协议签署时，世邦收购事实上因为四季花城增资工作尚未完成而未发生，不影响参股股东依赖第 2.3.1 条的清晰含义和效力，也即，为使控股股东完成其在该条下将四季花城 80%的股权最终转让至参股股东的义务（对此各方无争议），控股股东有完成世邦收购的责任；

第三，就被申请人提出的以下主张，即参股股东事实上知道 4.28 协议签署时，四季花城增资尚未完成，故其也知道彼时世邦收购尚未完成，申请人认为即使参股股东知道条文所写的概况并非事实，也不应影响合约不容反悔或协议不容反悔原则的应用，且本案的证据显示参股股东事实上并不知道在 4.28 协议签署时四季花城并未完成增资；

第四，就被申请人以 4.28 协议第 2.3.4 条为依据，称完成世邦收购是申请人的责任，申请人认为，4.28 协议第 2.3.4 条将需由参股股东主导并承担相关税费的范围限定在（a）因境内股权对价支付相关的转股手续（即绿洲科创将其在四季花城的 20%的股权转让给绿豪贸易）及所产生的税费和(b)因境外世邦托管安排及将世邦股权转让给喜盈国际和 Focus Town 的转股手续和产生的税费，而不包括世邦收购本身的转股手续或税费；

30

第五，根据专家意见，80%股转协议是完成世邦收购的根本性申请文件，而被申请人从未向申请人提供此文件。而对于被申请人主张世邦收购系因参股股东未向控股股东提供彼时在参股股东控制下的四季花城的审计报告及/或评估报告，从而令控股股东无法向相关政府机构提交"合理的股权转让价格"，而导致世邦收购未完成，申请人认为，基于专家意见，审计报告及/或评估报告仅会影响股权转让手续完成后（即商委审批和工商登记完成后）税务主管机关对转让价格适当性的评估和调整，不会影响转让效力本身。至于被申请人提出的参股股东负有承担世邦收购的税费责任，申请人认为此等税费由控股股东承担是 4.28 协议中应有之意，否则各方会在该协议中订明。

205. 就四季花城 20%的股权转让未获完成，被申请人主张是由于申请人拖延至 2011 年 3 月才指定绿豪贸易为 4.28 协议第 2.3.3 条下境内公司所致。申请人则主张，在绿洲科创在四季花城的持股比例降至 20%之前，即使申请人已经指定了境内公司，事实上也不能完成四季花城 20%的股权转让。

206. 被申请人主张，四季花城 80%和 20%股权的转让可以分开进行，因此，请仲裁庭分开考虑 80%和 20%股权转让的责任问题。被申请人亦提出，四季花城的控制权于 2009 年 11 月 15 日已完全交予申请人。

207. 被申请人认为，根据中国法律专家意见，四季花城 20%和 80%股权转让均须经过三个阶段的行政手续，即商务主管部门审批、工商变更登记、税务外汇等变更登记，其中季诺认为商务主管部门审批阶段已经涉及体现审计机构对审计报告和评估报告的要求，商务主管部门会将审计报告或评估报告作为重要参考，而季诺和叶永青均同意，奉贤区经济委员会公布的《外资企业股权转让的审批程序》中要求的"会计师事务所出具的企业上年度的审计报告"实践中各方应提供，且转股协议中通常应包含购买的股权的数额及其价格或计算方法。

208. 就 20%股权的转让，被申请人认为，由于 2009 年 11 月 15 日起申请人已实际控制四季花城，因此只有申请人才能使审计师/评估师对四季花城的资产作出转股前最新的审计/评估，但申请人一直未提供该等最新审计/评估，故无法得出合理的股权转让价格，缺乏该等，就无法拟备《股权转让协议》。因此，20%股权的转让未完成的责任在于申请人未履行其在 4.28 协议第 2.3.4 条项下的义务，促使四季花城准备最新的审计报告或评估报告，及时指定作为 20%股权受让人的境内企业，且在四季花城增资于 2011 年 7 月完成后（即绿洲科创在四季花城的股比降到 20%后），申请人仍未推进此部分转让。

31

209. 就 80%股权的转让，被申请人认为，这部分转让未获完成的关键在于绿庭置业向世邦转让其在四季花城的 80%的股权未获完成，而未完成的责任在于申请人。被申请人认为，根据 4.28 协议第 2.3.4 条的规定，绿庭置业向世邦转让其在四季花城 80%的股权属于"境外股权对价支付的其中一个步骤"，故被申请人对该转让仅有协助义务而无主导责任。申请人应负责此转让，包括拟备《股权转让协议》，而该协议也需要参考四季花城最新的审计报告或评估报告得出一个为主管机关接受的公允价格。同样，提供该审计报告或评估报告的责任在申请人。

210. 就在 4.28 协议签署时，申请人是否知道四季花城 80%的股权尚未转让给世邦，被申请人认为，证据资料表明申请清楚知道。而 4.28 协议第 2.3.1 条所写"绿洲投资…已经安排世邦公司收购了绿洲投资所持有之…四季花城 80%的股权"是一个笔误，若其彼时确实已完成该等收购，则此句应出现于 4.28 协议序言而非第 2.3.1 条，且该条第二句"该等股权收购完成后…"亦无必要。对此处，各方的真实意图是绿洲投资已安排了世邦去收购该 80%股权。

211. 就 80%股权转让的税费承担，被申请人主张该税费应由申请人承担，原因如下：第一，把四季花城 80%股权以迂回的途径转让给申请人设立的喜盈国际和 Focus Town 是为了替申请人省税；第二，申请人没有证据证明各方同意由被申请人来承担这 80%股权转让的税费；第三，各方定约时的意图是如果万一不能用 59 号文来帮助申请人省税，被申请人愿意考虑届时另行协商承担本应由申请人承担的一定比例的税费；第四，在 4.28 协议第 2.3.4 条下，也明确约定了"除此以外与股权对价支付有关的税收、费用的分担问题另行协商"；第五，申请人以合约不容反悔为由，主张既然 4.28 协议签署时四季花城 80%的股权已由绿庭置业转让给世邦，则相关税费当然由绿庭/世邦承担，与申请人无关，对此被申请人认为合约不容反悔在此不适用；第六，如仲裁庭认为这 80%股权转让的税费承担不涵盖在 4.28 协议第 2.3.4 条第二句下，则其应涵盖在该条第一句下。

**物业互换的完成**

212. 申请人主张，根据 4.28 协议第 3.1 条至第 3.3 条的约定，四季花城仅有义务将其开发的、位于协议中上海奉贤区指定地点的两幢 A2 型别墅在达到交易标准后转让给绿洲投资或控股股东指定的第三方，而该两幢 A2 型别墅的图纸建筑面积各约为 1200 平方米，且各方确认其作价共计为人民币 7200 万元。

213. 第一，对于何谓"图纸建筑面积"，申请人主张此即为上海奉贤区规划管理局批准的图纸所显示的建筑面积，而该图纸附于上海奉贤区规划管

32

理局于 2009 年 1 月 7 日（即四季花城仍在控股股东控制时）发出的《建设工程规划许可证》中，该许可证由控股股东移交参股股东，此后有关 A2 型别墅的建筑工程均依该图纸进行，图纸未经修改。基于上述原因，申请人主张，控股股东关于"图纸建筑面积"系指可销售面积或计容面积的说法不应被采纳。

214. 第二，对于 4.28 协议第 3.3 条约定的是将 A2 型别墅与九亭商铺做物业互换还是等价交换，申请人主张，各方约定为物业互换，即各方均同意将（i）九亭商铺和（ii）2 幢 A2 型别墅均作价为人民币 7200 万，由于两者价格相等，故此项对价相互抵消。因此，九亭商铺和 2 幢 A2 型别墅的市场价格与物业互换无关。

215. 申请人认为，由于控股股东无正当理由拒绝接受 A2 型别墅，也拒绝进行九亭商铺的转让，对参股股东造成严重损失（包括因参股股东没有对九亭商铺二期 2000 平方米的控制权而不能将此部分正常出租的租金损失）。

216. 被申请人认为，申请人提供的 A2 型别墅的地上面积只有各 600 多平方米，完全不符合 4.28 协议第 3.2 条要求各别墅的地上面积应有约 1200 平方米的要求。被申请人强调，4.28 协议本身未附任何图纸，控股股东在签署 4.28 协议前亦未有收到过显示每幢别墅合共建筑面积（含地上和地下建筑面积）约 1200 平方米的图纸。

217. 被申请人认为，4.28 协议第 3.2 条和第 3.3 条应理解为以 A2 型别墅与九亭商铺的价值均为人民币 7200 万元为出发点，即二者是做等价交换，而非物业互换。而要使两幢 A2 型别墅的估值达到共计人民币 7200 万元，以每平米人民币 31,500 元的单价计算，每幢别墅的地上面积必须各约 1200 平方米。被申请人主张"图纸建筑面积"一词在中国法律下没有特定的解释，需要根据协议各方在讨论和签署 4.28 协议时的具体情况去理解。

218. 被申请人认为，鉴于申请人提供的 A2 型别墅与 4.28 协议的要求不符，除非申请人 7 赔偿有缺陷的 A2 型别墅和被申请人应获得的别墅之间的差价（根据被申请人的计算为人民币 41,820,000 元），被申请人无义务接受该 A2 型别墅。而在此之前，被申请人亦无义务向申请人移交剩余 2000 平方米的控制权。

**债务清偿**

---

[7] 此处被申请人笔误写成"被申请人"。

219. 就债务清洁，申请人和被申请均就各方当事人有争议的债务清洁项目已在书面陈述中列出并表明其各自立场。

**VI. 申请人和被申请人的请求**

*申请人的请求*

220. 第一申请人和第二申请人均采纳同一份仲裁申请书。在该申请书的第 40 段，申请人列出以下请求：

   (1) 命令第一被申请人或被申请人促使绿庭地产与申请人或其指定的第三方签署一份有关九亭商铺的《上海市房地产买卖合同》并将九亭商铺的所有权转让给参股股东或其指定的第三方；（4.28 协议第 3.1 条）

   (2) 命令第一被申请人或被申请人促使其指定的第三方与四季花城签署 A2 型别墅的《上海市商品房预售合同》并完成有关的预售登记手续；（4.28 协议第 3.2 条）

   (3) 命令被申请人根据申请人的往来核对表（即仲裁申请书的附件一）（自裁决作出之日起的 4 周内）向申请人清结并支付有关四季花城与第一被申请人的债务；(4.28 协议第 3.6 条)

   (4) 命令第一被申请人安排及促使世邦公司收购第一被申请人的子公司绿庭置业所持有的四季花城 80%的股权；(4.28 协议第 2.3.1 条)[8]

   (5) 命令第一被申请人与参股股东（自裁决作出之日起的 2 周内）签署及促使其子公司绿庭置业共同签署有关世邦公司的股权购买权协议及托管协议；(4.28 协议第 2.3.1、2.3.2 条)[9]

   (6) 命令被申请人或第一被申请人促使绿洲科创转让其所持有的四季花城 20%的股权予绿豪贸易；[10]

---

[8] 世邦公司的董事会有四名董事，各方均有权任命两名董事。世邦公司的章程规定只要有两名董事签署决议即为有效。

[9] 按 4.28 协议的规定，应该是世邦公司收购四季花城的 80%股权后，由绿庭置业委托喜盈国际和 Focus Town 代世邦公司管理该 80%的股权。因此，托管协议应该由绿庭置业和喜盈国际及 Focus Town 签署。管理满 3 年之后，该 80%的股权以 1 元港币为对价从世邦公司转到喜盈国际和 Focus Town。有关股权购买权协议由绿洲投资与喜盈国际和 Focus Town 签署。

[10] 不需要有"第三方"字眼，因为申请人已经指定了绿豪贸易。

34

(7) 命令被申请人或第一被申请人促使绿庭地产清还有关九亭商铺全部抵押贷款或担保（包括利息）及解除九亭商铺现有的全部抵押担保；

(8) 作为（7）项的替换，命令被申请人赔偿申请人清还有关九亭商铺现有之全部抵押担保所需的总金额；[11]

(9) 命令被申请人支付回购股权现金对价的余款，即等值于人民币 1.5 亿的港币、并按 4.28 协议第 2.2.1（4）条调整后的最终金额。

## 被申请人方的反请求

221. 被申请人在其《答辩及反诉书》第 79-83 段，提出了四项反诉：

(A) 就股权对价的反诉

由于申请人的行为，股权对价未支付完成，被申请人的权益受到损害。被申请人要求仲裁庭裁定和/或宣告：

(1) 申请人违反 4.28 协议第 2.3.4 条；

(2) 申请人应立即办理世邦公司境外股权转让和绿豪贸易境内股权转让的相关手续（和/或促使相关手续的办理），包括但不限于：（i）对四季花城进行审计/评估以得出合理的股权转让价格；（ii）准备股权转让协议及其他相关交易文件以供被申请人阅览并且作为各方谈判的基础；（iii）联络相关政府审批机关获取审批需报送的材料，与被申请人沟通协调，并准备报送材料（在必要时向被申请人寻求协助）；（iv）向相关政府审批机关报送需审批的材料并按其需求补充材料（如有）；和（v）紧密关注审批过程并及时将更新的审批状况通知被申请人；

(3) 申请人应当共同和/或个别地承担世邦公司境外股权转让（即将四季花城 80%的股权从绿庭置业转让至世邦公司）所可能产生的任何税收和费用（包括但不限于世邦公司境外股权转让可能产生的中国税收费用）。或者，替代的，申请人应当与被申请人协商就世邦公司境外股权转让所可能产生的税收和费用（包括但不限于世邦公司境外股权转让可能产生的中国税收费用）的承担问题。

(B) 就九亭商铺与 A2 型别墅互换的反诉

---

[11] 2017 年 8 月 8 日开庭时，申请人称由于抵押已取消，第（g）、（h）两项已不需要了：誊本（第 9 天），26 页，22—27 行。

申请人欲交付给被申请人的两幢A2型别墅有缺陷，导致被申请人的权益受到损害。被申请人要求仲裁庭裁定和/或宣告：

(1)   申请人违反4.28协议第3.2条；

(2)   被申请人因申请人的违约遭受损失（包括但不限于价值的损失），有权获得赔偿金。申请人应共同和/或个别地赔偿被申请人遭受的损失。该损失的赔偿额有待评估。

(C)   就其他合约义务的债务清结的反诉

因为申请人提出不合理的要求，未能善意地与被申请人进行相关债权债务的清算，该清结未能完成。被申请人权益受到损害。被申请人要求仲裁庭裁定和/或宣告：

(1)   申请人违反4.28协议第3.6条

(2)   申请人应依据（i）被申请人编制的《花城房产往来款核对明细表第四稿》为基础；或者（ii）其他仲裁庭认为适当的基础，完成债权债务的清结。

(D)   就现金对价的反诉

申请人的行为导致第三期付款的部分先决条件不成就，被申请人的权益受到损害。被申请人要求仲裁庭裁定和/或宣告：

(1)   申请人违反4.28协议第2.3.4、2.1.3、2.2.1（4）和/或3.2条；

(2)   在第三期付款的先决条件全部满足（包括以上 A（2）和 A（3）段的诉求均实现以及4.28协议第2.2.1(3)条(e)项规定的的九亭商铺与A2别墅互换完成）的前提下，申请人才应当支付调整后的第三期付款。

(3)   作为第三期付款的调整，被申请人可从第三期付款中扣除或冲抵（i）世邦境外股权转让可能产生的任何税收和费用（包括世邦境外股权转让可能产生的中国税收费用）；和/或（ii）B（2）诉求的损失赔偿金额；

(4)   替代的，被申请人可从被裁定应支付申请人的款项中扣除或冲抵（i）世邦境外股权转让可能产生的任何税收和费用（包括世邦境外股权转让可能产生的中国税收费用）；和/或（ii）B（2）诉求的损失赔偿金额。

36

222. 被申请人的反诉请求建立在申请人是违约方的基础上。鉴于仲裁庭对此案的争议问题的分析和裁定，仲裁庭认为违反 4.28 协议的一方是被申请人。因此，被申请人的反诉请求均被驳回。

**VII. 仲裁庭的分析和理由**

223. 仲裁庭在仔细审阅并评估各方提供的证据、证人证词以及书面陈述书等文件后，做出以下分析。

**股权对价（四季花城股权的转让）**

224. 4.28 协议是控股股东和参股股东从 2009 年开始协商股权回购事宜的延续-见 4.28 协议引言的第 1 点：

"鉴于：1.控股股东和参股股东已与 2009 年 3 月 24 日作出股份重组的《股东会决议》[D3/607]，并于 2009 年 9 月 4 日签署了《会议纪要》[D2/615-616]，2009 年 11 月 9 日签署了《股份重组初步协议》（"**重组协议**"）[D2/622-625]。上述三份文件就绿洲投资回购参股股东持有的公司股份事宜确定了基本原则及交易架构。"

225. 4.28 协议引言的第 3 点阐明了协议的目的：

226. "鉴于：3.为解决股份回购中的具体问题，尽快完成《重组协议》所约定的各项交易，降低合资成本和时间成本，各方一直同意签署本协议，以明确回购价格、支付期限、支付方式及与此相关的其他问题。"

227. 有鉴于此，仲裁庭认为，各方签署 4.28 协议的主要目的是为了尽快完成《重组协议》所约定的各项交易。

228. 仲裁庭认为若 4.28 协议的内容有遗漏或模糊之处，可以参考上述三份文件的内容。事实上，4.28 协议的第 4.1 条也对此作了明确表述：

"本协议未涉及事项，以《重组协议》的约定为准。《重组协议》及本协议均未涉及的，由各方通过友好协商另行签订补充协议，补充协议与本协议有同等效力。"

229. 4.28 协议的第一条规定了"回购前的股权转让"。第 1.1 条明确了两个步骤：（1）柯铮光先生将其持有的绿洲投资股权转让于喜盈国际，徐宏标先生将其持有的绿洲投资股权转让于 Focus Town；（2）由绿洲投资回购喜盈国际和 Focus Town 分别持有的绿洲投资股权。第 1.2 条也明确了上述回购前股权转让的税收及其费用由参股股东承担。

230. 各方没有争议的是，第一条的回购前的股权转让已完成。

231. 4.28 协议第二条规定的是"绿洲投资回购对价",也即是现金对价。各方没有争议的是,绿洲投资回购对价的现金支付部分为等值于人民币 2.5 亿元的外汇("现金对价"):(第 2.1 条)。各方也同意,在实际支付时,现金对价的金额应作如下调整:

"2.1.1 现金对价中应扣除应由参股股东承担的历史遗留往来款人民币 4100 余万元;[12]

2.1.2 现金对价中应增加绿洲投资及控股股东愿意有条件支付的一次性额外补偿人民币 3000 万元("**额外补偿**")。该项额外补偿的支付条件为《重组协议》及本协议项下的绿洲投资股份回购及对价支付已经完成,双方对此无重大争议。

2.1.3 各方同意,在本协议签署后,涉及相关股权对价支付等相关事宜,需要调整现金对价的支付金额时,各方将另行签署补充协议。

2.1.4 各方同意,回购对价之现金部分应在香港以港币分成二等份并按下款(第 2.2 条)确定之时间,及时足额分别支付于参股股东所提供之喜盈国际和 Focus Town Limited 的银行账户。"

232. 第 2.2 条规定的是现金对价的支付条件和支付期限(第 2.2.1 条)。各方同意,回购对价现金部分支付时间如下:

"(1)相当于人民币 8 千万元的港币("**第一期付款**")…

(2)相当于人民币 2 千万元的港币("**第二期付款**"),于 2011 年 6 月 30 日前支付。[13]

(3)余款相当于人民币 1 亿 5 千万元的港币("**第三期付款**"),最终金额为根据下述第(4)项之规定,由各方另行同意或确认的调整后金额为准,在下列先决条件获得满足后的前提下于 2012 年 12 月 31 日前支付:

    (a)    四季花城股权转让的政府审批及登记手续已经完成;

    (b)    绿洲投资已经完成回购参股股东股权所必需的股东变更登记手续 [14]

---

[12] 这笔 4,100 余万元的款项在 2010 年 2 月 3 日的会议纪要中(D2/723)曾被提到。

[13] 第一和第二期付款已付。

[14] 已经完成。

(c) 参股股东与控股股东已经就前述第 2.1 款规定的现金对价支付安排及各项调整金额达成协议；

(d) 参股股东确认下述第 2.3.5 款规定的股权对价支付已经完成且各方对此无争议；

(e) 第 3.1 款所述之《上海市房地产买卖合同》及第 3.2 款所述之《上海市房地产预售合同》已经签署并完成在房地产登记机关的过户或预售登记手续。

(4) 现金对价之金额调整。各方同意，在支付第三期付款前，各方应根据如下各款之约定，计算并确定现金对价的调整金额，并以调整后之金额作为第三期付款的最终金额：

(a) 按照《重组协议》及本协议的约定，绿洲投资及控股股东应以四季花城 100%的股权作为股份回购的对价的一部分（"**股权对价**"）。如因任何法律法规要求该等股权转让必须标明股权转让价款并且须实际支付时，则参股股东因此向绿洲投资及控股股东实际支付的股权转让价款（扣除税费后的净额）部分应增加至现金对价中；

1. 仲裁庭认为，上述第（a）款应解读为如有任何法律法规要求被申请人将四季花城 100%股权转让给申请人时必须附有一个固定的价格，而该要求导致申请人将不得不为上述股权转让向被申请人实际支付金额，则该等实际支付金额（扣除其所引发的税款后）应加入到被申请人理应支付申请人的现金对价中。其隐含之意是，若各方为必需为四季花城股权转让定一个价格，则申请人应负担任何税款。

(b) 上述第 2.1.1 款及 2.1.2 款所约定之款项分担应反映在第三期付款的最终金额中；

2. 仲裁庭认为，根据第 2.1.1 条，申请人应负担人民币 41,224,613.21 元[15]的总额，而根据第 2.1.2 条，申请人理应从被申请人处收到人民币 3000 万。两者相抵，则申请人将仅需负担人民币 11,224,613.21 元，而该笔金额将从第三期付款（即人民币 1.5 亿）中扣除。

---

[15] LYP-1 [D1/253]; LYP-2 [D3/1199]。

39

(c)　根据本协议<u>其他条款</u>约定应由各方承担的<u>税费分担</u>应反映在第三期付款的最终金额中。

3.　仲裁庭认为，这意味着第三期付款必须参照各方根据 4.28 协议下的其他条款需要承担的税负做出调整。该等其他条款包括，比如，第 2.3.4 条。该条规定，因<u>境内</u>股权对价支付所产生的税收、费用，以及<u>境外</u>世邦公司托管安排及股权转让给喜盈国际和 Focus Town 的税收、费用由参股股东承担。除此之外的与股权对价支付有关的<u>税收、费用的分担</u>问题，由各方届时另行协商。因境内及境外股权对价支付相关的股权转让手续，即申请、登记、政府手续等项事宜均由参股股东负责办理，控股股东、绿洲投资提供必要的协助。基于上述理由，仲裁庭认为该第 2.3.4 条不适用于本案。

233.　综合以上的分析，第三期付款支付的最终金额应该以人民币 1.5 亿元作为基数，按照第 2.2.1（4）条件作出调整。

234.　至于第三期付款的支付的期限，第 2.2.1（3）款规定了 2012 年 12 月 31 日，但同时也必须满足第（a）至（e）项的先决条件。

235.　双方没有争议的是，先决条件（b）已满足。

236.　至于先决条件（a），各方指责对方是该先决条件未获满足的根源。因此，仲裁庭必须对这个问题作出裁决。

237.　至于先决条件（c），双方对第 2.1 款规定的现金对价支付安排已达成协议，但对各项调整金额没有达成协议。因此，仲裁庭必须对这个问题作出裁决。

238.　至于先决条件（d），双方对第 2.3.5 款规定的股权对价支付已经完成且各方对此无争议没有达成协议。因此，仲裁庭必须对这个问题作出裁决。

239.　至于先决条件（e），双方对于第 3.1 款和第 3.2 款所述的合同没有签署的原因持有不同的意见。因此，仲裁庭必须对这个问题作出裁决。

240.　就先决条件（a）（即四季花城股权转让的政府审批及登记手续已经完成），仲裁庭首先分析 4.28 协议第 2.3 款的内容。第 2.3 款规定股权对价的支付方式：

"根据《重组协议》，绿洲投资回购对价中股权部分以[四季花城]100%的股权计付（"**股权对价**"）。"

241. 股权对价的支付方式包括了境外和境内两部分。境外的部分由第 2.3.1 款和第 2.3.2 款规定，境内部分则由第 2.3.3 款规定。

242. 第 2.3.1 款规定：

"绿洲投资已在香港<u>设立了世邦公司，并已经安排世邦公司收购了</u>绿洲投资香港子公司绿庭置业所持有之四季花城 80%的股权。该等股权收购完成后，绿洲投资应与喜盈国际和 Focus Town Limited 签署一份《股权购买权协议》，约定在第 2.3.2 款约定的托管期限届满后，将世邦公司100%的股权以港币一元对价转让给喜盈国际和 Focus Town Limited。"（下划线后加）

243. 第 2.3.2 款规定：

"各方约定：绿洲投资在...《股权购买权协议》签署后，由绿庭置业与喜盈国际和 Focus Town Limited 签署相关托管协议，该协议约定：（1）喜盈国际和 Focus Town Limited 受绿庭置业委托管理世邦公司并代为行事股东权利三年（"**托管期限**"）；（2）托管期限内世邦公司或四季花城的所有债权债务、责任与风险均由参股股东承担。如因任何原因导致控股股东、绿洲投资或绿庭置业需承担世邦公司或四季花城在托管期间的债权债务、风险或责任时，参股股东需向控股股东、绿洲投资或绿庭置业提供全额补偿。"

244. 第 2.3.3 款规定：

"四季花城目前由绿洲投资下属绿洲科创生态有限公司持有的另外 20%股权转让予参股股东指定的一家中国国内企业（"**境内股权对家支付**"）。如按照中国法律规定，该等股权转让需实际支付对价时，按照前述第 2.2.1(4)(a)款的规定处理。"

245. 关于第 2.3.1 至 2.3.3 条，仲裁庭认为，有关四季花城的转让包括以下三个需要履行的步骤：

(1) **首先**，由绿洲投资成立的世邦公司收购绿庭置业持有的四季花城80%股权（简称为"**80%股权转让第一步**"）。第 2.3.1 条明确表述，绿洲投资已<u>在香港设立了世邦公司，并已经安排世邦公司收购了绿庭置业所持有之四季花城 80%的股权</u>。换句话说，80%股权转让第一步在 4.28 协议签署时已经完成。但是事实上，这第一步还未完成。

41

(2) **其次**，由绿洲投资把世邦公司的股权转让给第一及第二申请人分别拥有的喜盈国际和 Focus Town（简称为 "**80%股权转让第二步**"）。

(3) 在 80%股权转让第一步之后和 80%股权转让第二步之前，4.28 协议还约定参股股东和控股股东需要签署两份协议：一份是由绿洲投资与喜盈国际和Focus Town 签署的《股权购买权协议》；另一份是由绿庭置业与喜盈国际和Focus Town 签署的相关托管协议。

(4) 至于四季花城另外的 20%股权，则是由绿洲科创转让给参股股东指定的一家中国国内企业（简称为 "**20%股权转让**"）。根据第2.3.3 条，参股股东指定的中国国内企业是绿泰贸易。根据第2.3.3条，参股股东在 2011 年 3 月 15 日的信函中指定绿泰贸易为四季花城20%股权的受让方 [D3/901-903]。

246. 从第 2.3.4 条的内容清晰可见，此条文针对的是 80%股权转让第二步（即境外世邦公司托管安排及股权转让给喜盈国际和 Focus Town）和 20%股权转让（即境内股权对价支付）的手续和税务责任问题。此条文并不涵盖 80%股权转让第一步（即世邦公司收购绿庭置业持有的四季花城 80%的股权）。这是因为根据第 2.3.1 条，被申请人明确确定绿洲投资在 4.28协议签署时已经完成 80%股权转让第一步。换句话说，绿洲投资履行80%股权转让第一步的责任并不在第 2.3.4 条的范围内。

247. 关于四季花城的股权转让还有一段小插曲。绿洲投资是透过其两家子公司持有四季花城100%的股权：绿庭置业持有69%，绿洲科创持有31%。为了符合 4.28 协议的约定，四季花城必须增资，让绿庭置业增加其股份比例至 80%，绿洲科创降低其股份比例至 20%。

248. 2009 年 11 月 12 日，绿庭置业和绿洲科创签署了协议书 [D2/628-629]，就四季花城增加注册资本事宜达成协议。在该协议下，双方通过绿洲科创放弃新增注册资本的有限认缴权及绿庭置业单方增资，把双方的股权比例调整至 80%：20%。在同一天，四季花城也通过了董事会决议 [D2/631-632]，反映了上述股权调整。

249. 上海市商务委于 2009 年 12 月 21 日同意并批复了四季花城的增资[D2/705-706]。不过，国家外汇管理局上海市分局于 2010 年 3 月 23 日出具了不予行政许可决定书 [D2/728]。

250. 增资申请最终于 2011 年 7 月 27 日获批 [D3/980]，对此，双方没有争议。

251. 双方对于证据中的两份审计报告是否是四季花城股权转让的第一阶段审批过程中必须呈交的文件有不同的解释和立场。第一份审计报告 [D2/729]

是上海旭日会计师事务所于 2010 年 4 月 14 日作出。另一份审计报告 [D2/766-781]是 Crowe Howarth 浩华于 2010 年 4 月 28 日作出。

252. 第一申请人的主张是：证据显示申请人提供该两份审计报告给予被申请人是作为增资或清结所用的 [D1/255，257 第五点 – 季毓平之证人证言附加 LYP-3《关于四季花城与绿洲投资及其下属公司之间债务债权清结问题》]。

253. 被申请人则主张，这两份审计报告支持了被申请人的观点，即：申请人必须聘请评估师对四季花城的 100%股权价值进行评估，并提供四季花城 2016 年度审计报告给被申请人审阅。

254. 综上，仲裁庭认为第一申请人对该两份审计报告的解释较为有说服力，并且在时间节点上与增资申请最后获批的日期（即 2011 年 7 月 27 日）吻合。因此，仲裁庭支持第一申请人的主张。

### 各方专家证人（马贝艺、叶永青和季诺）的专家意见 – 四季花城股权转让需进行的审批步骤

255. 关于股权对价的问题，各方均传召了中国法律专家证人对审批程序，审批所需文件及税费问题作出专家报告。第一申请人的专家证人是马贝艺；第二申请人的专家证人是叶永青；被申请人的专家证人是季诺。

256. 三位专家证人对于股权转让问题所出具的联合意见（"《**联合意见**》"）在 C/438。在《联合意见》的第 6 段，三位专家指出，四季花城是一家根据《中华人民共和国中外合资经营企业法》设立的中外合资经营企业，股东有两名：绿庭置业（香港公司，占 80%股权）和绿洲科创（中国公司，占 20%股权）。

257. 三位专家在《联合意见》的第 8 段指出，《中外合资经营企业法实施条例》适用于四季花城股权转让。该条例的第二十条第一款规定："合营一方向第三方转让其全部或者部分股权的，须经合营他方同意，并报审批机构批准，向登记管理机构办理变更登记手续。"《外商投资企业投资者股权变更的若干规定》第三条也规定："企业投资者股权变更应遵守中国有关法律法规，并按照本规定经审批机关批准和登记机关变更登记。未经审批机关批准的股权变更无效。"因此，作为中外合资经营企业，四季花城的两项股权转让均应取得审批机关的批准，并进而向登记机关办理相应的变更登记手续。

258. 三位专家在《联合意见》的第 9 段指出，四季花城股权转让需经历三阶段行政手续：（1）在收集并准备齐全法律规定的文件后，由合营企业提交申请文件，报经审批机关批准股权转让。考虑到四季花城的总投资额

43

及从事的产业类型，其股权转让的具体审批由上海地方商务主管部门负责；（2）取得批准后，合营企业需向登记管理机构，即上海地方工商部门办理变更登记；以及（3）合营企业根据相关法律法规的要求进一步办理税务、外汇等方面的变更登记。

259. 关于第一个阶段（四季花城应向商务部门提交申请文件进行审批），三位专家在《联合意见》的第 10 段列明了四季花城作为股权转让审批的申请人需向审批机关提交的申请文件，这里无需赘述。并且，《联合意见》第 12 段提及了各方在文件准备方面的分工。

260. 关于第二个阶段（四季花城应向工商部门申请变更登记），三位专家在《联合意见》的第 15 段列明了应提交的文件，这里也无需赘述。三位专家同意，工商部门收取的变更文件与第一个阶段报商务部门的申请文件类似。各专家又在《联合意见》的第 36-38 段补充了他们的意见。

261. 关于第三个阶段（四季花城进一步办理税务、外汇等方面的变更登记），三位专家一致同意工商变更登记完成后，合营企业即可基于股权转让审批和变更登记结果具体办理本企业的税务、外汇等变更登记手续。

262. 在《联合意见》的第 19、20 段，三位专家一致同意，就四季花城股权转让的审批（即上述第一个阶段），以目前看到的转让方和受让方已准备好的材料（于下列出）尚不足以办理四季花城的审批和登记：

    (1) 绿庭置业的股东已出具日期为 2011 年 11 月 21 日的《香港绿庭置业有限公司股东会决议》，同意将其所持有的四季花城 80%的股权转让给世邦公司，绿洲科创向绿豪贸易转让其所持有的四季花城 20%股权时，放弃绿庭置业的优先受让权。

    (2) 绿洲科创的股东已出具日期为 2011 年 11 月 21 日的《香港绿洲科创生态科技有限公司股东会决议》，同意将其所持有的四季花城 20%的股权转让给绿豪贸易，并在绿庭置业向世邦公司转让其所持有的四季花城 80%股权时，放弃绿庭置业的优先受让权。

    (3) 绿庭置业的股东已出具的《香港绿庭置业有限公司股东会决议》，同意将其所持有的 50%股权以一美元的价格转让给喜盈国际，另 50%股权以一美元的价格转让给 Focus Town。

263. 三位专家就下述两个问题未达成一致意见：

    (1) 关于四季花城股权转让的审批权属于市商委还是奉贤区经委？

(2) 关于在股权转让审批环节是否需要提交四季花城的审计报告或评估报告？

264. 在第（1）个问题上，马贝艺认为，四季花城属于外商投资房地产开发、经营企业，其股权转让的审批机关是市商务委。季诺则认为，在《外商投资产业指导目录》（2015年修订稿）实施日（2015年4月10日）之前，四季花城股权转让审批权属于上海市级地方商务主管部门，在2015年4月10日后属于区级（奉贤）地方商务主管部门。叶永青则认为，由于本次股权转让交易本应发生在2015年4月10日即变更审批主体之前，故奉贤区商务主管部门并非本次股权转让的主管机关。

265. 在第（2）个问题上，马贝艺认为，没有任何资料表明评估报告与申请股权转让审批、办理变更登记等行政手续有关，因此，评估报告不属于合营企业需要准备的申请文件。至于审计报告，则是因为奉贤区经委网站显示，向其申请办理股权转让审批需要提供会计师事务所出具的合营企业上年度审计报告。马贝艺认为，该项要求不会构成合营企业申请股权转让审批的障碍，亦不属于合营企业必须准备的申请文件。叶永青认为，对于四季花城审计报告是否必须提供及由谁来负责准备的问题，一方面，《外商投资企业股权变更规定》未明文规定需提交审计报告，而考虑到四季花城的总投资额及其从事的产业类型，其股权转让的具体审批有上海地方商务主管部门负责，上海市商务部门公开的办事指南中的文件清单也不包括审计报告。另一方面，由于本次股权转让交易本应发生在2015年4月10日即变更审批主体之前，故奉贤区商务主管部门并非本次股权转让的主管机关，其文件要求并不构成商委审批的实质障碍。此外，叶永青认为，实践中上海市商务部门并无要求提供审计报告或评估报告的惯例，企业提交上一年度或最近月份的财务报表即可。因此，即使根据奉贤区商务主管部门的要求需要提交审计报告，实践中企业也往往可以提交上一年度或最近月份的财务报表替代。另外，对于是否需对四季花城进行评估，叶永青认为，评估对于本次股权转让取得商务审批和工商、税务变更登记并无影响，仅在绿庭置业进行纳税申报而税务机关质疑该股权转让价格时可能需要。特别是，在完成商委审批和工商变更后四季花城的股权就已经实现转让，工商变更完成后四季花城的股权将会变更到世邦公司的名下，后续税务程序虽然是世邦公司收购需要完成的程序，但并不会影响股权转让的实现。而评估作为后续税务机关确定股权转让价格的可能方式之一，税务机关还可以根据股权转让协议中的约定价格、四季花城的净资产价格、绿庭置业账面的长期股权投资金额、或四季花城的注册资本金额等来确定股权转让价格，而上述价格或金额均是可以获得的信息。所以叶永青认为，在中国税收法律法规和地方性法规都没有明文规定的前提下，对四季花城进行评估并不是完成股权转让的必要流程。

45

266. 季诺认为,奉贤区商务主管部门是本案四季花城股权转让的审批主体,其网上公示的文件清单中明确要求审计报告,四季花城应当满足这一要求。(关于本次股权转让交易应当在什么时点发生、以及如果未按时发生的后果由哪一方承担,应由仲裁庭决定,季诺不在专家意见中讨论。)实践中,审批机关往往会要求合营企业提供审计报告或评估报告,作为审查股权转让价格合理性的重要参考(例如,当约定的价格显著偏离审计报告等材料所反映的情况,可能构成取得批准的障碍)。季诺认为,根据上述分析,本案中,审计报告应当在审批环节予以准备,而审计报告的编制需以合营企业(即四季花城)提供的财务资料为基础,因此一般应有四季花城负责准备。如果四季花城未能提供审计报告,很可能构成取得批准的障碍。至于审批机关对于审计报告的形式、内容上有否特定要求,以及是否可以用其他类似文件(如评估报告、未审计的财务报表等)替代审计报告等问题,则取决于审批机关根据个案具体情况作出的裁量。

267. 仲裁庭认为:(1)关于四季花城股权转让的审批权属于哪个主管机构这一问题,应该从提交审批申请的时间点来看。三位专家均同意,在 2015 年 4 月 10 日之后,审批权属于上海奉贤区的商务主管部门。但是,4.28 协议是在 2010 年 4 月底就已经签署,而各方在第 2.2.1(3)条中的共识是余款应该在 2012 年 12 月 31 日前(在先决条件得以满足的前提下)支付。也即是说,各方认为 4.28 协议的先决条件应该可以在 2 年 8 个月内全部满足。因此,仲裁庭认为关键的时间点是在 2015 年 4 月 10 日之前,而当时的审批机关是市商务委,而非奉贤区商务主管部门。

268. 至于审计报告或评估报告,仲裁庭接受申请人的专家证人马贝艺和叶永青的意见,即:审计报告或评估报告在申请股权转让审批的环节是不需要的。而且,该问题与判定哪一方违约的问题其实是无关的。因为股权转让的第一步,即世邦公司收购绿庭置业所持有的四季花城 80%的股权都尚未完成,因此谈不上审批所需的文件。

269. 在仲裁程序启动之时(即 2013 年 2 月 22 日),双方连第一个阶段(四季花城向商务部门提交申请文件进行审批)都尚未开始,其原因何在?控股股东和参股股东都互相把矛头指向对方,指称对方没有负起其应负的责任。然而,一个不争的事实是,控股股东始终未履行 4.28 协议的第 2.3.1 条下的合同义务,安排世邦公司收购绿庭置业所持有的四季花城 80%的股权。这导致四季花城的股权转让无法完成,更别谈先决条件之一(即 4.28 协议中第 2.2.1(3)(a)条下规定的先决条件)的四季花城的股权转让审批及登记手续的完成了。

270. 证据显示,控股股东的律师(君和律师事务所的陶旭东律师)于 2010 年 5 月 13 日发电子邮件给参股股东的律师(金杜律师事务所的 Jeremy

Wong/黄俊杰律师），提及四季花城股权转让的一些法律问题，并要求通过电话会议讨论[D2/826]。同日，金杜回复电子邮件给君和，提及其从徐宏标处收到了《股权购买权协议》和《托管协议》的中文稿，对其有一些想法，并同意电话讨论[D2/825]。2010 年 5 月 24 日，金杜向君和发电子邮件，附上其对《股权购买权协议》和《托管协议》的修改建议，同时也提醒控股股东确保绿洲科创持有的四季花城 20%股权也应按4.28 协议第 2.3.3 条同时转让。邮件中还提到金杜现正草拟《世邦公司股权质押协议》及《世邦公司股东投票权代理协议》以配合上述两份协议的操作；待协议草拟完成，即发送给君和审阅[D2/824]。2010 年 6 月 1日，君和发电子邮件给金杜询问何时能提供股权质押协议及投票权代理协议的文本，并说希望在看到所有文本后一并向金杜反馈意见[D2/830]。2010 年 6 月 9 日，金杜发电子邮件给君和，附上草拟的《股东投票权代理契约》及《股权质押契约》供君和审阅并给予反馈意见[D2/829]。2010 年 8 月 31 日，金杜发电子邮件给君和，指出其于 2010 年6 月 9 日传阅《股东投票权代理契约》及《股权质押契约》草稿后，并未接获君和的反馈意见，并要求赐复[D2/829]。然而，根据徐宏标之证人陈述书第 23 段[B/14]，有迹象显示的是，绿洲投资及控股股东至今未有交还其已签署的《股权购买权协议》及/或《托管协议》，或就其内容向参股股东作出任何回复或提出任何意见。

271. 综上，仲裁庭认为控股股东违约。

272. 三位专家证人均同意，在第一阶段中，四季花城作为股权转让审批的申请人，需向审批机关提交若干文件（见《联合意见》第10-13段）。其中非常关键的一份文件是四季花城 80%及 20%的股权转让协议。在《联合意见》第29-35段中，三位专家证人发表了各自不同的意见。其中，季诺认为，股权转让协议和办理审批、登记所需要其他文件一样，都是不可或缺的申请文件之一。任何股权转让都必须以相关各方达成合意为前提。但是，与一般的股权转让相比，本案情况特殊。如果四季花城的实际控制权和各项证照、公章都已在股权转让发生前由被申请人移交给了申请人，那么股权转让的审批和登记不仅仅取决于转让的直接当事方即绿庭置业、绿洲科创、世邦公司以及绿素公司，还也取决于申请人是否认可该等股权转让，尤其是价格等关键条款，因为申请人已实际控制四季花城，并且对世邦公司并非完全无控制。如果四季花城的实际控制方不认可股权转让的条款和条件（特别是价格条款），即使各方签署了股权转让协议，四季花城也可以拒绝或消极推进审批和登记申请。另一方面，审批机关可能会考虑股权转让对价的合理性并通常要求企业提供审计报告。因此，谨慎起见，股权转让协议的订立需要合营企业（即四季花城）配合提供审计报告等材料供各方确定协议具体内容时参考。

273. 仲裁庭考虑了被申请人专家的意见后，认为被申请人专家的意见具有极大的猜测性。由于 1.5 亿港币（第三期付款）只能在若干先决条件得以满足后才支付给申请人，而其中一项先决条件是四季花城股权转让的政府审批及登记手续已经完成，申请人显然没有理由拒绝或消极推进审批和登记申请。因此，仲裁庭不予支持被申请人专家的意见。仲裁庭认为，被申请人完全可以其控制的绿庭置业和绿洲科创的名义准备股权转让协议供世邦公司和绿豪贸易审阅，但是被申请人完全没有推动这个过程，反而以各种理由推搪。

274. 综上，仲裁庭认为被申请人明显违反了 4.28 协议的第 2.3.1、2.3.2 及 2.3.3 条的合同义务。

275. 关于审计报告这一问题，各方在开庭时（尤其是在 2017 年 8 月 8 日结案口头陈词当天）一致同意在目前这个阶段（而非在仲裁启动时），已经有必要提交最新的四季花城的审计报告给审批单位，作为审批过程审阅的文件之一：卷本(第 9 天)，32 页，28-29 行。

**各方专家证人的专家意见 - 关于税费问题的意见**[C/451-454]

276. 三位专家对股权转让在中国法律下可能产生的纳税义务达成一致意见如下：

   (1)   按照中国税法，绿庭置业作为世邦收购的股权转让方是企业所得税的纳税主体，但对于该笔税负经济上的实际承担，中国法律不禁止交易当事人自行约定；

   (2)   绿庭置业缴纳企业所得税的计税基础，有两种处理方式；

   (3)   实践中，主管税务机关对 59 号文（即《关于企业重组业务企业所得税处理若干问题的通知》)中各项条件的审查较为严格，特殊性税务处理在本案中使用的可能性较小；

   (4)   股权转让方及受让方有义务缴纳印花税。

277. 至于 4.28 协议的第 2.3.4 条中的"除此以外的与股权对价支付有关的税收、费用的分摊问题，由各方解释另行协商"的约定，仲裁庭认为，该段文字的意思应由仲裁庭按香港法（合同的实体法）来诠释，专家们的意见对于该问题并无帮助。

278. 4.28 协议第 2.3.4 条第一句的前一半是："因境内股权对价支付所产生的税收、费用…由参股股东承担"。这里指的是绿洲科创把四季花城的 20%股权转给绿豪贸易所产生的税收和费用。双方对此没有争议。

48

279. 4.28 协议第 2.3.4 条第一句的后一半是："境外世邦公司托管安排及股权转让给喜盈公司和 Focus Town Limited 的税收、费用…由参股股东承担"。这句话的意思也是清晰的。

280. 4.28 协议第 2.3.4 条第二句是："除此以外的与股权对价支付有关的税收、费用的分担问题，由各方届时另行协商。"[下划线后加]

281. 双方对于与绿庭置业把四季花城的 80%股权转让给世邦公司有关的税费有争议。被申请人的立场是，第一句只包含了绿洲科创把四季花城的 20%股权转给绿素贸易以及世邦公司与喜盈公司和 Focus Town 的托管协议，但不包含绿庭置业把四季花城的 80%股权转给世邦公司的协议。申请人的立场则是：由于 4.28 协议第 2.3.1 条中已清楚地表明了绿洲投资已在香港新设立了世邦公司，并已经安排世邦公司收购了绿洲投资香港子公司绿庭置业所持有之四季花城 80%的股权，因此该交易不应被视为"除此以外"的情况，也不构成双方另行协商的情况。仲裁庭同意申请人的观点。

282. 关于三位专家证人一致意见第（二）点（即"绿庭置业缴纳企业所得税的计税基础"），仲裁庭认为，《59 号文》的运用和诠释与 4.28 协议的解释没有直接的关系。根据俞乃奋的证人证词第 29 段中提到，各方当时并没有探讨如果世邦境外股权转让按《59 号文》享受"特殊性税务处理"，该交易所产生《59 号文》下的税款由谁承担[B/46]。第一申请人的证供否认申请人在签订 4.28 协议时曾与控股股东探讨《59 号文》的"特殊处理"（见徐 [B/100, §§12-15]）。无论是申请人还是被申请人，立场都是各方在签订 4.28 协议的时候，并没有讨论《59 号文》下税负由谁承担的问题。因此，仲裁庭认为无须对该问题做出解释。况且，仲裁庭已经对 4.28 协议的第 2.3.1 条作出了了解，因此没有必要再探讨《59 号文》是否适用。

**<u>物业互换（九亭商铺和 A2 型别墅的互换）</u>**

283. 涉及物业互换的条款为 4.28 协议的第三条"与绿洲投资回购及回购对价的其他约定"：

*"3.1 本协议签署后 30 日内，绿洲投资和控股股东应指定其子公司上海绿庭房地产开发有限公司与参股股东或其指定第三方签署《上海市房地产买卖合同》，约定由绿庭房地产公司将已达到交易条件的松江区九亭绿庭尚诚房产项目商业用房约 8000 平方米（具体包括绿庭尚诚一期沿街三层商业用房约6000 平方米和二期中心广场西侧全部商业用房约2000 平方米）转让给参股股东或其指定的第三方。为避免歧义，（1）在《上海市房地产买卖合同》签署的同时，绿洲投资及控股股东应将该等商业用*

49

*房的使用权交付给参股股东或其指定的第三方，交付使用后的租金或其他收益归参股股东或其指定的第三方；（2）2011 年 6 月 30 日之前，绿洲投资及控股股东应将该等商业用房的所有权转移给参股股东或其指定的第三方。*

*3.2　在上述第3.1款所述之《上海市房地产买卖合同》签署同时，四季花城将与绿洲投资或控股股东制定的第三方签署《别墅定制合同》，将其开发的、位于上海奉贤区奉浦工业区半岛名墅项目中的中心岛 A2 型别墅 2 幢(图纸建筑面积各约 1200 平方米，绿洲投资和控股股东已收到该图纸并知晓其交房标准，确认其实际价格为下述价格) 在达到交房标准后转让与（予）绿洲投资或控股股东指定的第三方。为避免歧义，参股股东应促使四季花城于 2011 年 6 月 30 日与绿洲投资或控股股东指定的第三方签订《上海市房地产预售合同》并完成该等别墅的预售登记手续；*

*3.3　各方确认：上述《上海市房地产买卖合同》及《别墅定制合同》所涉之房屋的价值均作价[16]为 7200 万元。由于两者价格相等，为本协议之目的，此项对价视为相互抵消（无论其财务方面是否能做抵消论处），但双方约定不再实际支付。"*

284.　4.28 协议第 3.2 条约定，A2 型别墅的"图纸建筑面积各约 1200 平方米，绿洲投资和控股股东已收到该图纸并知晓其交房标准，确认其实际价格为下述价格"。"下述价格"是指第 3.3 条内的人民币 7200 万元。

285.　申请人指出，上述建筑图纸是在四季花城仍在控股股东的控制下时制定及获政府批准，并在控股股东知晓及授权下进行及完成。而且图纸一直由控股股东保管及控制，直至 2009 年 11 月 18 日才跟其他文件一起移交于参股股东。根据上海市奉贤规划管理局于 2012 年 1 月 15 日颁发之 A2 型别墅的《建设工程竣工规划验收合格证》，当中载明的建筑面积比原先的图纸建筑面积还要大。

286.　再者，即使建筑图纸与 4.28 协议指明的图纸建筑面积有所不一致，被申请人亦清楚明了，并未于相关时间内提出异议。就第 3.2 条关于建筑图纸的条文及其效力，第二申请人引用 "合约不容反悔" 原则 (contractual estoppel)及/或 "协定不容反悔" 原则 (estoppel by convention)。

287.　被申请人则否认控股股东了解别墅项目的情况及向参股股东提供图纸。被申请人反指于 2010 年 6 月 2 日参股股东才向控股股东递送一份别墅设计图，被申请人口头告知该图纸与协议约定不符并予退回。之后申请人虽有充分时间，却未修改图纸。而被申请人是从申请人 2013 年 2 月 4 日

---

[16] "作价"：在出让物品、赔偿物品损失或以物品偿还债务时估定物品的价格；规定价格：合理作价│作价赔偿。

的律师函才首次收到《上海市商品房预售合同》及了解申请人欲提供的别墅面积情况。

288. 被申请人指称申请人提供的别墅有以下缺陷，不符合他们按约定"量身定制"的别墅的要求：（1）别墅的可销售面积远低于 1200 平方米；（2）即使将不应计入可销售面积的地下室面积加入总面积的计算，别墅仍然不满足 4.28 协议约定的面积要求。如上所述，被申请人指的所谓"量身定制"别墅要求，明显与协议的条文不符。

**有关的书面往来**

289. 从参股股东及控股股东的书面往来可见，控股股东于 2011 年 3 月 25 日向参股股东发函，要求参股股东提供涉及别墅的"设计图纸，表明该等别墅的座落、面积、建筑品质符合 428 享有的约定及通常别墅的要求"。

290. 参股股东于 2011 年 4 月 25 日回函，指出：

*"贵方曾多次以我未提供中心岛 A2 型别墅图纸为由，迟迟不与我方签署二幢中心岛 A2 型别墅的定制合同，事实上，"4.28" 协议 3.2 条款已明确中心岛 A2 型别墅"图纸建筑面积各约 1200 平方米，绿洲投资和控股股东已收到该图纸并知晓其交房标准，确认其实际价格"。更何况，我方在"4.28"协议签订生效后，我方有应贵方要求，于 2010 年 6 月 2 日再次将中心岛 A2 型别墅的相关图纸交送给贵方。贵方作了签收。故，贵方以我方未提供中心岛 A2 型别墅图纸为由拒签定制合同是没有任何事实根据。"*

291. 在控股股东 2011 年 4 月 28 日的回函中，他们指称"我方并没有收到贵方所指'图纸建筑面积各约 1200 平方米'的中心岛 A2 型别墅图纸，不知是否会有送错的情况？为慎重起见，烦请贵方再送一次，以便核实"。控股股东当时的立场，不是参股股东提供的图纸有无问题，而是他们根本连图纸也没收到。

292. 参股股东在 2011 年 5 月 3 日回函，重申"我方曾在 2010 年 6 月 2 日应贵方要求，将中心岛 A2 型别墅相关图纸送交给贵方，这有贵方签收的凭据加以证实。如贵方对该建筑图纸有疑议，可到我方查实"。

293. 直到 2011 年 7 月 15 日，控股股东才就建筑图纸一事回复。这次他们终于承认参股股东曾向他们提供图纸，但却改口说该图纸不符规格："贵方确实向我方提供图纸，但该图纸显示的别墅建筑面积与 4.28 协议有重大差异，我方亦已在收到图纸的当时即向贵方提出"。

**九亭商铺**

294. 申请人指被申请人至今未能或拒绝指定及促使绿庭地产与参股股东或其指定第三方签署转让九亭商铺的《上海市房地产买卖合同》，导致他们蒙受损失。被申请人则指称由于申请人无法交付符合条件的别墅，被申请人无义务就九亭商铺签署《上海市商品房预售合同》及转移商铺的所有权给申请人或其指定方。由此可见，双方争议的核心是申请人提供的别墅是否符合 4.28 协议的约定。

295. 被申请人亦提出，无论如何，控股股东己透过授权委托书供申请人使用及出租商铺，实际享受商铺的收益。双方就授权的范围及期限均有所争议。第二申请人指出，至今被申请人仍占用着二期中心广场西侧 2000 平方米的商业用房。

296. 仲裁庭认为，在 4.28 协议的第三条下，双方所约定的是物业互换，而所涉之房屋的人民币 7200 万元的价值仅仅是一个估算（这即是"作价"两个字的意思），而非精确地以每平米的价格乘以 1200 平米的面积计算出实际价格。另外，形容 A2 型别墅的"图纸建筑面积各约 1200 平方米"的文字也支持该理解。被申请人则声称 A2 型别墅作价人民币 7,200 万元的计算是根据（1）两幢别墅共 2400 平方米的可销售建筑面积，及（2）每平方米建筑面积平均均价不低于人民币 31,500 元计算而来，被申请人声称这是双方同意 4.28 协议第 3.3 条的基础，但仲裁庭认为该等主张与 4.28 协议的明文规定明显不相符。因此，仲裁庭接受申请人的主张，裁定被申请人违反了第 3.1 条下的义务。

### 第二申请人对于九亭商铺损失的索赔

297. 第二申请人在其结案书面陈述的附件一（原来的结案书面陈述的附件一在 2017 年 8 月 8 日被新的附件一取代，各方均没有异议）中列出损失计算如下：

| 九庭商铺租金损失计算 (2017年8月8日修订版) | |
|---|---|
| **租金损失总和 (包括办公区及铺失) (元)** | 10,346,211 |
| *带阳台的办公区 (2000 多平方米)* | |
| | |
| **总面积 (平方米)** | 2,140.30 |
| 四季花城占用的面积 (平方米) | 424.35 |
| **可出租面积(平方米)** | 1,715.95 |

*柯烨颖证人证词: B/7/94,*
*第 46 段: 超市即是该段中*
*提到的第三方*

| | | |
|---|---|---|
| 超市面积 (平方米) | 860.85 | 顾勇之补充证人证言:B/12/129, 第 4.3 段 |
| 控股股东方占用的面积 (平方米) | 855.10 | 柯烨颖证人证词: B/7/94, 第 45 段 |
| 市场租金价格 (元/平方米/天) | 2.50 | 顾勇证词: 第 5 天[44(22-27)] |

| | | |
|---|---|---|
| 4.28 协议第 3.1(1)条项下参股股东应拥有商铺使用权租金的日期 | 5/28/2010 | 修订对申请人的回复及反诉答辩书的进一步答复书:A/6/97, 第 10.4 段 |
| 出租给超市的日期 | 6/1/2016 | |
| 计算损失的基准日 | 8/8/2017 | |
| 超市区由于控股股东拒绝提供授权而空置的天数 | 2,196 | |
| 超市区空置导致的损失 (元) | 4,726,067 | |
| 控股股东有违 3.1(1)条占用商铺的天数 | 2,629 | |
| 控股股东的占用而导致的损失 (元) | 5,620,145 | |
| 带阳台的办公区租金损失总额 (元) | 10,346,211 | |

298. 第二申请人主张: 虽然 A2 型别墅在 2011 年已竣工, 但由于控股股东无理的拒绝接受 A2 型别墅, 也拒绝进行九亭商铺的转让, 对参股股东造成了严重损失。理由如下:

(1) 根据 4.28 协议第 3.1 条, 九亭商铺项目的商业用房约 8000 平方米, 具体包括 (i) 绿庭尚城一期沿街三层商业用房约 6000 平方米; 和 (ii) 二期中心广场西侧全部商业用房约 2000 平方米。

(2) 二期 2000 平方米的租金很有可能高于每天每平方米 2.5 元人民币。这一点也是控股股东的证人顾勇先生同意的。

(3) 由于控股股东导致九亭商铺的转让无法进行, 且又不把 2000 平方米的控制权正式授予参股股东, 导致参股股东无法把该部分出租。

(4) 虽然参股股东在 2016 年 7 月把 2000 平方米的一部分阳台办公室租给了一个与柯女士有私人关系的第三方, 那是一个特殊安排 (基于第三方对柯女士的信任)。

53

(5)　控股股东通过授权委托书将一期 6000 平方米的控制权交给了参股股东，但至今未有移交二期 2000 平方米的控制权。这一说法，控股股东的证人顾勇先生是同意的。

299.　根据 4.28 协议第 3.1 条："本协议签署后 30 内，绿洲投资和控股股东应指定其子公司上海绿庭房地产开发有限公司与参股股东或其指定第三方签署《上海市房地产买卖合同》，约定由绿庭房地产公司将已达到交房条件的松江区九亭绿庭尚城房产项目商业用房约 8000 平方米（具体包括绿庭尚城一期沿街三层商业用房约 6000 平方米和二期中心广场西侧全部商业用房约 2000 平方米）转让给参股股东或其指定的第三方。为避免歧义（1）在《上海市房地产买卖合同》签署的同时，绿洲投资及控股股东应将该等商业用房的使用权交付给参股股东或其指定的第三方交付使用后的租金或其他收益归参股股东或其指定的第三方；（2）2011 年 6 月 30 日之前，绿洲投资及控股股东应将该等商业用房的所有权转移给参股股东或其指定的第三方。"

300.　从第 3.1（1）条可以看到，被申请人应履行义务（即交付使用权）的时间点为 4.28 协议签署后的 30 天内，即不迟于 2010 年 5 月 28 日。而从第 3.1（2）条可以看到，被申请人应履行义务（即移交所有权）的时间点为 2011 年 6 月 30 日之前。

301.　第 3.1 条和第 3.2，3.3 条是挂钩的，也即是说，松江区九亭绿庭尚城房产项目商业用房约 8000 平方米和奉贤区奉浦工业区半岛名墅项目的中心岛 A2 型别墅 2 幢是作价相等的（即人民币 7200 万元）。这一点在上面第 296 段已有所述。

302.　在第二申请人提交的附件一中，索赔额分两部分：（1）控股股东占用的面积；（2）超市区由于控股股东拒绝提供授权而控制的天数。若以 2017 年 8 月 8 日作为计算损失的基准日，那么损失总额为人民币 10,346,211 元（5,620,145 加 4,726,067 元）。

303.　由于仲裁庭在第 271 段已经裁定被申请人违反了其在 4.28 协议第 3.1 条项下的义务，因此仲裁庭接受第二申请人的主张，裁定控股股东赔偿申请人人民币 10,346,211 元的损失（以 2017 年 8 月 8 日作为计算损失的基准日）。

**四季花城与绿洲投资及其下属公司的债权债务的清结**

304.　根据 4.28 协议第 3.6 条："关联交易：本协议签署之日起，四季花城与绿洲投资及其下属公司之间的关联交易应予终止；所有债权债务应在一个月内予以清结。本协议另有约定的除外。"

54

305. 各方经过努力协商，把原来的争议范围缩小到 Bundle E, Tab 5 中所列出的几项。

306. 4.28 协议的第 3.6 条是一项相对独立的条款，与上述的有关股权转让对价的条款没有关连。仲裁庭认为，双方不能在合同限定的时段内把债权债务结清的原因不能归咎于任何一方，主要的原因是因为双方对于问题的看法不同。因此，在这个问题上，仲裁庭的工作就是对问题作出裁决，而不将违约责任归咎于任何一方。

307. 在第 3.6 条下，需要进行清结的是四季花城与绿洲投资及其下属公司之间的所有债权债务。这与股权转让或回购无关。因此，清结的结果不会构成第三期付款的金额调整：见 4.28 协议第 2.2.1（4）条。

308. 各方对于大部分有争议的清结项目达成了协议，剩下需要仲裁庭裁断的争议项目在 E/5/15-19 的列表里可见，分别为：第 1、1a、7、8、22、23、28 项。

**1、1a. 2009 年 11 月移交时备料款余额**

309. 根据申请人的事实证人齐赤扬先生的证人陈述书第 4a 段："列于预付账款 - 预付备料款 - 项目 1 科目的借方余额 41224613.21 元双方无异议。" 根据被申请人的事实证人李毓平女士证人证言第 11 段："根据移交给四季花城的财务资料，我计算出，截至 2009 年 11 月，第一类往来账款的余额为人民币 41224613.21，即截至 2009 年 11 月四季花城与科创的往来款余额。"因此，对这个数值，双方是没有争议的。

310. 但是，双方对于控股股东于 2016 年 1 月 29 日向升远支付的 1500 万元（1a 项）可否冲抵往来款有争议。

311. 证据显示，绿洲投资、绿庭科创与四季花城于 2016 年 1 月 29 日签订了一份《往来账款预付协议》[D3/1207]。同日，四季花城、上海升远建筑工程有限公司、绿庭科创也签订了一份《三方协议》[D3/1213]。该两份协议是针对四季花城和升远于 2015 年 1 月 10 日签署的《协议书》（就"乐康苑二期"两笔工程款共计 26,198,239 元拖欠的问题）而签署的。由于四季花城没有足够资金支付该工程款，因此要求绿洲投资的子公司绿庭科创代为预付该款。科创以代四季花城支付第一期工程款的名义直接向升远支付人民币 1500 万元。

312. 第二申请人和被申请人同意，被申请人于 2016 年 1 月 29 日向升远支付的人民币 1500 万元应该按《往来账款预付协议》的约定视为第一被申请人已代四季花城预先偿付往来账款人民币 1500 万元。但第一申请人不同意上述立场。

55

313. 仲裁庭还注意到，第一申请人并未参与两份协议的谈判或签署。[徐宏标的非宗教形式誓章第 12 段]

314. 仲裁庭认为，4.28 协议第 3.6 条的意思非常明确，即：四季花城与绿洲投资及其下属公司之间的所有债权债务必须在 4.28 协议的一个月内（2010年 5 月 28 日）结清。尽管科创代四季花城直接向升远支付了人民币 1500万元，然而，该笔款是在 2016 年才支付的，远远超出了 4.28 协议约定的时限。因此，仲裁庭认为该笔 1500 万元的款项并不在 4.28 协议第 3.6 条所规定的债权债务清结范围之内。该笔 1500 万元的款项是否可以冲抵人民币 41224613.21 的往来款的问题，和 4.28 协议的条款无关。该问题不在仲裁庭的管辖权之内，仲裁庭不予受理。

**7、8. 柯铮光和徐宏标 2009 年 1-11 月工资费用**

315. 第一申请人和第二申请人 2009 年在绿洲投资领取工资费用社保金等人民币 3127591.77 元。这个数值是双方都确认的（见齐赤扬之证人陈述书第9a 段；李毓平之证人证言第 12.3.1 段）。争议在于这笔钱应该由绿洲投资还是四季花城承担。被申请人的立场是，参股股东在《参股股东第一稿核对表》[D1/101]中曾同意由四季花城承担该费用，但在后续对账过程及双方往来函件沟通中又不同意由四季花城承担。控股股东主张依据股份回购原则，因参股股东自 2009 年初起只为四季花城提供服务，因此该费用应由四季花城自行承担。申请人则主张其 2009 年在绿洲投资领取的工资费用社保金是根据绿洲投资与柯、徐二人的雇佣关系产生的，与四季花城和绿洲投资下属公司的债权债务毫无关系，并不在 4.28协议第 3.6 条所规定的债权债务清结范围之内，亦与 4.28 协议毫不相干。

316. 李毓平在其证人证言第 12.2 段中介绍了因员工薪酬和社保费用所产生的需调整或分摊费用这一问题的背景。她解释：该项调整或分摊主要基于：（a）绿洲投资下属中国子公司之间存在部分员工与某一子公司建立劳动关系，并自该子公司领取薪酬并参与社会保险但主要为其他子公司提供服务的情况，故在四季花城于 2009 年 11 月进行人员交接时，控股股东应安排绿洲投资下属公司(除四季花城外)返还四季花城在 2009 年度为非服务于四季花城的员工支付的薪酬和社保费用；（b）因重组协议签署后，参股股东在 2009 年 11 月下旬拒绝支付四季花城所有员工的薪酬，后由绿洲投资下属公司以现金先行垫付，其中针对服务于四季花城员工的相应费用应由四季花城返还绿洲投资下属公司。

317. 仲裁庭认为，从 2009 年 11 月开始，柯、徐二人仅为四季花城（而非绿洲投资或除四季花城以外的下属公司）服务，因此按同样的逻辑，即使他们二位的薪酬与费用还是由绿洲投资支付，该笔数额也应当由四季花

56

城承担。况且，第一申请人和第二申请人在《参股股东第一稿核对表》中曾同意由四季花城承担该费用，之后才持不同意见。

318. 综上，仲裁庭支持被申请人的主张，命令四季花城承担并返还人民币3127591.77元给第一被申请人。

## 22. 乐康绿化工程尚未支付款项（人民币 1136313.42 元）

319. 根据被申请人事实证人李毓平的证词，四季花城应向绿洲投资下属怡景公司支付肖塘乐康苑二期绿化工程款人民币 1136313.42 元，这笔款是怡景公司为肖塘乐康苑二期做绿化支付的工程款人民币 1136313.42 元，尚未向四季花城索回）[李毓平之证人证言第 28.4 段[B/72]]。李毓平也说明了这笔款是在 2016 年 1 月份她得知控股股东与参股股东对涉及升远公司的工程款开了沟通后才添加到一份由她编制的《截至 2015 年 12 月 31 日的往来款核对明细表》当中。申请人事实证人齐赤扬别说，该笔工程款在交接时无相关记录，工程部称怡景公司与四季城公司已结清乐康苑二期工程款。当时订立的施工合同造价 350 万元，所支付工程款数额为 422 万元，已经多付了 122 万元，超出合同造价35% [见齐赤扬之证人陈述书第 9d 段[B/37]]。李毓平在其补充证人证言第 15 段回道："在回购基准日之后，怡景公司账面最终形成了四季花城乐康苑二期的工程成本 1136313.42 元。由于我当时认为双方已经根据回购基准日时的资产情况进行了拆分，因此这一块成本已变更成了怡景公司的亏空，所以我将其列入了往来款核对表。" [B/125]

320. 仲裁庭认为，未有足够证据显示怡景公司是应四季花城的要求代其支付该工程款，而被申请人方的证人也说该笔工程款是在回购基准日之后才形成的。因此，仲裁庭并没有证据基础来要求四季花城把该款项支付给怡景公司。综上，仲裁庭不支持被申请人的请求。

## 23、 10 千伏开关站投资分摊金额（人民币 4700 万元）

321. 李毓平在其证人证言第 28.3 段说，这笔款（四季花城应分摊上海四季生态科技有限公司开关站投资费用 470 万元）是在 2016 年 1 月份她得知控股股东与参股股东对涉及升远公司的工程款开了沟通后才添加到一份由她编制的《截至 2015 年 12 月 31 日的往来款核对明细表》当中[B/72]。齐赤扬则说，该分摊款是根据 2012 年四季花城就在建别墅专案与相邻专案开发时候四季生态科技发展有限公司订立之有关配电开发站投资分摊的协议而产生的，有关款项的支付责任或纠纷是由该 2012 年度分摊协定管辖，与 4.28 协议无关，亦不在 4.28 协议第 3.6 条所定的债权债务清结范围之内，因 4.28 协议第 3.6 条是就该协议签约日（2010 年 4 月 28 日）四季花城和绿洲投资及其下属公司之间的债权债务进行结算[B/37]。李毓

平在其补充证人证言第16段说，纵观4.28协议和11.9协议，没有一处对需要清结的债权债务所产生的时间做过限定。按照常理，在股权回购过程中进一步产生的债权债务也是需要结算的[B/125]。

322. 仲裁庭认为，第3.6条对债权债务的清结是有时间限定的，即4.28协议签订之后的一个月内(2010年5月28)。因此，这笔470万元的分摊款不包含在4.28协议的第3.6条内。仲裁庭不予以受理。

## 28. 绿洲投资及其下属公司占用四季花城资金所产生的利息；控股股东未付款项的利息

323. 申请人的立场是，利息清算是第3.6条的内容之一。分立前，集团内部资金同意调拨集中使用，根据需要由相应的单位、项目承担财务费用，以求集团整体综合效益最大化，这种模式可以理解。但是，四季花城以2008年12月31日为基准日分立后，绿洲投资控股方对四季花城仍采用这种模式无偿调用资金，摊派财务费用的管理核算模式，则有悖于相关协议精神：见齐赤扬之证人陈述书第7e段。李毓平在其证人证言第10段中对于集团资金调配做了解释。

324. 仲裁庭认为，尽管四季花城以2008年12月31日为基准日分立，但4.28协议是在大概一年半以后才签订，期间集团和四季花城有着所谓的"代管"关系。因此，事实上很难分割清楚到底是哪一方在利用或占用哪一方的资金。综上，仲裁庭不支持申请人方的要求。

## VIII. 仲裁庭的裁决和命令

基于上述原因，仲裁庭作出命令如下：

1. 命令被申请人（从裁决作出之日起的4周内）促使绿庭房产与申请人或其指定的第三方签署一份有关九亭商铺的《上海市房地产买卖合同》并将九亭商铺的所有权转让给参股股东或其指定的第三方。（4.28协议第3.1条）

2. 命令被申请人（从裁决作出之日起的4周内）促使第一被申请人指定的第三方与四季花城签署A2型别墅的《上海市商品房预售合同》并完成有关的预售登记手续。（4.28协议第3.2条）

3. 命令各方按裁决第304至324段的表示在裁决作出之日起的4周内清结并支付有关四季花城与第一被申请人的债务。（4.28协议第3.6条）

4. 命令申请人于本裁决作出之日起的2个月内向相关的审批机关提供一份审计报告。

58

5. 命令第一被申请人安排及促使世邦公司（从裁决作出之日起的 2 个月内）收购第一被申请人的子公司绿庭置业所持有的四季花城 80%的股权。（4.28 协议第 2.3.1 条）

6. 命令第一被申请人与参股股东（从裁决作出之日起的 2 周内）签署及促使其子公司绿庭置业共同签署有关世邦公司的股权购买权协议及托管协议。（4.28 协议第 2.3.1，2.3.2 条）

7. 命令第一被申请人（从裁决作出之日起的 2 个月内）促使绿洲科创转让其所持有的四季花城 20%的股权予绿豪贸易。

8. 命令被申请人（从上述第 1-6 项命令履行后的 4 周内）按 4.28 协议的第 2.2.1(4) 条款及裁决第 232(4)(a)(b)(c)及第 233 段的裁示支付调整后的最终金额。

9. 命令第二被申请人、第三被申请人和第四被申请人共同支付给申请人人民币 10,346,211 元的损失作为损失赔偿（以 2017 年 8 月 8 日作为计算损失的基准日）。

**IX. 仲裁费**

325. 关于仲裁费的问题，各方在结案时均同意仲裁庭在此阶段的裁决暂不处理，故仲裁庭将在各方提交相关证据文件后再对仲裁费做出裁定。

日期: 2018 年 2 月 28 日

仲裁地: 香港


鄭若驊資深大律師
仲裁员

黄旭伦资深大律师
仲裁员


杨炎龙
首席仲裁员
代表仲裁庭



**EXHIBIT D**

**Arbitration Case at the Hong Kong International Arbitration Centre ("HKIAC")**

**in accordance with the rules of the Hong Kong International Arbitration Centre (effective from September 1, 2008)**

**("HKIAC Rules")**

**HKIAC/A13028**

**Xu Hongbiao**

First Applicant

**Estate of Ke Zhengguang**

Second Applicant

and

**Oasis Investment Group Limited**

First Respondent

**Yu Naifen Stephany**

Second Respondent

**Yu Naiwen**

Third Respondent

**Yu Naiyun**

Fourth Respondent

---

**Final Arbitration Award (excluding interest and arbitration fees)**

---

**Table of Contents**

**Chapter**                                                                 **Page Number**

I.      Parties Concerned ............................................................................................... 1

II.     Arbitration Agreement and Applicable Laws ................................................... 2

III.    Arbitral Tribunal ................................................................................................ 3

IV.     Factual Background............................................................................................ 39

V.      Disputed Matters and Position of Both Parties .............................................. 42

VI.     Petitions of the Applicants and Respondents ................................................. 56

VII.    Analysis and Reasons of the Arbitral Tribunal .............................................. 60

VIII.   Ruling and Order of the Arbitral Tribunal..................................................... 95

IX.     Arbitration Fees................................................................................................ 97

<u>**Final Arbitration Award**</u>
<u>**(excluding interest and arbitration fees)**</u>

**I.     Parties Concerned**

1.      The Applicants in this case are:

**First Applicant: Mr. Xu Hongbiao**, Chinese citizen, Chinese identification card number 310104196403192854. His correspondence address is Room 419, Oasis Tower, No. 555 Zhongshan West Road, Shanghai City, China. Postal code: 200051.

**Second Applicant: Estate of Ke Zhengguang**, was Mr. **Ke Zhengguang** prior to December 15, 2013 (hereinafter referred to as "**Mr. Ke**" or "**Second Applicant**"). Prior to his death, Mr. Ke was a Chinese citizen with Chinese identification card number 310109195601033237. Mr. Ke passed away on December 15, 2013. Thereafter, the Second Applicant in this case was amended as Estate of Mr. Ke. The Administrators of the Estate of Mr. Ke are: (1) Mdm. Zhang Yuejin (widow of Mr. Ke, hereinafter referred to as "**Mdm. Zhang**"); and (2) Mdm. Ke Yeying (daughter of Mr. Ke, hereinafter referred to as "**Mdm. Ke**). Their correspondence address is Room 419, Oasis Tower, No. 555 Zhongshan West Road, Shanghai City, China. Postal code: 200051.

They are hereinafter collectively referred to as the "**Applicants**".

2.      In this case, C.L. Chow & Macksion Chan Solicitors (CLCMC Solicitors) was originally appointed as the representative of the Applicants. Address: 3/F, Alliance Building, No. 130-136 Connaught Road Central, Hong Kong. Mr. Ke passed away on December 15, 2013. On December 28, 2015, the High Court of Hong Kong issued the Letters of Administration and appointed Mdm. Zhang and Mdm. Ke as the Administrators of the Estate of Mr. Ke. On January 12, 2016, Baker & McKenzie Shanghai Office (after that, its Hong Kong Office also participated in this case; the Hong Kong and the Shanghai Office shall be collectively referred to as "**Baker**") (Address: Room 1601, Jinmao Tower, No. 88 Century Avenue, Pudong New Area, Shanghai, China/14/F Hutchison House, No. 10 Harcourt Road, Central, Hong Kong) sent a letter to the arbitration tribunal as Mdm. Zhang and Mdm. Ke's representative, and officially

represented the Second Applicant in participating in this case. CLCMC Solicitors remained the representative of the First Applicant.

3. The Respondents in this case are:

First Respondent: **Oasis Investment Group Limited** (hereinafter referred to as "**Oasis Investment**"), is a company limitd by shares registered in the British Virgin Islands, with its correspondence address as 12/F, Oasis Tower, No. 555 Zhongshan West Road, Shanghai City, China. Postal code: 200051

Second Respondent: **Mdm. Yu Naifen Stephany**, American citizen, U.S. Passport no. 710714118. Her correspondence address is 12/F, Oasis Tower, No. 555 Zhongshan West Road, Shanghai City, China. Postal code: 200051

Third Respondent: **Mdm. Yu Naiwen**, Chinese citizen, Chinese identification card number 310101196304040864. Her correspondence address is 12/F, Oasis Tower, No. 555 Zhongshan West Road, Shanghai City, China. Postal code: 200051

Fourth Respondent: **Mdm. Yu Naiyun**, Chinese citizen, Chinese identification card number 310106197207062822. Her correspondence address is 12/F, Oasis Tower, No. 555 Zhongshan West Road, Shanghai City, China. Postal code: 200051

They are hereinafter collectively referred to as the "**Respondents**".

4. O'Melveny & Myers LLP was originally appointed as the representative of the Respondents. Address: 31/F, AIA Central, No. 1 Connaught Road Central, Hong Kong. After October 12, 2016, the team members of the representative of the Respondents were joined by Sidley Austin LLP (address: 39/F, Two International Finance Centre, Central, Hong Kong). Sidley Austin LLP was then appointed by the Respondents to continue representing the Respondents in this case.

5. The Applicants and Respondents are hereinafter each referred to as the "**party concerned**", and both parties are referred to as "**all parties**".

## II. Arbitration Agreement and Applicable Laws

6. This arbitration involves the "Agreement on the Implementation of the 'Preliminary Share Restructuring Agreement'" (hereinafter referred to as the

"**4.28 Agreement**") concluded by all parties on April 28, 2010 for the breaking up of the First Respondent and its subsidiaries. The basis of filing in this arbitration is Article 4.2 of the "4.28 Agreement". It is said in this Article :

*"4.2 Any conflicts, disputes and claims resulting from this agreement or related to this agreement, breach of contract, termination of contract and void of contract (hereafter referred to as "disputes") shall be dealt with through amicable negotiations by all Parties. If the negotiation fails, any Party is entitled to submit the dispute to the Hong Kong International Arbitration Centre for arbitration. The arbitration is to be conducted in Chinese. The arbitration tribunal is to consist of three arbitrators. Oasis Investment and the Controlling Shareholders are entitled to nominate one arbitrator, the Non-controlling Shareholders are entitled to nominate another arbitrator, and the third arbitrator, who will be the chief arbitrator, is to be nominated by the Chairperson of the Hong Kong International Arbitration Centre. The outcome of arbitration is final and binding on all Parties."*

7. "Non-controlling Shareholders" in the abovementioned arbitration clause refers to the Applicants in this case. Oasis Investment and the "Controlling Shareholders" (that is, the Second, Third, and Fourth Respondents) refer to the Respondents in this case.

8. Based on Article 4.2 in the "4.28 Agreement" as cited above, this Arbitration Proceeding shall be managed by the HKIAC and conducted in accordance with the "HKIAC Rules". The arbitration location shall be Hong Kong and the arbitration language shall be Chinese.

9. The Article 4.1(sic) of the "4.28 Agreement" stipulates that the Agreement shall be governed by the laws of Hong Kong.

## III.  Arbitral Tribunal

10. The arbitral tribunal in this case shall comprise the following arbitrators:

(1)     Horace Wong Yuk-Lun, Senior Counsel, address: 10/F, New Henry House, No. 10 Ice House Street, Central, Hong Kong, nominated by the Applicants;

(2)     Teresa Cheng Yeuk-Wah, Senior Counsel, address: 38/F, Gloucester Tower, The Landmark, Central, Hong Kong, nominated by the Respondents; and

(3)     Mr. Yang Ing Loong (hereinafter referred to as "**Chief Arbitrator**"), address: 18/F, One Exchange Square, No. 8 Connaught Place, Central, Hong Kong, was appointed as the third arbitrator, who shall also act as the Chief Arbitrator, by the HKIAC Council in accordance with the agreement reached by all parties on arbitration.

11.     The arbitral tribunal was officially constituted on June 4, 2013 and all parties were informed of the constitution of the arbitral tribunal on the same day.

**Arbitration Proceedings**

12.     The arbitral tribunal held that it was not necessary to list all the corresponding letters between the representatives of the parties written during the process of this case. All procedural orders made by the arbitral tribunal have been issued in writing and they will not be repeated [in full] herein. It shall be emphasized that the arbitral tribunal has fully considered all the claims made by all the parties in writing, the testimonies given by the witnesses, and claims made during the hearings before the orders were issued. All instructions, orders, and decisions were made after negotiations by the three arbitrators. In this regard, this part of the arbitration award presents a summary on the milestones of this case.

13.     On February 22, 2013, the Applicants served a "Notice of Arbitration" (Case No. HKIAC/A13028) on the Respondents and submitted it to the HKIAC in Hong Kong to resolve the disputes arose under the "4.28 Agreement".

14.     On April 12, 2013, the Respondents submitted a "Response to the Notice of Arbitration".

15.     On April 8, 2013, HKIAC sent a letter to confirm the appointment of Horace Wong Yuk-Lun, Senior Counsel, as an arbitrator in this case as nominated by the Applicants. On April 22, 2013, the Respondents notified the HKIAC that Teresa Cheng Yeuk-Wah, Senior Counsel, shall be nominated as an arbitrator in this case. The next day, that is, April 23, 2013, HKIAC notified Mdm. Teresa Cheng Yeuk-wah that she had been nominated. On the same day, Mdm. Teresa Cheng Yeuk-wah notified HKIAC that she shall accept the nomination. On April 30,

4

2013, HKIAC sent a letter to confirm the appointment of Mdm. Teresa Cheng Yeuk-wah as an arbitrator in this case.

16.     On June 4, 2013, HKIAC sent a letter to confirm the appointment of Mr. Yang Ing Loong as the Chief Arbitrator in this case. On June 4, 2013, the arbitral tribunal was officially constituted.

17.     On June 4, 2013, HKIAC sent a letter to notify all parties that the arbitral tribunal had been constituted in accordance with the "HKIAC Rules".

18.     On June 7, 2013, the Chief Arbitrator sent a letter on behalf of the arbitral tribunal to notify all parties that the arbitral tribunal had been constituted. He requested all parties to confirm that they do not have any objections regarding the constitution of the arbitral tribunal and matters related to the arbitration rules, the arbitration language, and the applicable governing laws. At the same time, the arbitral tribunal provided an interim schedule it had drafted (it was converted to procedural orders subsequently) and requested that all parties conduct negotiation, reach a consensus (where possible) regarding the submission dates of the relevant documents, and submit a reply to the arbitral tribunal before 6 p.m. on June 14, 2013.

19.     On June 14, 2013, the Applicants sent a letter to the Chief Arbitrator to confirm the relevant matters as mentioned in paragraph 18 above and submitted the draft procedural order proposed by the Applicants. On the same day, the Respondents submitted a schedule proposed by the Respondents and supplemented a complete arbitral tribunal draft procedural order based on the said schedule, and confirmed the relevant matters as mentioned in paragraph 18 above.

20.     After considering the written opinions by all parties, the Chief Arbitrator issued the Procedural Order (I) (hereinafter referred to as "**Order (I)**") on behalf of the arbitration tribunal on June 25, 2013. One copy of the amended procedural schedule is annexed thereto.

21.     On August 30, 2013, the Respondents submitted their "Statement of Defence and Counterclaim" and list of appendices to the HKIAC via email and special courier. The arbitral tribunal confirmed and acknowledged the receipt of the electronic version via email on the same day.

22.     On October 8, 2013, the Applicants submitted their "Reply and Defence to Counterclaim" to the arbitral tribunal via email.

AP_Legal – 104494610.1

23. On November 12, 2013, the Respondents sent a letter to the arbitral tribunal and submitted their "Further Reply to the Applicants' Reply and Defence to Counterclaim" to the arbitral tribunal. The arbitral tribunal confirmed and acknowledged the receipt via email on the same day.

24. On November 22, 2013, the Applicants sent a letter to the arbitral tribunal and alleged that the Respondents had committed a serious breach of Order (I) by submitting the "Further Reply to the Applicants' Reply and Defence to Counterclaim" to the arbitral tribunal on November 12, 2013. The reason was that Order (I) did not permit the Respondents to provide a further reply to the Applicants' reply. The Applicants requested that the arbitral tribunal issue an order to revoke Paragraphs 1 to 32 (that is, the content of the further reply to the Applicants' reply) of the Respondent's further reply, and requested that the Respondents pay the Applicants for the attorney fees incurred due to their submission of the further reply.

25. On the same day, that is, November 22, 2013, the Respondents sent a letter to the arbitral tribunal and denied that their submission of the "Further Reply to the Applicants' Reply and Defence to Counterclaim" to the arbitral tribunal has breached Order (I). The reason was that the content of the further reply was only a reply to the Applicants' defence to counterclaims. However, in view that the Applicants' "Defence to Counterclaims" and the content of other portions were closely interconnected and overlapping, the reply to the Applicants' "Defence to Counterclaims" involved the content of other portions. Furthermore, as the reply was formatted and separately answered based on the sequence of the paragraphs of the Applicants' "Reply and Defence to Counterclaim", the Respondents requested that the arbitral tribunal reject the Applicants' request.

AP_Legal – 104494610.1

26. On November 25, 2013, the arbitral tribunal issued a reply to all parties via email and stated that after consideration, the arbitral tribunal will not order the Respondents to revoke Paragraph 1 to Paragraph 32 of their "Further Reply to the Applicants' Reply and Defence to Counterclaim". However, the arbitral tribunal permitted the Applicants to make further statement in writing with regard to the said paragraphs within one week (that is, on or before November 30). At the same time, the arbitral tribunal asked all parties whether an extension of the deadline of the Request for Production of Documents that each party was to present as stipulated in Order (I) was required (that is, November 26).

27. On the same day, that is, November 25, 2013, the Applicants submitted a reply to the arbitral tribunal via email; in view that the Respondents confirmed that the contents in their further reply were only limited to the Applicants' defence to counterclaims, the Applicants shall not make further statement in writing. Hence, the extension of the deadline on November 26 was not required.

28. On November 26, 2013, the Respondents submitted the "Respondents' Request for Production of Documents" to the arbitral tribunal.

29. On the same day, that is, November 26, 2013, the Applicants submitted the "Applicants' Document List" to the arbitral tribunal.

30. On December 5, 2013, the arbitral tribunal confirmed via email the receipt of the "Respondents' Request for Production of Documents" and the "Applicants' Document List" submitted on November 26, 2013 by the Respondents and the Applicants, respectively. At the same time, the arbitral tribunal reminded the Applicants that they did not submit a Request for Production of Documents stated in Paragraph 7 of Order (I) and requested the Applicants to clarify whether any requests for production of documents to the Respondents would be made before 6 p.m. on December 6, 2013.

31. On December 6, 2013, the Applicants sent an email to the arbitral tribunal to confirm that they did not have any requests for the production of documents at this stage.

32. On December 17, 2013, the Applicants submitted the Applicants' Reasonable Objections to the Respondents' Request for Production of Documents to the arbitral tribunal via email, and notified all parties that Mr. Ke had suddenly passed away the day before. The Applicants stated that they would discuss the

relevant legal procedures matters regarding the Second Applicant's continuation in this case with Mr. Ke's family members as soon as possible, and they would make recommendations to the arbitral tribunal as soon as possible after receiving the relevant instructions from Mr. Ke's family members.

33. On December 20, 2013, the arbitral tribunal requested the Respondents via email to respond to the Applicants' Reasonable Objections to the Respondents' Request for Production of Documents on December 27, 2013, and permitted the Applicants to make a final response on January 7, 2014 with regard to the Respondents' response. At the same time, the arbitral tribunal pointed out that, even though these steps were not explicitly stated in Order (I), it was added so as to facilitate better decision making by the arbitral tribunal. In addition, the arbitral tribunal stated that it shall wait for the Applicants' recommendations regarding the relevant matters on the legal procedures regarding the Second Applicant's continuation in this case.

34. On December 27, 2013, the Respondents submitted the "Respondents' Reasons for Rebuttal/Renewed Position to the Objections to the Request for Production of Documents" (hereinafter referred to as "**Reasons for Rebuttal/Renewed Position**") to the arbitral tribunal.

35. On January 9, 2014, the arbitral tribunal confirmed via email the receipt of the "'Respondents' Request for Production of Documents' including the Applicants' Objection Opinions and the Respondents' Reasons for Rebuttal/Renewed Position to the Objections to the Request for Production of Documents" submitted by the Respondents. In view that the deadline for the Applicants' final response to this document (January 7, 2014) had passed, the arbitral tribunal requested the Applicants to confirm whether a response would be made to the said document before 6 p.m. on that day. At the same time, the arbitral tribunal also requested the Applicants to provide statements or recommendations regarding the matters on the relevant legal procedures regarding the Second Applicant's continuation in this case.

36. On the same day, that is, January 9, 2014, the Applicants submitted a request via email to the arbitral tribunal to suspend the arbitration proceedings until January 15, 2014, and to extend the final deadline of the Applicant's response to the Respondents' "Reasons for Rebuttal/Renewed Position" to January 15, 2014. The Applicants stated that they shall submit the Applicant's response to the

Respondents' "Reasons for Rebuttal/Renewed Position" to the arbitral tribunal and provide further statements or recommendations regarding the impact of Mr. Ke's passing on this case on that day.

37. On January 10, 2014, the arbitral tribunal approved the Applicants' abovementioned request for extension, that is, the arbitration proceeding shall be suspended until January 15, 2014 and the final deadline for the Applicant's response to the Respondents' "Reasons for Rebuttal/Renewed Position" shall be extended to January 15, 2014, and agreed to the representative of the Applicants providing further statements or recommendations regarding the impact of Mr. Ke's passing on this case on that day. The arbitral tribunal also reserved the rights allowing the Respondents to provide a reply to the statements or recommendations.

38. On January 15, 2014, the Applicants sent a letter to the arbitral tribunal, with the Applicants' response to the Respondents' "Reasons for Rebuttal/Renewed Position" enclosed. The Applicants also requested for the extension of the statements or recommendations regarding the impact of Mr. Ke's passing on this case to January 30, 2014 based on the actual difficulties faced by Mr. Ke's wife, daughter, and their family members.

39. On January 16, 2014, the arbitral tribunal agreed to suspend the arbitration proceeding until January 30, 2014 via email.

40. On January 24, 2014, the representative of the Applicants (CLCMC Solicitors) sent an email to the arbitral tribunal to explain the situation of Mr. Ke's family in detail and claimed that the arbitration could proceed. The representative of the Applicants stated that it had already accepted the joint appointment by Mdm. Zhang, the wife of Mr. Ke, and Mdm. Ke, the daughter of Mr. Ke, to begin the legal procedures for the application at the High Court of Hong Kong to permit Mdm. Zhang or her authorized person, Ke Yele, to continue this case as the Administrator of the Estate of Mr. Ke, on behalf of the Estate of Mr. Ke. It shall also represent the First Applicant and Mdm. Zhang, the wife of Mr. Ke, and Mdm. Ke, the daughter of Mr. Ke, in the application to permit Mdm. Zhang or her authorized person, Ke Yele, to carry out all the procedures in this case as the Administrators of the Estate of Mr. Ke, without terminating the procedures of this case before the granting of permission by the High Court of Hong Kong. At

the same time, it shall notify the arbitral tribunal immediately after the official granting of permission by the High Court of Hong Kong.

41.     On the same day, that is, January 24, 2014, the arbitral tribunal sent an email to request the Respondents to provide a reply to the abovementioned request made by the Applicants on or before January 29, 2014.

42.     On January 29, 2014, the Respondents sent a letter to the arbitral tribunal and stated that they did not object to the request of the Applicant's representative in principle, that is, Mr. Ke's legal successor shall continue in this case and the termination of the procedures in this case was not required. However, the Applicants must provide the relevant information/clarification of the issues concerning the matter, including the identity of Ke Yele, Mdm. Zhang, and Mdm. Ke, and the relevant documents. The Respondents also requested that the arbitral tribunal allow them the opportunity to publish their final opinion within a certain period after they receive the information they requested.

43.     On January 30, 2014, the arbitral tribunal notified all parties via email that there were legal concerns regarding the viewpoints claimed by the representative of the Applicants in an email dated January 24, 2014, that is, to push forward the case procedures before the Administrators of the Estate of Mr. Ke are approved by the High Court of Hong Kong. At the same time, the arbitral tribunal invited the representative of the Applicants to reply to the letter dated January 29, 2014 sent by the Respondents' lawyer on or before February 14, 2014.

44.     On February 11, 2014, the Respondents sent a letter to the arbitral tribunal requesting for confirmation that the case procedure (including Item 10 of "Order (I)" and all procedures thereafter) was still suspended until further instructions from the arbitral tribunal. The arbitral tribunal sent a letter to all parties on February 12, 2014 confirming that the case procedure was temporarily suspended. It stated that further instructions would be given after further reply from the Second Applicant was received (the deadline shall be on February 14, 2014).

45.     On February 14, 2014, the Applicants sent a letter to the arbitral tribunal in response to the letter dated January 29, 2014 sent by the Respondents and the opinions in the email dated January 30, 2014 sent by the arbitral tribunal. They claimed that in view of Rule 15 of Order 15 of the Rules of the High Court in Chapter 4A of the Hong Kong Subsidiary Legislation and the precedent of the

High Court of Hong Kong (Lily Cheung v. The Official Solicitor and Another, [2008] 5 HKLRD 743), the arbitral tribunal could appoint Mdm. Zhang as the representative of the Estate of Mr. Ke in the case procedure for the continuation of case procedures. The identification documents of Mdm. Zhang, marriage certificate of Mdm. Zhang and the Second Applicant, death certificate[1] and identification documents of the Second Applicant, and the court verdict of the cited case were enclosed therewith.

46.    On February 25, 2014, the Respondents sent a letter to the arbitral tribunal requesting that the Applicants clarify whether they were no longer requesting to appoint Ke Yele as the Administrator of the Estate. The Respondents also objected to the Applicants' request to the arbitral tribunal to appoint Mdm. Zhang as a representative of the Second Applicant's estate in the case procedure for the continuation of case procedures, and claimed that the arbitral tribunal should wait until the final approval of the Administrators of the Estate of the Second Applicant had been officially issued by the High Court of Hong Kong before continuing case procedures.

47.    On February 26, 2014, the Applicants sent an email to the arbitral tribunal requesting that their response to the Respondents' letter dated February 25, 2014 to be sent on or before February 28, 2014. On the same day, the arbitral tribunal approved the Applicants' said request via email.

48.    On February 27, 2014, the arbitral tribunal notified all parties via email that the arbitral tribunal intended to hold a half-day hearing in the afternoon of April 2, 2014 at HKIAC. The primary objective was: To allow all parties to fully express their legal opinions and feasible solutions on impact of the passing of Mr. Ke on the arbitration proceedings, so as to facilitate the moving forward of arbitration proceedings.

49.    On February 27, 2014, the Applicants responded to the Respondents' letter dated February 25, 2014 and clarified that Mdm. Zhang and Mdm. Ke were willing and hoped that the arbitral tribunal would appoint Mdm. Zhang as the Administrator of the Estate of Mr. Ke.

---

[1]    The death certificate indicated that the Second Applicant passed away in Shanghai on December 15, 2013 at 10:20 p.m.

AP_Legal – 104494610.1

50. On March 11, 2014, after considering the correspondences between all parties regarding the question of hearing, the arbitral tribunal formulated a schedule for both parties to submit their legal opinions on the issue of the impact of the passing of Mr. Ke on the arbitration proceedings.

51. On March 25, 2014, all parties submitted their opinions in writing to the arbitral tribunal respectively with regard to the abovementioned issue. With regard to the date of the hearing, all parties stated that they had not reached a consensus. They requested that the arbitral tribunal consider reviewing the written materials submitted by all parties in this round before deciding whether a hearing was required.

52. On April 1, 2014, all parties submitted a rebuttal legal opinion to the other party's written opinions to the arbitral tribunal respectively.

53. On April 9, 2014, the Respondents sent a letter to the arbitral tribunal via email to propose that the arbitral tribunal give all parties two weeks to negotiate the matter regarding the recommendation made by the Respondents on seeking indemnification due to the legal risks that might be incurred by appointing Mdm. Zhang as the representative of the Second Applicant to participate in this case. On the same day, the Applicants sent a letter to the arbitral tribunal via email stating that the Respondents' interpretation of the Applicants' proposal was incorrect. At the same time, the Applicants suggested to the arbitral tribunal (and at the same time, confirmed that they were willing to unconditionally accept) that in the event the arbitral tribunal agreed with the potential risks raised by the Respondents after considering the statements and relevant documents provided by all parties, they requested that the arbitral tribunal directly issue the following binding order under the circumstances:

*"The First Applicant shall solely bear all liabilities of guarantee and indemnity and pay for the reasonable indemnification of the Respondents for the rights and interests of the Respondents affected due to Mdm. Zhang's actions in this arbitration proceedings and all losses incurred by the Respondents due to the rejection of her request as an Administrator of the Estate of the Second Applicant by the High Court."*

54. On the same day, that is, April 9, 2014, the Respondents expressed regret over the Applicants' response, and requested the arbitral tribunal to make a decision regarding the relevant request made by the Applicants.

AP_Legal – 104494610.1

55.     On April 29, 2014, the arbitral tribunal instructed all parties via email that in view that the legal opinions and written materials submitted by all parties were sufficient, the arbitral tribunal held that a hearing was not necessary.

56.     On May 30, 2014, the arbitral tribunal made a "Decision on the Impact of the Passing of the Second Applicant on the Arbitration Proceedings" ("**Decision (I)**"). The decision of the arbitral tribunal was as follows: (1) The arbitral tribunal does not possess jurisdiction over the appointment of the Administrator of the Estate of the Second Applicant; (2) As the arbitral tribunal does not possess the abovementioned jurisdiction, the case of the Second Applicant may only proceed after the Administrator of the Estate of the Second Applicant had been appointed by the High Court of Hong Kong; (3) In view of this, the only reasonable resolution to this matter by the arbitral tribunal is to suspend the arbitration at the current time until after the High Court of Hong Kong appoints the Administrator of the Estate of the Second Applicant; (4) The arbitral tribunal decided to reserve the decision for the allocation of the attorney fees for this request.

57.     On June 4, 2014, HKIAC sent the original copy of "Decision (I)" to all parties. There were no new developments in this case thereafter until April 2, 2015.

58.     On April 2, 2015, the representative of the Applicants sent an email to the arbitral tribunal on behalf of the First Applicant and made the following request (hereinafter referred to as "**Withdrawal/Addition Request**"): (1) To request for the arbitral tribunal to issue an order to withdraw the Second Applicant from this arbitration proceeding and add the Estate of the Second Applicant as the Fifth Respondent in this arbitration proceeding; (2) To permit the Applicant to amend the arbitration petition to reflect the withdrawal of the Second Applicant and the addition of the Estate of the Second Applicant as the Fifth Respondent; (3) To resume this arbitration proceedings. Enclosed with the Applicant's email were: A brief statement of the First Applicant, an affirmation of the First Applicant, and a draft of the amended arbitration petition. On the same day, the arbitral tribunal requested that the Respondents to submit their legal opinions regarding the Applicant' request before 6 p.m. on April 10, 2015.

59.     On April 9, 2015, the Respondents sent an email to the arbitral tribunal requesting for an extension of the deadline for their submission of the legal opinions to April 30, 2015. On the same day, the Applicants recommended to the

arbitral tribunal via email that, in view that this case procedure had been suspended for over 15 months since the passing of the Second Applicant, the grace period should be extended to April 17, 2015.

60.     On April 10, 2015, after careful consideration, the arbitral tribunal decided to extend the date of the Respondents' response to April 23, 2015 (before 6 p.m.).

61.     On April 20, 2015, Baker, as a representative of Mdm. Zhang and Mdm. Ke, sent a letter to the arbitral tribunal and claimed that the act of submitting a request to the arbitral tribunal to change (the Estate of) the Second Applicant to the Fifth Respondent without the knowledge of Mdm. Zhang and Mdm. Ke by the First Applicant had seriously damaged the legal rights and interest of the Second Applicant and/or its legal successors. Baker claimed that the arbitral tribunal should not make any decisions regarding the abovementioned request before fully taking its opinion into consideration. At the same time, Baker stated that Mdm. Zhang and Mdm. Ke were handling the relevant procedures to obtain the appointment by the High Court of Hong Kong as the Administrators of the Estate of the Second Applicant and it requested the arbitral tribunal to provide it with a duplicate copy of the abovementioned request made by the First Applicant and the relevant documents.

62.     On April 23, 2015, the Respondents sent a letter to the arbitral tribunal and stated that the Administrator of the Estate of the Second Applicant should have the right to express its opinion regarding the request "to remove the Second Applicant from these arbitration proceedings and add the Estate of the Second Applicant as the Fifth Respondent in these arbitration proceedings", and that the arbitral tribunal should not make any decisions regarding the abovementioned matter before the Administrator of the Estate of the Second Applicant has been appointed or confirmed. At the same time, the Respondents also claimed that the request made by the First Applicant lacked necessary basis. In view of the changes in the relationship of all parties, the arbitral tribunal should adopt a more cautious approach in handling the procedure and should not make a decision to support this request at this point. With regard to whether or not the Respondents could request for the First Applicant to jointly bear and perform all obligations and liabilities of the Applicants under the "4.28 Agreement", the Respondents raised specific questions concerning the matter and requested that the Applicants respond to them. On the same day, the Applicants sent an email to the arbitral tribunal to request for a written response with regard to the

abovementioned letter sent by the Respondents to be submitted to the arbitral tribunal within 14 days (that is, on or before May 7, 2015). The arbitral tribunal approved the Applicants' request of the said deadline via email on the same day.

63. On the same day, that is, April 23, 2015, the arbitral tribunal sent a reply to Baker via email stating that, in view of Mdm. Zhang and Mdm. Ke not being appointed by the court as the Administrators of the Estate of the Second Applicant, both of them shall not be the parties involved in this case and they shall not possess the requirements to make any requests to the arbitral tribunal. If Mdm. Ke and Mdm. Zhang officially became the legal Administrators of the Estate of the Second Applicant as appointed by the court in the future, they could make a separate request to the arbitral tribunal again.

64. On May 6, 2015, the Applicants requested to extend the deadline for the submission of the written response mentioned in Paragraph 62 above to on or before May 21, 2015. The arbitral tribunal approved the said request for extension on May 7, 2015.

65. On May 21, 2015, the Applicants submitted the "Written Response of the First Applicant" to the arbitral tribunal. The Applicants claimed that, in view that Mdm. Zhang and Mdm. Ke no longer wished to continue authorizing the representative of the Applicants to handle the procedures of the Estate, the representative of the Applicants would not be allowed to continue representing the Second Applicant based on legal principles. Also, as the outcome of Mdm. Zhang and Mdm. Ke's application to the High Court of Hong Kong to be appointed as the Administrators of the Estate of the Second Applicant was still unknown after over one year, the First Applicant believed that Mdm. Zhang and Mdm. Ke were affected by the Respondents and intentionally refused to handle the Estate or delay the handling of the Estate. Hence, the arbitral tribunal and all parties should not wait indefinitely for the succession of the Estate of the Second Applicant. Hence, the First Applicant recommended that the arbitral tribunal remove the Second Applicant and add the Second Applicant as the Fifth Respondent. Otherwise, in the event the arbitral tribunal held that the Second Applicant cannot or should not be added as the Fifth Respondent, the arbitral tribunal would be requested to consider the continuation of the individual arbitration of the First Applicant.

66. On June 16, 2015, Baker sent a letter to the arbitral tribunal stating that it had already submitted the application regarding the Administrator of the Estate of the Second Applicant to the High Court of Hong Kong on behalf of Mdm. Ke and Mdm. Zhang on June 12, 2015. On June 19, 2015, the arbitral tribunal forwarded this letter to all parties and instructed them to submit a written opinion on or before June 25, 2015 with regard to the submitted application of the appointment of the Administrator of the Estate of the Second Applicant, especially on whether it was necessary for the arbitral tribunal to consider the request made by the First Applicant.

67. On June 25, 2015, all parties submitted a written opinion to the arbitral tribunal in accordance with the instructions given by the arbitral tribunal on June 16, 2015.

68. On June 26, 2015, the arbitral tribunal instructed all parties via email that after reviewing the written statements/opinions made by all parties with regard to the Withdrawal/Addition Request made by the First Applicant, the arbitral tribunal held that, as the said request was relatively complex, a hearing on the said request was necessary to clarify and obtain the viewpoints and positions of all parties for consideration.

69. On June 29, 2015, the First Applicant sent a reply to the arbitral tribunal via email, stating that it had already discussed with the Respondents regarding the appropriate date and location of the hearing.

70. On July 13, 2015, the arbitral tribunal conducted a public hearing with regard to the Withdrawal/Addition Request made by the First Applicant. On the same day and after the hearing, the arbitral tribunal asked all parties via email whether they would agree to add the three appendices (that is, the letter dated July 10, 2015 sent by Baker to the arbitral tribunal, the "Preliminary Agreement on Share Restructuring for Oasis Investment Group Limited" dated November 9, 2009, and case materials related to Warwick Film Productions Ltd and Another v. Eisinger and Others) into the hearing folder submitted by the Applicants (and they shall be listed as document number 24, 25, and 26, from pages 207 to 218). On the same day, the First Applicant and the Respondents confirmed and agreed via email respectively.

71. On August 6, 2015, the arbitral tribunal notified all parties via email that it had made a decision (the electronic version of the decision was enclosed in the said

email) regarding the request made by the First Applicant on April 2, 2015. HKIAC would mail the original copy to all parties. At the same time, the arbitral tribunal requested that the lawyers for all parties discuss and formulate a copy of the arbitration procedural schedule as soon as possible for the arbitral tribunal's reference.

72.    On August 26, 2015, the First Applicant made a suggestion to the arbitral tribunal via email that the arbitration proceeding should proceed in accordance with the Procedural Order (I) dated June 25, 2013. The relevant arbitration procedural schedule should be an extension of this order and the corresponding timings should be adjusted (the specific adjustments were listed in the email). The First Applicant requested the arbitral tribunal to adopt the abovementioned schedule and issue a corresponding order.

73.    On August 27, 2015, the Respondents sent an email to the arbitral tribunal stating that the procedural schedule proposed by the First Applicant the day before was not a recommendation after discussion with the Respondents. The Respondents recommended that the arbitral tribunal give all parties seven days to conduct negotiations regarding the First Applicant's proposal and to reach a consensus as far as possible. Hence, the Respondents requested that the arbitral tribunal temporarily suspend giving instructions regarding the arbitration procedural schedule.

74.    On August 29, 2015, the arbitral tribunal ordered all parties to submit a procedural schedule upon reaching a consensus after negotiation by all parties on or before September 3, 2015. If all parties could not reach a consensus, the arbitral tribunal requested that each party raise their own opinions for the arbitral tribunal's reference.

75.    On September 1, 2015, the First Applicant sent an email to the arbitral tribunal stating that it agreed to the procedural schedule recommended by the Respondents on August 27, 2015 and requested the arbitral tribunal to adopt the abovementioned schedule where a consensus had been reached by all parties, and to issue the corresponding order.

76.    On September 14, 2015, the arbitral tribunal sent an email stating that it agreed to the procedural schedule recommended by the Respondents. In view that the widow of the Second Applicant, Mdm. Zhang, and daughter of the Second Applicant, Mdm. Ke, were represented by Baker, the arbitral tribunal requested that the lawyer of the First Applicant and the lawyer of the Respondents confirm

that they had already notified Baker of the decision made by the arbitral tribunal on August 6, 2015 via registered mail. On the same day, the First Applicant sent an email to the arbitral tribunal confirming that it had already sent a registered mail to Baker on that day (that is, September 14, 2015) regarding the decision made by the arbitral tribunal on August 6, 2015. On October 8, 2015, the Respondents stated to the arbitral tribunal that in view that the First Applicant had already sent the decision to Baker, the Respondents did not send the said decision to Baker again. However, the Respondents confirmed that the procedural schedule sent by the First Applicant on September 1, 2015 reflected the consensus of all parties, and requested the arbitral tribunal to issue a new procedural order.

77.     On December 21, 2015, the arbitral tribunal instructed all parties via email that in view that the Applicant had already sent a registered mail to Baker on September 14, 2015 regarding the decision made by the arbitral tribunal on August 6, 2015, the Respondents did not need to send the said decision to Baker. At the same time, the arbitral tribunal issued Procedural Order (II) (hereinafter referred to as "**Order (II)**"), and a copy of the amended procedural schedule was enclosed therewith.

78.     On December 24, 2015, Baker sent a letter to the arbitral tribunal stating that the High Court of Hong Kong had made a preliminary decision to authorize Mdm. Ke and Mdm. Zhang as the appointed Administrators of the Estate of the Second Applicant on November 6, 2015, and they hoped to receive the official decision from the High Court of Hong Kong soon.

79.     On January 12, 2016, Baker sent a letter to the arbitral tribunal stating that the High Court of Hong Kong had issued the Letters of Administration on December 28, 2015 and appointed Mdm. Zhang and Mdm. Ke as the Administrators of the Estate of the Second Applicant. The duplicate copy of the said Letters of Administration was also enclosed in the letter. In the letter, Baker also requested that the arbitral tribunal provide it with the dossier of this case that the arbitral tribunal had sent to all parties after the passing of the Second Applicant. On the same day, the arbitral tribunal forwarded this letter to the First Applicant and the Respondents, and instructed them to provide opinions for or against Baker at or before 6 p.m. on January 15, 2016.

AP_Legal – 104494610.1

80. On January 14, 2016, the First Applicant sent an email to the arbitral tribunal stating that the duplicate copy of the Letters of Administration provided by Baker was not complete. However, if Baker was able to provide the complete duplicate copy stating that the relevant Administrators of the Estate has legal rights to represent the Second Applicant in the administration or handling of its choses in action and liabilities under the 4.28 Agreement and/or in this case based on the Letters of Administration, the First Applicant shall not object to Baker's request in the letter dated January 12, 2016.

81. On January 15, 2016, the arbitral tribunal issued the "Decision of the Arbitral Tribunal on the 'Respondents' Request for Production of Documents'" ("**Decision (II)**") to all parties via email.

82. On January 15, 2016, the Respondents sent an email to the arbitral tribunal confirming that they did not object to Baker's request in the letter dated January 12, 2016.

83. On January 18, 2016, Baker sent a letter to the arbitral tribunal requesting that the arbitral tribunal notify it on the newest developments of this case, the next step in the procedure and the time schedule, and provide it with the documents it had requested for in the letter dated January 12, 2016.

84. On January 19, 2016, the arbitral tribunal replied to Baker via email and requested for it to provide the complete duplicate copy of the Letters of Administration so as to facilitate the arbitral tribunal's overall consideration of Baker's request. On the same day, the First Applicant sent a letter to the arbitral tribunal to submit a further supplementary written opinion with regard to the matters in Baker's letter dated January 12, 2016.

85. On January 27, 2016, the First Applicant sent an email to the arbitral tribunal confirming that the relevant documents in the Request for Production of Documents in the arbitral tribunal's Decision (II) were non-existent.

86. On January 29, 2016, Baker sent a letter to the arbitral tribunal stating that Mdm. Ke and Mdm. Zhang had reservations about providing the complete duplicate copy, as the complete duplicate copy of the Letters of Administration involved the private information of the Second Applicant. Baker also asked for the arbitral tribunal's understanding, or for it to provide clear reasons for disclosure.

87.     On February 2, 2016, the arbitral tribunal sent a letter to Baker stating that the documents it had previously provided were unable to clearly state whether the relevant Administrators of the Estate had the legal rights to represent the Second Applicant in the administration or handling of its choses in action and liabilities in the 4.28 Agreement and/or in this case based on the Letters of Administration, and requested that it provide the Schedule of Assets and Liabilities dated May 25, 2015 enclosed in the said Letters of Appointment to confirm the abovementioned issue.

88.     On February 17, 2016, Baker sent a letter to the arbitral tribunal stating that with regard to the list of appendices in the Letters of Administration presented by the High Court of Hong Kong, it would not provide explanations regarding the reasons for the disclosure of such choses in action made in a foreign country.

89.     On February 17, 2016, the arbitral tribunal announced to all parties via email that in accordance with the Order (II) stipulated by the arbitral tribunal on December 21, 2015, the segment for the production of documents had ended. However, the arbitral tribunal reserves its rights under Article 22.3 in the 2013 Administered Arbitration Rules.

90.     On February 19, 2016, the First Applicant submitted the electronic versions of the First Applicant's request to summon expert witnesses, the First Applicant's list of expert witnesses, and the First Applicant's list of factual witnesses to the arbitral tribunal via email. On the same day, the Respondents asked the arbitral tribunal for an extension of the deadline to March 4, 2016 for the submission of the witness request and name list. Thereafter, also on the same day, the First Applicant proposed an opinion in response regarding the said request for extension to the arbitral tribunal, stating that it objected to the extension of the deadline to March 4, 2016, but agreed to extend the deadline to February 26, 2016. On February 20, 2016, the arbitral tribunal approved the extension of the Respondents' submission deadline to February 26, 2016 at 6 p.m. via email.

91.     On February 25, 2016, the arbitral tribunal sent an email to the First Applicant and the Respondents with all the email/letter correspondences between the arbitral tribunal and Baker enclosed, and invited the First Applicant and the Respondents to submit, by March 11, 2016 latest, the final written opinion with regard to whether or not Mdm. Ke and Mdm. Zhang could represent the Second Applicant in this case.

AP_Legal – 104494610.1

92.     On February 26, 2016, the Respondents sent a letter to the arbitral tribunal to submit the list of factual witnesses the Respondents intended to summon and the list of expert witnesses the Respondents intended to summon, as well as the relevant applications.

93.     On March 4, 2016, the Respondents sent a letter to the arbitral tribunal stating that, in view that the First Applicant did not submit the relevant information regarding the expert witnesses that the Respondents had asked for, they shall reserve the rights to raise opinions regarding the witnesses the First Applicant intended to summon, and the rights to nominate a Chinese architectural surveyor as an expert witness. At the same time, the Respondents stated that all parties should abide by the arrangements of the relevant items in Order (II) with regard to the matter of expert witnesses.

94.     On the same day, that is, March 4, 2016, the First Applicant submitted a written opinion with regard to the necessity of the list of witnesses submitted by the Respondents in the letter dated February 26, 2016.

95.     On March 9, 2016, Baker sent a letter to the arbitral tribunal requesting that the arbitral tribunal give a reply with regard to the information of the relevant choses in action and legal liabilities in the list of appendices in the Letters of Administration of the Second Applicant, and the requests it had made in the letters dated January 12, 2016 and January 18, 2016.

96.     On March 10, 2016, the First Applicant submitted the "First Applicant's Supplementary Written Opinion and the Written Opinion of Relevant Cases" with regard to whether Mdm. Ke and Mdm. Zhang could represent the Second Applicant in this case. The First Applicant believed that, in view that the Letters of Administration confirmed by Baker did not include the choses in action and legal liabilities in the 4.28 Agreement, Mdm. Ke and Mdm. Zhang lacked the legal powers to represent the Second Applicant in this case.

97.     On March 11, 2016, the Respondents sent an email to the arbitral tribunal to reaffirm their opinion made in the letter dated January 15, 2016, that is, they did not object to the arbitral tribunal providing the dossier of this case for Mdm. Ke's and Mdm. Zhang's viewing, and they did not object to Mdm. Ke and Mdm. Zhang representing the Second Applicant in this case. On the same day, that is, March 11, 2016, the Respondents submitted a reply to the arbitral tribunal in

another email regarding the First Applicant's objection to the necessity of the list of witnesses submitted on March 4, 2016.

98. On March 24, 2016, Baker sent a letter to the arbitral tribunal to reaffirm its position, that is, on Mdm. Ke and Mdm. Zhang having the right to represent the Second Applicant in the participation of this case, and having the opinion that the arbitral tribunal should immediately suspend the case before the official decision of the issue regarding the appointment of the Administrator of the Estate of the Second Application has been made.

99. On March 29, 2016, the Respondents sent an email to the arbitral tribunal stating that they had reached a consensus with the First Applicant and requested for the arbitral tribunal to approve the extension of the deadline for the exchange of the witness testimonies by all parties (that is, Item 15 of Order (II)) to April 15, 2016. On the same day, that is March 29, 2016, the arbitral tribunal approved the said request via email.

100. On April 6, 2016, HKIAC sent an email with an attachment to all parties on the "Decision Regarding the Participation of Mdm. Ke Yeying, the Daughter, and Mdm. Zhang Yuejin, the Widow of the Second Applicant, Mr. Ke Zhengguang in the Hearing of the Arbitration Case Representing the Estate of the Second Applicant as Administrators of the Estate of Mr. Ke Zhengguang" ("**Decision (III)**") made by the arbitral tribunal dated April 6, 2016. The arbitral tribunal ruled that: (1) As the Administrators of the Estate of the Second Applicant, Mdm. Ke and Mdm. Zhang have the right to represent the Estate of the Second Applicant in the participation of the hearing of this case; (2) HKIAC shall immediately provide the dossier related to this case that was sent to all parties after the passing of the Second Applicant to Baker, the representative of the two administrators; (3) This case shall proceed. On the next day, that is, April 7, 2016, the arbitral tribunal sent the said Decision (III) to all parties via email.

101. On April 14, 2016, Baker sent a letter to the arbitral tribunal, in view that it had yet to receive the related dossier of this case, to request for the suspension of the current arbitration proceeding, so that it could have the opportunity to fully read and analyze the dossier of the case.

102. On April 15, 2016, the First Applicant sent an email to the arbitral tribunal with the electronic version of the statement made by the First Applicant's two witnesses enclosed. On the same day, the Respondents also sent an email to the

arbitral tribunal with the testimonies of the Respondents' four witnesses enclosed.

103.    On April 19, 2016, HKIAC provided Baker with the dossier of this case provided by the arbitral tribunal as instructed in Decision (III) via express courier.

104.    On April 28, 2016, the arbitral tribunal sent an email to all parties requesting that Baker, as the representative of the Second Applicant, notify the arbitral tribunal on the amount of additional time required for its client to prepare for its participation in the hearing of this case. In view of the accession of Baker, (1) the recommendation was that all parties convene a case management conference and all parties were requested to confirm the time for negotiation; (2) to suspend the procedural schedule dated December 21 , 2015 so as to provide the Second Applicant with the opportunity to submit its witness testimonies (if any).

105.    On May 3, 2016, the arbitral tribunal sent a letter to all parties and instructed Baker to clearly state its position on whether or not its client was requesting to participate in the hearing of this case.

106.    On May 4, 2016, the First Applicant sent an email to the arbitral tribunal to confirm the commencement time of the case management conference. On the same day, the Second Applicant sent an email to the arbitral tribunal confirming that Mdm. Ke and Mdm. Zhang would participate in the hearing of this case as the Administrators of the Estate of the Second Applicant.

107.    On May 6, 2016, the arbitral tribunal sent an email to all parties and instructed that the case management conference would be conducted face-to-face, and requested that all parties book the venue for the conference in advance.

108.    On May 10, 2016, the First Applicant sent an email to the arbitral tribunal requesting that the arbitral tribunal issue an order for the Estate of the Second Applicant to confirm their position, with regard to the following questions, with the arbitral tribunal and all parties concerned in this case on or before June 2, 2016 (1) Whether or not the Estate of the Second Applicant would request for claims from the First Applicant and/or the Respondents in this case; (2) Whether or not the Estate of the Second Applicant would adopt the existing arbitration petition submitted jointly by the First Applicant and the Second Applicant as its position for claims in this case; (3) Whether or not the Estate of the Second

Applicant would submit its new arbitration petition/Statement of Defence/response letter; (4) Whether or not the Estate of the Second Applicant would only participate in this case as observers. On the same day, that is, May 10, 2016, the arbitral tribunal sent an email to all parties and instructed the Second Applicant to provide its opinion with regard to the First Applicant's request no later than 6 p.m. on May 12, 2016.

109.    On May 11, 2016, the Second Applicant sent an email to the arbitral tribunal to request for an extension of the deadline of its reply to the First Applicant's abovementioned request to May 20, 2016.

110.    On May 12, 2016, the Respondents sent an email to the arbitral tribunal, stating that with regard to the First Applicant's request in the email dated May 10, 2016, the First Applicant should first clearly state whether or not it would still continue to request for the Administrators of the Estate of the Second Applicant to be converted to a Respondent, or to request for claims from the Administrators of the Estate of the Second Applicant.

AP_Legal – 104494610.1

111.	On May 13, 2016, the arbitral tribunal sent an email to all parties and approved the extension of the deadline requested by the Second Applicant in the email dated May 11, 2016.

112.	On May 17, 2016, the arbitral tribunal sent an email to all parties and instructed that the arbitral tribunal would take the First Applicant's opinion into consideration after the Second Applicant has replied to the First Applicant's questions before the deadline on May 20, 2016.

113.	On May 20, 2016, the Second Applicant sent an email to the arbitral tribunal in response to the First Applicant's questions in the email dated May 10, 2016 (1) The Estate of the Second Applicant would participate in this case as the Second Applicant, and the Second Applicant would not request for any claims from the First Applicant within the scope of the arbitration agreement; (2) The Second Applicant would adopt the arbitration petition submitted in accordance with the Second Applicant's instructions, but the Second Applicant objected to the amended arbitration petition submitted by the First Applicant (that is, the withdrawal of the Second Applicant and the adding as the Fifth Respondent); (3) The Second Applicant would not submit a new Statement of Defence; (4) The Second Applicant would attend the hearing as observers, but would be restricted by the conditions listed in the email.

114.	On May 22, 2016, the arbitral tribunal sent an email to all parties and permitted the First Applicant to respond to the Second Applicant's email dated May 20, 2016 no later than 6 p.m. on May 27, 2016.

115.	On June 3, 2016, the arbitral tribunal sent an email to all parties to remind the First Applicant that the deadline for its response to the Second Applicant's email dated May 20, 2016 had passed and instructed it to clearly state its position. On June 6, 2016, the First Applicant sent an email to the arbitral tribunal stating that it would submit a Written Statement of the First Applicant's Position no later than five days prior to the case management conference. On June 8, 2016, the Second Applicant sent an email to the arbitral tribunal to object to the abovementioned extension of deadline requested by the First Applicant and requested that the arbitral tribunal orders the First Applicant to submit its response no later than June 13, 2016.

116.	On June 14, 2016, the First Applicant sent an email to the arbitral tribunal with the enclosed "First Applicant's Written Response" that it had submitted in

response to the email dated May 20, 2016 sent by the Estate of the Second Applicant. In the said response, the First Applicant stated that, based on the position of the Estate of the Second Applicant in the email dated May 20, 2016, the First Applicant did not, at that moment, need to bring up the converting of the Estate of the Second Applicant to Fifth Respondent or request for the corresponding amendments to the arbitration petition. However, in view that the Estate of the Second Applicant reserving the rights to propose opinions or provide supplementations in the future, if the Estate of the Second Applicant were to proposes a position that would be different from or was unfavorable to the First Applicant, the First Applicant shall reserve the rights to once again request the arbitral tribunal to convert the Estate of the Second Applicant to a Respondent. The First Applicant also proposed that the arbitral tribunal order the Estate of the Second Applicant to submit an official written statement (including the confirmation that it did not have any opinions or additions to the pleadings and/or witness testimonies already submitted in the case at this point) on its position at that time and the attitude with regard to the case as mentioned above in the form of a pleading and/or witness statement as a "newly-added" party in the case. At the same time, the First Applicant requested for the guidelines of the current schedule to be postponed accordingly on the basis of the accession of the Estate of the Second Applicant.

117. On June 21, 2016, the arbitral tribunal sent an email to all parties and instructed the Second Applicant to provide its opinion on the First Applicant's written response before 6 p.m. on June 23, 2016, especially regarding the two questions below: (1) Will the Second Applicant adopt a different position from the First Applicant during the arbitration process? (2) Will the Second Applicant summon any factual witnesses or expert witnesses?

118. On June 23, 2016, the arbitral tribunal sent an email to all parties and instructed the Respondents to confirm as soon as possible on whether or not they would nominate a Chinese architectural surveyor as an expert witness.

119. On the same day, that is June 23, 2016, Baker sent an email to the arbitral tribunal with the "Outline of the Second Applicant's Written Statement" and its "Table of Content of Appendices" enclosed.

120. On June 24, 2016, the arbitral tribunal and all parties commenced the case management conference.

121. On June 28, 2016, the arbitral tribunal sent an email to all parties with the enclosed procedural order and Schedule of the Hearing ("**Order (III)**") dated June 28, 2016. In Order (III), the arbitral tribunal had approved the list of expert witnesses summoned by the First Applicant and the Respondents respectively, and formulated a Schedule of the Hearing.

122. On June 29, 2016, the Respondents sent a letter to the arbitral tribunal to submit the testimonies of the three witnesses of the Respondents. On the same day, the First Applicant sent an email to the arbitral tribunal to confirm that it had already delivered the hardcopy of the Statement of the First Applicant's Factual Witnesses along with appendices to the representative of the Second Applicant on the same day.

123. On July 21, 2016, Baker sent an email to HKIAC to confirm that it had received all documents dated up to December 5, 2013 that were submitted to the arbitral tribunal before the passing of the Second Applicant ("**dossiers**") provided to it in accordance with the requirements in Order (III). On the next day, that is July 22, 2016, Baker sent an email to the arbitral tribunal to request for an extension of the deadline for the relevant procedures and actions stated in the Schedule of the Hearing of Order (III) in view that the abovementioned dossiers were actually received later than the deadline stipulated in Order (III).

124. On July 26, 2016, Baker sent an email to the arbitral tribunal stating that it had noticed that a part of the appendix of the Respondents' "Statement of Defence and Counterclaim" was missing from the dossiers provided to it by HKIAC, and thereby requested for the arbitral tribunal to approve the extension of deadline that it had requested on July 22, 2016.

125. On July 28, 2016, the arbitral tribunal sent an email to all parties and instructed the First Applicant and the Respondents to provide opinions with regard to the request for the extension of deadline made by the Second Applicant.

126. On July 29, 2016, the First Applicant sent an email to the arbitral tribunal stating that the Second Applicant's delay in the receipt of the dossier was due to reasons attributable to itself. However, under the condition that the Second Applicant gave the promise to the arbitral tribunal that it would not request for a further extension of the deadline, the First Applicant would not object to the Second Applicant's request for the extension of deadline. On the same day, the Respondents sent an email to the arbitral tribunal stating that it would not object

27

to the Second Applicant's request for the extension of the deadline, and recommended that the deadlines stated in Item 9 to 11 of the Schedule of the Hearing should be extended accordingly as a result of the National Day holidays.

127. On July 30, 2016, the Second Applicant sent an email to the arbitral tribunal to refute the position proposed by the First Applicant that the Second Applicant's delay in the receipt of the dossiers was due to reasons attributable to itself, and requested that the arbitral tribunal issue the following orders: (1) Approve the Second Applicant's request for extension of deadline; (2) For the Respondents to provide the appendices of the "Statement of Defence and Counterclaim" (that is, Appendix B46, C1 - C30, and D1 - D30) yet to be received by the Second Applicant to the Second Applicant within seven days; (3) For the Second Applicant to pay the reasonable expenses for the printing of the abovementioned appendices of the "Statement of Defence and Counterclaim" to the Respondents; (4) For the Second Applicant to reserve the rights to claim the abovementioned expenses from the First Applicant; (5) For all parties to have the freedom to make other requests.

128. On August 1, 2016, the arbitral tribunal sent an email to all parties stating that the arbitral tribunal agreed to amend Order (III) on the basis that the time of the hearing remained the same, and it promulgated a new procedural order and Schedule of the Hearing ("**Order (IV)**").

129. On the same day, that is, August 1, 2016, the Second Applicant sent an email to the arbitral tribunal requesting the arbitral tribunal to issue orders with regard to the other requests made by it in the email dated July 30, 2016.

130. On August 2, 2016, the Respondent sent an email to the arbitral tribunal and agreed to conditionally provide the relevant appendices of the "Statement of Defence and Counterclaim" requested by the Second Applicant.

131. On August 5, 2016, the arbitral tribunal sent an email to all parties and instructed the Second Applicant and the Respondents to notify the arbitral tribunal of the outcome from their communications with regard to the provision of the relevant appendices of the "Statement of Defence and Counterclaim". On the same day, the Second Applicant sent an email to the arbitral tribunal to confirm that it had received the relevant appendices, and that it had reserved the rights to claim the expenses incurred from the First Applicant for obtaining the arbitration documents from HKIAC and the Respondents. On the same day, the First Applicant sent an email to the arbitral tribunal denying the allegation of "the

28

First Applicant illegally removed the documents from the Second Applicant's premises" made by the Second Applicant, and the relevant lawyer's letter was enclosed.

132. On August 15, 2016, the Second Applicant submitted the factual witness statement of Mdm. Ke to the arbitral tribunal via email. On the same day, the arbitral tribunal sent an email to all parties and approved the request made by the Second Applicant to summon Mr. Ye Yongqing as an expert witness.

133. On September 3, 2016, the First Applicant sent an email to the arbitral tribunal to request for the amendment of its "Reply and Defence to Counterclaim" in accordance with Article 18.1 of the "2013 Administered Arbitration Rules of the Hong Kong International Arbitration Centre"[2] ("**Request for Amendment**") and the draft of its "Amended Reply and Defence to Counterclaim" was enclosed. At the same time, the First Applicant requested the arbitral tribunal to instruct the Respondents to submit its "Amended Further Reply to the Applicants' Reply and Defence to Counterclaim" within seven days upon the submission of the "Amended Reply and Defence to Counterclaim" by the First Applicant, under the condition that the arbitral tribunal, the Second Applicant, and the Respondents did not object to the "Amended Reply and Defence to Counterclaim" submitted by the First Applicant.

134. On September 8, 2016, the Respondents sent an email to the arbitral tribunal and objected to the First Applicant's submission of the "Amended Reply and Defence to Counterclaim". On the next day, that is, September 9, 2016, the First Applicant sent an email to the arbitral tribunal and responded to the Respondents' reasons for objection.

135. On September 12, 2016, the Second Applicant sent an email to the arbitral tribunal stating that it agreed to the First Applicant's request for amendment, and sincerely requested the arbitral tribunal to approve the said request.

---

[2] The arbitral tribunal noticed that the First Applicant cited the "2013 Administered Arbitration Rules of the Hong Kong International Arbitration Centre". However, the "2008 Administered Arbitration Rules of the Hong Kong International Arbitration Centre" should be applied to this case instead. In view that, with regard to one party's amendment or supplementation of its request or defence, the difference in the relevant stipulations in the two sets of rules had no substantial impact on the arbitral tribunal's approval of the First Applicant's request for amendment, the arbitral tribunal shall deem the abovementioned citation of the "2013 Administered Arbitration Rules of the Hong Kong International Arbitration Centre" by the First Applicant as a typographical error.

AP_Legal – 104494610.1

136. On the same day, that is, September 12, 2016, the Respondents sent an email to the arbitral tribunal stating that all parties had reached a consensus with regard to the extension of the deadline in Items 8 and 9 in Order (IV) by one week, and requested for the arbitral tribunal's approval. On the same day, the arbitral tribunal sent an email to all parties and approved the said request for the extension of deadline.

137. On September 13, 2016, the arbitral tribunal sent an email to all parties and instructed that the arbitral tribunal had unanimously agreed to approve the First Applicant's request for amendment, but the First Applicant must pay all parties for all relevant expenses incurred with regard to the request for amendment. At the same time, the arbitral tribunal requested the First Applicant to officially submit the amended "Reply and Defence to Counterclaim" by September 15, 2016, and approved the submission of the amended "Further Reply to the Applicants' Reply and Defence to Counterclaim" by the Respondents to be no later than September 29, 2016.

138. On the same day, that is, September 13, 2016, the Second Applicant sent an email to the arbitral tribunal requesting the arbitral tribunal to provide it with an opportunity to submit a response letter to the arbitral tribunal with regard to the amendments to the "Reply and Defence to Counterclaim" made by the First Applicant. On September 21, 2016, the arbitral tribunal sent an email to all parties and stated that it did not support the Second Applicant's request to submit a response letter to the arbitral tribunal with regard to the amendments to the "Reply and Defence to Counterclaim" made by the First Applicant.

139. On September 14, 2016, the First Applicant sent an email to the arbitral tribunal and officially submitted the appendix "Amended Reply and Defence to Counterclaim".

140. On September 21, 2016, the First Applicant sent an email to the arbitral tribunal with two copies of the First Applicant's Statement on the Refutation of Factual Witnesses enclosed. On the same day, the Second Applicant sent an email to the arbitral tribunal with Mdm. Ke's Refutation of the Witness Statement and the appended evidence enclosed. On the same day, the Respondents also sent a letter to the arbitral tribunal, enclosing three copies of the supplementary witness statement of the Respondents' three witnesses, that is, the Second Applicant, Gu Yong, and Liu Yuping.

AP_Legal – 104494610.1

141.   On September 29, 2016, the Respondents sent a letter to the arbitral tribunal with the Respondents' "Amended Further Reply to the Applicants' Reply and Defence to Counterclaim" enclosed.

142.   On October 12, 2016, the representative of the Respondents sent an email to the arbitral tribunal stating that its team members had been joined by Sidley Austin LLP and was instructed by the Respondents to continue representing the Respondents in this case.

143.   On October 14, 2016, the Respondents sent an email to the arbitral tribunal stating that they requested to extend the deadline for the exchange of the Expert Witnesses Report by all parties in Item 9 of the arbitral tribunal's Order (IV) for seven days, from October 17, 2016 to October 24, 2016, upon reaching a consensus with all parties. However, this would not affect the deadlines for the subsequent items after Item 10 of Order (IV). On the same day, the arbitral tribunal sent an email to all parties and approved the abovementioned request under the condition that a consensus was reached by all parties.

144.   On October 24, 2016, the Second Applicant sent an email to the arbitral tribunal requesting the extension of the deadline for the exchange of the Expert Witnesses Report by all parties to October 28, 2016 under the condition that the next deadline (that is, the commencement of the experts' meeting on November 28, 2016) in the arbitration schedule would not be affected. The Second Applicant stated that it had already solicited the opinion of the First Applicant and the representative of the Respondents with regard to the said request, and the representative of the Respondents had agreed to it. However, the representative of the First Applicant had not provided any replies yet. On the same day, that is, October 24, 2016, the First Applicant sent an email to the arbitral tribunal stating that it did not object to the Second Applicant's abovementioned request, but it hoped that the arbitral tribunal issue an "unless" order with regard to this request for extension of deadline. On the same day, the arbitral tribunal sent an email to all parties and approved the abovementioned request for extension of deadline made by the Second Applicant. The arbitral tribunal also stated that it would not allow any requests for the extension of deadlines to be made unless there were unusual or special reasons, in order to prevent the commencement date of the hearing from being affected.

AP_Legal – 104494610.1

145. On October 28, 2016, the Second Applicant sent an email to the arbitral tribunal requesting to provide the first round of the unsigned expert report on the basis that the rights of all parties would not be affected on that day. On the same day, the First Applicant sent an email to the arbitral tribunal and objected to the Second Applicant's submission of the first round of the unsigned expert report. Thereafter, the arbitral tribunal sent an email to all parties on the same day and requested the Second Applicant to clarify the reasons for its unsigned expert report and when they could be signed; and whether or not the content in the signed expert report was fully consistent with the content in the unsigned expert report. Subsequently, the Second Applicant sent an email to the arbitral tribunal to explain the reasons for its request, and requested the arbitral tribunal to issue an order on whether or not the first round of the Expert Witnesses Report could be exchanged under the condition that the rights of all parties would not be affected.

146. On the same day, that is, October 28, 2016, the First Applicant sent an email to the arbitral tribunal with two copies of the First Applicant's Expert Witnesses Report enclosed. On the same day, the Second Applicant and the Respondents also sent emails to the arbitral tribunal separately, stating that they had delivered their signed Expert Witnesses Report to all the other parties without prejudice.

147. On November 15, 2016, the Second Applicant sent an email to the arbitral tribunal stating that, based on all the reasons listed in this email, the Second Applicant and Respondents unanimously deemed that the experts' meeting should commence on a "without prejudice" basis, and the representatives of all parties were not required to participate. The Second Applicant requested the arbitral tribunal to give instructions with regard to this matter.

148. On November 21, 2016, the arbitral tribunal sent an email to all parties and approved that the experts' meeting should commence on a "without prejudice" basis.

149. On December 13, 2016, the Respondents sent a letter to the arbitral tribunal stating that, in view that they had received different and even conflicting instructions and/or requests made by the First Applicant and the Second Applicant, respectively, they requested the arbitral tribunal to issue the following orders: (1) Instruct the Second Applicant (through its Administrators of the Estate) to express its opinions with regard to the two requests made by the

First Applicant in the letter dated December 9, 2016; (2) Instruct the First Applicant to express its opinions with regard to the recent request made by Mdm. Zhang; and (3) Unless the Applicants reach a consensus and provide a joint request to the Respondents, the Respondents shall not accept the unilateral instructions given by either the First Applicant or the Second Applicant.

150. On December 21, 2016, the Respondents sent an email to the arbitral tribunal stating that upon reaching a consensus by all parties, they requested to extend the deadline of the submission of the joint report on the statement of the viewpoints that were unanimously agreed upon by the expert witnesses and the statement of their differing viewpoints to January 4, 2017.

151. On December 30, 2016, the Second Applicant sent an email to the arbitral tribunal and enclosed its reply to the Respondents' letter dated December 13, 2016.

152. On December 31, 2016, the First Applicant sent an email to the arbitral tribunal and provided a reply to the Respondents' letter dated December 13, 2016 and the Second Applicant's letter dated December 30, 2016.

153. On January 11, 2017, the arbitral tribunal sent an email to all parties. The arbitral tribunal stated that it held that the mutual recriminations and allegations made by all parties were not related to this case. Hence, the arbitral tribunal would not take this matter into consideration or make judgements with regard to this matter. With regard to the "without prejudice" letter dated December 9 submitted by the Respondents to the First Applicant, the arbitral tribunal requested all parties to confirm that the arbitral tribunal would be able to continue hearing this case, regardless of whether a copy of the said letter was sent to the arbitral tribunal. The arbitral tribunal also reminded all parties to submit the joint expert reports.

154. Between January 12 - 13, 2017, all parties sent emails to the arbitral tribunal to confirm that the arbitral tribunal would be able to continue hearing this case.

155. On January 13, 2017, the Respondents sent an email to the arbitral tribunal stating that upon reaching a consensus by all parties, they requested to extend the deadline of the submission of the joint expert report to January 25, 2017. The arbitral tribunal sent an email to all parties on January 19, 2017 and approved the said request for extension of deadline under the condition that the overall Schedule of the Hearing would not be affected.

156. On February 16, 2017, the First Applicant sent an email to the arbitral tribunal and recommended that instructions be given by the arbitral tribunal with regard to the time of the pretrial conference.

157. On February 21, 2017, the Respondents sent a letter to the arbitral tribunal, enclosing (1) "Joint Expert Opinion Regarding the Issue on Equity Transfer and Issue on Taxes" jointly submitted on behalf of the Applicants and Respondents; and (2) "Joint Expert Opinion Regarding the Issue on Property" jointly submitted on behalf of the First Applicant and Respondents.

158. On February 27, 2017, the arbitral tribunal sent an email to all parties and notified them of the specific commencement time of the pretrial conference, which would be held on April 3, 2017. The arbitral tribunal also notified all parties that, as there was a conflict of time for one of the arbitrators, the arbitral tribunal agreed to allow the Chief Arbitrator to preside the pretrial conference on his own, and requested all parties' confirmation on this. All parties sent emails to the arbitral tribunal separately between February 27 - 28, 2017 to confirm that they agreed with the abovementioned arrangement.

159. On March 1, 2017, the Respondents sent an email to the arbitral tribunal, enclosing (1) Mdm. Yu Jian's Advisory Report of the Evaluation of the Byland Villa Project; (2) Mdm. Yu Jian's Advisory Report of the Evaluation of the Greencourt Sun City Project; and (3) Mr. Ji Nuo's Expert Opinion Letter and Summary of the Cited Laws and Regulations.

160. On March 6, 2017, the First Applicant sent a recommendation to the arbitral tribunal and made a complaint against the Respondents, stating that there were major additions or changes to the content of "Mr. Ji Nuo's Expert Opinion Letter and Summary of the Cited Laws and Regulations" submitted by the Respondents on March 1, 2017, as compared to the Mr. Ji Nuo's Expert Opinion Letter exchanged and submitted on October 28, 2016. The First Applicant requested the arbitral tribunal to issue an instruction on the refusal to accept all expert reports submitted by the Respondents in the email dated March 1, 2017, and to forbid either party to submit any new or amended expert reports.

161. On the same day, that is, March 6, 2017, the Second Applicant also sent an email to the arbitral tribunal and also objected to the Respondents' submission of the new expert report with content that was different from the version of the expert report submitted by them on February 21, 2017. It also requested the arbitral

tribunal to reject the expert report submitted by the Respondents on March 1, 2017.

162. On March 7, 2017, the arbitral tribunal sent an email to all parties and instructed the Respondents to reply to the abovementioned viewpoint and recommendations made by the First Applicant and the Second Applicant before 6 p.m. on March 9, 2017.

163. On March 9, 2017, the arbitral tribunal sent an email to all parties and recommended the adjustment of the commencement date of the hearing to May 16, 2017, instead of the original dates from May 15 to 26, 2017 (ten working days), due to the last-minute and urgent arrangement of one of the arbitrators, and where necessary, extend the time of the daily hearings. The arbitral tribunal requested all parties to confirm the above arrangement recommended by the arbitral tribunal before the pretrial conference on April 3, 2017. All parties sent emails to the arbitral tribunal separately between March 9 - 10, 2017 to confirm that they agreed with the abovementioned arrangement.

164. On March 9, 2017, the Respondents sent an email to the arbitral tribunal to reply to the Applicants' request for rejection in the email dated March 6, 2017, and requested the arbitral tribunal to reject the Applicants' request for rejection. On March 10, 2017, the arbitral tribunal sent an email to all parties and instructed the First Applicant and the Second Applicant that, if they intended to reply to the Respondents' email, they would have to provide a reply before March 14, 2017.

165. On March 13 and 14, 2017, the First Applicant and the Second Applicant sent letters to the arbitral tribunal separately and provided their replies to the Respondents' email dated March 9, 2017.

166. On March 29, 2017, the First Applicant sent an email to the arbitral tribunal enclosing a copy of the agenda of the pretrial conference jointly drafted by all parties.

167. On March 30, 2017, the Respondents sent an email to the arbitral tribunal and stated that they were willing to provide a copy of the Comparison Version of Mr. Ji Nuo's Final Expert Opinion Letter and the version dated October 28, 2016 ("**comparison version**") de bene esse (conditionally) to prove that the final version did not have "major additions or changes to the content" as described by the First Applicant. On such basis, the arbitral tribunal sent an email on the same

day and instructed the Respondents to provide the comparison version for review by the arbitral tribunal, as well as by the First and Second Applicant.

168.     On March 31, 2017, the Second Applicant sent an email to the arbitral tribunal stating that it objected to the Respondents' provision of the comparison version de bene esse, and also objected to the official submission of the comparison version by the Respondents. It also requested the arbitral tribunal to reject the Respondents' request to submit the comparison version or to not take the said comparison version into consideration. On the same day, on March 31, 2017, the Respondents sent an email to the arbitral tribunal and provided the comparison version to all parties. The First Applicant also provided a reply to the email on the Respondents' submission of the comparison version on the same day.

169.     On April 2, 2017, the arbitral tribunal sent an email to all parties to summarize the email correspondences with regard to the comparison version and the main position of all parties, and stated that it would further communicate with all parties during the pretrial conference.

170.     On April 3, 2017, the arbitral tribunal and all parties commenced the pretrial conference at HKIAC.

171.     On April 4, 2017, the arbitral tribunal sent an email to all parties and instructed that it: (1) Permitted Mr. Ji Nuo's Expert Opinion Letter submitted by the Respondents on October 28, 2016; (2) Rejected the amendments to Paragraph 8, Paragraph 9, and Paragraph 32 in Mr. Ji Nuo's Expert Opinion Letter and Summary of the Cited Laws and Regulations submitted by the Respondents on March 1, 2017; (3) Rejected Note 3, Note 7, Note 22, Note 23, Note 24, and the deleted Note 5 (at the same time, refer to point 4 below) in Appendix II of Mr. Ji Nuo's Expert Opinion Letter submitted by the Respondents on March 1, 2017; (4) Permitted all sentences of "Refer to Page [x] of the Summary of the Laws and Regulations" and the "Summary of the Cited Laws and Regulations" (except for Note 3, Note 7, Note 22, Note 23, Note 24, and the deleted Note 5) in Appendix II of Mr. Ji Nuo's Expert Opinion Letter submitted by the Respondents on March 1, 2017; (5) Permitted the "Summary of the Cited Laws and Regulations" submitted by the Respondents on March 1, 2017; (6) Did not support the issuance of any orders as to costs.

172.     On April 5, 2017, the arbitral tribunal issued a procedural order ("**Order (V)**") to all parties with regard to the details of the hearing arrangement via email.

173. On April 11 and 19, 2017, the arbitral tribunal sent an email to all parties and provided supplementary instructions with regard to the issues related to the dossiers of the hearing.

174. On May 5, 2017, the First Applicant and the Second Applicant sent emails to the arbitral tribunal separately, enclosing the electronic version of the Written Statement Prior to the Hearing (including "Authorities") submitted by each of them.

175. Between May 5 - 6, 2017, all parties sent an email to the arbitral tribunal separately and stated that they were unable to submit the relevant Chronology and Introduction of the People Involved in the Case before the deadline stipulated in Order (V) because all parties were unable to reach a consensus with regard to the Chronology and content of the Introduction of the People Involved in the Case. At the same time, the Respondents recommended that the deadline for the submission of the said documents be extended to 6 p.m. on May 9, 2017. On May 7, 2017, the arbitral tribunal approved the extension of the said deadline to 2 p.m. on May 8, 2017.

AP_Legal – 104494610.1

176. On May 8, 2017, the Respondents sent an email to the arbitral tribunal stating that upon reaching a consensus with both Applicants, they requested to extend the deadline of the submission of the Respondents' Written Statement Prior to the Hearing to 6 p.m. on May 9, 2017. The arbitral tribunal approved the said request on the same day, that is, May 8, 2017. On May 9, 2017, the Respondents sent an email to the arbitral tribunal, enclosing the electronic version of the Written Statement Prior to the Hearing and "Authorities" submitted by them. On the next day, that is, May 9, 2017, the Respondents resubmitted the electronic version of the "Authorities" to the arbitral tribunal via email as there were missing pages in the electronic version of the "Authorities".

177. On May 9, 2017, the Second Applicant sent an email to the arbitral tribunal, enclosing the: (1) Chronology; and (2) Introduction and Relationship Chart of the People Involved in the Case of all parties. The Second Applicant stated that the above documents covered the position of all parties, but as all parties were unable to reach a full consensus with regard to the content of the said documents within the stipulated deadline, the Applicants had added markings and comments in the portions of the documents where the opinions of the parties were different for the arbitral tribunal's reference.

178. On May 14, 2017, the arbitral tribunal sent an email to all parties and instructed all parties to inform the witnesses of the arbitration of the time and order of their appearance before 3 p.m. on May 15, 2017. The arbitral tribunal also instructed that the arbitral tribunal wished to receive a copy of the schedule that had been formulated upon the consensus of all parties.

179. On May 15, 2017, the First Applicant sent an email to the arbitral tribunal with the electronic version of the List of the First Applicant's Supplementary Laws and Regulations in the Applicants' Written Statement Prior to the Hearing enclosed. On the same day, on May 15, 2017, the Respondents sent an email to the arbitral tribunal with the (1) Amended "Authorities" of the Respondents' Written Statement Prior to the Hearing[3]; and (2) Relevant Schematic Diagram of the Structure of Equity Transfer and Checklist of the Steps enclosed.

---

[3] "Legal Judgements" was original document used in the Respondents' emails and its appendices.

180. On May 16, 2017, the First Applicant sent an email to the arbitral tribunal with the time and order of the appearance of the witnesses that was jointly discussed by all parties enclosed.

181. On May 16, 2017, the arbitral tribunal and all parties commenced the hearing. The hearing was conducted consecutively from May 16, 2017 to May 25, 2017 and ended on May 25, 2017. On August 8, 2017, the arbitral tribunal held a hearing to take all parties' closing argument into consideration.

182. On the first day of the trial on May 16, 2017, all parties agreed to delete the following paragraph for the purpose of the trial: That is, (a) Paragraphs 56-65 of the statement of Xu Hongbiao's statement (Pages 24-27 in Dossier B); (b) Paragraphs 23-24 of the statement of Xu Hongbiao's rebuttal to the factual witness (Page 104 in Dossier B); (c) Paragraphs 5-6 (Page 134 in Dossier B), Paragraphs 19-31 (Pages 135-137 in Dossier B, and Paragraphs 39-59 (Pages 138-142 in Dossier B) of Ke Yeying's rebuttal to the witness' statement.

## IV. Factual Background

AP_Legal – 104494610.1

183. Oasis Investment (First Respondent) is a company registered and established in the British Virgin Islands on July 26, 2001. It is also the parent company of the following three companies: Shanghai Greencourt Property Development Co., Ltd ("**Greencourt Property Development**"), Greencourt Properties Limited ("**Greencourt Properties**"), and Shanghai Oasis Kechuang Ecological Technology Co., Ltd. ("**Oasis Kechuang**"). Other than Greencourt Properties, which was established in Hong Kong, both Greencourt Property Development and Oasis Kechuang were established within China.

184. The total number of shares issued by Oasis Investment was 48,000 shares. The original equity distribution was as follows: Xu Hongbiao (First Applicant) held 8,000 shares (16.6%), Ke Zhengguang (deceased, his Estate is the Second Applicant of this case) held 8,000 shares (16.6%), Yu Naifen Stephany (Second Respondent) held 23,520 shares (49%), Yu Naiwen (Third Respondent) held 8,000 shares (16.6%), and Yu Naiyun (Fourth Respondent) held 480 shares (1%). As the total shares held by Yu Naifen Stephany, Yu Naiwen, and Yu Naiyun accounted for 66.6% of the shares, they were referred to as the "Controlling Shareholders" in the 4.28 Agreement. Xu Hongbiao and Ke Zhengguang were referred to as the "Non-controlling Shareholders" in the 4.28 Agreement.

185. Since early 2009, the Controlling Shareholders and the Non-controlling Shareholders started discussions with regard to issues on share restructuring for Oasis Investment. The discussion process and content can be seen in the following documents: "Minutes of the Greencourt Meetings of Shareholders and Board of Directors Regarding the Splitting of Assets and Other Related Matters" [D2/61/607] dated March 24, 2009, "Minutes for the Greencourt Shareholders' Meeting Convened on August 20, 2009" (also referred to as "8.20 Minutes" [D2/63/615] dated September 4, 2009, "Preliminary Agreement on Share Restructuring for Oasis Investment Group Limited" ("**Restructuring Agreement**") [D2/68/622] dated November 9, 2009, and "Meeting Minutes" [D2/96/718] dated February 3, 2010.

186.    In the end, both parties and the related companies concluded the "4.28 Agreement"[4] on April 28, 2010, and its main content was as follows:

(1)     Ke Zhengguang and Xu Hongbiao would transfer the equity they each held in Oasis Investment to Cheergain International Group Limited ("**Cheergain International**") and Focus Town Limited ("**Focus Town**") respectively. After the said transfers had been completed, Oasis Investment then repurchase the equity of Oasis Investment held by Cheergain International and Focus Town respectively ("**Equity Transfer before Repurchase**"). The Respondents agreed to the above arrangement and were willing to provide the necessary cooperation: See Article 1.1 [D2/100/751].

(2)     Oasis Investment must pay consideration to the Non-controlling Shareholders in three parts, including cash consideration, equity consideration, and consideration of property exchange with regard to the Equity Transfer before Repurchase:

(3)     **For cash consideration**, a total of RMB 250 million was to be paid in three installments, and they were: [RMB] 80 million, 20 million, and 150 million, respectively; for the payment made in each period, the necessary prerequisites must be met: See Article 2.1 and Article 2.2 [D2/100/752].

(4)     **The equity consideration** was to be calculated and paid based on 100% of the equity of Shanghai Greencourt Four-Season-Flower-City Property Development Co., Ltd. ("**SJHC**"): See Article 2.3 [D2/100/754]. The aim of the arrangement made under the 4.28 agreement was to allow the Non-controlling Shareholders to fully own and control SJHC.

(5)     **For the consideration of property exchange**, Oasis Investment and the Controlling Shareholders must appoint Greencourt Property Development and the Non-controlling Shareholders (or its appointed

---

[4]     There were ten signatories of the 4.28 Agreement. They were (i) Oasis Investment; (ii) Yu Naifen Stephany; (iii) Yu Naiwen; (iv) Yu Naijun; (v) Ke Zhengguang; (vi) Xu Hongbiao; (vii) Cheergain International Group Limited; (viii) Focus Town Limited; (ix) Greencourt Properties; and (x) Oasis Kechuang.

third party) to conclude the "Shanghai Real Estate Sale and Purchase Contract" and transfer the property for commercial use of approximately 8,000 square meters, located at Jiuting, Songjiang District, Shanghai City ("**Jiuting Stores**") Greencourt Sun City Real Estate Project held by Greencourt Property Development to the Non-controlling Shareholders (or its appointed third party). At the same time, SJHC and Oasis Investment or a third party appointed by the Controlling Shareholders shall conclude the "Villa Order Contract" and transfer the two buildings of A2-type villas on Central Island ("**A2-Type villas**") of the Peninsula Villa Project located at Fengpu Industrial Area, Fengxian District, Shanghai City that it had developed to Oasis Investment or a third party appointed by the Controlling Shareholders. All parties confirmed that the value of the property involved in the abovementioned "Shanghai Real Estate Sale and Purchase Contract" and "Villa Order Contract" were all priced at RMB 72 million. As the prices of the two properties were equivalent, the consideration for this item was deemed as a mutual offset: See Article 3.1 to Article 3.3 [D2/100/755].

(6)     Starting from the date of conclusion of the Agreement, the related party transactions between SJHC and Oasis Investment and its subsidiary companies should be terminated; all the pre-existing [intragroup] debts and claims should be settled within one month: See Article 3.6 [D2/100/756].

187.    After the conclusion of the 4.28 Agreement, the Equity Transfer before Repurchase by Cheergain International and Focus town was completed on May 4, 2010 [D2/110 - 114/791 - 799]. That is, the Non-controlling Shareholders had promptly fulfilled a part of its obligations under the 4.28 Agreement. However, the Non-controlling Shareholders and Controlling Shareholders had a dispute with regard to the cash consideration, equity consideration, and consideration of property exchange of the share repurchase, as well as issues on the settlement of the debts and claims, which eventually led to this arbitration.

## V.     Disputed Matters and Position of Both Parties

### A.     Cash Consideration

AP_Legal – 104494610.1

188. With regard to cash consideration, Oasis Investment had paid the amount for the first and second installments (a total of RMB 100 million) to the Non-controlling Shareholders in accordance with the stipulations in the 4.28 Agreement.

189. However, Oasis Investment had not yet paid the amount for the third installment (estimated to be RMB 150 million. The final amount should be adjusted in accordance with the stipulations in Article 2.2.1 (4) of the 4.28 Agreement). According the Article 2.2.1 (3), the amount for the third installment must be paid before December 31, 2012, under the condition that the following prerequisites were met:

   (1)    The government approvals and registration procedures for the equity transfer of SJHC must be already completed;

   (2)    Oasis Investment must have completed the registration procedures for the change in shareholders required for the repurchase of the equity of the Non-controlling Shareholders;

   (3)    The Non-controlling Shareholders and Controlling Shareholders must have reached an agreement with regard to the arrangements for the payment of cash consideration and the adjusted amount of each item as stipulated in Article 2.1;

   (4)    The Non-controlling Shareholders must have confirmed that the payment of equity consideration stipulated in Article 2.3.5 of the 4.28 Agreement had been completed and all parties have no objections to the above;

   (5)    The "Shanghai Real Estate Sale and Purchase Contract" of Jiuting Stores as described in Article 3.1 of the 4.28 Agreement and the "Shanghai Real Estate Presale Contract" of A2-type villas as described in Article 3.2 of the 4.28 Agreement must be concluded and the registration procedures for the transfer of ownership or presale must be completed at the Real Estate Registration Authority.

190. The Non-controlling Shareholders and the Controlling Shareholders both alleged that items (1), (3), (4) and (5) of the abovementioned prerequisites had not been fully met due to the breach of contract by the other parties. It was undisputed by both parties that item (2) of the prerequisites had been completed.

43

### B.     Equity Consideration

**Equity Transfer Structure**

191.    Article 2.3.1 of the 4.28 Agreement stipulates that:

*"Oasis Investment has newly incorporated Shibang Company Ltd ("**Shibang Company**") in Hong Kong and has arranged for Shibang Company to acquire 80% of the equity interest in [SJHC] held by [Greencourt Properties], a subsidiary of Oasis Investment in Hong Kong. After the completion of the said equity acquisition, Oasis Investment shall sign the "Equity Purchase Option Agreement" with [Cheergain International] and [Focus Town] and agree that upon the expiration of the entrustment period mentioned in Article 2.3.2 below, 100% of the equity of Shibang Company shall be transferred to [Cheergain International] and [Focus Town] at a consideration of HKD 1"*

192.    Article 2.3.2 of the 4.28 Agreement further stipulates that:

*"All Parties Agree That:  After Oasis Investment's signing of the Equity Purchase Option Agreement for the equity transfer of Shibang Company to [Cheergain International] and [Focus Town], Greencourt Properties is to sign the relevant Entrustment Agreement with [Cheergain International] and [Focus Town]. This agreement shall stipulate that:  (1) [Cheergain International] and [Focus Town] are entrusted by Greencourt Properties to manage Shibang Company and to exercise the shareholders' rights on its behalf for three years (the "entrustment period"); (2) during the entrustment period, the Non-controlling Shareholders are responsible for all the debts and claims, risks and liabilities of Shibang Company and SJHC. If for any reason the Controlling Shareholders, Oasis Investment or Greencourt Properties are required to bear the debts and claims, risks and liabilities of Shibang Company or SJHC during the entrustment term, the Non-controlling Shareholders are required to fully compensate the Controlling Shareholders, Oasis Investment and Greencourt Properties."*

193.    While Article 2.3.3 of the 4.28 Agreement stipulates that:

*"The remaining 20% of the equity of [SJHC] currently held by [Oasis Kechuang], a subsidiary of Oasis Investment, is to be transferred to a domestic company in China appointed by the Non-controlling Shareholders ("Onshore Payment of Equity Consideration"). If under the laws of the People's Republic*

*of China, an actual payment of consideration is required to be made for such equity transfer, the provisions of the abovementioned Article 2.2.1(4)(a) shall apply."*

194.    Article 2.3.4 of the 4.28 Agreement stipulates that:

*"All Parties Agree That:   The Non-controlling Shareholders shall be responsible for all the tax and expenses incurred due to the <u>Onshore</u> Payment of Equity Consideration, as well as the tax and expenses incurred <u>offshore</u> due to the entrustment arrangement made by Shibang Company and the equity transfer of Shibang Company to [Cheergain International] and [Focus Town]. Apart from this, the sharing of the tax and expenses relating to the payment of Equity Consideration is to be negotiated by all the Parties in due course. All procedures relating to the onshore and offshore payment of Equity Consideration, such as applications, registrations and government procedures, etc. are to be undertaken by the Non-controlling Shareholders while the Controlling Shareholders and Oasis Investment are to provide the necessary assistance. (underlines added later)*

## C.    Consideration of Property Exchange

195.    The 4.28 Agreement stipulates a property exchange by both parties, that is: The exchange of the Jiuting Stores and A2-type villas and they shall both be deemed as considerations. The position of the Applicants was: The 4.28 Agreement confirmed that both parties shall not make actual payment for the value of the property as the value of the Jiuting Stores and A2-type villas were both priced at RMB 72 million and were mutually offset. Hence, there were no issues with regard to whether or not the Jiuting Stores and A2-type villas were actually equivalent. Furthermore, it was also clearly stated in Article 3.2 of the Agreement that the two buildings of the A2-type villas had a "drawing area of 1,200 square meters each", but it was never mentioned or suggested in the Agreement that the price of RMB 72 million was calculated based on the saleable gross floor area.

196.    Whereas, the Respondent declared that the price of RMB 72 million of the A2-type villas was calculated based on (1) the saleable gross floor area of the two buildings of the villa, which was 2,400 square meters in total, and (2) the average price of every square meter of the gross floor area not being lower than

RMB 31,500. The Respondents declared that this was the basis of both parties' agreement on Article 3.3 of the 4.28 Agreement.

197.    Below, the arbitral tribunal provided an overview of all the claims of all parties that were not fulfilled as agreed with regard to cash consideration, equity consideration, and consideration of property exchange. If the arbitral tribunal did not specially point out the statement or viewpoint of a certain party in this arbitral award, this does not mean that the arbitral tribunal failed to consider the portion of the statement. In view of the wide range of statements made by all parties in this case, the arbitral tribunal held that it was not necessary to list every statement made by the parties concerned. It was also not practical to list every statement made by the parties concerned in this arbitral award. The arbitral tribunal had read and carefully considered the statements made by all parties. The members of the arbitral tribunal had also conducted discussions with regard to the statements made by all parties.

**Payment of Cash Consideration**

198.    The Applicants held that in accordance with Article 2.2.1 (3)(d) in the 4.28 Agreement, one of the prerequisites in the clause regarding the payment of cash consideration by the Controlling Shareholders was that the Non-controlling Shareholders confirmed that the payment for equity consideration as stipulated in Paragraph 2.3.5 of the 4.28 Agreement had been completed, and all parties had no objections to this. However, "both parties of the arbitration had disputes with regard to each of the following steps of equity transfer: (1) Shibang Company's acquisition of 80% of the equity of SJHC held by Greencourt Properties; (2) The transfer of the equity of Shibang Company to Focus Town Limited and Cheergain International owned by the Non-controlling Shareholders made by Oasis Investment; (3) The transfer of "20%"[5] of the equity of SJHC held by Oasis Kechuang to a domestic company within China established by the Non-controlling Shareholders (that is, Shanghai Luhao Trading Co., Ltd. (hereinafter referred to as "**Luhao Trading**"). The reason for the incomplete equity transfer of these three items should be attributable to the Respondents.

---

[5]    There was a typographical error wrongly written as 80% in the concluding statement of the Applicants.

199. The Respondents agreed to the claim that the prerequisites were not met, but held that the Applicants should be responsible for the prerequisites stipulated in Paragraph B to Paragraph D of Article 2.2.1 (3) that were not being met.

200. As described in Paragraphs 189-190 above, Oasis Investment had not yet paid the said amount to the Non-controlling Shareholders as certain prerequisites for the payment of the said amount were not met. The reasons for prerequisites not being met were related to the incomplete payment of the equity consideration. Hence, the arbitral tribunal shall provide an overview of the position of all parties in the portion involving equity consideration below.

**Payment of Equity Consideration**

201. With regard to the payment of equity consideration, Article 2.3.5 of the 4.28 Agreement stipulates that the equity consideration shall be deemed as completed after the conclusion of the two sets of agreements below: (1) The "Equity Purchase Option Agreement" as described in Article 2.3.1, and (2) the "Entrustment Agreement" as described in Article 2.3.2. In accordance with the stipulations in the 4.28 Agreement, Oasis Investment and the Controlling Shareholders should conclude an "Equity Purchase Option Agreement" with Cheergain International and Focus Town. Under this Agreement, Oasis Investment shall transfer 100% of its equity in Shibang Company to Cheergain International and Focus Town established by the Non-controlling Shareholders at a consideration of HKD 1. Upon the conclusion of the abovementioned "Equity Purchase Option Agreement" of Shibang Company, Greencourt Properties shall conclude an "Entrustment Agreement" with Cheergain International and Focus Town. Under this Agreement, all parties agree that (a) Cheergain International and Focus Town shall be authorized by Greencourt Properties to manage Shibang Company, and they may exercise shareholders rights on behalf of it for three years; (b) During three-year entrustment period, all debts and claims, liabilities, and risks of Shibang Company and SJHC shall be borne by the Non-controlling Shareholders. The Non-controlling Shareholders shall also be liable for compensation to the Controlling Shareholders with regard to the actual debts and claims, liabilities, and risks borne by the Controlling Shareholders.

202. The Applicants claimed that the transfer of SJHC involved the three following steps: (1) Oasis Investment should assist Shibang Company with the completion

47

of the acquisition of 80% of equity of SJHC held by Greencourt Properties ("acquisition by Shibang", i.e. the first step of the transfer of 80% equity of SJHC); (2) After the expiration of the three-year entrustment period, Oasis Investment should transfer the equity of Shibang Company to Focus Town and Cheergain International established by the Non-controlling Shareholders (i.e. the second step of the transfer of 80% equity of SJHC); (3) Oasis Kechuang should transfer its [20%][6] equity in SJCH to a domestic company (i.e. Luhao Trading) in China designated by the Non-controlling Shareholders. The Applicants claimed that both [Applicants and Respondents] of the arbitration have disputes concerning each of the above equity transfer steps. However, the fundamental reason for the incomplete transfer of the equity of SJHC was caused by the Controlling Shareholders' violation of their contractual obligations under 4.28 Agreement and serious delays.

---

[6]     There was a typographical error wrongly written as 80% in the concluding statement of the Applicants.

203. The Respondents claimed that there were three reasons why Shibang Company failed to complete the purchase: (1) Upon signing the 4.28 Agreement, the equity of Greencourt Properties in SJHC was only 69% and it did not enjoy the preferential tax treatment under the "Notice on Several Issues Concerning Corporate Income Tax Treatment of Enterprise Restructurings promulgated by the Ministry of Finance and the State Administration of Taxation" promulgated by the Ministry of Finance and State Administration of Taxation on April 30, 2009 (hereinafter referred to as "**Document No. 59**") (at least 75% required), thus it had to increase its capital to at least 75%, and this capital increase was only completed in July 2011 (increased to 80%); (2) The Controlling Shareholders only "arranged" for Shibang Company's acquisition obligations under Article 2.3.1, and this obligation was fulfilled when they established Shibang Company; (3) The Non-controlling Shareholders had actual control over SJHC at that time, but they did not provide the audit report and/or evaluation report of SJHC, which made it impossible for the Controlling Shareholders to submit a "reasonable equity transfer price" to the relevant government agency, thereby causing Shibang Company to fail in the completion of the acquisition.

204. The Applicants claimed that:

Firstly, the fundamental reason for the unsuccessful acquisition by Shibang Company was that the Controlling Shareholders had violated the provision of Article 2.3.1 of the 4.28 Agreement and did not provide the most basic equity transfer agreement between Greencourt Properties and Shibang Company regarding the transfer of 80% equity of SJHC ("**80% equity transfer agreement**"), resulting in the inability to proceed with the transfer (not to mention completion).

Secondly, according to the expressed provisions of Article 2.3.1 of the 4.28 Agreement, the acquisition by Shibang Company had been carried out when the 4.28 Agreement was signed. Based on the principle of contractual estoppel and the principle of estoppel by convention, the Controlling Shareholders could not go back on their promise and say that they had only needed to "arrange" for Shibang's acquisition, ignoring the importance of the obligation of "acquisition" itself. In addition, they also could not go back on their promise and say that Shibang Company had not completed the acquisition. Therefore, even if the acquisition by Shibang Company had not taken place as the capital increase of

49

SJHC had not been completed upon the signing of the 4.28 Agreement, it should not affect the reliance of the Non-controlling Shareholders on the clear meaning and validity of Article 2.3.1, that is, the Controlling Shareholders have the responsibility to complete the acquisition by Shibang Company to enable themselves to fulfill the obligation to ultimately transfer the 80% equity of SJHC to the Non-controlling Shareholders under that Article (which has not been disputed by the parties concerned).

Thirdly, the Respondents presented the following claims, i.e. the Non-controlling Shareholders knew, as a matter of fact that, the capital increase of SJHC had not been completed upon the signing of the 4.28 Agreement, thus they also knew that Shibang Company had not completed the acquisition at that time. The Applicants believed that even if the Non-controlling Shareholders knew that the overview stated in the Article was not factual, it should not affect the application of the principle of contractual estoppel or the principle of estoppel by convention, and the evidence in this case showed that the Non-controlling Shareholders did not actually know that the capital increase of SJHC had not been completed upon the signing of the 4.28 Agreement.

Fourthly, the Respondents claimed that the completion of the acquisition by Shibang Company was a responsibility of the Applicants based on Article 2.3.4 of the 4.28 Agreement. The Applicants believed that Article 2.3.4 of the 4.28 Agreement limited the scope of the relevant taxes and fees that should be managed and borne by the Non-controlling Shareholders to (a) equity transfer procedures related to the payment of onshore equity consideration (i.e. the transfer of 20% equity of SJHC by Oasis Kechuang to Luhao Trading) and resulting taxes and (b) the entrustment arrangement with Shibang Company outside of Mainland China and the equity transfer procedures for the transfer of equity by Shibang to Cheergain International and Focus Town, as well as the resulting taxes, but excluding the equity transfer procedures or taxes related to the acquisition by Shibang Company.

Fifthly, according to expert opinions, the 80% equity transfer agreement was a fundamental application document for the completion of the acquisition by Shibang Company, and the Respondents had never provided this document to the Applicants. Regarding the Respondents' claim that Shibang Company failed to complete the acquisition because the Controlling Shareholders could not submit a "reasonable equity transfer price" to the relevant government agency

due to the failure of the Non-controlling Shareholders to provide the audit report and/or evaluation report of SJHC that were under the control of the Non-controlling Shareholders at that time, the Applicants believed that, based on expert opinions, the audit report and/or evaluation report would only affect the assessment and adjustment of the appropriateness of the transfer price by the tax authorities after the equity transfer procedures were completed (i.e. after review and approval by the Commission of Commerce and the completion of the industrial and commercial registration), and would not affect the effect of the transfer itself. Regarding the tax liability to be borne by the Non-controlling Shareholders with respect to the acquisition by Shibang Company put forward by the Respondents, the Applicants believed that such taxes should be borne by the Controlling Shareholders as intended in the 4.28 Agreement; Otherwise, the parties concerned would have specified differently in the agreement.

205. Regarding the failure to complete the transfer of 20% equity of SJHC, the Respondents claimed that it was because the Applicants only designated Luhao Trading as the onshore company under Article 2.3.3 of the 4.28 Agreement in March 2011. The Applicants claimed that even if the Applicants had already designated an onshore company before Oasis Kechuang's shareholding ratio in SJHC was reduced to 20%, the transfer of 20% equity of SJHC remained impossible to complete.

206. The Respondents claimed that the transfer of 80% and 20% equities of SJHC could be carried out separately. Therefore, it requested the arbitral tribunal to consider the responsibilities of the 80% and 20% equity transfer separately. The Respondents also pointed out that the controlling rights of SJHC had been fully handed over to the Applicants on November 15, 2009.

207. The Respondents believed that, based on the opinions of Chinese legal experts, the transfer of 80% and 20% equities of SJHC would need to undergo three stages of administrative procedures, i.e. review and approval by the competent commerce department, industrial and commercial registration of changes, taxation of foreign currency transaction and other registration of changes, among which Ji Nuo believed that the stage of review and approval by competent commercial authority would already reflect the requirements of the audit agency on audit report and evaluation report, and the competent commerce department would use the audit report or evaluation report as an important reference; at the same time, both Ji Nuo and Ye Yongqing agree that "the

enterprise's audit report for the previous year issued by an accounting firm" required in the "Review and Approval Procedures for Equity Transfer of Foreign-Invested Enterprises" published by Fengxian District Economic Committee should be provided by the parties concerned, and the equity transfer agreement should usually include the amount of equity purchased and its price or calculation method.

208. Regarding the transfer of the 20% equity, the Respondents believed that, since the Applicants had actually controlled SJHC from November 15, 2009 onwards, only the Applicants could enable the auditor/evaluator to perform the latest audit/evaluation on the assets of SJHC before the equity transfer, but the Applicants did not provide the latest audit/evaluation, thus a reasonable equity transfer price could not be obtained and the "Equity Transfer Agreement" could not be prepared in the absence of this price. Therefore, the responsibility of the incomplete transfer of the 20% equity lies with the Applicants' failure to perform its obligations under Article 2.3.4 of the 4.28 Agreement, which drove SJHC to prepare the latest audit report or evaluation report, and to promptly designate an onshore company to be the transferee of the 20% equity. In addition, the Applicants had yet to push forward this part of the equity transfer after SJHC's capital increase was completed in July 2011 (i.e. after Oasis Kechuang's equity of SJHC was reduced to 20%).

209. Regarding the transfer of the 80% equity, the Respondents believed that the key to this incomplete transfer was that Greencourt Properties transferred its 80% equity in SJHC to Shibang Company and the responsibility of the incomplete transfer lies with the Applicants. The Respondents believed that, according to the provision of Article 2.3.4 of the 4.28 Agreement, the transfer of the 80% equity of SJHC from Greencourt Properties to Shibang Company was "one of the steps in the payment of foreign equity consideration", thus the Respondents only had the obligation to assist the transfer and had no management responsibility. The Applicants should be responsible for this transfer, including the preparation of the "Equity Transfer Agreement", and the said agreement had to also refer to the latest audit report or evaluation report of SJHC to arrive at a fair price acceptable to the competent authority. Similarly, the responsibility for providing the audit report or evaluation report lies with the Applicants.

210. Regarding whether the Applicants knew that the 80% equity of SJHC had not been transferred to Shibang upon the signing of the 4.28 Agreement, the

Respondents believed that the evidence showed that the Applicants clearly knew about it. The sentence "Oasis Investment ... has arranged for Shibang Company to acquire 80% of the equity in [SJHC] … held by Oasis Investment" under Article 2.3.1 in the 4.28 Agreement was a typographical error. If it had actually completed such acquisition at that time, the sentence should appear in the foreword of the 4.28 Agreement rather than in Article 2.3.1, and the second sentence of the said Article "After the completion of the said equity acquisition..." would also be unnecessary. For this, the real intention of the parties concerned was that Oasis Investment had already arranged for Shibang Company to purchase the 80% equity.

211.  Regarding the assumption of tax arising from the 80% equity transfer, the Respondents claimed that the tax should be borne by the Applicants for the following reasons: Firstly, the 80% equity of SJHC was transferred in a devious way to Cheergain International and Focus Town, which were established by the Applicants to save tax for the Applicants; secondly, the Applicants had no evidence to prove that the parties concerned agreed that the Respondents should bear the taxes for the transfer of this 80% equity; thirdly, upon concluding the agreement, the intention of the parties concerned was that in the event Document No. 59 could not be used to help the Applicants save tax, the Respondents would be willing to consider separately negotiating on paying a certain proportion of the taxes that should be borne by the Applicants at the appointed time; fourthly, Article 2.3.4 of the 4.28 Agreement also clearly stipulated that "Apart from this, the sharing of the tax and expenses relating to the payment of Equity Consideration is to be negotiated by all the Parties in due course"; fifthly, the Applicants claimed that, based on the principle of contractual estoppel, the relevant taxes should be borne by Greencourt/Shibang since the 80% equity of SJHC was transferred by Greencourt Properties to Shibang Company upon the signing of the 4.28 Agreement, and this had nothing to do with the Applicants. The Respondents believed that the principle of contractual estoppel did not apply here; sixthly, if the arbitral tribunal held that the tax liability of this 80% equity transfer is not covered under the second sentence of Article 2.3.4 of the 4.28 Agreement, then it should be covered under the first sentence of the said article.

## Completion of Property Exchange

AP_Legal – 104494610.1

212.  The Applicants claimed that, according to stipulations of Articles 3.1 to 3.3 of the 4.28 Agreement, SJHC is only obliged to transfer the two A2-type villas that it developed at the designated location in Fengxian District, Shanghai to the Oasis Investment or a third party designated by the Controlling Shareholders after achieving the property handover criteria. The gross floor area on drawings of each of the two A2-type villas was about 1,200 square meters, and the parties concerned confirmed that the total price was RMB 72 million.

213.  Firstly, the Applicants claimed that "gross floor area on drawings" meant the gross floor area shown on the drawings approved by the Shanghai Fengxian District Planning, Land and Resources Administration, and the said drawing was enclosed in the Construction Project Planning Permit issued by the Fengxian District Planning, Land and Resources Administration on January 7, 2009 (i.e. when SJHC was still controlled by the Controlling Shareholders). The said permit was handed over by the Controlling Shareholders to the Non-controlling Shareholders, and subsequently the construction of the relevant A2-type villas was carried out according to the said drawing. In addition, the drawing had not been modified. Based on the above reasons, the Applicants claimed that the Controlling Shareholders' reference of the "gross floor area on drawings" as the saleable area or super built-up area should not be adopted.

214.  Secondly, Article 3.3 of the 4.28 Agreement stipulates that the A2-type villas and Jiuting Stores should be used for property exchange or equivalent-value exchange. The Applicants claimed that the parties concerned agreed to carry out property exchange, i.e. the parties concerned agreed that (i) Jiuting Stores and (ii) the two A2-type villas were priced at RMB 72 million. Since the two prices were equal, the considerations were offset by each other. Therefore, the market prices of Jiuting Stores and the two A2-type villas have nothing to do with the property exchange.

215.  The Applicants believed that the Controlling Shareholders' refusal to accept the A2-type villas without justifiable reasons and its refusal to transfer the Jiuting Stores caused the Non-controlling Shareholders to suffer serious losses (including the rental losses resulting from the Non-controlling Shareholders' inability to have control over the 2,000 square meters of the Phase-II Jiuting Stores and to lease out this part of the stores).

AP_Legal – 104494610.1

216.    The Respondents believed that the above-ground floor area of the A2-type villas provided by the Applicants was only 600 square meters each, which was completely inconsistent with the requirements of Article 3.2 of the 4.28 Agreement, wherein the above-ground floor area of each villa should be approximately 1,200 square meters. The Respondents emphasized that the 4.28 Agreement itself was not accompanied by any drawings, and the Controlling Shareholders had not received any drawings showing the total gross floor area of each villa (including gross floor area above and below ground) was approximately 1,200 square meters before signing the 4.28 Agreement.

217.    The Respondents believed that Articles 3.2 and 3.3 of the 4.28 Agreement should be interpreted as that the value of the A2-type villas and Jiuting Stores should start from RMB 72 million, i.e., the two should be used for exchange at equivalent value and not for property exchange. In order for the valuation of the two A2-type villas to reach up to a total of RMB 72 million and calculated at a unit price of RMB 31,500 per square meter, the floor area of each villa must be approximately 1,200 square meters. The Respondents claimed that the term "gross floor area on drawings" had no specific interpretation under Chinese law and that it must be understood in light of the specific circumstances of the parties concerned in agreement when the 4.28 Agreement was discussed and signed.

218.    The Respondents believed that, in view of the fact that the A2-type villas provided by the Applicants were inconsistent with the requirements of the 4.28 Agreement, unless the Applicants[7] compensate for the price difference between the defective A2-type villas and the villas the Respondents should receive (according to the calculation of the Respondents, was RMB 41,820,000), the Respondents were not obliged to accept the A2-type villas [provided by the Applicants]. Prior to this, the Respondents had no obligation to hand over the control rights of the remaining 2,000 square meters of the [Jiuting] property to the Applicants.

**Debt Settlement**

---

[7]    The Respondents was mistakenly written as "the Respondents" here.

AP_Legal – 104494610.1

219. Regarding debt settlement, the Applicants and the Respondents have listed the debt settlement items disputed by the parties concerned in their written statement and indicated their respective positions.

## VI.    Petitions of the Applicants and Respondents

### Petitions of the Applicants

220. Both the First Applicant and the Second Applicant adopt the same arbitration petition. In Paragraph 40 of the said application, the Applicants listed the following petitions:

(1)     Order that the First Respondent or the Respondents to cause Greencourt Property Development to sign the "Shanghai Real Estate Sale and Purchase Contract" regarding the Jiuting Stores with the Applicants or their designated third party, and to transfer the ownership of the Jiuting Stores to the Non-controlling Shareholders or their designated third party; (Article 3.1 of the 4.28 Agreement)

(2)     Order that the First Respondent or the Respondents to cause its designated third party to sign the A2-type villas' "Shanghai Commercial Real Estate Presale Contract" with SJHC and complete the relevant presale registration procedures; (Article 3.2 of the 4.28 Agreement)

(3)     Order that the Respondents to settle and pay the debts of SJHC and the First Respondent to the Applicants based on the current account checklist of the Applicants (i.e. Appendix 1 of the arbitration petition) (within 4 weeks from the date of the arbitration award); (Article 3.6 of the 4.28 Agreement)

(4)     Order that the First Respondent to arrange for and cause Shibang Company to acquire the 80% equity of SJHC held by Greencourt Properties, a subsidiary of the First Respondent; (Article 2.3.1 of the 4.28 Agreement)[8]

---

[8]    The board of directors of Shibang Company has four directors, and the parties concerned have the right to appoint two directors. The Articles of Association of Shibang Company stipulates that a resolution is effective as long as it is signed by two directors.

(5)     Order that the First Respondent and the Controlling Shareholders to sign and cause their subsidiary, Greencourt Properties, to co-sign the Equity Purchase Option Agreement and the entrustment agreement concerning Shibang Company; (Articles 2.3.1 and 2.3.2 of the 4.28 Agreement)[9]

(6)     Order that the Respondents or the First Respondent to cause Oasis Kechuang to transfer its 20% equity of SJHC to Luhao Trading;[10]

(7)     Order that the Respondents or the First Respondent to cause Greencourt Property Development to repay all mortgage, loans or guarantees (including interests) of the Jiuting Stores and to remove all existing mortgage, guarantees on the Jiuting Stores;

(8)     As an alternative to Item (7), order that the Respondents to compensate the Applicants for the total amount required for the repayment of all existing mortgage guarantees on Jiuting Stores by the Applicants;[11]

(9)     Order that the Respondents to pay the balance of the cash consideration for the repurchase of equity, i.e. Hong Kong dollars equivalent to RMB 150 million and the final amount shall be adjusted in accordance with Article 2.2.1(4) of the 4.28 Agreement.

## Counter-claims of the Respondents

221.    The Respondents put forward four counterclaims in Paragraphs 79 - 83 of their Statement of Defence and Counterclaim:

(A)     Counterclaim on equity consideration

---

[9]     According to the provisions of the 4.28 Agreement, after Shibang Company has acquired the 80% equity of SJHC, Greencourt Properties should entrust Cheergain International and Focus Town to manage the 80% equity on behalf of Shibang Company. Therefore, the entrustment agreement should be signed by Greencourt Properties, Cheergain International and Focus Town. After the 3 years of entrustment management, the 80% equity will be transferred from Shibang Company to Cheergain International and Focus Town at a consideration of HKD 1.The relevant Equity Purchase Option Agreement should be signed by Oasis Investment, Cheergain International and Focus Town.

[10]    There is no need for the word "third party" because the Applicant has already designated Luhao Trading.

[11]    When the hearing was held on August 8, 2017, the Applicants stated that because the mortgage was canceled, two items, namely Item (g) and Item (h), were no longer needed: fair copy (Day 9), Lines 22 - 27 on Page 26.

AP_Legal – 104494610.1

Due to the behavior of the Applicants, the equity consideration was not paid, and the rights and interests of the Respondents were damaged. The Respondents requested the arbitral tribunal to rule and/or declare that:

(1)     The Applicants violated Article 2.3.4 of the 4.28 Agreement;

(2)     The Applicants should immediately take care of the procedures (and/or cause the handling of the relevant procedures) related to the offshore transfer of equity to Shibang Company and the onshore transfer of equity to Luhao Trading, including but not limited to: (i) to conduct audit/evaluation on SJHC to obtain the reasonable equity transfer price; (ii) to prepare the equity transfer agreement and other relevant transaction documents for the Respondents to read and use as a basis to conduct negotiation with the parties concerned; (iii) to contact the relevant government review and approval authority to obtain the materials to be submitted for review and approval, communicate with the Respondents and prepare materials for submission (seek assistance from the Respondents whenever necessary); (iv) to submit the necessary review and approval materials to the relevant government review and approval authority and to supplement the materials according to its needs (if any); and (v) to pay close attention to the review and approval process, and to notify the Respondents of the updated review and approval status in a timely manner;

(3)     The Applicants should jointly and/or individually bear any taxes and expenses (including but not limited to the possible Chinese taxes and fees arising from the offshore transfer of equity to Shibang Company) that may arise from the offshore transfer of equity to Shibang Company (i.e. the transfer of SJHC's 80% equity from Greencourt Properties to Shibang Company). Or, alternatively, the Applicants should negotiate with the Respondents about the assumption of taxes and expenses (including but not limited to the possible Chinese taxes and expenses arising from the offshore transfer of equity to Shibang Company) that may arise from the offshore transfer of equity to Shibang Company.

(B)     <u>Counterclaim on exchange between Jiuting Stores and A2-type villas</u>

The two <u>A2</u>-type villas that the Applicants intended to deliver to the Respondents were defective, resulting in damage to the Respondents' rights and interests. The Respondents requested the arbitral tribunal to rule and/or declare:

(1)     The Applicants violated Article 3.2 of the 4.28 Agreement;

(2)     The Respondents suffered losses (including but not limited to loss of value) due to the breach of contract by the Applicants and are entitled to compensation. The Applicants should jointly and/or individually pay the losses suffered by the Respondents. The amount of compensation for such losses to be evaluated.

(C)     <u>Counterclaim on debt settlement for other contractual obligations</u>

As the Applicants made an unreasonable request and failed to carry out the settlement of the relevant debts and claims with the Respondents in good faith, the debt settlement cannot be completed. The rights and interests of the Respondents are damaged. The Respondents requested the arbitral tribunal to rule and/or declare:

(1)     The Applicants violated Article 3.6 of the 4.28 Agreement;

(2)     The Applicants should complete the settlement of debts and claims based on (i) the Fourth Draft of the Checklist of the Current Account of Flower-City Property prepared by the Respondents; or (ii) on such basis that the arbitral tribunal should consider otherwise appropriate.

(D)     <u>Counterclaim on cash consideration</u>

The Applicants' actions resulted in the failure to meet certain prerequisites for the third payment, causing the rights and interests of the Respondents to be damaged. The Respondents requested the arbitral tribunal to rule and/or declare:

(1)     The Applicants violated Articles 2.3.4, 2.1.3, 2.2.1(4) and/or 3.2 of the 4.28 Agreement;

(2)     Under the premise that all the prerequisites for the third payment are met (including the realization of the abovementioned claims in A(2) and A(3), and the completion of the exchange between Jiuting Stores and the A2-type villas as specified in Article 2.2.1(3)(e) of the 4.28 Agreement), the Respondents should pay the adjusted third payment.

AP_Legal – 104494610.1

(3) As an adjustment to the third payment, the Respondents can deduct or offset (i) any taxes and expenses that may arise from the offshore transfer of equity to Shibang Company (including the possible Chinese taxes and expenses arising from the offshore transfer of equity to Shibang Company) from the third payment; and/or (ii) the amount of compensation for the loss claimed in B(2);

(4) Alternatively, the Respondents can deduct or offset (i) any taxes and expenses that may arise from offshore transfer of equity to Shibang Company (including the possible Chinese taxes and expenses arising from the offshore transfer of equity to Shibang Company) from the amount awarded to the Applicants; and/or (ii) the amount of compensation for the loss claimed in B(2);

222. The Respondents' counterclaim is based on the fact that the Applicants were the breaching parties. In view of the arbitral tribunal's analysis and ruling of the disputed issues in this case, the arbitral tribunal held that the parties that had violated the 4.28 Agreement were the Respondents. Therefore, the Respondents' counterclaims were all rejected.

## VII. Analysis and Reasons of Arbitral Tribunal

223. The arbitral tribunal made the following analysis after carefully reviewing and evaluating the evidence, witness statements, written statements and other documents provided by the parties concerned.

**Equity consideration (transfer of SJHC's equity)**

224. The 4.28 agreement is a continuation of the matters related to the repurchase of equity negotiated between the Controlling Shareholders and the Non-controlling Shareholders from 2009 onwards - see Point 1 of the Introduction to the 4.28 Agreement:

"Whereas: 1. The Controlling Shareholders and the Non-controlling Shareholders had adopted the "Shareholder Resolutions" regarding share restructuring on 24 March 2009, and signed the "Meeting Minutes" on 4 September 2009 and the "Preliminary Share Restructuring Agreement" (the "Restructuring Agreement") on 9 November 2009. The above three documents set out the basic principles and transaction framework for Oasis Investment's repurchase of shares held by the Non-controlling Shareholders."

225. Point 3 of the Introduction to the 4.28 Agreement clarifies the purpose of the agreement:

226. "Whereas: 3. In order to address the issues relating specifically to the repurchase, complete all the transactions specified in the Restructuring Agreement as soon as possible, and to reduce the transaction cost as well as time cost for all the Parties involved, the Parties agree to sign this agreement to specify the repurchase price, the payment schedule, the payment method and any other issues involved."

227. In view of this, the arbitral tribunal held that the main purpose of the signing the 4.28 Agreement by the parties concerned was to complete all the transactions as stipulated in the Restructuring Agreement as soon as possible.

228. The arbitral tribunal held that if there are omissions or ambiguity in the content of the 4.28 Agreement, it may refer to the contents of the above three documents. In fact, Article 4.1 of the 4.28 Agreement also expressly states:

"For matters not addressed in this Agreement, the stipulations of the Restructuring Agreement shall prevail. For matters not addressed in the Restructuring Agreement and this Agreement, the parties concerned shall enter into supplementary agreements through friendly negotiations, and those supplementary agreements and this Agreement shall have the same effect."

229. The first article of the 4.28 Agreement specifies the "equity transfer before repurchase". Article 1.1 defines two steps: (1) Mr. Ke Zhengguang was to transferr his equity interest in Oasis Investment to Cheergain International and Mr. Xu Hongbiao was to transfer his equity interest in Oasis Investment to Focus Town; (2) Oasis Investment was to repurchase the equity of Oasis Investment from Cheergain International and Focus Town, respectively. Article 1.2 also clarifies that the abovementioned taxes resulting from the equity transfer before the repurchase and its fees shall be borne by the Non-controlling Shareholders.

230. The parties concerned did not dispute that the first equity transfer before the repurchase had been completed.

231. Article 2 of the 4.28 Agreement specifies the "Oasis Investment's repurchase consideration", which is also the cash consideration. The parties concerned did not dispute that the cash payment portion of Oasis Investment's repurchase consideration was foreign currency equivalent to RMB 250 million ("cash

61

consideration"):(Article 2.1). The parties concerned also agree that, during the actual payment, the amount of cash consideration should be adjusted as follows:

"2.1.1 An amount of approximately RMB 41 million resulting from previous transactions for which the Non-controlling Shareholders shall be held liable shall be deducted from the Cash Consideration;[12]

2.1.2 A conditional payment of a one-off additional compensation in the amount of RMB 30 million ("Additional Compensation") that Oasis Investment and the Controlling Shareholders are willing to pay shall be added to the Cash Consideration. The condition for this Additional Compensation is that Oasis Investment's share repurchase and payment of consideration will be completed pursuant to the provisions of the Restructuring Agreement and this ~~supplemental~~ agreement, and there is no major dispute between the Parties.

2.1.3 All parties agreed that, following the signing of this Agreement, when the payment of the relevant equity consideration is to be made and when the amount of Cash Consideration is to adjusted, the parties would then sign a supplementary agreement.

2.1.4 All parties agreed that the cash portion of the repurchase consideration shall be divided into two equal portions in Hong Kong dollars in Hong Kong and paid in full and on time to the bank accounts of Cheergain International and Focus Town Limited provided by the Non-controlling Shareholders at the time as determined in the article below (Article 2.2)."

232.    Article 2.2 specifies the payment conditions and payment period of the cash consideration (Article 2.2.1). The parties concerned agreed that the payment time of the cash consideration for the repurchase is as follows:

"(1)    Hong Kong dollars equivalent to RMB 80 million ("**1st Payment**")...

(2)    Hong Kong dollars equivalent to RMB 20 million ("**2nd Payment**") should be paid before 30 June 2011.[13]

---

[12]    this amount of more than RMB 41 million was mentioned in the minutes of the meeting on February 3, 2010 (D2/723).

[13]    The first and second payments had been paid.

AP_Legal – 104494610.1

(3)    The remaining amount equivalent to RMB 150 million in Hong Kong dollars ("**3rd payment** "), being the final payment subject to those adjustments agreed to or confirmed by all Parties under provisions of Article (4) below) is to be paid by 31 December 2012 once the following prerequisites are met:

(a)    SJHC's equity transfer being approved by the government and the registration of the transfer being completed;

(b)    Oasis Investment completing the registration for the change of shareholders that is necessary for the repurchase of the Non-controlling Shareholders' equity;

(c)    Non-controlling Shareholders and Controlling Shareholders reaching an agreement on the payment arrangement in respect of the Cash Consideration and various adjustments to the amount specified in the aforementioned Article 2.1；

(d)    Non-controlling Shareholders confirm that the payment of equity consideration specified in Article 2.3.5 below being completed and there being no dispute among all parties;

(e)    Both of the Shanghai Real Estate Sale and Purchase Contract mentioned in Article 3.1 and the Shanghai Real Estate Presale Contract mentioned in Article 3.2 being signed and the registration of transfer [of ownership] or the registration of presale with the Real Estate Registration Authority being completed.

(4)    Adjustments to the Amount of Cash Consideration. All Parties agree that, before the payment of the 3rd Payment, under provisions of the following Articles, all parties shall calculate and determine the adjustments to the amount of Cash Consideration, and take the adjusted amount as the final amount for purposes of the 3rd Payment:

(a)    Under the provisions of the Restructuring Agreement and this agreement, Oasis Investment and Controlling Shareholders shall use 100% of SJHC's equity as part of share repurchase consideration ("Equity Consideration"). If under any laws and regulations, such equity transfer must indicate a price of

equity and that this price must actually be paid, the actual amount (net amount after deduction of tax and fees) paid by the Non-Controlling Shareholders to Oasis Investment and the Controlling Shareholders for the equity transfer shall be added to the Cash Consideration;

1. The arbitral tribunal held that Item (a) above should be interpreted as if the Respondents are required by the laws and regulations to provide a fixed price for the transfer of SJHC's 100% equity, and the said requirement causes the Applicants to have to pay the actual amount for the above transfer of equity to the Respondents, the actual amount of such payment (after deducting the tax incurred) should be added into the cash consideration to be paid by the Respondents to the Applicants. The implication is that, if the parties concerned must set a price for the transfer of SJHC's equity, the Applicants should bear the tax.

(b) The sharing of the amount stipulated in Articles 2.1.1 and 2.1.2 above shall be reflected in the final amount of the 3ʳᵈ Payment;

2. The arbitral tribunal held that, according to Article 2.1.1, the Applicants should bear the total amount of RMB 41,224,613.21 [14], and according to Article 2.1.2, the Applicants should receive RMB 30 million from the Respondents. After the two are offset, the Applicants will only need to pay approximately RMB 11,224,613.21, and the amount will be deducted from the third payment (i.e. RMB 150 million).

(c) Under provisions of <u>other Articles</u> of this agreement, all <u>tax and expenses</u> that shall be <u>paid</u> by the parties shall be reflected in the final amount of the 3ʳᵈ Payment.

---

[14] LYP-l [Dl/253]: LYP-2 [D3/1199].

3. The arbitral tribunal held that this means that the third payment must be adjusted with reference to the tax burden that the parties concerned are required to bear under the other terms in the 4.28 Agreement. These other terms include, for example, Article 2.3.4. This article specifies that the taxes and expenses arising from the payment of <u>onshore</u> equity consideration, and the taxes and fees arising from <u>offshore</u> entrustment arrangement with Shibang Company and the transfer of equity to Cheergain International and Focus Town, shall be borne by the Non-controlling Shareholders. Apart from this, the <u>sharing of the taxes and expenses</u> related to the payment of equity consideration shall be separately negotiated by all parties at the appointed time. Matters that arise due to the equity transfer procedures related to the payment of onshore and offshore equity considerations, i.e. application, registration, government procedures etc., shall be handled by the Non-controlling Shareholders, and the Controlling Shareholders and Oasis Investment shall provide the necessary assistance. Based on the above reasons, the arbitral tribunal held that Article 2.3.4 does not apply to this case.

233. A comprehensive analysis of the above indicated that the final amount of the third payment should be adjusted based on Article 2.2.1(4), with RMB 150 million as the base amount.

234. As for the payment deadline of the third payment, Article 2.2.1(3) specifies it to be December 31, 2012, but prerequisites (a) to (e) must also be met.

235. There is no dispute between the two parties that the prerequisite (b) has been met.

236. As for prerequisite (a), the parties have been alleging that the other party is the reason for the unmet prerequisites. Therefore, the arbitral tribunal must make a ruling on this issue.

237. As for prerequisite (c), both parties have reached an agreement on the payment arrangements for the cash consideration specified in Article 2.1, but no

agreement has been reached on various adjustments. Therefore, the arbitral tribunal must make a ruling on this issue.

238. As for prerequisite (d), the payment of equity consideration by both parties as specified in Article 2.3.5 has been completed, and the parties concerned have no disputes over this and have not reached an agreement. Therefore, the arbitral tribunal must make a ruling on this issue.

239. As for prerequisite (e), both parties have different opinions on the reasons why the contracts mentioned in Articles 3.1 and 3.2 have not been signed. Therefore, the arbitral tribunal must make a ruling on this issue.

240. As for prerequisite (a) (i.e. the government review and approval and registration procedures for the transfer of SJHC's equity had been completed), the arbitral tribunal first analyzed the content of Article 2.3 of the 4.28 Agreement. Article 2.3 specifies the payment method of equity consideration:

"According to the Restructuring Agreement, the equity portion of Oasis Investment's repurchase consideration is calculated as 100% equity of [SJHC] ("Equity Consideration")."

241. The payment method of the equity consideration includes both offshore and onshore components. The offshore component is specified in Articles 2.3.1 and 2.3.2, and the onshore component is specified in Article 2.3.3.

242. Article 2.3.1 specifies that:

"Oasis Investment <u>has newly incorporated</u> Shibang Company Ltd ("Shibang Company") in Hong Kong and <u>has arranged</u> for Shibang Company to <u>acquire</u> 80% of the equity interest in SJHC held by Greencourt Properties Limited, a subsidiary of Oasis Investment in Hong Kong. After the completion of the said equity acquisition, Oasis Investment shall sign the "Equity Purchase Option Agreement" with Cheergain International and Focus Town Limited and agree that upon the expiration of the entrustment period mentioned in Article 2.3.2 below, 100% of the equity of Shibang Company shall be transferred to Cheergain International and Focus Town Limited at a consideration of HKD 1." (underlines added later)

243. Article 2.3.2 specifies that:

"All Parties Agree That: After Oasis Investment's signing of the Equity Purchase Option Agreement for the equity transfer of Shibang Company to Cheergain International and Focus Town Limited, Greencourt Properties is to sign the relevant Entrustment Agreement with Cheergain International and Focus Town Limited. This agreement shall stipulate that: (1) Cheergain International Group Limited and Focus Town Limited are entrusted by Greencourt Properties to manage Shibang Company and to exercise the shareholders' rights on its behalf for three years (the "**entrustment period**"); (2) during the entrustment period, the Non-controlling Shareholders are responsible for all the debts and claims, risks and liabilities of Shibang Company and SJHC. If for any reason the Controlling Shareholders, Oasis Investment or Greencourt Properties are required to bear the debts and claims, risks and liabilities of Shibang Company or SJHC during the entrustment term, the Non-controlling Shareholders are required to fully compensate the Controlling Shareholders, Oasis Investment and Greencourt Properties."

244. Article 2.3.3 specifies that:

"The remaining 20% of the equity of SJHC currently held by Oasis Kechuang Shengtai Limited, a subsidiary of Oasis Investment, is to be transferred to a domestic company in China appointed by the Non-controlling Shareholders ("**Onshore Payment of Equity Consideration**"). If under the laws of the People's Republic of China, an actual payment of consideration is required to be made for such equity transfer, the provisions of the abovementioned Article 2.2.1(4)(a) shall apply."

245. Regarding Articles 2.3.1 to 2.3.3, the arbitral tribunal held that the transfer of SJHC included the following three steps that must be performed:

(1) **First**, Shibang Company, established by Oasis Investment, should acquire 80% equity interest of SJHC held by Greencourt Properties (hereinafter referred to as the "**first step of the 80% equity transfer**"). Article 2.3.1 expressly states that Oasis Investment <u>has</u> established Shibang Company in Hong Kong and <u>has arranged for</u> Shibang Company to <u>acquire</u> 80% of equity of SJHC held by Greencourt Properties, a subsidiary invested by Oasis Investment in Hong Kong. In other words, the first step in the 80% equity transfer ought to have been completed when the 4.28 Agreement was signed. However, in fact, this first step has not been completed yet.

(2) **Second**, Oasis Investment should transfer the equity of Shibang Company to Cheergain International and Focus Town owned by the First Applicant and Second Applicant respectively (referred to as "**step 2 of the 80% equity transfer**").

(3) After the first step of the 80% equity transfer and before the second step of the 80% equity transfer, the 4.28 Agreement also stipulates that the Non-controlling Shareholders and the Controlling Shareholders must sign two agreements: One would be the "Equity Purchase Option Agreement" signed by Oasis Investment and Cheergain International and Focus Town; the other would be the relevant entrustment agreement signed by Greencourt Properties and Cheergain International and Focus Town.

AP_Legal – 104494610.1

(4)　　The other 20% equity of SJHC would be transferred from Oasis Kechuang to an onshore company in China designated by the Non-controlling Shareholders (referred to as the "**20% equity transfer**"). According to Article 2.3.3, the Chinese onshore company designated by the Non-controlling Shareholders is Luhao Trading. According to Article 2.3.3, the Non-controlling Shareholders designated Luhao Trading as the transferee of the 20% equity of SJHC in the letter issued on March 15, 2011 [D3/901-903].

246.　It can be clearly seen from the content of Article 2.3.4 that this Article deals with the procedures and tax liability of the second step of the 80% equity transfer (i.e. the offshore entrustment arrangement with Shibang Company and the transfer of equity to Cheergain International and Focus Town) and the 20% equity transfer (i.e. payment of onshore equity consideration). This article does not cover the first step of the 80% equity transfer (i.e. Shibang Company's acquisition of 80% equity of SJHC held by Greencourt Properties). This is because, according to Article 2.3.1, the Respondents clearly confirmed that Oasis Investment had completed the first step of the 80% equity transfer upon the signing of the 4.28 Agreement. In other words, the responsibility of Oasis Investment in fulfilling the first step of the 80% equity transfer is not within the scope of Article 2.3.4.

247.　There was still a small episode about the transfer of SJHC's equity. Oasis Investment held 100% equity of SJHC through its two subsidiaries: Greencourt Properties held 69% and Oasis Kechuang held 31%. In order to comply with the 4.28 Agreement, SJHC must increase its capital, so that Greencourt Properties could increase its shareholding ratio to 80%, and Oasis Kechuang could lower its shareholding ratio to 20%.

248.　On November 12, 2009, Greencourt Properties and Oasis Kechuang signed an agreement [D2/628-629] to reach an agreement on the increase of registered capital in SJHC. Under this Agreement, both parties agreed to adjust the shareholding ratio of the two parties to 80%:20% through the giving up of the limited subscription rights of newly added registered capital by Oasis Kechuang and the unilateral capital increase by Greencourt Properties. On the same day, SJHC also passed the board resolution [D2/631-632], reflecting the above equity adjustment.

249. The Shanghai Municipal Commission of Commerce consented and approved the capital increase of SJHC on December 21, 2009 [D2/705-706]. However, the Shanghai Branch of the State Administration of Foreign Exchange issued a decision to not grant an administrative license [D2/728] on March 23, 2010.

250. The application for capital increase was finally approved on July 27, 2011 [D3/980], and both parties had no dispute over this.

251. Both parties had different interpretations and positions on whether the two audit reports in the evidence were the documents that had to be submitted during the first phase of review and approval for the transfer of SJHC's equity. The first audit report [D2/729] was issued by Shanghai Xuri Certified Public Accountant Firm on April 14, 2010. Another audit report [D2/766-781] was issued by Crowe Howarth on April 28, 2010.

252. The First Applicant's claim was: The evidence shows that the Applicants provided the two audit reports to the Respondents to use for capital increase or settlement [D1/255,257 Point 5 - Li Shuping's witness statement attached to LYP-3 "Issues Regarding the Settlement of Claims and Debts between SJHC and Oasis Investment and Its Subsidiaries"].

253. The Respondents claimed that the two audit reports supported the Respondents' view, i.e.: The applicant must hire an appraiser to evaluate the value of 100% equity of SJHC and provide the 2016 annual audit report of SJHC to the Respondents for review.

254. In summary, the arbitral tribunal held that the First Applicant's explanation of the two audit reports was more persuasive, and the dates coincided with the final approval date of the capital increase application (i.e. July 27, 2011). Therefore, the arbitral tribunal endorsed the claim of the First Applicant.

**Expert opinion of various expert witnesses (Ma Beiyi, Ye Yongqing, Ji Nuo) - review and approval procedures must be carried out for the transfer of SJHC's equity**

255. With regard to the issue of equity consideration, the parties concerned have summoned Chinese legal expert witnesses to make expert reports on the review and approval procedures, documents required for the review and approval, and taxes. The First Applicant's expert witness was Ma Beiyi; the Second

Applicant's expert witness was Ye Yongqing; the Respondents' expert witness was Ji Nuo.

256. The joint opinion of the three expert witnesses on the issue of equity transfer ("**Joint Opinion**") is in C/438. In Paragraph 6 of the Joint Opinion, three experts pointed out that SJHC was a sino-foreign equity joint venture established under the "Law of the People's Republic of China on Sino-Foreign Equity Joint Ventures", and it had two shareholders: Greencourt Properties (Hong Kong company, 80% equity) and Oasis Kechuang (Chinese company, 20% equity).

257. Three experts pointed out in Paragraph 8 of the Joint Opinion that the Regulations for the Implementation of "Regulations for the Implementation of the Law on Sino-Foreign Equity Joint Ventures" was applicable to the transfer of SJHC's equity. Article 20, Paragraph 1 of the Regulations specifies that: "When a joint venture party transfers all or part of its equity to a third party, it must be approved by the other joint venture party and shall be submitted to the review and approval agency for approval, and shall complete the procedures for change registration with the registration management agency."Article 3 of the "Several Provisions on Changes in Equity Interest of Investors in Foreign-invested Enterprises" also specifies that: "Changes in the equity interest of corporate investors shall comply with relevant Chinese laws and regulations, and shall be approved by the review and approval authority and registered by the registration authority in accordance with this provision. Changes in equity are invalid without the approval of the review and approval authority."Therefore, as a sino-foreign equity joint venture, the two equity transfers of SJHC should be approved by the review and approval authority, and the corresponding procedures for change registration shall be subsequently carried out with the registration authority.

258. The three experts pointed out in Paragraph 9 of the "Joint Opinion" that the transfer of SJHC's equity would require three stages of administrative procedures: (1) After collecting and preparing the documents required by law, the joint venture should submit the application documents to the review and approval authority for the approval of the equity transfer. Taking into account the total investment amount of SJHC and its type of industry, the specific review and approval of its equity transfer should be the responsibility of the local competent commerce department of Shanghai; (2) after obtaining the approval, the joint venture should apply for the change with the registration management

agency, i.e. complete the change registration with the local industry and commerce department of Shanghai; and (3) the joint venture should, in accordance with the requirements of relevant laws and regulations, further complete the registration of changes in terms of taxation, foreign exchange and other aspects.

259. Regarding the first phase (SJHC should submit application documents to the commerce department for review and approval), the three experts listed in Paragraph 10 of the "Joint Opinion" that SJHC, as an applicant for the review and approval of equity transfer, must submit the application documents to the review and approval authority, and there was no need to repeat it here. In addition, Paragraph 12 of the "Joint Opinion" mentioned the division of labor between the parties concerned in the preparation of the documents.

260. Regarding the second phase (SJHC should apply for change registration with the administration for industry and commerce), the three experts set out the documents to be submitted in Paragraph 15 of the "Joint Opinion", and there was also no need to repeat them here. The three experts agreed that the change documents received by the administration for industry and commerce were similar to the application documents submitted to the commerce department in the first phase. The experts also added their opinions in Paragraphs 36-38 of the Joint Opinion.

261. Regarding the third phase (SJHC further completes the registration of changes in terms of taxation, foreign exchange and other aspects), the three experts unanimously agreed that after the completion of the industrial and commercial registration of changes, the joint venture could specifically complete the procedures for registration of changes in terms of tax, foreign exchange and other aspects of the enterprise based on the review and approval, as well as on the change registration results of the equity transfer.

262. In Paragraphs 19 and 20 of the "Joint Opinion", the three experts unanimously agreed that, regarding the review and approval of the transfer of SJHC's equity (i.e. the first phase mentioned above), the materials (listed below) that the transferor and the transferee had prepared were not enough to complete the review and approval and registration of SJHC:

(1)     The shareholders of Greencourt Properties had issued the "Shareholder Resolution of Greencourt Properties Limited, Hong Kong"

dated November 21, 2011, agreeing to transfer its 80% equity in SJHC to Shibang Company and to give up its pre-emptive rights when Oasis Kechuang transferred its 20% equity in SJHC to Luhao Trading.

(2)     The shareholders of Oasis Kechuang had issued the "Shareholder Resolution of Oasis Kechuang Ecological Technology Co., Ltd., Hong Kong" dated November 21, 2011, agreeing to transfer its 20% equity in SJHC to Luhao Trading and to give up its pre-emptive rights when Greencourt Properties transferred its 80% equity in SJHC to Shibang Company

(3)     The shareholders of Greencourt Properties had issued the "Shareholder Resolution of Greencourt Properties Limited, Hong Kong" agreeing to transfer its 50% equity to Cheergain International at the price of USD 1 (*sic*) and transfer its another 50% equity to Focus Town at the price of USD 1 (*sic*).

263.   The three experts did not reach a consensus on the following two issues:

(1)     Should the right to review and approve the transfer of SJHC's equity belong to the municipal commission of commerce or Fengxian District Economic Committee?

(2)     Is the audit report or evaluation report of SJHC required for the review and approval of the equity transfer?

264.   Regarding Question (1), Ma Beiyi believed that SJHC was a foreign-invested real estate development and management company, and its approval authority for equity transfer should be the municipal commission of commerce. However, Ji Nuo believed that the authority to review and approve the transfer of SJHC's equity belonged to the local competent commerce department of Shanghai Municipality prior to the implementation date (April 10, 2015) of the "Catalogue for the Guidance of Foreign Investment Industries" (Amended in 2015), but the authority to review and approve belonged to the local competent commerce department at the district level (Fengxian) after April 10, 2015. Ye Yongqing believed that since this equity transfer transaction should have occurred before April 10, 2015, i.e. before the review and approval agency was changed, the competent commerce department of Fengxian District is not the competent authority for this equity transfer.

AP_Legal – 104494610.1

265. Regarding Question (2), Ma Beiyi believed that there was no information to indicate that the evaluation report was related to the review and approval application and the completion of change registration and other administrative procedures for the equity transfer. Therefore, the evaluation report was not considered an application document that the joint venture had to prepare. As for the audit report, it was because the website of the Fengxian District Economic Committee showed that the previous year's audit report of the joint venture issued by an accounting firm has to be provided to apply for review and approval for equity transfer with the committee. But Ma Beiyi believed that this requirement would not constitute an obstacle for the joint venture to apply for the review and approval of the equity transfer, nor did it belong to the application documents that had to be prepared by the joint venture. Ye Yongqing believed that, regarding the issues on whether the audit report of SJHC had to be provided and who should be responsible to prepare it, on one hand, the "Provisions on Changes in Equity Interest of Investors in Foreign-invested Enterprises" did not expressly require that an audit report had to be submitted, and taking into account the total investment amount of SJHC and the type of industry that it was involved in, the local competent commerce department of Shanghai should be responsible for the specific review and approval of its equity transfer. Furthermore, the list of documents in the service guide published by the commerce department of Shanghai Municipality did not include the audit report. On the other hand, since this equity transfer transaction should have occurred on April 10, 2015, i.e. before the review and approval agency was changed, the competent commerce department of Fengxian District was not the competent authority for this equity transfer, thus its document requirements would not constitute a substantial obstacle to the approval of the commerce commission. In addition, Ye Yongqing believed that, in practice, the commerce department of Shanghai Municipality did not have the practice of requesting for audit report or evaluation report, and enterprises could just submit their financial statements for the previous year or the most recent month. Therefore, even if an audit report had to be submitted in accordance with the requirements of the competent commerce department of Fengxian District, in practice, enterprises could often submit their financial statements for the previous year or the most recent month instead. In addition, regarding whether it was necessary to perform evaluation on SJHC, Ye Yongqing believed that the evaluation had no effect on the obtaining of commerce review and approval for this equity transfer, as well as the registration of changes in industry and commerce, and taxation. It may be necessary only if the taxation authority questioned the price of this equity

74

transfer when Greencourt Properties filed tax returns. In particular, the transfer of SJHC's equity had already been realized after the completion of review and approval by the commerce commission and the changes in industrial and commercial, and SJHC's equity would be under Shibang Company's name after the completion of changes in industrial and commercial. Although, the subsequent tax procedures had to be completed by Shibang Company for the acquisition, it would not affect the realization of the equity transfer. Although a valuation may be one of the methods that the subsequent taxation authority may use to determine the equity transfer price, the taxation authority may also use the agreed price in the equity transfer agreement, the net asset price of SJHC, the long-term equity investment amount in the account book of Greencourt Properties, or the registered capital amount of SJHC to determine the equity transfer price, and the above prices or amounts were information that could be obtained. Hence, Ye Yongqing believed that the valuation of SJHC was not a necessary process for the completion of equity transfer under the premise that it was not expressly prescribed by the Chinese tax laws and regulations and local regulations.

266. Ji Nuo believed that the competent commerce department of Fengxian District was the review and approval agency of the transfer of SJHC's equity in this case. The list of documents published on the Internet clearly required an audit report, and SJHC should meet this requirement. (The question of when this equity transfer transaction should take place, and which party should bear the consequences of the failure to complete the transaction on time should be decided by the arbitral tribunal, thus Ji Nuo did not discuss this in the expert opinion.) In practice, the review and approval authority would often require the joint venture to provide audit report or evaluation report as an important reference for reviewing the reasonableness of the equity transfer price (for example, when the agreed price deviates significantly from the circumstances reflected in the audit report and other materials, it may constitute as an obstacle to approval). Ji Nuo believed that, according to the above analysis, in this case, the audit report should be prepared for the review and approval process, and the preparation of the audit report should be based on financial information provided by the joint venture (i.e. SJHC). Therefore, SJHC should usually be responsible for the preparation. If SJHC failed to provide an audit report, it would constitute an obstacle to obtaining approval. As for the review and approval authority's specific requirements for the form and content of the audit report, whether it could be replaced by other similar documents (such as evaluation report,

unaudited financial statement, etc.) and other issues, it would depend on the discretion of the review and approval authority according to case-specific circumstances.

267. The arbitral tribunal held that: (1) The question of which competent authority would have the right to review and approve the transfer of SJHC's equity should be considered from the time point at which the review and approval application was submitted. All three experts agreed that, after April 10, 2015, the right of approval would belong to the competent commerce department of Fengxian District, Shanghai. However, the 4.28 Agreement was signed at the end of April 2010, and the consensus of the parties concerned in Article 2.2.1(3) was that the balance should be paid before December 31, 2012 (on condition that the prerequisites were satisfied). In other words, the parties concerned believed that the prerequisites of the 4.28 Agreement should be fully satisfied within two years and eight months. Therefore, the arbitral tribunal held that the key time point was before April 10, 2015, and the review and approval authority at that time was the municipal commission of commerce instead of the competent commerce department of Fengxian District.

268. As for the audit report or evaluation report, the arbitral tribunal accepted the opinions of the Applicants' expert witnesses Ma Beiyi and Ye Yongqing, i.e.: The audit report or evaluation report would not be needed for the application for the review and approval of equity transfer. Moreover, this issue was in fact irrelevant to determine which party was breaching the contract. As the first step of the equity transfer, that is, Shibang Company's acquisition of 80% of SJHC held by Greencourt Properties was not yet completed, the documents required for approval was not available.

269. At the time of the commencement of the arbitration proceeding (i.e. February 22, 2013), both parties had not yet begun the first phase (SJHC submitted the application documents to the commerce department for review and approval). What were the reasons? The Controlling Shareholders and the Non-controlling Shareholders blamed each other, alleging that each other did not bear its share of responsibility. However, it is an indisputable fact that the Controlling Shareholders had not fulfilled the contractual obligations under Article 2.3.1 of the 4.28 Agreement and arranged for Shibang Company to acquire 80% of equity in SJHC held by Greencourt Properties. This resulted in the failure to complete the transfer of SJHC's equity, let alone the review and approval and registration procedures for the transfer of SJHC's equity, which was one of the

prerequisites (i.e. the prerequisites set out in Article 2.2.1(3)(a) of the 4.28 Agreement).

270. Evidence shows that the Controlling Shareholders' lawyer (attorney Tao Xudong of JunHe LLP) sent an e-mail to the lawyer of the Non-controlling Shareholders (attorney Jeremy Wong of King & Wood Mallesons) on May 13, 2010, mentioning some legal issues regarding the transfer of SJHC's equity and requested discussion by telephone conference [D2/826]. On the same day, King & Wood Mallesons responded to the email to JunHe, mentioning that it had received the Chinese manuscripts of Equity Purchase Option Agreement and Entrustment Agreement from Xu Hongbiao's office, and it had some ideas and agreed to discuss the matter via telephone [D2/825]. On May 24, 2010, King & Wood Mallesons sent an email to JunHe with its amendment recommendations regarding to the "Equity Purchase Option Agreement" and Entrustment Agreement, and also reminded the Controlling Shareholders to ensure that the 20% equity in SJHC held by Oasis Kechuang should also be transferred at the same time according to Article 2.3.3 of the 4.28 Agreement. The e-mail also mentioned that King & Wood Mallesons was drafting the "Equity Pledge Agreement of Shibang Company" and "Shareholder Voting Rights Proxy Agreement of Shibang Company" to cooperate with the performance of the above two agreements; after the agreements were drafted, they would be sent to JunHe for review [D2/824]. On June 1, 2010, JunHe sent an email to King & Wood Mallesons to ask when it could provide a copy of the equity pledge agreement and voting rights proxy agreement, and said that it hoped to see all the documents and send feedback to King & Wood Mallesons [D2/ 830]. On June 9, 2010, King & Wood Mallesons sent an email to JunHe with the drafts of "Shareholder Voting Rights Proxy Agreement" and "Equity Pledge Agreement" for JunHe to review and give feedback [D2/829]. On August 31, 2010, King & Wood Mallesons sent an email to JunHe, pointing out that they did not receive JunHe's feedback after sending the drafts of "Shareholder Voting Rights Proxy Agreement" and "Equity Pledge Agreement" on June 9, 2010, and requesting for a response [D2/829]. However, according to Paragraph 23 [B/14] of Xu Hongbiao's witness statement, a violation of the 4.28 Agreement was that Oasis Investment and its Controlling Shareholders had not yet returned their signed "Equity Purchase Option Agreement" and/or "Escrow Agreement", or provide a response regarding its content to the Non-controlling Shareholders or put forward any suggestions.

271.    In summary, the arbitral tribunal held that the Controlling Shareholders were in breach.

272.    All three expert witnesses agreed that, in the first phase, SJHC, as an applicant for review and approval of equity transfer, must submit several documents to the review and approval authority (see Paragraphs 10 - 13 of the "Joint Opinion"). One of the key documents is the 80% and 20% equity transfer agreement of SJHC. Regarding Paragraphs 29 - 35 of the "Joint Opinion", three expert witnesses expressed their different opinions. Among them, Ji Nuo believed that the equity transfer agreement was one of the indispensable application documents, just like other documents required for review and approval and registration. Any equity transfer must be based on the premise that the relevant parties had reached an agreement. However, as compared to general equity transfer, this case was special. If the actual control rights, various licenses and official seals of SJHC had been transferred to the Applicants by the Respondents before the equity transfer occurred, the review and approval and registration of the equity transfer would not only depend on the direct parties to the transfer, i.e. Greencourt Properties, Oasis Kechuang, Shibang Company and Luhao Company, but also depend on the Applicants' approval of such equity transfer, especially the key terms such as the price, because the Applicants had actual control over SJHC, and it was not that they had no control over Shibang Company. If the actual controllers of SJHC did not recognize the terms and conditions of the equity transfer (especially the price terms), even if the parties concerned had signed the equity transfer agreement, SJHC would still be able to refuse or passively push forward the review and approval and registration applications. On the other hand, the review and approval authority may consider the reasonableness of the equity transfer consideration and usually require the company to provide an audit report. Therefore, for the sake of caution, the conclusion of the equity transfer agreement required that the joint venture (i.e. SJHC) cooperate with the provision of audit report and other materials to the parties concerned as references to determine the specific content of the agreement.

273.    After considering the opinions of the Respondents' expert, the arbitral tribunal believes that the opinions of the Respondents' expert are highly speculative. As HKD 150 million (the third installment) can only be paid to the Applicants after the various prerequisites are met, and one of the prerequisites would be the completion of procedures for government approval and registration of the

transfer of SJHC's equity, obviously, the Applicants would have no reason to refuse or to passively go about the approval and registration application. Therefore, the arbitral tribunal does not endorse the opinions of the Respondents' expert. The arbitral tribunal believes that the Respondents can fully prepare the equity transfer agreement, in the name of Greencourt Properties and Oasis Kechuang, for Shibang Company's and Luhao Trading's perusal. However, the Respondents did not kick start this process at all; rather, they delayed the process using various excuses.

274. In summary, the arbitral tribunal believes that the Respondents have clearly violated the contractual obligations in Articles 2.3.1, 2.3.2 and 2.3.3 of the 4.28 Agreement.

275. With regard to the audit report, all parties unanimously agreed in the hearing (especially on August 8, 2017 when the closing oral statement was given) that, at this current stage (and not when the arbitration started), there is a need to submit the latest audit report of SJHC to the approval unit, and this report is one of the documents to be reviewed during the approval process; Transcription (Day 9), Lines 28-29 on Page 32.

**Expert opinions of the expert witnesses of all parties - opinions on taxation issues** [C/451-454]

276. The three experts reached the following consensus on the tax obligations that might have arisen from the equity transfer under the law of China:

(1) According to the tax law of China, as the equity transferor in the acquisition of Shibang Company, Greencourt Properties would be subjected to corporate income tax, but the law of China does not prohibit the parties involved in the transaction to agree on the actual bearing of the financial tax burden;

(2) There are two ways to handle the tax basis for corporate income tax payable by Greencourt Properties;

(3) In practice, the tax authorities are stricter with the review of various conditions in Document No. 59 (that is, the "Notice on Several Issues Concerning Corporate Income Tax Treatment of Enterprise Restructurings promulgated by the Ministry of Finance and the State

79

Administration of Taxation"), and there is a relatively low possibility of special tax treatment in this case;

(4) The equity transferor and transferee have the obligation to pay stamp duty.

277. With regard to the agreement in Article 2.3.4 of the 4.28 Agreement: "Apart from this, the sharing of the tax and expenses relating to the payment of Equity Consideration is to be negotiated by all the Parties in due course", the arbitral tribunal believes that, the meaning of this sentence should be interpreted by the arbitral tribunal based on the law of Hong Kong (the substantive law of the contract), and the opinions of experts have no bearing on this issue.

278. The first half of the first sentence of Article 2.3.4 in the 4.28 Agreement stipulates that "The Non-controlling Shareholders shall be responsible for all the tax and expenses incurred due to the Onshore Payment of Equity Consideration …". This refers to the taxes and expenses arising from Oasis Kechuang's transfer of 20% equity of SJHC to Luhao Trading. Both parties had no dispute concerning this matter.

279. The second half of the first sentence of Article 2.3.4 in 4.28 Agreement is: "The Non-controlling Shareholders shall be responsible for … the tax and expenses incurred offshore due to the entrustment arrangement made by Shibang Company and the equity transfer of Shibang Company to Cheergain International Group Limited and Focus Town Limited". The meaning of this sentence is also clear.

280. The second sentence of Article 2.3.4 in 4.28 Agreement is: "Apart from this, the sharing of the tax and expenses relating to the payment of Equity Consideration is to be negotiated by all the Parties in due course."[Underlines added after]

281. Both parties had a dispute on the taxes related to Greencourt Properties' transfer of 80% equity interest of SJHC to Shibang Company. The Respondents' position was that, the first sentence only covered Oasis Kechuang's transfer of 20% equity of SJHC to Luhao Trading and Shibang Company's entrustment agreement with Cheergain International and Focus Town, but it did not cover the agreement of Greencourt Properties' transfer of 80% equity of SJHC to Shibang Company. The Applicant's position was that: As it was clearly expressed in Article 2.3.1 of 4.28 Agreement that Oasis Investment had established Shibang

Company in Hong Kong and had arranged for Shibang Company to acquire 80% equity of SJHC held by Greencourt Properties, which was the Hong Kong subsidiary of Oasis Investment, this transaction should not be considered a situation that was "apart from these items" or a situation to be separately discussed by both parties. The arbitral tribunal agrees with the Applicant's standpoint.

282.    With regard to item (2) of the consensus of the three expert witnesses (that is, "the tax basis for corporate income tax payable by Greencourt Properties"), the arbitral tribunal believes that, the application and interpretation of "Document No. 59" are of no direct relationship to the interpretation of the 4.28 Agreement. As mentioned in the 29th paragraph of the witness statement of Yu Naifen Stephany, all parties did not discuss about who should bear the taxes arising from the transaction under "Document No. 59" in the event Shibang Company's offshore equity transfer would be entitled to "special tax treatment" based on "Document No. 59"[B/46]. The first Applicant's evidence denied that the Applicants had discussed with the Controlling Shareholder about the "special treatment" of "Document No. 59" when signing the 4.28 Agreement (see Xu [B/100, §§12-15]. The position of both the Applicants and the Respondents was that, all parties did not discuss about who should bear the taxes arising from the transaction under "Document No. 59" when signing the 4.28 Agreement. Therefore, the arbitral tribunal believes that no ruling is required for this issue. Moreover, the arbitral tribunal has interpreted Article 2.3.1 of 4.28 Agreement, hence it would not be necessary to discuss if "Document No. 59" is applicable.

**Property exchange (exchange of Jiuting Stores and A2-type villas)**

283.    The clause related to property exchange is Article 3 "Other agreements relating to Oasis Investment's repurchase and repurchase consideration" of 4.28 Agreement:

*"3.1 Within 30 days of the signing of this agreement, Oasis Investment and the Controlling Shareholders shall procure a subsidiary, namely, Shanghai Greencourt Real Estate Development Limited to sign the "Shanghai Real Estate Sale and Purchase Contract" with the Non-controlling Shareholders or their nominated third party, and undertake to transfer approximate 8000 m2 of commercial space which shall meet the appropriate delivery standards (specifically, the property includes approximately 6000 m2 of commercial space*

*on the third level along the streetside of Phase 1 of Greencourt Sun City Commercial Building, and all the commercial space of approximately 2000 m2 of the west side of the Central Plaza of Phase 2 of Greencourt Sun City) at the Jiuting Greencourt Sun City Real Estate Project in Songjiang District, to the Non-controlling Shareholders or their nominated third party. For the avoidance of doubt, (1) when the Shanghai Real Estate Sale and Purchase Contract is signed, Oasis Investment and the Controlling Shareholders shall transfer the right to use such commercial space to the Non-controlling Shareholders or their nominated third party, and the Non-controlling Shareholders or their nominated third party are to receive rental income and other earnings after the transfer; and (2) by 30 June 2011, Oasis Investment and the Controlling Shareholders shall transfer the ownership of such commercial space to the Non-controlling Shareholders or their nominated third party.*

*3.2 At the time of signing the aforementioned "Shanghai Real Estate Sale and Purchase Contract", SJHC shall sign the "Villa Order Contract" with Oasis Investment and the Controlling Shareholders, to transfer the SJHC-developed two A2-type villas (building area of approximately 1200 m2 each as set out on a building plan, which building plan Oasis Investment and the Controlling Shareholders have received and have been notified of the delivery standards, and both confirmed the actual price as stated below) located on the Central Island, Peninsula Villa Project, Fengpu Industrial Area, Fengxian District, Shanghai City, to Oasis Investment or their nominated third party once the villas meet the delivery standards. For the avoidance of doubt, the Non-controlling Shareholders shall procure SJHC to sign the "Shanghai Real Estate Presale Contract" with Oasis Investment or the third party nominated by the Controlling Shareholders on 30 June 2011 and to complete the presale registration of such villas..*

*3.3 All Parties Confirm: the properties involved in the aforementioned "Shanghai Real Estate Sale and Purchase Contract" and the "Villa Order Contract" (or the Shanghai Real Estate Presale Contract) are all priced at RMB 72 million. Because the prices of the properties involved are equal, for the purposes of this agreement, the considerations under the contracts are to be set off against each other (whether or not such offset is plausible from an accounting perspective, and that the Parties agree that no actual payment is to be made)."*

284. According to Article 3.2 of the 4.28 Agreement, the A2-type villas have "*building area of approximately 1200 m² each as set out on a building plan, which building plan Oasis Investment and the Controlling Shareholders have received and have been notified of the delivery standards, and both confirmed the actual price as stated below*". "The actual price as stated below" refers to RMB 72 million in Article 3.3.

285. The Applicants pointed out that, the aforementioned construction drawings were prepared and approved by the government when SJHC was still controlled by the Controlling Shareholder, and they were implemented and completed with the knowledge and authorization of the Controlling Shareholder. Moreover, the drawings were always kept and controlled by the Controlling Shareholder, and they were only handed over to the Non-controlling Shareholders together with other documents on November 18, 2009. According to the "Acceptance Certificate for Completed Construction Project and Planning" for A2-type villas issued by the Planning, Land and Resources Administration of Fengxian District, Shanghai City on January 15, 2012, the gross floor area stated on the certificate was bigger than the gross floor area in the original drawings.

286. Moreover, even if the gross floor area on the construction drawings was inconsistent with the drawings specified in the 4.28 Agreement, the Respondents were clearly aware of that and had not raised any objection within the relevant period of time. With regard to the clause on construction drawings in Article 3.2 and its effect, the Second Applicant cited the principle of "contractual estoppel" and the principle of "estoppel by convention".

287. The Respondents denied that the Controlling Shareholder knew about circumstances regarding the villa project and gave the drawings to the Non-controlling Shareholders. The Respondents pointed out that the Non-controlling Shareholders only submitted a copy of the villa design drawing to the Controlling Shareholder on June 2, 2010, and the Respondents informed verbally that the drawing was inconsistent with the agreement and returned it. Although the Applicants had adequate time thereafter, it did not alter the drawing. The Respondents only received the "Shanghai Commercial Housing Presale Contract" for the first time through the Applicants' lawyer letter on February 4, 2013, and knew about the area of the villas to be provided by the Applicants.

288.     The Respondents claimed that the villas provided by the Applicants had the following defects and did not meet the requirements of "customized" villas as agreed by them: (1) the saleable area of the villas was much lower than 1,200 square meters; (2) even if basement area, which should not be included in the saleable area, were to be added to the total area, the villas still did not meet the required area stated in the 4.28 Agreement. As mentioned above, the requirements of "customized" villa stated by the Respondents are clearly inconsistent with the clauses of the agreement.

**Related written correspondence**

289.     The written correspondence between the Non-controlling Shareholders and the Controlling Shareholder reveals that the Controlling Shareholder sent a letter to the Non-controlling Shareholders on March 25, 2011 requesting the Non-controlling Shareholders to provide the "design drawings of the involved villas, which should show the villas' location, area and construction quality meeting the provisions in the 4.28 Agreement and the usual requirements of a villa".

290.     The Non-controlling Shareholders replied in a letter on April 25, 2011 and pointed out that:

          *"You have repeatedly delayed signing the Villa Order Contract for the two A2-type Villas located on Central Island with us on many occasions by claiming that we have not provided the drawings of the Central Island A2-type Villas to you; but in reality, Article 3.2 of the 4.28 Agreement has specified that the gross floor area on the drawings of the Central Island A2-type Villas is about 1,200 square meters each, and Oasis Investment and the Controlling Shareholder have received the drawings and are aware of the delivery criteria, and they have confirmed the actual price as stated". Moreover, our side had re-submitted the relevant drawings of Central Island A2-type Villas to you on June 2, 2010 in response to your request after the 4.28 Agreement took effect. You received and signed for the receipt of the drawings. Therefore, there is no factual basis for your refusal to sign the Villa Order Contract by stating that we have not furnished the drawings of the Central Island A2-type Villas."*

291.     In the reply letter of the Controlling Shareholder dated April 28, 2011, they claimed that "we have not received the drawings of Central Island A2-type Villas with the 'gross floor area of about 1,200 square meters each' as mentioned

by you, have they been sent wrongly? For the sake of caution, please resend them again for our verification". The Controlling Shareholders' position then was not that there was a problem with the drawings provided by the Non-controlling Shareholders, but that they did not receive the drawings at all.

292. The Non-controlling Shareholders replied in a letter on May 3, 2011 and reiterated that "we have responded to your request on June 2, 2010 and sent the relevant drawings of Central Island A2-type Villas to you, and we have your signed acknowledgment to prove this. If you have any doubt about the construction drawings, you can check with us".

293. The Controlling Shareholder only gave a reply concerning the construction drawings on July 15, 2011. In this reply, they finally acknowledged that the Non-controlling Shareholders had given the drawings to them, but they then said that the drawings were not in compliance with the requirements: "you have indeed given the drawings to us, but the drawings showed a huge discrepancy between the gross floor area of the Villas and that agreed in the 4.28 Agreement, and we had also raised this issue to you when we received the drawings".

**Jiuting Stores**

294. The Applicants said that the Respondents had so far been unable or refused to appoint and cause Greencourt Property Development and the Non-controlling Shareholders or a third party appointed by them to sign the "Shanghai Real Estate Sale and Purchase Contract" for the transfer of the Jiuting Stores, and this caused them to suffer losses. However, the Respondents said that the Applicants failed to meet the requirements for the Villas, hence the Respondents did not have the obligation to sign the "Shanghai Commercial Housing Presale Contract" for the Jiuting Stores and transfer the ownership of the stores to the Applicants or the party appointed by them. This shows that the main issue of dispute between the parties is whether the Villas provided by the Applicants met the requirements in the 4.28 Agreement.

295. The Respondents also pointed out that, regardless, the Controlling Shareholder had allowed the Applicants to use and rent the store through an authorization letter, and the Applicants were actually entitled to the revenue from the stores. Both parties had a dispute over the scope and deadline of the authorization. The Second Applicant pointed out that, the Respondents were still occupying 2,000

square meters of commercial property at the west wing of the Phase 2 Central Square up to the current day.

296. The arbitral tribunal believes that, under Article 3 of the 4.28 Agreement, the agreement of the parties is for the property exchange, and the value of RMB 72 million of the involved property is only an estimation (this is the meaning of the word "pricing"); it is not an actual price calculated accurately by multiplying the price per square meter with the area of 1,200 square meters. In addition, the phrase "gross floor area on drawings of the about 1,200 square meters each", which was used to describe the A2-type villas, should also be understood in this contect. The Respondents also claimed that the pricing of RMB 72 million for the A2-type villas was calculated based on (1) the saleable gross floor area of two villas, which was 2,400 square meters in total, and (2) an average price of no less than RMB 31,500 per square meter of gross floor area. The Respondents claimed that this was the basis for Article 3.3 of the 4.28 Agreement between the parties, but the arbitral tribunal believes that this claim is obviously inconsistent with the stipulations that have been expressly stated in the 4.28 Agreement. Therefore, the arbitral tribunal has accepted the claims of the Applicants and ruled that the Respondents violated the obligations under Article 3.1.

### The Second Applicant's claim for losses of Jiuting Stores

297. The Second Applicant listed the following calculation of losses in appendix 1 of its written concluding statement (the original appendix 1 of the written concluding statement was replaced by the new appendix 1 on August 8, 2017, and the parties did not have any objection to that):

| Calculation of rent losses of Jiuting Stores (revised version dated August 8, 2017) | | |
|---|---|---|
| **Total rent losses (includes the office area and store) (RMB)** | 10,346,211 | |
| *Office area with balcony (over 2,000 square meters)* | | |
| | | |
| Total area (square meters) | 2,140.30 | |
| Area occupied by SJHC (square meters) | 424.35 | |
| **Leasable area (square meters)** | **1,715.95** | |
| | | Witness statement of Ke Yeying: B/7/94, Paragraph 46: The supermarket is the third party mentioned in the |

| | | paragraph. |
|---|---|---|
| Area of supermarket (square meters) | 860.85 | Supplementary witness statement of Gu Yong: B/12/129, Paragraph 4.3 |
| Area occupied by the Controlling Shareholder (square meters) | 855.10 | Witness statement of Ke Yeying: B/7/94, Paragraph 45 |
| Market rent price (RMB/square meters/day) | 2.50 | Gu Yong's statement: Day 5 [44(22-27)] |
| | | |
| Date on which the Non-controlling Shareholders should be entitled to the right of use and rent of the stores under Article 3.1(1) of the 4.28 Agreement | 5/28/2010 | Revision of the Further Reply to the Applicants' Reply and Defence to Counterclaim: A/6/97, Paragraph 10.4 |
| Date of lease to supermarket: | 6/1/2016 | |
| Reference date for calculation of losses | 8/8/2017 | |
| **Number of days whereby the supermarket area was vacant due to the Controlling Shareholder's refusal to provide authorization** | **2,196** | |
| Losses arising from vacant supermarket area (RMB) | 4,726,067 | |
| | | |
| Number of days whereby the Controlling Shareholder occupied the store in breach of Article 3.1(1) | 2,629 | |
| Losses arising from occupation by the Controlling Shareholder (RMB) | 5,620,145 | |
| | | |
| **Total rent losses of the office area with balcony (RMB)** | **10,346,211** | |

298. Claims of the Second Applicant: Although the A2-type villas were completed in 2011, the Controlling Shareholder unduly refused to accept the A2-type villas and refused to execute the transfer of the Jiuting Stores, and these caused the Non-controlling Shareholders to suffer heavy losses. The reasons are as follows:

   (1)   According to Article 3.1 of the 4.28 Agreement, the commercial property of the Jiuting Stores project is about 8,000 square meters, and this specifically included (i) about 6,000 square meters of the level three commercial space of the Greencourt Sun City Phase 1 along the

streetside; and (ii) about 2,000 square meters of all commercial space at the west wing of the Phase 2 Central Plaza.

(2)    The rent of the 2,000 square meters [of commercial property] in Phase 2 was most probably higher than RMB 2.5 per day per square meter. Mr. Gu Yong, who is the Controlling Shareholder's witness, also agreed with this point.

(3)    As the Controlling Shareholder prevented the transfer of Jiuting Stores and did not grant the controlling rights of the 2,000 square meters [of commercial property] to the Non-controlling Shareholders, the Non-controlling Shareholders could not rent out this portion [of commercial property].

(4)    Although the Non-controlling Shareholders rented a portion of the office with balcony in the 2,000 square meters [of commercial property] to a third party who is related to Mdm. Ke in July 2016, that was a special arrangement (based on the third party's trust in Mdm. Ke).

(5)    The Controlling Shareholder granted the controlling rights of the 6,000 square meters [of commercial property] in Phase 1 to the Non-controlling Shareholders through the authorization letter, but the controlling rights of the 2,000 square meters [of commercial property] in Phase 2 have not been granted so far. Mr. Gu Yong, who was the Controlling Shareholder's witness, also agreed with this point.

299.    According to Article 3.1 of the 4.28 Agreement: "Within 30 days of the signing of this agreement, Oasis Investment and the Controlling Shareholders shall procure a subsidiary, namely, Shanghai Greencourt Real Estate Development Limited to sign the "Shanghai Real Estate Sale and Purchase Contract" with the Non-controlling Shareholders or their nominated third party, and undertake to transfer approximate 8000 m2 of commercial space which shall meet the appropriate delivery standards (specifically, the property includes approximately 6000 m2 of commercial space on the third level along the streetside of Phase 1 of Greencourt Sun City Commercial Building, and all the commercial space of approximately 2000 m2 of the west side of the Central Plaza of Phase 2 of Greencourt Sun City) at the Jiuting Greencourt Sun City Real Estate Project in Songjiang District, to the Non-controlling Shareholders or their nominated third party. For the avoidance of doubt, (1) when the Shanghai

Real Estate Sale and Purchase Contract is signed, Oasis Investment and the Controlling Shareholders shall transfer the right to use such commercial space to the Non-controlling Shareholders or their nominated third party, and the Non-controlling Shareholders or their nominated third party are to receive rental income and other earnings after the transfer; and (2) by 30 June 2011, Oasis Investment and the Controlling Shareholders shall transfer the ownership of such commercial space to the Non-controlling Shareholders or their nominated third party."

300. Article 3.1(1) shows that the Respondents were required to fulfill their obligations (that is, to deliver the right of use) within 30 days after signing the 4.28 Agreement, and this was to be no later than May 28, 2010. Article 3.1(2) shows that the Respondents were required to fulfill their obligations (that is, transfer the ownership) before June 30, 2011.

301. Article 3.1 is linked to Articles 3.2 and 3.3, which means that the commercial property of Jiuting Green Court Sun City Real Estate Project at Songjiang District, which covers an area of about 8,000 square meters, had the same pricing as the 2 Central Island A2-type villas of the Peninsula Villa Project at Fengpu Industrial Area, Fengxian District (that is, RMB 72 million). This point has been stated in Paragraph 296 above.

302. In Appendix 1 submitted by the Second Applicant, the claims are divided into two portions: (1) areas occupied by the Controlling Shareholder; (2) number of days that the supermarket area was being controlled due to the Controlling Shareholder's refusal to grant authorization. If August 8, 2017 is used as the reference date for calculation of losses, the total losses would be RMB 10,346,211 (RMB 5,620,145 plus RMB 4,726,067).

303. As the arbitral tribunal has ruled, in Paragraph 271, the Respondents breached of its obligations under Article 3.1 of the 4.28 Agreement, the arbitral tribunal therefore accepts the Second Applicant's claims and rules that the Controlling Shareholder should compensate the Applicants for their losses of RMB 10,346,211 (using August 8, 2017 as the reference date for calculation of losses).

**Settlement of pre-existing debts and claims between SJHC and Oasis Investment and their subsidiaries**

304. According to Article 3.6 of the 4.28 Agreement: "Related party transactions: With effect from the signing of this agreement, the related party transactions between SJHC and Oasis Investment and their subsidiaries shall be terminated; all pre-existing debts and claims shall be settled within one month. This excludes situations that are otherwise stipulated in this agreement.."

305. All parties had made effort to negotiate and agreed to reduce the original scope of dispute to the few items listed in Bundle E, Tab 5.

306. Article 3.6 of the 4.28 Agreement is an independent clause, and it is not related to the above clauses on pricing of the equity transfer. The arbitral tribunal believes that the parties cannot hold any other party responsible for the failure to settle the pre-existing debts and claims within the time frame prescribed by the agreement, and the main reason is that the parties have different views concerning the issues involved. Therefore, with regard to this issue, the arbitral tribunal role is to pass a ruling on this issue, and it will not hold any party liable for the breach of agreement.

307. Under Article 3.6, all the pre-existing debts and claims between SJHC and Oasis Investment and their subsidiaries are to be settled. This is unrelated to the equity transfer or the repurchase. Therefore, the outcome of the settlement shall not contribute to the adjustment of the 3rd Payment. See Article 2.2.1(4) of 4.28 Agreement.

308. All parties have reached an agreement on most of the disputed settlement items, and the remaining disputed items that require ruling by the arbitral tribunal can be found in the list in E/5/15-19, which are: Items 1, 1a, 7, 8, 22, 23 and 28.

**1, 1a. Balance of reserves during transfer in November 2009**

309. According to Paragraph 4a of the witness statement of Mr. Qi Chiyang, who was the Applicants' factual witness: "Both parties have no objection to the debit balance of RMB 41,224,613.21 stated in prepayments - prepaid reserves - item 1." According to Paragraph 11 of the witness statement of Madam Li Shuping, who was the Respondents' factual witness: "Based on the financial information submitted to SJHC, my calculations show that, as of November 2009, the balance of the category 1 current account is RMB 41,224,613.21, which is the balance of current account between SJHC and [Oasis] Kechuang as of November 2009." Therefore, the parties had no dispute on this value.

310. However, both parties had a dispute on whether the RMB 15 million paid by the Controlling Shareholder to Shengyuan on January 29, 2016 (item 1a) could offset the current account debit amount.

311. The evidence shows that Oasis Investment, Greencourt Kechuang and SJHC signed a copy of the "Current Account Prepayment Agreement" on January 29, 2016 [D3/1207]. On the same day, SJHC, Shanghai Shengyuan Construction Engineering Co., Ltd. and Greencourt Kechuang also signed a copy of the "Tripartite Agreement" [D3/1213]. These two agreements were signed for the "Agreement Letter" signed by SJHC and Shengyuan on January 10, 2015 (for the arrears of two project amounts of the "Lekang Park Phase 2", which added up to RMB 26,198,239). As SJHC did not have sufficient funds to pay the project amount, it requested for Greencourt Kechuang, which is a subsidiary of Oasis Investment, to pay the amount on its behalf. [Oasis] Kechuang paid RMB 15 million directly to Shengyuan as the first installment of the project amount on behalf of SJHC.

312. The Second Applicant and the Respondents agreed that, the amount of RMB 15 million paid by the Respondents to Shengyuan on January 29, 2016 should be considered as prepayment of the current account of RMB 15 million by the First Respondent on behalf of SJHC based on the agreement in the "Current Account Prepayment Agreement". However, the First Applicant did not agree with the aforementioned position.

313. The arbitral tribunal also noticed that the First Applicant was not involved in the negotiation and the signing of the two agreements. [Paragraph 12 of Xu Hongbiao's non-religious affidavit]

314. The arbitral tribunal believes that the meaning of Article 3.6 in the 4.28 Agreement is very clear, which is: all the pre-existing debts and claims between SJHC and Oasis Investment and their subsidiaries must be settled within one month of the 4.28 Agreement (May 28, 2010). Although [Oasis] Kechuang paid RMB 15 million directly to Shengyuan on behalf of SJHC, the said amount was paid only in 2016, which was far beyond the deadline stated in the 4.28 Agreement. Therefore, the arbitral tribunal believes that this amount of RMB 15 million does not fall under the scope of pre-existing debts and claims stated in Article 3.6 of the 4.28 Agreement. The issue of whether this amount of RMB 15 million can offset the current account debit of RMB 41,224,613.21 is not related

to the terms of the 4.28 Agreement. This issue is not within the jurisdiction of the arbitral tribunal, hence it shall not be ruled upon by the arbitral tribunal.

### 7, 8. Renumerations and expenses of Ke Zhengguang and Xu Hongbiao from January - November 2009

315. The First Applicant and the Second Applicant received renumerations, expenses and social security contribution amounting to RMB 3,127,591.77 from Oasis Investment in 2009. This amount was confirmed by both parties (see Paragraph 9a of Qi Chiyang's witness statement; Paragraph 12.3.1 of Li Shuping's witness statement). The dispute was whether this sum should be borne by Oasis Investment or SJHC. The Respondents' position was that, the Non-controllilng Shareholders agreed in the "First Draft Checklist of the Non-controlling Shareholders" that SJHC should bear this amount, but in the subsequent reconciliation process and the correspondences between the parties, [the Non-controlling Shareholders] did not agree for SJHC to bear the amount. The Controlling Shareholder asserted that, based on the principles in respect of the share repurchase, as the Non-controlling Shareholders only rendered services to SJHC since the start of 2009, the amount should be borne solely by SJHC. The Applicants claimed that their renumerations, expenses and social security contributions received from Oasis Investment in 2009 were based on the employment relationship between Oasis Investment and Ke [Zhengguang] and Xu [Hongbiao], and that relationship was not related to the pre-existing debts and claims between SJHC and Oasis Investment and their subsidiaries, hence these amounts were not under the scope of settlement of pre-existing debts and claims as stated in Article 3.6 of the 4.28 Agreement, and they were not related to the 4.28 Agreement.

316. In Paragraph 12.2 of Li Shuping's witness statement, she introduced the background in which expenses were adjusted or apportioned due to staff remuneration and social security contribution. She explained: This adjustment or apportionment was based mainly on these factors: (a) some employees of the Chinese subsidiaries of Oasis Investment had a labor relationship with a certain subsidiary, and they received remuneration and social security contribution from that subsidiary while primarily serving another subsidiary. Therefore, when SJHC executed a staff takeover in November 2009, the Controlling Shareholder should have arranged for Oasis Investment's subsidiaries (excluding SJHC) to return to SJHC the remuneration and social security contribution paid to

employees who did not serve SJHC in 2009; (b) as the Non-controlling Shareholders refused to pay the remuneration for all employees of SJHC in the second half of November 2009 after signing the restructuring agreement, and the subsidiaries of Oasis Investment then had to pay them in cash first, therefore, the corresponding expenses for employees who served SJHC should be returned to the subsidiaries of Oasis Investment by SJHC.

317.	The arbitral tribunal believes that, from November 2009 onward, Ke [Zhengguang] and Xu [Hongbiao] only served SJHC (and not Oasis Investment or subsidiaries other than SJHC), and based on this logic, even though their remunerations and expenses were still paid by Oasis Investment, this amount should also be borne by SJHC. Moreover, the First Applicant and the Second Applicant had agreed in the "First Draft Checklist of the Non-controlling Shareholders" that SJHC should bear this amount, and they only disagreed with this later.

318.	In summary, the arbitral tribunal endorses the Respondents' claim and ordered SJHC to bear and return RMB 3,127,591.77 to the First Respondent.

## 22. Outstanding amount of Lekang Greening Engineering (RMB 1,136,313.42)

319.	According to the statement of Li Shuping, who was the Respondents' factual witness, SJHC should pay RMB 1,136,313.42 as the greening project amount for Xiaotang Lekang Park Phase 2 to Oasis Investment' subsidiary Yijing Company (this amount was the project amount of RMB 1,136,313.42 paid by Yijing for the greening of Xiaotang Lekang Park Phase 2, and this amount was not claimed from SJHC) [Paragraph 28.4 of Li Shuping's witness statement [B/72]]. Li Shuping also explained that this sum was only added to the "Checklist of Current Account as of December 31, 2015" file prepared by her in January 2016 after she knew about the communication between the Controlling Shareholder and the Non-controlling Shareholders about the project amount of Shengyuan Company. Qi Chiyang, who was the Applicants' factual witness, said that there was no record of this sum of project amount during delivery, and the engineering department said that Yijing Company and SJHC had settled the project amount for Lekang Park Phase 2. The construction price was RMB 3.5 million in the construction contract that was concluded at that time, and the amount actually paid for the project was RMB 4.22 million. An excess of RMB 1.22 million was already paid, and this was 35% more than the construction price under the

93

contract [see Paragraph 9d of Qi Chiyang's witness statement [B/37]]. In Paragraph 15 of her supplementary witness statement, Li Shuping replied: "After the repurchase reference date, a project cost of RMB 1,136,313.42 for SJHC's Lekang Park Phase 2 was eventually formulated in Yijing Company's books. At that time, I thought that all the parties had carried out the split based on their assets during the repurchase reference date, hence this cost became Yijing Company's deficit and I added it into the account checklist." [B/125]

320. The arbitral tribunal believes that, there is insufficient evidence to show that Yijing Company took over the payment of the project amount in response to SJHC's request, and the Respondents' witness also said that this amount was only formed after the repurchase reference date. Therefore, the arbitral tribunal has no evidence-based reason to ask SJHC to pay this sum to Yijing Company. In summary, the arbitral tribunal does not endorse the Respondents' request.

## 23. Apportioned investment cost for the 10 kV switch station (RMB 47(*sic*) million)

321. In Paragraph 28.3 of her witness statement, Li Shuping said that she only added this sum (SJHC should share the investment cost of RMB 4.7 million for the switch station of Shanghai Four Seasons Ecological Technology Co., Ltd.) to the "Checklist of Current Account as of December 31, 2015" prepared by her in January 2016 after she knew about the communication between the Controlling Shareholder and the Non-controlling Shareholders about the project amount of Shengyuan Company [B/72]. Qi Chiyang said that this apportioned amount came from an agreement on apportionment of investment cost of the relevant distribution development station concluded with Four Seasons Ecological Technology Co., Ltd. when SJHC built the villas and developed neighboring projects in 2012. The payment responsibilities or disputes on the payments were controlled by the 2012 apportionment agreement, and they were neither related to the 4.28 Agreement nor were they under the scope of settlement of the debts and claims stated in Article 3.6 of the 4.28 Agreement because Article 3.6 of the 4.28 Agreement says that the debts and claims between SJHC and Oasis Investment and their subsidiaries were to be settled on the signing date of the Agreement (April 28, 2010) [B/37]. In Paragraph 16 of her supplementary witness statement, Li Shuping said that, after reviewing the 4.28 Agreement and the 11.9 Agreement comprehensively, [she considered that] no restriction was imposed on the time whereby the debts and claims were to be settled. Based on

common sense, the debts and claims that further arised during the equity repurchase process should also be settled accordingly [B/125].

322. The arbitral tribunal believes that, Article 3.6 has a deadline for the settlement of the debts and claims, that is, within one month after the signing of the 4.28 Agreement (May 28, 2010). Therefore, this shared amount of RMB 4.7 million is not covered by Article 3.6 of the 4.28 Agreement. This matter is not to be decided upon by the arbitral tribunal.

**28.   For the interest arising from Oasis Investment and its subsidiaries' retaining of the funds of SJHC, the Controlling Shareholder has yet paid the interest [back to SJHC/Non-controlling Shareholders]**

323. The Applicants' position was that interest clearing should form part of Article 3.6.   Prior to the split [by way of share restructuring], the Group had centralized use of funds to bear the costs of the corresponding units and projects financial costs as needed, so as to maximize the Group's overall profits. Such a model is understandable. However, following SJHC's split on December 31, 2008 as the reference date, Oasis Investment's controlling party continued to adopt this model on SJHC and freely transferred funds [out of SJHC] without consideration.   By adopting a management accounting model of apportioning financial costs, this went against the spirit of the relevant agreement: See Paragraph 7e of Qi Chiyang's witness statement. Li Shuping explained about the group funds allocation in Paragraph 10 of his witness statement.

324. The arbitral tribunal believes that, regardless of whether SJHC was split on December 31, 2008 as the reference date, the 4.28 Agreement was only signed in about one and a half years later, hence there existed a "custodian" relationship between the Group and SJHC during this period of time. Therefore, it is practically very challenging to identify clearly which party was utilizing or occupying which party's funds. In summary, the arbitral tribunal does not support the Applicants' request.

## VIII.   Ruling and Order of the Arbitral Tribunal

Based on the aforementioned reasons, the arbitral tribunal ordered as follows:

1. (Within 4 weeks from the day this ruling is passed) The Respondents are to to cause Greencourt Real Estate to sign a "Shanghai Real Estate Sale and Purchase Contract" for the Jiuting Stores with the Applicants or a third party appointed by

the Applicants, and transfer the ownership of the Jiuting Stores to the Non-controlling Shareholders or a third party appointed by them. (Article 3.1 of 4.28 Agreement)

2.   (Within 4 weeks from the day this ruling is passed) The Respondents are to cause the First Respondent to appoint a third party to sign the "Shanghai Commercial Housing Presale Contract" for A2-type villas with SJHC, and complete the relevant presale registration procedures. (Article 3.2 of 4.28 Agreement)

3.   All parties are ordered to settle and pay the debts of SJHC and the First Respondent within 4 weeks from the day the ruling is passed based on Paragraphs 304 to 324 of this ruling. (Article 3.6 of 4.28 Agreement)

4.   The Applicants are ordered to submit an audit report to the relevant approval authorities within 2 months from the day the ruling is passed.

5.   (Within 2 months from the day this ruling is passed) The First Respondent is ordered to arrange for and cause Shibang Company to acquire the 80% equity interest of SJHC held by the First Respondent's subsidiary Greencourt Properties. (Article 2.3.1 of 4.28 Agreement)

6.   (Within 2 weeks from the day this ruling is passed) The First Respondent and Non-controlling Shareholders are to sign, and the First Respondent is to cause their subsidiary, Greencourt Properties, to jointly sign, the Equity Purchase Option Agreement and Entrustment Agreement concerning Shibang Company. (Articles 2.3.1 and 2.3.2 of 4.28 Agreement)

7.   (Within 2 months from the day this ruling is passed) The First Respondent is ordered to cause Oasis Kechuang to transfer its 20% equity in SJHC to Luhao Trading.

8.   (Within 4 weeks after the execution of the orders numbered 1-6 above) The Respondents are to pay the final amount after making the adjustments set out in Article 2.2.1(4) of the 4.28 Agreement and in Paragraphs 232(4)(a)(b)(c) and 233 of this ruling.

9.   The second respondent, third respondent and fourth respondent are jointly and severally ordered to pay RMB10,346,211 to the applicants as compensation for their losses (using August 8, 2017 as reference date for calculation of losses).

## IX. Arbitration Fee

325. With regard to the arbitration fee, all parties agreed during the closing that it would not need to be decided by the arbitral tribunal at this stage, hence the arbitral tribunal will pass the ruling on arbitration fee after all the parties have submitted the relevant supporting documents.

Date: February 28, 2018

Arbitration venue: Hong Kong


_____                              _____
[signature]                                   [signature]
Teresa Cheng Yeuk-Wah,                        Horace Wong Yuk-Lun,
Senior Counsel                                Senior Counsel
Arbitrator                                    Arbitrator

                    _____              [stamp]
                    [signature]               Hong Kong International
                    Yang Ing Loong            Arbitration Centre
                    Chief Arbitrator          HONG KONG
                    on behalf of arbitral tribunal   INTERNATIONAL
                                              ARBITRATION CENTRE



TRANSPERFECT

# CERTIFICATION

TransPerfect is globally certified under the standards ISO 9001:2015 and ISO 17100:2015. This Translation Certificate confirms the included documents have been completed in conformance with the Quality Management System documented in its ISO process maps and are, to the best knowledge and belief of all TransPerfect employees engaged on the project, full and accurate translations of the source material.

File Name(s):      Final Arbitration Award (HKIAC) dated 28 February 2018

Source Language(s)      Simplified Chinese

Target Language(s)      English

Authorized Signature:



Name:      *Sylvia Lau*

Title:      *Project Assistant*

Date:      *Oct. 22nd, 2018*