# EXHIBIT D



# CERTIFICATION

TransPerfect is globally certified under the standards ISO 9001:2015 and ISO 17100:2015. This Translation Certificate confirms the included documents have been completed in conformance with the Quality Management System documented in its ISO process maps and are, to the best knowledge and belief of all TransPerfect employees engaged on the project, full and accurate translations of the source material.

File Name(s):       Final Arbitration Award (HKIAC) dated 28 February 2018

Source Language(s)    Simplified Chinese

Target Language(s)    English

Authorized Signature:



Name:     Sylvia Lau

Title:      Project Assistant

Date:      Oct. 22nd, 2018

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS
TRANSPERFECT TRANSLATIONS LIMITED    UNITS 1704-5, 17F, UNIVERSAL TRADE CENTRE, 3-5A ARBUTHNOT ROAD, CENTRAL, HONG KONG
T +852 2292.9900  F +852 2545.7781    WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

**Arbitration Case at the Hong Kong International Arbitration Centre ("HKIAC")**

**in accordance with the rules of the Hong Kong International Arbitration Centre (effective from September 1, 2008)**

**("HKIAC Rules")**

**HKIAC/A13028**

**Xu Hongbiao**

First Applicant

**Estate of Ke Zhengguang**

Second Applicant

and

**Oasis Investment Group Limited**

First Respondent

**Yu Naifen Stephany**

Second Respondent

**Yu Naiwen**

Third Respondent

**Yu Naiyun**

Fourth Respondent

---

**Final Arbitration Award (excluding interest and arbitration fees)**

---

**Table of Contents**

| Chapter | Page Number |
|---|---|

I.    Parties Concerned ................................................................................................. 1

II.   Arbitration Agreement and Applicable Laws ................................................... 2

III.  Arbitral Tribunal ............................................................................................... 3

IV.  Factual Background........................................................................................... 39

V.    Disputed Matters and Position of Both Parties ............................................. 42

VI.  Petitions of the Applicants and Respondents ................................................ 56

VII.  Analysis and Reasons of the Arbitral Tribunal ............................................ 60

VIII.  Ruling and Order of the Arbitral Tribunal.................................................... 95

IX.  Arbitration Fees................................................................................................ 97

**Final Arbitration Award**
**(excluding interest and arbitration fees)**

## I.     Parties Concerned

1.     The Applicants in this case are:

**First Applicant: Mr. Xu Hongbiao**, Chinese citizen, Chinese identification card number 310104196403192854. His correspondence address is Room 419, Oasis Tower, No. 555 Zhongshan West Road, Shanghai City, China. Postal code: 200051.

**Second Applicant: Estate of Ke Zhengguang**, was Mr. **Ke Zhengguang** prior to December 15, 2013 (hereinafter referred to as "**Mr. Ke**" or "**Second Applicant**"). Prior to his death, Mr. Ke was a Chinese citizen with Chinese identification card number 310109195601033237. Mr. Ke passed away on December 15, 2013. Thereafter, the Second Applicant in this case was amended as Estate of Mr. Ke. The Administrators of the Estate of Mr. Ke are: (1) Mdm. Zhang Yuejin (widow of Mr. Ke, hereinafter referred to as "**Mdm. Zhang**"); and (2) Mdm. Ke Yeying (daughter of Mr. Ke, hereinafter referred to as "**Mdm. Ke**). Their correspondence address is Room 419, Oasis Tower, No. 555 Zhongshan West Road, Shanghai City, China. Postal code: 200051.

They are hereinafter collectively referred to as the "**Applicants**".

2.     In this case, C.L. Chow & Macksion Chan Solicitors (CLCMC Solicitors) was originally appointed as the representative of the Applicants. Address: 3/F, Alliance Building, No. 130-136 Connaught Road Central, Hong Kong. Mr. Ke passed away on December 15, 2013. On December 28, 2015, the High Court of Hong Kong issued the Letters of Administration and appointed Mdm. Zhang and Mdm. Ke as the Administrators of the Estate of Mr. Ke. On January 12, 2016, Baker & McKenzie Shanghai Office (after that, its Hong Kong Office also participated in this case; the Hong Kong and the Shanghai Office shall be collectively referred to as "**Baker**") (Address: Room 1601, Jinmao Tower, No. 88 Century Avenue, Pudong New Area, Shanghai, China/14/F Hutchison House, No. 10 Harcourt Road, Central, Hong Kong) sent a letter to the arbitration tribunal as Mdm. Zhang and Mdm. Ke's representative, and officially

1

represented the Second Applicant in participating in this case. CLCMC Solicitors remained the representative of the First Applicant.

3.     The Respondents in this case are:

First Respondent: **Oasis Investment Group Limited** (hereinafter referred to as "**Oasis Investment**"), is a company limitd by shares registered in the British Virgin Islands, with its correspondence address as 12/F, Oasis Tower, No. 555 Zhongshan West Road, Shanghai City, China. Postal code: 200051

Second Respondent: **Mdm. Yu Naifen Stephany**, American citizen, U.S. Passport no. 710714118. Her correspondence address is 12/F, Oasis Tower, No. 555 Zhongshan West Road, Shanghai City, China. Postal code: 200051

Third Respondent: **Mdm. Yu Naiwen**, Chinese citizen, Chinese identification card number 310101196304040864. Her correspondence address is 12/F, Oasis Tower, No. 555 Zhongshan West Road, Shanghai City, China. Postal code: 200051

Fourth Respondent: **Mdm. Yu Naiyun**, Chinese citizen, Chinese identification card number 310106197207062822. Her correspondence address is 12/F, Oasis Tower, No. 555 Zhongshan West Road, Shanghai City, China. Postal code: 200051

They are hereinafter collectively referred to as the "**Respondents**".

4.     O'Melveny & Myers LLP was originally appointed as the representative of the Respondents. Address: 31/F, AIA Central, No. 1 Connaught Road Central, Hong Kong. After October 12, 2016, the team members of the representative of the Respondents were joined by Sidley Austin LLP (address: 39/F, Two International Finance Centre, Central, Hong Kong). Sidley Austin LLP was then appointed by the Respondents to continue representing the Respondents in this case.

5.     The Applicants and Respondents are hereinafter each referred to as the "**party concerned**", and both parties are referred to as "**all parties**".

## II.     Arbitration Agreement and Applicable Laws

6.     This arbitration involves the "Agreement on the Implementation of the 'Preliminary Share Restructuring Agreement'" (hereinafter referred to as the

2

"**4.28 Agreement**") concluded by all parties on April 28, 2010 for the breaking up of the First Respondent and its subsidiaries. The basis of filing in this arbitration is Article 4.2 of the "4.28 Agreement". It is said in this Article :

*"4.2  Any conflicts, disputes and claims resulting from this agreement or related to this agreement, breach of contract, termination of contract and void of contract (hereafter referred to as "disputes") shall be dealt with through amicable negotiations by all Parties. If the negotiation fails, any Party is entitled to submit the dispute to the Hong Kong International Arbitration Centre for arbitration. The arbitration is to be conducted in Chinese. The arbitration tribunal is to consist of three arbitrators. Oasis Investment and the Controlling Shareholders are entitled to nominate one arbitrator, the Non-controlling Shareholders are entitled to nominate another arbitrator, and the third arbitrator, who will be the chief arbitrator, is to be nominated by the Chairperson of the Hong Kong International Arbitration Centre. The outcome of arbitration is final and binding on all Parties."*

7.    "Non-controlling Shareholders" in the abovementioned arbitration clause refers to the Applicants in this case. Oasis Investment and the "Controlling Shareholders" (that is, the Second, Third, and Fourth Respondents) refer to the Respondents in this case.

8.    Based on Article 4.2 in the "4.28 Agreement" as cited above, this Arbitration Proceeding shall be managed by the HKIAC and conducted in accordance with the "HKIAC Rules". The arbitration location shall be Hong Kong and the arbitration language shall be Chinese.

9.    The Article 4.1(sic) of the "4.28 Agreement" stipulates that the Agreement shall be governed by the laws of Hong Kong.

## III.   Arbitral Tribunal

10.   The arbitral tribunal in this case shall comprise the following arbitrators:

(1)    Horace Wong Yuk-Lun, Senior Counsel, address: 10/F, New Henry House, No. 10 Ice House Street, Central, Hong Kong, nominated by the Applicants;

(2)     Teresa Cheng Yeuk-Wah, Senior Counsel, address: 38/F, Gloucester Tower, The Landmark, Central, Hong Kong, nominated by the Respondents; and

(3)     Mr. Yang Ing Loong (hereinafter referred to as "**Chief Arbitrator**"), address: 18/F, One Exchange Square, No. 8 Connaught Place, Central, Hong Kong, was appointed as the third arbitrator, who shall also act as the Chief Arbitrator, by the HKIAC Council in accordance with the agreement reached by all parties on arbitration.

11.    The arbitral tribunal was officially constituted on June 4, 2013 and all parties were informed of the constitution of the arbitral tribunal on the same day.

**Arbitration Proceedings**

12.    The arbitral tribunal held that it was not necessary to list all the corresponding letters between the representatives of the parties written during the process of this case. All procedural orders made by the arbitral tribunal have been issued in writing and they will not be repeated [in full] herein. It shall be emphasized that the arbitral tribunal has fully considered all the claims made by all the parties in writing, the testimonies given by the witnesses, and claims made during the hearings before the orders were issued. All instructions, orders, and decisions were made after negotiations by the three arbitrators. In this regard, this part of the arbitration award presents a summary on the milestones of this case.

13.    On February 22, 2013, the Applicants served a "Notice of Arbitration" (Case No. HKIAC/A13028) on the Respondents and submitted it to the HKIAC in Hong Kong to resolve the disputes arose under the "4.28 Agreement".

14.    On April 12, 2013, the Respondents submitted a "Response to the Notice of Arbitration".

15.    On April 8, 2013, HKIAC sent a letter to confirm the appointment of Horace Wong Yuk-Lun, Senior Counsel, as an arbitrator in this case as nominated by the Applicants. On April 22, 2013, the Respondents notified the HKIAC that Teresa Cheng Yeuk-Wah, Senior Counsel, shall be nominated as an arbitrator in this case. The next day, that is, April 23, 2013, HKIAC notified Mdm. Teresa Cheng Yeuk-wah that she had been nominated. On the same day, Mdm. Teresa Cheng Yeuk-wah notified HKIAC that she shall accept the nomination. On April 30,

4

2013, HKIAC sent a letter to confirm the appointment of Mdm. Teresa Cheng Yeuk-wah as an arbitrator in this case.

16.    On June 4, 2013, HKIAC sent a letter to confirm the appointment of Mr. Yang Ing Loong as the Chief Arbitrator in this case. On June 4, 2013, the arbitral tribunal was officially constituted.

17.    On June 4, 2013, HKIAC sent a letter to notify all parties that the arbitral tribunal had been constituted in accordance with the "HKIAC Rules".

18.    On June 7, 2013, the Chief Arbitrator sent a letter on behalf of the arbitral tribunal to notify all parties that the arbitral tribunal had been constituted. He requested all parties to confirm that they do not have any objections regarding the constitution of the arbitral tribunal and matters related to the arbitration rules, the arbitration language, and the applicable governing laws. At the same time, the arbitral tribunal provided an interim schedule it had drafted (it was converted to procedural orders subsequently) and requested that all parties conduct negotiation, reach a consensus (where possible) regarding the submission dates of the relevant documents, and submit a reply to the arbitral tribunal before 6 p.m. on June 14, 2013.

19.    On June 14, 2013, the Applicants sent a letter to the Chief Arbitrator to confirm the relevant matters as mentioned in paragraph 18 above and submitted the draft procedural order proposed by the Applicants. On the same day, the Respondents submitted a schedule proposed by the Respondents and supplemented a complete arbitral tribunal draft procedural order based on the said schedule, and confirmed the relevant matters as mentioned in paragraph 18 above.

20.    After considering the written opinions by all parties, the Chief Arbitrator issued the Procedural Order (I) (hereinafter referred to as "**Order (I)**") on behalf of the arbitration tribunal on June 25, 2013. One copy of the amended procedural schedule is annexed thereto.

21.    On August 30, 2013, the Respondents submitted their "Statement of Defence and Counterclaim" and list of appendices to the HKIAC via email and special courier. The arbitral tribunal confirmed and acknowledged the receipt of the electronic version via email on the same day.

22.    On October 8, 2013, the Applicants submitted their "Reply and Defence to Counterclaim" to the arbitral tribunal via email.

23.    On November 12, 2013, the Respondents sent a letter to the arbitral tribunal and submitted their "Further Reply to the Applicants' Reply and Defence to Counterclaim" to the arbitral tribunal. The arbitral tribunal confirmed and acknowledged the receipt via email on the same day.

24.    On November 22, 2013, the Applicants sent a letter to the arbitral tribunal and alleged that the Respondents had committed a serious breach of Order (I) by submitting the "Further Reply to the Applicants' Reply and Defence to Counterclaim" to the arbitral tribunal on November 12, 2013. The reason was that Order (I) did not permit the Respondents to provide a further reply to the Applicants' reply. The Applicants requested that the arbitral tribunal issue an order to revoke Paragraphs 1 to 32 (that is, the content of the further reply to the Applicants' reply) of the Respondent's further reply, and requested that the Respondents pay the Applicants for the attorney fees incurred due to their submission of the further reply.

25.    On the same day, that is, November 22, 2013, the Respondents sent a letter to the arbitral tribunal and denied that their submission of the "Further Reply to the Applicants' Reply and Defence to Counterclaim" to the arbitral tribunal has breached Order (I). The reason was that the content of the further reply was only a reply to the Applicants' defence to counterclaims. However, in view that the Applicants' "Defence to Counterclaims" and the content of other portions were closely interconnected and overlapping, the reply to the Applicants' "Defence to Counterclaims" involved the content of other portions. Furthermore, as the reply was formatted and separately answered based on the sequence of the paragraphs of the Applicants' "Reply and Defence to Counterclaim", the Respondents requested that the arbitral tribunal reject the Applicants' request.

AP_Legal – 104494610.1

26.     On November 25, 2013, the arbitral tribunal issued a reply to all parties via email and stated that after consideration, the arbitral tribunal will not order the Respondents to revoke Paragraph 1 to Paragraph 32 of their "Further Reply to the Applicants' Reply and Defence to Counterclaim". However, the arbitral tribunal permitted the Applicants to make further statement in writing with regard to the said paragraphs within one week (that is, on or before November 30). At the same time, the arbitral tribunal asked all parties whether an extension of the deadline of the Request for Production of Documents that each party was to present as stipulated in Order (I) was required (that is, November 26).

27.     On the same day, that is, November 25, 2013, the Applicants submitted a reply to the arbitral tribunal via email; in view that the Respondents confirmed that the contents in their further reply were only limited to the Applicants' defence to counterclaims, the Applicants shall not make further statement in writing. Hence, the extension of the deadline on November 26 was not required.

28.     On November 26, 2013, the Respondents submitted the "Respondents' Request for Production of Documents" to the arbitral tribunal.

29.     On the same day, that is, November 26, 2013, the Applicants submitted the "Applicants' Document List" to the arbitral tribunal.

30.     On December 5, 2013, the arbitral tribunal confirmed via email the receipt of the "Respondents' Request for Production of Documents" and the "Applicants' Document List" submitted on November 26, 2013 by the Respondents and the Applicants, respectively. At the same time, the arbitral tribunal reminded the Applicants that they did not submit a Request for Production of Documents stated in Paragraph 7 of Order (I) and requested the Applicants to clarify whether any requests for production of documents to the Respondents would be made before 6 p.m. on December 6, 2013.

31.     On December 6, 2013, the Applicants sent an email to the arbitral tribunal to confirm that they did not have any requests for the production of documents at this stage.

32.     On December 17, 2013, the Applicants submitted the Applicants' Reasonable Objections to the Respondents' Request for Production of Documents to the arbitral tribunal via email, and notified all parties that Mr. Ke had suddenly passed away the day before. The Applicants stated that they would discuss the

7

relevant legal procedures matters regarding the Second Applicant's continuation in this case with Mr. Ke's family members as soon as possible, and they would make recommendations to the arbitral tribunal as soon as possible after receiving the relevant instructions from Mr. Ke's family members.

33.     On December 20, 2013, the arbitral tribunal requested the Respondents via email to respond to the Applicants' Reasonable Objections to the Respondents' Request for Production of Documents on December 27, 2013, and permitted the Applicants to make a final response on January 7, 2014 with regard to the Respondents' response. At the same time, the arbitral tribunal pointed out that, even though these steps were not explicitly stated in Order (I), it was added so as to facilitate better decision making by the arbitral tribunal. In addition, the arbitral tribunal stated that it shall wait for the Applicants' recommendations regarding the relevant matters on the legal procedures regarding the Second Applicant's continuation in this case.

34.     On December 27, 2013, the Respondents submitted the "Respondents' Reasons for Rebuttal/Renewed Position to the Objections to the Request for Production of Documents" (hereinafter referred to as "**Reasons for Rebuttal/Renewed Position**") to the arbitral tribunal.

35.     On January 9, 2014, the arbitral tribunal confirmed via email the receipt of the "'Respondents' Request for Production of Documents' including the Applicants' Objection Opinions and the Respondents' Reasons for Rebuttal/Renewed Position to the Objections to the Request for Production of Documents" submitted by the Respondents. In view that the deadline for the Applicants' final response to this document (January 7, 2014) had passed, the arbitral tribunal requested the Applicants to confirm whether a response would be made to the said document before 6 p.m. on that day. At the same time, the arbitral tribunal also requested the Applicants to provide statements or recommendations regarding the matters on the relevant legal procedures regarding the Second Applicant's continuation in this case.

36.     On the same day, that is, January 9, 2014, the Applicants submitted a request via email to the arbitral tribunal to suspend the arbitration proceedings until January 15, 2014, and to extend the final deadline of the Applicant's response to the Respondents' "Reasons for Rebuttal/Renewed Position" to January 15, 2014. The Applicants stated that they shall submit the Applicant's response to the

8

Respondents' "Reasons for Rebuttal/Renewed Position" to the arbitral tribunal and provide further statements or recommendations regarding the impact of Mr. Ke's passing on this case on that day.

37.     On January 10, 2014, the arbitral tribunal approved the Applicants' abovementioned request for extension, that is, the arbitration proceeding shall be suspended until January 15, 2014 and the final deadline for the Applicant's response to the Respondents' "Reasons for Rebuttal/Renewed Position" shall be extended to January 15, 2014, and agreed to the representative of the Applicants providing further statements or recommendations regarding the impact of Mr. Ke's passing on this case on that day. The arbitral tribunal also reserved the rights allowing the Respondents to provide a reply to the statements or recommendations.

38.     On January 15, 2014, the Applicants sent a letter to the arbitral tribunal, with the Applicants' response to the Respondents' "Reasons for Rebuttal/Renewed Position" enclosed. The Applicants also requested for the extension of the statements or recommendations regarding the impact of Mr. Ke's passing on this case to January 30, 2014 based on the actual difficulties faced by Mr. Ke's wife, daughter, and their family members.

39.     On January 16, 2014, the arbitral tribunal agreed to suspend the arbitration proceeding until January 30, 2014 via email.

40.     On January 24, 2014, the representative of the Applicants (CLCMC Solicitors) sent an email to the arbitral tribunal to explain the situation of Mr. Ke's family in detail and claimed that the arbitration could proceed. The representative of the Applicants stated that it had already accepted the joint appointment by Mdm. Zhang, the wife of Mr. Ke, and Mdm. Ke, the daughter of Mr. Ke, to begin the legal procedures for the application at the High Court of Hong Kong to permit Mdm. Zhang or her authorized person, Ke Yele, to continue this case as the Administrator of the Estate of Mr. Ke, on behalf of the Estate of Mr. Ke. It shall also represent the First Applicant and Mdm. Zhang, the wife of Mr. Ke, and Mdm. Ke, the daughter of Mr. Ke, in the application to permit Mdm. Zhang or her authorized person, Ke Yele, to carry out all the procedures in this case as the Administrators of the Estate of Mr. Ke, without terminating the procedures of this case before the granting of permission by the High Court of Hong Kong. At

9

the same time, it shall notify the arbitral tribunal immediately after the official granting of permission by the High Court of Hong Kong.

41.     On the same day, that is, January 24, 2014, the arbitral tribunal sent an email to request the Respondents to provide a reply to the abovementioned request made by the Applicants on or before January 29, 2014.

42.     On January 29, 2014, the Respondents sent a letter to the arbitral tribunal and stated that they did not object to the request of the Applicant's representative in principle, that is, Mr. Ke's legal successor shall continue in this case and the termination of the procedures in this case was not required. However, the Applicants must provide the relevant information/clarification of the issues concerning the matter, including the identity of Ke Yele, Mdm. Zhang, and Mdm. Ke, and the relevant documents. The Respondents also requested that the arbitral tribunal allow them the opportunity to publish their final opinion within a certain period after they receive the information they requested.

43.     On January 30, 2014, the arbitral tribunal notified all parties via email that there were legal concerns regarding the viewpoints claimed by the representative of the Applicants in an email dated January 24, 2014, that is, to push forward the case procedures before the Administrators of the Estate of Mr. Ke are approved by the High Court of Hong Kong. At the same time, the arbitral tribunal invited the representative of the Applicants to reply to the letter dated January 29, 2014 sent by the Respondents' lawyer on or before February 14, 2014.

44.     On February 11, 2014, the Respondents sent a letter to the arbitral tribunal requesting for confirmation that the case procedure (including Item 10 of "Order (I)" and all procedures thereafter) was still suspended until further instructions from the arbitral tribunal. The arbitral tribunal sent a letter to all parties on February 12, 2014 confirming that the case procedure was temporarily suspended. It stated that further instructions would be given after further reply from the Second Applicant was received (the deadline shall be on February 14, 2014).

45.     On February 14, 2014, the Applicants sent a letter to the arbitral tribunal in response to the letter dated January 29, 2014 sent by the Respondents and the opinions in the email dated January 30, 2014 sent by the arbitral tribunal. They claimed that in view of Rule 15 of Order 15 of the Rules of the High Court in Chapter 4A of the Hong Kong Subsidiary Legislation and the precedent of the

10

High Court of Hong Kong (Lily Cheung v. The Official Solicitor and Another, [2008] 5 HKLRD 743), the arbitral tribunal could appoint Mdm. Zhang as the representative of the Estate of Mr. Ke in the case procedure for the continuation of case procedures. The identification documents of Mdm. Zhang, marriage certificate of Mdm. Zhang and the Second Applicant, death certificate[1] and identification documents of the Second Applicant, and the court verdict of the cited case were enclosed therewith.

46.   On February 25, 2014, the Respondents sent a letter to the arbitral tribunal requesting that the Applicants clarify whether they were no longer requesting to appoint Ke Yele as the Administrator of the Estate. The Respondents also objected to the Applicants' request to the arbitral tribunal to appoint Mdm. Zhang as a representative of the Second Applicant's estate in the case procedure for the continuation of case procedures, and claimed that the arbitral tribunal should wait until the final approval of the Administrators of the Estate of the Second Applicant had been officially issued by the High Court of Hong Kong before continuing case procedures.

47.   On February 26, 2014, the Applicants sent an email to the arbitral tribunal requesting that their response to the Respondents' letter dated February 25, 2014 to be sent on or before February 28, 2014. On the same day, the arbitral tribunal approved the Applicants' said request via email.

48.   On February 27, 2014, the arbitral tribunal notified all parties via email that the arbitral tribunal intended to hold a half-day hearing in the afternoon of April 2, 2014 at HKIAC. The primary objective was: To allow all parties to fully express their legal opinions and feasible solutions on impact of the passing of Mr. Ke on the arbitration proceedings, so as to facilitate the moving forward of arbitration proceedings.

49.   On February 27, 2014, the Applicants responded to the Respondents' letter dated February 25, 2014 and clarified that Mdm. Zhang and Mdm. Ke were willing and hoped that the arbitral tribunal would appoint Mdm. Zhang as the Administrator of the Estate of Mr. Ke.

---

[1]   The death certificate indicated that the Second Applicant passed away in Shanghai on December 15, 2013 at 10:20 p.m.

11

50. On March 11, 2014, after considering the correspondences between all parties regarding the question of hearing, the arbitral tribunal formulated a schedule for both parties to submit their legal opinions on the issue of the impact of the passing of Mr. Ke on the arbitration proceedings.

51. On March 25, 2014, all parties submitted their opinions in writing to the arbitral tribunal respectively with regard to the abovementioned issue. With regard to the date of the hearing, all parties stated that they had not reached a consensus. They requested that the arbitral tribunal consider reviewing the written materials submitted by all parties in this round before deciding whether a hearing was required.

52. On April 1, 2014, all parties submitted a rebuttal legal opinion to the other party's written opinions to the arbitral tribunal respectively.

53. On April 9, 2014, the Respondents sent a letter to the arbitral tribunal via email to propose that the arbitral tribunal give all parties two weeks to negotiate the matter regarding the recommendation made by the Respondents on seeking indemnification due to the legal risks that might be incurred by appointing Mdm. Zhang as the representative of the Second Applicant to participate in this case. On the same day, the Applicants sent a letter to the arbitral tribunal via email stating that the Respondents' interpretation of the Applicants' proposal was incorrect. At the same time, the Applicants suggested to the arbitral tribunal (and at the same time, confirmed that they were willing to unconditionally accept) that in the event the arbitral tribunal agreed with the potential risks raised by the Respondents after considering the statements and relevant documents provided by all parties, they requested that the arbitral tribunal directly issue the following binding order under the circumstances:

*"The First Applicant shall solely bear all liabilities of guarantee and indemnity and pay for the reasonable indemnification of the Respondents for the rights and interests of the Respondents affected due to Mdm. Zhang's actions in this arbitration proceedings and all losses incurred by the Respondents due to the rejection of her request as an Administrator of the Estate of the Second Applicant by the High Court."*

54. On the same day, that is, April 9, 2014, the Respondents expressed regret over the Applicants' response, and requested the arbitral tribunal to make a decision regarding the relevant request made by the Applicants.

55.   On April 29, 2014, the arbitral tribunal instructed all parties via email that in view that the legal opinions and written materials submitted by all parties were sufficient, the arbitral tribunal held that a hearing was not necessary.

56.   On May 30, 2014, the arbitral tribunal made a "Decision on the Impact of the Passing of the Second Applicant on the Arbitration Proceedings" ("**Decision (I)**"). The decision of the arbitral tribunal was as follows: (1) The arbitral tribunal does not possess jurisdiction over the appointment of the Administrator of the Estate of the Second Applicant; (2) As the arbitral tribunal does not possess the abovementioned jurisdiction, the case of the Second Applicant may only proceed after the Administrator of the Estate of the Second Applicant had been appointed by the High Court of Hong Kong; (3) In view of this, the only reasonable resolution to this matter by the arbitral tribunal is to suspend the arbitration at the current time until after the High Court of Hong Kong appoints the Administrator of the Estate of the Second Applicant; (4) The arbitral tribunal decided to reserve the decision for the allocation of the attorney fees for this request.

57.   On June 4, 2014, HKIAC sent the original copy of "Decision (I)" to all parties. There were no new developments in this case thereafter until April 2, 2015.

58.   On April 2, 2015, the representative of the Applicants sent an email to the arbitral tribunal on behalf of the First Applicant and made the following request (hereinafter referred to as "**Withdrawal/Addition Request**"): (1) To request for the arbitral tribunal to issue an order to withdraw the Second Applicant from this arbitration proceeding and add the Estate of the Second Applicant as the Fifth Respondent in this arbitration proceeding; (2) To permit the Applicant to amend the arbitration petition to reflect the withdrawal of the Second Applicant and the addition of the Estate of the Second Applicant as the Fifth Respondent; (3) To resume this arbitration proceedings. Enclosed with the Applicant's email were: A brief statement of the First Applicant, an affirmation of the First Applicant, and a draft of the amended arbitration petition. On the same day, the arbitral tribunal requested that the Respondents to submit their legal opinions regarding the Applicant' request before 6 p.m. on April 10, 2015.

59.   On April 9, 2015, the Respondents sent an email to the arbitral tribunal requesting for an extension of the deadline for their submission of the legal opinions to April 30, 2015. On the same day, the Applicants recommended to the

AP_Legal – 104494610.1

arbitral tribunal via email that, in view that this case procedure had been suspended for over 15 months since the passing of the Second Applicant, the grace period should be extended to April 17, 2015.

60.    On April 10, 2015, after careful consideration, the arbitral tribunal decided to extend the date of the Respondents' response to April 23, 2015 (before 6 p.m.).

61.    On April 20, 2015, Baker, as a representative of Mdm. Zhang and Mdm. Ke, sent a letter to the arbitral tribunal and claimed that the act of submitting a request to the arbitral tribunal to change (the Estate of) the Second Applicant to the Fifth Respondent without the knowledge of Mdm. Zhang and Mdm. Ke by the First Applicant had seriously damaged the legal rights and interest of the Second Applicant and/or its legal successors. Baker claimed that the arbitral tribunal should not make any decisions regarding the abovementioned request before fully taking its opinion into consideration. At the same time, Baker stated that Mdm. Zhang and Mdm. Ke were handling the relevant procedures to obtain the appointment by the High Court of Hong Kong as the Administrators of the Estate of the Second Applicant and it requested the arbitral tribunal to provide it with a duplicate copy of the abovementioned request made by the First Applicant and the relevant documents.

62.    On April 23, 2015, the Respondents sent a letter to the arbitral tribunal and stated that the Administrator of the Estate of the Second Applicant should have the right to express its opinion regarding the request "to remove the Second Applicant from these arbitration proceedings and add the Estate of the Second Applicant as the Fifth Respondent in these arbitration proceedings", and that the arbitral tribunal should not make any decisions regarding the abovementioned matter before the Administrator of the Estate of the Second Applicant has been appointed or confirmed. At the same time, the Respondents also claimed that the request made by the First Applicant lacked necessary basis. In view of the changes in the relationship of all parties, the arbitral tribunal should adopt a more cautious approach in handling the procedure and should not make a decision to support this request at this point. With regard to whether or not the Respondents could request for the First Applicant to jointly bear and perform all obligations and liabilities of the Applicants under the "4.28 Agreement", the Respondents raised specific questions concerning the matter and requested that the Applicants respond to them. On the same day, the Applicants sent an email to the arbitral tribunal to request for a written response with regard to the

14

abovementioned letter sent by the Respondents to be submitted to the arbitral tribunal within 14 days (that is, on or before May 7, 2015). The arbitral tribunal approved the Applicants' request of the said deadline via email on the same day.

63.    On the same day, that is, April 23, 2015, the arbitral tribunal sent a reply to Baker via email stating that, in view of Mdm. Zhang and Mdm. Ke not being appointed by the court as the Administrators of the Estate of the Second Applicant, both of them shall not be the parties involved in this case and they shall not possess the requirements to make any requests to the arbitral tribunal. If Mdm. Ke and Mdm. Zhang officially became the legal Administrators of the Estate of the Second Applicant as appointed by the court in the future, they could make a separate request to the arbitral tribunal again.

64.    On May 6, 2015, the Applicants requested to extend the deadline for the submission of the written response mentioned in Paragraph 62 above to on or before May 21, 2015. The arbitral tribunal approved the said request for extension on May 7, 2015.

65.    On May 21, 2015, the Applicants submitted the "Written Response of the First Applicant" to the arbitral tribunal. The Applicants claimed that, in view that Mdm. Zhang and Mdm. Ke no longer wished to continue authorizing the representative of the Applicants to handle the procedures of the Estate, the representative of the Applicants would not be allowed to continue representing the Second Applicant based on legal principles. Also, as the outcome of Mdm. Zhang and Mdm. Ke's application to the High Court of Hong Kong to be appointed as the Administrators of the Estate of the Second Applicant was still unknown after over one year, the First Applicant believed that Mdm. Zhang and Mdm. Ke were affected by the Respondents and intentionally refused to handle the Estate or delay the handling of the Estate. Hence, the arbitral tribunal and all parties should not wait indefinitely for the succession of the Estate of the Second Applicant. Hence, the First Applicant recommended that the arbitral tribunal remove the Second Applicant and add the Second Applicant as the Fifth Respondent. Otherwise, in the event the arbitral tribunal held that the Second Applicant cannot or should not be added as the Fifth Respondent, the arbitral tribunal would be requested to consider the continuation of the individual arbitration of the First Applicant.

66.    On June 16, 2015, Baker sent a letter to the arbitral tribunal stating that it had already submitted the application regarding the Administrator of the Estate of the Second Applicant to the High Court of Hong Kong on behalf of Mdm. Ke and Mdm. Zhang on June 12, 2015. On June 19, 2015, the arbitral tribunal forwarded this letter to all parties and instructed them to submit a written opinion on or before June 25, 2015 with regard to the submitted application of the appointment of the Administrator of the Estate of the Second Applicant, especially on whether it was necessary for the arbitral tribunal to consider the request made by the First Applicant.

67.    On June 25, 2015, all parties submitted a written opinion to the arbitral tribunal in accordance with the instructions given by the arbitral tribunal on June 16, 2015.

68.    On June 26, 2015, the arbitral tribunal instructed all parties via email that after reviewing the written statements/opinions made by all parties with regard to the Withdrawal/Addition Request made by the First Applicant, the arbitral tribunal held that, as the said request was relatively complex, a hearing on the said request was necessary to clarify and obtain the viewpoints and positions of all parties for consideration.

69.    On June 29, 2015, the First Applicant sent a reply to the arbitral tribunal via email, stating that it had already discussed with the Respondents regarding the appropriate date and location of the hearing.

70.    On July 13, 2015, the arbitral tribunal conducted a public hearing with regard to the Withdrawal/Addition Request made by the First Applicant. On the same day and after the hearing, the arbitral tribunal asked all parties via email whether they would agree to add the three appendices (that is, the letter dated July 10, 2015 sent by Baker to the arbitral tribunal, the "Preliminary Agreement on Share Restructuring for Oasis Investment Group Limited" dated November 9, 2009, and case materials related to Warwick Film Productions Ltd and Another v. Eisinger and Others) into the hearing folder submitted by the Applicants (and they shall be listed as document number 24, 25, and 26, from pages 207 to 218). On the same day, the First Applicant and the Respondents confirmed and agreed via email respectively.

71.    On August 6, 2015, the arbitral tribunal notified all parties via email that it had made a decision (the electronic version of the decision was enclosed in the said

16

email) regarding the request made by the First Applicant on April 2, 2015. HKIAC would mail the original copy to all parties. At the same time, the arbitral tribunal requested that the lawyers for all parties discuss and formulate a copy of the arbitration procedural schedule as soon as possible for the arbitral tribunal's reference.

72.   On August 26, 2015, the First Applicant made a suggestion to the arbitral tribunal via email that the arbitration proceeding should proceed in accordance with the Procedural Order (I) dated June 25, 2013. The relevant arbitration procedural schedule should be an extension of this order and the corresponding timings should be adjusted (the specific adjustments were listed in the email). The First Applicant requested the arbitral tribunal to adopt the abovementioned schedule and issue a corresponding order.

73.   On August 27, 2015, the Respondents sent an email to the arbitral tribunal stating that the procedural schedule proposed by the First Applicant the day before was not a recommendation after discussion with the Respondents. The Respondents recommended that the arbitral tribunal give all parties seven days to conduct negotiations regarding the First Applicant's proposal and to reach a consensus as far as possible. Hence, the Respondents requested that the arbitral tribunal temporarily suspend giving instructions regarding the arbitration procedural schedule.

74.   On August 29, 2015, the arbitral tribunal ordered all parties to submit a procedural schedule upon reaching a consensus after negotiation by all parties on or before September 3, 2015. If all parties could not reach a consensus, the arbitral tribunal requested that each party raise their own opinions for the arbitral tribunal's reference.

75.   On September 1, 2015, the First Applicant sent an email to the arbitral tribunal stating that it agreed to the procedural schedule recommended by the Respondents on August 27, 2015 and requested the arbitral tribunal to adopt the abovementioned schedule where a consensus had been reached by all parties, and to issue the corresponding order.

76.   On September 14, 2015, the arbitral tribunal sent an email stating that it agreed to the procedural schedule recommended by the Respondents. In view that the widow of the Second Applicant, Mdm. Zhang, and daughter of the Second Applicant, Mdm. Ke, were represented by Baker, the arbitral tribunal requested that the lawyer of the First Applicant and the lawyer of the Respondents confirm

17

that they had already notified Baker of the decision made by the arbitral tribunal on August 6, 2015 via registered mail. On the same day, the First Applicant sent an email to the arbitral tribunal confirming that it had already sent a registered mail to Baker on that day (that is, September 14, 2015) regarding the decision made by the arbitral tribunal on August 6, 2015. On October 8, 2015, the Respondents stated to the arbitral tribunal that in view that the First Applicant had already sent the decision to Baker, the Respondents did not send the said decision to Baker again. However, the Respondents confirmed that the procedural schedule sent by the First Applicant on September 1, 2015 reflected the consensus of all parties, and requested the arbitral tribunal to issue a new procedural order.

77.    On December 21, 2015, the arbitral tribunal instructed all parties via email that in view that the Applicant had already sent a registered mail to Baker on September 14, 2015 regarding the decision made by the arbitral tribunal on August 6, 2015, the Respondents did not need to send the said decision to Baker. At the same time, the arbitral tribunal issued Procedural Order (II) (hereinafter referred to as "**Order (II)**"), and a copy of the amended procedural schedule was enclosed therewith.

78.    On December 24, 2015, Baker sent a letter to the arbitral tribunal stating that the High Court of Hong Kong had made a preliminary decision to authorize Mdm. Ke and Mdm. Zhang as the appointed Administrators of the Estate of the Second Applicant on November 6, 2015, and they hoped to receive the official decision from the High Court of Hong Kong soon.

79.    On January 12, 2016, Baker sent a letter to the arbitral tribunal stating that the High Court of Hong Kong had issued the Letters of Administration on December 28, 2015 and appointed Mdm. Zhang and Mdm. Ke as the Administrators of the Estate of the Second Applicant. The duplicate copy of the said Letters of Administration was also enclosed in the letter. In the letter, Baker also requested that the arbitral tribunal provide it with the dossier of this case that the arbitral tribunal had sent to all parties after the passing of the Second Applicant. On the same day, the arbitral tribunal forwarded this letter to the First Applicant and the Respondents, and instructed them to provide opinions for or against Baker at or before 6 p.m. on January 15, 2016.

80.     On January 14, 2016, the First Applicant sent an email to the arbitral tribunal stating that the duplicate copy of the Letters of Administration provided by Baker was not complete. However, if Baker was able to provide the complete duplicate copy stating that the relevant Administrators of the Estate has legal rights to represent the Second Applicant in the administration or handling of its choses in action and liabilities under the 4.28 Agreement and/or in this case based on the Letters of Administration, the First Applicant shall not object to Baker's request in the letter dated January 12, 2016.

81.     On January 15, 2016, the arbitral tribunal issued the "Decision of the Arbitral Tribunal on the 'Respondents' Request for Production of Documents'" ("**Decision (II)**") to all parties via email.

82.     On January 15, 2016, the Respondents sent an email to the arbitral tribunal confirming that they did not object to Baker's request in the letter dated January 12, 2016.

83.     On January 18, 2016, Baker sent a letter to the arbitral tribunal requesting that the arbitral tribunal notify it on the newest developments of this case, the next step in the procedure and the time schedule, and provide it with the documents it had requested for in the letter dated January 12, 2016.

84.     On January 19, 2016, the arbitral tribunal replied to Baker via email and requested for it to provide the complete duplicate copy of the Letters of Administration so as to facilitate the arbitral tribunal's overall consideration of Baker's request. On the same day, the First Applicant sent a letter to the arbitral tribunal to submit a further supplementary written opinion with regard to the matters in Baker's letter dated January 12, 2016.

85.     On January 27, 2016, the First Applicant sent an email to the arbitral tribunal confirming that the relevant documents in the Request for Production of Documents in the arbitral tribunal's Decision (II) were non-existent.

86.     On January 29, 2016, Baker sent a letter to the arbitral tribunal stating that Mdm. Ke and Mdm. Zhang had reservations about providing the complete duplicate copy, as the complete duplicate copy of the Letters of Administration involved the private information of the Second Applicant. Baker also asked for the arbitral tribunal's understanding, or for it to provide clear reasons for disclosure.

19

87.    On February 2, 2016, the arbitral tribunal sent a letter to Baker stating that the documents it had previously provided were unable to clearly state whether the relevant Administrators of the Estate had the legal rights to represent the Second Applicant in the administration or handling of its choses in action and liabilities in the 4.28 Agreement and/or in this case based on the Letters of Administration, and requested that it provide the Schedule of Assets and Liabilities dated May 25, 2015 enclosed in the said Letters of Appointment to confirm the abovementioned issue.

88.    On February 17, 2016, Baker sent a letter to the arbitral tribunal stating that with regard to the list of appendices in the Letters of Administration presented by the High Court of Hong Kong, it would not provide explanations regarding the reasons for the disclosure of such choses in action made in a foreign country.

89.    On February 17, 2016, the arbitral tribunal announced to all parties via email that in accordance with the Order (II) stipulated by the arbitral tribunal on December 21, 2015, the segment for the production of documents had ended. However, the arbitral tribunal reserves its rights under Article 22.3 in the 2013 Administered Arbitration Rules.

90.    On February 19, 2016, the First Applicant submitted the electronic versions of the First Applicant's request to summon expert witnesses, the First Applicant's list of expert witnesses, and the First Applicant's list of factual witnesses to the arbitral tribunal via email. On the same day, the Respondents asked the arbitral tribunal for an extension of the deadline to March 4, 2016 for the submission of the witness request and name list. Thereafter, also on the same day, the First Applicant proposed an opinion in response regarding the said request for extension to the arbitral tribunal, stating that it objected to the extension of the deadline to March 4, 2016, but agreed to extend the deadline to February 26, 2016. On February 20, 2016, the arbitral tribunal approved the extension of the Respondents' submission deadline to February 26, 2016 at 6 p.m. via email.

91.    On February 25, 2016, the arbitral tribunal sent an email to the First Applicant and the Respondents with all the email/letter correspondences between the arbitral tribunal and Baker enclosed, and invited the First Applicant and the Respondents to submit, by March 11, 2016 latest, the final written opinion with regard to whether or not Mdm. Ke and Mdm. Zhang could represent the Second Applicant in this case.

20

AP_Legal – 104494610.1

92.   On February 26, 2016, the Respondents sent a letter to the arbitral tribunal to submit the list of factual witnesses the Respondents intended to summon and the list of expert witnesses the Respondents intended to summon, as well as the relevant applications.

93.   On March 4, 2016, the Respondents sent a letter to the arbitral tribunal stating that, in view that the First Applicant did not submit the relevant information regarding the expert witnesses that the Respondents had asked for, they shall reserve the rights to raise opinions regarding the witnesses the First Applicant intended to summon, and the rights to nominate a Chinese architectural surveyor as an expert witness. At the same time, the Respondents stated that all parties should abide by the arrangements of the relevant items in Order (II) with regard to the matter of expert witnesses.

94.   On the same day, that is, March 4, 2016, the First Applicant submitted a written opinion with regard to the necessity of the list of witnesses submitted by the Respondents in the letter dated February 26, 2016.

95.   On March 9, 2016, Baker sent a letter to the arbitral tribunal requesting that the arbitral tribunal give a reply with regard to the information of the relevant choses in action and legal liabilities in the list of appendices in the Letters of Administration of the Second Applicant, and the requests it had made in the letters dated January 12, 2016 and January 18, 2016.

96.   On March 10, 2016, the First Applicant submitted the "First Applicant's Supplementary Written Opinion and the Written Opinion of Relevant Cases" with regard to whether Mdm. Ke and Mdm. Zhang could represent the Second Applicant in this case. The First Applicant believed that, in view that the Letters of Administration confirmed by Baker did not include the choses in action and legal liabilities in the 4.28 Agreement, Mdm. Ke and Mdm. Zhang lacked the legal powers to represent the Second Applicant in this case.

97.   On March 11, 2016, the Respondents sent an email to the arbitral tribunal to reaffirm their opinion made in the letter dated January 15, 2016, that is, they did not object to the arbitral tribunal providing the dossier of this case for Mdm. Ke's and Mdm. Zhang's viewing, and they did not object to Mdm. Ke and Mdm. Zhang representing the Second Applicant in this case. On the same day, that is, March 11, 2016, the Respondents submitted a reply to the arbitral tribunal in

21

another email regarding the First Applicant's objection to the necessity of the list of witnesses submitted on March 4, 2016.

98.    On March 24, 2016, Baker sent a letter to the arbitral tribunal to reaffirm its position, that is, on Mdm. Ke and Mdm. Zhang having the right to represent the Second Applicant in the participation of this case, and having the opinion that the arbitral tribunal should immediately suspend the case before the official decision of the issue regarding the appointment of the Administrator of the Estate of the Second Application has been made.

99.    On March 29, 2016, the Respondents sent an email to the arbitral tribunal stating that they had reached a consensus with the First Applicant and requested for the arbitral tribunal to approve the extension of the deadline for the exchange of the witness testimonies by all parties (that is, Item 15 of Order (II)) to April 15, 2016. On the same day, that is March 29, 2016, the arbitral tribunal approved the said request via email.

100.    On April 6, 2016, HKIAC sent an email with an attachment to all parties on the "Decision Regarding the Participation of Mdm. Ke Yeying, the Daughter, and Mdm. Zhang Yuejin, the Widow of the Second Applicant, Mr. Ke Zhengguang in the Hearing of the Arbitration Case Representing the Estate of the Second Applicant as Administrators of the Estate of Mr. Ke Zhengguang" ("**Decision (III)**") made by the arbitral tribunal dated April 6, 2016. The arbitral tribunal ruled that: (1) As the Administrators of the Estate of the Second Applicant, Mdm. Ke and Mdm. Zhang have the right to represent the Estate of the Second Applicant in the participation of the hearing of this case; (2) HKIAC shall immediately provide the dossier related to this case that was sent to all parties after the passing of the Second Applicant to Baker, the representative of the two administrators; (3) This case shall proceed. On the next day, that is, April 7, 2016, the arbitral tribunal sent the said Decision (III) to all parties via email.

101.    On April 14, 2016, Baker sent a letter to the arbitral tribunal, in view that it had yet to receive the related dossier of this case, to request for the suspension of the current arbitration proceeding, so that it could have the opportunity to fully read and analyze the dossier of the case.

102.    On April 15, 2016, the First Applicant sent an email to the arbitral tribunal with the electronic version of the statement made by the First Applicant's two witnesses enclosed. On the same day, the Respondents also sent an email to the

AP_Legal – 104494610.1

arbitral tribunal with the testimonies of the Respondents' four witnesses enclosed.

103.   On April 19, 2016, HKIAC provided Baker with the dossier of this case provided by the arbitral tribunal as instructed in Decision (III) via express courier.

104.   On April 28, 2016, the arbitral tribunal sent an email to all parties requesting that Baker, as the representative of the Second Applicant, notify the arbitral tribunal on the amount of additional time required for its client to prepare for its participation in the hearing of this case. In view of the accession of Baker, (1) the recommendation was that all parties convene a case management conference and all parties were requested to confirm the time for negotiation; (2) to suspend the procedural schedule dated December 21 , 2015 so as to provide the Second Applicant with the opportunity to submit its witness testimonies (if any).

105.   On May 3, 2016, the arbitral tribunal sent a letter to all parties and instructed Baker to clearly state its position on whether or not its client was requesting to participate in the hearing of this case.

106.   On May 4, 2016, the First Applicant sent an email to the arbitral tribunal to confirm the commencement time of the case management conference. On the same day, the Second Applicant sent an email to the arbitral tribunal confirming that Mdm. Ke and Mdm. Zhang would participate in the hearing of this case as the Administrators of the Estate of the Second Applicant.

107.   On May 6, 2016, the arbitral tribunal sent an email to all parties and instructed that the case management conference would be conducted face-to-face, and requested that all parties book the venue for the conference in advance.

108.   On May 10, 2016, the First Applicant sent an email to the arbitral tribunal requesting that the arbitral tribunal issue an order for the Estate of the Second Applicant to confirm their position, with regard to the following questions, with the arbitral tribunal and all parties concerned in this case on or before June 2, 2016 (1) Whether or not the Estate of the Second Applicant would request for claims from the First Applicant and/or the Respondents in this case; (2) Whether or not the Estate of the Second Applicant would adopt the existing arbitration petition submitted jointly by the First Applicant and the Second Applicant as its position for claims in this case; (3) Whether or not the Estate of the Second

23

Applicant would submit its new arbitration petition/Statement of Defence/response letter; (4) Whether or not the Estate of the Second Applicant would only participate in this case as observers. On the same day, that is, May 10, 2016, the arbitral tribunal sent an email to all parties and instructed the Second Applicant to provide its opinion with regard to the First Applicant's request no later than 6 p.m. on May 12, 2016.

109.   On May 11, 2016, the Second Applicant sent an email to the arbitral tribunal to request for an extension of the deadline of its reply to the First Applicant's abovementioned request to May 20, 2016.

110.   On May 12, 2016, the Respondents sent an email to the arbitral tribunal, stating that with regard to the First Applicant's request in the email dated May 10, 2016, the First Applicant should first clearly state whether or not it would still continue to request for the Administrators of the Estate of the Second Applicant to be converted to a Respondent, or to request for claims from the Administrators of the Estate of the Second Applicant.

111.  On May 13, 2016, the arbitral tribunal sent an email to all parties and approved the extension of the deadline requested by the Second Applicant in the email dated May 11, 2016.

112.  On May 17, 2016, the arbitral tribunal sent an email to all parties and instructed that the arbitral tribunal would take the First Applicant's opinion into consideration after the Second Applicant has replied to the First Applicant's questions before the deadline on May 20, 2016.

113.  On May 20, 2016, the Second Applicant sent an email to the arbitral tribunal in response to the First Applicant's questions in the email dated May 10, 2016 (1) The Estate of the Second Applicant would participate in this case as the Second Applicant, and the Second Applicant would not request for any claims from the First Applicant within the scope of the arbitration agreement; (2) The Second Applicant would adopt the arbitration petition submitted in accordance with the Second Applicant's instructions, but the Second Applicant objected to the amended arbitration petition submitted by the First Applicant (that is, the withdrawal of the Second Applicant and the adding as the Fifth Respondent); (3) The Second Applicant would not submit a new Statement of Defence; (4) The Second Applicant would attend the hearing as observers, but would be restricted by the conditions listed in the email.

114.  On May 22, 2016, the arbitral tribunal sent an email to all parties and permitted the First Applicant to respond to the Second Applicant's email dated May 20, 2016 no later than 6 p.m. on May 27, 2016.

115.  On June 3, 2016, the arbitral tribunal sent an email to all parties to remind the First Applicant that the deadline for its response to the Second Applicant's email dated May 20, 2016 had passed and instructed it to clearly state its position. On June 6, 2016, the First Applicant sent an email to the arbitral tribunal stating that it would submit a Written Statement of the First Applicant's Position no later than five days prior to the case management conference. On June 8, 2016, the Second Applicant sent an email to the arbitral tribunal to object to the abovementioned extension of deadline requested by the First Applicant and requested that the arbitral tribunal orders the First Applicant to submit its response no later than June 13, 2016.

116.  On June 14, 2016, the First Applicant sent an email to the arbitral tribunal with the enclosed "First Applicant's Written Response" that it had submitted in

25

response to the email dated May 20, 2016 sent by the Estate of the Second Applicant. In the said response, the First Applicant stated that, based on the position of the Estate of the Second Applicant in the email dated May 20, 2016, the First Applicant did not, at that moment, need to bring up the converting of the Estate of the Second Applicant to Fifth Respondent or request for the corresponding amendments to the arbitration petition. However, in view that the Estate of the Second Applicant reserving the rights to propose opinions or provide supplementations in the future, if the Estate of the Second Applicant were to proposes a position that would be different from or was unfavorable to the First Applicant, the First Applicant shall reserve the rights to once again request the arbitral tribunal to convert the Estate of the Second Applicant to a Respondent. The First Applicant also proposed that the arbitral tribunal order the Estate of the Second Applicant to submit an official written statement (including the confirmation that it did not have any opinions or additions to the pleadings and/or witness testimonies already submitted in the case at this point) on its position at that time and the attitude with regard to the case as mentioned above in the form of a pleading and/or witness statement as a "newly-added" party in the case. At the same time, the First Applicant requested for the guidelines of the current schedule to be postponed accordingly on the basis of the accession of the Estate of the Second Applicant.

117.   On June 21, 2016, the arbitral tribunal sent an email to all parties and instructed the Second Applicant to provide its opinion on the First Applicant's written response before 6 p.m. on June 23, 2016, especially regarding the two questions below: (1) Will the Second Applicant adopt a different position from the First Applicant during the arbitration process? (2) Will the Second Applicant summon any factual witnesses or expert witnesses?

118.   On June 23, 2016, the arbitral tribunal sent an email to all parties and instructed the Respondents to confirm as soon as possible on whether or not they would nominate a Chinese architectural surveyor as an expert witness.

119.   On the same day, that is June 23, 2016, Baker sent an email to the arbitral tribunal with the "Outline of the Second Applicant's Written Statement" and its "Table of Content of Appendices" enclosed.

120.   On June 24, 2016, the arbitral tribunal and all parties commenced the case management conference.

121.   On June 28, 2016, the arbitral tribunal sent an email to all parties with the enclosed procedural order and Schedule of the Hearing ("**Order (III)**") dated June 28, 2016. In Order (III), the arbitral tribunal had approved the list of expert witnesses summoned by the First Applicant and the Respondents respectively, and formulated a Schedule of the Hearing.

122.   On June 29, 2016, the Respondents sent a letter to the arbitral tribunal to submit the testimonies of the three witnesses of the Respondents. On the same day, the First Applicant sent an email to the arbitral tribunal to confirm that it had already delivered the hardcopy of the Statement of the First Applicant's Factual Witnesses along with appendices to the representative of the Second Applicant on the same day.

123.   On July 21, 2016, Baker sent an email to HKIAC to confirm that it had received all documents dated up to December 5, 2013 that were submitted to the arbitral tribunal before the passing of the Second Applicant ("**dossiers**") provided to it in accordance with the requirements in Order (III). On the next day, that is July 22, 2016, Baker sent an email to the arbitral tribunal to request for an extension of the deadline for the relevant procedures and actions stated in the Schedule of the Hearing of Order (III) in view that the abovementioned dossiers were actually received later than the deadline stipulated in Order (III).

124.   On July 26, 2016, Baker sent an email to the arbitral tribunal stating that it had noticed that a part of the appendix of the Respondents' "Statement of Defence and Counterclaim" was missing from the dossiers provided to it by HKIAC, and thereby requested for the arbitral tribunal to approve the extension of deadline that it had requested on July 22, 2016.

125.   On July 28, 2016, the arbitral tribunal sent an email to all parties and instructed the First Applicant and the Respondents to provide opinions with regard to the request for the extension of deadline made by the Second Applicant.

126.   On July 29, 2016, the First Applicant sent an email to the arbitral tribunal stating that the Second Applicant's delay in the receipt of the dossier was due to reasons attributable to itself. However, under the condition that the Second Applicant gave the promise to the arbitral tribunal that it would not request for a further extension of the deadline, the First Applicant would not object to the Second Applicant's request for the extension of deadline. On the same day, the Respondents sent an email to the arbitral tribunal stating that it would not object

27

to the Second Applicant's request for the extension of the deadline, and recommended that the deadlines stated in Item 9 to 11 of the Schedule of the Hearing should be extended accordingly as a result of the National Day holidays.

127.    On July 30, 2016, the Second Applicant sent an email to the arbitral tribunal to refute the position proposed by the First Applicant that the Second Applicant's delay in the receipt of the dossiers was due to reasons attributable to itself, and requested that the arbitral tribunal issue the following orders: (1) Approve the Second Applicant's request for extension of deadline; (2) For the Respondents to provide the appendices of the "Statement of Defence and Counterclaim" (that is, Appendix B46, C1 - C30, and D1 - D30) yet to be received by the Second Applicant to the Second Applicant within seven days; (3) For the Second Applicant to pay the reasonable expenses for the printing of the abovementioned appendices of the "Statement of Defence and Counterclaim" to the Respondents; (4) For the Second Applicant to reserve the rights to claim the abovementioned expenses from the First Applicant; (5) For all parties to have the freedom to make other requests.

128.    On August 1, 2016, the arbitral tribunal sent an email to all parties stating that the arbitral tribunal agreed to amend Order (III) on the basis that the time of the hearing remained the same, and it promulgated a new procedural order and Schedule of the Hearing ("**Order (IV)**").

129.    On the same day, that is, August 1, 2016, the Second Applicant sent an email to the arbitral tribunal requesting the arbitral tribunal to issue orders with regard to the other requests made by it in the email dated July 30, 2016.

130.    On August 2, 2016, the Respondent sent an email to the arbitral tribunal and agreed to conditionally provide the relevant appendices of the "Statement of Defence and Counterclaim" requested by the Second Applicant.

131.    On August 5, 2016, the arbitral tribunal sent an email to all parties and instructed the Second Applicant and the Respondents to notify the arbitral tribunal of the outcome from their communications with regard to the provision of the relevant appendices of the "Statement of Defence and Counterclaim". On the same day, the Second Applicant sent an email to the arbitral tribunal to confirm that it had received the relevant appendices, and that it had reserved the rights to claim the expenses incurred from the First Applicant for obtaining the arbitration documents from HKIAC and the Respondents. On the same day, the First Applicant sent an email to the arbitral tribunal denying the allegation of "the

28

First Applicant illegally removed the documents from the Second Applicant's premises" made by the Second Applicant, and the relevant lawyer's letter was enclosed.

132.   On August 15, 2016, the Second Applicant submitted the factual witness statement of Mdm. Ke to the arbitral tribunal via email. On the same day, the arbitral tribunal sent an email to all parties and approved the request made by the Second Applicant to summon Mr. Ye Yongqing as an expert witness.

133.   On September 3, 2016, the First Applicant sent an email to the arbitral tribunal to request for the amendment of its "Reply and Defence to Counterclaim" in accordance with Article 18.1 of the "2013 Administered Arbitration Rules of the Hong Kong International Arbitration Centre"[2] ("**Request for Amendment**") and the draft of its "Amended Reply and Defence to Counterclaim" was enclosed. At the same time, the First Applicant requested the arbitral tribunal to instruct the Respondents to submit its "Amended Further Reply to the Applicants' Reply and Defence to Counterclaim" within seven days upon the submission of the "Amended Reply and Defence to Counterclaim" by the First Applicant, under the condition that the arbitral tribunal, the Second Applicant, and the Respondents did not object to the "Amended Reply and Defence to Counterclaim" submitted by the First Applicant.

134.   On September 8, 2016, the Respondents sent an email to the arbitral tribunal and objected to the First Applicant's submission of the "Amended Reply and Defence to Counterclaim". On the next day, that is, September 9, 2016, the First Applicant sent an email to the arbitral tribunal and responded to the Respondents' reasons for objection.

135.   On September 12, 2016, the Second Applicant sent an email to the arbitral tribunal stating that it agreed to the First Applicant's request for amendment, and sincerely requested the arbitral tribunal to approve the said request.

---

[2]   The arbitral tribunal noticed that the First Applicant cited the "2013 Administered Arbitration Rules of the Hong Kong International Arbitration Centre". However, the "2008 Administered Arbitration Rules of the Hong Kong International Arbitration Centre" should be applied to this case instead. In view that, with regard to one party's amendment or supplementation of its request or defence, the difference in the relevant stipulations in the two sets of rules had no substantial impact on the arbitral tribunal's approval of the First Applicant's request for amendment, the arbitral tribunal shall deem the abovementioned citation of the "2013 Administered Arbitration Rules of the Hong Kong International Arbitration Centre" by the First Applicant as a typographical error.

AP_Legal – 104494610.1

136.   On the same day, that is, September 12, 2016, the Respondents sent an email to the arbitral tribunal stating that all parties had reached a consensus with regard to the extension of the deadline in Items 8 and 9 in Order (IV) by one week, and requested for the arbitral tribunal's approval. On the same day, the arbitral tribunal sent an email to all parties and approved the said request for the extension of deadline.

137.   On September 13, 2016, the arbitral tribunal sent an email to all parties and instructed that the arbitral tribunal had unanimously agreed to approve the First Applicant's request for amendment, but the First Applicant must pay all parties for all relevant expenses incurred with regard to the request for amendment. At the same time, the arbitral tribunal requested the First Applicant to officially submit the amended "Reply and Defence to Counterclaim" by September 15, 2016, and approved the submission of the amended "Further Reply to the Applicants' Reply and Defence to Counterclaim" by the Respondents to be no later than September 29, 2016.

138.   On the same day, that is, September 13, 2016, the Second Applicant sent an email to the arbitral tribunal requesting the arbitral tribunal to provide it with an opportunity to submit a response letter to the arbitral tribunal with regard to the amendments to the "Reply and Defence to Counterclaim" made by the First Applicant. On September 21, 2016, the arbitral tribunal sent an email to all parties and stated that it did not support the Second Applicant's request to submit a response letter to the arbitral tribunal with regard to the amendments to the "Reply and Defence to Counterclaim" made by the First Applicant.

139.   On September 14, 2016, the First Applicant sent an email to the arbitral tribunal and officially submitted the appendix "Amended Reply and Defence to Counterclaim".

140.   On September 21, 2016, the First Applicant sent an email to the arbitral tribunal with two copies of the First Applicant's Statement on the Refutation of Factual Witnesses enclosed. On the same day, the Second Applicant sent an email to the arbitral tribunal with Mdm. Ke's Refutation of the Witness Statement and the appended evidence enclosed. On the same day, the Respondents also sent a letter to the arbitral tribunal, enclosing three copies of the supplementary witness statement of the Respondents' three witnesses, that is, the Second Applicant, Gu Yong, and Liu Yuping.

30

141.   On September 29, 2016, the Respondents sent a letter to the arbitral tribunal with the Respondents' "Amended Further Reply to the Applicants' Reply and Defence to Counterclaim" enclosed.

142.   On October 12, 2016, the representative of the Respondents sent an email to the arbitral tribunal stating that its team members had been joined by Sidley Austin LLP and was instructed by the Respondents to continue representing the Respondents in this case.

143.   On October 14, 2016, the Respondents sent an email to the arbitral tribunal stating that they requested to extend the deadline for the exchange of the Expert Witnesses Report by all parties in Item 9 of the arbitral tribunal's Order (IV) for seven days, from October 17, 2016 to October 24, 2016, upon reaching a consensus with all parties. However, this would not affect the deadlines for the subsequent items after Item 10 of Order (IV). On the same day, the arbitral tribunal sent an email to all parties and approved the abovementioned request under the condition that a consensus was reached by all parties.

144.   On October 24, 2016, the Second Applicant sent an email to the arbitral tribunal requesting the extension of the deadline for the exchange of the Expert Witnesses Report by all parties to October 28, 2016 under the condition that the next deadline (that is, the commencement of the experts' meeting on November 28, 2016) in the arbitration schedule would not be affected. The Second Applicant stated that it had already solicited the opinion of the First Applicant and the representative of the Respondents with regard to the said request, and the representative of the Respondents had agreed to it. However, the representative of the First Applicant had not provided any replies yet. On the same day, that is, October 24, 2016, the First Applicant sent an email to the arbitral tribunal stating that it did not object to the Second Applicant's abovementioned request, but it hoped that the arbitral tribunal issue an "unless" order with regard to this request for extension of deadline. On the same day, the arbitral tribunal sent an email to all parties and approved the abovementioned request for extension of deadline made by the Second Applicant. The arbitral tribunal also stated that it would not allow any requests for the extension of deadlines to be made unless there were unusual or special reasons, in order to prevent the commencement date of the hearing from being affected.

AP_Legal – 104494610.1

145.    On October 28, 2016, the Second Applicant sent an email to the arbitral tribunal requesting to provide the first round of the unsigned expert report on the basis that the rights of all parties would not be affected on that day. On the same day, the First Applicant sent an email to the arbitral tribunal and objected to the Second Applicant's submission of the first round of the unsigned expert report. Thereafter, the arbitral tribunal sent an email to all parties on the same day and requested the Second Applicant to clarify the reasons for its unsigned expert report and when they could be signed; and whether or not the content in the signed expert report was fully consistent with the content in the unsigned expert report. Subsequently, the Second Applicant sent an email to the arbitral tribunal to explain the reasons for its request, and requested the arbitral tribunal to issue an order on whether or not the first round of the Expert Witnesses Report could be exchanged under the condition that the rights of all parties would not be affected.

146.    On the same day, that is, October 28, 2016, the First Applicant sent an email to the arbitral tribunal with two copies of the First Applicant's Expert Witnesses Report enclosed. On the same day, the Second Applicant and the Respondents also sent emails to the arbitral tribunal separately, stating that they had delivered their signed Expert Witnesses Report to all the other parties without prejudice.

147.    On November 15, 2016, the Second Applicant sent an email to the arbitral tribunal stating that, based on all the reasons listed in this email, the Second Applicant and Respondents unanimously deemed that the experts' meeting should commence on a "without prejudice" basis, and the representatives of all parties were not required to participate. The Second Applicant requested the arbitral tribunal to give instructions with regard to this matter.

148.    On November 21, 2016, the arbitral tribunal sent an email to all parties and approved that the experts' meeting should commence on a "without prejudice" basis.

149.    On December 13, 2016, the Respondents sent a letter to the arbitral tribunal stating that, in view that they had received different and even conflicting instructions and/or requests made by the First Applicant and the Second Applicant, respectively, they requested the arbitral tribunal to issue the following orders: (1) Instruct the Second Applicant (through its Administrators of the Estate) to express its opinions with regard to the two requests made by the

First Applicant in the letter dated December 9, 2016; (2) Instruct the First Applicant to express its opinions with regard to the recent request made by Mdm. Zhang; and (3) Unless the Applicants reach a consensus and provide a joint request to the Respondents, the Respondents shall not accept the unilateral instructions given by either the First Applicant or the Second Applicant.

150. On December 21, 2016, the Respondents sent an email to the arbitral tribunal stating that upon reaching a consensus by all parties, they requested to extend the deadline of the submission of the joint report on the statement of the viewpoints that were unanimously agreed upon by the expert witnesses and the statement of their differing viewpoints to January 4, 2017.

151. On December 30, 2016, the Second Applicant sent an email to the arbitral tribunal and enclosed its reply to the Respondents' letter dated December 13, 2016.

152. On December 31, 2016, the First Applicant sent an email to the arbitral tribunal and provided a reply to the Respondents' letter dated December 13, 2016 and the Second Applicant's letter dated December 30, 2016.

153. On January 11, 2017, the arbitral tribunal sent an email to all parties. The arbitral tribunal stated that it held that the mutual recriminations and allegations made by all parties were not related to this case. Hence, the arbitral tribunal would not take this matter into consideration or make judgements with regard to this matter. With regard to the "without prejudice" letter dated December 9 submitted by the Respondents to the First Applicant, the arbitral tribunal requested all parties to confirm that the arbitral tribunal would be able to continue hearing this case, regardless of whether a copy of the said letter was sent to the arbitral tribunal. The arbitral tribunal also reminded all parties to submit the joint expert reports.

154. Between January 12 - 13, 2017, all parties sent emails to the arbitral tribunal to confirm that the arbitral tribunal would be able to continue hearing this case.

155. On January 13, 2017, the Respondents sent an email to the arbitral tribunal stating that upon reaching a consensus by all parties, they requested to extend the deadline of the submission of the joint expert report to January 25, 2017. The arbitral tribunal sent an email to all parties on January 19, 2017 and approved the said request for extension of deadline under the condition that the overall Schedule of the Hearing would not be affected.

156. On February 16, 2017, the First Applicant sent an email to the arbitral tribunal and recommended that instructions be given by the arbitral tribunal with regard to the time of the pretrial conference.

157. On February 21, 2017, the Respondents sent a letter to the arbitral tribunal, enclosing (1) "Joint Expert Opinion Regarding the Issue on Equity Transfer and Issue on Taxes" jointly submitted on behalf of the Applicants and Respondents; and (2) "Joint Expert Opinion Regarding the Issue on Property" jointly submitted on behalf of the First Applicant and Respondents.

158. On February 27, 2017, the arbitral tribunal sent an email to all parties and notified them of the specific commencement time of the pretrial conference, which would be held on April 3, 2017. The arbitral tribunal also notified all parties that, as there was a conflict of time for one of the arbitrators, the arbitral tribunal agreed to allow the Chief Arbitrator to preside the pretrial conference on his own, and requested all parties' confirmation on this. All parties sent emails to the arbitral tribunal separately between February 27 - 28, 2017 to confirm that they agreed with the abovementioned arrangement.

159. On March 1, 2017, the Respondents sent an email to the arbitral tribunal, enclosing (1) Mdm. Yu Jian's Advisory Report of the Evaluation of the Byland Villa Project; (2) Mdm. Yu Jian's Advisory Report of the Evaluation of the Greencourt Sun City Project; and (3) Mr. Ji Nuo's Expert Opinion Letter and Summary of the Cited Laws and Regulations.

160. On March 6, 2017, the First Applicant sent a recommendation to the arbitral tribunal and made a complaint against the Respondents, stating that there were major additions or changes to the content of "Mr. Ji Nuo's Expert Opinion Letter and Summary of the Cited Laws and Regulations" submitted by the Respondents on March 1, 2017, as compared to the Mr. Ji Nuo's Expert Opinion Letter exchanged and submitted on October 28, 2016. The First Applicant requested the arbitral tribunal to issue an instruction on the refusal to accept all expert reports submitted by the Respondents in the email dated March 1, 2017, and to forbid either party to submit any new or amended expert reports.

161. On the same day, that is, March 6, 2017, the Second Applicant also sent an email to the arbitral tribunal and also objected to the Respondents' submission of the new expert report with content that was different from the version of the expert report submitted by them on February 21, 2017. It also requested the arbitral

AP_Legal – 104494610.1

tribunal to reject the expert report submitted by the Respondents on March 1, 2017.

162.   On March 7, 2017, the arbitral tribunal sent an email to all parties and instructed the Respondents to reply to the abovementioned viewpoint and recommendations made by the First Applicant and the Second Applicant before 6 p.m. on March 9, 2017.

163.   On March 9, 2017, the arbitral tribunal sent an email to all parties and recommended the adjustment of the commencement date of the hearing to May 16, 2017, instead of the original dates from May 15 to 26, 2017 (ten working days), due to the last-minute and urgent arrangement of one of the arbitrators, and where necessary, extend the time of the daily hearings. The arbitral tribunal requested all parties to confirm the above arrangement recommended by the arbitral tribunal before the pretrial conference on April 3, 2017. All parties sent emails to the arbitral tribunal separately between March 9 - 10, 2017 to confirm that they agreed with the abovementioned arrangement.

164.   On March 9, 2017, the Respondents sent an email to the arbitral tribunal to reply to the Applicants' request for rejection in the email dated March 6, 2017, and requested the arbitral tribunal to reject the Applicants' request for rejection. On March 10, 2017, the arbitral tribunal sent an email to all parties and instructed the First Applicant and the Second Applicant that, if they intended to reply to the Respondents' email, they would have to provide a reply before March 14, 2017.

165.   On March 13 and 14, 2017, the First Applicant and the Second Applicant sent letters to the arbitral tribunal separately and provided their replies to the Respondents' email dated March 9, 2017.

166.   On March 29, 2017, the First Applicant sent an email to the arbitral tribunal enclosing a copy of the agenda of the pretrial conference jointly drafted by all parties.

167.   On March 30, 2017, the Respondents sent an email to the arbitral tribunal and stated that they were willing to provide a copy of the Comparison Version of Mr. Ji Nuo's Final Expert Opinion Letter and the version dated October 28, 2016 ("**comparison version**") de bene esse (conditionally) to prove that the final version did not have "major additions or changes to the content" as described by the First Applicant. On such basis, the arbitral tribunal sent an email on the same

day and instructed the Respondents to provide the comparison version for review by the arbitral tribunal, as well as by the First and Second Applicant.

168.    On March 31, 2017, the Second Applicant sent an email to the arbitral tribunal stating that it objected to the Respondents' provision of the comparison version de bene esse, and also objected to the official submission of the comparison version by the Respondents. It also requested the arbitral tribunal to reject the Respondents' request to submit the comparison version or to not take the said comparison version into consideration. On the same day, on March 31, 2017, the Respondents sent an email to the arbitral tribunal and provided the comparison version to all parties. The First Applicant also provided a reply to the email on the Respondents' submission of the comparison version on the same day.

169.    On April 2, 2017, the arbitral tribunal sent an email to all parties to summarize the email correspondences with regard to the comparison version and the main position of all parties, and stated that it would further communicate with all parties during the pretrial conference.

170.    On April 3, 2017, the arbitral tribunal and all parties commenced the pretrial conference at HKIAC.

171.    On April 4, 2017, the arbitral tribunal sent an email to all parties and instructed that it: (1) Permitted Mr. Ji Nuo's Expert Opinion Letter submitted by the Respondents on October 28, 2016; (2) Rejected the amendments to Paragraph 8, Paragraph 9, and Paragraph 32 in Mr. Ji Nuo's Expert Opinion Letter and Summary of the Cited Laws and Regulations submitted by the Respondents on March 1, 2017; (3) Rejected Note 3, Note 7, Note 22, Note 23, Note 24, and the deleted Note 5 (at the same time, refer to point 4 below) in Appendix II of Mr. Ji Nuo's Expert Opinion Letter submitted by the Respondents on March 1, 2017; (4) Permitted all sentences of "Refer to Page [x] of the Summary of the Laws and Regulations" and the "Summary of the Cited Laws and Regulations" (except for Note 3, Note 7, Note 22, Note 23, Note 24, and the deleted Note 5) in Appendix II of Mr. Ji Nuo's Expert Opinion Letter submitted by the Respondents on March 1, 2017; (5) Permitted the "Summary of the Cited Laws and Regulations" submitted by the Respondents on March 1, 2017; (6) Did not support the issuance of any orders as to costs.

172.    On April 5, 2017, the arbitral tribunal issued a procedural order ("**Order (V)**") to all parties with regard to the details of the hearing arrangement via email.

173.    On April 11 and 19, 2017, the arbitral tribunal sent an email to all parties and provided supplementary instructions with regard to the issues related to the dossiers of the hearing.

174.    On May 5, 2017, the First Applicant and the Second Applicant sent emails to the arbitral tribunal separately, enclosing the electronic version of the Written Statement Prior to the Hearing (including "Authorities") submitted by each of them.

175.    Between May 5 - 6, 2017, all parties sent an email to the arbitral tribunal separately and stated that they were unable to submit the relevant Chronology and Introduction of the People Involved in the Case before the deadline stipulated in Order (V) because all parties were unable to reach a consensus with regard to the Chronology and content of the Introduction of the People Involved in the Case. At the same time, the Respondents recommended that the deadline for the submission of the said documents be extended to 6 p.m. on May 9, 2017. On May 7, 2017, the arbitral tribunal approved the extension of the said deadline to 2 p.m. on May 8, 2017.

AP_Legal – 104494610.1

176.    On May 8, 2017, the Respondents sent an email to the arbitral tribunal stating that upon reaching a consensus with both Applicants, they requested to extend the deadline of the submission of the Respondents' Written Statement Prior to the Hearing to 6 p.m. on May 9, 2017. The arbitral tribunal approved the said request on the same day, that is, May 8, 2017. On May 9, 2017, the Respondents sent an email to the arbitral tribunal, enclosing the electronic version of the Written Statement Prior to the Hearing and "Authorities" submitted by them. On the next day, that is, May 9, 2017, the Respondents resubmitted the electronic version of the "Authorities" to the arbitral tribunal via email as there were missing pages in the electronic version of the "Authorities".

177.    On May 9, 2017, the Second Applicant sent an email to the arbitral tribunal, enclosing the: (1) Chronology; and (2) Introduction and Relationship Chart of the People Involved in the Case of all parties. The Second Applicant stated that the above documents covered the position of all parties, but as all parties were unable to reach a full consensus with regard to the content of the said documents within the stipulated deadline, the Applicants had added markings and comments in the portions of the documents where the opinions of the parties were different for the arbitral tribunal's reference.

178.    On May 14, 2017, the arbitral tribunal sent an email to all parties and instructed all parties to inform the witnesses of the arbitration of the time and order of their appearance before 3 p.m. on May 15, 2017. The arbitral tribunal also instructed that the arbitral tribunal wished to receive a copy of the schedule that had been formulated upon the consensus of all parties.

179.    On May 15, 2017, the First Applicant sent an email to the arbitral tribunal with the electronic version of the List of the First Applicant's Supplementary Laws and Regulations in the Applicants' Written Statement Prior to the Hearing enclosed. On the same day, on May 15, 2017, the Respondents sent an email to the arbitral tribunal with the (1) Amended "Authorities" of the Respondents' Written Statement Prior to the Hearing[3]; and (2) Relevant Schematic Diagram of the Structure of Equity Transfer and Checklist of the Steps enclosed.

---

[3]    "Legal Judgements" was original document used in the Respondents' emails and its appendices.

AP_Legal – 104494610.1

180.   On May 16, 2017, the First Applicant sent an email to the arbitral tribunal with the time and order of the appearance of the witnesses that was jointly discussed by all parties enclosed.

181.   On May 16, 2017, the arbitral tribunal and all parties commenced the hearing. The hearing was conducted consecutively from May 16, 2017 to May 25, 2017 and ended on May 25, 2017. On August 8, 2017, the arbitral tribunal held a hearing to take all parties' closing argument into consideration.

182.   On the first day of the trial on May 16, 2017, all parties agreed to delete the following paragraph for the purpose of the trial: That is, (a) Paragraphs 56-65 of the statement of Xu Hongbiao's statement (Pages 24-27 in Dossier B); (b) Paragraphs 23-24 of the statement of Xu Hongbiao's rebuttal to the factual witness (Page 104 in Dossier B); (c) Paragraphs 5-6 (Page 134 in Dossier B), Paragraphs 19-31 (Pages 135-137 in Dossier B, and Paragraphs 39-59 (Pages 138-142 in Dossier B) of Ke Yeying's rebuttal to the witness' statement.

## IV.   Factual Background

183.   Oasis Investment (First Respondent) is a company registered and established in the British Virgin Islands on July 26, 2001. It is also the parent company of the following three companies: Shanghai Greencourt Property Development Co., Ltd ("**Greencourt Property Development**"), Greencourt Properties Limited ("**Greencourt Properties**"), and Shanghai Oasis Kechuang Ecological Technology Co., Ltd. ("**Oasis Kechuang**"). Other than Greencourt Properties, which was established in Hong Kong, both Greencourt Property Development and Oasis Kechuang were established within China.

184.   The total number of shares issued by Oasis Investment was 48,000 shares. The original equity distribution was as follows: Xu Hongbiao (First Applicant) held 8,000 shares (16.6%), Ke Zhengguang (deceased, his Estate is the Second Applicant of this case) held 8,000 shares (16.6%), Yu Naifen Stephany (Second Respondent) held 23,520 shares (49%), Yu Naiwen (Third Respondent) held 8,000 shares (16.6%), and Yu Naiyun (Fourth Respondent) held 480 shares (1%). As the total shares held by Yu Naifen Stephany, Yu Naiwen, and Yu Naiyun accounted for 66.6% of the shares, they were referred to as the "Controlling Shareholders" in the 4.28 Agreement. Xu Hongbiao and Ke Zhengguang were referred to as the "Non-controlling Shareholders" in the 4.28 Agreement.

185.   Since early 2009, the Controlling Shareholders and the Non-controlling Shareholders started discussions with regard to issues on share restructuring for Oasis Investment. The discussion process and content can be seen in the following documents: "Minutes of the Greencourt Meetings of Shareholders and Board of Directors Regarding the Splitting of Assets and Other Related Matters" [D2/61/607] dated March 24, 2009, "Minutes for the Greencourt Shareholders' Meeting Convened on August 20, 2009" (also referred to as "8.20 Minutes" [D2/63/615] dated September 4, 2009, "Preliminary Agreement on Share Restructuring for Oasis Investment Group Limited" ("**Restructuring Agreement**") [D2/68/622] dated November 9, 2009, and "Meeting Minutes" [D2/96/718] dated February 3, 2010.

AP_Legal – 104494610.1

186.   In the end, both parties and the related companies concluded the "4.28 Agreement"[4] on April 28, 2010, and its main content was as follows:

(1)      Ke Zhengguang and Xu Hongbiao would transfer the equity they each held in Oasis Investment to Cheergain International Group Limited ("**Cheergain International**") and Focus Town Limited ("**Focus Town**") respectively. After the said transfers had been completed, Oasis Investment then repurchase the equity of Oasis Investment held by Cheergain International and Focus Town respectively ("**Equity Transfer before Repurchase**"). The Respondents agreed to the above arrangement and were willing to provide the necessary cooperation: See Article 1.1 [D2/100/751].

(2)      Oasis Investment must pay consideration to the Non-controlling Shareholders in three parts, including cash consideration, equity consideration, and consideration of property exchange with regard to the Equity Transfer before Repurchase:

(3)      **For cash consideration**, a total of RMB 250 million was to be paid in three installments, and they were: [RMB] 80 million, 20 million, and 150 million, respectively; for the payment made in each period, the necessary prerequisites must be met: See Article 2.1 and Article 2.2 [D2/100/752].

(4)       **The equity consideration** was to be calculated and paid based on 100% of the equity of Shanghai Greencourt Four-Season-Flower-City Property Development Co., Ltd. ("**SJHC**"): See Article 2.3 [D2/100/754]. The aim of the arrangement made under the 4.28 agreement was to allow the Non-controlling Shareholders to fully own and control SJHC.

(5)      **For the consideration of property exchange**, Oasis Investment and the Controlling Shareholders must appoint Greencourt Property Development and the Non-controlling Shareholders (or its appointed

---

[4]      There were ten signatories of the 4.28 Agreement. They were (i) Oasis Investment; (ii) Yu Naifen Stephany; (iii) Yu Naiwen; (iv) Yu Naijun; (v) Ke Zhengguang; (vi) Xu Hongbiao; (vii) Cheergain International Group Limited; (viii) Focus Town Limited; (ix) Greencourt Properties; and (x) Oasis Kechuang.

AP_Legal – 104494610.1

third party) to conclude the "Shanghai Real Estate Sale and Purchase Contract" and transfer the property for commercial use of approximately 8,000 square meters, located at Jiuting, Songjiang District, Shanghai City ("**Jiuting Stores**") Greencourt Sun City Real Estate Project held by Greencourt Property Development to the Non-controlling Shareholders (or its appointed third party).  At the same time, SJHC and Oasis Investment or a third party appointed by the Controlling Shareholders shall conclude the "Villa Order Contract" and transfer the two buildings of A2-type villas on Central Island ("**A2-Type villas**") of the Peninsula Villa Project located at Fengpu Industrial Area, Fengxian District, Shanghai City that it had developed to Oasis Investment or a third party appointed by the Controlling Shareholders. All parties confirmed that the value of the property involved in the abovementioned "Shanghai Real Estate Sale and Purchase Contract" and "Villa Order Contract" were all priced at RMB 72 million. As the prices of the two properties were equivalent, the consideration for this item was deemed as a mutual offset: See Article 3.1 to Article 3.3 [D2/100/755].

(6)     Starting from the date of conclusion of the Agreement, the related party transactions between SJHC and Oasis Investment and its subsidiary companies should be terminated; all the pre-existing [intragroup] debts and claims should be settled within one month: See Article 3.6 [D2/100/756].

187.   After the conclusion of the 4.28 Agreement, the Equity Transfer before Repurchase by Cheergain International and Focus town was completed on May 4, 2010 [D2/110 - 114/791 - 799]. That is, the Non-controlling Shareholders had promptly fulfilled a part of its obligations under the 4.28 Agreement. However, the Non-controlling Shareholders and Controlling Shareholders had a dispute with regard to the cash consideration, equity consideration, and consideration of property exchange of the share repurchase, as well as issues on the settlement of the debts and claims, which eventually led to this arbitration.

## V.     Disputed Matters and Position of Both Parties

### A.     Cash Consideration

188. With regard to cash consideration, Oasis Investment had paid the amount for the first and second installments (a total of RMB 100 million) to the Non-controlling Shareholders in accordance with the stipulations in the 4.28 Agreement.

189. However, Oasis Investment had not yet paid the amount for the third installment (estimated to be RMB 150 million. The final amount should be adjusted in accordance with the stipulations in Article 2.2.1 (4) of the 4.28 Agreement). According the Article 2.2.1 (3), the amount for the third installment must be paid before December 31, 2012, under the condition that the following prerequisites were met:

    (1)    The government approvals and registration procedures for the equity transfer of SJHC must be already completed;

    (2)    Oasis Investment must have completed the registration procedures for the change in shareholders required for the repurchase of the equity of the Non-controlling Shareholders;

    (3)    The Non-controlling Shareholders and Controlling Shareholders must have reached an agreement with regard to the arrangements for the payment of cash consideration and the adjusted amount of each item as stipulated in Article 2.1;

    (4)    The Non-controlling Shareholders must have confirmed that the payment of equity consideration stipulated in Article 2.3.5 of the 4.28 Agreement had been completed and all parties have no objections to the above;

    (5)    The "Shanghai Real Estate Sale and Purchase Contract" of Jiuting Stores as described in Article 3.1 of the 4.28 Agreement and the "Shanghai Real Estate Presale Contract" of A2-type villas as described in Article 3.2 of the 4.28 Agreement must be concluded and the registration procedures for the transfer of ownership or presale must be completed at the Real Estate Registration Authority.

190. The Non-controlling Shareholders and the Controlling Shareholders both alleged that items (1), (3), (4) and (5) of the abovementioned prerequisites had not been fully met due to the breach of contract by the other parties. It was undisputed by both parties that item (2) of the prerequisites had been completed.

43

**B.    Equity Consideration**

**Equity Transfer Structure**

191.    Article 2.3.1 of the 4.28 Agreement stipulates that:

*"Oasis Investment has newly incorporated Shibang Company Ltd ("**Shibang Company**") in Hong Kong and has arranged for Shibang Company to acquire 80% of the equity interest in [SJHC] held by [Greencourt Properties], a subsidiary of Oasis Investment in Hong Kong. After the completion of the said equity acquisition, Oasis Investment shall sign the "Equity Purchase Option Agreement" with [Cheergain International] and [Focus Town] and agree that upon the expiration of the entrustment period mentioned in Article 2.3.2 below, 100% of the equity of Shibang Company shall be transferred to [Cheergain International] and [Focus Town] at a consideration of HKD 1"*

192.    Article 2.3.2 of the 4.28 Agreement further stipulates that:

*"All Parties Agree That:  After Oasis Investment's signing of the Equity Purchase Option Agreement for the equity transfer of Shibang Company to [Cheergain International] and [Focus Town], Greencourt Properties is to sign the relevant Entrustment Agreement with [Cheergain International] and [Focus Town]. This agreement shall stipulate that:  (1) [Cheergain International] and [Focus Town] are entrusted by Greencourt Properties to manage Shibang Company and to exercise the shareholders' rights on its behalf for three years (the "entrustment period"); (2) during the entrustment period, the Non-controlling Shareholders are responsible for all the debts and claims, risks and liabilities of Shibang Company and SJHC. If for any reason the Controlling Shareholders, Oasis Investment or Greencourt Properties are required to bear the debts and claims, risks and liabilities of Shibang Company or SJHC during the entrustment term, the Non-controlling Shareholders are required to fully compensate the Controlling Shareholders, Oasis Investment and Greencourt Properties."*

193.    While Article 2.3.3 of the 4.28 Agreement stipulates that:

*"The remaining 20% of the equity of [SJHC] currently held by [Oasis Kechuang], a subsidiary of Oasis Investment, is to be transferred to a domestic company in China appointed by the Non-controlling Shareholders ("Onshore Payment of Equity Consideration"). If under the laws of the People's Republic*

44

*of China, an actual payment of consideration is required to be made for such equity transfer, the provisions of the abovementioned Article 2.2.1(4)(a) shall apply."*

194.    Article 2.3.4 of the 4.28 Agreement stipulates that:

*"All Parties Agree That:   The Non-controlling Shareholders shall be responsible for all the tax and expenses incurred due to the <u>Onshore</u> Payment of Equity Consideration, as well as the tax and expenses incurred <u>offshore</u> due to the entrustment arrangement made by Shibang Company and the equity transfer of Shibang Company to [Cheergain International] and [Focus Town]. Apart from this, the sharing of the tax and expenses relating to the payment of Equity Consideration is to be negotiated by all the Parties in due course. All procedures relating to the onshore and offshore payment of Equity Consideration, such as applications, registrations and government procedures, etc. are to be undertaken by the Non-controlling Shareholders while the Controlling Shareholders and Oasis Investment are to provide the necessary assistance. (underlines added later)*

## C.    Consideration of Property Exchange

195.    The 4.28 Agreement stipulates a property exchange by both parties, that is: The exchange of the Jiuting Stores and A2-type villas and they shall both be deemed as considerations. The position of the Applicants was: The 4.28 Agreement confirmed that both parties shall not make actual payment for the value of the property as the value of the Jiuting Stores and A2-type villas were both priced at RMB 72 million and were mutually offset. Hence, there were no issues with regard to whether or not the Jiuting Stores and A2-type villas were actually equivalent. Furthermore, it was also clearly stated in Article 3.2 of the Agreement that the two buildings of the A2-type villas had a "drawing area of 1,200 square meters each", but it was never mentioned or suggested in the Agreement that the price of RMB 72 million was calculated based on the saleable gross floor area.

196.    Whereas, the Respondent declared that the price of RMB 72 million of the A2-type villas was calculated based on (1) the saleable gross floor area of the two buildings of the villa, which was 2,400 square meters in total, and (2) the average price of every square meter of the gross floor area not being lower than

AP_Legal – 104494610.1

RMB 31,500. The Respondents declared that this was the basis of both parties' agreement on Article 3.3 of the 4.28 Agreement.

197.    Below, the arbitral tribunal provided an overview of all the claims of all parties that were not fulfilled as agreed with regard to cash consideration, equity consideration, and consideration of property exchange. If the arbitral tribunal did not specially point out the statement or viewpoint of a certain party in this arbitral award, this does not mean that the arbitral tribunal failed to consider the portion of the statement. In view of the wide range of statements made by all parties in this case, the arbitral tribunal held that it was not necessary to list every statement made by the parties concerned. It was also not practical to list every statement made by the parties concerned in this arbitral award. The arbitral tribunal had read and carefully considered the statements made by all parties. The members of the arbitral tribunal had also conducted discussions with regard to the statements made by all parties.

**Payment of Cash Consideration**

198.    The Applicants held that in accordance with Article 2.2.1 (3)(d) in the 4.28 Agreement, one of the prerequisites in the clause regarding the payment of cash consideration by the Controlling Shareholders was that the Non-controlling Shareholders confirmed that the payment for equity consideration as stipulated in Paragraph 2.3.5 of the 4.28 Agreement had been completed, and all parties had no objections to this. However, "both parties of the arbitration had disputes with regard to each of the following steps of equity transfer: (1) Shibang Company's acquisition of 80% of the equity of SJHC held by Greencourt Properties; (2) The transfer of the equity of Shibang Company to Focus Town Limited and Cheergain International owned by the Non-controlling Shareholders made by Oasis Investment; (3) The transfer of "20%"[5] of the equity of SJHC held by Oasis Kechuang to a domestic company within China established by the Non-controlling Shareholders (that is, Shanghai Luhao Trading Co., Ltd. (hereinafter referred to as "**Luhao Trading**"). The reason for the incomplete equity transfer of these three items should be attributable to the Respondents.

---

[5]    There was a typographical error wrongly written as 80% in the concluding statement of the Applicants.

46

199.   The Respondents agreed to the claim that the prerequisites were not met, but held that the Applicants should be responsible for the prerequisites stipulated in Paragraph B to Paragraph D of Article 2.2.1 (3) that were not being met.

200.   As described in Paragraphs 189-190 above, Oasis Investment had not yet paid the said amount to the Non-controlling Shareholders as certain prerequisites for the payment of the said amount were not met. The reasons for prerequisites not being met were related to the incomplete payment of the equity consideration. Hence, the arbitral tribunal shall provide an overview of the position of all parties in the portion involving equity consideration below.

**Payment of Equity Consideration**

201.   With regard to the payment of equity consideration, Article 2.3.5 of the 4.28 Agreement stipulates that the equity consideration shall be deemed as completed after the conclusion of the two sets of agreements below: (1) The "Equity Purchase Option Agreement" as described in Article 2.3.1, and (2) the "Entrustment Agreement" as described in Article 2.3.2. In accordance with the stipulations in the 4.28 Agreement, Oasis Investment and the Controlling Shareholders should conclude an "Equity Purchase Option Agreement" with Cheergain International and Focus Town. Under this Agreement, Oasis Investment shall transfer 100% of its equity in Shibang Company to Cheergain International and Focus Town established by the Non-controlling Shareholders at a consideration of HKD 1. Upon the conclusion of the abovementioned "Equity Purchase Option Agreement" of Shibang Company, Greencourt Properties shall conclude an "Entrustment Agreement" with Cheergain International and Focus Town. Under this Agreement, all parties agree that (a) Cheergain International and Focus Town shall be authorized by Greencourt Properties to manage Shibang Company, and they may exercise shareholders rights on behalf of it for three years; (b) During three-year entrustment period, all debts and claims, liabilities, and risks of Shibang Company and SJHC shall be borne by the Non-controlling Shareholders. The Non-controlling Shareholders shall also be liable for compensation to the Controlling Shareholders with regard to the actual debts and claims, liabilities, and risks borne by the Controlling Shareholders.

202.   The Applicants claimed that the transfer of SJHC involved the three following steps: (1) Oasis Investment should assist Shibang Company with the completion

47

of the acquisition of 80% of equity of SJHC held by Greencourt Properties ("acquisition by Shibang", i.e. the first step of the transfer of 80% equity of SJHC); (2) After the expiration of the three-year entrustment period, Oasis Investment should transfer the equity of Shibang Company to Focus Town and Cheergain International established by the Non-controlling Shareholders (i.e. the second step of the transfer of 80% equity of SJHC); (3) Oasis Kechuang should transfer its [20%][6] equity in SJCH to a domestic company (i.e. Luhao Trading) in China designated by the Non-controlling Shareholders. The Applicants claimed that both [Applicants and Respondents] of the arbitration have disputes concerning each of the above equity transfer steps. However, the fundamental reason for the incomplete transfer of the equity of SJHC was caused by the Controlling Shareholders' violation of their contractual obligations under 4.28 Agreement and serious delays.

---

[6]   There was a typographical error wrongly written as 80% in the concluding statement of the Applicants.

AP_Legal – 104494610.1

203.   The Respondents claimed that there were three reasons why Shibang Company failed to complete the purchase: (1) Upon signing the 4.28 Agreement, the equity of Greencourt Properties in SJHC was only 69% and it did not enjoy the preferential tax treatment under the "Notice on Several Issues Concerning Corporate Income Tax Treatment of Enterprise Restructurings promulgated by the Ministry of Finance and the State Administration of Taxation" promulgated by the Ministry of Finance and State Administration of Taxation on April 30, 2009 (hereinafter referred to as "**Document No. 59**") (at least 75% required), thus it had to increase its capital to at least 75%, and this capital increase was only completed in July 2011 (increased to 80%); (2) The Controlling Shareholders only "arranged" for Shibang Company's acquisition obligations under Article 2.3.1, and this obligation was fulfilled when they established Shibang Company; (3) The Non-controlling Shareholders had actual control over SJHC at that time, but they did not provide the audit report and/or evaluation report of SJHC, which made it impossible for the Controlling Shareholders to submit a "reasonable equity transfer price" to the relevant government agency, thereby causing Shibang Company to fail in the completion of the acquisition.

204.   The Applicants claimed that:

Firstly, the fundamental reason for the unsuccessful acquisition by Shibang Company was that the Controlling Shareholders had violated the provision of Article 2.3.1 of the 4.28 Agreement and did not provide the most basic equity transfer agreement between Greencourt Properties and Shibang Company regarding the transfer of 80% equity of SJHC ("**80% equity transfer agreement**"), resulting in the inability to proceed with the transfer (not to mention completion).

Secondly, according to the expressed provisions of Article 2.3.1 of the 4.28 Agreement, the acquisition by Shibang Company had been carried out when the 4.28 Agreement was signed. Based on the principle of contractual estoppel and the principle of estoppel by convention, the Controlling Shareholders could not go back on their promise and say that they had only needed to "arrange" for Shibang's acquisition, ignoring the importance of the obligation of "acquisition" itself. In addition, they also could not go back on their promise and say that Shibang Company had not completed the acquisition. Therefore, even if the acquisition by Shibang Company had not taken place as the capital increase of

49

SJHC had not been completed upon the signing of the 4.28 Agreement, it should not affect the reliance of the Non-controlling Shareholders on the clear meaning and validity of Article 2.3.1, that is, the Controlling Shareholders have the responsibility to complete the acquisition by Shibang Company to enable themselves to fulfill the obligation to ultimately transfer the 80% equity of SJHC to the Non-controlling Shareholders under that Article (which has not been disputed by the parties concerned).

Thirdly, the Respondents presented the following claims, i.e. the Non-controlling Shareholders knew, as a matter of fact that, the capital increase of SJHC had not been completed upon the signing of the 4.28 Agreement, thus they also knew that Shibang Company had not completed the acquisition at that time. The Applicants believed that even if the Non-controlling Shareholders knew that the overview stated in the Article was not factual, it should not affect the application of the principle of contractual estoppel or the principle of estoppel by convention, and the evidence in this case showed that the Non-controlling Shareholders did not actually know that the capital increase of SJHC had not been completed upon the signing of the 4.28 Agreement.

Fourthly, the Respondents claimed that the completion of the acquisition by Shibang Company was a responsibility of the Applicants based on Article 2.3.4 of the 4.28 Agreement. The Applicants believed that Article 2.3.4 of the 4.28 Agreement limited the scope of the relevant taxes and fees that should be managed and borne by the Non-controlling Shareholders to (a) equity transfer procedures related to the payment of onshore equity consideration (i.e. the transfer of 20% equity of SJHC by Oasis Kechuang to Luhao Trading) and resulting taxes and (b) the entrustment arrangement with Shibang Company outside of Mainland China and the equity transfer procedures for the transfer of equity by Shibang to Cheergain International and Focus Town, as well as the resulting taxes, but excluding the equity transfer procedures or taxes related to the acquisition by Shibang Company.

Fifthly, according to expert opinions, the 80% equity transfer agreement was a fundamental application document for the completion of the acquisition by Shibang Company, and the Respondents had never provided this document to the Applicants. Regarding the Respondents' claim that Shibang Company failed to complete the acquisition because the Controlling Shareholders could not submit a "reasonable equity transfer price" to the relevant government agency

due to the failure of the Non-controlling Shareholders to provide the audit report and/or evaluation report of SJHC that were under the control of the Non-controlling Shareholders at that time, the Applicants believed that, based on expert opinions, the audit report and/or evaluation report would only affect the assessment and adjustment of the appropriateness of the transfer price by the tax authorities after the equity transfer procedures were completed (i.e. after review and approval by the Commission of Commerce and the completion of the industrial and commercial registration), and would not affect the effect of the transfer itself. Regarding the tax liability to be borne by the Non-controlling Shareholders with respect to the acquisition by Shibang Company put forward by the Respondents, the Applicants believed that such taxes should be borne by the Controlling Shareholders as intended in the 4.28 Agreement; Otherwise, the parties concerned would have specified differently in the agreement.

205.  Regarding the failure to complete the transfer of 20% equity of SJHC, the Respondents claimed that it was because the Applicants only designated Luhao Trading as the onshore company under Article 2.3.3 of the 4.28 Agreement in March 2011. The Applicants claimed that even if the Applicants had already designated an onshore company before Oasis Kechuang's shareholding ratio in SJHC was reduced to 20%, the transfer of 20% equity of SJHC remained impossible to complete.

206.  The Respondents claimed that the transfer of 80% and 20% equities of SJHC could be carried out separately. Therefore, it requested the arbitral tribunal to consider the responsibilities of the 80% and 20% equity transfer separately. The Respondents also pointed out that the controlling rights of SJHC had been fully handed over to the Applicants on November 15, 2009.

207.  The Respondents believed that, based on the opinions of Chinese legal experts, the transfer of 80% and 20% equities of SJHC would need to undergo three stages of administrative procedures, i.e. review and approval by the competent commerce department, industrial and commercial registration of changes, taxation of foreign currency transaction and other registration of changes, among which Ji Nuo believed that the stage of review and approval by competent commercial authority would already reflect the requirements of the audit agency on audit report and evaluation report, and the competent commerce department would use the audit report or evaluation report as an important reference; at the same time, both Ji Nuo and Ye Yongqing agree that "the

enterprise's audit report for the previous year issued by an accounting firm" required in the "Review and Approval Procedures for Equity Transfer of Foreign-Invested Enterprises" published by Fengxian District Economic Committee should be provided by the parties concerned, and the equity transfer agreement should usually include the amount of equity purchased and its price or calculation method.

208.   Regarding the transfer of the 20% equity, the Respondents believed that, since the Applicants had actually controlled SJHC from November 15, 2009 onwards, only the Applicants could enable the auditor/evaluator to perform the latest audit/evaluation on the assets of SJHC before the equity transfer, but the Applicants did not provide the latest audit/evaluation, thus a reasonable equity transfer price could not be obtained and the "Equity Transfer Agreement" could not be prepared in the absence of this price. Therefore, the responsibility of the incomplete transfer of the 20% equity lies with the Applicants' failure to perform its obligations under Article 2.3.4 of the 4.28 Agreement, which drove SJHC to prepare the latest audit report or evaluation report, and to promptly designate an onshore company to be the transferee of the 20% equity. In addition, the Applicants had yet to push forward this part of the equity transfer after SJHC's capital increase was completed in July 2011 (i.e. after Oasis Kechuang's equity of SJHC was reduced to 20%).

209.   Regarding the transfer of the 80% equity, the Respondents believed that the key to this incomplete transfer was that Greencourt Properties transferred its 80% equity in SJHC to Shibang Company and the responsibility of the incomplete transfer lies with the Applicants. The Respondents believed that, according to the provision of Article 2.3.4 of the 4.28 Agreement, the transfer of the 80% equity of SJHC from Greencourt Properties to Shibang Company was "one of the steps in the payment of foreign equity consideration", thus the Respondents only had the obligation to assist the transfer and had no management responsibility. The Applicants should be responsible for this transfer, including the preparation of the "Equity Transfer Agreement", and the said agreement had to also refer to the latest audit report or evaluation report of SJHC to arrive at a fair price acceptable to the competent authority. Similarly, the responsibility for providing the audit report or evaluation report lies with the Applicants.

210.   Regarding whether the Applicants knew that the 80% equity of SJHC had not been transferred to Shibang upon the signing of the 4.28 Agreement, the

Respondents believed that the evidence showed that the Applicants clearly knew about it. The sentence "Oasis Investment ... has arranged for Shibang Company to acquire 80% of the equity in [SJHC] … held by Oasis Investment" under Article 2.3.1 in the 4.28 Agreement was a typographical error. If it had actually completed such acquisition at that time, the sentence should appear in the foreword of the 4.28 Agreement rather than in Article 2.3.1, and the second sentence of the said Article "After the completion of the said equity acquisition..." would also be unnecessary. For this, the real intention of the parties concerned was that Oasis Investment had already arranged for Shibang Company to purchase the 80% equity.

211. Regarding the assumption of tax arising from the 80% equity transfer, the Respondents claimed that the tax should be borne by the Applicants for the following reasons: Firstly, the 80% equity of SJHC was transferred in a devious way to Cheergain International and Focus Town, which were established by the Applicants to save tax for the Applicants; secondly, the Applicants had no evidence to prove that the parties concerned agreed that the Respondents should bear the taxes for the transfer of this 80% equity; thirdly, upon concluding the agreement, the intention of the parties concerned was that in the event Document No. 59 could not be used to help the Applicants save tax, the Respondents would be willing to consider separately negotiating on paying a certain proportion of the taxes that should be borne by the Applicants at the appointed time; fourthly, Article 2.3.4 of the 4.28 Agreement also clearly stipulated that "Apart from this, the sharing of the tax and expenses relating to the payment of Equity Consideration is to be negotiated by all the Parties in due course"; fifthly, the Applicants claimed that, based on the principle of contractual estoppel, the relevant taxes should be borne by Greencourt/Shibang since the 80% equity of SJHC was transferred by Greencourt Properties to Shibang Company upon the signing of the 4.28 Agreement, and this had nothing to do with the Applicants. The Respondents believed that the principle of contractual estoppel did not apply here; sixthly, if the arbitral tribunal held that the tax liability of this 80% equity transfer is not covered under the second sentence of Article 2.3.4 of the 4.28 Agreement, then it should be covered under the first sentence of the said article.

**Completion of Property Exchange**

212.  The Applicants claimed that, according to stipulations of Articles 3.1 to 3.3 of the 4.28 Agreement, SJHC is only obliged to transfer the two A2-type villas that it developed at the designated location in Fengxian District, Shanghai to the Oasis Investment or a third party designated by the Controlling Shareholders after achieving the property handover criteria. The gross floor area on drawings of each of the two A2-type villas was about 1,200 square meters, and the parties concerned confirmed that the total price was RMB 72 million.

213.  Firstly, the Applicants claimed that "gross floor area on drawings" meant the gross floor area shown on the drawings approved by the Shanghai Fengxian District Planning, Land and Resources Administration, and the said drawing was enclosed in the Construction Project Planning Permit issued by the Fengxian District Planning, Land and Resources Administration on January 7, 2009 (i.e. when SJHC was still controlled by the Controlling Shareholders). The said permit was handed over by the Controlling Shareholders to the Non-controlling Shareholders, and subsequently the construction of the relevant A2-type villas was carried out according to the said drawing. In addition, the drawing had not been modified. Based on the above reasons, the Applicants claimed that the Controlling Shareholders' reference of the "gross floor area on drawings" as the saleable area or super built-up area should not be adopted.

214.  Secondly, Article 3.3 of the 4.28 Agreement stipulates that the A2-type villas and Jiuting Stores should be used for property exchange or equivalent-value exchange. The Applicants claimed that the parties concerned agreed to carry out property exchange, i.e. the parties concerned agreed that (i) Jiuting Stores and (ii) the two A2-type villas were priced at RMB 72 million. Since the two prices were equal, the considerations were offset by each other. Therefore, the market prices of Jiuting Stores and the two A2-type villas have nothing to do with the property exchange.

215.  The Applicants believed that the Controlling Shareholders' refusal to accept the A2-type villas without justifiable reasons and its refusal to transfer the Jiuting Stores caused the Non-controlling Shareholders to suffer serious losses (including the rental losses resulting from the Non-controlling Shareholders' inability to have control over the 2,000 square meters of the Phase-II Jiuting Stores and to lease out this part of the stores).

216.    The Respondents believed that the above-ground floor area of the A2-type villas provided by the Applicants was only 600 square meters each, which was completely inconsistent with the requirements of Article 3.2 of the 4.28 Agreement, wherein the above-ground floor area of each villa should be approximately 1,200 square meters. The Respondents emphasized that the 4.28 Agreement itself was not accompanied by any drawings, and the Controlling Shareholders had not received any drawings showing the total gross floor area of each villa (including gross floor area above and below ground) was approximately 1,200 square meters before signing the 4.28 Agreement.

217.    The Respondents believed that Articles 3.2 and 3.3 of the 4.28 Agreement should be interpreted as that the value of the A2-type villas and Jiuting Stores should start from RMB 72 million, i.e., the two should be used for exchange at equivalent value and not for property exchange. In order for the valuation of the two A2-type villas to reach up to a total of RMB 72 million and calculated at a unit price of RMB 31,500 per square meter, the floor area of each villa must be approximately 1,200 square meters. The Respondents claimed that the term "gross floor area on drawings" had no specific interpretation under Chinese law and that it must be understood in light of the specific circumstances of the parties concerned in agreement when the 4.28 Agreement was discussed and signed.

218.    The Respondents believed that, in view of the fact that the A2-type villas provided by the Applicants were inconsistent with the requirements of the 4.28 Agreement, unless the Applicants[7] compensate for the price difference between the defective A2-type villas and the villas the Respondents should receive (according to the calculation of the Respondents, was RMB 41,820,000), the Respondents were not obliged to accept the A2-type villas [provided by the Applicants]. Prior to this, the Respondents had no obligation to hand over the control rights of the remaining 2,000 square meters of the [Jiuting] property to the Applicants.

**Debt Settlement**

---

[7]     The Respondents was mistakenly written as "the Respondents" here.

55

219.    Regarding debt settlement, the Applicants and the Respondents have listed the debt settlement items disputed by the parties concerned in their written statement and indicated their respective positions.

## VI.    Petitions of the Applicants and Respondents

### Petitions of the Applicants

220.    Both the First Applicant and the Second Applicant adopt the same arbitration petition. In Paragraph 40 of the said application, the Applicants listed the following petitions:

(1)    Order that the First Respondent or the Respondents to cause Greencourt Property Development to sign the "Shanghai Real Estate Sale and Purchase Contract" regarding the Jiuting Stores with the Applicants or their designated third party, and to transfer the ownership of the Jiuting Stores to the Non-controlling Shareholders or their designated third party; (Article 3.1 of the 4.28 Agreement)

(2)    Order that the First Respondent or the Respondents to cause its designated third party to sign the A2-type villas' "Shanghai Commercial Real Estate Presale Contract" with SJHC and complete the relevant presale registration procedures; (Article 3.2 of the 4.28 Agreement)

(3)    Order that the Respondents to settle and pay the debts of SJHC and the First Respondent to the Applicants based on the current account checklist of the Applicants (i.e. Appendix 1 of the arbitration petition) (within 4 weeks from the date of the arbitration award); (Article 3.6 of the 4.28 Agreement)

(4)    Order that the First Respondent to arrange for and cause Shibang Company to acquire the 80% equity of SJHC held by Greencourt Properties, a subsidiary of the First Respondent; (Article 2.3.1 of the 4.28 Agreement)[8]

---

[8]    The board of directors of Shibang Company has four directors, and the parties concerned have the right to appoint two directors. The Articles of Association of Shibang Company stipulates that a resolution is effective as long as it is signed by two directors.

56

(5)     Order that the First Respondent and the Controlling Shareholders to sign and cause their subsidiary, Greencourt Properties, to co-sign the Equity Purchase Option Agreement and the entrustment agreement concerning Shibang Company; (Articles 2.3.1 and 2.3.2 of the 4.28 Agreement)[9]

(6)     Order that the Respondents or the First Respondent to cause Oasis Kechuang to transfer its 20% equity of SJHC to Luhao Trading;[10]

(7)     Order that the Respondents or the First Respondent to cause Greencourt Property Development to repay all mortgage, loans or guarantees (including interests) of the Jiuting Stores and to remove all existing mortgage, guarantees on the Jiuting Stores;

(8)     As an alternative to Item (7), order that the Respondents to compensate the Applicants for the total amount required for the repayment of all existing mortgage guarantees on Jiuting Stores by the Applicants;[11]

(9)     Order that the Respondents to pay the balance of the cash consideration for the repurchase of equity, i.e. Hong Kong dollars equivalent to RMB 150 million and the final amount shall be adjusted in accordance with Article 2.2.1(4) of the 4.28 Agreement.

**Counter-claims of the Respondents**

221.    The Respondents put forward four counterclaims in Paragraphs 79 - 83 of their Statement of Defence and Counterclaim:

(A)     Counterclaim on equity consideration

---

[9]     According to the provisions of the 4.28 Agreement, after Shibang Company has acquired the 80% equity of SJHC, Greencourt Properties should entrust Cheergain International and Focus Town to manage the 80% equity on behalf of Shibang Company. Therefore, the entrustment agreement should be signed by Greencourt Properties, Cheergain International and Focus Town. After the 3 years of entrustment management, the 80% equity will be transferred from Shibang Company to Cheergain International and Focus Town at a consideration of HKD 1.The relevant Equity Purchase Option Agreement should be signed by Oasis Investment, Cheergain International and Focus Town.

[10]    There is no need for the word "third party" because the Applicant has already designated Luhao Trading.

[11]    When the hearing was held on August 8, 2017, the Applicants stated that because the mortgage was canceled, two items, namely Item (g) and Item (h), were no longer needed: fair copy (Day 9), Lines 22 - 27 on Page 26.

AP_Legal – 104494610.1

Due to the behavior of the Applicants, the equity consideration was not paid, and the rights and interests of the Respondents were damaged. The Respondents requested the arbitral tribunal to rule and/or declare that:

(1)　　The Applicants violated Article 2.3.4 of the 4.28 Agreement;

(2)　　The Applicants should immediately take care of the procedures (and/or cause the handling of the relevant procedures) related to the offshore transfer of equity to Shibang Company and the onshore transfer of equity to Luhao Trading, including but not limited to: (i) to conduct audit/evaluation on SJHC to obtain the reasonable equity transfer price; (ii) to prepare the equity transfer agreement and other relevant transaction documents for the Respondents to read and use as a basis to conduct negotiation with the parties concerned; (iii) to contact the relevant government review and approval authority to obtain the materials to be submitted for review and approval, communicate with the Respondents and prepare materials for submission (seek assistance from the Respondents whenever necessary); (iv) to submit the necessary review and approval materials to the relevant government review and approval authority and to supplement the materials according to its needs (if any); and (v) to pay close attention to the review and approval process, and to notify the Respondents of the updated review and approval status in a timely manner;

(3)　　The Applicants should jointly and/or individually bear any taxes and expenses (including but not limited to the possible Chinese taxes and fees arising from the offshore transfer of equity to Shibang Company) that may arise from the offshore transfer of equity to Shibang Company (i.e. the transfer of SJHC's 80% equity from Greencourt Properties to Shibang Company). Or, alternatively, the Applicants should negotiate with the Respondents about the assumption of taxes and expenses (including but not limited to the possible Chinese taxes and expenses arising from the offshore transfer of equity to Shibang Company) that may arise from the offshore transfer of equity to Shibang Company.

(B)　　Counterclaim on exchange between Jiuting Stores and A2-type villas

The two <u>A2</u>-type villas that the Applicants intended to deliver to the Respondents were defective, resulting in damage to the Respondents' rights and interests. The Respondents requested the arbitral tribunal to rule and/or declare:

(1)      The Applicants violated Article 3.2 of the 4.28 Agreement;

(2)      The Respondents suffered losses (including but not limited to loss of value) due to the breach of contract by the Applicants and are entitled to compensation. The Applicants should jointly and/or individually pay the losses suffered by the Respondents. The amount of compensation for such losses to be evaluated.

(C)      <u>Counterclaim on debt settlement for other contractual obligations</u>

As the Applicants made an unreasonable request and failed to carry out the settlement of the relevant debts and claims with the Respondents in good faith, the debt settlement cannot be completed. The rights and interests of the Respondents are damaged. The Respondents requested the arbitral tribunal to rule and/or declare:

(1)      The Applicants violated Article 3.6 of the 4.28 Agreement;

(2)      The Applicants should complete the settlement of debts and claims based on (i) the Fourth Draft of the Checklist of the Current Account of Flower-City Property prepared by the Respondents; or (ii) on such basis that the arbitral tribunal should consider otherwise appropriate.

(D)      <u>Counterclaim on cash consideration</u>

The Applicants' actions resulted in the failure to meet certain prerequisites for the third payment, causing the rights and interests of the Respondents to be damaged. The Respondents requested the arbitral tribunal to rule and/or declare:

(1)      The Applicants violated Articles 2.3.4, 2.1.3, 2.2.1(4) and/or 3.2 of the 4.28 Agreement;

(2)      Under the premise that all the prerequisites for the third payment are met (including the realization of the abovementioned claims in A(2) and A(3), and the completion of the exchange between Jiuting Stores and the A2-type villas as specified in Article 2.2.1(3)(e) of the 4.28 Agreement), the Respondents should pay the adjusted third payment.

59

(3)     As an adjustment to the third payment, the Respondents can deduct or offset (i) any taxes and expenses that may arise from the offshore transfer of equity to Shibang Company (including the possible Chinese taxes and expenses arising from the offshore transfer of equity to Shibang Company) from the third payment; and/or (ii) the amount of compensation for the loss claimed in B(2);

(4)     Alternatively, the Respondents can deduct or offset (i) any taxes and expenses that may arise from offshore transfer of equity to Shibang Company (including the possible Chinese taxes and expenses arising from the offshore transfer of equity to Shibang Company) from the amount awarded to the Applicants; and/or (ii) the amount of compensation for the loss claimed in B(2);

222.    The Respondents' counterclaim is based on the fact that the Applicants were the breaching parties. In view of the arbitral tribunal's analysis and ruling of the disputed issues in this case, the arbitral tribunal held that the parties that had violated the 4.28 Agreement were the Respondents. Therefore, the Respondents' counterclaims were all rejected.

## VII.    Analysis and Reasons of Arbitral Tribunal

223.    The arbitral tribunal made the following analysis after carefully reviewing and evaluating the evidence, witness statements, written statements and other documents provided by the parties concerned.

**Equity consideration (transfer of SJHC's equity)**

224.    The 4.28 agreement is a continuation of the matters related to the repurchase of equity negotiated between the Controlling Shareholders and the Non-controlling Shareholders from 2009 onwards - see Point 1 of the Introduction to the 4.28 Agreement:

"Whereas: 1. The Controlling Shareholders and the Non-controlling Shareholders had adopted the "Shareholder Resolutions" regarding share restructuring on 24 March 2009, and signed the "Meeting Minutes" on 4 September 2009 and the "Preliminary Share Restructuring Agreement" (the "Restructuring Agreement") on 9 November 2009. The above three documents set out the basic principles and transaction framework for Oasis Investment's repurchase of shares held by the Non-controlling Shareholders."

225.   Point 3 of the Introduction to the 4.28 Agreement clarifies the purpose of the agreement:

226.   "Whereas: 3. In order to address the issues relating specifically to the repurchase, complete all the transactions specified in the Restructuring Agreement as soon as possible, and to reduce the transaction cost as well as time cost for all the Parties involved, the Parties agree to sign this agreement to specify the repurchase price, the payment schedule, the payment method and any other issues involved."

227.   In view of this, the arbitral tribunal held that the main purpose of the signing the 4.28 Agreement by the parties concerned was to complete all the transactions as stipulated in the Restructuring Agreement as soon as possible.

228.   The arbitral tribunal held that if there are omissions or ambiguity in the content of the 4.28 Agreement, it may refer to the contents of the above three documents. In fact, Article 4.1 of the 4.28 Agreement also expressly states:

"For matters not addressed in this Agreement, the stipulations of the Restructuring Agreement shall prevail. For matters not addressed in the Restructuring Agreement and this Agreement, the parties concerned shall enter into supplementary agreements through friendly negotiations, and those supplementary agreements and this Agreement shall have the same effect."

229.   The first article of the 4.28 Agreement specifies the "equity transfer before repurchase". Article 1.1 defines two steps: (1) Mr. Ke Zhengguang was to transferr his equity interest in Oasis Investment to Cheergain International and Mr. Xu Hongbiao was to transfer his equity interest in Oasis Investment to Focus Town; (2) Oasis Investment was to repurchase the equity of Oasis Investment from Cheergain International and Focus Town, respectively. Article 1.2 also clarifies that the abovementioned taxes resulting from the equity transfer before the repurchase and its fees shall be borne by the Non-controlling Shareholders.

230.   The parties concerned did not dispute that the first equity transfer before the repurchase had been completed.

231.   Article 2 of the 4.28 Agreement specifies the "Oasis Investment's repurchase consideration", which is also the cash consideration. The parties concerned did not dispute that the cash payment portion of Oasis Investment's repurchase consideration was foreign currency equivalent to RMB 250 million ("cash

consideration"):(Article 2.1). The parties concerned also agree that, during the actual payment, the amount of cash consideration should be adjusted as follows:

"2.1.1 An amount of approximately RMB 41 million resulting from previous transactions for which the Non-controlling Shareholders shall be held liable shall be deducted from the Cash Consideration;[12]

2.1.2 A conditional payment of a one-off additional compensation in the amount of RMB 30 million ("Additional Compensation") that Oasis Investment and the Controlling Shareholders are willing to pay shall be added to the Cash Consideration. The condition for this Additional Compensation is that Oasis Investment's share repurchase and payment of consideration will be completed pursuant to the provisions of the Restructuring Agreement and this supplemental agreement, and there is no major dispute between the Parties.

2.1.3 All parties agreed that, following the signing of this Agreement, when the payment of the relevant equity consideration is to be made and when the amount of Cash Consideration is to adjusted, the parties would then sign a supplementary agreement.

2.1.4 All parties agreed that the cash portion of the repurchase consideration shall be divided into two equal portions in Hong Kong dollars in Hong Kong and paid in full and on time to the bank accounts of Cheergain International and Focus Town Limited provided by the Non-controlling Shareholders at the time as determined in the article below (Article 2.2)."

232.   Article 2.2 specifies the payment conditions and payment period of the cash consideration (Article 2.2.1). The parties concerned agreed that the payment time of the cash consideration for the repurchase is as follows:

"(1)      Hong Kong dollars equivalent to RMB 80 million ("**1st Payment**")...

(2)      Hong Kong dollars equivalent to RMB 20 million ("**2nd Payment**") should be paid before 30 June 2011.[13]

---

[12]    this amount of more than RMB 41 million was mentioned in the minutes of the meeting on February 3, 2010 (D2/723).

[13]    The first and second payments had been paid.

AP_Legal – 104494610.1

(3)     The remaining amount equivalent to RMB 150 million in Hong Kong dollars ("**3rd payment** "), <u>being the final payment subject to those adjustments agreed to or confirmed by all Parties under provisions of Article (4) below</u>) is to be paid by 31 December 2012 <u>once the following prerequisites are met</u>:

    (a)     SJHC's equity transfer being approved by the government and the registration of the transfer being completed;

    (b)     Oasis Investment completing the registration for the change of shareholders that is necessary for the repurchase of the Non-controlling Shareholders' equity;

    (c)     Non-controlling Shareholders and Controlling Shareholders reaching an agreement on the payment arrangement in respect of the Cash Consideration and various adjustments to the amount specified in the aforementioned Article 2.1；

    (d)     Non-controlling Shareholders confirm that the payment of equity consideration specified in Article 2.3.5 below being completed and there being no dispute among all parties;

    (e)     Both of the Shanghai Real Estate Sale and Purchase Contract mentioned in Article 3.1 and the Shanghai Real Estate Presale Contract mentioned in Article 3.2 being signed and the registration of transfer [of ownership] or the registration of presale with the Real Estate Registration Authority being completed.

(4)     <u>Adjustments to the Amount of Cash Consideration</u>. All Parties agree that, before the payment of the 3rd Payment, under provisions of the following Articles, all parties shall calculate and determine the adjustments to the amount of Cash Consideration, and take the adjusted amount as the final amount for purposes of the 3rd Payment:

    (a)     Under the provisions of the Restructuring Agreement and this agreement, Oasis Investment and Controlling Shareholders shall use 100% of SJHC's equity as part of share repurchase consideration ("Equity Consideration"). If under any laws and regulations, such equity transfer must indicate a price of

equity and that this price must actually be paid, the actual amount (net amount after deduction of tax and fees) paid by the Non-Controlling Shareholders to Oasis Investment and the Controlling Shareholders for the equity transfer shall be added to the Cash Consideration;

1.  The arbitral tribunal held that Item (a) above should be interpreted as if the Respondents are required by the laws and regulations to provide a fixed price for the transfer of SJHC's 100% equity, and the said requirement causes the Applicants to have to pay the actual amount for the above transfer of equity to the Respondents, the actual amount of such payment (after deducting the tax incurred) should be added into the cash consideration to be paid by the Respondents to the Applicants. The implication is that, if the parties concerned must set a price for the transfer of SJHC's equity, the Applicants should bear the tax.

(b)  The sharing of the amount stipulated in Articles 2.1.1 and 2.1.2 above shall be reflected in the final amount of the 3rd Payment;

2.  The arbitral tribunal held that, according to Article 2.1.1, the Applicants should bear the total amount of RMB 41,224,613.21 [14], and according to Article 2.1.2, the Applicants should receive RMB 30 million from the Respondents. After the two are offset, the Applicants will only need to pay approximately RMB 11,224,613.21, and the amount will be deducted from the third payment (i.e. RMB 150 million).

(c)  Under provisions of other Articles of this agreement, all tax and expenses that shall be paid by the parties shall be reflected in the final amount of the 3rd Payment.

---

[14]   LYP-l [Dl/253]: LYP-2 [D3/1199].

3.  The arbitral tribunal held that this means that the third payment must be adjusted with reference to the tax burden that the parties concerned are required to bear under the other terms in the 4.28 Agreement. These other terms include, for example, Article 2.3.4. This article specifies that the taxes and expenses arising from the payment of <u>onshore</u> equity consideration, and the taxes and fees arising from <u>offshore</u> entrustment arrangement with Shibang Company and the transfer of equity to Cheergain International and Focus Town, shall be borne by the Non-controlling Shareholders. Apart from this, the <u>sharing of the taxes and expenses</u> related to the payment of equity consideration shall be separately negotiated by all parties at the appointed time. Matters that arise due to the equity transfer procedures related to the payment of onshore and offshore equity considerations, i.e. application, registration, government procedures etc., shall be handled by the Non-controlling Shareholders, and the Controlling Shareholders and Oasis Investment shall provide the necessary assistance. Based on the above reasons, the arbitral tribunal held that Article 2.3.4 does not apply to this case.

233. A comprehensive analysis of the above indicated that the final amount of the third payment should be adjusted based on Article 2.2.1(4), with RMB 150 million as the base amount.

234. As for the payment deadline of the third payment, Article 2.2.1(3) specifies it to be December 31, 2012, but prerequisites (a) to (e) must also be met.

235. There is no dispute between the two parties that the prerequisite (b) has been met.

236. As for prerequisite (a), the parties have been alleging that the other party is the reason for the unmet prerequisites. Therefore, the arbitral tribunal must make a ruling on this issue.

237. As for prerequisite (c), both parties have reached an agreement on the payment arrangements for the cash consideration specified in Article 2.1, but no

65

agreement has been reached on various adjustments. Therefore, the arbitral tribunal must make a ruling on this issue.

238.    As for prerequisite (d), the payment of equity consideration by both parties as specified in Article 2.3.5 has been completed, and the parties concerned have no disputes over this and have not reached an agreement. Therefore, the arbitral tribunal must make a ruling on this issue.

239.    As for prerequisite (e), both parties have different opinions on the reasons why the contracts mentioned in Articles 3.1 and 3.2 have not been signed. Therefore, the arbitral tribunal must make a ruling on this issue.

240.    As for prerequisite (a) (i.e. the government review and approval and registration procedures for the transfer of SJHC's equity had been completed), the arbitral tribunal first analyzed the content of Article 2.3 of the 4.28 Agreement. Article 2.3 specifies the payment method of equity consideration:

AP_Legal – 104494610.1

"According to the Restructuring Agreement, the equity portion of Oasis Investment's repurchase consideration is calculated as 100% equity of [SJHC] ("Equity Consideration")."

241.   The payment method of the equity consideration includes both offshore and onshore components. The offshore component is specified in Articles 2.3.1 and 2.3.2, and the onshore component is specified in Article 2.3.3.

242.   Article 2.3.1 specifies that:

"Oasis Investment has newly incorporated Shibang Company Ltd ("Shibang Company") in Hong Kong and has arranged for Shibang Company to acquire 80% of the equity interest in SJHC held by Greencourt Properties Limited, a subsidiary of Oasis Investment in Hong Kong. After the completion of the said equity acquisition, Oasis Investment shall sign the "Equity Purchase Option Agreement" with Cheergain International and Focus Town Limited and agree that upon the expiration of the entrustment period mentioned in Article 2.3.2 below, 100% of the equity of Shibang Company shall be transferred to Cheergain International and Focus Town Limited at a consideration of HKD 1." (underlines added later)

243.   Article 2.3.2 specifies that:

"All Parties Agree That:  After Oasis Investment's signing of the Equity Purchase Option Agreement for the equity transfer of Shibang Company to Cheergain International and Focus Town Limited, Greencourt Properties is to sign the relevant Entrustment Agreement with Cheergain International and Focus Town Limited. This agreement shall stipulate that:  (1) Cheergain International Group Limited and Focus Town Limited are entrusted by Greencourt Properties to manage Shibang Company and to exercise the shareholders' rights on its behalf for three years (the "**entrustment period**"); (2) during the entrustment period, the Non-controlling Shareholders are responsible for all the debts and claims, risks and liabilities of Shibang Company and SJHC. If for any reason the Controlling Shareholders, Oasis Investment or Greencourt Properties are required to bear the debts and claims, risks and liabilities of Shibang Company or SJHC during the entrustment term, the Non-controlling Shareholders are required to fully compensate the Controlling Shareholders, Oasis Investment and Greencourt Properties."

244.   Article 2.3.3 specifies that:

"The remaining 20% of the equity of SJHC currently held by Oasis Kechuang Shengtai Limited, a subsidiary of Oasis Investment, is to be transferred to a domestic company in China appointed by the Non-controlling Shareholders ("**Onshore Payment of Equity Consideration**"). If under the laws of the People's Republic of China, an actual payment of consideration is required to be made for such equity transfer, the provisions of the abovementioned Article 2.2.1(4)(a) shall apply."

245.   Regarding Articles 2.3.1 to 2.3.3, the arbitral tribunal held that the transfer of SJHC included the following three steps that must be performed:

(1)      **First**, Shibang Company, established by Oasis Investment, should acquire 80% equity interest of SJHC held by Greencourt Properties (hereinafter referred to as the "**first step of the 80% equity transfer**"). Article 2.3.1 expressly states that Oasis Investment has established Shibang Company in Hong Kong and has arranged for Shibang Company to acquire 80% of equity of SJHC held by Greencourt Properties, a subsidiary invested by Oasis Investment in Hong Kong. In other words, the first step in the 80% equity transfer ought to have been completed when the 4.28 Agreement was signed. However, in fact, this first step has not been completed yet.

(2)      **Second**, Oasis Investment should transfer the equity of Shibang Company to Cheergain International and Focus Town owned by the First Applicant and Second Applicant respectively (referred to as "**step 2 of the 80% equity transfer**").

(3)      After the first step of the 80% equity transfer and before the second step of the 80% equity transfer, the 4.28 Agreement also stipulates that the Non-controlling Shareholders and the Controlling Shareholders must sign two agreements: One would be the "Equity Purchase Option Agreement" signed by Oasis Investment and Cheergain International and Focus Town; the other would be the relevant entrustment agreement signed by Greencourt Properties and Cheergain International and Focus Town.

(4)     The other 20% equity of SJHC would be transferred from Oasis Kechuang to an onshore company in China designated by the Non-controlling Shareholders (referred to as the "**20% equity transfer**"). According to Article 2.3.3, the Chinese onshore company designated by the Non-controlling Shareholders is Luhao Trading. According to Article 2.3.3, the Non-controlling Shareholders designated Luhao Trading as the transferee of the 20% equity of SJHC in the letter issued on March 15, 2011 [D3/901-903].

246.    It can be clearly seen from the content of Article 2.3.4 that this Article deals with the procedures and tax liability of the second step of the 80% equity transfer (i.e. the offshore entrustment arrangement with Shibang Company and the transfer of equity to Cheergain International and Focus Town) and the 20% equity transfer (i.e. payment of onshore equity consideration). This article does not cover the first step of the 80% equity transfer (i.e. Shibang Company's acquisition of 80% equity of SJHC held by Greencourt Properties). This is because, according to Article 2.3.1, the Respondents clearly confirmed that Oasis Investment had completed the first step of the 80% equity transfer upon the signing of the 4.28 Agreement. In other words, the responsibility of Oasis Investment in fulfilling the first step of the 80% equity transfer is not within the scope of Article 2.3.4.

247.    There was still a small episode about the transfer of SJHC's equity. Oasis Investment held 100% equity of SJHC through its two subsidiaries: Greencourt Properties held 69% and Oasis Kechuang held 31%. In order to comply with the 4.28 Agreement, SJHC must increase its capital, so that Greencourt Properties could increase its shareholding ratio to 80%, and Oasis Kechuang could lower its shareholding ratio to 20%.

248.    On November 12, 2009, Greencourt Properties and Oasis Kechuang signed an agreement [D2/628-629] to reach an agreement on the increase of registered capital in SJHC. Under this Agreement, both parties agreed to adjust the shareholding ratio of the two parties to 80%:20% through the giving up of the limited subscription rights of newly added registered capital by Oasis Kechuang and the unilateral capital increase by Greencourt Properties. On the same day, SJHC also passed the board resolution [D2/631-632], reflecting the above equity adjustment.

AP_Legal – 104494610.1

249.    The Shanghai Municipal Commission of Commerce consented and approved the capital increase of SJHC on December 21, 2009 [D2/705-706]. However, the Shanghai Branch of the State Administration of Foreign Exchange issued a decision to not grant an administrative license [D2/728] on March 23, 2010.

250.    The application for capital increase was finally approved on July 27, 2011 [D3/980], and both parties had no dispute over this.

251.    Both parties had different interpretations and positions on whether the two audit reports in the evidence were the documents that had to be submitted during the first phase of review and approval for the transfer of SJHC's equity. The first audit report [D2/729] was issued by Shanghai Xuri Certified Public Accountant Firm on April 14, 2010. Another audit report [D2/766-781] was issued by Crowe Howarth on April 28, 2010.

252.    The First Applicant's claim was: The evidence shows that the Applicants provided the two audit reports to the Respondents to use for capital increase or settlement [D1/255,257 Point 5 - Li Shuping's witness statement attached to LYP-3 "Issues Regarding the Settlement of Claims and Debts between SJHC and Oasis Investment and Its Subsidiaries"].

253.    The Respondents claimed that the two audit reports supported the Respondents' view, i.e.: The applicant must hire an appraiser to evaluate the value of 100% equity of SJHC and provide the 2016 annual audit report of SJHC to the Respondents for review.

254.    In summary, the arbitral tribunal held that the First Applicant's explanation of the two audit reports was more persuasive, and the dates coincided with the final approval date of the capital increase application (i.e. July 27, 2011). Therefore, the arbitral tribunal endorsed the claim of the First Applicant.

**Expert opinion of various expert witnesses (Ma Beiyi, Ye Yongqing, Ji Nuo) - review and approval procedures must be carried out for the transfer of SJHC's equity**

255.    With regard to the issue of equity consideration, the parties concerned have summoned Chinese legal expert witnesses to make expert reports on the review and approval procedures, documents required for the review and approval, and taxes. The First Applicant's expert witness was Ma Beiyi; the Second

Applicant's expert witness was Ye Yongqing; the Respondents' expert witness was Ji Nuo.

256.  The joint opinion of the three expert witnesses on the issue of equity transfer ("**Joint Opinion**") is in C/438. In Paragraph 6 of the Joint Opinion, three experts pointed out that SJHC was a sino-foreign equity joint venture established under the "Law of the People's Republic of China on Sino-Foreign Equity Joint Ventures", and it had two shareholders: Greencourt Properties (Hong Kong company, 80% equity) and Oasis Kechuang (Chinese company, 20% equity).

257.  Three experts pointed out in Paragraph 8 of the Joint Opinion that the Regulations for the Implementation of "Regulations for the Implementation of the Law on Sino-Foreign Equity Joint Ventures" was applicable to the transfer of SJHC's equity. Article 20, Paragraph 1 of the Regulations specifies that: "When a joint venture party transfers all or part of its equity to a third party, it must be approved by the other joint venture party and shall be submitted to the review and approval agency for approval, and shall complete the procedures for change registration with the registration management agency."Article 3 of the "Several Provisions on Changes in Equity Interest of Investors in Foreign-invested Enterprises" also specifies that: "Changes in the equity interest of corporate investors shall comply with relevant Chinese laws and regulations, and shall be approved by the review and approval authority and registered by the registration authority in accordance with this provision. Changes in equity are invalid without the approval of the review and approval authority."Therefore, as a sino-foreign equity joint venture, the two equity transfers of SJHC should be approved by the review and approval authority, and the corresponding procedures for change registration shall be subsequently carried out with the registration authority.

258.  The three experts pointed out in Paragraph 9 of the "Joint Opinion" that the transfer of SJHC's equity would require three stages of administrative procedures: (1) After collecting and preparing the documents required by law, the joint venture should submit the application documents to the review and approval authority for the approval of the equity transfer. Taking into account the total investment amount of SJHC and its type of industry, the specific review and approval of its equity transfer should be the responsibility of the local competent commerce department of Shanghai; (2) after obtaining the approval, the joint venture should apply for the change with the registration management

71

agency, i.e. complete the change registration with the local industry and commerce department of Shanghai; and (3) the joint venture should, in accordance with the requirements of relevant laws and regulations, further complete the registration of changes in terms of taxation, foreign exchange and other aspects.

259.   Regarding the first phase (SJHC should submit application documents to the commerce department for review and approval), the three experts listed in Paragraph 10 of the "Joint Opinion" that SJHC, as an applicant for the review and approval of equity transfer, must submit the application documents to the review and approval authority, and there was no need to repeat it here. In addition, Paragraph 12 of the "Joint Opinion" mentioned the division of labor between the parties concerned in the preparation of the documents.

260.   Regarding the second phase (SJHC should apply for change registration with the administration for industry and commerce), the three experts set out the documents to be submitted in Paragraph 15 of the "Joint Opinion", and there was also no need to repeat them here. The three experts agreed that the change documents received by the administration for industry and commerce were similar to the application documents submitted to the commerce department in the first phase. The experts also added their opinions in Paragraphs 36-38 of the Joint Opinion.

261.   Regarding the third phase (SJHC further completes the registration of changes in terms of taxation, foreign exchange and other aspects), the three experts unanimously agreed that after the completion of the industrial and commercial registration of changes, the joint venture could specifically complete the procedures for registration of changes in terms of tax, foreign exchange and other aspects of the enterprise based on the review and approval, as well as on the change registration results of the equity transfer.

262.   In Paragraphs 19 and 20 of the "Joint Opinion", the three experts unanimously agreed that, regarding the review and approval of the transfer of SJHC's equity (i.e. the first phase mentioned above), the materials (listed below) that the transferor and the transferee had prepared were not enough to complete the review and approval and registration of SJHC:

(1)      The shareholders of Greencourt Properties had issued the "Shareholder Resolution of Greencourt Properties Limited, Hong Kong"

dated November 21, 2011, agreeing to transfer its 80% equity in SJHC to Shibang Company and to give up its pre-emptive rights when Oasis Kechuang transferred its 20% equity in SJHC to Luhao Trading.

(2)     The shareholders of Oasis Kechuang had issued the "Shareholder Resolution of Oasis Kechuang Ecological Technology Co., Ltd., Hong Kong" dated November 21, 2011, agreeing to transfer its 20% equity in SJHC to Luhao Trading and to give up its pre-emptive rights when Greencourt Properties transferred its 80% equity in SJHC to Shibang Company

(3)     The shareholders of Greencourt Properties had issued the "Shareholder Resolution of Greencourt Properties Limited, Hong Kong" agreeing to transfer its 50% equity to Cheergain International at the price of USD 1 (*sic*) and transfer its another 50% equity to Focus Town at the price of USD 1 (*sic*).

263.    The three experts did not reach a consensus on the following two issues:

(1)     Should the right to review and approve the transfer of SJHC's equity belong to the municipal commission of commerce or Fengxian District Economic Committee?

(2)     Is the audit report or evaluation report of SJHC required for the review and approval of the equity transfer?

264.    Regarding Question (1), Ma Beiyi believed that SJHC was a foreign-invested real estate development and management company, and its approval authority for equity transfer should be the municipal commission of commerce. However, Ji Nuo believed that the authority to review and approve the transfer of SJHC's equity belonged to the local competent commerce department of Shanghai Municipality prior to the implementation date (April 10, 2015) of the "Catalogue for the Guidance of Foreign Investment Industries" (Amended in 2015), but the authority to review and approve belonged to the local competent commerce department at the district level (Fengxian) after April 10, 2015. Ye Yongqing believed that since this equity transfer transaction should have occurred before April 10, 2015, i.e. before the review and approval agency was changed, the competent commerce department of Fengxian District is not the competent authority for this equity transfer.

AP_Legal – 104494610.1

265. Regarding Question (2), Ma Beiyi believed that there was no information to indicate that the evaluation report was related to the review and approval application and the completion of change registration and other administrative procedures for the equity transfer. Therefore, the evaluation report was not considered an application document that the joint venture had to prepare. As for the audit report, it was because the website of the Fengxian District Economic Committee showed that the previous year's audit report of the joint venture issued by an accounting firm has to be provided to apply for review and approval for equity transfer with the committee. But Ma Beiyi believed that this requirement would not constitute an obstacle for the joint venture to apply for the review and approval of the equity transfer, nor did it belong to the application documents that had to be prepared by the joint venture. Ye Yongqing believed that, regarding the issues on whether the audit report of SJHC had to be provided and who should be responsible to prepare it, on one hand, the "Provisions on Changes in Equity Interest of Investors in Foreign-invested Enterprises" did not expressly require that an audit report had to be submitted, and taking into account the total investment amount of SJHC and the type of industry that it was involved in, the local competent commerce department of Shanghai should be responsible for the specific review and approval of its equity transfer. Furthermore, the list of documents in the service guide published by the commerce department of Shanghai Municipality did not include the audit report. On the other hand, since this equity transfer transaction should have occurred on April 10, 2015, i.e. before the review and approval agency was changed, the competent commerce department of Fengxian District was not the competent authority for this equity transfer, thus its document requirements would not constitute a substantial obstacle to the approval of the commerce commission. In addition, Ye Yongqing believed that, in practice, the commerce department of Shanghai Municipality did not have the practice of requesting for audit report or evaluation report, and enterprises could just submit their financial statements for the previous year or the most recent month. Therefore, even if an audit report had to be submitted in accordance with the requirements of the competent commerce department of Fengxian District, in practice, enterprises could often submit their financial statements for the previous year or the most recent month instead. In addition, regarding whether it was necessary to perform evaluation on SJHC, Ye Yongqing believed that the evaluation had no effect on the obtaining of commerce review and approval for this equity transfer, as well as the registration of changes in industry and commerce, and taxation. It may be necessary only if the taxation authority questioned the price of this equity

74

transfer when Greencourt Properties filed tax returns. In particular, the transfer of SJHC's equity had already been realized after the completion of review and approval by the commerce commission and the changes in industrial and commercial, and SJHC's equity would be under Shibang Company's name after the completion of changes in industrial and commercial. Although, the subsequent tax procedures had to be completed by Shibang Company for the acquisition, it would not affect the realization of the equity transfer. Although a valuation may be one of the methods that the subsequent taxation authority may use to determine the equity transfer price, the taxation authority may also use the agreed price in the equity transfer agreement, the net asset price of SJHC, the long-term equity investment amount in the account book of Greencourt Properties, or the registered capital amount of SJHC to determine the equity transfer price, and the above prices or amounts were information that could be obtained. Hence, Ye Yongqing believed that the valuation of SJHC was not a necessary process for the completion of equity transfer under the premise that it was not expressly prescribed by the Chinese tax laws and regulations and local regulations.

266.    Ji Nuo believed that the competent commerce department of Fengxian District was the review and approval agency of the transfer of SJHC's equity in this case. The list of documents published on the Internet clearly required an audit report, and SJHC should meet this requirement. (The question of when this equity transfer transaction should take place, and which party should bear the consequences of the failure to complete the transaction on time should be decided by the arbitral tribunal, thus Ji Nuo did not discuss this in the expert opinion.) In practice, the review and approval authority would often require the joint venture to provide audit report or evaluation report as an important reference for reviewing the reasonableness of the equity transfer price (for example, when the agreed price deviates significantly from the circumstances reflected in the audit report and other materials, it may constitute as an obstacle to approval). Ji Nuo believed that, according to the above analysis, in this case, the audit report should be prepared for the review and approval process, and the preparation of the audit report should be based on financial information provided by the joint venture (i.e. SJHC). Therefore, SJHC should usually be responsible for the preparation. If SJHC failed to provide an audit report, it would constitute an obstacle to obtaining approval. As for the review and approval authority's specific requirements for the form and content of the audit report, whether it could be replaced by other similar documents (such as evaluation report,

AP_Legal – 104494610.1

unaudited financial statement, etc.) and other issues, it would depend on the discretion of the review and approval authority according to case-specific circumstances.

267. The arbitral tribunal held that: (1) The question of which competent authority would have the right to review and approve the transfer of SJHC's equity should be considered from the time point at which the review and approval application was submitted. All three experts agreed that, after April 10, 2015, the right of approval would belong to the competent commerce department of Fengxian District, Shanghai. However, the 4.28 Agreement was signed at the end of April 2010, and the consensus of the parties concerned in Article 2.2.1(3) was that the balance should be paid before December 31, 2012 (on condition that the prerequisites were satisfied). In other words, the parties concerned believed that the prerequisites of the 4.28 Agreement should be fully satisfied within two years and eight months. Therefore, the arbitral tribunal held that the key time point was before April 10, 2015, and the review and approval authority at that time was the municipal commission of commerce instead of the competent commerce department of Fengxian District.

268. As for the audit report or evaluation report, the arbitral tribunal accepted the opinions of the Applicants' expert witnesses Ma Beiyi and Ye Yongqing, i.e.: The audit report or evaluation report would not be needed for the application for the review and approval of equity transfer. Moreover, this issue was in fact irrelevant to determine which party was breaching the contract. As the first step of the equity transfer, that is, Shibang Company's acquisition of 80% of SJHC held by Greencourt Properties was not yet completed, the documents required for approval was not available.

269. At the time of the commencement of the arbitration proceeding (i.e. February 22, 2013), both parties had not yet begun the first phase (SJHC submitted the application documents to the commerce department for review and approval). What were the reasons? The Controlling Shareholders and the Non-controlling Shareholders blamed each other, alleging that each other did not bear its share of responsibility. However, it is an indisputable fact that the Controlling Shareholders had not fulfilled the contractual obligations under Article 2.3.1 of the 4.28 Agreement and arranged for Shibang Company to acquire 80% of equity in SJHC held by Greencourt Properties. This resulted in the failure to complete the transfer of SJHC's equity, let alone the review and approval and registration procedures for the transfer of SJHC's equity, which was one of the

76

prerequisites (i.e. the prerequisites set out in Article 2.2.1(3)(a) of the 4.28 Agreement).

270. Evidence shows that the Controlling Shareholders' lawyer (attorney Tao Xudong of JunHe LLP) sent an e-mail to the lawyer of the Non-controlling Shareholders (attorney Jeremy Wong of King & Wood Mallesons) on May 13, 2010, mentioning some legal issues regarding the transfer of SJHC's equity and requested discussion by telephone conference [D2/826]. On the same day, King & Wood Mallesons responded to the email to JunHe, mentioning that it had received the Chinese manuscripts of Equity Purchase Option Agreement and Entrustment Agreement from Xu Hongbiao's office, and it had some ideas and agreed to discuss the matter via telephone [D2/825]. On May 24, 2010, King & Wood Mallesons sent an email to JunHe with its amendment recommendations regarding to the "Equity Purchase Option Agreement" and Entrustment Agreement, and also reminded the Controlling Shareholders to ensure that the 20% equity in SJHC held by Oasis Kechuang should also be transferred at the same time according to Article 2.3.3 of the 4.28 Agreement. The e-mail also mentioned that King & Wood Mallesons was drafting the "Equity Pledge Agreement of Shibang Company" and "Shareholder Voting Rights Proxy Agreement of Shibang Company" to cooperate with the performance of the above two agreements; after the agreements were drafted, they would be sent to JunHe for review [D2/824]. On June 1, 2010, JunHe sent an email to King & Wood Mallesons to ask when it could provide a copy of the equity pledge agreement and voting rights proxy agreement, and said that it hoped to see all the documents and send feedback to King & Wood Mallesons [D2/ 830]. On June 9, 2010, King & Wood Mallesons sent an email to JunHe with the drafts of "Shareholder Voting Rights Proxy Agreement" and "Equity Pledge Agreement" for JunHe to review and give feedback [D2/829]. On August 31, 2010, King & Wood Mallesons sent an email to JunHe, pointing out that they did not receive JunHe's feedback after sending the drafts of "Shareholder Voting Rights Proxy Agreement" and "Equity Pledge Agreement" on June 9, 2010, and requesting for a response [D2/829]. However, according to Paragraph 23 [B/14] of Xu Hongbiao's witness statement, a violation of the 4.28 Agreement was that Oasis Investment and its Controlling Shareholders had not yet returned their signed "Equity Purchase Option Agreement" and/or "Escrow Agreement", or provide a response regarding its content to the Non-controlling Shareholders or put forward any suggestions.

271.   In summary, the arbitral tribunal held that the Controlling Shareholders were in breach.

272.   All three expert witnesses agreed that, in the first phase, SJHC, as an applicant for review and approval of equity transfer, must submit several documents to the review and approval authority (see Paragraphs 10 - 13 of the "Joint Opinion"). One of the key documents is the 80% and 20% equity transfer agreement of SJHC. Regarding Paragraphs 29 - 35 of the "Joint Opinion", three expert witnesses expressed their different opinions. Among them, Ji Nuo believed that the equity transfer agreement was one of the indispensable application documents, just like other documents required for review and approval and registration. Any equity transfer must be based on the premise that the relevant parties had reached an agreement. However, as compared to general equity transfer, this case was special. If the actual control rights, various licenses and official seals of SJHC had been transferred to the Applicants by the Respondents before the equity transfer occurred, the review and approval and registration of the equity transfer would not only depend on the direct parties to the transfer, i.e. Greencourt Properties, Oasis Kechuang, Shibang Company and Luhao Company, but also depend on the Applicants' approval of such equity transfer, especially the key terms such as the price, because the Applicants had actual control over SJHC, and it was not that they had no control over Shibang Company. If the actual controllers of SJHC did not recognize the terms and conditions of the equity transfer (especially the price terms), even if the parties concerned had signed the equity transfer agreement, SJHC would still be able to refuse or passively push forward the review and approval and registration applications. On the other hand, the review and approval authority may consider the reasonableness of the equity transfer consideration and usually require the company to provide an audit report. Therefore, for the sake of caution, the conclusion of the equity transfer agreement required that the joint venture (i.e. SJHC) cooperate with the provision of audit report and other materials to the parties concerned as references to determine the specific content of the agreement.

273.   After considering the opinions of the Respondents' expert, the arbitral tribunal believes that the opinions of the Respondents' expert are highly speculative. As HKD 150 million (the third installment) can only be paid to the Applicants after the various prerequisites are met, and one of the prerequisites would be the completion of procedures for government approval and registration of the

transfer of SJHC's equity, obviously, the Applicants would have no reason to refuse or to passively go about the approval and registration application. Therefore, the arbitral tribunal does not endorse the opinions of the Respondents' expert. The arbitral tribunal believes that the Respondents can fully prepare the equity transfer agreement, in the name of Greencourt Properties and Oasis Kechuang, for Shibang Company's and Luhao Trading's perusal. However, the Respondents did not kick start this process at all; rather, they delayed the process using various excuses.

274.    In summary, the arbitral tribunal believes that the Respondents have clearly violated the contractual obligations in Articles 2.3.1, 2.3.2 and 2.3.3 of the 4.28 Agreement.

275.    With regard to the audit report, all parties unanimously agreed in the hearing (especially on August 8, 2017 when the closing oral statement was given) that, at this current stage (and not when the arbitration started), there is a need to submit the latest audit report of SJHC to the approval unit, and this report is one of the documents to be reviewed during the approval process; Transcription (Day 9), Lines 28-29 on Page 32.

**Expert opinions of the expert witnesses of all parties - opinions on taxation issues** [C/451-454]

276.    The three experts reached the following consensus on the tax obligations that might have arisen from the equity transfer under the law of China:

(1)      According to the tax law of China, as the equity transferor in the acquisition of Shibang Company, Greencourt Properties would be subjected to corporate income tax, but the law of China does not prohibit the parties involved in the transaction to agree on the actual bearing of the financial tax burden;

(2)      There are two ways to handle the tax basis for corporate income tax payable by Greencourt Properties;

(3)      In practice, the tax authorities are stricter with the review of various conditions in Document No. 59 (that is, the "Notice on Several Issues Concerning Corporate Income Tax Treatment of Enterprise Restructurings promulgated by the Ministry of Finance and the State

79

Administration of Taxation"), and there is a relatively low possibility of special tax treatment in this case;

(4)    The equity transferor and transferee have the obligation to pay stamp duty.

277.    With regard to the agreement in Article 2.3.4 of the 4.28 Agreement: "Apart from this, the sharing of the tax and expenses relating to the payment of Equity Consideration is to be negotiated by all the Parties in due course", the arbitral tribunal believes that, the meaning of this sentence should be interpreted by the arbitral tribunal based on the law of Hong Kong (the substantive law of the contract), and the opinions of experts have no bearing on this issue.

278.    The first half of the first sentence of Article 2.3.4 in the 4.28 Agreement stipulates that "The Non-controlling Shareholders shall be responsible for all the tax and expenses incurred due to the Onshore Payment of Equity Consideration …". This refers to the taxes and expenses arising from Oasis Kechuang's transfer of 20% equity of SJHC to Luhao Trading. Both parties had no dispute concerning this matter.

279.    The second half of the first sentence of Article 2.3.4 in 4.28 Agreement is: "The Non-controlling Shareholders shall be responsible for …  the tax and expenses incurred offshore due to the entrustment arrangement made by Shibang Company and the equity transfer of Shibang Company to Cheergain International Group Limited and Focus Town Limited". The meaning of this sentence is also clear.

280.    The second sentence of Article 2.3.4 in 4.28 Agreement is: "Apart from this, the sharing of the tax and expenses relating to the payment of Equity Consideration is to be negotiated by all the Parties in due course."[Underlines added after]

281.    Both parties had a dispute on the taxes related to Greencourt Properties' transfer of 80% equity interest of SJHC to Shibang Company. The Respondents' position was that, the first sentence only covered Oasis Kechuang's transfer of 20% equity of SJHC to Luhao Trading and Shibang Company's entrustment agreement with Cheergain International and Focus Town, but it did not cover the agreement of Greencourt Properties' transfer of 80% equity of SJHC to Shibang Company. The Applicant's position was that: As it was clearly expressed in Article 2.3.1 of 4.28 Agreement that Oasis Investment had established Shibang

AP_Legal – 104494610.1

Company in Hong Kong and had arranged for Shibang Company to acquire 80% equity of SJHC held by Greencourt Properties, which was the Hong Kong subsidiary of Oasis Investment, this transaction should not be considered a situation that was "apart from these items" or a situation to be separately discussed by both parties. The arbitral tribunal agrees with the Applicant's standpoint.

282.   With regard to item (2) of the consensus of the three expert witnesses (that is, "the tax basis for corporate income tax payable by Greencourt Properties"), the arbitral tribunal believes that, the application and interpretation of "Document No. 59" are of no direct relationship to the interpretation of the 4.28 Agreement. As mentioned in the 29th paragraph of the witness statement of Yu Naifen Stephany, all parties did not discuss about who should bear the taxes arising from the transaction under "Document No. 59" in the event Shibang Company's offshore equity transfer would be entitled to "special tax treatment" based on "Document No. 59"[B/46]. The first Applicant's evidence denied that the Applicants had discussed with the Controlling Shareholder about the "special treatment" of "Document No. 59" when signing the 4.28 Agreement (see Xu [B/100, §§12-15]. The position of both the Applicants and the Respondents was that, all parties did not discuss about who should bear the taxes arising from the transaction under "Document No. 59" when signing the 4.28 Agreement. Therefore, the arbitral tribunal believes that no ruling is required for this issue. Moreover, the arbitral tribunal has interpreted Article 2.3.1 of 4.28 Agreement, hence it would not be necessary to discuss if "Document No. 59" is applicable.

**Property exchange (exchange of Jiuting Stores and A2-type villas)**

283.   The clause related to property exchange is Article 3 "Other agreements relating to Oasis Investment's repurchase and repurchase consideration" of 4.28 Agreement:

*"3.1 Within 30 days of the signing of this agreement, Oasis Investment and the Controlling Shareholders shall procure a subsidiary, namely, Shanghai Greencourt Real Estate Development Limited to sign the "Shanghai Real Estate Sale and Purchase Contract" with the Non-controlling Shareholders or their nominated third party, and undertake to transfer approximate 8000 m2 of commercial space which shall meet the appropriate delivery standards (specifically, the property includes approximately 6000 m2 of commercial space*

AP_Legal – 104494610.1

on the third level along the streetside of Phase 1 of Greencourt Sun City Commercial Building, and all the commercial space of approximately 2000 m2 of the west side of the Central Plaza of Phase 2 of Greencourt Sun City) at the Jiuting Greencourt Sun City Real Estate Project in Songjiang District, to the Non-controlling Shareholders or their nominated third party. For the avoidance of doubt, (1) when the Shanghai Real Estate Sale and Purchase Contract is signed, Oasis Investment and the Controlling Shareholders shall transfer the right to use such commercial space to the Non-controlling Shareholders or their nominated third party, and the Non-controlling Shareholders or their nominated third party are to receive rental income and other earnings after the transfer; and (2) by 30 June 2011, Oasis Investment and the Controlling Shareholders shall transfer the ownership of such commercial space to the Non-controlling Shareholders or their nominated third party.

3.2 At the time of signing the aforementioned "Shanghai Real Estate Sale and Purchase Contract", SJHC shall sign the "Villa Order Contract" with Oasis Investment and the Controlling Shareholders, to transfer the SJHC-developed two A2-type villas (building area of approximately 1200 m2 each as set out on a building plan, which building plan Oasis Investment and the Controlling Shareholders have received and have been notified of the delivery standards, and both confirmed the actual price as stated below) located on the Central Island, Peninsula Villa Project, Fengpu Industrial Area, Fengxian District, Shanghai City, to Oasis Investment or their nominated third party once the villas meet the delivery standards. For the avoidance of doubt, the Non-controlling Shareholders shall procure SJHC to sign the "Shanghai Real Estate Presale Contract" with Oasis Investment or the third party nominated by the Controlling Shareholders on 30 June 2011 and to complete the presale registration of such villas..

3.3 All Parties Confirm: the properties involved in the aforementioned "Shanghai Real Estate Sale and Purchase Contract" and the "Villa Order Contract" (or the Shanghai Real Estate Presale Contract) are all priced at RMB 72 million. Because the prices of the properties involved are equal, for the purposes of this agreement, the considerations under the contracts are to be set off against each other (whether or not such offset is plausible from an accounting perspective, and that the Parties agree that no actual payment is to be made)."

284.   According to Article 3.2 of the 4.28 Agreement, the A2-type villas have "*building area of approximately 1200 m² each as set out on a building plan, which building plan Oasis Investment and the Controlling Shareholders have received and have been notified of the delivery standards, and both confirmed the actual price as stated below*". "The actual price as stated below" refers to RMB 72 million in Article 3.3.

285.   The Applicants pointed out that, the aforementioned construction drawings were prepared and approved by the government when SJHC was still controlled by the Controlling Shareholder, and they were implemented and completed with the knowledge and authorization of the Controlling Shareholder. Moreover, the drawings were always kept and controlled by the Controlling Shareholder, and they were only handed over to the Non-controlling Shareholders together with other documents on November 18, 2009. According to the "Acceptance Certificate for Completed Construction Project and Planning" for A2-type villas issued by the Planning, Land and Resources Administration of Fengxian District, Shanghai City on January 15, 2012, the gross floor area stated on the certificate was bigger than the gross floor area in the original drawings.

286.   Moreover, even if the gross floor area on the construction drawings was inconsistent with the drawings specified in the 4.28 Agreement, the Respondents were clearly aware of that and had not raised any objection within the relevant period of time. With regard to the clause on construction drawings in Article 3.2 and its effect, the Second Applicant cited the principle of "contractual estoppel" and the principle of "estoppel by convention".

287.   The Respondents denied that the Controlling Shareholder knew about circumstances regarding the villa project and gave the drawings to the Non-controlling Shareholders. The Respondents pointed out that the Non-controlling Shareholders only submitted a copy of the villa design drawing to the Controlling Shareholder on June 2, 2010, and the Respondents informed verbally that the drawing was inconsistent with the agreement and returned it. Although the Applicants had adequate time thereafter, it did not alter the drawing. The Respondents only received the "Shanghai Commercial Housing Presale Contract" for the first time through the Applicants' lawyer letter on February 4, 2013, and knew about the area of the villas to be provided by the Applicants.

288.  The Respondents claimed that the villas provided by the Applicants had the following defects and did not meet the requirements of "customized" villas as agreed by them: (1) the saleable area of the villas was much lower than 1,200 square meters; (2) even if basement area, which should not be included in the saleable area, were to be added to the total area, the villas still did not meet the required area stated in the 4.28 Agreement. As mentioned above, the requirements of "customized" villa stated by the Respondents are clearly inconsistent with the clauses of the agreement.

**Related written correspondence**

289.  The written correspondence between the Non-controlling Shareholders and the Controlling Shareholder reveals that the Controlling Shareholder sent a letter to the Non-controlling Shareholders on March 25, 2011 requesting the Non-controlling Shareholders to provide the "design drawings of the involved villas, which should show the villas' location, area and construction quality meeting the provisions in the 4.28 Agreement and the usual requirements of a villa".

290.  The Non-controlling Shareholders replied in a letter on April 25, 2011 and pointed out that:

*"You have repeatedly delayed signing the Villa Order Contract for the two A2-type Villas located on Central Island with us on many occasions by claiming that we have not provided the drawings of the Central Island A2-type Villas to you; but in reality, Article 3.2 of the 4.28 Agreement has specified that the gross floor area on the drawings of the Central Island A2-type Villas is about 1,200 square meters each, and Oasis Investment and the Controlling Shareholder have received the drawings and are aware of the delivery criteria, and they have confirmed the actual price as stated". Moreover, our side had re-submitted the relevant drawings of Central Island A2-type Villas to you on June 2, 2010 in response to your request after the 4.28 Agreement took effect. You received and signed for the receipt of the drawings. Therefore, there is no factual basis for your refusal to sign the Villa Order Contract by stating that we have not furnished the drawings of the Central Island A2-type Villas."*

291.  In the reply letter of the Controlling Shareholder dated April 28, 2011, they claimed that "we have not received the drawings of Central Island A2-type Villas with the 'gross floor area of about 1,200 square meters each' as mentioned

by you, have they been sent wrongly? For the sake of caution, please resend them again for our verification". The Controlling Shareholders' position then was not that there was a problem with the drawings provided by the Non-controlling Shareholders, but that they did not receive the drawings at all.

292. The Non-controlling Shareholders replied in a letter on May 3, 2011 and reiterated that "we have responded to your request on June 2, 2010 and sent the relevant drawings of Central Island A2-type Villas to you, and we have your signed acknowledgment to prove this. If you have any doubt about the construction drawings, you can check with us".

293. The Controlling Shareholder only gave a reply concerning the construction drawings on July 15, 2011. In this reply, they finally acknowledged that the Non-controlling Shareholders had given the drawings to them, but they then said that the drawings were not in compliance with the requirements: "you have indeed given the drawings to us, but the drawings showed a huge discrepancy between the gross floor area of the Villas and that agreed in the 4.28 Agreement, and we had also raised this issue to you when we received the drawings".

**Jiuting Stores**

294. The Applicants said that the Respondents had so far been unable or refused to appoint and cause Greencourt Property Development and the Non-controlling Shareholders or a third party appointed by them to sign the "Shanghai Real Estate Sale and Purchase Contract" for the transfer of the Jiuting Stores, and this caused them to suffer losses.   However, the Respondents said that the Applicants failed to meet the requirements for the Villas, hence the Respondents did not have the obligation to sign the "Shanghai Commercial Housing Presale Contract" for the Jiuting Stores and transfer the ownership of the stores to the Applicants or the party appointed by them. This shows that the main issue of dispute between the parties is whether the Villas provided by the Applicants met the requirements in the 4.28 Agreement.

295. The Respondents also pointed out that, regardless, the Controlling Shareholder had allowed the Applicants to use and rent the store through an authorization letter, and the Applicants were actually entitled to the revenue from the stores. Both parties had a dispute over the scope and deadline of the authorization. The Second Applicant pointed out that, the Respondents were still occupying 2,000

square meters of commercial property at the west wing of the Phase 2 Central Square up to the current day.

296.    The arbitral tribunal believes that, under Article 3 of the 4.28 Agreement, the agreement of the parties is for the property exchange, and the value of RMB 72 million of the involved property is only an estimation (this is the meaning of the word "pricing"); it is not an actual price calculated accurately by multiplying the price per square meter with the area of 1,200 square meters. In addition, the phrase "gross floor area on drawings of the about 1,200 square meters each", which was used to describe the A2-type villas, should also be understood in this contect. The Respondents also claimed that the pricing of RMB 72 million for the A2-type villas was calculated based on (1) the saleable gross floor area of two villas, which was 2,400 square meters in total, and (2) an average price of no less than RMB 31,500 per square meter of gross floor area. The Respondents claimed that this was the basis for Article 3.3 of the 4.28 Agreement between the parties, but the arbitral tribunal believes that this claim is obviously inconsistent with the stipulations that have been expressly stated in the 4.28 Agreement. Therefore, the arbitral tribunal has accepted the claims of the Applicants and ruled that the Respondents violated the obligations under Article 3.1.

**The Second Applicant's claim for losses of Jiuting Stores**

297.    The Second Applicant listed the following calculation of losses in appendix 1 of its written concluding statement (the original appendix 1 of the written concluding statement was replaced by the new appendix 1 on August 8, 2017, and the parties did not have any objection to that):

| Calculation of rent losses of Jiuting Stores (revised version dated August 8, 2017) | | |
|---|---|---|
| Total rent losses (includes the office area and store) (RMB) | 10,346,211 | |
| *Office area with balcony (over 2,000 square meters)* | | |
| | | |
| Total area (square meters) | 2,140.30 | |
| Area occupied by SJHC (square meters) | 424.35 | |
| **Leasable area (square meters)** | **1,715.95** | |
| | | Witness statement of Ke Yeying: B/7/94, Paragraph 46: The supermarket is the third party mentioned in the |

| | | paragraph. |
|---|---|---|
| Area of supermarket (square meters) | 860.85 | Supplementary witness statement of Gu Yong: B/12/129, Paragraph 4.3 |
| Area occupied by the Controlling Shareholder (square meters) | 855.10 | Witness statement of Ke Yeying: B/7/94, Paragraph 45 |
| Market rent price (RMB/square meters/day) | 2.50 | Gu Yong's statement: Day 5 [44(22-27)] |

| | | |
|---|---|---|
| Date on which the Non-controlling Shareholders should be entitled to the right of use and rent of the stores under Article 3.1(1) of the 4.28 Agreement | 5/28/2010 | Revision of the Further Reply to the Applicants' Reply and Defence to Counterclaim: A/6/97, Paragraph 10.4 |
| Date of lease to supermarket: | 6/1/2016 | |
| Reference date for calculation of losses | 8/8/2017 | |
| **Number of days whereby the supermarket area was vacant due to the Controlling Shareholder's refusal to provide authorization** | **2,196** | |
| Losses arising from vacant supermarket area (RMB) | 4,726,067 | |
| | | |
| Number of days whereby the Controlling Shareholder occupied the store in breach of Article 3.1(1) | 2,629 | |
| Losses arising from occupation by the Controlling Shareholder (RMB) | 5,620,145 | |
| | | |
| **Total rent losses of the office area with balcony (RMB)** | **10,346,211** | |

298.   Claims of the Second Applicant: Although the A2-type villas were completed in 2011, the Controlling Shareholder unduly refused to accept the A2-type villas and refused to execute the transfer of the Jiuting Stores, and these caused the Non-controlling Shareholders to suffer heavy losses. The reasons are as follows:

(1)   According to Article 3.1 of the 4.28 Agreement, the commercial property of the Jiuting Stores project is about 8,000 square meters, and this specifically included (i) about 6,000 square meters of the level three commercial space of the Greencourt Sun City Phase 1 along the

AP_Legal – 104494610.1

streetside; and (ii) about 2,000 square meters of all commercial space at the west wing of the Phase 2 Central Plaza.

(2)     The rent of the 2,000 square meters [of commercial property] in Phase 2 was most probably higher than RMB 2.5 per day per square meter. Mr. Gu Yong, who is the Controlling Shareholder's witness, also agreed with this point.

(3)     As the Controlling Shareholder prevented the transfer of Jiuting Stores and did not grant the controlling rights of the 2,000 square meters [of commercial property] to the Non-controlling Shareholders, the Non-controlling Shareholders could not rent out this portion [of commercial property].

(4)     Although the Non-controlling Shareholders rented a portion of the office with balcony in the 2,000 square meters [of commercial property] to a third party who is related to Mdm. Ke in July 2016, that was a special arrangement (based on the third party's trust in Mdm. Ke).

(5)     The Controlling Shareholder granted the controlling rights of the 6,000 square meters [of commercial property] in Phase 1 to the Non-controlling Shareholders through the authorization letter, but the controlling rights of the 2,000 square meters [of commercial property] in Phase 2 have not been granted so far. Mr. Gu Yong, who was the Controlling Shareholder's witness, also agreed with this point.

299.    According to Article 3.1 of the 4.28 Agreement: "Within 30 days of the signing of this agreement, Oasis Investment and the Controlling Shareholders shall procure a subsidiary, namely, Shanghai Greencourt Real Estate Development Limited to sign the "Shanghai Real Estate Sale and Purchase Contract" with the Non-controlling Shareholders or their nominated third party, and undertake to transfer approximate 8000 m2 of commercial space which shall meet the appropriate delivery standards (specifically, the property includes approximately 6000 m2 of commercial space on the third level along the streetside of Phase 1 of Greencourt Sun City Commercial Building, and all the commercial space of approximately 2000 m2 of the west side of the Central Plaza of Phase 2 of Greencourt Sun City) at the Jiuting Greencourt Sun City Real Estate Project in Songjiang District, to the Non-controlling Shareholders or their nominated third party. For the avoidance of doubt, (1) when the Shanghai

88

Real Estate Sale and Purchase Contract is signed, Oasis Investment and the Controlling Shareholders shall transfer the right to use such commercial space to the Non-controlling Shareholders or their nominated third party, and the Non-controlling Shareholders or their nominated third party are to receive rental income and other earnings after the transfer; and (2) by 30 June 2011, Oasis Investment and the Controlling Shareholders shall transfer the ownership of such commercial space to the Non-controlling Shareholders or their nominated third party."

300.    Article 3.1(1) shows that the Respondents were required to fulfill their obligations (that is, to deliver the right of use) within 30 days after signing the 4.28 Agreement, and this was to be no later than May 28, 2010. Article 3.1(2) shows that the Respondents were required to fulfill their obligations (that is, transfer the ownership) before June 30, 2011.

301.    Article 3.1 is linked to Articles 3.2 and 3.3, which means that the commercial property of Jiuting Green Court Sun City Real Estate Project at Songjiang District, which covers an area of about 8,000 square meters, had the same pricing as the 2 Central Island A2-type villas of the Peninsula Villa Project at Fengpu Industrial Area, Fengxian District (that is, RMB 72 million). This point has been stated in Paragraph 296 above.

302.    In Appendix 1 submitted by the Second Applicant, the claims are divided into two portions: (1) areas occupied by the Controlling Shareholder; (2) number of days that the supermarket area was being controlled due to the Controlling Shareholder's refusal to grant authorization. If August 8, 2017 is used as the reference date for calculation of losses, the total losses would be RMB 10,346,211 (RMB 5,620,145 plus RMB 4,726,067).

303.    As the arbitral tribunal has ruled, in Paragraph 271, the Respondents breached of its obligations under Article 3.1 of the 4.28 Agreement, the arbitral tribunal therefore accepts the Second Applicant's claims and rules that the Controlling Shareholder should compensate the Applicants for their losses of RMB 10,346,211 (using August 8, 2017 as the reference date for calculation of losses).

**Settlement of pre-existing debts and claims between SJHC and Oasis Investment and their subsidiaries**

304.   According to Article 3.6 of the 4.28 Agreement: "Related party transactions: With effect from the signing of this agreement, the related party transactions between SJHC and Oasis Investment and their subsidiaries shall be terminated; all pre-existing debts and claims shall be settled within one month. This excludes situations that are otherwise stipulated in this agreement.."

305.   All parties had made effort to negotiate and agreed to reduce the original scope of dispute to the few items listed in Bundle E, Tab 5.

306.   Article 3.6 of the 4.28 Agreement is an independent clause, and it is not related to the above clauses on pricing of the equity transfer. The arbitral tribunal believes that the parties cannot hold any other party responsible for the failure to settle the pre-existing debts and claims within the time frame prescribed by the agreement, and the main reason is that the parties have different views concerning the issues involved. Therefore, with regard to this issue, the arbitral tribunal role is to pass a ruling on this issue, and it will not hold any party liable for the breach of agreement.

307.   Under Article 3.6, all the pre-existing debts and claims between SJHC and Oasis Investment and their subsidiaries are to be settled. This is unrelated to the equity transfer or the repurchase. Therefore, the outcome of the settlement shall not contribute to the adjustment of the 3rd Payment. See Article 2.2.1(4) of 4.28 Agreement.

308.   All parties have reached an agreement on most of the disputed settlement items, and the remaining disputed items that require ruling by the arbitral tribunal can be found in the list in E/5/15-19, which are: Items 1, 1a, 7, 8, 22, 23 and 28.

**1, 1a. Balance of reserves during transfer in November 2009**

309.   According to Paragraph 4a of the witness statement of Mr. Qi Chiyang, who was the Applicants' factual witness: "Both parties have no objection to the debit balance of RMB 41,224,613.21 stated in prepayments - prepaid reserves - item 1." According to Paragraph 11 of the witness statement of Madam Li Shuping, who was the Respondents' factual witness: "Based on the financial information submitted to SJHC, my calculations show that, as of November 2009, the balance of the category 1 current account is RMB 41,224,613.21, which is the balance of current account between SJHC and [Oasis] Kechuang as of November 2009." Therefore, the parties had no dispute on this value.

310. However, both parties had a dispute on whether the RMB 15 million paid by the Controlling Shareholder to Shengyuan on January 29, 2016 (item 1a) could offset the current account debit amount.

311. The evidence shows that Oasis Investment, Greencourt Kechuang and SJHC signed a copy of the "Current Account Prepayment Agreement" on January 29, 2016 [D3/1207]. On the same day, SJHC, Shanghai Shengyuan Construction Engineering Co., Ltd. and Greencourt Kechuang also signed a copy of the "Tripartite Agreement" [D3/1213]. These two agreements were signed for the "Agreement Letter" signed by SJHC and Shengyuan on January 10, 2015 (for the arrears of two project amounts of the "Lekang Park Phase 2", which added up to RMB 26,198,239). As SJHC did not have sufficient funds to pay the project amount, it requested for Greencourt Kechuang, which is a subsidiary of Oasis Investment, to pay the amount on its behalf. [Oasis] Kechuang paid RMB 15 million directly to Shengyuan as the first installment of the project amount on behalf of SJHC.

312. The Second Applicant and the Respondents agreed that, the amount of RMB 15 million paid by the Respondents to Shengyuan on January 29, 2016 should be considered as prepayment of the current account of RMB 15 million by the First Respondent on behalf of SJHC based on the agreement in the "Current Account Prepayment Agreement". However, the First Applicant did not agree with the aforementioned position.

313. The arbitral tribunal also noticed that the First Applicant was not involved in the negotiation and the signing of the two agreements. [Paragraph 12 of Xu Hongbiao's non-religious affidavit]

314. The arbitral tribunal believes that the meaning of Article 3.6 in the 4.28 Agreement is very clear, which is: all the pre-existing debts and claims between SJHC and Oasis Investment and their subsidiaries must be settled within one month of the 4.28 Agreement (May 28, 2010). Although [Oasis] Kechuang paid RMB 15 million directly to Shengyuan on behalf of SJHC, the said amount was paid only in 2016, which was far beyond the deadline stated in the 4.28 Agreement. Therefore, the arbitral tribunal believes that this amount of RMB 15 million does not fall under the scope of pre-existing debts and claims stated in Article 3.6 of the 4.28 Agreement. The issue of whether this amount of RMB 15 million can offset the current account debit of RMB 41,224,613.21 is not related

to the terms of the 4.28 Agreement. This issue is not within the jurisdiction of the arbitral tribunal, hence it shall not be ruled upon by the arbitral tribunal.

## 7, 8. Renumerations and expenses of Ke Zhengguang and Xu Hongbiao from January - November 2009

315.  The First Applicant and the Second Applicant received renumerations, expenses and social security contribution amounting to RMB 3,127,591.77 from Oasis Investment in 2009. This amount was confirmed by both parties (see Paragraph 9a of Qi Chiyang's witness statement; Paragraph 12.3.1 of Li Shuping's witness statement). The dispute was whether this sum should be borne by Oasis Investment or SJHC. The Respondents' position was that, the Non-controllilng Shareholders agreed in the "First Draft Checklist of the Non-controlling Shareholders" that SJHC should bear this amount, but in the subsequent reconciliation process and the correspondences between the parties, [the Non-controlling Shareholders] did not agree for SJHC to bear the amount. The Controlling Shareholder asserted that, based on the principles in respect of the share repurchase, as the Non-controlling Shareholders only rendered services to SJHC since the start of 2009, the amount should be borne solely by SJHC. The Applicants claimed that their renumerations, expenses and social security contributions received from Oasis Investment in 2009 were based on the employment relationship between Oasis Investment and Ke [Zhengguang] and Xu [Hongbiao], and that relationship was not related to the pre-existing debts and claims between SJHC and Oasis Investment and their subsidiaries, hence these amounts were not under the scope of settlement of pre-existing debts and claims as stated in Article 3.6 of the 4.28 Agreement, and they were not related to the 4.28 Agreement.

316.  In Paragraph 12.2 of Li Shuping's witness statement, she introduced the background in which expenses were adjusted or apportioned due to staff remuneration and social security contribution. She explained: This adjustment or apportionment was based mainly on these factors: (a) some employees of the Chinese subsidiaries of Oasis Investment had a labor relationship with a certain subsidiary, and they received remuneration and social security contribution from that subsidiary while primarily serving another subsidiary. Therefore, when SJHC executed a staff takeover in November 2009, the Controlling Shareholder should have arranged for Oasis Investment's subsidiaries (excluding SJHC) to return to SJHC the remuneration and social security contribution paid to

employees who did not serve SJHC in 2009; (b) as the Non-controlling Shareholders refused to pay the remuneration for all employees of SJHC in the second half of November 2009 after signing the restructuring agreement, and the subsidiaries of Oasis Investment then had to pay them in cash first, therefore, the corresponding expenses for employees who served SJHC should be returned to the subsidiaries of Oasis Investment by SJHC.

317.   The arbitral tribunal believes that, from November 2009 onward, Ke [Zhengguang] and Xu [Hongbiao] only served SJHC (and not Oasis Investment or subsidiaries other than SJHC), and based on this logic, even though their remunerations and expenses were still paid by Oasis Investment, this amount should also be borne by SJHC. Moreover, the First Applicant and the Second Applicant had agreed in the "First Draft Checklist of the Non-controlling Shareholders" that SJHC should bear this amount, and they only disagreed with this later.

318.   In summary, the arbitral tribunal endorses the Respondents' claim and ordered SJHC to bear and return RMB 3,127,591.77 to the First Respondent.

## 22. Outstanding amount of Lekang Greening Engineering (RMB 1,136,313.42)

319.   According to the statement of Li Shuping, who was the Respondents' factual witness, SJHC should pay RMB 1,136,313.42 as the greening project amount for Xiaotang Lekang Park Phase 2 to Oasis Investment' subsidiary Yijing Company (this amount was the project amount of RMB 1,136,313.42 paid by Yijing for the greening of Xiaotang Lekang Park Phase 2, and this amount was not claimed from SJHC) [Paragraph 28.4 of Li Shuping's witness statement [B/72]]. Li Shuping also explained that this sum was only added to the "Checklist of Current Account as of December 31, 2015" file prepared by her in January 2016 after she knew about the communication between the Controlling Shareholder and the Non-controlling Shareholders about the project amount of Shengyuan Company. Qi Chiyang, who was the Applicants' factual witness, said that there was no record of this sum of project amount during delivery, and the engineering department said that Yijing Company and SJHC had settled the project amount for Lekang Park Phase 2. The construction price was RMB 3.5 million in the construction contract that was concluded at that time, and the amount actually paid for the project was RMB 4.22 million. An excess of RMB 1.22 million was already paid, and this was 35% more than the construction price under the

93

contract [see Paragraph 9d of Qi Chiyang's witness statement [B/37]]. In Paragraph 15 of her supplementary witness statement, Li Shuping replied: "After the repurchase reference date, a project cost of RMB 1,136,313.42 for SJHC's Lekang Park Phase 2 was eventually formulated in Yijing Company's books. At that time, I thought that all the parties had carried out the split based on their assets during the repurchase reference date, hence this cost became Yijing Company's deficit and I added it into the account checklist." [B/125]

320. The arbitral tribunal believes that, there is insufficient evidence to show that Yijing Company took over the payment of the project amount in response to SJHC's request, and the Respondents' witness also said that this amount was only formed after the repurchase reference date. Therefore, the arbitral tribunal has no evidence-based reason to ask SJHC to pay this sum to Yijing Company. In summary, the arbitral tribunal does not endorse the Respondents' request.

## 23. Apportioned investment cost for the 10 kV switch station (RMB 47(*sic*) million)

321. In Paragraph 28.3 of her witness statement, Li Shuping said that she only added this sum (SJHC should share the investment cost of RMB 4.7 million for the switch station of Shanghai Four Seasons Ecological Technology Co., Ltd.) to the "Checklist of Current Account as of December 31, 2015" prepared by her in January 2016 after she knew about the communication between the Controlling Shareholder and the Non-controlling Shareholders about the project amount of Shengyuan Company [B/72]. Qi Chiyang said that this apportioned amount came from an agreement on apportionment of investment cost of the relevant distribution development station concluded with Four Seasons Ecological Technology Co., Ltd. when SJHC built the villas and developed neighboring projects in 2012. The payment responsibilities or disputes on the payments were controlled by the 2012 apportionment agreement, and they were neither related to the 4.28 Agreement nor were they under the scope of settlement of the debts and claims stated in Article 3.6 of the 4.28 Agreement because Article 3.6 of the 4.28 Agreement says that the debts and claims between SJHC and Oasis Investment and their subsidiaries were to be settled on the signing date of the Agreement (April 28, 2010) [B/37]. In Paragraph 16 of her supplementary witness statement, Li Shuping said that, after reviewing the 4.28 Agreement and the 11.9 Agreement comprehensively, [she considered that] no restriction was imposed on the time whereby the debts and claims were to be settled. Based on

common sense, the debts and claims that further arised during the equity repurchase process should also be settled accordingly [B/125].

322.  The arbitral tribunal believes that, Article 3.6 has a deadline for the settlement of the debts and claims, that is, within one month after the signing of the 4.28 Agreement (May 28, 2010). Therefore, this shared amount of RMB 4.7 million is not covered by Article 3.6 of the 4.28 Agreement. This matter is not to be decided upon by the arbitral tribunal.

### 28.  For the interest arising from Oasis Investment and its subsidiaries' retaining of the funds of SJHC, the Controlling Shareholder has yet paid the interest [back to SJHC/Non-controlling Shareholders]

323.  The Applicants' position was that interest clearing should form part of Article 3.6.  Prior to the split [by way of share restructuring], the Group had centralized use of funds to bear the costs of the corresponding units and projects financial costs as needed, so as to maximize the Group's overall profits. Such a model is understandable. However, following SJHC's split on December 31, 2008 as the reference date, Oasis Investment's controlling party continued to adopt this model on SJHC and freely transferred funds [out of SJHC] without consideration.  By adopting a management accounting model of apportioning financial costs, this went against the spirit of the relevant agreement: See Paragraph 7e of Qi Chiyang's witness statement. Li Shuping explained about the group funds allocation in Paragraph 10 of his witness statement.

324.  The arbitral tribunal believes that, regardless of whether SJHC was split on December 31, 2008 as the reference date, the 4.28 Agreement was only signed in about one and a half years later, hence there existed a "custodian" relationship between the Group and SJHC during this period of time. Therefore, it is practically very challenging to identify clearly which party was utilizing or occupying which party's funds. In summary, the arbitral tribunal does not support the Applicants' request.

## VIII.  Ruling and Order of the Arbitral Tribunal

Based on the aforementioned reasons, the arbitral tribunal ordered as follows:

1.  (Within 4 weeks from the day this ruling is passed) The Respondents are to to cause Greencourt Real Estate to sign a "Shanghai Real Estate Sale and Purchase Contract" for the Jiuting Stores with the Applicants or a third party appointed by

the Applicants, and transfer the ownership of the Jiuting Stores to the Non-controlling Shareholders or a third party appointed by them. (Article 3.1 of 4.28 Agreement)

2.   (Within 4 weeks from the day this ruling is passed) The Respondents are to cause the First Respondent to appoint a third party to sign the "Shanghai Commercial Housing Presale Contract" for A2-type villas with SJHC, and complete the relevant presale registration procedures. (Article 3.2 of 4.28 Agreement)

3.   All parties are ordered to settle and pay the debts of SJHC and the First Respondent within 4 weeks from the day the ruling is passed based on Paragraphs 304 to 324 of this ruling. (Article 3.6 of 4.28 Agreement)

4.   The Applicants are ordered to submit an audit report to the relevant approval authorities within 2 months from the day the ruling is passed.

5.   (Within 2 months from the day this ruling is passed) The First Respondent is ordered to arrange for and cause Shibang Company to acquire the 80% equity interest of SJHC held by the First Respondent's subsidiary Greencourt Properties. (Article 2.3.1 of 4.28 Agreement)

6.   (Within 2 weeks from the day this ruling is passed) The First Respondent and Non-controlling Shareholders are to sign, and the First Respondent is to cause their subsidiary, Greencourt Properties, to jointly sign, the Equity Purchase Option Agreement and Entrustment Agreement concerning Shibang Company. (Articles 2.3.1 and 2.3.2 of 4.28 Agreement)

7.   (Within 2 months from the day this ruling is passed) The First Respondent is ordered to cause Oasis Kechuang to transfer its 20% equity in SJHC to Luhao Trading.

8.   (Within 4 weeks after the execution of the orders numbered 1-6 above) The Respondents are to pay the final amount after making the adjustments set out in Article 2.2.1(4) of the 4.28 Agreement and in Paragraphs 232(4)(a)(b)(c) and 233 of this ruling.

9.   The second respondent, third respondent and fourth respondent are jointly and severally ordered to pay RMB10,346,211 to the applicants as compensation for their losses (using August 8, 2017 as reference date for calculation of losses).

## IX.    Arbitration Fee

325.    With regard to the arbitration fee, all parties agreed during the closing that it would not need to be decided by the arbitral tribunal at this stage, hence the arbitral tribunal will pass the ruling on arbitration fee after all the parties have submitted the relevant supporting documents.

AP_Legal – 104494610.1

Date: February 28, 2018

Arbitration venue: Hong Kong

| | |
|---|---|
| [signature] | [signature] |
| Teresa Cheng Yeuk-Wah, | Horace Wong Yuk-Lun, |
| Senior Counsel | Senior Counsel |
| Arbitrator | Arbitrator |

[signature]

Yang Ing Loong

Chief Arbitrator

on behalf of arbitral tribunal

[stamp]

Hong Kong International
Arbitration Centre
HONG KONG
INTERNATIONAL
ARBITRATION CENTRE