ESTATE OF KE ZHENGGUANG,

                                    Petitioner,

—*against*—

YU NAIFEN STEPHANY
(a/k/a/ STEPHANY YU,
a/k/a/ STEPHANY NAIFEN YU
a/k/a/ STEPHANY N. DOMBROWSKI),

                                    Respondent.

8:18-cv-03546-PWG

ESTATE OF KE ZHENGGUANG,

                                    Petitioner,

—*against*—

YU NAIFEN STEPHANY
(a/k/a/ STEPHANY YU,
a/k/a/ STEPHANY NAIFEN YU
a/k/a/ STEPHANY N. DOMBROWSKI),

                                    Respondent.

8:20-cv-2260-PWG

## DECLARATION OF STEPHANY YU

1.      I am the respondent in the above consolidated cases, and submit this declaration in support of my motion for the Court to adopt my proposed form of judgment, instead of the proposal from the Petitioner (the "Estate").

2.      Unless indicated otherwise, the statements in this declaration are based on my personal knowledge, and the exhibits are true copies of the originals. The exhibits that we have had translated into English contain the English translation first, followed by a certification from the translator, and then followed by the original Chinese language document.

**Introduction**

3.      In these consolidated cases, the Estate seeks to enforce various rulings from an arbitration proceeding in Hong Kong concerning the breakup of a real estate partnership in China. The tribunal directed the parties to carry out certain corporate and real estate transactions that were first set forth in a contract from 2010 (the "2010 Agreement") by which my partners and I set out how we were to separate our interests. While I do not believe the award should be enforced here in the United States (and, in fact, have been pursuing legal proceedings in China to advance the transactions required by the award), I recognize and respect that the Court has ruled that the tribunal's decisions are enforceable here.

4.      As I understand it, the question now before the Court concerns the proper form of the judgment, so that we can complete this case and appeal. My lawyers have prepared one form of judgment (with my consultation and approval) (Ex. 1), and they have provided me with the competing proposal from the Estate (Ex. 2). The most significant difference concerns interest on a payment that is referred to as "Order 8" in the arbitral award. In summary, once various corporate and real estate transactions are completed, the respondents in the arbitration (including me) must make a final payment to the two claimants (one of whom is the petitioner here, the Estate) in Hong Kong Dollars of the equivalent of RMB 150 million, subject to certain offsets.

5.      The amount that would be due to the Estate under Order 8 is approximately $10 million U.S. Dollars, and the Estate is seeking to impose on me the obligation to pay interest at 6% on that amount from the day the arbitration award was issued in February 2018 forward (approximately $1,700 per day). This is the approximately $1.8 million the Estate is seeking in ¶ 4(c) of its proposed judgment.

6.      The Estate's request is inconsistent with the tribunal's rulings, which awarded only 36 months of pre-award interest, and no post-award interest. In addition, it is inconceivable

that the tribunal would have decided to impose indefinite interest on the respondents because the tribunal was not asked to decide, and did not decide, who has been responsible for the delay in fulfilling the conditions to the Order 8 payment over the past two-and-one-half years. Nor would the tribunal have a basis to assume that any future delay would be attributable to the respondents. As I will detail below, the delay has been caused by the Estate, which has been stalling and playing games for years, in an apparent effort to gain a tactical advantage in how the corporate transactions are undertaken, in order to shift certain tax burdens to the respondents.

7.      In contrast to the Estate's stalling, I am eager to carry out the tribunal's rulings, and finally put all dealings with my former business partners in the past. These are not just words. I have gone to great lengths to carry out the 2010 Agreement and the arbitral award. Even before the 2010 Agreement was signed, I transferred to the claimants (through my companies) control over a highly valuable subsidiary, referred to as Siji Huacheng or "SJHC," and also gave them control over certain commercial properties referred to as the Jiuting Shops. The claimants have been able to profit from these transfers for years, whereas our side (my companies and my sisters) have not received what we were supposed to receive in return under the 2010 Agreement. We have not received, for example, two villas that we were supposed to receive in exchange for the Jiuting Shops. And the claimants were supposed to complete the formal ownership transfer of SJHC, so that my sisters and I would not retain the responsibility or liability for SJHC, a company that for the past decade has been completely run by the claimants.

8.      One reason these steps have not been completed is that the Estate and its co-claimant have been uncooperative and have been fighting with one another as to how to actually move forward with the transactions that are encompassed in the tribunal's decisions. Another is that the Estate has deliberately obstructed things to gain leverage to re-structure the

transactions in a way that would shift tax obligations to our side. I have even filed litigation in China to move things forward, but the Estate has taken unreasonable positions in that litigation to create more delay.

9. While I am sure the Estate will present a different, and untrue, version of the facts, the broader point here is that it would make no sense for the tribunal to have concluded, beforehand, that interest payments for the delay fall exclusively to me, no matter what. That would allow the Estate to continue delaying things indefinitely, earning 6% annual interest all along the way, regardless of who causes the delay, and regardless of whether any delay is attributable to the various necessary regulatory approvals in China and Hong Kong over which I have no control. I do not believe this unreasonable outcome is what the tribunal ruled, and that is why I respectfully request that the Court deny the Estate's request for post-award interest.

10. Understanding the details of the award, and the events that followed, is critical to understanding these issues. Some of that history is set forth in two declarations I have already submitted in this case. I stand by those declarations in full, and attach them both here for the Court's convenience. (*See* Ex. 3; Ex. 4 (both without exhibits)). Other parts of the history were set forth in two declarations from Gu Yong, an executive with my companies in China, and I attach these here, as well. (*See* Ex. 5 (without exhibits); Ex. 6.)

11. I will summarize the relevant events below, so that the Court can have factual background in one place. This will include events set forth in my prior declarations, as well as new information pertaining to subsequent events.

**The Parties**

12. I am a Chinese native and, until moving with my family to Maryland in 2016, had lived most of my life in China. I maintain a residence in China, and frequently travel there for business.

13.     In the early 2000s, I was among a group of business partners that formed Oasis Investment Group Limited ("Oasis") to buy and develop real estate in China. The other partners were Ke Zhengguang, Xu Hongbiao and my two sisters, Naiwen and Naijun.

**The 2009 and 2010 Agreements**

14.     In November 2009, the Oasis partners and certain of their affiliated entities entered into a preliminary written agreement to separate their interests in Oasis, entitled "Equity Reorganization Preliminary Agreement" (the "2009" Agreement). Broadly speaking, the 2009 Agreement called for Oasis to repurchase the shares held by Messrs. Ke and Xu for RMB 250 million, and to also transfer to them one of Oasis's subsidiaries, Shanghai Greencourt Four-Season-Flower-City Property Development Co., Ltd., or Siji Huacheng ("SJHC"). SJHC owns a property development in China and today is worth at least $100 million.

15.     In April 2010, the Oasis partners and certain of their affiliated entities (including Oasis itself) entered a follow-on written agreement entitled "Agreement on the Implementation of 'The Preliminary Share Restructuring Agreement'" (the "2010 Agreement"), with a similar but more intricate plan for the business separation. (Ex. 7.) The 2010 Agreement referred to my sisters and me as the "Controlling Shareholders" and to Messrs. Ke and Xu as the "Non-controlling Shareholders."

16.     The 2010 Agreement included multiple, detailed provisions concerning how the parties' interests were to be divided. In very simplified terms, there are three primary components: (a) the subsidiary transfer, (b) the property swap, and (c) the cash payments.

17.     First, for the subsidiary transfer, Messrs. Xu and Ke were to receive 100% ownership in SJHC through a multi-step process. The mechanics were as follows. An Oasis subsidiary, Greencourt Properties Ltd. ("Greencourt Properties"), a Hong Kong company, would transfer its 80% ownership stake in SJHC to a newly formed company, Shibang Company Ltd.

("Shibang"). (*Id.* at 5 (§ 2.3.1).) Next, Oasis would sign an Equity Purchase Option Agreement agreeing to transfer Shibang to the Non-controlling Shareholders after the expiration of a three-year "entrustment period." (*Id.* (§2.3.2).) Once the Equity Purchase Option Agreement was signed, Greencourt Properties was to sign an Entrustment Agreement granting the Non-controlling Shareholders the right to manage and control Shibang for the entrustment period. (*Id.* (§ 2.3.3).) At the same time, another Oasis subsidiary, Shanghai Oasis Kechuang Ecological Technology Co., Ltd. ("Oasis Kechuang"), a Chinese company would transfer its 20% ownership stake in SJHC to a domestic company in China appointed by the Non-controlling Shareholders. (*Id.*). All debts and claims as between SJHC and Oasis were to be "settled" within one month. (*Id*. at 8 (§ 3.6).)

    18.    Figures 1 and 2 below depict, in simplified terms, the corporate structure before the SJHC transaction (Figure 1), and then what was supposed to happen immediately after, during the entrustment period (Figure 2).





Figure 2: Share Transaction: Transfer 80% of SJHC to Shibang and Transfer 20% of SJHC to Non-controlling Shareholders' Designee

19.     The purpose of this indirect transfer mechanism was to make the overall transaction more tax efficient. Under Chinese law, an equity transfer between affiliates can be treated as a tax-free "reorganization" if certain conditions are met. One condition, for example, is that the seller of the equity (here, Greencourt Properties) must directly own 100% equity in the buyer of the equity (here, Shibang) and must agree not to sell the equity of the buyer within three years. That is why the parties agreed on a three year "entrustment period" during which SJHC would still be majority owned by Shibang (an indirect subsidiary of Oasis), but would be controlled by Messrs. Ke and Xu. I would not have agreed to include SJHC as part of the buyout consideration to Messrs. Ke and Xu if doing so would simply force me to pay additional taxes. That would make the deal too expensive. It would have been easier to simply pay them cash, or to offer other consideration instead. It was only the expectation of transferring SJHC as a tax-free transaction that made the economics work, and this was the basis for structuring the transfer in two steps, meeting the government's requirements for tax-free treatment.

20.     Second, for the property exchange, a different subsidiary of Oasis, Shanghai

Greencourt Real Estate Development Limited ("Greencourt Real Estate"), a Chinese company,

was to sign an agreement transferring approximately 8,000 square meters of commercial space

(the "Jiuting Shops") in Shanghai to the Non-controlling Shareholders. (*Id.* at 7 (§ 3.1).) In

exchange, a company controlled by the Non-controlling Shareholders was supposed to sign an

agreement transferring to Oasis and the Controlling Shareholders two "Villas," each of

approximately 1,200 square meters, also located in Shanghai, China and owned by SJHC. (*Id.* at

7 (§ 3.2).) Figure 3 below depicts the property exchange.



21.     Third, for the cash buyback component, Oasis was to buy back the interests of

Messrs. Xu and Ke by paying cash to the entities through which they held their shares, in three

installments, totaling a base amount of RMB 250 million (subject to various regulatory, tax and

other adjustments). (*Id.* at 2-7 (Arts. 1-2).) The third and final installment of RMB 150 million

(as adjusted) was to be paid only when the other steps in the separation process (summarized

above) were complete. (*Id*. at 4-7 (§ 2.2.1(4)).) This was to incentivize Messrs. Xu and Ke, who already controlled SJHC, to complete the transfer and relieve Oasis, my sisters and me of the liability risks associated with holding title to a company over which we had no control.

**Arbitration in Hong Kong**

22.     In February 2013, the Non-controlling Shareholders filed a Notice of Arbitration against Oasis and against the Controlling Shareholders relating to various disputes that arose in attempting to implement the 2010 Agreement. Mr. Ke died during the arbitration and the Estate took over representing his interests in the case.

23.     In February 2018, the tribunal issued its final award (the "Final Award"), which can be briefly summarized as follows. (Ex. 8.)

24.     First, Orders 1-3, concern the property exchange and debt settlement, and direct various parties to carry out those provisions, as set forth in the 2010 Agreement. (*Id*. at 95-96.)

25.     Second, Orders 4-7 concern the transfer of SJHC. Order 4 directs the Non-controlling shareholders to "submit an audit report to the relevant approval authorities" for the transaction. (*Id*. at 96.) This was necessary to establish the value of the transaction, and to fix a price for tax purposes, all of which is required to obtain the necessary regulatory approval. Orders 5-7 specify what entities must engage in what transactions to complete the formal transfer. (*Id*.)

26.     Third, Order 8 requires Oasis to make the final payment, subject to adjustments, when the conditions have been completed.

27.     Finally, Order 9 sets forth certain damages for rent in China relating to the property exchange. Oasis and the Controlling Shareholders did not believe the Villas offered by the Non-controlling shareholders met the requirements of the 2010 Agreement because the square footage was too small. (Award at 84 (¶ 288).) Thus, instead of formally transferring the

commercial space, the Oasis subsidiary that owned the commercial space allowed the Non-controlling shareholders to use most of the commercial space (approximately 6,000 of the 8,000 square meters) via an "authorization letter." (*Id*. at 85-86 (¶¶ 294-95).) The tribunal concluded that the Controlling Shareholders should have fully exchanged the commercial space for the Villas and thus were liable to the Non-controlling Shareholders for the rental value of the 2,000 square-meter portion that the Controlling Shareholders retained. (*Id*. 86-89 (¶¶ 296-303).) The tribunal calculated the damages to be RMB 10,346,211 based upon an analysis of rental rates in similar commercial buildings in China. (*Id*.) To date, we have not received use or ownership of the Villas.

**Efforts to Comply With the Specific Performance Aspects of the Award**

28.     Oasis and the Controlling Shareholders have endeavored to comply with the Award, but have been impeded at nearly every step along the way by the Estate and Mr. Xu fighting with one another or otherwise not cooperating, and by the Estate's outright obstruction. I do not care how the Estate and Mr. Xu sort out their disputes, but simply want to put this matter in the past, and complete what the parties agreed to do more than a decade ago.

29.     One of the biggest challenges with carrying out the award has been the SJHC transaction, which has been beset with issues arising from disputes between Mr. Ke's heirs and Mr. Xu over control of the company. While the formal transfer of the shares of SJHC to the Non-controlling Shareholders has not been completed, Oasis ceded control of SJHC to the them even before the 2010 Agreement. Oasis has had no control over, nor gained any economic benefit from, SJHC since then.

30.     For reasons that are unclear, however, Mr. Ke's heirs have apparently seized from the other claimant, Xu Hongbiao, control of the SJHC board, and have gained control of the corporate seal necessary to execute legal documents (referred to as a "chop"). In the Chinese

legal and business worlds, very little can be done without the corporate "chop," and control of the "chop" is virtually synonymous with day-to-day control of a company. Mr. Xu has complained vociferously about having been pushed aside, and, as a result, to this day will not cooperate with Mr. Ke's representatives unless they give him joint control over SJHC.

31.     The disputes between the Estate and Mr. Xu have also impeded the regulatory aspect of the SJHC transaction. Regulators must approve the transaction, but Mr. Xu and Mr. Ke's representatives cannot agree on who should lead the process, and have refused to provide the Controlling Shareholders the necessary materials (including the audit report referred to in Order 4) to actually complete this step of the process. The Controlling Shareholders have signed the necessary shareholder agreement for the transactions, but cannot take the next steps forward without cooperation from the claimants, including by the claimants providing the required documentation.

32.     The claimants' infighting has impeded the property exchange, too.  The claimants have repeatedly provided conflicting instructions as to what company is to be the buyer. In addition, the claimants have not agreed as to exactly how the property would be divided. There are 14 Jiuting Shops, and the claimants have not agreed whether they will own the entire lot together in equal proportion (or some other proportion), or whether each will take ownership of a certain number of the shops. We cannot proceed without the claimants providing a unified path forward. The roadblocks to the property exchange have been particularly prejudicial and unfair to Oasis and to me, since the claimants have had near complete control over the Jiuting Shops for years (including the economic benefits), while Oasis has never possessed or had any benefit from the Villas that were supposed to be provided in exchange.

33.     Even the seemingly straightforward damages award in Order 9 has been the

subject of needless games. I have always been willing to pay the RMB 10,346,211 awarded in

Order 9, and repeatedly tried to do so. While Mr. Xu has accepted his portion of the payment, the

Estate has made it impossible to complete the payment to it without creating the risk of severe,

personal penalties to me. That is because the Estate has refused to provide payment instructions

for a bank in Mainland China. As the Estate well knows, under China's strict currency control

laws, it is illegal to pay obligations arising from events in China (such as the damages here,

associated with Chinese real estate) outside China in foreign currency. (*See* Exs. 9, 10 (prior

expert declarations without exhibits).) The details of my efforts to lawfully make this payment in

Mainland China, and the Estate's failure to cooperate are set out in more detail in my prior

declarations.

34.     In brief summary, my counsel sent the Estate's counsel multiple letters throughout

2018 trying to obtain payment instructions in Mainland China, but the Estate refused to

cooperate. On November 1, 2018, at my direction, Greencourt Real Estate attempted to wire the

funds to a Hong Kong bank account that the Estate's counsel had provided. (Ex. 11.) The wire

was not allowed to go through, however, likely because, among other reasons, it cannot be

approved without proof that the proper taxes had been paid and authorization from the Chinese

currency regulator (referred to as "SAFE"). Moreover, the payment of such a large amount

would be easily tracked by SAFE and, if found to be improper, could trigger an investigation and

regulatory action by SAFE.

35.     On December 31, 2018, Greencourt Real Estate sent a check for the full amount

sought in this case, RMB 5,173,105.50, to one of the lawyers representing the Estate in the

arbitration, Eva Yao, who works in the Shanghai office of the DLA Piper law firm. (Ex. 12.) As

with the payment to Mr. Xu, the payment was made from Greencourt Real Estate, the Oasis subsidiary that, according to the final award, was supposed to transfer to the claimants the commercial real estate that was the subject of the damages award. The check was never deposited.

**Shanghai Legal Proceedings**

36.     On April 3, 2019, at my direction, Greencourt Properties filed a Civil Complaint in Shanghai, China against SJHC (which the Estate has controlled at relevant times) to force it to cooperate in the first step of the share transfer, namely the transfer of 80% of SJHC's equity to Shibang. (Ex. 13, 14.) The transfer was properly authorized by the SJHC shareholders (Oasis and Greencourt Properties), but SJHC, under the day-to-day control of the Estate, refused to cooperate. Mr. Xu authorized Shibang to join the lawsuit because, at least as to this aspect of the dispute, he agreed with me.

37.     The Estate's response (via SJHC) to the case reflects more of its obstruction. SJHC argued that any transfer to Shibang was improper because, according to SJHC, under the 2010 Agreement, Shibang was supposed to be a direct subsidiary of Oasis, as opposed to being an indirect subsidiary via Greencourt Properties (a direct subsidiary of Oasis).

38.     The Estate has argued in the litigation that it prefers this structure because it takes the transaction outside the special tax rules discussed above for tax-free reorganizations. Under the rules, an equity transaction between two non-Chinese entities can be subject to special tax treatment in China for corporate income tax purpose only if the seller directly owns 100% equity in the buyer (among other requirements) and agrees not to transfer the buyer's equity within three years. Greencourt Properties transferring SJHC's equity to its own subsidiary, Shibang, would qualify, but Greencourt Properties transferring the equity to its parent, Oasis, would not. Without the special tax treatment, the initial transfer of SJHC from Greencourt Properties would

be a taxable transaction, with Oasis having to immediately pay taxes on the gain in value of SJHC since it was first acquired in 2007. This is a benefit to the Estate because Oasis paying taxes on the gain up front would establish a new, higher tax basis for the value of SJHC. After the three-year entrustment period, when the Estate's nominee company (Cheergain) obtains formal ownership of SJHC, the higher tax basis would mean a lower taxable gain for Cheergain. In short, the Estate wants to make Oasis pay taxes up front, so that its company can pay less in taxes later.

39.     The Estate's position on this point is ridiculous.

40.     It is inconsistent with the Final Award in the arbitration, which directs Oasis to cause its "subsidiary, **Greencourt Properties**, to jointly sign, the Equity Purchase Option Agreement and Entrustment Agreement concerning Shibang Company." (Final Award, at 96 (Order 6) (emphasis added).) Greencourt was to sign these agreements concerning Shibang because it was (and was always supposed be) the parent company of Shibang. Through five years of the arbitration neither Mr. Ke nor his representatives suggested once that Shibang was supposed to be re-formed under a different parent company.

41.     In fact, Shibang was established as a subsidiary of Greencourt Properties (not Oasis) in 2009 when both Messrs. Ke and Xu were directors. (*Id.* Ex. 15; Ex. 16.) They agreed to its formation for exactly the purpose of holding the SJHC equity. (*Id*. ¶ 40.)

42.     The 2010 Agreement specifically states that Greencourt Properties (not Oasis) is the company that is to "entrust[]" control of Shibang to the companies of Messrs. Ke and Xu: "Cheergain International Group Limited and Focus Town Limited are entrusted **by Greencourt Properties** to manage Shibang Company." (2010 Agreement § 2.3.2 (emphasis added).) The Estate is obviously making up this new position.

43.     In May and June 2020, my lawyers presented these and other arguments to the civil court in Shanghai. (Ex. 17, 18.)

**Arbitral Tribunal Issues Its Costs and Interest Ruling, Including a Correction**

44.     While the proceedings were ongoing in Shanghai, the arbitral tribunal in Hong Kong issued two rulings (an initial decision and a clarification) that the Estate is seeking to enforce here.

45.     The first is a ruling dated March 16, 2020, in which the arbitral tribunal awarded the claimants certain of the costs of the arbitration, and interest. (the "March 2020 Costs and Interest Ruling"). (Ex. 19.)

46.     As is relevant here, the Estate argued that the respondents should be forced to pay pre-award interest on Order 8 from December 2012 through the date of the award in February 2018 (a period of over five years) and should be forced to pay pre-award interest on Order 9 (the damages award) for a period of approximately six months. (*Id*. at 15 (¶ 39). The pre-award interest rate the Estate proposed was the Hong Kong "prime" rate (currently 5%), plus 1%, compounding annually. (*Id.* 15-16 (¶¶ 40-41).) The Estate argued that post-award interest should accrue at the Hong Kong statutory rate of 8%. (*Id*. at 16 (¶¶ 42-43).) The respondents argued that, if any interest is to be awarded for Order 8, the interest rate should be HKBOR plus 2%, without compounding, and the interest period should be 36 months only. (*Id*. at 35 (¶ 72).) Our proposal of 36 months was based on taking the length of arbitration proceedings, and subtracting the period when, through no fault of ours, the arbitration was delayed by proceedings associated with the Estate substituting for Mr. Ke. (*Id*. at 26 (¶ 61(2)).)

47.     The tribunal largely adopted our position, and stated: "The arbitration tribunal holds the opinion that the method of calculation of the Respondents is reasonable and adopted." (*Id*. at 41 (¶ 102).) The relevant Order, paragraph 108, stated as follows:

15

> With regards to Orders No.8 and No.9 in the final award of the arbitral tribunal (excluding the arbitration fees and interest), the Respondents shall pay the interest. The method to calculate the interest is as follows: Simple interest with the principal amount of RMB 145,974,006 multiplied by the interest rate which is the most preferential loan interest rate of HSBC in Hong Kong plus 1%.

(*Id*. at 42 (¶ 108).)

48.     We asked the tribunal to clarify and correct the award, because (among other things) the initial decision did not properly distinguish the interest and payment obligations between Orders 8 and 9.

49.     On June 26, 2020, the tribunal issued its ruling on our application (Ex. 20 (the "June 2020 Costs and Interest Ruling" and, with the March 2020 Ruling, the "Costs and Interest Rulings").) Here, too, the tribunal largely sided with us. As is relevant here, the tribunal modified paragraph 108 to state as follows:

> According to the 8th and 9th orders of the arbitral tribunal in the Final Award (Except Interest and Arbitration fees), the respondents must pay interest. The calculation method of the interest is: (i) RMB 135,627,795 of the principal × simple interest (HSBC prime rate + 1%) × 36 months of interest period (applicable to the 8th order of the Final Award); + (ii) RMB 10,346,211 of the principal × simple interest (HSBC prime rate + 1%) × 204 days of interest period (from 8 August 2017 to 28 February 2018) (applicable to the order of the Final Award).

(*Id*. at 12 (¶ 44).)

50.     To me, this is clear that the interest period for Order 8 is 36 months. The tribunal did not indicate that the respondents were to accrue interest indefinitely with respect to a payment that is not yet due and that is conditional on various transactions that require the parties' cooperation to complete. Nothing occurred during the arbitration to suggest that the tribunal was blaming all the delays, past and future, relating to carrying out the award on our side. After all,

the tribunal agreed with the respondents that the interest period should only be 36 months, and not the five years the claimants sought.

**Further Proceedings in Shanghai Civil Court**

51.     On June 30, 2020, just a few days after the June 2020 Costs and Interest Ruling from the arbitral tribunal, the civil court in Shanghai issued its judgment. (Ex. 21.) The court found that the SJHC transfer would have negative tax implications for the claimants, and so the court directed the parties to negotiate with one another to come up with an allocation of the tax burdens before the SJHC transfer occurs: "[T]he court holds that the controlling shareholder and the participating shareholders should negotiate on the tax burden under the circumstance that special tax treatment may be applied to the equity transfer involved in the case, in order to reach a new agreement, and the plaintiff may not separately request the equity transfer before a new agreement is formed." (*Id*. at 9.)

52.     Additionally, the court found that the transfer of SJHC's equity could not be accomplished without unanimous consent of the board. An instruction from all the shareholders was not enough. (*Id*. at 10.)

53.     We disagree with this ruling and have appealed. (Ex. 22, 23 (appeal briefs).) Among the many errors is that the court did not take into account that Messrs. Ke and Xu agreed from the start to structure the transaction to take advantage of special tax treatment that they are now disputing. (*Id*.) A hearing on the appeal took place on October 27, 2020, and we expect to prevail.

**The Shanghai Proceedings and the Estate's Demand for Post-Award Interest**

54.     The Shanghai proceedings are important to the question before this Court about Order 8 interest because it would make no sense for the respondents to have to pay interest for delay caused by the Estate, including, for example, the Estate's ridiculous legal positions in the

Shanghai case. This remains true even assuming the first court's judgment is upheld. According to that judgment, the parties would be required to "negotiate on the tax burden" and how to share it among the parties. These negotiations will be greatly impacted by whether or not the respondents are responsible, as the Estate argues, for interest payment all along (which is approximately $1,700 per day). If so, then the Estate will have even more incentive to stall and delay until it gets what it wants. In fact, the Estate would be *rewarded* for causing delay. In addition, if the appeals court adopts the lower court's view that unanimous board consent is required to advance the transaction, that would make matters worse. It is highly doubtful that the SJHC board, which includes Mr. Xu and representatives of the Estate, will agree to proceed as outlined in the 2010 Agreement and Final Award. This means that, if the decision stands and if this Court agrees to award post-award interest on Order 8, I might accrue interest indefinitely, while the Estate holds out for a more advantageous transaction.

55.     The arbitral tribunal surely did not intend for this result. In fact, the arbitral tribunal did not have before it the details about the Shanghai proceedings, or even the detailed history presented in this case about the Estate's other improper games. It does not make sense to me how the Estate can argue that I should be indefinitely responsible for substantial interest payments associated with Order 8, regardless of whether I have any responsibility for the delay in completing the preconditions for the Order 8 payment to come due.

56.     I would urge the Court to consider this important factual context in deciding on the form of judgment in this case.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 16, 2020

Stephany Yu

# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

---

ESTATE OF KE ZHENGGUANG,

                        Petitioner,

—*against*—

YU NAIFEN STEPHANY
(a/k/a/ STEPHANY YU,
a/k/a/ STEPHANY NAIFEN YU
a/k/a/ STEPHANY N. DOMBROWSKI),

                        Respondent.

8:18-cv-03546-PWG

---

ESTATE OF KE ZHENGGUANG,

                        Petitioner,

—*against*—

YU NAIFEN STEPHANY
(a/k/a/ STEPHANY YU,
a/k/a/ STEPHANY NAIFEN YU
a/k/a/ STEPHANY N. DOMBROWSKI),

                        Respondent.

8:20-cv-2260-PWG

---

## [PROPOSED] CONSOLIDATED FINAL JUDGMENT

WHEREAS Ke Zhengguang and Respondent Yu Naifen Stephany (a/k/a/ Stephany Yu, a/k/a/ Stephany Naifen Yu a/k/a/ Stephany N. Dombrowski) ("Stephany Yu") are among the parties to that certain "Agreement on the Implementation of 'The Preliminary Share Restructuring Agreement,'" which called for disputes to be resolved via arbitration in Hong Kong (18-cv-03546, ECF No. 35-1) (the "2010 Agreement");

WHEREAS in February 2013, Ke Zhengguang and Xu Hongbiao (the "Arbitral Claimants") filed an arbitration against the remaining parties to the 2010 Agreement, Stephany Yu, Oasis Investment Group Limited, Yu Naiwen and Yu Naiyen (the "Arbitral Respondents");

WHEREAS the Petitioner the Estate of Ke Zhengguang (the "Estate") was substituted by for Ke Zhengguang following his death;

WHEREAS the arbitral tribunal issued a final award, dated February 28, 2018 (*id.* ECF No. 35-3), as clarified in a supplemental award, dated December 19, 2018 (*id.* ECF No. 35-5) (collectively, the "Final Award");

WHEREAS the Estate filed an Amended Petition in this Court against Stephany Yu (*id.* ECF No. 35) under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 33 U.N.T.S. 38 and 9 U.S.C. § 207 (the "New York Convention"), to confirm the Final Award (the "First Petition") (18-cv-03546);

WHEREAS Stephany Yu moved to dismiss the First Petition (18-cv-03546, ECF Nos. 40-45);

WHEREAS, on February 24, 2020, the Court denied the motion and granted the First Petition (*id*. ECF No. 53);

WHEREAS in March 2020 the arbitral tribunal issued a ruling relating to costs and interest (20-cv-2260 ECF 1-3) and, in June 2020, issued a ruling clarifying and/or correcting the March 2020 ruling (*id*. ECF 1-5) (collectively, the "Costs and Interest Rulings");

WHEREAS in August 2020, the Estate filed a Petition under the New York Convention to confirm the Costs and Interest Rulings (*id*. ECF 1) (the "Second Petition") (20-cv-2260);

WHEREAS the parties stipulated to a procedure for briefing their disputes relating to the Second Petition, while preserving (but not re-litigating) their disputes with respect to the First

Petition, in anticipation of the Court issuing a single, consolidated Final Judgment that would then be the subject of a consolidated appeal (18-cv-03546, ECF No. 69; 20-cv-2260 ECF No. 19); and

WHEREAS the Court has considered the parties' submissions and is prepared to enter a single, consolidated Final Judgment.

It is hereby **ADJUDGED** as follows:

1.      The Final Award and Costs and Interests Rulings are confirmed, and their Orders are hereby entered as the judgment of the Court, but only insofar as those Orders by their terms impose obligations upon the parties before the Court, the Estate and Stephany Yu.

2.      With respect to Order 9 of the Final Award, judgment is entered against Stephany Yu in the amount of **$817,350.67**,[1] plus pre-award interest in the amount of **$24,512.19**,[2] for a total of **$841,862.86**. Post-judgment interest shall be based on the rate specified in 28 U.S.C. § 1961, from the date of entry of this Final Judgment until its satisfaction.

3.      With respect to the attorneys' fees and costs for the arbitration, judgment is entered against Stephany Yu in the amount of **$1,029,136.27**.[3] Post-judgment interest shall be

---

[1] This is calculated as the Estate's one-half portion of the Order 9 award amount, RMB10,346,211, times the currency exchange rate published in the *Wall Street Journal* from RMB to U.S. Dollars of 0.1580, as of February 28, 2018, the date of the Final Award.

[2] This is calculated as the Estate's one-half portion of the Order 9 award amount, RMB10,346,211, times 6% interest (Hong Kong Prime, plus 1%) for the 204-day interest period specified in the Costs and Interest Rulings, times the currency exchange rate published in the *Wall Street Journal* from RMB to U.S. Dollars of 0.1413, as of June 26, 2020, the date the Costs and Interest Rulings were finalized.

[3] This is calculated as the attorneys' fees (6,599,822 HKD) and arbitration costs (1,377,978.55 HKD) awarded to the Estate, times the currency exchange rate published in the *Wall Street Journal* from HKD to U.S. Dollars of 0.1290, as of June 26, 2020, the date the Costs and Interest Rulings were finalized.

based on the rate specified in 28 U.S.C. § 1961, from the date of entry of this Final Judgment until its satisfaction.

4.      With respect to Order 8 of the Final Award, judgment is entered against Stephany Yu for pre-award interest in the amount of **$1,724,778.67**,[4] payable only if and when the conditions for payment of the principal of Order 8 are satisfied, at which point post-judgment interest shall begin to accrue, and will accrue at the rate specified in 28 U.S.C. § 1961, until the amounts due under Order 8 are satisfied.

5.      No post-award, pre-judgment interest is awarded.

6.      Each party is to bear its own costs and fees.

_____
Hon. Paul W. Grimm, U.S.D.J.
Dated:

---

[4] This is calculated as the Estate's one-half portion of the Order 8 award principal, RMB67,813,898, times 6% interest (Hong Kong Prime, plus 1%) for the 36-month period specified in the Costs and Interest Rulings, times the currency exchange rate published in the *Wall Street Journal* from RMB to U.S. Dollars of 0.1413, as of June 26, 2020, the date the Costs and Interest Rulings were finalized.

# EXHIBIT 2

<table>
<tr><td>

ESTATE OF KE ZHENGGUANG,

                            Petitioner,

           *—against—*

YU NAIFEN STEPHANY
(a/k/a/ STEPHANY YU,
a/k/a/ STEPHANY NAIFEN YU
a/k/a/ STEPHANY N. DOMBROWSKI),

                       Respondent.

</td><td>

8:18-cv-03546-PWG

</td></tr>
</table>

<table>
<tr><td>

ESTATE OF KE ZHENGGUANG,

                            Petitioner,

            *—against—*

YU NAIFEN STEPHANY
(a/k/a/ STEPHANY YU,
a/k/a/ STEPHANY NAIFEN YU
a/k/a/ STEPHANY N. DOMBROWSKI),

                       Respondent.

</td><td>

8:20-cv-02260-GJH

</td></tr>
</table>

**[PETITIONER'S PROPOSED] CONSOLIDATED FINAL JUDGMENT**

WHEREAS, Ke Zhengguang and Respondent Yu Naifen Stephany (a/k/a/ Stephany Yu, a/k/a/ Stephany Naifen Yu a/k/a/ Stephany N. Dombrowski) ("Stephany Yu") are among the parties to that certain "Agreement on the Implementation of 'The Preliminary Share Restructuring Agreement,'" which called for disputes to be resolved via arbitration in Hong Kong (ECF No. 35-1) (the "2010 Agreement");

WHEREAS, in February 2013, Ke Zhengguang and Xu Hongbiao (the "Arbitral Claimants") filed an arbitration against the remaining parties to the 2010 Agreement, Stephany Yu, Oasis Investment Group Limited, Yu Naiwen and Yu Naiyen (the "Arbitral Respondents");

WHEREAS, Petitioner the Estate of Ke Zhengguang (the "Estate") was substituted by the arbitral tribunal as a party in the arbitration for Ke Zhengguang following his death;

WHEREAS, the arbitral tribunal issued a final award, dated February 25, 2018 (Case No. 8:18-cv-03546-PWG; ECF No. 35-3), as clarified in a supplemental award, dated December 19, 2018 (ECF No. 35-5) (collectively, the "Final Award"), which did not address issues related to attorneys' fees, costs, or interest;

WHEREAS, in March 2019, the Estate filed an Amended Petition in this Court against Stephany Yu (Case No. 8:18-cv-03546-PWG; ECF No. 35) under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 33 U.N.T.S. 38 and 9 U.S.C. § 207, to confirm the Final Award; and

WHEREAS, on February 24, 2020, the Court issued a Memorandum Opinion (the "February 24, 2020 Opinion") granting the Amended Petition (Case No. 8:18-cv-03546-PWG; ECF No. 53);

WHEREAS, on March 16, 2020, the arbitral tribunal issued an award (the "March 2020 Award") which awarded attorney's fees, costs, and interest to Petitioner;

WHEREAS, on June 26, 2020, the arbitral tribunal issued an award (the "June 2020 Award," and together with the March 2020 Award, the "Costs and Interest Award") correcting and clarifying the March 2020 Award;

WHEREAS, in August 2020, Petitioner initiated a new, related action in this Court (Case 20-cv-2260) by filing a Petition under the New York Convention to confirm the Costs and Interest Award. (ECF 1);

WHEREAS, on October 16, 2020, Petitioner and Respondent entered into a stipulation (the "Consolidation Stipulation") that, among other things, consolidated the above-referenced actions (18-cv-03546 and 20-cv-2260) pursuant to Rule 42 of the Federal Rules of Civil Procedure for all purposes, including resolving disputes as to the form and content of a consolidated judgment pertaining to both the First Petition and the Second Petition;

WHEREAS, on October 16, 2020, the Court approved the Consolidation Stipulation;

NOW THEREFORE, it is hereby ADJUDGED as follows:

1.      The Final Award is confirmed, and its Orders are hereby entered as the judgment of the Court.

2.      With respect to Order 9 of the Final Award, judgment is entered against Respondent in the amount of **$817,350.67**.[1]

3.      The Costs and Interest Award is confirmed, and its Orders are hereby entered as the judgment of the Court.

4.      With respect to the Costs and Interests Award, judgment is entered against Respondent in the amount of **$4,546,256.93**, which includes the following component amounts:

---

[1] This is calculated as Petitioner's one-half portion of the award amount, RMB10,346,211, times the currency exchange rate published in the Wall Street Journal from RMB to U.S. Dollars of 0.1580, as of February 28, 2018.

a. The sum of **$1,027,286.03**, which represents legal fees and costs that Respondent was ordered to pay to Petitioner in paragraph 107 of the March 2020 Award, as modified by the June 2020 Award, after converting to U.S. dollars;[2]

b. The sum of **$1,770,510.83**, which represents Petitioner's share of the *pre-Final award interest* awarded by paragraph 108 of the March 2020 Award, as modified by the June 2020 Award;[3]

c. The sum of **$1,791,774.23**, which represents Petitioner's share of the *post-Final award interest* awarded by paragraph 108 of the March 2020 Award, as modified by the June 2020 Award, calculated through and including December 31, 2020.[4]

5. In addition, with respect to the Costs and Interests Award, the Clerk of the Court shall enter judgment in an additional amount (which represents *post-Final Award interest* based on the same formula outlined in 4(c) above, calculated through the date of this judgment), as

---

[2] The sum of $1,027,286.03 represents legal fees and costs awarded to Petitioner (HKD 7,977,800.55) in the March 2020 Award (as modified by the June 2020 Award), converted to U.S. dollars at the exchange rate published in the *Wall Street Journal* as of March 16, 2020 (each US dollar equals 7.7659 HK dollars).

[3] The sum of $1,770,510.83 represents pre-Final Award interest on 50% of the principal amount awarded by the Tribunal in Orders 8 and 9 of the 2018 Final Award (pre-award interest on the remaining 50% of such principal amount is due to the other claimant in the arbitration, Xu Hongbiao, who is identified as the "First Claimant."). The sum of $1,770,510.83 (which comprises $1,745,581.39 pre-award interest in Order No. 8 and $24,929.44 pre-award interest in Order No. 9) has been calculated using the formula set forth in the March 2020 Award as modified by the June 2020 Award (RMB 12,380,828.12), converted to U.S. dollars at the exchange rate published in the *Wall Street Journal* as of March 16, 2020.

[4] The sum of $1,791,774.23 represents post-Final Award interest on 50% of the principal amount awarded by the Tribunal in Orders 8 and 9 of the 2018 Final Award (post-award interest on the remaining 50% of such principal amount is due to the other claimant in the arbitration, Xu Hongbiao, who is identified as the "First Claimant."). The sum of $1,791,774.23 (which comprises post-award interest of $1,664,778.51 awarded in Order No. 8 and post-award interest of $126,995.72 awarded in Order No. 9) has been calculated using the formula set forth in the March 2020 Award as modified by the June 2020 Award (RMB 12,226,631.59), converted to U.S. dollars at the exchange rate published in the *Wall Street Journal* as of March 16, 2020.

follows.  Interest shall be shall be calculated based the principal amount of RMB 72,987,003 (which represents 50% of the principal amount awarded by the Tribunal in Orders 8 and 9 of the Final Award)  at 6% per annum (which is the HSBC prime rate in Hong Kong, plus 1%, as mandated by the Costs and Interest Award), running from  January 1, 2021 until the date that the Clerk of the Court enters this judgment.

6.      Post-judgment interest shall be based on the rate specified in 28 U.S.C. § 1961, from the date of entry of this Final Judgment until its satisfaction.

7.      Each party is to bear its own costs and fees.

_____
Hon. Paul W. Grimm, U.S.D.J.
Dated:

# EXHIBIT 3

# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

ESTATE OF KEZHENGGUANG,

Petitioner,

*—against—*

YU NAIFEN STEPHANY
(a/k/a/ STEPHANY YU,
a/k/a/ STEPHANY NAIFEN YU
a/k/a/ STEPHANY N. DOMBROWSKI),

Respondent.

8:18-cv-03546-PWG

## DECLARATION OF STEPHANY YU

1.      I am the respondent in this case, and submit this declaration in support of my motion to dismiss the case.  Unless indicated otherwise, the statements in this declaration are based on my personal knowledge, and the exhibits are true copies of the originals.

## **Introduction**

2.      As detailed more fully below, the petitioner in this case (the "Estate") is attempting to enforce an arbitration award against me personally in a manner that would be fundamentally unfair.  The award directs various parties to complete complex real estate and corporate transactions in China that I (for myself and on behalf of various related companies) have been trying to carry out for the past year, only to be thwarted by non-cooperation and infighting between the Estate and its co-claimant, Mr. Xu Hongbiao.  Mr. Xu is not part of these proceedings.

3.      There is also a damages component of the award that, via the relevant company in China, I have tried repeatedly to pay in China, but that the Estate will not accept there.  Its lawyers have insisted on payment outside China, which they well know violates Chinese

currency control laws and which places me at severe personal risk in China, where I regularly

travel, and have significant business operations.  The Estate apparently does not care if the

Chinese government comes after me.  This is particularly frustrating because the liability in

reality belongs to a company in China that has ample assets and that is prepared to pay there.

4.      I want to get these transactions completed, and have the damages paid, so as to

have no more dealings with the claimants, but am caught in the middle of their disputes.  I cannot

execute the necessary corporate transactions, or get the necessary regulatory approval, without

cooperation and uniform instruction from the two claimants (only one of whom is part of these

proceedings).

5.      If the Estate is successful at enforcing the award here, and making me pay the

damages award here, then I will be in an impossible situation of potentially violating Chinese

law with respect to the payment, and, depending on how the remainder of the award is enforced

here, will be at risk of inconsistent demands from Chinese regulators (who must approve broad

aspects of the implementation of the award), and at risk of inconsistent demands and/or

additional litigation from Mr. Xu, who has threated all along the way to hold me responsible if

he does not get his way.

6.      At bottom, there is no reason for litigation here.  If any legal proceedings are

necessary, they should take place in China, which is where the underlying events took place, and

were a court would be better suited to deal with all the stakeholders, including Mr. Xu, and

including the relevant companies, as opposed to placing a target only on me as an individual.  I

would therefore urge the Court to dismiss the petition.

**The Parties**

7.      I am a Chinese native and, until moving with my family to Maryland in 2016, had lived most of my life in China.  I maintain a residence in China, and frequently travel there for business.

8.      In the early 2000s, I was among a group of business partners that formed Oasis Investment Group Limited ("Oasis") to buy and develop real estate in China.  The other partners were Ke Zhengguang, Xu Hongbiao and my two sisters, Naiwen and Naijun.

**The 2009 and 2010 Agreements**

9.      In November 2009, the Oasis partners and certain of their affiliated entities entered into a preliminary written agreement to separate their interests in Oasis, entitled "Equity Reorganization Preliminary Agreement" (the "2009" Agreement).  (Ex. A.)  Broadly speaking, the 2009 Agreement called for Oasis to repurchase the shares held by Messrs. Ke and Xu for RMB 250 million, and to also transfer to them one of Oasis's subsidiaries, Shanghai Greencourt Four-Season-Flower-City Property Development Co., Ltd., or Siji Huacheng ("SJHC").  (*Id.*)

10.     In April 2010, the Oasis partners and certain of their affiliated entities (including Oasis itself) entered a follow-on written agreement entitled "Agreement on the Implementation of 'The Preliminary Share Restructuring Agreement'" (the "2010 Agreement"), with a similar but more intricate plan for the business separation.  The 2010 Agreement referred to my sisters and me as the "Controlling Shareholders" and to Messrs. Ke and Xu as the "Non-controlling Shareholders."

11.     The 2010 Agreement included multiple, detailed provisions concerning how the parties' interests were to be divided.  In very simplified terms, there are three primary components:  (a) a cash buyback, (b) a subsidiary transfer, and (c) a property exchange (a new feature that was not part of the 2009 Agreement).

3

12.     First, for the cash buyback component, Oasis was to buy back the interests of

Messrs. Xu and Ke by paying cash to the entities through which they held their shares, in three

installments, totaling a base amount of RMB 250 million (subject to various regulatory, tax and

other adjustments).  (2010 Agreement at 2-7 (Arts. 1-2).)  The third and final installment of

RMB 150 million (as adjusted) was to be paid only when the other steps in the separation

process (summarized below) were complete.  (*Id*. at 4-7 (§ 2.2.1(4)).)

13.     Second, for the subsidiary transfer, Messrs. Xu and Ke were to receive 100%

ownership in a subsidiary of Oasis, SJHC, through a complex, multi-step process.  SJHC is the

entity that owns a large and profitable property development in China.

14.     The mechanics were as follows.  An Oasis subsidiary, Greencourt Properties Ltd.

("Greencourt Properties"), a Hong Kong company, would transfer its 80% ownership stake in

SJHC to Oasis's newly formed company, Shibang Company Ltd. ("Shibang").  (2010 Agreement

at 5 (§ 2.3.1).)  Next, Oasis would sign an Equity Purchase Option Agreement agreeing to

transfer Shibang to the Non-controlling Shareholders after the expiration of a three-year

"entrustment period."  (*Id.* (§2.3.2).)  Once the Equity Purchase Option Agreement was signed,

Greencourt Properties was to sign an Entrustment Agreement granting the Non-controlling

Shareholders the right to manage and control Shibang for the entrustment period.  (*Id.* (§ 2.3.3).)

At the same time, another Oasis subsidiary, Shanghai Oasis Kechuang Ecological Technology

Co., Ltd. ("Oasis Kechuang"), a Chinese company would transfer its 20% ownership stake in

SJHC to a domestic company in China appointed by the Non-controlling Shareholders. (*Id.*).  All

debts and claims as between SJHC and Oasis were to be "settled" within one month.  (*Id*. at 8

(§ 3.6).)  Figures 1 and 2 below depict, in simplified terms, the corporate structure before the

SJHC transaction (Figure 1), and then what was supposed to happen immediately after, during the entrustment period (Figure 2).





15. Third, for the property exchange, a different subsidiary of Oasis, Shanghai Greencourt Real Estate Development Limited ("Greencourt Real Estate"), a Chinese company, was to sign an agreement transferring approximately 8,000 square meters of commercial space (the "Jiuting Shops") in Shanghai to the Non-controlling Shareholders. (*Id.* at 7 (§ 3.1).) In exchange, a company controlled by the Non-controlling Shareholders was supposed to sign an agreement transferring to Oasis and the Controlling Shareholders two "Villas," each of approximately 1,200 square meters, also located in Shanghai, China and owned by SJHC. (*Id.* at 7 (§ 3.2).) The property exchange was not part of the original, 2009 Agreement. The idea originated from Mr. Ke; my preference had been to keep the separation simpler, as we had originally agreed. Knowing now all the complications that have ensued in completing this transaction (discussed below), I wish we had never agreed to it.

16. The 2010 Agreement stated that "the prices of the properties involved are equal," namely 72 million RMB, and that the consideration each side was transferring was "to be set off against each other." (*Id.* at 7 (§ 3.3).) Figure 3 below depicts the property exchange.



**Figure 3: Property Exchange – Jiuting Stores Exchanged for Two Villas**

**Arbitration in Hong Kong**

17.     In February 2013, the Non-controlling Shareholders filed a Notice of Arbitration against Oasis and against the Controlling Shareholders relating to various disputes that arose in attempting to implement the 2010 Agreement.

18.     In February 2018, the Panel ultimately issued its final award (the "Award"), which can be briefly summarized as follows.

19.     First, Orders 1-3, concern the property exchange and debt settlement, and direct various parties to carry out those provisions, as set forth in the 2010 Agreement.

20.     Second, Orders 4-7 concern the transfer of SJHC.  Order 4 directs the Non-controlling shareholders to "submit an audit report to the relevant approval authorities" for the transaction.  This was necessary to establish the value of the transaction, and to fix a price for

tax purposes, all of which is required to obtain the necessary regulatory approval.  Orders 5-7 specify what entities must engage in what transactions to complete the formal transfer.

21.     Third, Order 8 requires Oasis to make the final payment, subject to adjustments, when the conditions have been completed.

22.     Finally, Order 9 sets forth certain damages for rent in China relating to the property exchange.  Oasis and the Controlling Shareholders did not believe the Villas offered by the Non-controlling shareholders met the requirements of the 2010 Agreement because the square footage was too small.  (Award at 84 (¶ 288).)  Thus, instead of formally transferring the commercial space, the Oasis subsidiary that owned the commercial space allowed the Non-controlling shareholders to use most of the commercial space (approximately 6,000 of the 8,000 square meters) via an "authorization letter."  (*Id*. at 85-86 (¶¶ 294-95).)  The Panel concluded that the Controlling Shareholders should have fully exchanged the commercial space for the Villas and thus were liable to the Non-controlling shareholders for the rental value of the 2,000 square-meter portion that the Controlling Shareholders retained.  (*Id*. 86-89 (¶¶ 296-303).) The Panel calculated the damages to be RMB 10,346,211 based upon an analysis of rental rates in similar commercial buildings in China.  (*Id*.)

**Efforts to Comply With the Specific Performance Aspects of the Award**

23.     Oasis and the Controlling Shareholders have endeavored to comply with the Award, but have been impeded at nearly every step along the way by the Estate and Mr. Xu fighting with one another or otherwise not cooperating.   I do not care how the Estate and Mr. Xu sort out their disputes, but simply want to put this matter in the past, and complete what the

parties agreed to almost a decade ago with finality and without the risk of being subjected to conflicting obligations or more litigation.[1]

24.     One of the biggest challenges with carrying out the award has been the SJHC transaction, which has been beset with issues arising from disputes between Mr. Ke's heirs and Mr. Xu over control of the company.  While the formal transfer of the shares of SJHC to the Non-controlling shareholders has not been completed, Oasis ceded control of SJHC to the them even before the 2010 Agreement.  Oasis has had no control over, nor gained any economic benefit from, SJHC since then.

25.     For reasons that are unclear, however, Mr. Ke's heirs have apparently seized from the other claimant, Xu Hongbiao, control of the SJHC board, and have gained control of the corporate seal necessary to execute legal documents (referred to as a "chop").  In the Chinese legal and business worlds, very little can be done without the corporate "chop," and control of the "chop" is virtually synonymous with day-to-day control of a company.  Mr. Xu has complained vociferously about having been pushed aside, and, as a result, to this day will not provide the necessary cooperation to complete the transaction, unless Mr. Ke's representatives give him joint control over SJHC.

26.     The disputes between the Estate and Mr. Xu have also impeded the regulatory aspect of the SJHC transaction.  Regulators must approve the transaction, but Mr. Xu and Mr. Ke's representatives cannot agree on who should lead the process, and have refused to provide the Controlling Shareholders the necessary materials (including the audit report referred to in Order 4) to actually complete this step of the process.  The Controlling Shareholders have signed

---

[1] The details of these disputes are set forth more fully in the accompanying declaration of Yong Gu ("Gu Decl."), and the in the correspondence attached to his declaration.

the necessary shareholder agreement for the transactions, but cannot take the next steps forward without cooperation from the claimants, including by the claimants providing the required documentation.

27.     The claimants' infighting has impeded the property exchange, too.   The claimants have repeatedly provided conflicting instructions as to what company is to be the buyer.   In addition, the claimants have not agreed as to exactly how the property would be divided.   There are 14 Jiuting Shops, and the claimants have not agreed whether they will own the entire lot together in equal proportion (or some other proportion), or whether each will take ownership of a certain number of the shops.   We cannot proceed without the claimants providing a unified path forward.   The roadblocks to the property exchange have been particularly prejudicial and unfair to Oasis and to me, since the claimants have had near complete control over the Jiuting Shops for years (including the economic benefits), while Oasis has never possessed or had any benefit from the Villas that were supposed to be provided in exchange.

**Efforts to Pay the Damages Amount in Order 9**

28.     Even the seemingly straightforward damages award in Order 9 has been obstructed by the claimants (in this case, by the Estate).   I have always been willing to pay the RMB 10,346,211 awarded in Order 9, and repeatedly tried to do so.   But the Estate, by insisting on payment outside China in violation of currency control laws, has made it impossible to complete the payment without risking severe, personal penalties.   The details of my efforts, and the Estate's failure to cooperate are set out below.

29.     On May 2, 2018, I paid half of the damages relating to the lost rent in Shanghai associated with the property exchange to Mr. Xu, who provided details for a bank in China into which the funds were wired.

30.     The payment to Mr. Xu was made from Greencourt Real Estate, the Oasis subsidiary that, according to the final award, was supposed to transfer to the claimants, at the direction of me and the other respondents, the commercial real estate that was the subject of the damages award.  I paid this first half to Mr. Xu based on the instruction from claimants' counsel that Mr. Xu was entitled to half of this portion of the award.  However, I do not know with complete certainty how the underlying obligation is divided as between Mr. Xu and Mr. Ke, and have not received a release in return from Mr. Xu.

31.     As mentioned, the other claimant, the Estate, has not been cooperative.  We have tried through multiple letters to get the Estate to cooperate with our making payment.

32.     On March 23, 2018, counsel for the Estate sent a letter regarding performance of the orders in the arbitral award.  (Gu Decl. Ex. 1.)  The letter demanded payment of the RMB 10,346,211 to a bank account that would be specified later.  (*Id.* at 2.)

33.     On April 2, 2018, our counsel sent a letter in response.  (Gu Decl. Ex. 3.)  Our counsel stated that we were prepared to pay the damages amount in Order 9, and asked that payment information be provided for a domestic Chinese bank account.  (*Id.* at 2 (¶ 3).)  The letter explained that, in light of China's strict foreign exchange control laws, any payment to be made outside China would require the parties to jointly apply to a bank to see if that would even be possible.  (*Id.*)

34.     On April 13, 2018, counsel for the Estate sent a letter in reply to our counsel's letter dated April 2, 2018.  (Gu Decl. Ex. 5.)  The Estate's counsel specified a bank in Hong Kong, and demanded to be paid "in Hong Kong dollars or other non-RMB currencies equivalent to RMB 5,173,105.5 (to be converted at the exchange rate published by the People's Bank of China as of 28 February 2018)."  (*Id.* at 3.)  The letter stated that the Estate was "entitled to

11

designate whatever bank account, be it a PRC or foreign bank account, that it considers appropriate" to receive payment.  (*Id*.)

35.     On April 30, 2018, our counsel wrote back to explain that the funds for payment of Order 9 were held in China, and "again invite[d] [the Estate] to consider providing a bank account within China," and stated that payment would be made within five business days thereafter.  (Gu Decl. Ex. 7, at 2 (¶ 4).)

36.     On May 9, 2018, the Estate's counsel wrote back.  (Gu Decl. Ex. 10.)  Regarding payment of the damages award, the Estate's counsel stated that "only payment . . . to a foreign bank account will be accepted" and that the Estate was unwilling to "negotiate further."  (*Id*. at 3.)

37.     On May 14, 2018, our counsel again wrote the Estate regarding the damages award.  (Gu Decl. Ex. 11.)  Counsel reiterated that we have "always been willing" to pay, but that the Estate had refused to provide the necessary bank account information.  (*Id*. at 2–3.)  The letter pointed out that the award referred to payment in RMB, not a foreign currency, and that the likelihood of Chinese officials authorizing the payment to leave China was low.  (*Id*. at 2.)

38.     On October 29, 2018, our counsel yet again implored the Estate to cooperate, and made clear that we were prepared to pay as soon as the Estate provided proper bank account information.  (Gu Decl. Ex. 26, at 10.)

39.     On November 1, 2018, at my direction, Greencourt Real Estate attempted to wire the funds to the overseas bank account specified in the April 13, 2018, letter from the Estate's counsel.  (Ex. B.)  The wire was not allowed to go through, however, likely because, among other reasons, it cannot be approved without proof that the proper taxes had been paid and authorization from the Chinese currency regulator (referred to as "SAFE").  Moreover, the

payment of such a large amount would be easily tracked by SAFE and, if found to be improper, could trigger an investigation and regulatory action by SAFE.

40.     In fact, my counsel in China, Jun He, contacted an official at the Shanghai Foreign Currency Administration on a confidential basis, who stated that if SAFE were to be alerted to the transaction, they would not allow Ke's Estate to receive the wire in Hong Kong.

41.     The Estate never did provide the banking information and, instead, in November 2018, filed the initial petition in this case.

42.     The Estate's attempts to collect judgment outside of China, and specifically in the U.S., are extremely frustrating and contrary to the intent of the Award and Chinese law. Specifically, even though Order 9 states that I be jointly ordered to pay RMB 10,346,211 to the claimants, the party owing damages is actually Greencourt Real Estate. Greencourt Real Estate, a limited liability company, owned and controlled the commercial space on which the damages for lost rent are based. I am only an indirect shareholder, protected under Chinese law from personal liability. In fact, Order 1 of the Award directs me only to "urge" or "facilitate" Greencourt Real Estate to transfer the commercial space in exchange for the Villas — drawing the clear distinction between me and the company.  I should not be personally held responsible for Greencourt Real Estate's actions or any damages arising out of such actions, and certainly not chased by claimants seeking to collect assets from me in the United States, at the very least while Greencourt Real Estate has assets in China that are more than sufficient to satisfy the Award.

43.     On December 31, 2018, Greencourt Real Estate sent a check for the full amount sought in this case, RMB 5,173,105.50, to one of the lawyers representing the Estate in the arbitration, Eva Yao, who works in the Shanghai office of the DLA Piper law firm.  (Ex. C.)  As with the payment to Mr. Xu, the payment was made from Greencourt Real Estate, the Oasis

subsidiary that, according to the final award, was supposed to transfer to the claimants the commercial real estate that was the subject of the damages award.

44.     On January 2, 2019, my U.S. counsel, Steptoe & Johnson LLP, then sent a copy of that transmission, along with a certified translation of the check, to the U.S. counsel that at the time represented the Estate in this matter, Stephen A. Cash, and requested that the Estate dismiss this case.  (Ex. D.)  I understand that the check expired before being deposited.  I am of course willing and able to have a new check issued if the petitioner will accept it.

**The Ability of Ke's Representatives to Receive Payment in RMB**

45.     I understand that the Estate has argued that since "neither of the Estate's administrators is a citizen of the PRC or even resides in the PRC," it would be impossible for them to receive RMB payments in China.  (Am. Pet. [ECF 35], at 7 (¶ 25).)  That is not believable.

46.     During the arbitration, the Estate's counsel submitted various documents showing that the administrators are in fact Chinese citizens, and that they had Chinese addresses at the time.  Those documents include two "notarial certificates," one of which contains a copy of the birth certificate for one administrator (Mr. Ke's daughter Ke Yeying) showing she is a Chinese citizen (Ex. E), and another certifying the that both Ms. Ke Yeying and the other administrator (Mr. Ke's wife, Zhang Yuejin) are related to Mr. Ke and identifying them by their Chinese citizen ID numbers.  (Ex. F.)  Separately, the Estate in 2014 sent an email to the Panel attaching a copy of the ID card and marriage certificate for Ms. Zhang Yuejin, and both those documents show that she is (or at least was at the time) a PRC citizen.  (Ex. G.)  Yet another document from the arbitration, an email attaching a Hong Kong court filing, shows both administrators as having addresses in China.  (Ex. H.)

14

47.     More broadly, the Estate's administrators effectively control the day-to-day business of SJHC, a large Chinese real estate business worth at least $100 million USD, and operating entirely within Mainland China.  They clearly must transact business in RMB on a regular basis, and have presumably received income from its operations in RMB.  In fact, Ms. Ke Yeying is SJHC's general manager.  As such, she is presumably required by Chinese law to be paid compensation, and to pay taxes, and the like.  All of this would be done in RMB.

48.     Further confirming these points, Mr. Ke's representatives designated a particular Chinese company, Shanghai Qingxuan Enterprise Management Consulting Co., Ltd. (上海青玄企业管理咨询有限公司, in Chinese) to receive the Jiuting Shops, and public records in China show that that company is owned solely by Ms. Zhang.  (Ex. I.)  The company is identified as a domestic Chinese company, indicating again that Ms. Zhang is a Chinese citizen.

49.     I cannot understand how Mr. Ke's representatives can undertake extensive business in China, via Chinese companies, and yet somehow claim that it would be impossible to receive payment in the official Chinese currency, RMB.

**Conclusion**

50.     If legal proceedings are necessary, they should take place in China, which is where the underlying events took place.  A proceeding in China is better suited to ensuring that any steps to carrying out the Award (including payments) will comply with Chinese law, and that the steps will actually happen.  The relevant people, entities and government agencies are primarily located in China, as I have summarized on the attached Appendix I.  In fact, there is already ongoing litigation in China relating to one aspect of the 2010 Agreement (the settling of certain of the pre-existing SJHC debts).  I am of course willing to submit to the jurisdiction of a

Chinese court to address the issues in this case (preserving of course any other defenses in such a proceeding).

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April **5th** 2019.

_Stephany Yu_

Stephany Yu

# EXHIBIT 4

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

ESTATE OF KE ZHENGGUANG,

                          Petitioner,

           —*against*—

YU NAIFEN STEPHANY
(a/k/a/ STEPHANY YU,
a/k/a/ STEPHANY NAIFEN YU
a/k/a/ STEPHANY N. DOMBROWSKI),

                        Respondent.

8:18-cv-03546-PWG

**REPLY DECLARATION OF STEPHANY YU**

1.      I am the respondent in this case, and submit this reply declaration in further support of my motion to dismiss the case.  Unless indicated otherwise, the statements in this declaration are based on my personal knowledge, and the exhibits are true copies of the originals.

2.      As detailed in my initial declaration, I have been trying for over a year now to carry out the terms of the arbitration award that gives rise to this case (the "Award"), only to be met with obstacles from the claimants, including their inability to agree on how to proceed.  This has been time consuming and expensive for me personally.  I would much prefer to put this case in the past, and never deal with either of the claimants again.

3.      I have reviewed the Declaration of Ke Yeying opposing my motion to dismiss, and it contains several misstatements that must be corrected.  Specifically, she claims that my obligations under the award are "straightforward" and "clear" and then tries to list the steps I have "refused to perform," with "manufactur[ed] excuses."  (Ke Decl. ¶¶ 13-14.)  She also claims that the actions of the Estate's co-claimant, Xu Hongbiao "have no effect or bearing" on carrying out the Award.  (*Id.* ¶ 21.)

4.      These statements ignore entirely the details provided with my moving papers as to why carrying out the award has been impeded at every turn by the claimants' infighting and failure to cooperate.  She does not even try to address the extensive correspondence included with my motion.  These statements also ignore the fact that the claimants have had control over SJHC and the Jiuting Shops for almost 10 years now, while I still have not received the villas that were supposed to be provided in return.  Again, it would be better for me to have this process completed.

5.      The current state of the disputes is summarized briefly in a letter that my lawyers in China sent to counsel for the Estate and for Mr. Xu on May 10, 2019.  (Ex. A.)   The main points are recited below.

6.      **Transfer of the Jiuting Shops (Order 1)**.  The claimants have failed to give uniform direction as to how ownership should be divided and what designated companies should receive the properties. (*Id*. at 2.)  Ms. Ke indicates in her declaration (for the first time) that the two claimants have agreed that "50% ownership of each title" for each should be transferred to the "recipient" each has specified.  (Ke Decl. ¶ 22.)  The problem is that Mr. Xu has designated himself (a natural person) and the Estate has designated a company.  As I understand it, the local regulators will not allow for ownership to be divided in this way.

7.      **Transfer of the Villas (Order 2).**  Ms. Ke speculates that I have not specified a company to receive the villas because I am trying to create an excuse to not make the final payment in Order 8.  (Ke Decl. ¶ 14 & nn. 4-5.)  That is not true.  As she well knows, it would create negative tax consequences for both sides if the villas and the Jiuting Shops are not exchanged simultaneously.  In any case, my counsel's letter identifies the company that will receive the villas.  (Ex. A, at 5.)

8.      **Settlement of SJHC Debts (Order 3)**.  The SJHC debt settlement payment cannot be made for the simple reason that the claimants are fighting over where the money should go.  (*Id*. at 3.)  The Estate wants the funds to go to a bank account with SJHC, but Mr. Xu will not agree, because he believes he was wrongly pushed out of SJHC.  (Gu Decl. Ex. 13.)

9.      **Providing the Audit Report for SJHC Transfer (Order 4)**.  Providing the audit report is an obligation of the claimants, and, despite repeated demands, they have not complied.

10.     **Transfer of SJHC (Orders 5-7)**.  Because the Estate and Mr. Xu are bitterly divided over control of SJHC, they cannot agree as to how to carry out the procedures for obtaining regulatory approval to formally transfer the company, nor have they provided the necessary documentation.  (Ex. A, at 4.)  While Ms. Ke now states that the regulatory approval can be pursued by me or my representatives "accompanied by a SJHC representative" (Ke. Decl. ¶ 14 (Orders 5 and 7)), the Estate's lawyers have all along insisted that SJHC "lead the equity transfer" via its hand-picked representative, Zhu Qianqian.  (Gu Decl. Ex. 19, at 3.)  Mr. Xu has refused to agree to this approach, and made clear that, as far as he was concerned, Ms. Zhu was not authorized to act for SJHC.  (*Id*. Ex. 25, at 1.)  Our company, Oasis Investment Group Limited ("Oasis"), has done everything in its power to advance the process, including signing the relevant share transfer agreement, and issuing the shareholders' resolution approving the transfer. (*Id.* at 3-5.)  In fact, an Oasis subsidiary, Greencourt Properties Limited ("Greencourt HK") recently filed suit in China to force SJHC to honor the share transfer agreement, so that the SJHC transaction can finally advance.  (Exs. B, C.)  I authorized this suit to be filed because I want this process completed.  Ms. Ke's accusations that I am trying to duck responsibility are simply not true.

3

11. **Final Cash Payment (Order 8)**. I agree with Ms. Ke that this payment is "conditional on completion of [the] other steps" (Ke Decl. ¶ 14 n.5), and am prepared for this payment to be made when they are completed.

12. **Damages (Order 9)**. As detailed in my initial declaration, I have tried repeatedly to pay the damages award to the Estate (including by sending a check for the full amount to the Estate's counsel in Shanghai), but the Estate has failed to cooperate. (Yu Decl. ¶¶ 28-44.) Ms. Ke claims that I "well know[]" the Estate cannot receive RMB in China because it is a Hong Kong entity (Ke Decl. ¶ 16), but that appears to be a brand new position. When the Estate was refusing to cooperate before, it never claimed that it would be impossible to receive RMB. Instead, the Estate argued in a letter in April 2018 that it was "entitled to designate whatever bank account, be it a PRC or foreign bank account, that it considers appropriate" to receive payment. (Gu Decl. Ex. 5, at 3.) The next month, it sent a letter stating that "only payment . . . to a foreign bank account will be accepted" and that the Estate was unwilling to "negotiate further." (Gu Decl. Ex. 10, at 3.) If payment to a Chinese bank account were impossible all along, I would have expected the Estate to have said so at the time. For the reasons stated in my initial declaration, it is simply not credible that Mr. Ke's heirs are unable to transact in RMB in China. (Yu Decl. ¶¶ 45-49.)

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 16, 2019.

Stephany Yu

4

# EXHIBIT 5

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

ESTATE OF KEZHENGGUANG,

                                        Petitioner,

        —*against*—

YU NAIFEN STEPHANY
(a/k/a/ STEPHANY YU,
a/k/a/ STEPHANY NAIFEN YU
a/k/a/ STEPHANY N. DOMBROWSKI),

                                        Respondent.

8:18-cv-03546-PWG

**DECLARATION OF LIN YANG**
*(Certification of English Translation of Gu Yong Declaration)*

1.      My name is Lin Yang.  I am an associate with Steptoe & Johnson LLP, resident in the

firm's office in Beijing, China.  I am over the age of 18 and if called to testify to the matters set

forth in this Declaration, I would be competent to do so.  My native language is Mandarin

Chinese, but I am also fluent in English.  I attended law school in the United States and am

admitted to practice law in New York and in the District of Columbia.

2.      Attached hereto is a true and accurate English translation of the Declaration of Gu Yong

in this matter.  The original, Mandarin Chinese Declaration of Mr. Gu is also attached, following

the English translation.

        Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the

United States of America that the foregoing is true and correct.

        Executed on April  8 , 2019.

                                        _____
                                                Lin Yang

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| ESTATE OF KEZHENGGUANG, | |
| Petitioner, | |
| —*against*— | 8:18-cv-03546-PWG |
| YU NAIFEN STEPHANY (a/k/a/ STEPHANY YU, a/k/a/ STEPHANY NAIFEN YU a/k/a/ STEPHANY N. DOMBROWSKI), | |
| Respondent. | |

**DECLARATION OF GU YONG [ENGLISH TRANSLATION]**

1.       My name is GU Yong (顾勇) and I am a board director of the Shanghai Greencourt Real Estate Development Ltd. (上海绿庭房地产开发有限公司, in Chinese) ("Greencourt Real Estate Development") and a board director of the Shanghai Greencourt Kechuang Ecological Technology Co. Ltd (上海绿庭科创生态科技有限公司, in Chinese; formerly "Shanghai Oasis Kechuang Ecological Technology Co. Ltd.", 上海绿洲科创生态科技有限公司, in Chinese) ("Oasis Kechuang"), based in Shanghai, People's Republic of China ("PRC" or "China"). Greencourt Real Estate Development and Oasis Kechuang are affiliates of Oasis Investment Group Limited ("Oasis") and I make this declaration in support of the motion to dismiss filed by Ms. Stephany Yu in the pending litigation before the District Court of Maryland.  I am over the age of 18 and if called to testify to the matters set forth in this Declaration, I would be competent to do so.  The statements in this declaration are based on my personal knowledge (except where indicated otherwise) and the exhibits are true copies of the originals.  My native language is

Mandarin Chinese, and I understand that this Declaration will be translated into English for the benefit of the Court.

2.      I have personal knowledge of the various Chinese transactions contemplated by the "Agreement on the Implementation of 'The Preliminary Share Restructuring Agreement,'" dated April 28, 2010 (the "2010 Agreement") and the arbitral award issued on February 28, 2018 ("Award") and have been involved in pushing forward the implementation of the share transfers and the property transfer in those transactions in China on behalf of Oasis and its controlling shareholders.  Since the Award was issued, Oasis and its controlling shareholders have been working hard to urge forward the transactions that are reflected in the 2010 Agreement and the Award.  However, these efforts have been significantly impeded by Mr. KE Zhengguang's representatives and also by Mr. XU Hongbiao, the applicants in the Hong Kong arbitration.

3.      One of the primary matters that the Award contemplates must be addressed is having the ownership in Shanghai Greencourt Four-Season-Flower-City Property Development Co., Ltd. (上海绿庭四季花城房地产开发有限公司, in Chinese) ("SJHC") restructured to align with the 2010 Agreement.  SJHC is a Chinese joint venture company with Hong Kong investment engaged in real estate development in China, and, as such, under Chinese law and regulatory practice, changing the ownership in SJHC and effecting the parties' agreements can be a complicated process, and involves at the very least, the submission by a representative or an agent designated by SJHC to the commercial department of the local government of filing documents, share transfer agreements and a series of supporting documents for PRC regulator scrutiny and verification.   Oasis and its controlling shareholders have worked to urge those transactions forward, but they cannot be effected without cooperation from Mr. KE's

representatives and Mr. XU, especially as control over SJHC had already been transferred from Greencourt Properties Limited (绿庭置业有限公司, in Chinese) ("Greencourt HK") and Oasis Kechuang to Mssrs. KE and XU as explained in detail below.

4.      In this Declaration, I first summarize those steps that Oasis and its controlling shareholders have taken to urge forward the ownership changes in SJHC (namely Orders 4, 5, and 7 of the Award) and then outline those steps Oasis and its controlling shareholders have taken to urge forward the property exchange transactions contemplated by the 2010 Agreement and the Award (Orders 1 and 2 of the Award).  I also highlight various points of resistance we have encountered from Mr. KE's representatives and Mr. XU from the letters and correspondence that have been exchanged between counsel for the respective parties in this dispute.

## **THE CONTROL OF AND CHANGING THE REGISTERED OWNERSHIP IN SJHC**

5.      Orders 4-7 of the Award relate to the changes in registered ownership that are to happen to SJHC, a Chinese joint venture company with Hong Kong investment, to implement the 2010 Agreement.  Orders 4-7 reflect a series of steps that are necessary to affect this registered ownership change in China.  These Orders reflect that certain documents need to be collected, prepared, and executed for submission to the PRC authorities in support of the ownership changes to SJHC.  Many of these steps have already been accomplished, but some of them are not in the control of Oasis (or its controlling shareholders, Respondent Ms. YU and her sisters, YU Naiwen and YU Naiyun).

6.      SJHC is a Chinese company organized as a joint venture with Hong Kong investment under Chinese law. Greencourt HK owns 80% of the registered capital in SJHC and Shanghai

3

Oasis Kechuang Ecological Technology Co. Ltd (上海绿洲科创生态科技有限公司, in Chinese) ("Oasis Kechuang") owns 20% of the registered capital in SJHC.  The 2010 Agreement and the Award contemplate that 80% of the ownership interest in SJHC will be transferred from Greencourt HK to another Hong Kong company, a company named Shibang Company Limited (世邦有限公司, in Chinese) ("Shibang") and that the 20% ownership interest in SJHC will be transferred from Oasis Kechuang to a Chinese company jointly designated by Mr. KE (now his representatives after his passing) and Mr. XU.

7.      Prior to the execution of the 2010 Agreement (as memorialized in Clause 2.3.5 of the 2010 Agreement), Oasis and its controlling shareholders had already transferred day-to-day control over SJHC to Mssrs. KE and XU.  I understand that Oasis and its controlling shareholders had already delivered its actual control of SJHC (including management documents, financial documents, bank accounts) to Mssrs. KE and XU in the late 2009/early 2010 timeframe. Greencourt HK and Oasis Kechuang appointed four people that had been jointly designated by Mssrs. KE and XU to be the board directors of SJHC in September 2010.  I understand that the four board directors appointed were Mr. XU Hongbiao (徐宏标, in Chinese), who became the first applicant in the Hong Kong arbitration, Mr. KE Zhengguang (柯铮光, in Chinese), who became the second applicant in the Hong Kong arbitration, Mr. KE Zhengfu (Mr. KE's brother) (柯铮夫, in Chinese), and Mr. XU Liangyan (许良彦, in Chinese).  After Mr. KE Zhengguang's passing, I understand that Ms. KE Yeying (Mr. KE's daughter and one of the administrators for Mr. KE's assets named by the Petitioner in this litigation), was appointed as the director in SJHC who would replace Mr. KE Zhengguang and that this change took place in March 2014.  Ms. KE was also appointed by the board of SJHC as the general manager for SJHC and I understand

remains so to this day.  I further understand that Ms. KE maintains the control over the use of

SJHC's corporate seal and incorporation certificate for SJHC.  I understand the current board of

SJHC consists of Mr. XU Hongbiao, Ms. KE Yeying, Mr. KE Zhengfu, and Mr. XU Liangyan.  I

understand that Mr. XU Liangyan is the Legal Representative of SJHC.

8.      Since the issuance of the Award, Oasis and its controlling shareholders have been

working diligently on the ground to coordinate with Mr. KE's representatives and Mr. XU to

urge the ownership share transfers.  The share transfer agreement contemplated by Order 5 and

other relevant documents, including the shareholder's resolution of SJHC approving the 80%

share transfer and the Statement of Waiver of Right of First Refusal by Oasis Kechuang, have

already been signed or issued.  The ownership transfer agreement contemplated by Order 7 has

already been prepared.  However, those transfers cannot be effected if Mr. KE's representatives

and Mr. XU refuse to cooperate with providing the documents required to be submitted to the

PRC authorities for the transfer. While Order 6 relates to the transfer of ownership and control

over Shibang, ownership and control over Shibang does not become important until after the

transfer from Greencourt HK to Shibang of 80% of the ownership in SJHC has been effected.

9.      Despite Oasis and its controlling shareholders' good faith efforts, Oasis and the

controlling shareholders' attempts to push forward the ownership share transfer process for

SJHC have been impeded by Mr. XU and Mr. KE's representatives.  For example, Mr. XU has

demanded that the board membership in SJHC must first be changed before the ownership

changes can take place.  Representatives for Mr. KE have rejected Mr. XU's demands, leaving

Oasis and its controlling shareholders without clear instructions.   I provide some more detail

below from the letters that have been exchanged between counsel for the respective parties.

a) On May 3, 2018, counsel for Mr. XU wrote to counsel for Oasis and its controlling shareholders, with copy to counsel for representatives for Mr. KE, demanding that Oasis and its controlling shareholders re-appoint SJHC's current board directors, legal representative and general manager before the ownership interests in SJHC were transferred.  (Ex. 8.)  Mr. XU alleged that he had lost control over SJHC and asserted that SJHC had participated in a series of "unthinkable" incidents while it was under "illegal control" (presumably, of Mr. KE's representatives).  (*Id.* at 1)

b) On May 9, 2018, counsel for Mr. KE's representatives rejected Mr. XU's demand to replace board directors and the legal representative in SJHC indicating that changes to the governance structure of SJHC was a matter to be discussed and agreed to by both Mr. XU and the representatives for Mr. KE, and that such matters were to be decided after the ownership transfer of SJHC was completed.  (Ex. 10., ¶ 3)

c) On May 18, 2018, counsel for Mr. XU wrote to counsel for Oasis and its controlling shareholders again, with copy to counsel for representatives for Mr. KE, stating that he believed Mr. KE's representatives "had not expressed disagreement" with respect to the re-appointment of board directors demanded by Mr. XU and therefore asked Oasis and its controlling shareholders to provide comments on the replacement plan proposed by Mr. XU.  (Ex. 12.)

d) On May 24, 2018, in order to be able to move forward with the ownership share transfer process in SJHC, counsel for Oasis and its controlling shareholders wrote to counsel for Mr. XU, with copy to counsel for Mr. KE's representatives, highlighting their conflicting positions and calling on them to resolve their disputes among themselves. (Ex. 17.)

6

e) On June 30, 2018, counsel for Mr. XU wrote to counsel for Oasis and its controlling shareholders with copy to counsel for KE's representatives, stating that Mr. XU had received documents that suggest "serious legal issues" in SJHC project contracts, and that he also learned that Mr. XU Liangyan had become physically unfit to perform the duties of legal representative for SJHC. (Ex. 15.)  Counsel for Mr. Xu asserted that since Mr. KE's representative became a board director and general manager of SJHC, Mr. XU's control and management rights in SJHC had been "illegally encroached" and that, in spite of this, Oasis and its controlling shareholders were still unreasonably rejecting his instructions to replace the board and the legal representative in SJHC.  He further asserted that those who were controlling SJHC (presumably KE's representatives) had seriously damaged normal operations and the commercial rights and interests of SJHC which seriously threatened and damaged his legitimate rights and interests in SJHC. (*Id.*) Mr. Xu further disavowed responsibility for any harm caused to Oasis and its controlling shareholders and threatened to "pursue [Oasis and its controlling shareholders]" for all losses resulting from their failure to act.   (*Id.*)

f) On July 5, 2018, counsel for Mr. KE's representatives objected again to the replacement of board directors and legal representative for SJHC. (Ex. 16.)

10.     Besides their diverging instructions regarding changing the corporate governance structure in SJHC, Mr. XU and Mr. KE's representatives have also given conflicting and irreconcilable instructions regarding how the ownership share transfer procedures should be carried out. It was agreed by both Mr. XU and Oasis and the controlling shareholders that it should be Oasis and the controlling shareholders to lead the work on share transfer procedures and to collect the documents for submission to the government authorities.  However, Mr. KE's

representatives have repeatedly demanded that SJHC lead the work on share transfer procedures and the relevant documents should be submitted to SJHC instead of Oasis and the controlling shareholders.  Mr. XU also rejected individual designated by Mr. KE's representatives to handle the share transfer procedures on behalf of SJHC.  In addition, Mr. XU and Mr. KE's representatives have also refused to provide to Oasis and the controlling shareholders the relevant documents required for effectuating the share transfer for SJHC, including SJHC's audit report, despite Oasis and its controlling shareholders' tremendous efforts in trying to lead and coordinate the process. I provide some more detail below from the correspondences between counsels for the respective parties.

a) On April 2, 2018, counsel for Oasis and the controlling shareholders wrote to counsel for Mr. XU and counsel for Mr. KE's representatives, requesting copies of the most recently issued business license, Articles of Association and audit report of SJHC for use in preparation for the share transfer documentation.  (Ex. 3, ¶ 7.)

b) On April 13, 2018, counsel for Mr. KE's representatives replied to counsel for Oasis and the controlling shareholders, advising that they would provide SJHC's business license and Articles of Association thereafter and would also provide SJHC's audit report when it is ready. (Ex. 5, ¶ 8.)

c) On April 26, 2018, counsel for Mr. KE's representatives changed their mind and refused to provide a copy of SJHC's audit report to Oasis and the controlling shareholders and instead demanded all documents for share transfer that are in the possession of Oasis and its controlling shareholders be provided to KE's representatives for submission to the PRC authorities. (Ex. 6.)

d)   On April 30, 2018, counsel for Oasis and its controlling shareholders noted to counsel for

Mr. KE's representatives and counsel for Mr. XU that they would provide the share

transfer agreement and other documents required for the share transfer to Mr. XU and Mr.

KE's representatives by May 10, 2018 after confirming the documentation requirements

with the relevant government authorities. (Ex. 7.) Counsel for Oasis and its controlling

shareholders asked again to be provided with SJHC's audit report, business license and

Articles of Association of SJHC. (*Id.*, ¶ 3)

e)   On May 9, 2018, Counsel for Mr. KE's representatives replied to counsel for Oasis and

its controlling shareholders, refusing to provide the documents requested and demanded

again all share transfer documents be provided to Mr. KE's representatives. (Ex. 10.)

f)   On July 19, 2018, counsel for Oasis and the controlling shareholders wrote to counsel for

Mr. XU and counsel for Mr. KE's representatives, providing the required document list

for the share transfer that had been confirmed with an agency company (Shanghai

Yingtong Enterprise Consulting Co., Ltd) ("Agency Company") which had been

previously retained by SJHC to assist with the share transfer process. (Ex. 18.)  Most of

the documents on the list needed to be prepared by Mr. XU and Mr. KE's representatives

or SJHC while others needed to be prepared by Oasis and the controlling shareholders.

Along with the list, counsel for Oasis and the controlling shareholders also provided draft

agreements and other documents that that had been prepared by Oasis and the controlling

shareholders for review by Mr. XU and Mr. KE's representatives. (*Id.*) Counsel for Oasis

and the controlling shareholders asked Mr. XU and Mr. KE's representatives to send the

documents that they needed to prepare to counsel for Oasis and the controlling

shareholders, who would then forward those documents to the Agency Company for submission to the PRC authorities. (*Id.*)

g)  On August 6, 2018, counsel for Mr. KE's representatives wrote to Oasis and the controlling shareholders, with copy to counsel to Mr. XU, demanding again that SJHC lead the work on the share transfer procedures and designating a Ms. Zhu Qianqian (title stated to be Assistant to General Manager) as SJHC's contact who would be responsible for handling the SJHC share transfer. (Ex. 19.)  Counsel to Mr. KE's representatives also asked for additional time to verify the documentation requirements and other issues. (*Id.*)

h)  On August 31, 2018, counsel for Oasis and the controlling shareholders wrote to counsel for Mr. KE's representatives, with copy to counsel for Mr. XU, stating that Oasis and the controlling shareholders had contacted Ms. Zhu Qianqian on August 7 and 21 of 2018, respectively, but had not been provided with the relevant share transfer documents. (Ex. 20.)

i)  On September 7, 2018, Zhu Qianqian wrote to counsel for Oasis and the controlling shareholders, demanding that the share transfer documents be sent to her.  (Ex. 21.)  This September 7, 2018 letter bears neither the seal nor the letterhead of SJHC.

j)  On September 19, 2018, counsel for Mr. XU wrote to counsel for Oasis and the controlling shareholders, with copy to counsel for Mr. KE's representatives, stating that, pursuant to the Award, the procedures for the 80% share transfer to Shibang should be handled by Oasis and the controlling shareholders, with SJHC providing the necessary assistance and documents required for the transfer, and that, apart from this, SJHC and

10

Mr. KE's representatives should not interfere with or obstruct the transfer process

handled by Oasis and the controlling shareholders. (Ex. 23)

k)  On September 29, 2018, counsel for Oasis and the controlling shareholders wrote to

counsel for Mr. KE's representatives and counsel for Mr. XU, asking for authorization

documents issued by SJHC and Mr. XU with regard to whether Zhu Qianqian could

participate in the share transfer procedures as the authorized representative for SJHC. (Ex.

24.)  Counsel for Oasis and the controlling shareholders also stated that the share transfer

procedures should be led by Oasis and its controlling shareholders (which they had been

diligently trying to do) because the award had required Oasis and the controlling

shareholders to urge the transfer forward and also because SJHC was neither a party to

the arbitration nor to the share transfer.  (*Id.*)

l)  On October 5, 2018, counsel for Mr. XU wrote to counsel for Oasis and the controlling

shareholders, with copy to counsel for Mr. KE's representatives, stating that Ms. Zhu

Qianqian had not been authorized by SJHC or Mr. XU to handle the shares transfer in

SJHC and that Mr. XU completely agreed with Oasis and its controlling shareholders that

the transfer procedures should be coordinated and led by the Oasis and the controlling

shareholders.  (Ex. 25.)

11.     Until now, Mr. KE's representatives have simply not provided Oasis and its controlling

shareholders with the documents (including the audit report) that are needed to effectuate the

ownership transfer with the relevant PRC authorities, despite repeated requests to do so by Oasis

and its controlling shareholders as set forth above.

12.     On the other hand, as set forth below, recently Mr. XU has also refused to cooperate with the preparation of documents for the shares transfer and has indicated to counsel for Oasis and its controlling shareholders that he would not move forward with the ownership transfer until the controlling shareholders of Oasis help him to obtain control of SJHC.

   a) On January 23 &25, 2019, counsel for Oasis and the controlling shareholders emailed counsel for Mr. XU, requesting him to re-sign a June 2018 board resolution of Shibang which he had previously signed as one of the two directors of Shibang, so that Ms. Stephany Yu (the other board director of Shibang) would be authorized to have relevant documents of Shibang legalized in Hong Kong for the shares transfer in SJHC. (Ex. 29.)

   b) According to counsel for Oasis and its controlling shareholders, on January 30, 2019, during a face-to-face meeting with them, Mr. XU refused to re-sign the board resolution of Shibang stating that he would look to Ms. Stephany Yu to support him to regain control of SJHC and he would not push forward the 80% share transfer in SJHC before that.

13.     In addition to the document requests sent by counsel for Oasis and the controlling shareholders to counsel for Mr. XU and counsel for Mr. KE's representatives as set out above, additional specific requests with respect to the transfer of 20% shares in SJHC as contemplated in Order 7 were also made to Mr. XU and counsel for Mr. KE's representatives.  On September 29, 2018, counsel for Oasis and the controlling shareholders asked Mr. XU and Mr. KE's representatives to advise as to their mutually agreed plan regarding the apportionment of tax for the 20% share transfer pursuant to the Award. (Ex. 24.)  So far, we have not yet received such information from Mr. XU and Mr. KE's representatives. Moreover, Oasis and the controlling

shareholders have also been advised by the Agency Company that if the 80% shares transfer and

the 20% shares transfer are handled at the same time, the PRC government authorities may not

agree to effect the changes.

**PROPERTY EXCHANGE TRANSACTIONS CONTEMPLATED BY
THE 2010 AGREEMENT AND THE AWARD**

14.　　The Jiuting properties that are subject to the 2010 Agreement and the Award refer to

commercial properties of a total area of approximately 8,000 square meters in the Greencourt

Sun City Real Estate Project located at Jiuting, Songjiang District, Shanghai City, which

comprises of about 6,000 square meters in buildings of the first-stage of the project and about

2,000 square meters at the Central Plaza of the second-stage of the project (as memorialized in

Clause 3.1 of the 2010 Agreement).  The Jiuting properties totaling 8,000 square meters

comprise of 14 properties (title certificates).

15.　　In order to execute the 14 sales agreements for the 14 properties and effect the

transactions contemplated by the 2010 Agreement and the Award with regard to the Jiuting

properties, as a first step, Mr. XU and Mr. KE's representatives must notify Oasis and the

controlling shareholders of their designated transferee(s) to receive the properties.  If they each

designate a different transferee, they must also advise Oasis and the controlling shareholders on

their agreement as to how to divide the properties, including the proportion to each, and whether

they would jointly share each of the properties (title certificate) or if they would split the

properties at an agreed proportion in terms of price or space, with Mr. XU and Mr. KE's

representatives each owning some of the shops.  In addition, as applications for title change need

to be submitted to and reviewed by local government authorities that are responsible for

effectuating the change, the mode of division once agreed by Mr. XU and Mr. KE's

representatives, must also be acceptable to such government authorities in order for the title transfer to be successful.

16.     Oasis and the controlling shareholders have made significant efforts, including notifying Greencourt Real Estate Development to start moving forward with preparing for the property transfer as soon as they received the award and Greencourt Real Estate Development moving its sales office for the Jiuting shops in May 2018 after being pressed by Oasis and the controlling shareholders.  In addition, Oasis and the controlling shareholders also worked hard to coordinate with Mr. XU and Mr. KE's representatives in trying to push forward the property transactions. However, Oasis and the controlling shareholders' efforts have been impeded as Mr. XU and Mr. KE's representatives have not clearly instructed Oasis and the controlling shareholders as to their mutual agreement on the designation of transferees and how to divide the property.  I provide some more detail below from the letters that have been exchanged between counsels for the respective parties.

a)  On March 23, 2018, counsel for Mr. KE's representatives notified counsel for Oasis and the controlling shareholders that they would advise about the transferees after consulting with Mr. XU. (Ex. 1.)

b)  On March 28, 2018, counsel for Mr. XU wrote to counsel for Oasis and its controlling shareholders, with copy to counsel for Mr. KE's representatives, designating a company named "Shanghai Jingquan Cultural Development Co., Ltd." to receive "50% of the ownership of Jiuting Store[s]." (Ex. 2, ¶ 1.)

c)  On April 2, 2018, counsel for Oasis and the controlling shareholders wrote to counsel for Mr. XU and counsel for Mr. KE's representatives, asking the latter to confirm whether

14

they accept the company designated by Mr. XU as the transferee for the Jiuting properties
and to advise on how the properties should be divided. (Ex. 3.) They also asked counsel
for Mr. XU to clarify what they meant by "50% ownership of Jiuting [Stores]" in the
March 28, 2018 email. (*Id*., ¶ 2(b))

d)  On April 6, 2018, counsel for Mr. XU wrote to counsel for Oasis and the controlling
    shareholders, with copy to counsel for Mr. KE's representatives, instructing that 50% of
    ownership in each of the title certificate of the Jiuting properties should be respectively
    transferred to Mr. XU and Mr. KE's representatives or third party(s) designated by them.
    (Ex. 4, ¶ 1(b).)

e)  On April 13, 2018, silent about Mr. XU's instruction dated April 6, 2018, counsel to Mr.
    KE's representatives advised counsel for Oasis and the controlling shareholders, with
    copy to counsel for Mr. XU that they would submit a "joint proposal" that contained
    transferee information. (Ex. 5, ¶ 6.)

f)  On May 3, 2018, counsel for Mr. XU advised counsel for Oasis and the controlling
    shareholders that he would reply on the transfer of the Jiuting stores shortly thereafter.
    (Ex. 8, at 2.)

g)  On August 31, 2018, Oasis and the controlling shareholders again emailed Mr. Xu and
    Mr. Ke's representatives stating that they had been unable to proceed as they had not
    been given uniform instruction. (Ex. 20.)

h)  On September 11, 2018, counsel for Mr. KE's representatives wrote to counsel for Oasis
    and the controlling shareholders, with copy to counsel for Mr. XU, stating that they had

reached agreement with Mr. Xu to have "50% of Jiuting store's equity" transferred to companies respectively designated by them, and designated a company named Shanghai Qingxuan  Business Management Consulting Co., Ltd. as their transferee. (Ex. 22, at 1.) However, counsel for Mr. KE's representatives did not clarify what they meant about transferring "50% of Jiuting store's equity", i.e., whether Mr. XU and Mr. KE's representatives had agreed to own each title certificate by 50/50 or they would divide the properties by 50/50 in terms of price/space, with each owning some of the shops.

i)   On September 19, 2018, counsel for Mr. XU wrote to counsel for Oasis and its controlling shareholders, with copy to counsel for Mr. KE's representatives, advising that Mr. XU changed his transferee from the company he previously designated in the March 28, 2018 letter to himself because he learned that, in practice, titles to shops cannot be processed to be jointly owned by two companies.  (Ex. 23, ¶1.)

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

16

Executed on April 8, 2019.

_____
Yong GU

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

ESTATE OF KEZHENGGUANG,

Petitioner,

—*against*—

YU NAIFEN STEPHANY
(a/k/a/ STEPHANY YU,
a/k/a/ STEPHANY NAIFEN YU
a/k/a/ STEPHANY N. DOMBROWSKI),

Respondent.

8:18-cv-03546-PWG

顾勇之声明书

1.  我叫顾勇，是上海绿庭房地产开发有限公司（"绿庭房地产"）的董事，以及上海绿庭科创生态科技有限公司（原上海绿洲科创生态科技有限公司，"绿洲科创"）的董事，位于中华人民共和国（"中国"）上海市。 绿庭房地产和绿洲科创是绿洲投资集团有限公司（"绿洲"）的附属公司。我出具本声明是用来支持 Stephany Yu 女士在马里兰地区联邦法院的未决诉讼中所提交的驳回起诉动议。我已年满 18 岁，如获传召就本声明书所述事项作证，将具备如是作证的能力。本声明的内容是根据我个人所知信息（除非另行说明），且附件中的文件都是原件的真实复印件。我的母语是中文，我了解本声明将会被翻译成英文以便于法庭理解 。

2.  我知道于 2010 年 4 月 28 日签署的《关于执行《股份重组初步协议》的协议书》（"《2010 年协议》"）以及于 2018 年 2 月 28 日做出的仲裁裁决（"《裁决》"）中所预期在中国进行的各项交易，也参与了代表绿洲及其控股股东在中国推进这些交易中的股权变更事宜与房产互换事宜的实施。 自《裁决》做出以来，绿洲及其控股股东一直在

努力促使《2010 年协议》和《裁决》中所述的交易。 然而，这些努力受到了香港仲裁中的申请人柯铮光先生之代表以及徐宏标先生的严重阻碍。

3.    《裁决》中所载的一个需进行的主要事项是根据《2010 年协议》对上海绿庭四季花城房地产开发有限公司（"四季花城"）的股权进行重组。四季花城是一家在中国从事房地产开发的含有香港投资的合资企业，根据中国法律和监管规定，变更四季花城股权并落实各方协议是一个复杂的过程，至少包括由四季花城指定的代表或委托的代理人向当地商务主管部门提交申报文件、以及股权转让协议等一系列证明文件，供监管机构审查和核准。绿洲投资及其股东一直在努力促使这些交易，但如果柯先生之代表和徐先生不予以配合，这些交易就无法完成，尤其是考虑到四季花城的控制权早已从绿庭置业有限公司（"绿庭香港"）和绿洲科创转移给柯先生和徐先生(如下文详述)。

4.    在本声明书中，我首先概述绿洲及其控股股东为促使四季花城股权变更所采取的措施（即《裁决》的第 4、5 和 7 号命令），再概述绿洲及其控股股东为促使《2010 年协议》和《裁决》所涉的房地产互换交易所采取的措施（《裁决》的第 1 和第 2 号令）。我还会重点介绍如本纠纷各方律师的通信中所体现的我们受到的来自柯先生之代表和徐先生的各种阻力。

<u>对四季花城的控制权以及股权登记的变更</u>

5.    《裁决》的第 4-7 号命令涉及对含有香港投资的合资企业四季花城登记股权的变更，以履行《2010 年协议》，这些仲裁命令反映了为在中国实现该登记股权变更所需采取的一系列步骤。 这些仲裁命令意味着需要收集、准备和签署某些文件并提交给中国政

府部门，以支持四季花城的股权变更。 其中多项步骤已经完成，但其中一些步骤并非由绿洲（或其控股股东，被告俞女士及其姐妹俞乃雯和俞乃筠）所控制。

6.　四季花城是一家根据中国法律组建的性质为含香港投资合资企业的中国公司。绿庭香港持有四季花城 80%的注册资本，而上海绿洲科创生态科技有限公司（"绿洲科创"）持有其 20%的注册资本。 根据《2010 年协议》和《裁决》，绿庭香港应将四季花城 80%的所有权权益转让给另一家名为世邦有限公司（"世邦"）的香港公司，且绿洲科创应将四季花城 20%的所有权权益转让给柯先生（在其去世后，现为他的代表）和徐先生共同指定的一家中国公司。

7.　绿洲及其控股股东在签署《2010 年协议》之前（如该协议第 2.3.5 条所述），对四季花城的实际控制权已交给柯先生和徐先生。据我所知，绿洲及其控股股东已在 2009 年底/ 2010 年初这段时间将其对四季花城的实际控制权（包括经营资料、财务资料、银行账户）交给了柯先生和徐先生。绿庭香港和绿洲科创于 2010 年 9 月委派了四名由柯先生和徐先生共同指定的人员作为四季花城的董事。据我所知，这四位董事分别是香港仲裁中的第一申请人徐宏标先生、香港仲裁中的第二申请人柯铮光先生、柯铮夫先生（柯先生的哥哥）和许良彦先生。柯铮光先生去世后，据我所知，柯烨颖女士（柯先生女儿，且是本诉原告之名的柯先生财产的管理人中的一位）在 2014 年 3 月被委派为四季花城的董事，作为柯铮光先生的替任。柯女士还被四季花城董事会聘任为四季花城的总经理，且据我所知，柯女士至今一直担任此职位。另外，据我了解，柯女士还掌管着四季花城的公章和证照的使用。据我所知，四季花城现任董事会成员由徐宏标先生、柯烨颖女士、柯铮夫先生和许良彦先生组成，其中许良彦先生为四季花城的法定代表人。

8.　　自《裁决》做出以来，绿洲及其控股股东一直非常努力的去与柯先生之代表和徐先生协调，以促使股权的转让。第 5 号命令所涉及的股权转让协议及其他相关文件，包括批准 80%股权转让的四季花城股东会决议以及绿洲科创放弃优先购买权的声明，都已签署或签发完成。第 7 号命令所涉及的所有权转让协议也已起草完毕。但是，如果柯先生之代表和徐先生拒绝配合提供转让所需提交给中国政府部门的文件，则这些转让无法完成。第 6 号命令涉及对世邦的所有权和控制权的转让，但在绿庭香港得以向世邦转让 80%四季花城所有权之前，世邦的所有权和控制权问题意义不大。

9.　　尽管绿洲及其控股股东做出了真诚的努力，但其对于四季花城股权转让程序的推进受到了徐先生和柯先生之代表的阻碍。例如，徐先生要求在四季花城所有权变更之前，必须先对四季花城的董事会成员进行更换。而柯先生之代表拒绝徐先生的要求，由此导致绿洲及其控股股东得不到明确的指示。下面我将提供各方律师在通信交流中的更多细节。

　　a) 2018 年 5 月 3 日，徐先生的律师致函绿洲及其控股股东的律师，并抄送柯先生之代表的律师，要求绿洲及其控股股东在四季花城所有权权益转移之前重新委派四季花城的现任董事会成员和法定代表人。（附件 8）徐先生声称，他已经失去了对四季花城的管控权，且声称四季花城在被"非法控制"之下（据推测，是指由柯先生代表所控制）发生了一些"不可思议"事件。（*同上*。见第 1 段）

　　b) 2018 年 5 月 9 日，柯先生之代表的律师拒绝了徐先生关于替换四季花城董事会成员和法定代表人的要求，并指出对四季花城治理结构的变更应经徐先生和柯先生代表的讨论和同意，并在四季花城所有权转让完成后决定。（附件 10。见第 3 段）

c) 2018 年 5 月 18 日，徐先生的律师再次致函绿洲及其控股股东的律师，并抄送柯先生代表的律师，称其认为柯先生之代表对徐先生关于重新委派董事会成员的要求"并没有表示异议"，并因此要求绿洲及其控股股东对徐先生提出的人员变更方案提供意见。（附件 12）。

d) 2018 年 5 月 24 日，为了能够继续推进四季花城股权转让，绿洲及其控股股东的律师致函徐先生的律师，并抄送柯先生之代表的律师，指出他们两方的立场相互不一致，并希望他们自己内部协调解决争议。（附件 17）

e) 2018 年 6 月 30 日，徐先生的律师致函绿洲及其控股股东的律师，并抄送柯先生之代表的律师，声称徐先生收到了表明四季花城工程合约存在"严重法律问题"的文件，并称其得知许良彦先生的身体条件已经不具备履行作为四季花城法人代表的能力。（附件 15）徐先生的律师声称，自柯先生之代表出任四季花城的董事和总经理之后，徐先生对四季花城的控制权和经营权已被 "非法侵占"，并称绿洲及其控股股东不顾如此情况，仍无理拒绝其替换四季花城董事和法人代表的指示。徐先生进一步声称，四季花城的控制人（据推测，指柯先生之代表）严重损害了四季花城的正常营运及商业权益，严重威胁和损害了其在四季花城的合法权益。（*同上。*）另，徐先生还宣称不会承担由此引致绿洲及其控股股东的任何损失，并威胁"向[绿洲及其控股股东]追讨"一切因其不作为所导致的损失。（*同上。*）

f) 2018 年 7 月 5 日，柯先生之代表的律师再次拒绝对四季花城董事和法人代表进行替换。（附件 16）

10.　　除了对四季花城治理结构变更做出不同指示外，徐先生和柯先生之代表就股权转让手续如何进行所做的指示也是相互矛盾且不可调和的。徐先生与绿洲及其控股股东均同意，应由绿洲及控股股东主导股权转让手续的工作，并收集需提交给政府主管部门的文件。然而，柯先生之代表却多次要求由四季花城来主导股权转让手续的工作，并要将相关文件交给四季花城而非绿洲及其控股股东。徐先生亦拒绝同意柯先生之代表指定的人士作为四季花城的代表来代表四季花城办理股权转让手续。此外，尽管绿洲及其控股股东十分努力地去主导和协调转让工作，但徐先生及柯先生之代表还是拒绝向绿洲及其控股股东提供实现四季花城股权转让所需的相关文件，包括四季花城的审计报告。下面我将提供各方律师在通信交流中的更多细节。

a) 2018 年 4 月 2 日，绿洲及其控股股东的律师致函徐先生的律师和柯先生之代表的律师，要求其提供四季花城最新的营业执照、公司章程以及审计报告，以供准备股权转让文件之用。（附件 3。见第 7 段）。

b) 2018 年 4 月 13 日，柯先生之代表的律师回复绿洲及其控股股东的律师，告知其随后将提供四季花城的营业执照和公司章程，并将在完成审计报告后提供该文件。（附件 5。见第 8 段）

c) 2018 年 4 月 26 日，柯先生之代表的律师改变主意，拒绝向绿洲及其控股股东提供四季花城审计报告的副本，而是要求绿洲及其控股股东将其持有的所有文件交给柯先生之代表，以提交予中国政府部门。（附件 6）

d) 2018 年 4 月 30 日，绿洲及其控股股东的律师向柯先生之代表的律师和徐先生的律师告知，其将在和相关机关确认文件要求后，于 2018 年 5 月 10 日之前将股权转让所需的股权转让协议等文件提供给徐先生以及柯先生之代表。（附件 7）绿洲及其控股股东的律师再次要求对方提供四季花城的审计报告、营业执照和公司章程。（*同上*。见第 3 段）

e) 2018 年 5 月 9 日，柯先生之代表的律师回复绿洲及其控股股东的律师，拒绝提供所要求的文件，并再次要求将所有股权转让文件提供给柯先生之代表。（附件 10）。

f) 2018 年 7 月 19 日，绿洲及其控股股东的律师致函徐先生的律师和柯先生之代表的律师，提供了经四季花城之前聘用的协助办理股权转让的代理公司上海盈通企业咨询有限公司（"代理公司"）确认的股份转让所需文件清单。（附件 18）清单上的大部分文件需要由徐先生和柯先生之代表或四季花城准备，其他文件则需要由绿洲及其控股股东准备。绿洲及其控股股东的律师还随清单提供了由绿洲及其控股股东准备好的协议草本和其他文件，供徐先生及柯先生之代表审阅。（*同上*。）绿洲及其控股股东的律师要求徐先生和柯先生之代表提供他们所需准备的文件给绿洲及其控股股东的律师，并由其随后转交给代理公司用以提交给中国政府部门。（*同上*。）

g) 2018 年 8 月 6 日，柯先生之代表的律师致函绿洲及其控股股东的律师，并抄送徐先生的律师，再次要求由四季花城主导股权转让手续，并指定了朱倩倩女士（职位为总经理助理）作为四季花城的联系人，负责办理四季花城股权转让手续。（附件

7

19）另，柯先生之代表的律师还要求更多时间来核实文件要求和其他问题。（*同上。*）

h) 2018 年 8 月 31 日，绿洲及其控股股东的律师致函柯先生之代表的律师，并抄送徐先生的律师，指出绿洲及其控股股东已于 2018 年 8 月 7 日和 21 日联系了朱倩倩女士，但仍尚未收到相关股权转让文件。（附件 20）

i) 2018 年 9 月 7 日，朱倩倩致函绿洲及其控股股东的律师，要求将股权转让文件发给她。（附件 21）2018 年 9 月 7 日的这封函件既没有四季花城的印章，也没有四季花城的函头。

j) 2018 年 9 月 19 日，徐先生的律师致函绿洲及其控股股东的律师，并抄送柯先生之代表的律师，表示根据《裁决》命令，80%的股权转让至世邦公司的程序应由绿洲及其控股股东负责办理，四季花城应提供必要协助和转让所需的文件，除此之外，四季花城及柯先生之代表不应就绿洲及其控股股东办理有关转让的过程作出任何干涉和阻挠。（附件 23）

k) 2018 年 9 月 29 日，绿洲及其控股股东的律师致函柯先生之代表的律师和徐先生的律师，请徐先生对朱倩倩是否作为四季花城的有权代表参与股权转让事宜，要求四季花城和徐先生出具授权文件。（附件 24）。绿洲及其控股股东的律师还指出，股权转让手续应由绿洲及其控股股东主导（其一直努力如此行事），因为《裁决》要求绿洲及其控股股东安排并促使转让，而且四季花城既非仲裁的一方，也非股权转让的一方（*同上。*）

8

l) 2018 年 10 月 5 日，徐先生的律师致函绿洲及其控股股东的律师，并抄送柯先生之代表的律师，告知朱倩倩女士未取得四季花城或徐先生的授权来处理四季花城股权转让事宜，且徐先生表示完全同意绿洲及其控股股东的意见，即同意由绿洲及其控股股东统筹和主导转让程序。(附件 25)

11. 到目前为止，柯先生之代表还没有向绿洲及其控股股东提供为进行股权转让需向中国政府有关部门提交的文件（包括审计报告），尽管如上文所述，绿洲及其控股股东曾多次要求提供该等文件。

12. 另一方面，如下文所述，徐先生亦于近期拒绝就股权转让文件的准备进行配合，并向绿洲及其控股股东的律师表示，除非绿洲的控股股东帮助其获得对四季花城的控制权，否则其不会继续推进股权转让。

a) 2019 年 1 月 23 及 25 日，绿洲及其控股股东的律师通过邮件通知徐先生的律师，要求徐先生重新签署其此前已于 2018 年 6 月作为世邦两名董事之一签署的世邦董事会决议，授权 Stephany Yu 女士（世邦的另一名董事）为四季花城的股权转让将世邦的相关文件在香港进行公证。（附件 29）

b) 据绿洲及其控股股东的律师反映，2019 年 1 月 30 日，徐先生在与其的会面中，表示拒绝重新签署世邦董事会决议，称他希望 Stephany Yu 女士能就其重新获得对四季花城的控制权予以配合，在此之前他不会推动四季花城 80%股权转让。

13. 绿洲及其控股股东的律师除了向徐先生的律师和柯先生之代表的律师发出的如上所述的文件要求之外，还向徐先生以及柯先生之代表的律师就第 7 号命令下所涉及的四季

花城 20%股权转让提出了其他具体要求。2018 年 9 月 29 日，绿洲及其控股股东的律师要求徐先生和柯先生之代表告知其根据《裁决》就 20%股权转让的税费承担方案达成的共识。（附件 24）但到目前为止，我们尚未收到徐先生和柯先生之代表就此的回应。此外，代理公司亦已告知绿洲及其控股股东，如果同时处理 80%股权转让以及 20%股权转让，中国政府主管部门可能不会同意此等变更。

**《2010 年协议》以及《裁决》所涉之房地产互换交易**

14.    《2010 年协议》和《仲裁裁决》中所涉及的九亭房产是指位于上海松江区九亭的绿庭尚城房产项目下的商业用房，总面积约 8000 平方米，包括位于项目一期约 6000 平方米的房产，以及位于项目二期中心广场的约 2000 平方米的面积的房产（如《2010 年协议》第 3.1 条所述）。总计约 8000 平方米的九亭房产包含 14 套房产（产权证）。

15.    为了就这 14 套房产签署 14 个买卖合同并完成《2010 年协议》和《裁决》所述的九亭房产交易，首先，徐先生和柯先生之代表必须告知绿洲及其控股股东其指定接收房产的受让人。如果他们各自指定不同的受让人，他们还必须向绿洲及其控股股东告知他们就房产如何分割所达成的共识，包括分割比例，以及他们将共同持有每套房产（产权证），还是将以价格或面积为基础依照约定比例分割房产，从而每方拥有若干套商铺。此外，由于需要向负责办理产权登记的当地政府部门提交产权变更申请以供其审查，一旦徐先生和柯先生之代表就分割方式达成共识，该分割方式也必须为该等政府部门所接受，才能成功实现产权转移。

16.    绿洲及其控股股东已做出极大的努力，包括：收到裁决后立即通知绿庭房地产开始推动房产转让准备，在绿洲及其控股股东督促下绿庭房地产销售办公室在 2018 年 5 月

10

自商铺内搬离。并且，绿洲及其控股股东积极与徐先生和柯先生之代表进行协调，努力推进房产转让。但是，由于徐先生和柯先生之代表未明确告知绿洲及其控股股东其双方就受让人的指定以及房地产的分割所达成的共识，致使绿洲及其控股股东的努力受阻。下面我将提供各方律师在通信交流中的更多细节。

a) 2018 年 3 月 23 日，柯先生之代表的律师通知绿洲及其控股股东的律师，表示他们将在与徐先生的律师商议后，告知有关受让人的信息。（附件 1）

b) 2018 年 3 月 28 日，徐先生的律师致函绿洲及其控股股东的律师，并抄送柯先生之代表的律师，指定"上海景荃文化发展有限公司"接收"九亭商铺 50%所有权"。（附件 2。见第 1 段）

c) 2018 年 4 月 2 日，绿洲及其控股股东的律师致函徐先生的律师和柯先生之代表的律师，要求柯先生之代表确认是否接受徐先生指定的公司作为九亭房产受让人，并要求柯先生之代表告知房产分割的方式。（附件 3）同时，绿洲及其控股股东的律师还要求徐先生的律师澄清其在 2018 年 3 月 28 日电子邮件中所提到的"九亭商铺 50%所有权"的意思。（*同上*。见第 2(b)段）

d) 2018 年 4 月 6 日，徐先生的律师致函绿洲及其控股股东的律师，并抄送柯先生之代表的律师，指示九亭房产每个房产证的 50%份额分别转让给徐先生及柯先生之代表（或他们指定的第三方）。（附件 4。见第 1(b)段）

e) 2018 年 4 月 13 日，柯先生之代表的律师致函绿洲及其控股股东的律师，并抄送徐先生的律师，其未就徐先生的律师于 2018 年 4 月 6 日所作的指示做出回应，但告知他们将提交一份载明受让人信息的"共同提议"。（附件 5。见第 6 段）

f) 2018 年 5 月 3 日，徐先生的律师告知绿洲及其控股股东的律师，其将尽快就九亭商铺的转让事宜作出答复。（附件 8。见第 2 段）

g) 2018 年 8 月 31 日，绿洲及其控股股东再次致函徐先生和柯先生之代表的律师，指出由于没有得到统一的指示，他们无法继续进一步行事。（附件 20。）

h) 2018 年 9 月 11 日，柯先生之代表的律师致函绿洲及其控股股东的律师，并抄送徐先生的律师，声称其已与徐先生达成共识，约定将"九亭商铺 50%的权益"分别转让给他们双方各自指定的公司，且其指定上海青玄企业管理咨询有限公司作为其受让人。（附件 22。见第 1 段）但是，柯先生之代表的律师未澄清他们所说的转让"九亭商铺 50%的权益"的具体含义，例如，徐先生和柯先生之代表是同意以 50/50 的比例持有每一个房产证，还是按 50/50 的比例按价格/面积分割房产，从而各自拥有其中一部分商铺。

i) 2018 年 9 月 19 日，徐先生的律师致函绿洲及其控股股东的律师，并抄送柯先生之代表的律师，告知由于徐先生了解到商铺所有权由两家公司共同拥有在处理过程中不具备可实现性，因此将其受让人从此前在 2018 年 3 月 28 日函件中指定的公司变更为其自己。（附件 23。见第 1 段）

根据《美国法典》第 28 编第 1746 条，我声明上述情况属实，否则将依美国法律接受伪证罪处罚。

签署日期：2019 年 4 月 8 日。

顾勇

# EXHIBIT 6

UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

| | |
|---|---|
| ESTATE OF KE ZHENGGUANG,<br><br>               Petitioner,<br><br>      —*against*—<br><br>YU NAIFEN STEPHANY<br>(a/k/a/ STEPHANY YU,<br>a/k/a/ STEPHANY NAIFEN YU<br>a/k/a/ STEPHANY N. DOMBROWSKI),<br><br>              Respondent. | 8:18-cv-03546-PWG |

**DECLARATION OF MEIHUI XIAO**
***(Certification of English Translation of Gu Yong Declaration)***

1.      My name is Meihui Xiao.  I am an associate with Steptoe & Johnson LLP, resident in the firm's office in Beijing, China.  I am over the age of 18 and if called to testify to the matters set forth in this Declaration, I would be competent to do so.  My native language is Mandarin Chinese, but I am also fluent in English.  I attended law school in the United States and am admitted to practice law in New York.

2.      Attached hereto is a true and accurate English translation of the Declaration of Gu Yong in this matter.  The original, Mandarin Chinese Declaration of Mr. Gu is also attached, following the English translation.

      Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

      Executed on May 17, 2019.

                                _____
                                      Meihui Xiao

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

ESTATE OF KE ZHENGGUANG,

                                        Petitioner,

         —*against*—

YU NAIFEN STEPHANY
(a/k/a/ STEPHANY YU,
a/k/a/ STEPHANY NAIFEN YU
a/k/a/ STEPHANY N. DOMBROWSKI),

                                        Respondent.

8:18-cv-03546-PWG

**DECLARATION OF GU YONG [ENGLISH TRANSLATION]**

1.      I make this declaration in support of the Reply filed by Ms. Stephany Yu to rebut

various statements in the Declaration of Ke Yeying filed in the pending litigation before the

District Court of Maryland on May 6, 2019.

2.      Ms. Ke's allegations that implementation of the orders under the Award is

straightforward and that Ms. Stephany Yu has the ability to unilaterally perform the requirements

but refused to do so (Ke Decl. ¶ 13) are completely inaccurate and unfounded. As I explained in

details in paragraphs 3-16 of my first Declaration filed on April 8, 2019, implementation of the

SJHC ownership change and the property transactions contemplated in the Award is a

complicated process that cannot be completed without the cooperation from Mr. XU and Mr.

KE's representatives, as well as SJHC. However, KE's representatives and XU refused to

cooperate and disagreed among themselves regarding the implementation of the orders, which I

have explained in details in my first Declaration, supported by exhibits of correspondences

among the parties. In her declaration, Ms. Ke completely ignores the evidence I presented and provided no evidence to support any of her allegations.

3.      Regarding Orders 5-7 in connection with the SJHC ownership transfer, Ms. Ke suggested that the transfer entails simply "submit[ting] [the] transfer application and collate documents to the relevant government department." (Ke Decl. ¶ 14 ("Orders 5&7").)  However, the ownership transfer process is much more complicated. As I explained in my first Declaration, the SJHC ownership transfer involves many steps and Oasis's subsidiaries have completed the steps that they can do unilaterally including the signing of the relevant share transfer agreement and the issuance of the SJHC shareholders' resolution approving the share transfer and other relevant documents. (Gu Decl. ¶¶ 5-13.) For the other steps that require cooperation from Mr. XU and Mr. KE's representatives, such as the preparation and collection of other relevant documents for submission to the government authorities, Oasis was unable to proceed because Mr. XU and Mr. KE's representatives refused to cooperate and gave conflicting instructions. For example, Mr. XU objected to Mr. KE's representatives' proposal to have SJHC lead the work on transfer procedures and also objected to their designation of a SJHC representative to handle the transfer procedures on behalf of SJHC. (Gu Decl. ¶¶ 9-11.) In addition, contrary to Ms. KE's allegation that "the differences of opinion held by Mr. Xu have no effect or bearing on Respondent Yu's obligations under the Award" (Ke Decl. ¶ 21), Mr. XU, as a result of his different opinion regarding SJHC corporate governance, refused to sign a Shibang Company board resolution which is essential for the SJHC share transfer. (Gu Decl. ¶¶ 12-13.)

4.      Regarding the property transactions contemplated in the Award, Ms. Ke claims for the first time in her declaration that each of the properties will be jointly owned by a company designated by Mr. KE's representatives and Mr. XU himself. (Ke Decl. ¶ 22.) Prior to this, as I

2

set forth in details in paragraphs 15-16 of my first Declaration, Mr. KE's representatives and Mr.

XU never jointly advised Oasis or its controlling shareholders as to how in practice they would

like to divide the Jiuting Shops — *i.e.*, whether they would jointly share each of the properties or

they would split the properties at an agreed proportion in terms of price or space. The

aforementioned information including information about the purchasers and purchase price of

each of the Jiuting stores is essential to the property sales agreements. Without such information,

Oasis has been unable to urge Greencourt Real Estate Development to conclude sales agreement

for the properties with the designees of Mr. XU and Mr. KE's representatives and as such was

unable to submit the applications for title change to the local government authorities that are

responsible for effectuating the change. In addition, such joint ownership (each property to be

jointly owned by a company designated by Mr. KE's representatives and Mr. XU himself) is

highly unusual. According to inquiries we recently made with Shanghai Songjiang District Real

Estate Trading Center, the Songjiang District Housing Management Bureau, as well as real estate

agents, this approach may not be accepted by the relevant authorities.

5.      Regarding Order 3 about SJHC debt settlement, Ms. Ke argued that this can be simply

implemented by making payment to the SJHC bank account that "has already been provided to"

Ms. Yu. (Ke Decl. ¶ 14 ("Order 3")) However, this is untrue and like the other orders, Oasis'

attempts to implement this order has been frustrated by the completely conflicting instructions

given by Mr. XU and Mr. KE's representatives. On April 13, 2018, counsel for Mr. KE's

representatives wrote to counsel for Oasis and its controlling shareholders, with copy to counsel

for Mr. XU, providing information of a Bank of China account of SJHC which was said to be an

account mutually agreed by the two claimants for receiving the payment under Order 3. (First Gu

Decl. Ex. 5.)  However, on May 25, 2018, counsel for Mr. XU emailed a letter to counsel for

Oasis and its controlling shareholders, with copy to counsel for Mr. KE's representatives, saying that as Mr. XU's personal seal for SJHC's finance was "illegally abolished", rendering him unable to monitor the financial situation of SJHC.  Mr. XU demanded that payment under Order 3 only be made after the two claimants have jointly designated a SJHC account that is jointly supervised by the two claimants. (First Gu Decl. Ex. 13.) Mr. XU threatened to hold Oasis liable for any damages resulted to SJHC or Mr. XU if Oasis makes payment to any other SJHC account (referring to the Bank of China account provided by counsel for Mr. KE's representatives in their April 13, 2018 email). *Id.* Mr. XU and Mr. KE's representatives have not yet designated a jointly supervised bank account as referenced in Mr. XU's May 25 letter. As these two letters sufficiently demonstrate, payment under Order 3 was impossible due to Mr. XU and Mr. KE's representatives' bitter disagreements with respect to the bank account to receive the payment.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 16, 2019.

_____Yong Gu_____
Yong GU

4

UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

ESTATE OF KE ZHENGGUANG,

Petitioner,

—*against*—

YU NAIFEN STEPHANY
(a/k/a/ STEPHANY YU,
a/k/a/ STEPHANY NAIFEN YU
a/k/a/ STEPHANY N. DOMBROWSKI),

Respondent.

8:18-cv-03546-PWG

顾勇之声明书

1.　　我出具本声明来驳斥在马里兰联邦法院的诉讼中于 2019 年 5 月 6 日提交的柯烨颖之声明中的多项陈述，从而支持 Stephany Yu 女士所提交的回应。

2.　　柯女士所声称的履行仲裁裁决中的命令非常简单，且 Stephany Yu 女士有能力单独完成但却拒绝履行这一说法(见柯女士声明第 13 段)是完全错误且毫无根据的。 如我在 2019 年 4 月 8 日提交的第一次声明书中第 3 到 16 段所详细阐述的，仲裁裁决所涉及的关于四季花城股权变更以及房产交易的实施是一个复杂的过程，且必须有徐先生、柯先生之代表以及四季花城的配合才能完成。但是，如我在内附了当事人之间相关信函的第一次声明书中所详细阐述的，柯先生之代表和徐先生拒绝予以配合且两方关于裁决的执行事宜持矛盾意见。柯女士在其声明中完全无视我提交的证据而未提供任何证据来支持她所做的任何指控。

3.    关于四季花城股权变更相关的裁决第 5-7 号命令，柯女士表示变更只需要简单的"提交变更申请和收集整理相关文件给相关政府部门"即可(见柯女士声明第 14 段(第 5 和 7 号命令)) 。然而，股权变更程序远远比这复杂。如我在第一次声明书中所解释的，四季花城股权变更涉及多个步骤，而绿洲的附属公司已完成了其能够独立完成的步骤，包括 80%股份转让的协议和批准股权转让的股东会协议及其他相关文件的签署和签发（见我第一次声明书第 5-13 段）。对于剩余的必须由徐先生和柯先生之代表配合完成的步骤，例如准备和收集其他相关文件以供向政府提交，则由于两人拒绝配合并给出相互矛盾的指示而导致绿洲无法推进。例如徐先生反对柯先生之代表提议的由四季花城来主导转让程序，并反对柯先生之代表指定的人士作为四季花城的代表来办理变更事宜（见我第一次声明书第 9-11 段）。另外，与柯女士在其声明中所声称的"徐先生所持的不同意见对命女士在裁决下的义务没有影响或关系"恰恰相反，由于徐先生对于四季花城的治理结构持不同意见，他拒绝签署四季花城股权转让所需的一份世邦公司的董事会决议（见我第一次声明书第 12-13 段）。

4.    关于仲裁裁决中涉及的房产交易，柯女士在其声明中首次表示将由柯先生之代表指定的一家公司和徐先生本人共同所有每一套房产（见柯女士之声明第 22 段）。在此之前，如我在第一次声明书第 15-16 段中详细说明的，柯先生之代表和徐先生从未共同向绿洲及其控股股东告知其打算如何分割九亭商铺，他们将共同持有每套房产还是将以价格或面积为基础依照约定比例分割房产。前述包括商铺购买方、各商铺购买价格等在内的这些信息是商铺买卖合同的必要因素，因为缺乏这些信息绿洲无法促使绿庭房地产与徐先生和柯先生之代表指定的受让人签署商铺买卖合同，因此无法向负责办理产权登记的当地政

2

府部门提交后续产权变更申请。另外，这种产权共有方式（由柯先生之代表指定的一家公司和徐先生本人共同所有每一套房产）非常罕见，根据我们近期向上海市松江区房地产交易中心和松江区房管局的工作人员、以及房产经纪执业人员了解的情况来看，这种方式可能不会被相关政府部门所认可。

5. 关于四季花城债务清洁相关的第 3 号命令，柯女士声称只要向"已经提供给俞女士的"四季花城银行账户付款即可（见柯女士之声明第 14 段（"第 3 号命令"））。然而这并不属实，且如同其他命令一样，这个命令也由于徐先生和柯先生之代表的完全相矛盾的指令而导致绿洲无法实施。2018 年 4 月 13 日，柯先生之代表的律师给绿洲及其控股股东的律师写信，抄送了徐先生的律师，信中提供了一个据其声称是徐先生和柯先生之代表共同同意用来接收第 3 号命令下款项的四季花城的中国银行账户(见我第一次声明书之附件 5)。然而，2018 年 5 月 25 日，徐先生的律师致函我方律师，抄送柯先生之代表的律师，说由于其四季花城财务个人印章被"非法废除"而无法监察四季花城财务情况，因此要求我方只可在徐先生和柯先生之代表共同提供两方共同监管的四季花城账户后才可将第 3 号命令下的款项支付至这一账户（见我第一次声明之附件 13）。徐先生威胁说如果绿洲支付到四季花城的其他账户（意指柯先生之代表在其 2018 年 4 月 13 日邮件中提供的中国银行账户），则会就四季花城或徐先生由此遭受的损失追究绿洲的法律责任(同上)。徐先生和柯先生之代表至今尚未指定徐先生于 5 月 25 日邮件中提到的由两方共同监管的银行账户。如这两封邮件所充分体现的，由于徐先生和柯先生之代表之间就接收付款的银行账户的不同意见，导致无法进行第 3 号命令下的支付。

根据《美国法典》第 28 编第 1746 条，我声明上述情况属实，否则将依美国法律接受伪证罪处罚。

签署日期：2019 年 5 月 16 日。

顾勇

# EXHIBIT 7


TRANSPERFECT

# CERTIFICATION

TransPerfect is globally certified under the standards ISO 9001:2015 and ISO 17100:2015. This Translation Certificate confirms the included documents have been completed in conformance with the Quality Management System documented in its ISO process maps and are, to the best knowledge and belief of all TransPerfect employees engaged on the project, full and accurate translations of the source material.

File Name(s):           Agreement dated 28 April 2010 - "The Preliminary Share Restructuring Agreement"

Source Language(s)      Simplified Chinese

Target Language(s)      English

*Authorized Signature:*

*Name:*     *Maggie Cheng*

*Title:*    *Project Coordinator*

*Date:*     *Sept. 17ᵗʰ, 2018*

TRANSPERFECT TRANSLATIONS LIMITED    UNITS 1704-5, 17F, UNIVERSAL TRADE CENTRE, 3-5A ARBUTHNOT ROAD, CENTRAL, HONG KONG
T +852 2292.9900  F +852 2545.7781    WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

[Original handwritten text is indicated in italics]

*Document Evidence 1*                                                *Fen Ke Wen Jun*

Agreement on the Implementation of

"The Preliminary Share Restructuring Agreement"

This agreement is entered into by the following parties on 28 April 2010:

(A) Oasis Investment Group Limited, a company limited by shares incorporated in the British Virgin Islands, with registered address at [    ] (hereafter referred to as "Oasis Investment");

(B) Ms Naifen YU, an American citizen; USA passport number: 710714118 and mailing address at Room 419, Oasis Building, 555 West Zhongshan Road, Shanghai, postcode: 200051;

(C) Ms Naiwen YU, a Chinese citizen; Chinese ID card number: 310101196304040864 and mailing address at Room 419, Oasis Building, 555 West Zhongshan Road, Shanghai, postcode: 200051;

(D) Ms Naijun YU, a Chinese citizen; Chinese ID card number: 310106197207062822 and mailing address at Room 419, Oasis Building, 555 West Zhongshan Road, Shanghai, postcode: 200051;

(E) Mr Zhengguang KE, a Chinese citizen; Chinese ID card number: 310109195601033237 and mailing address at Room 419, Oasis Building, 555 West Zhongshan Road, Shanghai, postcode: 200051;

(F) Mr Hongbiao XU, a Chinese citizen; Chinese ID card number: 310104196403192854 and mailing address at Room 419, Oasis Building, 555 West Zhongshan Road, Shanghai, postcode: 200051;

(G) Cheergain International Group Limited, a company limited by shares incorporated in the British Virgin Islands with its registered address at [   ];

(H) Focus Town Limited, a company limited by shares incorporated in the British Virgin Islands with its registered address at [    ];

(I) Greencourt Properties Limited, a company limited by shares incorporated in Hong Kong with its registered address at [    ] (hereafter referred to as "Greencourt Properties");

(J) Shanghai Oasis Kechuang Shengtai Keji Limited, a company limited by shares incorporated in Fengxian District, Shanghai with its registered address is [   ] (hereafter referred to as "Oasis Kechuang").

*Fen Ke Wen Jun*

Ms Naifen YU, Ms Naiwen YU and Ms Naijun YU are collectively referred to as the "Controlling Shareholders" of Oasis Investment; Mr Zhengguang KE (or Cheergain International Group Limited owned by him) and Mr Hongbiao XU (or Focus Town Limited owned by him) are collectively referred to as the "Non-controlling Shareholders" of Oasis Investment. Oasis Investment, the Controlling Shareholders and the Non-controlling Shareholders, when they are addressed individually each is referred to as a "Party", and collectively as the "Parties".

Whereas :

1. The Controlling Shareholders and the Non-controlling Shareholders had adopted the "Shareholder Resolutions" regarding share restructuring on 24 March 2009, and signed the "Meeting Minutes" on 4 September 2009 and the "Preliminary Share Restructuring Agreement" (the "Restructuring Agreement") on 9 November 2009. The above three documents set out the basic principles and transaction framework for Oasis Investment's repurchase of shares held by the Non-controlling Shareholders.

2. Under clauses 2.1 and 2.2 of the Restructuring Agreement, Oasis Investment is to pay repurchase consideration that shall consist of an amount in foreign currency which amount shall be equivalent to RMB 250 million, plus 100% of the equity in Shanghai [Greencourt] Four-Season-Flower-City Property Development Co., Limited (hereafter referred to as "SJHC"). Issues relating to the repurchase payment schedule and payment method were agreed to be negotiated separately by the Parties.

3. In order to address the issues relating specifically to the repurchase, complete all the transactions specified in the Restructuring Agreement as soon as possible, and to reduce the transaction cost as well as time cost for all the Parties involved, the Parties agree to sign this agreement to specify the repurchase price, the payment schedule, the payment method and any other issues involved.

After amicable negotiations, all Parties unanimously reached the following decisions:

Article 1      Equity Transfer Prior to the Repurchase by Oasis Investment

1.1      Due to commercial needs, Mr Zhengguang KE decided to transfer his equity in Oasis Investment to Cheergain International Group Limited, and Mr Hongbiao XU to transfer his equity in Oasis Investment to Focus Town Limited. After the completion of the aforementioned transfer, Oasis Investment is to repurchase its shares held by Cheergain International Group Limited and Focus Town Limited (hereafter, the aforementioned arrangement is to be referred to as the "Equity Transfer Prior to the Repurchase"). Oasis Investment and the Controlling Shareholders agreed to the aforementioned arrangement and are willing to provide the necessary assistance.

1.2      Non-controlling Shareholders are responsible for the tax and expenses associated with the aforementioned Equity Transfer Prior to the Repurchase.

2

[Original handwritten text is indicated in italics]

*Fen Ke Wen Jun*

Article 2      Oasis Investment's Repurchase Consideration

2.1      Cash Consideration and its Payment Arrangement. Under the Restructuring Agreement, the cash component of Oasis Investment's repurchase consideration is an amount of foreign currency which is equivalent to RMB 250 million ("Cash Consideration"). All parties agree that when the actual payment is made, the amount of Cash Consideration is to be adjusted according to the following:

2.1.1      An amount of approximately RMB 41 million resulting from previous transactions for which the Non-controlling Shareholders shall be held liable shall be deducted from the Cash Consideration;

2.1.2      A conditional payment of a one-off additional compensation in the amount of RMB 30 million ("Additional Compensation") that Oasis Investment and the Controlling Shareholders are willing to pay shall be added to the Cash Consideration. The condition for this Additional Compensation is that Oasis Investment's share repurchase and payment of consideration will be completed pursuant to the provisions of the Restructuring Agreement and this supplemental agreement, and there is no major dispute between the Parties.

2.1.3      All parties agreed that, following the signing of this Agreement, when the payment of the relevant equity consideration is to be made and when the amount of Cash Consideration is to adjusted, the parties would then sign a supplementary agreement.

2.1.4      All parties agreed that the cash portion of the repurchase consideration shall be divided into two equal portions in Hong Kong dollars in Hong Kong and paid in full and on time to the bank accounts of Cheergain International and Focus Town Limited provided by the Non-controlling Shareholders at the time as determined in the article below.

2.2      Conditions and Schedule for the Payment of Cash Consideration

2.2.1      All Parties agree that the cash component of the repurchase is to be paid according to the following schedule:

(1)      Hong Kong dollars equivalent to RMB 80 million ("1st Payment") is to be paid within 10 days once the following prerequisites are met:

    (a)      All Parties have signed this supplemental agreement;

    (b)      Non-controlling Shareholders have signed the Resolution of Oasis Investment Shareholders' Meeting on the repurchase of the Non-controlling Shareholders' equity.

(2)      Hong Kong dollars equivalent to RMB 20 million ("2nd Payment") should be paid before 30 June 2011.

3

(3)     The remaining amount equivalent to RMB 150 million in Hong Kong dollars ("3rd Payment"), being the final payment subject to those adjustments agreed to or confirmed by all Parties under provisions of Article (4) below) is to be paid by 31 December 2012 once the following prerequisites are met:

   (a)   SJHC's equity transfer being approved by the government and the registration of the transfer being completed;

   (b)   Oasis Investment completing the registration of the change of shareholders that is necessary for the repurchase of the Non-controlling Shareholders' equity;

   (c)   Non-controlling Shareholders and Controlling Shareholders reaching an agreement on the payment arrangement in respect of the Cash Consideration and various adjustments to the amount specified in the aforementioned Article 2.1;

   (d)   Non-controlling Shareholders confirming that the payment of equity consideration specified in Article 2.3.5 below being completed and there being no dispute among all parties;

   (e)   Both of the Shanghai Real Estate Sale and Purchase Contract mentioned in Article 3.1 and the Shanghai Real Estate Presale Contract mentioned in Article 3.2 being signed and the registration of transfer [of ownership] or the registration of presale with the Real Estate Registration Authority being completed.

(4)     Adjustments to the Amount of Cash Consideration

All Parties agree that, before the payment of the 3rd Payment, under provisions of the following Articles, all parties shall calculate and determine the adjustments to the amount of Cash Consideration, and take the adjusted amount as the final amount for purposes of the 3rd Payment.

   (a)   Under the provisions of the Restructuring Agreement and this agreement, Oasis Investment and Controlling Shareholders shall use 100% of SJHC's equity as part of the share repurchase consideration ("Equity Consideration"). If under any laws and regulations, such equity transfer must indicate a price and that this price must actually be paid, the actual amount (net amount after deduction of tax and fees) paid by the Non-Controlling Shareholders to Oasis Investment and the Controlling Shareholders for the equity transfer shall be added to the Cash Consideration;

   (b)   The sharing of the amount stipulated in Articles 2.1.1 and 2.1.2 above shall be reflected in the final amount of the 3rd Payment;

   (c)   Under provisions of other Articles of this agreement, all tax and expenses that shall be paid by the parties shall be reflected in the final amount of the 3rd Payment.

[Original handwritten text is indicated in italics]

*Fen Ke Wen Jun*

2.3 Payment Method of Equity Consideration. According to the Restructuring Agreement, the equity portion of Oasis Investment's repurchase consideration is calculated as 100% equity of Shanghai Greencourt Four-Season-Flower-City Property Development Co., Limited ("Equity Consideration"). Such Equity Consideration shall be paid in the following methods:

2.3.1 Oasis Investment has newly incorporated Shibang Company Ltd ("Shibang Company") in Hong Kong and has arranged for Shibang Company to acquire 80% of the equity interest in Shanghai Greencourt Four-Season-Flower-City Property Development Co., Limited (hereafter referred to as "SJHC") held by Greencourt Properties Limited, a subsidiary of Oasis Investment in Hong Kong. After the completion of the said equity acquisition, Oasis Investment shall sign the "Equity Purchase Option Agreement" with Cheergain International Group [Limited] and Focus Town Limited and agree that upon the expiration of the entrustment period mentioned in Article 2.3.2 below, 100% of the equity of Shibang Company shall be transferred to Cheergain International Group [Limited] and Focus Town Limited at a consideration of HKD 1.

2.3.2 All Parties Agree That: After Oasis Investment's signing of the Equity Purchase Option Agreement for the equity transfer of Shibang Company to Cheergain International Group Limited and Focus Town Limited, Greencourt Properties is to sign the relevant Entrustment Agreement with Cheergain International Group Limited and Focus Town Limited. This agreement shall stipulate that: (1) Cheergain International Group Limited and Focus Town Limited are entrusted by Greencourt Properties to manage Shibang Company and to exercise the shareholders' rights on its behalf for three years (the "entrustment period"); (2) during the entrustment period, the Non-controlling Shareholders are responsible for all the debts and claims, risks and liabilities of Shibang Company and SJHC. If for any reason the Controlling Shareholders, Oasis Investment or Greencourt Properties are required to bear the debts and claims, risks and liabilities of Shibang Company or SJHC during the entrustment term, the Non-controlling Shareholders are required to fully compensate the Controlling Shareholders, Oasis Investment and Greencourt Properties.

2.3.3 The remaining 20% of the equity of SJHC currently held by Oasis Kechuang Shengtai Limited, a subsidiary of Oasis Investment, is to be transferred to a domestic company in China appointed by the Non-controlling Shareholders ("Onshore Payment of Equity Consideration"). If under the laws of the People's Republic of China, an actual payment of consideration is required to be made for such equity transfer, the provisions of the abovementioned Article 2.2.1(4)(a) shall apply.

2.3.4 All Parties Agree That: The Non-controlling Shareholders shall be responsible for all the tax and expenses incurred due to the Onshore Payment of Equity Consideration, as well as the tax and expenses incurred offshore due to the entrustment arrangement made by Shibang Company and the equity transfer of Shibang Company to Cheergain International Group Limited and Focus Town Limited. Apart from this, the sharing of the tax and expenses relating to the payment of Equity Consideration is to be negotiated by all the Parties in due course. All procedures relating to the onshore and offshore payment of Equity Consideration, such as applications, registrations and government procedures, etc. are to be

undertaken by the Non-controlling Shareholders while the Controlling Shareholders and Oasis Investment are to provide the necessary assistance.

6

[Original handwritten text is indicated in italics] *Fen Ke Wen Jun*

2.3.5 As a result of Oasis Investment and the Controlling Shareholders having already transferred the management rights of SJHC to the Non-controlling Shareholders before this agreement is signed, all Parties agree that, upon Oasis Investment and the Controlling Shareholders having signed the Equity Purchase Option Agreement specified in the aforementioned Article 2.3.1 and the Entrustment Agreement specified in Article 2.3.2, the payment of Equity Consideration is to be deemed as complete.

Article 3 Other Agreements Relating to Oasis Investment's Repurchase and Repurchase Consideration

3.1 Within 30 days of the signing of this agreement, Oasis Investment and the Controlling Shareholders shall procure a subsidiary, namely, Shanghai Greencourt Real Estate Development Limited to sign the "Shanghai Real Estate Sale and Purchase Contract" with the Non-controlling Shareholders or their nominated third party, and undertake to transfer approximate 8000 $m^2$ of commercial space which shall meet the appropriate delivery standards (specifically, the property includes approximately 6000 $m^2$ of commercial space on the third level along the streetside of Phase 1 of Greencourt Sun City Commercial Building, and all the commercial space of approximately 2000 $m^2$ of the west side of the Central Plaza of Phase 2 of Greencourt Sun City) at the Jiuting Greencourt Sun City Real Estate Project in Songjiang District, to the Non-controlling Shareholders or their nominated third party. For the avoidance of doubt, (1) when the Shanghai Real Estate Sale and Purchase Contract is signed, Oasis Investment and the Controlling Shareholders shall transfer the right to use such commercial space to the Non-controlling Shareholders or their nominated third party, and the Non-controlling Shareholders or their nominated third party are to receive rental income and other earnings after the transfer; and (2) by 30 June 2011, Oasis Investment and the Controlling Shareholders shall transfer the ownership of such commercial space to the Non-controlling Shareholders or their nominated third party.

3.2 At the time of signing the aforementioned "Shanghai Real Estate Sale and Purchase Contract", SJHC shall sign the "Villa Order Contract" with Oasis Investment and the Controlling Shareholders, to transfer the SJHC-developed two A2-type villas (building area of approximately 1200 $m^2$ each as set out on a building plan, which building plan Oasis Investment and the Controlling Shareholders have received and have been notified of the delivery standards, and both confirmed the actual price as stated below) located on the Central Island, Peninsula Villa Project, Fengpu Industrial Area, Fengxian District, Shanghai City, to Oasis Investment or their nominated third party once the villas meet the delivery standards. For the avoidance of doubt, the Non-controlling Shareholders shall procure SJHC to sign the "Shanghai Real Estate Presale Contract" with Oasis Investment or the third party nominated by the Controlling Shareholders on 30 June 2011 and to complete the presale registration of such villas.

3.3 All Parties Confirm: the properties involved in the aforementioned "Shanghai Real Estate Sale and Purchase Contract" and the "Villa Order Contract" (or the Shanghai Real Estate Presale Contract) are all priced at RMB 72 million. Because the prices of the properties involved are equal, for the purposes of this agreement, the considerations under the contracts are to be set off against each other (whether or not such offset is plausible from an accounting perspective, and that the Parties agree that no actual payment is to be made).

7

3.4    Brand Name: From the date when this agreement is signed, all the brand names and other intellectual property of Oasis Investment and its subsidiaries are to be owned by the Controlling Shareholders, except with respect to SJHC and its property naming rights, logo, trade mark which have been obtained by the Non-controlling Shareholders under this agreement (and only to be used within the current business scope of SJHC, and not to be used for any new business). Without the approval of the Controlling Shareholders, the Non-controlling Shareholders shall not continue to use such brand names and other intellectual property.

3.5    Appointments: The Parties agree that from the date when the 1st Payment is paid, the Non-controlling Shareholders shall be considered to have resigned from all the positions they hold in Oasis Investment and its subsidiaries (except the positions they hold in SJHC), and the Controlling Shareholders shall be considered to have resigned from all the positions they hold in SJHC. Under provisions of this Article, Oasis Investment and its subsidiaries may complete procedures relating to the change of directors, supervisors and other posts.

3.6    Related party transactions: With effect from the signing of this agreement, the related party transactions between SJHC and Oasis Investment and their subsidiaries shall be terminated; all pre-existing debts and claims shall be settled within one month. This excludes situations that are otherwise stipulated in this agreement.

3.7    Promise: The Non-controlling Shareholders promise not to make any claims against Oasis Investment, the Controlling Shareholders and their subsidiaries worldwide on the condition that this agreement is fully and timely fulfilled.

3.8    SJHC's business documents, license and company seal shall be transferred to the Non-controlling Shareholders once the 1st Payment is paid.

Article 4    Miscellaneous

4.1    For matters not addressed in this Agreement, the stipulations of the Restructuring Agreement shall prevail. For matters not addressed in the Restructuring Agreement and this Agreement, the parties concerned shall enter into supplementary agreements through friendly negotiations, and those supplementary agreements and this Agreement shall have the same effect.

4.2    Any conflicts, disputes and claims resulting from this agreement or related to this agreement, breach of contract, termination of contract and void of contract (hereafter referred to as "disputes") shall be dealt with through amicable negotiations by all Parties. If the negotiation fails, any Party is entitled to submit the dispute to the Hong Kong International Arbitration Centre for arbitration. The arbitration is to be conducted in Chinese. The arbitration tribunal is to consist of three arbitrators. Oasis Investment and the Controlling Shareholders are entitled to nominate one arbitrator, the Non-controlling Shareholders are entitled to nominate another arbitrator, and the third arbitrator, who will be the chief arbitrator, is to be nominated by the Chairperson of the Hong Kong International Arbitration Centre. The outcome of arbitration is final and binding on all Parties.

4.3    This agreement is to take effect on the date when it is signed.

8

AP_Legal – 104479225.1

[Original handwritten text is indicated in italics]                              *Fen Ke Wen Jun*

4.4    This agreement is written in Chinese and has ten copies; each Party holds one copy.


Signed by:

Oasis Investment Group Limited

[signature] _____            [signature] _____

Naifen YU                                       Zhengguang KE



[signature] _____            [signature] _____

Naiwen YU                                       Cheergain International Group Limited


[signature] _____            [signature] _____

Naijun YU                                       Hongbiao XU


[signature] _____            [signature] _____

Greencourt Properties Limited                   Focus Town Limited


_____

Shanghai Oasis Kechuang Shengtai Keji Limited (seal)

[illegible seal]


For and on behalf of Oasis Investment Group Limited

[signature] _____

Authorised Signature(s)

AP_Legal – 104479225.1

# EXHIBIT 8



# CERTIFICATION

TransPerfect is globally certified under the standards ISO 9001:2015 and ISO 17100:2015. This Translation Certificate confirms the included documents have been completed in conformance with the Quality Management System documented in its ISO process maps and are, to the best knowledge and belief of all TransPerfect employees engaged on the project, full and accurate translations of the source material.

| | |
|---|---|
| File Name(s): | Final Arbitration Award (HKIAC) dated 28 February 2018 |
| Source Language(s) | Simplified Chinese |
| Target Language(s) | English |

Authorized Signature:



| | |
|---|---|
| *Name:* | *Sylvia Lau* |
| *Title:* | *Project Assistant* |
| *Date:* | *Oct. 22nd, 2018* |

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS
TRANSPERFECT TRANSLATIONS LIMITED   UNITS 1704-5, 17F, UNIVERSAL TRADE CENTRE, 3-5A ARBUTHNOT ROAD, CENTRAL, HONG KONG
T +852 2292.9900  F +852 2545.7781   WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

**Arbitration Case at the Hong Kong International Arbitration Centre ("HKIAC")**

**in accordance with the rules of the Hong Kong International Arbitration Centre (effective from September 1, 2008)**

**("HKIAC Rules")**

**HKIAC/A13028**

**Xu Hongbiao**

First Applicant

**Estate of Ke Zhengguang**

Second Applicant

and

**Oasis Investment Group Limited**

First Respondent

**Yu Naifen Stephany**

Second Respondent

**Yu Naiwen**

Third Respondent

**Yu Naiyun**

Fourth Respondent

---

**Final Arbitration Award (excluding interest and arbitration fees)**

---

**Table of Contents**

**Chapter**                                                                                              **Page Number**

I.      Parties Concerned ......................................................................................................... 1

II.     Arbitration Agreement and Applicable Laws ................................................................ 2

III.    Arbitral Tribunal ........................................................................................................... 3

IV.     Factual Background........................................................................................................ 39

V.      Disputed Matters and Position of Both Parties ............................................................. 42

VI.     Petitions of the Applicants and Respondents ................................................................ 56

VII.    Analysis and Reasons of the Arbitral Tribunal ............................................................. 60

VIII.   Ruling and Order of the Arbitral Tribunal.................................................................... 95

IX.     Arbitration Fees............................................................................................................. 97

## Final Arbitration Award
### (excluding interest and arbitration fees)

## I.  Parties Concerned

1.  The Applicants in this case are:

    **First Applicant: Mr. Xu Hongbiao**, Chinese citizen, Chinese identification card number 310104196403192854. His correspondence address is Room 419, Oasis Tower, No. 555 Zhongshan West Road, Shanghai City, China. Postal code: 200051.

    **Second Applicant: Estate of Ke Zhengguang**, was Mr. **Ke Zhengguang** prior to December 15, 2013 (hereinafter referred to as "**Mr. Ke**" or "**Second Applicant**"). Prior to his death, Mr. Ke was a Chinese citizen with Chinese identification card number 310109195601033237. Mr. Ke passed away on December 15, 2013. Thereafter, the Second Applicant in this case was amended as Estate of Mr. Ke. The Administrators of the Estate of Mr. Ke are: (1) Mdm. Zhang Yuejin (widow of Mr. Ke, hereinafter referred to as "**Mdm. Zhang**"); and (2) Mdm. Ke Yeying (daughter of Mr. Ke, hereinafter referred to as "**Mdm. Ke**). Their correspondence address is Room 419, Oasis Tower, No. 555 Zhongshan West Road, Shanghai City, China. Postal code: 200051.

    They are hereinafter collectively referred to as the "**Applicants**".

2.  In this case, C.L. Chow & Macksion Chan Solicitors (CLCMC Solicitors) was originally appointed as the representative of the Applicants. Address: 3/F, Alliance Building, No. 130-136 Connaught Road Central, Hong Kong. Mr. Ke passed away on December 15, 2013. On December 28, 2015, the High Court of Hong Kong issued the Letters of Administration and appointed Mdm. Zhang and Mdm. Ke as the Administrators of the Estate of Mr. Ke. On January 12, 2016, Baker & McKenzie Shanghai Office (after that, its Hong Kong Office also participated in this case; the Hong Kong and the Shanghai Office shall be collectively referred to as "**Baker**") (Address: Room 1601, Jinmao Tower, No. 88 Century Avenue, Pudong New Area, Shanghai, China/14/F Hutchison House, No. 10 Harcourt Road, Central, Hong Kong) sent a letter to the arbitration tribunal as Mdm. Zhang and Mdm. Ke's representative, and officially

1

represented the Second Applicant in participating in this case. CLCMC Solicitors remained the representative of the First Applicant.

3.    The Respondents in this case are:

First Respondent: **Oasis Investment Group Limited** (hereinafter referred to as "**Oasis Investment**"), is a company limitd by shares registered in the British Virgin Islands, with its correspondence address as 12/F, Oasis Tower, No. 555 Zhongshan West Road, Shanghai City, China. Postal code: 200051

Second Respondent: **Mdm. Yu Naifen Stephany**, American citizen, U.S. Passport no. 710714118. Her correspondence address is 12/F, Oasis Tower, No. 555 Zhongshan West Road, Shanghai City, China. Postal code: 200051

Third Respondent: **Mdm. Yu Naiwen**, Chinese citizen, Chinese identification card number 310101196304040864. Her correspondence address is 12/F, Oasis Tower, No. 555 Zhongshan West Road, Shanghai City, China. Postal code: 200051

Fourth Respondent: **Mdm. Yu Naiyun**, Chinese citizen, Chinese identification card number 310106197207062822. Her correspondence address is 12/F, Oasis Tower, No. 555 Zhongshan West Road, Shanghai City, China. Postal code: 200051

They are hereinafter collectively referred to as the "**Respondents**".

4.    O'Melveny & Myers LLP was originally appointed as the representative of the Respondents. Address: 31/F, AIA Central, No. 1 Connaught Road Central, Hong Kong. After October 12, 2016, the team members of the representative of the Respondents were joined by Sidley Austin LLP (address: 39/F, Two International Finance Centre, Central, Hong Kong). Sidley Austin LLP was then appointed by the Respondents to continue representing the Respondents in this case.

5.    The Applicants and Respondents are hereinafter each referred to as the "**party concerned**", and both parties are referred to as "**all parties**".

## II.    Arbitration Agreement and Applicable Laws

6.    This arbitration involves the "Agreement on the Implementation of the 'Preliminary Share Restructuring Agreement'" (hereinafter referred to as the

"**4.28 Agreement**") concluded by all parties on April 28, 2010 for the breaking up of the First Respondent and its subsidiaries. The basis of filing in this arbitration is Article 4.2 of the "4.28 Agreement". It is said in this Article :

*"4.2  Any conflicts, disputes and claims resulting from this agreement or related to this agreement, breach of contract, termination of contract and void of contract (hereafter referred to as "disputes") shall be dealt with through amicable negotiations by all Parties. If the negotiation fails, any Party is entitled to submit the dispute to the Hong Kong International Arbitration Centre for arbitration. The arbitration is to be conducted in Chinese. The arbitration tribunal is to consist of three arbitrators. Oasis Investment and the Controlling Shareholders are entitled to nominate one arbitrator, the Non-controlling Shareholders are entitled to nominate another arbitrator, and the third arbitrator, who will be the chief arbitrator, is to be nominated by the Chairperson of the Hong Kong International Arbitration Centre. The outcome of arbitration is final and binding on all Parties."*

7.  "Non-controlling Shareholders" in the abovementioned arbitration clause refers to the Applicants in this case. Oasis Investment and the "Controlling Shareholders" (that is, the Second, Third, and Fourth Respondents) refer to the Respondents in this case.

8.  Based on Article 4.2 in the "4.28 Agreement" as cited above, this Arbitration Proceeding shall be managed by the HKIAC and conducted in accordance with the "HKIAC Rules". The arbitration location shall be Hong Kong and the arbitration language shall be Chinese.

9.  The Article 4.1(sic) of the "4.28 Agreement" stipulates that the Agreement shall be governed by the laws of Hong Kong.

## III.   Arbitral Tribunal

10.  The arbitral tribunal in this case shall comprise the following arbitrators:

(1)   Horace Wong Yuk-Lun, Senior Counsel, address: 10/F, New Henry House, No. 10 Ice House Street, Central, Hong Kong, nominated by the Applicants;

3

AP_Legal – 104494610.1

(2)     Teresa Cheng Yeuk-Wah, Senior Counsel, address: 38/F, Gloucester Tower, The Landmark, Central, Hong Kong, nominated by the Respondents; and

(3)     Mr. Yang Ing Loong (hereinafter referred to as "**Chief Arbitrator**"), address: 18/F, One Exchange Square, No. 8 Connaught Place, Central, Hong Kong, was appointed as the third arbitrator, who shall also act as the Chief Arbitrator, by the HKIAC Council in accordance with the agreement reached by all parties on arbitration.

11.     The arbitral tribunal was officially constituted on June 4, 2013 and all parties were informed of the constitution of the arbitral tribunal on the same day.

**Arbitration Proceedings**

12.     The arbitral tribunal held that it was not necessary to list all the corresponding letters between the representatives of the parties written during the process of this case. All procedural orders made by the arbitral tribunal have been issued in writing and they will not be repeated [in full] herein. It shall be emphasized that the arbitral tribunal has fully considered all the claims made by all the parties in writing, the testimonies given by the witnesses, and claims made during the hearings before the orders were issued. All instructions, orders, and decisions were made after negotiations by the three arbitrators. In this regard, this part of the arbitration award presents a summary on the milestones of this case.

13.     On February 22, 2013, the Applicants served a "Notice of Arbitration" (Case No. HKIAC/A13028) on the Respondents and submitted it to the HKIAC in Hong Kong to resolve the disputes arose under the "4.28 Agreement".

14.     On April 12, 2013, the Respondents submitted a "Response to the Notice of Arbitration".

15.     On April 8, 2013, HKIAC sent a letter to confirm the appointment of Horace Wong Yuk-Lun, Senior Counsel, as an arbitrator in this case as nominated by the Applicants. On April 22, 2013, the Respondents notified the HKIAC that Teresa Cheng Yeuk-Wah, Senior Counsel, shall be nominated as an arbitrator in this case. The next day, that is, April 23, 2013, HKIAC notified Mdm. Teresa Cheng Yeuk-wah that she had been nominated. On the same day, Mdm. Teresa Cheng Yeuk-wah notified HKIAC that she shall accept the nomination. On April 30,

4

2013, HKIAC sent a letter to confirm the appointment of Mdm. Teresa Cheng Yeuk-wah as an arbitrator in this case.

16.    On June 4, 2013, HKIAC sent a letter to confirm the appointment of Mr. Yang Ing Loong as the Chief Arbitrator in this case. On June 4, 2013, the arbitral tribunal was officially constituted.

17.    On June 4, 2013, HKIAC sent a letter to notify all parties that the arbitral tribunal had been constituted in accordance with the "HKIAC Rules".

18.    On June 7, 2013, the Chief Arbitrator sent a letter on behalf of the arbitral tribunal to notify all parties that the arbitral tribunal had been constituted. He requested all parties to confirm that they do not have any objections regarding the constitution of the arbitral tribunal and matters related to the arbitration rules, the arbitration language, and the applicable governing laws. At the same time, the arbitral tribunal provided an interim schedule it had drafted (it was converted to procedural orders subsequently) and requested that all parties conduct negotiation, reach a consensus (where possible) regarding the submission dates of the relevant documents, and submit a reply to the arbitral tribunal before 6 p.m. on June 14, 2013.

19.    On June 14, 2013, the Applicants sent a letter to the Chief Arbitrator to confirm the relevant matters as mentioned in paragraph 18 above and submitted the draft procedural order proposed by the Applicants. On the same day, the Respondents submitted a schedule proposed by the Respondents and supplemented a complete arbitral tribunal draft procedural order based on the said schedule, and confirmed the relevant matters as mentioned in paragraph 18 above.

20.    After considering the written opinions by all parties, the Chief Arbitrator issued the Procedural Order (I) (hereinafter referred to as "**Order (I)**") on behalf of the arbitration tribunal on June 25, 2013. One copy of the amended procedural schedule is annexed thereto.

21.    On August 30, 2013, the Respondents submitted their "Statement of Defence and Counterclaim" and list of appendices to the HKIAC via email and special courier. The arbitral tribunal confirmed and acknowledged the receipt of the electronic version via email on the same day.

22.    On October 8, 2013, the Applicants submitted their "Reply and Defence to Counterclaim" to the arbitral tribunal via email.

5

23.   On November 12, 2013, the Respondents sent a letter to the arbitral tribunal and submitted their "Further Reply to the Applicants' Reply and Defence to Counterclaim" to the arbitral tribunal. The arbitral tribunal confirmed and acknowledged the receipt via email on the same day.

24.   On November 22, 2013, the Applicants sent a letter to the arbitral tribunal and alleged that the Respondents had committed a serious breach of Order (I) by submitting the "Further Reply to the Applicants' Reply and Defence to Counterclaim" to the arbitral tribunal on November 12, 2013. The reason was that Order (I) did not permit the Respondents to provide a further reply to the Applicants' reply. The Applicants requested that the arbitral tribunal issue an order to revoke Paragraphs 1 to 32 (that is, the content of the further reply to the Applicants' reply) of the Respondent's further reply, and requested that the Respondents pay the Applicants for the attorney fees incurred due to their submission of the further reply.

25.   On the same day, that is, November 22, 2013, the Respondents sent a letter to the arbitral tribunal and denied that their submission of the "Further Reply to the Applicants' Reply and Defence to Counterclaim" to the arbitral tribunal has breached Order (I). The reason was that the content of the further reply was only a reply to the Applicants' defence to counterclaims. However, in view that the Applicants' "Defence to Counterclaims" and the content of other portions were closely interconnected and overlapping, the reply to the Applicants' "Defence to Counterclaims" involved the content of other portions. Furthermore, as the reply was formatted and separately answered based on the sequence of the paragraphs of the Applicants' "Reply and Defence to Counterclaim", the Respondents requested that the arbitral tribunal reject the Applicants' request.

AP_Legal – 104494610.1

26.     On November 25, 2013, the arbitral tribunal issued a reply to all parties via email and stated that after consideration, the arbitral tribunal will not order the Respondents to revoke Paragraph 1 to Paragraph 32 of their "Further Reply to the Applicants' Reply and Defence to Counterclaim". However, the arbitral tribunal permitted the Applicants to make further statement in writing with regard to the said paragraphs within one week (that is, on or before November 30). At the same time, the arbitral tribunal asked all parties whether an extension of the deadline of the Request for Production of Documents that each party was to present as stipulated in Order (I) was required (that is, November 26).

27.     On the same day, that is, November 25, 2013, the Applicants submitted a reply to the arbitral tribunal via email; in view that the Respondents confirmed that the contents in their further reply were only limited to the Applicants' defence to counterclaims, the Applicants shall not make further statement in writing. Hence, the extension of the deadline on November 26 was not required.

28.     On November 26, 2013, the Respondents submitted the "Respondents' Request for Production of Documents" to the arbitral tribunal.

29.     On the same day, that is, November 26, 2013, the Applicants submitted the "Applicants' Document List" to the arbitral tribunal.

30.     On December 5, 2013, the arbitral tribunal confirmed via email the receipt of the "Respondents' Request for Production of Documents" and the "Applicants' Document List" submitted on November 26, 2013 by the Respondents and the Applicants, respectively. At the same time, the arbitral tribunal reminded the Applicants that they did not submit a Request for Production of Documents stated in Paragraph 7 of Order (I) and requested the Applicants to clarify whether any requests for production of documents to the Respondents would be made before 6 p.m. on December 6, 2013.

31.     On December 6, 2013, the Applicants sent an email to the arbitral tribunal to confirm that they did not have any requests for the production of documents at this stage.

32.     On December 17, 2013, the Applicants submitted the Applicants' Reasonable Objections to the Respondents' Request for Production of Documents to the arbitral tribunal via email, and notified all parties that Mr. Ke had suddenly passed away the day before. The Applicants stated that they would discuss the

7

relevant legal procedures matters regarding the Second Applicant's continuation in this case with Mr. Ke's family members as soon as possible, and they would make recommendations to the arbitral tribunal as soon as possible after receiving the relevant instructions from Mr. Ke's family members.

33. On December 20, 2013, the arbitral tribunal requested the Respondents via email to respond to the Applicants' Reasonable Objections to the Respondents' Request for Production of Documents on December 27, 2013, and permitted the Applicants to make a final response on January 7, 2014 with regard to the Respondents' response. At the same time, the arbitral tribunal pointed out that, even though these steps were not explicitly stated in Order (I), it was added so as to facilitate better decision making by the arbitral tribunal. In addition, the arbitral tribunal stated that it shall wait for the Applicants' recommendations regarding the relevant matters on the legal procedures regarding the Second Applicant's continuation in this case.

34. On December 27, 2013, the Respondents submitted the "Respondents' Reasons for Rebuttal/Renewed Position to the Objections to the Request for Production of Documents" (hereinafter referred to as "**Reasons for Rebuttal/Renewed Position**") to the arbitral tribunal.

35. On January 9, 2014, the arbitral tribunal confirmed via email the receipt of the "'Respondents' Request for Production of Documents' including the Applicants' Objection Opinions and the Respondents' Reasons for Rebuttal/Renewed Position to the Objections to the Request for Production of Documents" submitted by the Respondents. In view that the deadline for the Applicants' final response to this document (January 7, 2014) had passed, the arbitral tribunal requested the Applicants to confirm whether a response would be made to the said document before 6 p.m. on that day. At the same time, the arbitral tribunal also requested the Applicants to provide statements or recommendations regarding the matters on the relevant legal procedures regarding the Second Applicant's continuation in this case.

36. On the same day, that is, January 9, 2014, the Applicants submitted a request via email to the arbitral tribunal to suspend the arbitration proceedings until January 15, 2014, and to extend the final deadline of the Applicant's response to the Respondents' "Reasons for Rebuttal/Renewed Position" to January 15, 2014. The Applicants stated that they shall submit the Applicant's response to the

8

Respondents' "Reasons for Rebuttal/Renewed Position" to the arbitral tribunal and provide further statements or recommendations regarding the impact of Mr. Ke's passing on this case on that day.

37.     On January 10, 2014, the arbitral tribunal approved the Applicants' abovementioned request for extension, that is, the arbitration proceeding shall be suspended until January 15, 2014 and the final deadline for the Applicant's response to the Respondents' "Reasons for Rebuttal/Renewed Position" shall be extended to January 15, 2014, and agreed to the representative of the Applicants providing further statements or recommendations regarding the impact of Mr. Ke's passing on this case on that day. The arbitral tribunal also reserved the rights allowing the Respondents to provide a reply to the statements or recommendations.

38.     On January 15, 2014, the Applicants sent a letter to the arbitral tribunal, with the Applicants' response to the Respondents' "Reasons for Rebuttal/Renewed Position" enclosed. The Applicants also requested for the extension of the statements or recommendations regarding the impact of Mr. Ke's passing on this case to January 30, 2014 based on the actual difficulties faced by Mr. Ke's wife, daughter, and their family members.

39.     On January 16, 2014, the arbitral tribunal agreed to suspend the arbitration proceeding until January 30, 2014 via email.

40.     On January 24, 2014, the representative of the Applicants (CLCMC Solicitors) sent an email to the arbitral tribunal to explain the situation of Mr. Ke's family in detail and claimed that the arbitration could proceed. The representative of the Applicants stated that it had already accepted the joint appointment by Mdm. Zhang, the wife of Mr. Ke, and Mdm. Ke, the daughter of Mr. Ke, to begin the legal procedures for the application at the High Court of Hong Kong to permit Mdm. Zhang or her authorized person, Ke Yele, to continue this case as the Administrator of the Estate of Mr. Ke, on behalf of the Estate of Mr. Ke. It shall also represent the First Applicant and Mdm. Zhang, the wife of Mr. Ke, and Mdm. Ke, the daughter of Mr. Ke, in the application to permit Mdm. Zhang or her authorized person, Ke Yele, to carry out all the procedures in this case as the Administrators of the Estate of Mr. Ke, without terminating the procedures of this case before the granting of permission by the High Court of Hong Kong. At

9

the same time, it shall notify the arbitral tribunal immediately after the official granting of permission by the High Court of Hong Kong.

41.    On the same day, that is, January 24, 2014, the arbitral tribunal sent an email to request the Respondents to provide a reply to the abovementioned request made by the Applicants on or before January 29, 2014.

42.    On January 29, 2014, the Respondents sent a letter to the arbitral tribunal and stated that they did not object to the request of the Applicant's representative in principle, that is, Mr. Ke's legal successor shall continue in this case and the termination of the procedures in this case was not required. However, the Applicants must provide the relevant information/clarification of the issues concerning the matter, including the identity of Ke Yele, Mdm. Zhang, and Mdm. Ke, and the relevant documents. The Respondents also requested that the arbitral tribunal allow them the opportunity to publish their final opinion within a certain period after they receive the information they requested.

43.    On January 30, 2014, the arbitral tribunal notified all parties via email that there were legal concerns regarding the viewpoints claimed by the representative of the Applicants in an email dated January 24, 2014, that is, to push forward the case procedures before the Administrators of the Estate of Mr. Ke are approved by the High Court of Hong Kong. At the same time, the arbitral tribunal invited the representative of the Applicants to reply to the letter dated January 29, 2014 sent by the Respondents' lawyer on or before February 14, 2014.

44.    On February 11, 2014, the Respondents sent a letter to the arbitral tribunal requesting for confirmation that the case procedure (including Item 10 of "Order (I)" and all procedures thereafter) was still suspended until further instructions from the arbitral tribunal. The arbitral tribunal sent a letter to all parties on February 12, 2014 confirming that the case procedure was temporarily suspended. It stated that further instructions would be given after further reply from the Second Applicant was received (the deadline shall be on February 14, 2014).

45.    On February 14, 2014, the Applicants sent a letter to the arbitral tribunal in response to the letter dated January 29, 2014 sent by the Respondents and the opinions in the email dated January 30, 2014 sent by the arbitral tribunal. They claimed that in view of Rule 15 of Order 15 of the Rules of the High Court in Chapter 4A of the Hong Kong Subsidiary Legislation and the precedent of the

High Court of Hong Kong (Lily Cheung v. The Official Solicitor and Another, [2008] 5 HKLRD 743), the arbitral tribunal could appoint Mdm. Zhang as the representative of the Estate of Mr. Ke in the case procedure for the continuation of case procedures. The identification documents of Mdm. Zhang, marriage certificate of Mdm. Zhang and the Second Applicant, death certificate[1] and identification documents of the Second Applicant, and the court verdict of the cited case were enclosed therewith.

46.    On February 25, 2014, the Respondents sent a letter to the arbitral tribunal requesting that the Applicants clarify whether they were no longer requesting to appoint Ke Yele as the Administrator of the Estate. The Respondents also objected to the Applicants' request to the arbitral tribunal to appoint Mdm. Zhang as a representative of the Second Applicant's estate in the case procedure for the continuation of case procedures, and claimed that the arbitral tribunal should wait until the final approval of the Administrators of the Estate of the Second Applicant had been officially issued by the High Court of Hong Kong before continuing case procedures.

47.    On February 26, 2014, the Applicants sent an email to the arbitral tribunal requesting that their response to the Respondents' letter dated February 25, 2014 to be sent on or before February 28, 2014. On the same day, the arbitral tribunal approved the Applicants' said request via email.

48.    On February 27, 2014, the arbitral tribunal notified all parties via email that the arbitral tribunal intended to hold a half-day hearing in the afternoon of April 2, 2014 at HKIAC. The primary objective was: To allow all parties to fully express their legal opinions and feasible solutions on impact of the passing of Mr. Ke on the arbitration proceedings, so as to facilitate the moving forward of arbitration proceedings.

49.    On February 27, 2014, the Applicants responded to the Respondents' letter dated February 25, 2014 and clarified that Mdm. Zhang and Mdm. Ke were willing and hoped that the arbitral tribunal would appoint Mdm. Zhang as the Administrator of the Estate of Mr. Ke.

---

[1]    The death certificate indicated that the Second Applicant passed away in Shanghai on December 15, 2013 at 10:20 p.m.

50. On March 11, 2014, after considering the correspondences between all parties regarding the question of hearing, the arbitral tribunal formulated a schedule for both parties to submit their legal opinions on the issue of the impact of the passing of Mr. Ke on the arbitration proceedings.

51. On March 25, 2014, all parties submitted their opinions in writing to the arbitral tribunal respectively with regard to the abovementioned issue. With regard to the date of the hearing, all parties stated that they had not reached a consensus. They requested that the arbitral tribunal consider reviewing the written materials submitted by all parties in this round before deciding whether a hearing was required.

52. On April 1, 2014, all parties submitted a rebuttal legal opinion to the other party's written opinions to the arbitral tribunal respectively.

53. On April 9, 2014, the Respondents sent a letter to the arbitral tribunal via email to propose that the arbitral tribunal give all parties two weeks to negotiate the matter regarding the recommendation made by the Respondents on seeking indemnification due to the legal risks that might be incurred by appointing Mdm. Zhang as the representative of the Second Applicant to participate in this case. On the same day, the Applicants sent a letter to the arbitral tribunal via email stating that the Respondents' interpretation of the Applicants' proposal was incorrect. At the same time, the Applicants suggested to the arbitral tribunal (and at the same time, confirmed that they were willing to unconditionally accept) that in the event the arbitral tribunal agreed with the potential risks raised by the Respondents after considering the statements and relevant documents provided by all parties, they requested that the arbitral tribunal directly issue the following binding order under the circumstances:

*"The First Applicant shall solely bear all liabilities of guarantee and indemnity and pay for the reasonable indemnification of the Respondents for the rights and interests of the Respondents affected due to Mdm. Zhang's actions in this arbitration proceedings and all losses incurred by the Respondents due to the rejection of her request as an Administrator of the Estate of the Second Applicant by the High Court."*

54. On the same day, that is, April 9, 2014, the Respondents expressed regret over the Applicants' response, and requested the arbitral tribunal to make a decision regarding the relevant request made by the Applicants.

55.    On April 29, 2014, the arbitral tribunal instructed all parties via email that in view that the legal opinions and written materials submitted by all parties were sufficient, the arbitral tribunal held that a hearing was not necessary.

56.    On May 30, 2014, the arbitral tribunal made a "Decision on the Impact of the Passing of the Second Applicant on the Arbitration Proceedings" ("**Decision (I)**"). The decision of the arbitral tribunal was as follows: (1) The arbitral tribunal does not possess jurisdiction over the appointment of the Administrator of the Estate of the Second Applicant; (2) As the arbitral tribunal does not possess the abovementioned jurisdiction, the case of the Second Applicant may only proceed after the Administrator of the Estate of the Second Applicant had been appointed by the High Court of Hong Kong; (3) In view of this, the only reasonable resolution to this matter by the arbitral tribunal is to suspend the arbitration at the current time until after the High Court of Hong Kong appoints the Administrator of the Estate of the Second Applicant; (4) The arbitral tribunal decided to reserve the decision for the allocation of the attorney fees for this request.

57.    On June 4, 2014, HKIAC sent the original copy of "Decision (I)" to all parties. There were no new developments in this case thereafter until April 2, 2015.

58.    On April 2, 2015, the representative of the Applicants sent an email to the arbitral tribunal on behalf of the First Applicant and made the following request (hereinafter referred to as "**Withdrawal/Addition Request**"): (1) To request for the arbitral tribunal to issue an order to withdraw the Second Applicant from this arbitration proceeding and add the Estate of the Second Applicant as the Fifth Respondent in this arbitration proceeding; (2) To permit the Applicant to amend the arbitration petition to reflect the withdrawal of the Second Applicant and the addition of the Estate of the Second Applicant as the Fifth Respondent; (3) To resume this arbitration proceedings. Enclosed with the Applicant's email were: A brief statement of the First Applicant, an affirmation of the First Applicant, and a draft of the amended arbitration petition. On the same day, the arbitral tribunal requested that the Respondents to submit their legal opinions regarding the Applicant' request before 6 p.m. on April 10, 2015.

59.    On April 9, 2015, the Respondents sent an email to the arbitral tribunal requesting for an extension of the deadline for their submission of the legal opinions to April 30, 2015. On the same day, the Applicants recommended to the

arbitral tribunal via email that, in view that this case procedure had been suspended for over 15 months since the passing of the Second Applicant, the grace period should be extended to April 17, 2015.

60.    On April 10, 2015, after careful consideration, the arbitral tribunal decided to extend the date of the Respondents' response to April 23, 2015 (before 6 p.m.).

61.    On April 20, 2015, Baker, as a representative of Mdm. Zhang and Mdm. Ke, sent a letter to the arbitral tribunal and claimed that the act of submitting a request to the arbitral tribunal to change (the Estate of) the Second Applicant to the Fifth Respondent without the knowledge of Mdm. Zhang and Mdm. Ke by the First Applicant had seriously damaged the legal rights and interest of the Second Applicant and/or its legal successors. Baker claimed that the arbitral tribunal should not make any decisions regarding the abovementioned request before fully taking its opinion into consideration. At the same time, Baker stated that Mdm. Zhang and Mdm. Ke were handling the relevant procedures to obtain the appointment by the High Court of Hong Kong as the Administrators of the Estate of the Second Applicant and it requested the arbitral tribunal to provide it with a duplicate copy of the abovementioned request made by the First Applicant and the relevant documents.

62.    On April 23, 2015, the Respondents sent a letter to the arbitral tribunal and stated that the Administrator of the Estate of the Second Applicant should have the right to express its opinion regarding the request "to remove the Second Applicant from these arbitration proceedings and add the Estate of the Second Applicant as the Fifth Respondent in these arbitration proceedings", and that the arbitral tribunal should not make any decisions regarding the abovementioned matter before the Administrator of the Estate of the Second Applicant has been appointed or confirmed. At the same time, the Respondents also claimed that the request made by the First Applicant lacked necessary basis. In view of the changes in the relationship of all parties, the arbitral tribunal should adopt a more cautious approach in handling the procedure and should not make a decision to support this request at this point. With regard to whether or not the Respondents could request for the First Applicant to jointly bear and perform all obligations and liabilities of the Applicants under the "4.28 Agreement", the Respondents raised specific questions concerning the matter and requested that the Applicants respond to them. On the same day, the Applicants sent an email to the arbitral tribunal to request for a written response with regard to the

14

abovementioned letter sent by the Respondents to be submitted to the arbitral tribunal within 14 days (that is, on or before May 7, 2015). The arbitral tribunal approved the Applicants' request of the said deadline via email on the same day.

63.     On the same day, that is, April 23, 2015, the arbitral tribunal sent a reply to Baker via email stating that, in view of Mdm. Zhang and Mdm. Ke not being appointed by the court as the Administrators of the Estate of the Second Applicant, both of them shall not be the parties involved in this case and they shall not possess the requirements to make any requests to the arbitral tribunal. If Mdm. Ke and Mdm. Zhang officially became the legal Administrators of the Estate of the Second Applicant as appointed by the court in the future, they could make a separate request to the arbitral tribunal again.

64.     On May 6, 2015, the Applicants requested to extend the deadline for the submission of the written response mentioned in Paragraph 62 above to on or before May 21, 2015. The arbitral tribunal approved the said request for extension on May 7, 2015.

65.     On May 21, 2015, the Applicants submitted the "Written Response of the First Applicant" to the arbitral tribunal. The Applicants claimed that, in view that Mdm. Zhang and Mdm. Ke no longer wished to continue authorizing the representative of the Applicants to handle the procedures of the Estate, the representative of the Applicants would not be allowed to continue representing the Second Applicant based on legal principles. Also, as the outcome of Mdm. Zhang and Mdm. Ke's application to the High Court of Hong Kong to be appointed as the Administrators of the Estate of the Second Applicant was still unknown after over one year, the First Applicant believed that Mdm. Zhang and Mdm. Ke were affected by the Respondents and intentionally refused to handle the Estate or delay the handling of the Estate. Hence, the arbitral tribunal and all parties should not wait indefinitely for the succession of the Estate of the Second Applicant. Hence, the First Applicant recommended that the arbitral tribunal remove the Second Applicant and add the Second Applicant as the Fifth Respondent. Otherwise, in the event the arbitral tribunal held that the Second Applicant cannot or should not be added as the Fifth Respondent, the arbitral tribunal would be requested to consider the continuation of the individual arbitration of the First Applicant.

66.   On June 16, 2015, Baker sent a letter to the arbitral tribunal stating that it had
      already submitted the application regarding the Administrator of the Estate of
      the Second Applicant to the High Court of Hong Kong on behalf of Mdm. Ke
      and Mdm. Zhang on June 12, 2015. On June 19, 2015, the arbitral tribunal
      forwarded this letter to all parties and instructed them to submit a written opinion
      on or before June 25, 2015 with regard to the submitted application of the
      appointment of the Administrator of the Estate of the Second Applicant,
      especially on whether it was necessary for the arbitral tribunal to consider the
      request made by the First Applicant.

67.   On June 25, 2015, all parties submitted a written opinion to the arbitral tribunal
      in accordance with the instructions given by the arbitral tribunal on June 16,
      2015.

68.   On June 26, 2015, the arbitral tribunal instructed all parties via email that after
      reviewing the written statements/opinions made by all parties with regard to the
      Withdrawal/Addition Request made by the First Applicant, the arbitral tribunal
      held that, as the said request was relatively complex, a hearing on the said
      request was necessary to clarify and obtain the viewpoints and positions of all
      parties for consideration.

69.   On June 29, 2015, the First Applicant sent a reply to the arbitral tribunal via
      email, stating that it had already discussed with the Respondents regarding the
      appropriate date and location of the hearing.

70.   On July 13, 2015, the arbitral tribunal conducted a public hearing with regard to
      the Withdrawal/Addition Request made by the First Applicant. On the same day
      and after the hearing, the arbitral tribunal asked all parties via email whether
      they would agree to add the three appendices (that is, the letter dated July 10,
      2015 sent by Baker to the arbitral tribunal, the "Preliminary Agreement on Share
      Restructuring for Oasis Investment Group Limited" dated November 9, 2009,
      and case materials related to Warwick Film Productions Ltd and Another v.
      Eisinger and Others) into the hearing folder submitted by the Applicants (and
      they shall be listed as document number 24, 25, and 26, from pages 207 to 218).
      On the same day, the First Applicant and the Respondents confirmed and agreed
      via email respectively.

71.   On August 6, 2015, the arbitral tribunal notified all parties via email that it had
      made a decision (the electronic version of the decision was enclosed in the said

email) regarding the request made by the First Applicant on April 2, 2015. HKIAC would mail the original copy to all parties. At the same time, the arbitral tribunal requested that the lawyers for all parties discuss and formulate a copy of the arbitration procedural schedule as soon as possible for the arbitral tribunal's reference.

72.   On August 26, 2015, the First Applicant made a suggestion to the arbitral tribunal via email that the arbitration proceeding should proceed in accordance with the Procedural Order (I) dated June 25, 2013. The relevant arbitration procedural schedule should be an extension of this order and the corresponding timings should be adjusted (the specific adjustments were listed in the email). The First Applicant requested the arbitral tribunal to adopt the abovementioned schedule and issue a corresponding order.

73.   On August 27, 2015, the Respondents sent an email to the arbitral tribunal stating that the procedural schedule proposed by the First Applicant the day before was not a recommendation after discussion with the Respondents. The Respondents recommended that the arbitral tribunal give all parties seven days to conduct negotiations regarding the First Applicant's proposal and to reach a consensus as far as possible. Hence, the Respondents requested that the arbitral tribunal temporarily suspend giving instructions regarding the arbitration procedural schedule.

74.   On August 29, 2015, the arbitral tribunal ordered all parties to submit a procedural schedule upon reaching a consensus after negotiation by all parties on or before September 3, 2015. If all parties could not reach a consensus, the arbitral tribunal requested that each party raise their own opinions for the arbitral tribunal's reference.

75.   On September 1, 2015, the First Applicant sent an email to the arbitral tribunal stating that it agreed to the procedural schedule recommended by the Respondents on August 27, 2015 and requested the arbitral tribunal to adopt the abovementioned schedule where a consensus had been reached by all parties, and to issue the corresponding order.

76.   On September 14, 2015, the arbitral tribunal sent an email stating that it agreed to the procedural schedule recommended by the Respondents. In view that the widow of the Second Applicant, Mdm. Zhang, and daughter of the Second Applicant, Mdm. Ke, were represented by Baker, the arbitral tribunal requested that the lawyer of the First Applicant and the lawyer of the Respondents confirm

that they had already notified Baker of the decision made by the arbitral tribunal on August 6, 2015 via registered mail. On the same day, the First Applicant sent an email to the arbitral tribunal confirming that it had already sent a registered mail to Baker on that day (that is, September 14, 2015) regarding the decision made by the arbitral tribunal on August 6, 2015. On October 8, 2015, the Respondents stated to the arbitral tribunal that in view that the First Applicant had already sent the decision to Baker, the Respondents did not send the said decision to Baker again. However, the Respondents confirmed that the procedural schedule sent by the First Applicant on September 1, 2015 reflected the consensus of all parties, and requested the arbitral tribunal to issue a new procedural order.

77.   On December 21, 2015, the arbitral tribunal instructed all parties via email that in view that the Applicant had already sent a registered mail to Baker on September 14, 2015 regarding the decision made by the arbitral tribunal on August 6, 2015, the Respondents did not need to send the said decision to Baker. At the same time, the arbitral tribunal issued Procedural Order (II) (hereinafter referred to as "**Order (II)**"), and a copy of the amended procedural schedule was enclosed therewith.

78.   On December 24, 2015, Baker sent a letter to the arbitral tribunal stating that the High Court of Hong Kong had made a preliminary decision to authorize Mdm. Ke and Mdm. Zhang as the appointed Administrators of the Estate of the Second Applicant on November 6, 2015, and they hoped to receive the official decision from the High Court of Hong Kong soon.

79.   On January 12, 2016, Baker sent a letter to the arbitral tribunal stating that the High Court of Hong Kong had issued the Letters of Administration on December 28, 2015 and appointed Mdm. Zhang and Mdm. Ke as the Administrators of the Estate of the Second Applicant. The duplicate copy of the said Letters of Administration was also enclosed in the letter. In the letter, Baker also requested that the arbitral tribunal provide it with the dossier of this case that the arbitral tribunal had sent to all parties after the passing of the Second Applicant. On the same day, the arbitral tribunal forwarded this letter to the First Applicant and the Respondents, and instructed them to provide opinions for or against Baker at or before 6 p.m. on January 15, 2016.

AP_Legal – 104494610.1

80.   On January 14, 2016, the First Applicant sent an email to the arbitral tribunal stating that the duplicate copy of the Letters of Administration provided by Baker was not complete. However, if Baker was able to provide the complete duplicate copy stating that the relevant Administrators of the Estate has legal rights to represent the Second Applicant in the administration or handling of its choses in action and liabilities under the 4.28 Agreement and/or in this case based on the Letters of Administration, the First Applicant shall not object to Baker's request in the letter dated January 12, 2016.

81.   On January 15, 2016, the arbitral tribunal issued the "Decision of the Arbitral Tribunal on the 'Respondents' Request for Production of Documents'" ("**Decision (II)**") to all parties via email.

82.   On January 15, 2016, the Respondents sent an email to the arbitral tribunal confirming that they did not object to Baker's request in the letter dated January 12, 2016.

83.   On January 18, 2016, Baker sent a letter to the arbitral tribunal requesting that the arbitral tribunal notify it on the newest developments of this case, the next step in the procedure and the time schedule, and provide it with the documents it had requested for in the letter dated January 12, 2016.

84.   On January 19, 2016, the arbitral tribunal replied to Baker via email and requested for it to provide the complete duplicate copy of the Letters of Administration so as to facilitate the arbitral tribunal's overall consideration of Baker's request. On the same day, the First Applicant sent a letter to the arbitral tribunal to submit a further supplementary written opinion with regard to the matters in Baker's letter dated January 12, 2016.

85.   On January 27, 2016, the First Applicant sent an email to the arbitral tribunal confirming that the relevant documents in the Request for Production of Documents in the arbitral tribunal's Decision (II) were non-existent.

86.   On January 29, 2016, Baker sent a letter to the arbitral tribunal stating that Mdm. Ke and Mdm. Zhang had reservations about providing the complete duplicate copy, as the complete duplicate copy of the Letters of Administration involved the private information of the Second Applicant. Baker also asked for the arbitral tribunal's understanding, or for it to provide clear reasons for disclosure.

19

87.   On February 2, 2016, the arbitral tribunal sent a letter to Baker stating that the documents it had previously provided were unable to clearly state whether the relevant Administrators of the Estate had the legal rights to represent the Second Applicant in the administration or handling of its choses in action and liabilities in the 4.28 Agreement and/or in this case based on the Letters of Administration, and requested that it provide the Schedule of Assets and Liabilities dated May 25, 2015 enclosed in the said Letters of Appointment to confirm the abovementioned issue.

88.   On February 17, 2016, Baker sent a letter to the arbitral tribunal stating that with regard to the list of appendices in the Letters of Administration presented by the High Court of Hong Kong, it would not provide explanations regarding the reasons for the disclosure of such choses in action made in a foreign country.

89.   On February 17, 2016, the arbitral tribunal announced to all parties via email that in accordance with the Order (II) stipulated by the arbitral tribunal on December 21, 2015, the segment for the production of documents had ended. However, the arbitral tribunal reserves its rights under Article 22.3 in the 2013 Administered Arbitration Rules.

90.   On February 19, 2016, the First Applicant submitted the electronic versions of the First Applicant's request to summon expert witnesses, the First Applicant's list of expert witnesses, and the First Applicant's list of factual witnesses to the arbitral tribunal via email. On the same day, the Respondents asked the arbitral tribunal for an extension of the deadline to March 4, 2016 for the submission of the witness request and name list. Thereafter, also on the same day, the First Applicant proposed an opinion in response regarding the said request for extension to the arbitral tribunal, stating that it objected to the extension of the deadline to March 4, 2016, but agreed to extend the deadline to February 26, 2016. On February 20, 2016, the arbitral tribunal approved the extension of the Respondents' submission deadline to February 26, 2016 at 6 p.m. via email.

91.   On February 25, 2016, the arbitral tribunal sent an email to the First Applicant and the Respondents with all the email/letter correspondences between the arbitral tribunal and Baker enclosed, and invited the First Applicant and the Respondents to submit, by March 11, 2016 latest, the final written opinion with regard to whether or not Mdm. Ke and Mdm. Zhang could represent the Second Applicant in this case.

20

92.     On February 26, 2016, the Respondents sent a letter to the arbitral tribunal to submit the list of factual witnesses the Respondents intended to summon and the list of expert witnesses the Respondents intended to summon, as well as the relevant applications.

93.     On March 4, 2016, the Respondents sent a letter to the arbitral tribunal stating that, in view that the First Applicant did not submit the relevant information regarding the expert witnesses that the Respondents had asked for, they shall reserve the rights to raise opinions regarding the witnesses the First Applicant intended to summon, and the rights to nominate a Chinese architectural surveyor as an expert witness. At the same time, the Respondents stated that all parties should abide by the arrangements of the relevant items in Order (II) with regard to the matter of expert witnesses.

94.     On the same day, that is, March 4, 2016, the First Applicant submitted a written opinion with regard to the necessity of the list of witnesses submitted by the Respondents in the letter dated February 26, 2016.

95.     On March 9, 2016, Baker sent a letter to the arbitral tribunal requesting that the arbitral tribunal give a reply with regard to the information of the relevant choses in action and legal liabilities in the list of appendices in the Letters of Administration of the Second Applicant, and the requests it had made in the letters dated January 12, 2016 and January 18, 2016.

96.     On March 10, 2016, the First Applicant submitted the "First Applicant's Supplementary Written Opinion and the Written Opinion of Relevant Cases" with regard to whether Mdm. Ke and Mdm. Zhang could represent the Second Applicant in this case. The First Applicant believed that, in view that the Letters of Administration confirmed by Baker did not include the choses in action and legal liabilities in the 4.28 Agreement, Mdm. Ke and Mdm. Zhang lacked the legal powers to represent the Second Applicant in this case.

97.     On March 11, 2016, the Respondents sent an email to the arbitral tribunal to reaffirm their opinion made in the letter dated January 15, 2016, that is, they did not object to the arbitral tribunal providing the dossier of this case for Mdm. Ke's and Mdm. Zhang's viewing, and they did not object to Mdm. Ke and Mdm. Zhang representing the Second Applicant in this case. On the same day, that is, March 11, 2016, the Respondents submitted a reply to the arbitral tribunal in

21

another email regarding the First Applicant's objection to the necessity of the list of witnesses submitted on March 4, 2016.

98.   On March 24, 2016, Baker sent a letter to the arbitral tribunal to reaffirm its position, that is, on Mdm. Ke and Mdm. Zhang having the right to represent the Second Applicant in the participation of this case, and having the opinion that the arbitral tribunal should immediately suspend the case before the official decision of the issue regarding the appointment of the Administrator of the Estate of the Second Application has been made.

99.   On March 29, 2016, the Respondents sent an email to the arbitral tribunal stating that they had reached a consensus with the First Applicant and requested for the arbitral tribunal to approve the extension of the deadline for the exchange of the witness testimonies by all parties (that is, Item 15 of Order (II)) to April 15, 2016. On the same day, that is March 29, 2016, the arbitral tribunal approved the said request via email.

100.  On April 6, 2016, HKIAC sent an email with an attachment to all parties on the "Decision Regarding the Participation of Mdm. Ke Yeying, the Daughter, and Mdm. Zhang Yuejin, the Widow of the Second Applicant, Mr. Ke Zhengguang in the Hearing of the Arbitration Case Representing the Estate of the Second Applicant as Administrators of the Estate of Mr. Ke Zhengguang" ("**Decision (III)**") made by the arbitral tribunal dated April 6, 2016. The arbitral tribunal ruled that: (1) As the Administrators of the Estate of the Second Applicant, Mdm. Ke and Mdm. Zhang have the right to represent the Estate of the Second Applicant in the participation of the hearing of this case; (2) HKIAC shall immediately provide the dossier related to this case that was sent to all parties after the passing of the Second Applicant to Baker, the representative of the two administrators; (3) This case shall proceed. On the next day, that is, April 7, 2016, the arbitral tribunal sent the said Decision (III) to all parties via email.

101.  On April 14, 2016, Baker sent a letter to the arbitral tribunal, in view that it had yet to receive the related dossier of this case, to request for the suspension of the current arbitration proceeding, so that it could have the opportunity to fully read and analyze the dossier of the case.

102.  On April 15, 2016, the First Applicant sent an email to the arbitral tribunal with the electronic version of the statement made by the First Applicant's two witnesses enclosed. On the same day, the Respondents also sent an email to the

arbitral tribunal with the testimonies of the Respondents' four witnesses enclosed.

103.     On April 19, 2016, HKIAC provided Baker with the dossier of this case provided by the arbitral tribunal as instructed in Decision (III) via express courier.

104.     On April 28, 2016, the arbitral tribunal sent an email to all parties requesting that Baker, as the representative of the Second Applicant, notify the arbitral tribunal on the amount of additional time required for its client to prepare for its participation in the hearing of this case. In view of the accession of Baker, (1) the recommendation was that all parties convene a case management conference and all parties were requested to confirm the time for negotiation; (2) to suspend the procedural schedule dated December 21 , 2015 so as to provide the Second Applicant with the opportunity to submit its witness testimonies (if any).

105.     On May 3, 2016, the arbitral tribunal sent a letter to all parties and instructed Baker to clearly state its position on whether or not its client was requesting to participate in the hearing of this case.

106.     On May 4, 2016, the First Applicant sent an email to the arbitral tribunal to confirm the commencement time of the case management conference. On the same day, the Second Applicant sent an email to the arbitral tribunal confirming that Mdm. Ke and Mdm. Zhang would participate in the hearing of this case as the Administrators of the Estate of the Second Applicant.

107.     On May 6, 2016, the arbitral tribunal sent an email to all parties and instructed that the case management conference would be conducted face-to-face, and requested that all parties book the venue for the conference in advance.

108.     On May 10, 2016, the First Applicant sent an email to the arbitral tribunal requesting that the arbitral tribunal issue an order for the Estate of the Second Applicant to confirm their position, with regard to the following questions, with the arbitral tribunal and all parties concerned in this case on or before June 2, 2016 (1) Whether or not the Estate of the Second Applicant would request for claims from the First Applicant and/or the Respondents in this case; (2) Whether or not the Estate of the Second Applicant would adopt the existing arbitration petition submitted jointly by the First Applicant and the Second Applicant as its position for claims in this case; (3) Whether or not the Estate of the Second

23

Applicant would submit its new arbitration petition/Statement of Defence/response letter; (4) Whether or not the Estate of the Second Applicant would only participate in this case as observers. On the same day, that is, May 10, 2016, the arbitral tribunal sent an email to all parties and instructed the Second Applicant to provide its opinion with regard to the First Applicant's request no later than 6 p.m. on May 12, 2016.

109.    On May 11, 2016, the Second Applicant sent an email to the arbitral tribunal to request for an extension of the deadline of its reply to the First Applicant's abovementioned request to May 20, 2016.

110.    On May 12, 2016, the Respondents sent an email to the arbitral tribunal, stating that with regard to the First Applicant's request in the email dated May 10, 2016, the First Applicant should first clearly state whether or not it would still continue to request for the Administrators of the Estate of the Second Applicant to be converted to a Respondent, or to request for claims from the Administrators of the Estate of the Second Applicant.

111.    On May 13, 2016, the arbitral tribunal sent an email to all parties and approved the extension of the deadline requested by the Second Applicant in the email dated May 11, 2016.

112.    On May 17, 2016, the arbitral tribunal sent an email to all parties and instructed that the arbitral tribunal would take the First Applicant's opinion into consideration after the Second Applicant has replied to the First Applicant's questions before the deadline on May 20, 2016.

113.    On May 20, 2016, the Second Applicant sent an email to the arbitral tribunal in response to the First Applicant's questions in the email dated May 10, 2016 (1) The Estate of the Second Applicant would participate in this case as the Second Applicant, and the Second Applicant would not request for any claims from the First Applicant within the scope of the arbitration agreement; (2) The Second Applicant would adopt the arbitration petition submitted in accordance with the Second Applicant's instructions, but the Second Applicant objected to the amended arbitration petition submitted by the First Applicant (that is, the withdrawal of the Second Applicant and the adding as the Fifth Respondent); (3) The Second Applicant would not submit a new Statement of Defence; (4) The Second Applicant would attend the hearing as observers, but would be restricted by the conditions listed in the email.

114.    On May 22, 2016, the arbitral tribunal sent an email to all parties and permitted the First Applicant to respond to the Second Applicant's email dated May 20, 2016 no later than 6 p.m. on May 27, 2016.

115.    On June 3, 2016, the arbitral tribunal sent an email to all parties to remind the First Applicant that the deadline for its response to the Second Applicant's email dated May 20, 2016 had passed and instructed it to clearly state its position. On June 6, 2016, the First Applicant sent an email to the arbitral tribunal stating that it would submit a Written Statement of the First Applicant's Position no later than five days prior to the case management conference. On June 8, 2016, the Second Applicant sent an email to the arbitral tribunal to object to the abovementioned extension of deadline requested by the First Applicant and requested that the arbitral tribunal orders the First Applicant to submit its response no later than June 13, 2016.

116.    On June 14, 2016, the First Applicant sent an email to the arbitral tribunal with the enclosed "First Applicant's Written Response" that it had submitted in

AP_Legal – 104494610.1

response to the email dated May 20, 2016 sent by the Estate of the Second Applicant. In the said response, the First Applicant stated that, based on the position of the Estate of the Second Applicant in the email dated May 20, 2016, the First Applicant did not, at that moment, need to bring up the converting of the Estate of the Second Applicant to Fifth Respondent or request for the corresponding amendments to the arbitration petition. However, in view that the Estate of the Second Applicant reserving the rights to propose opinions or provide supplementations in the future, if the Estate of the Second Applicant were to proposes a position that would be different from or was unfavorable to the First Applicant, the First Applicant shall reserve the rights to once again request the arbitral tribunal to convert the Estate of the Second Applicant to a Respondent. The First Applicant also proposed that the arbitral tribunal order the Estate of the Second Applicant to submit an official written statement (including the confirmation that it did not have any opinions or additions to the pleadings and/or witness testimonies already submitted in the case at this point) on its position at that time and the attitude with regard to the case as mentioned above in the form of a pleading and/or witness statement as a "newly-added" party in the case. At the same time, the First Applicant requested for the guidelines of the current schedule to be postponed accordingly on the basis of the accession of the Estate of the Second Applicant.

117. On June 21, 2016, the arbitral tribunal sent an email to all parties and instructed the Second Applicant to provide its opinion on the First Applicant's written response before 6 p.m. on June 23, 2016, especially regarding the two questions below: (1) Will the Second Applicant adopt a different position from the First Applicant during the arbitration process? (2) Will the Second Applicant summon any factual witnesses or expert witnesses?

118. On June 23, 2016, the arbitral tribunal sent an email to all parties and instructed the Respondents to confirm as soon as possible on whether or not they would nominate a Chinese architectural surveyor as an expert witness.

119. On the same day, that is June 23, 2016, Baker sent an email to the arbitral tribunal with the "Outline of the Second Applicant's Written Statement" and its "Table of Content of Appendices" enclosed.

120. On June 24, 2016, the arbitral tribunal and all parties commenced the case management conference.

AP_Legal – 104494610.1

121.  On June 28, 2016, the arbitral tribunal sent an email to all parties with the enclosed procedural order and Schedule of the Hearing ("**Order (III)**") dated June 28, 2016. In Order (III), the arbitral tribunal had approved the list of expert witnesses summoned by the First Applicant and the Respondents respectively, and formulated a Schedule of the Hearing.

122.  On June 29, 2016, the Respondents sent a letter to the arbitral tribunal to submit the testimonies of the three witnesses of the Respondents. On the same day, the First Applicant sent an email to the arbitral tribunal to confirm that it had already delivered the hardcopy of the Statement of the First Applicant's Factual Witnesses along with appendices to the representative of the Second Applicant on the same day.

123.  On July 21, 2016, Baker sent an email to HKIAC to confirm that it had received all documents dated up to December 5, 2013 that were submitted to the arbitral tribunal before the passing of the Second Applicant ("**dossiers**") provided to it in accordance with the requirements in Order (III). On the next day, that is July 22, 2016, Baker sent an email to the arbitral tribunal to request for an extension of the deadline for the relevant procedures and actions stated in the Schedule of the Hearing of Order (III) in view that the abovementioned dossiers were actually received later than the deadline stipulated in Order (III).

124.  On July 26, 2016, Baker sent an email to the arbitral tribunal stating that it had noticed that a part of the appendix of the Respondents' "Statement of Defence and Counterclaim" was missing from the dossiers provided to it by HKIAC, and thereby requested for the arbitral tribunal to approve the extension of deadline that it had requested on July 22, 2016.

125.  On July 28, 2016, the arbitral tribunal sent an email to all parties and instructed the First Applicant and the Respondents to provide opinions with regard to the request for the extension of deadline made by the Second Applicant.

126.  On July 29, 2016, the First Applicant sent an email to the arbitral tribunal stating that the Second Applicant's delay in the receipt of the dossier was due to reasons attributable to itself. However, under the condition that the Second Applicant gave the promise to the arbitral tribunal that it would not request for a further extension of the deadline, the First Applicant would not object to the Second Applicant's request for the extension of deadline. On the same day, the Respondents sent an email to the arbitral tribunal stating that it would not object

to the Second Applicant's request for the extension of the deadline, and recommended that the deadlines stated in Item 9 to 11 of the Schedule of the Hearing should be extended accordingly as a result of the National Day holidays.

127.   On July 30, 2016, the Second Applicant sent an email to the arbitral tribunal to refute the position proposed by the First Applicant that the Second Applicant's delay in the receipt of the dossiers was due to reasons attributable to itself, and requested that the arbitral tribunal issue the following orders: (1) Approve the Second Applicant's request for extension of deadline; (2) For the Respondents to provide the appendices of the "Statement of Defence and Counterclaim" (that is, Appendix B46, C1 - C30, and D1 - D30) yet to be received by the Second Applicant to the Second Applicant within seven days; (3) For the Second Applicant to pay the reasonable expenses for the printing of the abovementioned appendices of the "Statement of Defence and Counterclaim" to the Respondents; (4) For the Second Applicant to reserve the rights to claim the abovementioned expenses from the First Applicant; (5) For all parties to have the freedom to make other requests.

128.   On August 1, 2016, the arbitral tribunal sent an email to all parties stating that the arbitral tribunal agreed to amend Order (III) on the basis that the time of the hearing remained the same, and it promulgated a new procedural order and Schedule of the Hearing ("**Order (IV)**").

129.   On the same day, that is, August 1, 2016, the Second Applicant sent an email to the arbitral tribunal requesting the arbitral tribunal to issue orders with regard to the other requests made by it in the email dated July 30, 2016.

130.   On August 2, 2016, the Respondent sent an email to the arbitral tribunal and agreed to conditionally provide the relevant appendices of the "Statement of Defence and Counterclaim" requested by the Second Applicant.

131.   On August 5, 2016, the arbitral tribunal sent an email to all parties and instructed the Second Applicant and the Respondents to notify the arbitral tribunal of the outcome from their communications with regard to the provision of the relevant appendices of the "Statement of Defence and Counterclaim". On the same day, the Second Applicant sent an email to the arbitral tribunal to confirm that it had received the relevant appendices, and that it had reserved the rights to claim the expenses incurred from the First Applicant for obtaining the arbitration documents from HKIAC and the Respondents. On the same day, the First Applicant sent an email to the arbitral tribunal denying the allegation of "the

First Applicant illegally removed the documents from the Second Applicant's premises" made by the Second Applicant, and the relevant lawyer's letter was enclosed.

132.  On August 15, 2016, the Second Applicant submitted the factual witness statement of Mdm. Ke to the arbitral tribunal via email. On the same day, the arbitral tribunal sent an email to all parties and approved the request made by the Second Applicant to summon Mr. Ye Yongqing as an expert witness.

133.  On September 3, 2016, the First Applicant sent an email to the arbitral tribunal to request for the amendment of its "Reply and Defence to Counterclaim" in accordance with Article 18.1 of the "2013 Administered Arbitration Rules of the Hong Kong International Arbitration Centre"[2] ("**Request for Amendment**") and the draft of its "Amended Reply and Defence to Counterclaim" was enclosed. At the same time, the First Applicant requested the arbitral tribunal to instruct the Respondents to submit its "Amended Further Reply to the Applicants' Reply and Defence to Counterclaim" within seven days upon the submission of the "Amended Reply and Defence to Counterclaim" by the First Applicant, under the condition that the arbitral tribunal, the Second Applicant, and the Respondents did not object to the "Amended Reply and Defence to Counterclaim" submitted by the First Applicant.

134.  On September 8, 2016, the Respondents sent an email to the arbitral tribunal and objected to the First Applicant's submission of the "Amended Reply and Defence to Counterclaim". On the next day, that is, September 9, 2016, the First Applicant sent an email to the arbitral tribunal and responded to the Respondents' reasons for objection.

135.  On September 12, 2016, the Second Applicant sent an email to the arbitral tribunal stating that it agreed to the First Applicant's request for amendment, and sincerely requested the arbitral tribunal to approve the said request.

---

[2]  The arbitral tribunal noticed that the First Applicant cited the "2013 Administered Arbitration Rules of the Hong Kong International Arbitration Centre". However, the "2008 Administered Arbitration Rules of the Hong Kong International Arbitration Centre" should be applied to this case instead. In view that, with regard to one party's amendment or supplementation of its request or defence, the difference in the relevant stipulations in the two sets of rules had no substantial impact on the arbitral tribunal's approval of the First Applicant's request for amendment, the arbitral tribunal shall deem the abovementioned citation of the "2013 Administered Arbitration Rules of the Hong Kong International Arbitration Centre" by the First Applicant as a typographical error.

136.    On the same day, that is, September 12, 2016, the Respondents sent an email to the arbitral tribunal stating that all parties had reached a consensus with regard to the extension of the deadline in Items 8 and 9 in Order (IV) by one week, and requested for the arbitral tribunal's approval. On the same day, the arbitral tribunal sent an email to all parties and approved the said request for the extension of deadline.

137.    On September 13, 2016, the arbitral tribunal sent an email to all parties and instructed that the arbitral tribunal had unanimously agreed to approve the First Applicant's request for amendment, but the First Applicant must pay all parties for all relevant expenses incurred with regard to the request for amendment. At the same time, the arbitral tribunal requested the First Applicant to officially submit the amended "Reply and Defence to Counterclaim" by September 15, 2016, and approved the submission of the amended "Further Reply to the Applicants' Reply and Defence to Counterclaim" by the Respondents to be no later than September 29, 2016.

138.    On the same day, that is, September 13, 2016, the Second Applicant sent an email to the arbitral tribunal requesting the arbitral tribunal to provide it with an opportunity to submit a response letter to the arbitral tribunal with regard to the amendments to the "Reply and Defence to Counterclaim" made by the First Applicant. On September 21, 2016, the arbitral tribunal sent an email to all parties and stated that it did not support the Second Applicant's request to submit a response letter to the arbitral tribunal with regard to the amendments to the "Reply and Defence to Counterclaim" made by the First Applicant.

139.    On September 14, 2016, the First Applicant sent an email to the arbitral tribunal and officially submitted the appendix "Amended Reply and Defence to Counterclaim".

140.    On September 21, 2016, the First Applicant sent an email to the arbitral tribunal with two copies of the First Applicant's Statement on the Refutation of Factual Witnesses enclosed. On the same day, the Second Applicant sent an email to the arbitral tribunal with Mdm. Ke's Refutation of the Witness Statement and the appended evidence enclosed. On the same day, the Respondents also sent a letter to the arbitral tribunal, enclosing three copies of the supplementary witness statement of the Respondents' three witnesses, that is, the Second Applicant, Gu Yong, and Liu Yuping.

141.   On September 29, 2016, the Respondents sent a letter to the arbitral tribunal with the Respondents' "Amended Further Reply to the Applicants' Reply and Defence to Counterclaim" enclosed.

142.   On October 12, 2016, the representative of the Respondents sent an email to the arbitral tribunal stating that its team members had been joined by Sidley Austin LLP and was instructed by the Respondents to continue representing the Respondents in this case.

143.   On October 14, 2016, the Respondents sent an email to the arbitral tribunal stating that they requested to extend the deadline for the exchange of the Expert Witnesses Report by all parties in Item 9 of the arbitral tribunal's Order (IV) for seven days, from October 17, 2016 to October 24, 2016, upon reaching a consensus with all parties. However, this would not affect the deadlines for the subsequent items after Item 10 of Order (IV). On the same day, the arbitral tribunal sent an email to all parties and approved the abovementioned request under the condition that a consensus was reached by all parties.

144.   On October 24, 2016, the Second Applicant sent an email to the arbitral tribunal requesting the extension of the deadline for the exchange of the Expert Witnesses Report by all parties to October 28, 2016 under the condition that the next deadline (that is, the commencement of the experts' meeting on November 28, 2016) in the arbitration schedule would not be affected. The Second Applicant stated that it had already solicited the opinion of the First Applicant and the representative of the Respondents with regard to the said request, and the representative of the Respondents had agreed to it. However, the representative of the First Applicant had not provided any replies yet. On the same day, that is, October 24, 2016, the First Applicant sent an email to the arbitral tribunal stating that it did not object to the Second Applicant's abovementioned request, but it hoped that the arbitral tribunal issue an "unless" order with regard to this request for extension of deadline. On the same day, the arbitral tribunal sent an email to all parties and approved the abovementioned request for extension of deadline made by the Second Applicant. The arbitral tribunal also stated that it would not allow any requests for the extension of deadlines to be made unless there were unusual or special reasons, in order to prevent the commencement date of the hearing from being affected.

AP_Legal – 104494610.1

145.    On October 28, 2016, the Second Applicant sent an email to the arbitral tribunal requesting to provide the first round of the unsigned expert report on the basis that the rights of all parties would not be affected on that day. On the same day, the First Applicant sent an email to the arbitral tribunal and objected to the Second Applicant's submission of the first round of the unsigned expert report. Thereafter, the arbitral tribunal sent an email to all parties on the same day and requested the Second Applicant to clarify the reasons for its unsigned expert report and when they could be signed; and whether or not the content in the signed expert report was fully consistent with the content in the unsigned expert report. Subsequently, the Second Applicant sent an email to the arbitral tribunal to explain the reasons for its request, and requested the arbitral tribunal to issue an order on whether or not the first round of the Expert Witnesses Report could be exchanged under the condition that the rights of all parties would not be affected.

146.    On the same day, that is, October 28, 2016, the First Applicant sent an email to the arbitral tribunal with two copies of the First Applicant's Expert Witnesses Report enclosed. On the same day, the Second Applicant and the Respondents also sent emails to the arbitral tribunal separately, stating that they had delivered their signed Expert Witnesses Report to all the other parties without prejudice.

147.    On November 15, 2016, the Second Applicant sent an email to the arbitral tribunal stating that, based on all the reasons listed in this email, the Second Applicant and Respondents unanimously deemed that the experts' meeting should commence on a "without prejudice" basis, and the representatives of all parties were not required to participate. The Second Applicant requested the arbitral tribunal to give instructions with regard to this matter.

148.    On November 21, 2016, the arbitral tribunal sent an email to all parties and approved that the experts' meeting should commence on a "without prejudice" basis.

149.    On December 13, 2016, the Respondents sent a letter to the arbitral tribunal stating that, in view that they had received different and even conflicting instructions and/or requests made by the First Applicant and the Second Applicant, respectively, they requested the arbitral tribunal to issue the following orders: (1) Instruct the Second Applicant (through its Administrators of the Estate) to express its opinions with regard to the two requests made by the

32

First Applicant in the letter dated December 9, 2016; (2) Instruct the First Applicant to express its opinions with regard to the recent request made by Mdm. Zhang; and (3) Unless the Applicants reach a consensus and provide a joint request to the Respondents, the Respondents shall not accept the unilateral instructions given by either the First Applicant or the Second Applicant.

150. On December 21, 2016, the Respondents sent an email to the arbitral tribunal stating that upon reaching a consensus by all parties, they requested to extend the deadline of the submission of the joint report on the statement of the viewpoints that were unanimously agreed upon by the expert witnesses and the statement of their differing viewpoints to January 4, 2017.

151. On December 30, 2016, the Second Applicant sent an email to the arbitral tribunal and enclosed its reply to the Respondents' letter dated December 13, 2016.

152. On December 31, 2016, the First Applicant sent an email to the arbitral tribunal and provided a reply to the Respondents' letter dated December 13, 2016 and the Second Applicant's letter dated December 30, 2016.

153. On January 11, 2017, the arbitral tribunal sent an email to all parties. The arbitral tribunal stated that it held that the mutual recriminations and allegations made by all parties were not related to this case. Hence, the arbitral tribunal would not take this matter into consideration or make judgements with regard to this matter. With regard to the "without prejudice" letter dated December 9 submitted by the Respondents to the First Applicant, the arbitral tribunal requested all parties to confirm that the arbitral tribunal would be able to continue hearing this case, regardless of whether a copy of the said letter was sent to the arbitral tribunal. The arbitral tribunal also reminded all parties to submit the joint expert reports.

154. Between January 12 - 13, 2017, all parties sent emails to the arbitral tribunal to confirm that the arbitral tribunal would be able to continue hearing this case.

155. On January 13, 2017, the Respondents sent an email to the arbitral tribunal stating that upon reaching a consensus by all parties, they requested to extend the deadline of the submission of the joint expert report to January 25, 2017. The arbitral tribunal sent an email to all parties on January 19, 2017 and approved the said request for extension of deadline under the condition that the overall Schedule of the Hearing would not be affected.

156.    On February 16, 2017, the First Applicant sent an email to the arbitral tribunal and recommended that instructions be given by the arbitral tribunal with regard to the time of the pretrial conference.

157.    On February 21, 2017, the Respondents sent a letter to the arbitral tribunal, enclosing (1) "Joint Expert Opinion Regarding the Issue on Equity Transfer and Issue on Taxes" jointly submitted on behalf of the Applicants and Respondents; and (2) "Joint Expert Opinion Regarding the Issue on Property" jointly submitted on behalf of the First Applicant and Respondents.

158.    On February 27, 2017, the arbitral tribunal sent an email to all parties and notified them of the specific commencement time of the pretrial conference, which would be held on April 3, 2017. The arbitral tribunal also notified all parties that, as there was a conflict of time for one of the arbitrators, the arbitral tribunal agreed to allow the Chief Arbitrator to preside the pretrial conference on his own, and requested all parties' confirmation on this. All parties sent emails to the arbitral tribunal separately between February 27 - 28, 2017 to confirm that they agreed with the abovementioned arrangement.

159.    On March 1, 2017, the Respondents sent an email to the arbitral tribunal, enclosing (1) Mdm. Yu Jian's Advisory Report of the Evaluation of the Byland Villa Project; (2) Mdm. Yu Jian's Advisory Report of the Evaluation of the Greencourt Sun City Project; and (3) Mr. Ji Nuo's Expert Opinion Letter and Summary of the Cited Laws and Regulations.

160.    On March 6, 2017, the First Applicant sent a recommendation to the arbitral tribunal and made a complaint against the Respondents, stating that there were major additions or changes to the content of "Mr. Ji Nuo's Expert Opinion Letter and Summary of the Cited Laws and Regulations" submitted by the Respondents on March 1, 2017, as compared to the Mr. Ji Nuo's Expert Opinion Letter exchanged and submitted on October 28, 2016. The First Applicant requested the arbitral tribunal to issue an instruction on the refusal to accept all expert reports submitted by the Respondents in the email dated March 1, 2017, and to forbid either party to submit any new or amended expert reports.

161.    On the same day, that is, March 6, 2017, the Second Applicant also sent an email to the arbitral tribunal and also objected to the Respondents' submission of the new expert report with content that was different from the version of the expert report submitted by them on February 21, 2017. It also requested the arbitral

34

tribunal to reject the expert report submitted by the Respondents on March 1, 2017.

162.   On March 7, 2017, the arbitral tribunal sent an email to all parties and instructed the Respondents to reply to the abovementioned viewpoint and recommendations made by the First Applicant and the Second Applicant before 6 p.m. on March 9, 2017.

163.   On March 9, 2017, the arbitral tribunal sent an email to all parties and recommended the adjustment of the commencement date of the hearing to May 16, 2017, instead of the original dates from May 15 to 26, 2017 (ten working days), due to the last-minute and urgent arrangement of one of the arbitrators, and where necessary, extend the time of the daily hearings. The arbitral tribunal requested all parties to confirm the above arrangement recommended by the arbitral tribunal before the pretrial conference on April 3, 2017. All parties sent emails to the arbitral tribunal separately between March 9 - 10, 2017 to confirm that they agreed with the abovementioned arrangement.

164.   On March 9, 2017, the Respondents sent an email to the arbitral tribunal to reply to the Applicants' request for rejection in the email dated March 6, 2017, and requested the arbitral tribunal to reject the Applicants' request for rejection. On March 10, 2017, the arbitral tribunal sent an email to all parties and instructed the First Applicant and the Second Applicant that, if they intended to reply to the Respondents' email, they would have to provide a reply before March 14, 2017.

165.   On March 13 and 14, 2017, the First Applicant and the Second Applicant sent letters to the arbitral tribunal separately and provided their replies to the Respondents' email dated March 9, 2017.

166.   On March 29, 2017, the First Applicant sent an email to the arbitral tribunal enclosing a copy of the agenda of the pretrial conference jointly drafted by all parties.

167.   On March 30, 2017, the Respondents sent an email to the arbitral tribunal and stated that they were willing to provide a copy of the Comparison Version of Mr. Ji Nuo's Final Expert Opinion Letter and the version dated October 28, 2016 ("**comparison version**") de bene esse (conditionally) to prove that the final version did not have "major additions or changes to the content" as described by the First Applicant. On such basis, the arbitral tribunal sent an email on the same

35

day and instructed the Respondents to provide the comparison version for review by the arbitral tribunal, as well as by the First and Second Applicant.

168.　On March 31, 2017, the Second Applicant sent an email to the arbitral tribunal stating that it objected to the Respondents' provision of the comparison version de bene esse, and also objected to the official submission of the comparison version by the Respondents. It also requested the arbitral tribunal to reject the Respondents' request to submit the comparison version or to not take the said comparison version into consideration. On the same day, on March 31, 2017, the Respondents sent an email to the arbitral tribunal and provided the comparison version to all parties. The First Applicant also provided a reply to the email on the Respondents' submission of the comparison version on the same day.

169.　On April 2, 2017, the arbitral tribunal sent an email to all parties to summarize the email correspondences with regard to the comparison version and the main position of all parties, and stated that it would further communicate with all parties during the pretrial conference.

170.　On April 3, 2017, the arbitral tribunal and all parties commenced the pretrial conference at HKIAC.

171.　On April 4, 2017, the arbitral tribunal sent an email to all parties and instructed that it: (1) Permitted Mr. Ji Nuo's Expert Opinion Letter submitted by the Respondents on October 28, 2016; (2) Rejected the amendments to Paragraph 8, Paragraph 9, and Paragraph 32 in Mr. Ji Nuo's Expert Opinion Letter and Summary of the Cited Laws and Regulations submitted by the Respondents on March 1, 2017; (3) Rejected Note 3, Note 7, Note 22, Note 23, Note 24, and the deleted Note 5 (at the same time, refer to point 4 below) in Appendix II of Mr. Ji Nuo's Expert Opinion Letter submitted by the Respondents on March 1, 2017; (4) Permitted all sentences of "Refer to Page [x] of the Summary of the Laws and Regulations" and the "Summary of the Cited Laws and Regulations" (except for Note 3, Note 7, Note 22, Note 23, Note 24, and the deleted Note 5) in Appendix II of Mr. Ji Nuo's Expert Opinion Letter submitted by the Respondents on March 1, 2017; (5) Permitted the "Summary of the Cited Laws and Regulations" submitted by the Respondents on March 1, 2017; (6) Did not support the issuance of any orders as to costs.

172.　On April 5, 2017, the arbitral tribunal issued a procedural order ("**Order (V)**") to all parties with regard to the details of the hearing arrangement via email.

36

173.   On April 11 and 19, 2017, the arbitral tribunal sent an email to all parties and provided supplementary instructions with regard to the issues related to the dossiers of the hearing.

174.   On May 5, 2017, the First Applicant and the Second Applicant sent emails to the arbitral tribunal separately, enclosing the electronic version of the Written Statement Prior to the Hearing (including "Authorities") submitted by each of them.

175.   Between May 5 - 6, 2017, all parties sent an email to the arbitral tribunal separately and stated that they were unable to submit the relevant Chronology and Introduction of the People Involved in the Case before the deadline stipulated in Order (V) because all parties were unable to reach a consensus with regard to the Chronology and content of the Introduction of the People Involved in the Case. At the same time, the Respondents recommended that the deadline for the submission of the said documents be extended to 6 p.m. on May 9, 2017. On May 7, 2017, the arbitral tribunal approved the extension of the said deadline to 2 p.m. on May 8, 2017.

AP_Legal – 104494610.1

176.    On May 8, 2017, the Respondents sent an email to the arbitral tribunal stating that upon reaching a consensus with both Applicants, they requested to extend the deadline of the submission of the Respondents' Written Statement Prior to the Hearing to 6 p.m. on May 9, 2017. The arbitral tribunal approved the said request on the same day, that is, May 8, 2017. On May 9, 2017, the Respondents sent an email to the arbitral tribunal, enclosing the electronic version of the Written Statement Prior to the Hearing and "Authorities" submitted by them. On the next day, that is, May 9, 2017, the Respondents resubmitted the electronic version of the "Authorities" to the arbitral tribunal via email as there were missing pages in the electronic version of the "Authorities".

177.    On May 9, 2017, the Second Applicant sent an email to the arbitral tribunal, enclosing the: (1) Chronology; and (2) Introduction and Relationship Chart of the People Involved in the Case of all parties. The Second Applicant stated that the above documents covered the position of all parties, but as all parties were unable to reach a full consensus with regard to the content of the said documents within the stipulated deadline, the Applicants had added markings and comments in the portions of the documents where the opinions of the parties were different for the arbitral tribunal's reference.

178.    On May 14, 2017, the arbitral tribunal sent an email to all parties and instructed all parties to inform the witnesses of the arbitration of the time and order of their appearance before 3 p.m. on May 15, 2017. The arbitral tribunal also instructed that the arbitral tribunal wished to receive a copy of the schedule that had been formulated upon the consensus of all parties.

179.    On May 15, 2017, the First Applicant sent an email to the arbitral tribunal with the electronic version of the List of the First Applicant's Supplementary Laws and Regulations in the Applicants' Written Statement Prior to the Hearing enclosed. On the same day, on May 15, 2017, the Respondents sent an email to the arbitral tribunal with the (1) Amended "Authorities" of the Respondents' Written Statement Prior to the Hearing[3]; and (2) Relevant Schematic Diagram of the Structure of Equity Transfer and Checklist of the Steps enclosed.

---

[3]     "Legal Judgements" was original document used in the Respondents' emails and its appendices.

180. On May 16, 2017, the First Applicant sent an email to the arbitral tribunal with the time and order of the appearance of the witnesses that was jointly discussed by all parties enclosed.

181. On May 16, 2017, the arbitral tribunal and all parties commenced the hearing. The hearing was conducted consecutively from May 16, 2017 to May 25, 2017 and ended on May 25, 2017. On August 8, 2017, the arbitral tribunal held a hearing to take all parties' closing argument into consideration.

182. On the first day of the trial on May 16, 2017, all parties agreed to delete the following paragraph for the purpose of the trial: That is, (a) Paragraphs 56-65 of the statement of Xu Hongbiao's statement (Pages 24-27 in Dossier B); (b) Paragraphs 23-24 of the statement of Xu Hongbiao's rebuttal to the factual witness (Page 104 in Dossier B); (c) Paragraphs 5-6 (Page 134 in Dossier B), Paragraphs 19-31 (Pages 135-137 in Dossier B, and Paragraphs 39-59 (Pages 138-142 in Dossier B) of Ke Yeying's rebuttal to the witness' statement.

## IV.   Factual Background

AP_Legal – 104494610.1

183. Oasis Investment (First Respondent) is a company registered and established in the British Virgin Islands on July 26, 2001. It is also the parent company of the following three companies: Shanghai Greencourt Property Development Co., Ltd ("**Greencourt Property Development**"), Greencourt Properties Limited ("**Greencourt Properties**"), and Shanghai Oasis Kechuang Ecological Technology Co., Ltd. ("**Oasis Kechuang**"). Other than Greencourt Properties, which was established in Hong Kong, both Greencourt Property Development and Oasis Kechuang were established within China.

184. The total number of shares issued by Oasis Investment was 48,000 shares. The original equity distribution was as follows: Xu Hongbiao (First Applicant) held 8,000 shares (16.6%), Ke Zhengguang (deceased, his Estate is the Second Applicant of this case) held 8,000 shares (16.6%), Yu Naifen Stephany (Second Respondent) held 23,520 shares (49%), Yu Naiwen (Third Respondent) held 8,000 shares (16.6%), and Yu Naiyun (Fourth Respondent) held 480 shares (1%). As the total shares held by Yu Naifen Stephany, Yu Naiwen, and Yu Naiyun accounted for 66.6% of the shares, they were referred to as the "Controlling Shareholders" in the 4.28 Agreement. Xu Hongbiao and Ke Zhengguang were referred to as the "Non-controlling Shareholders" in the 4.28 Agreement.

185. Since early 2009, the Controlling Shareholders and the Non-controlling Shareholders started discussions with regard to issues on share restructuring for Oasis Investment. The discussion process and content can be seen in the following documents: "Minutes of the Greencourt Meetings of Shareholders and Board of Directors Regarding the Splitting of Assets and Other Related Matters" [D2/61/607] dated March 24, 2009, "Minutes for the Greencourt Shareholders' Meeting Convened on August 20, 2009" (also referred to as "8.20 Minutes" [D2/63/615] dated September 4, 2009, "Preliminary Agreement on Share Restructuring for Oasis Investment Group Limited" ("**Restructuring Agreement**") [D2/68/622] dated November 9, 2009, and "Meeting Minutes" [D2/96/718] dated February 3, 2010.

AP_Legal – 104494610.1

186.   In the end, both parties and the related companies concluded the "4.28 Agreement"[4] on April 28, 2010, and its main content was as follows:

(1)   Ke Zhengguang and Xu Hongbiao would transfer the equity they each held in Oasis Investment to Cheergain International Group Limited ("**Cheergain International**") and Focus Town Limited ("**Focus Town**") respectively. After the said transfers had been completed, Oasis Investment then repurchase the equity of Oasis Investment held by Cheergain International and Focus Town respectively ("**Equity Transfer before Repurchase**"). The Respondents agreed to the above arrangement and were willing to provide the necessary cooperation: See Article 1.1 [D2/100/751].

(2)   Oasis Investment must pay consideration to the Non-controlling Shareholders in three parts, including cash consideration, equity consideration, and consideration of property exchange with regard to the Equity Transfer before Repurchase:

(3)   **For cash consideration**, a total of RMB 250 million was to be paid in three installments, and they were: [RMB] 80 million, 20 million, and 150 million, respectively; for the payment made in each period, the necessary prerequisites must be met: See Article 2.1 and Article 2.2 [D2/100/752].

(4)   **The equity consideration** was to be calculated and paid based on 100% of the equity of Shanghai Greencourt Four-Season-Flower-City Property Development Co., Ltd. ("**SJHC**"): See Article 2.3 [D2/100/754]. The aim of the arrangement made under the 4.28 agreement was to allow the Non-controlling Shareholders to fully own and control SJHC.

(5)   **For the consideration of property exchange**, Oasis Investment and the Controlling Shareholders must appoint Greencourt Property Development and the Non-controlling Shareholders (or its appointed

---

[4]   There were ten signatories of the 4.28 Agreement. They were (i) Oasis Investment; (ii) Yu Naifen Stephany; (iii) Yu Naiwen; (iv) Yu Naijun; (v) Ke Zhengguang; (vi) Xu Hongbiao; (vii) Cheergain International Group Limited; (viii) Focus Town Limited; (ix) Greencourt Properties; and (x) Oasis Kechuang.

third party) to conclude the "Shanghai Real Estate Sale and Purchase Contract" and transfer the property for commercial use of approximately 8,000 square meters, located at Jiuting, Songjiang District, Shanghai City ("**Jiuting Stores**") Greencourt Sun City Real Estate Project held by Greencourt Property Development to the Non-controlling Shareholders (or its appointed third party). At the same time, SJHC and Oasis Investment or a third party appointed by the Controlling Shareholders shall conclude the "Villa Order Contract" and transfer the two buildings of A2-type villas on Central Island ("**A2-Type villas**") of the Peninsula Villa Project located at Fengpu Industrial Area, Fengxian District, Shanghai City that it had developed to Oasis Investment or a third party appointed by the Controlling Shareholders. All parties confirmed that the value of the property involved in the abovementioned "Shanghai Real Estate Sale and Purchase Contract" and "Villa Order Contract" were all priced at RMB 72 million. As the prices of the two properties were equivalent, the consideration for this item was deemed as a mutual offset: See Article 3.1 to Article 3.3 [D2/100/755].

(6)     Starting from the date of conclusion of the Agreement, the related party transactions between SJHC and Oasis Investment and its subsidiary companies should be terminated; all the pre-existing [intragroup] debts and claims should be settled within one month: See Article 3.6 [D2/100/756].

187.    After the conclusion of the 4.28 Agreement, the Equity Transfer before Repurchase by Cheergain International and Focus town was completed on May 4, 2010 [D2/110 - 114/791 - 799]. That is, the Non-controlling Shareholders had promptly fulfilled a part of its obligations under the 4.28 Agreement. However, the Non-controlling Shareholders and Controlling Shareholders had a dispute with regard to the cash consideration, equity consideration, and consideration of property exchange of the share repurchase, as well as issues on the settlement of the debts and claims, which eventually led to this arbitration.

## V.     Disputed Matters and Position of Both Parties

### A.      Cash Consideration

188.   With regard to cash consideration, Oasis Investment had paid the amount for the first and second installments (a total of RMB 100 million) to the Non-controlling Shareholders in accordance with the stipulations in the 4.28 Agreement.

189.   However, Oasis Investment had not yet paid the amount for the third installment (estimated to be RMB 150 million. The final amount should be adjusted in accordance with the stipulations in Article 2.2.1 (4) of the 4.28 Agreement). According the Article 2.2.1 (3), the amount for the third installment must be paid before December 31, 2012, under the condition that the following prerequisites were met:

(1)   The government approvals and registration procedures for the equity transfer of SJHC must be already completed;

(2)   Oasis Investment must have completed the registration procedures for the change in shareholders required for the repurchase of the equity of the Non-controlling Shareholders;

(3)   The Non-controlling Shareholders and Controlling Shareholders must have reached an agreement with regard to the arrangements for the payment of cash consideration and the adjusted amount of each item as stipulated in Article 2.1;

(4)   The Non-controlling Shareholders must have confirmed that the payment of equity consideration stipulated in Article 2.3.5 of the 4.28 Agreement had been completed and all parties have no objections to the above;

(5)   The "Shanghai Real Estate Sale and Purchase Contract" of Jiuting Stores as described in Article 3.1 of the 4.28 Agreement and the "Shanghai Real Estate Presale Contract" of A2-type villas as described in Article 3.2 of the 4.28 Agreement must be concluded and the registration procedures for the transfer of ownership or presale must be completed at the Real Estate Registration Authority.

190.   The Non-controlling Shareholders and the Controlling Shareholders both alleged that items (1), (3), (4) and (5) of the abovementioned prerequisites had not been fully met due to the breach of contract by the other parties. It was undisputed by both parties that item (2) of the prerequisites had been completed.

AP_Legal – 104494610.1

**B.      Equity Consideration**

**Equity Transfer Structure**

191.    Article 2.3.1 of the 4.28 Agreement stipulates that:

*"Oasis Investment has newly incorporated Shibang Company Ltd ("**Shibang Company**") in Hong Kong and has arranged for Shibang Company to acquire 80% of the equity interest in [SJHC] held by [Greencourt Properties], a subsidiary of Oasis Investment in Hong Kong. After the completion of the said equity acquisition, Oasis Investment shall sign the "Equity Purchase Option Agreement" with [Cheergain International] and [Focus Town] and agree that upon the expiration of the entrustment period mentioned in Article 2.3.2 below, 100% of the equity of Shibang Company shall be transferred to [Cheergain International] and [Focus Town] at a consideration of HKD 1"*

192.    Article 2.3.2 of the 4.28 Agreement further stipulates that:

*"All Parties Agree That:  After Oasis Investment's signing of the Equity Purchase Option Agreement for the equity transfer of Shibang Company to [Cheergain International] and [Focus Town], Greencourt Properties is to sign the relevant Entrustment Agreement with [Cheergain International] and [Focus Town]. This agreement shall stipulate that:  (1) [Cheergain International] and [Focus Town] are entrusted by Greencourt Properties to manage Shibang Company and to exercise the shareholders' rights on its behalf for three years (the "entrustment period"); (2) during the entrustment period, the Non-controlling Shareholders are responsible for all the debts and claims, risks and liabilities of Shibang Company and SJHC. If for any reason the Controlling Shareholders, Oasis Investment or Greencourt Properties are required to bear the debts and claims, risks and liabilities of Shibang Company or SJHC during the entrustment term, the Non-controlling Shareholders are required to fully compensate the Controlling Shareholders, Oasis Investment and Greencourt Properties."*

193.    While Article 2.3.3 of the 4.28 Agreement stipulates that:

*"The remaining 20% of the equity of [SJHC] currently held by [Oasis Kechuang], a subsidiary of Oasis Investment, is to be transferred to a domestic company in China appointed by the Non-controlling Shareholders ("Onshore Payment of Equity Consideration"). If under the laws of the People's Republic*

*of China, an actual payment of consideration is required to be made for such equity transfer, the provisions of the abovementioned Article 2.2.1(4)(a) shall apply."*

194.   Article 2.3.4 of the 4.28 Agreement stipulates that:

*"All Parties Agree That:   The Non-controlling Shareholders shall be responsible for all the tax and expenses incurred due to the <u>Onshore</u> Payment of Equity Consideration, as well as the tax and expenses incurred <u>offshore</u> due to the entrustment arrangement made by Shibang Company and the equity transfer of Shibang Company to [Cheergain International] and [Focus Town]. Apart from this, the sharing of the tax and expenses relating to the payment of Equity Consideration is to be negotiated by all the Parties in due course. All procedures relating to the onshore and offshore payment of Equity Consideration, such as applications, registrations and government procedures, etc. are to be undertaken by the Non-controlling Shareholders while the Controlling Shareholders and Oasis Investment are to provide the necessary assistance. (underlines added later)*

**C.     Consideration of Property Exchange**

195.   The 4.28 Agreement stipulates a property exchange by both parties, that is: The exchange of the Jiuting Stores and A2-type villas and they shall both be deemed as considerations. The position of the Applicants was: The 4.28 Agreement confirmed that both parties shall not make actual payment for the value of the property as the value of the Jiuting Stores and A2-type villas were both priced at RMB 72 million and were mutually offset. Hence, there were no issues with regard to whether or not the Jiuting Stores and A2-type villas were actually equivalent. Furthermore, it was also clearly stated in Article 3.2 of the Agreement that the two buildings of the A2-type villas had a "drawing area of 1,200 square meters each", but it was never mentioned or suggested in the Agreement that the price of RMB 72 million was calculated based on the saleable gross floor area.

196.   Whereas, the Respondent declared that the price of RMB 72 million of the A2-type villas was calculated based on (1) the saleable gross floor area of the two buildings of the villa, which was 2,400 square meters in total, and (2) the average price of every square meter of the gross floor area not being lower than

RMB 31,500. The Respondents declared that this was the basis of both parties' agreement on Article 3.3 of the 4.28 Agreement.

197.    Below, the arbitral tribunal provided an overview of all the claims of all parties that were not fulfilled as agreed with regard to cash consideration, equity consideration, and consideration of property exchange. If the arbitral tribunal did not specially point out the statement or viewpoint of a certain party in this arbitral award, this does not mean that the arbitral tribunal failed to consider the portion of the statement. In view of the wide range of statements made by all parties in this case, the arbitral tribunal held that it was not necessary to list every statement made by the parties concerned. It was also not practical to list every statement made by the parties concerned in this arbitral award. The arbitral tribunal had read and carefully considered the statements made by all parties. The members of the arbitral tribunal had also conducted discussions with regard to the statements made by all parties.

**Payment of Cash Consideration**

198.    The Applicants held that in accordance with Article 2.2.1 (3)(d) in the 4.28 Agreement, one of the prerequisites in the clause regarding the payment of cash consideration by the Controlling Shareholders was that the Non-controlling Shareholders confirmed that the payment for equity consideration as stipulated in Paragraph 2.3.5 of the 4.28 Agreement had been completed, and all parties had no objections to this. However, "both parties of the arbitration had disputes with regard to each of the following steps of equity transfer: (1) Shibang Company's acquisition of 80% of the equity of SJHC held by Greencourt Properties; (2) The transfer of the equity of Shibang Company to Focus Town Limited and Cheergain International owned by the Non-controlling Shareholders made by Oasis Investment; (3) The transfer of "20%"[5] of the equity of SJHC held by Oasis Kechuang to a domestic company within China established by the Non-controlling Shareholders (that is, Shanghai Luhao Trading Co., Ltd. (hereinafter referred to as "**Luhao Trading**"). The reason for the incomplete equity transfer of these three items should be attributable to the Respondents.

---

[5]    There was a typographical error wrongly written as 80% in the concluding statement of the Applicants.

AP_Legal – 104494610.1

199.  The Respondents agreed to the claim that the prerequisites were not met, but held that the Applicants should be responsible for the prerequisites stipulated in Paragraph B to Paragraph D of Article 2.2.1 (3) that were not being met.

200.  As described in Paragraphs 189-190 above, Oasis Investment had not yet paid the said amount to the Non-controlling Shareholders as certain prerequisites for the payment of the said amount were not met. The reasons for prerequisites not being met were related to the incomplete payment of the equity consideration. Hence, the arbitral tribunal shall provide an overview of the position of all parties in the portion involving equity consideration below.

**Payment of Equity Consideration**

201.  With regard to the payment of equity consideration, Article 2.3.5 of the 4.28 Agreement stipulates that the equity consideration shall be deemed as completed after the conclusion of the two sets of agreements below: (1) The "Equity Purchase Option Agreement" as described in Article 2.3.1, and (2) the "Entrustment Agreement" as described in Article 2.3.2. In accordance with the stipulations in the 4.28 Agreement, Oasis Investment and the Controlling Shareholders should conclude an "Equity Purchase Option Agreement" with Cheergain International and Focus Town. Under this Agreement, Oasis Investment shall transfer 100% of its equity in Shibang Company to Cheergain International and Focus Town established by the Non-controlling Shareholders at a consideration of HKD 1. Upon the conclusion of the abovementioned "Equity Purchase Option Agreement" of Shibang Company, Greencourt Properties shall conclude an "Entrustment Agreement" with Cheergain International and Focus Town. Under this Agreement, all parties agree that (a) Cheergain International and Focus Town shall be authorized by Greencourt Properties to manage Shibang Company, and they may exercise shareholders rights on behalf of it for three years; (b) During three-year entrustment period, all debts and claims, liabilities, and risks of Shibang Company and SJHC shall be borne by the Non-controlling Shareholders. The Non-controlling Shareholders shall also be liable for compensation to the Controlling Shareholders with regard to the actual debts and claims, liabilities, and risks borne by the Controlling Shareholders.

202.  The Applicants claimed that the transfer of SJHC involved the three following steps: (1) Oasis Investment should assist Shibang Company with the completion

47

of the acquisition of 80% of equity of SJHC held by Greencourt Properties ("acquisition by Shibang", i.e. the first step of the transfer of 80% equity of SJHC); (2) After the expiration of the three-year entrustment period, Oasis Investment should transfer the equity of Shibang Company to Focus Town and Cheergain International established by the Non-controlling Shareholders (i.e. the second step of the transfer of 80% equity of SJHC); (3) Oasis Kechuang should transfer its [20%][6] equity in SJCH to a domestic company (i.e. Luhao Trading) in China designated by the Non-controlling Shareholders. The Applicants claimed that both [Applicants and Respondents] of the arbitration have disputes concerning each of the above equity transfer steps. However, the fundamental reason for the incomplete transfer of the equity of SJHC was caused by the Controlling Shareholders' violation of their contractual obligations under 4.28 Agreement and serious delays.

---

[6]   There was a typographical error wrongly written as 80% in the concluding statement of the Applicants.

203.   The Respondents claimed that there were three reasons why Shibang Company failed to complete the purchase: (1) Upon signing the 4.28 Agreement, the equity of Greencourt Properties in SJHC was only 69% and it did not enjoy the preferential tax treatment under the "Notice on Several Issues Concerning Corporate Income Tax Treatment of Enterprise Restructurings promulgated by the Ministry of Finance and the State Administration of Taxation" promulgated by the Ministry of Finance and State Administration of Taxation on April 30, 2009 (hereinafter referred to as "**Document No. 59**") (at least 75% required), thus it had to increase its capital to at least 75%, and this capital increase was only completed in July 2011 (increased to 80%); (2) The Controlling Shareholders only "arranged" for Shibang Company's acquisition obligations under Article 2.3.1, and this obligation was fulfilled when they established Shibang Company; (3) The Non-controlling Shareholders had actual control over SJHC at that time, but they did not provide the audit report and/or evaluation report of SJHC, which made it impossible for the Controlling Shareholders to submit a "reasonable equity transfer price" to the relevant government agency, thereby causing Shibang Company to fail in the completion of the acquisition.

204.   The Applicants claimed that:

Firstly, the fundamental reason for the unsuccessful acquisition by Shibang Company was that the Controlling Shareholders had violated the provision of Article 2.3.1 of the 4.28 Agreement and did not provide the most basic equity transfer agreement between Greencourt Properties and Shibang Company regarding the transfer of 80% equity of SJHC ("**80% equity transfer agreement**"), resulting in the inability to proceed with the transfer (not to mention completion).

Secondly, according to the expressed provisions of Article 2.3.1 of the 4.28 Agreement, the acquisition by Shibang Company had been carried out when the 4.28 Agreement was signed. Based on the principle of contractual estoppel and the principle of estoppel by convention, the Controlling Shareholders could not go back on their promise and say that they had only needed to "arrange" for Shibang's acquisition, ignoring the importance of the obligation of "acquisition" itself. In addition, they also could not go back on their promise and say that Shibang Company had not completed the acquisition. Therefore, even if the acquisition by Shibang Company had not taken place as the capital increase of

SJHC had not been completed upon the signing of the 4.28 Agreement, it should not affect the reliance of the Non-controlling Shareholders on the clear meaning and validity of Article 2.3.1, that is, the Controlling Shareholders have the responsibility to complete the acquisition by Shibang Company to enable themselves to fulfill the obligation to ultimately transfer the 80% equity of SJHC to the Non-controlling Shareholders under that Article (which has not been disputed by the parties concerned).

Thirdly, the Respondents presented the following claims, i.e. the Non-controlling Shareholders knew, as a matter of fact that, the capital increase of SJHC had not been completed upon the signing of the 4.28 Agreement, thus they also knew that Shibang Company had not completed the acquisition at that time. The Applicants believed that even if the Non-controlling Shareholders knew that the overview stated in the Article was not factual, it should not affect the application of the principle of contractual estoppel or the principle of estoppel by convention, and the evidence in this case showed that the Non-controlling Shareholders did not actually know that the capital increase of SJHC had not been completed upon the signing of the 4.28 Agreement.

Fourthly, the Respondents claimed that the completion of the acquisition by Shibang Company was a responsibility of the Applicants based on Article 2.3.4 of the 4.28 Agreement. The Applicants believed that Article 2.3.4 of the 4.28 Agreement limited the scope of the relevant taxes and fees that should be managed and borne by the Non-controlling Shareholders to (a) equity transfer procedures related to the payment of onshore equity consideration (i.e. the transfer of 20% equity of SJHC by Oasis Kechuang to Luhao Trading) and resulting taxes and (b) the entrustment arrangement with Shibang Company outside of Mainland China and the equity transfer procedures for the transfer of equity by Shibang to Cheergain International and Focus Town, as well as the resulting taxes, but excluding the equity transfer procedures or taxes related to the acquisition by Shibang Company.

Fifthly, according to expert opinions, the 80% equity transfer agreement was a fundamental application document for the completion of the acquisition by Shibang Company, and the Respondents had never provided this document to the Applicants. Regarding the Respondents' claim that Shibang Company failed to complete the acquisition because the Controlling Shareholders could not submit a "reasonable equity transfer price" to the relevant government agency

due to the failure of the Non-controlling Shareholders to provide the audit report and/or evaluation report of SJHC that were under the control of the Non-controlling Shareholders at that time, the Applicants believed that, based on expert opinions, the audit report and/or evaluation report would only affect the assessment and adjustment of the appropriateness of the transfer price by the tax authorities after the equity transfer procedures were completed (i.e. after review and approval by the Commission of Commerce and the completion of the industrial and commercial registration), and would not affect the effect of the transfer itself. Regarding the tax liability to be borne by the Non-controlling Shareholders with respect to the acquisition by Shibang Company put forward by the Respondents, the Applicants believed that such taxes should be borne by the Controlling Shareholders as intended in the 4.28 Agreement; Otherwise, the parties concerned would have specified differently in the agreement.

205.    Regarding the failure to complete the transfer of 20% equity of SJHC, the Respondents claimed that it was because the Applicants only designated Luhao Trading as the onshore company under Article 2.3.3 of the 4.28 Agreement in March 2011. The Applicants claimed that even if the Applicants had already designated an onshore company before Oasis Kechuang's shareholding ratio in SJHC was reduced to 20%, the transfer of 20% equity of SJHC remained impossible to complete.

206.    The Respondents claimed that the transfer of 80% and 20% equities of SJHC could be carried out separately. Therefore, it requested the arbitral tribunal to consider the responsibilities of the 80% and 20% equity transfer separately. The Respondents also pointed out that the controlling rights of SJHC had been fully handed over to the Applicants on November 15, 2009.

207.    The Respondents believed that, based on the opinions of Chinese legal experts, the transfer of 80% and 20% equities of SJHC would need to undergo three stages of administrative procedures, i.e. review and approval by the competent commerce department, industrial and commercial registration of changes, taxation of foreign currency transaction and other registration of changes, among which Ji Nuo believed that the stage of review and approval by competent commercial authority would already reflect the requirements of the audit agency on audit report and evaluation report, and the competent commerce department would use the audit report or evaluation report as an important reference; at the same time, both Ji Nuo and Ye Yongqing agree that "the

51

enterprise's audit report for the previous year issued by an accounting firm" required in the "Review and Approval Procedures for Equity Transfer of Foreign-Invested Enterprises" published by Fengxian District Economic Committee should be provided by the parties concerned, and the equity transfer agreement should usually include the amount of equity purchased and its price or calculation method.

208. Regarding the transfer of the 20% equity, the Respondents believed that, since the Applicants had actually controlled SJHC from November 15, 2009 onwards, only the Applicants could enable the auditor/evaluator to perform the latest audit/evaluation on the assets of SJHC before the equity transfer, but the Applicants did not provide the latest audit/evaluation, thus a reasonable equity transfer price could not be obtained and the "Equity Transfer Agreement" could not be prepared in the absence of this price. Therefore, the responsibility of the incomplete transfer of the 20% equity lies with the Applicants' failure to perform its obligations under Article 2.3.4 of the 4.28 Agreement, which drove SJHC to prepare the latest audit report or evaluation report, and to promptly designate an onshore company to be the transferee of the 20% equity. In addition, the Applicants had yet to push forward this part of the equity transfer after SJHC's capital increase was completed in July 2011 (i.e. after Oasis Kechuang's equity of SJHC was reduced to 20%).

209. Regarding the transfer of the 80% equity, the Respondents believed that the key to this incomplete transfer was that Greencourt Properties transferred its 80% equity in SJHC to Shibang Company and the responsibility of the incomplete transfer lies with the Applicants. The Respondents believed that, according to the provision of Article 2.3.4 of the 4.28 Agreement, the transfer of the 80% equity of SJHC from Greencourt Properties to Shibang Company was "one of the steps in the payment of foreign equity consideration", thus the Respondents only had the obligation to assist the transfer and had no management responsibility. The Applicants should be responsible for this transfer, including the preparation of the "Equity Transfer Agreement", and the said agreement had to also refer to the latest audit report or evaluation report of SJHC to arrive at a fair price acceptable to the competent authority. Similarly, the responsibility for providing the audit report or evaluation report lies with the Applicants.

210. Regarding whether the Applicants knew that the 80% equity of SJHC had not been transferred to Shibang upon the signing of the 4.28 Agreement, the

Respondents believed that the evidence showed that the Applicants clearly knew about it. The sentence "Oasis Investment ... has arranged for Shibang Company to acquire 80% of the equity in [SJHC] … held by Oasis Investment" under Article 2.3.1 in the 4.28 Agreement was a typographical error. If it had actually completed such acquisition at that time, the sentence should appear in the foreword of the 4.28 Agreement rather than in Article 2.3.1, and the second sentence of the said Article "After the completion of the said equity acquisition..." would also be unnecessary. For this, the real intention of the parties concerned was that Oasis Investment had already arranged for Shibang Company to purchase the 80% equity.

211.   Regarding the assumption of tax arising from the 80% equity transfer, the Respondents claimed that the tax should be borne by the Applicants for the following reasons: Firstly, the 80% equity of SJHC was transferred in a devious way to Cheergain International and Focus Town, which were established by the Applicants to save tax for the Applicants; secondly, the Applicants had no evidence to prove that the parties concerned agreed that the Respondents should bear the taxes for the transfer of this 80% equity; thirdly, upon concluding the agreement, the intention of the parties concerned was that in the event Document No. 59 could not be used to help the Applicants save tax, the Respondents would be willing to consider separately negotiating on paying a certain proportion of the taxes that should be borne by the Applicants at the appointed time; fourthly, Article 2.3.4 of the 4.28 Agreement also clearly stipulated that "Apart from this, the sharing of the tax and expenses relating to the payment of Equity Consideration is to be negotiated by all the Parties in due course"; fifthly, the Applicants claimed that, based on the principle of contractual estoppel, the relevant taxes should be borne by Greencourt/Shibang since the 80% equity of SJHC was transferred by Greencourt Properties to Shibang Company upon the signing of the 4.28 Agreement, and this had nothing to do with the Applicants. The Respondents believed that the principle of contractual estoppel did not apply here; sixthly, if the arbitral tribunal held that the tax liability of this 80% equity transfer is not covered under the second sentence of Article 2.3.4 of the 4.28 Agreement, then it should be covered under the first sentence of the said article.

**Completion of Property Exchange**

AP_Legal – 104494610.1

212.   The Applicants claimed that, according to stipulations of Articles 3.1 to 3.3 of the 4.28 Agreement, SJHC is only obliged to transfer the two A2-type villas that it developed at the designated location in Fengxian District, Shanghai to the Oasis Investment or a third party designated by the Controlling Shareholders after achieving the property handover criteria. The gross floor area on drawings of each of the two A2-type villas was about 1,200 square meters, and the parties concerned confirmed that the total price was RMB 72 million.

213.   Firstly, the Applicants claimed that "gross floor area on drawings" meant the gross floor area shown on the drawings approved by the Shanghai Fengxian District Planning, Land and Resources Administration, and the said drawing was enclosed in the Construction Project Planning Permit issued by the Fengxian District Planning, Land and Resources Administration on January 7, 2009 (i.e. when SJHC was still controlled by the Controlling Shareholders). The said permit was handed over by the Controlling Shareholders to the Non-controlling Shareholders, and subsequently the construction of the relevant A2-type villas was carried out according to the said drawing. In addition, the drawing had not been modified. Based on the above reasons, the Applicants claimed that the Controlling Shareholders' reference of the "gross floor area on drawings" as the saleable area or super built-up area should not be adopted.

214.   Secondly, Article 3.3 of the 4.28 Agreement stipulates that the A2-type villas and Jiuting Stores should be used for property exchange or equivalent-value exchange. The Applicants claimed that the parties concerned agreed to carry out property exchange, i.e. the parties concerned agreed that (i) Jiuting Stores and (ii) the two A2-type villas were priced at RMB 72 million. Since the two prices were equal, the considerations were offset by each other. Therefore, the market prices of Jiuting Stores and the two A2-type villas have nothing to do with the property exchange.

215.   The Applicants believed that the Controlling Shareholders' refusal to accept the A2-type villas without justifiable reasons and its refusal to transfer the Jiuting Stores caused the Non-controlling Shareholders to suffer serious losses (including the rental losses resulting from the Non-controlling Shareholders' inability to have control over the 2,000 square meters of the Phase-II Jiuting Stores and to lease out this part of the stores).

216.   The Respondents believed that the above-ground floor area of the A2-type villas provided by the Applicants was only 600 square meters each, which was completely inconsistent with the requirements of Article 3.2 of the 4.28 Agreement, wherein the above-ground floor area of each villa should be approximately 1,200 square meters. The Respondents emphasized that the 4.28 Agreement itself was not accompanied by any drawings, and the Controlling Shareholders had not received any drawings showing the total gross floor area of each villa (including gross floor area above and below ground) was approximately 1,200 square meters before signing the 4.28 Agreement.

217.   The Respondents believed that Articles 3.2 and 3.3 of the 4.28 Agreement should be interpreted as that the value of the A2-type villas and Jiuting Stores should start from RMB 72 million, i.e., the two should be used for exchange at equivalent value and not for property exchange. In order for the valuation of the two A2-type villas to reach up to a total of RMB 72 million and calculated at a unit price of RMB 31,500 per square meter, the floor area of each villa must be approximately 1,200 square meters. The Respondents claimed that the term "gross floor area on drawings" had no specific interpretation under Chinese law and that it must be understood in light of the specific circumstances of the parties concerned in agreement when the 4.28 Agreement was discussed and signed.

218.   The Respondents believed that, in view of the fact that the A2-type villas provided by the Applicants were inconsistent with the requirements of the 4.28 Agreement, unless the Applicants[7] compensate for the price difference between the defective A2-type villas and the villas the Respondents should receive (according to the calculation of the Respondents, was RMB 41,820,000), the Respondents were not obliged to accept the A2-type villas [provided by the Applicants]. Prior to this, the Respondents had no obligation to hand over the control rights of the remaining 2,000 square meters of the [Jiuting] property to the Applicants.

**Debt Settlement**

---

[7]   The Respondents was mistakenly written as "the Respondents" here.

AP_Legal – 104494610.1

219.    Regarding debt settlement, the Applicants and the Respondents have listed the debt settlement items disputed by the parties concerned in their written statement and indicated their respective positions.

## VI.    Petitions of the Applicants and Respondents

### Petitions of the Applicants

220.    Both the First Applicant and the Second Applicant adopt the same arbitration petition. In Paragraph 40 of the said application, the Applicants listed the following petitions:

(1)    Order that the First Respondent or the Respondents to cause Greencourt Property Development to sign the "Shanghai Real Estate Sale and Purchase Contract" regarding the Jiuting Stores with the Applicants or their designated third party, and to transfer the ownership of the Jiuting Stores to the Non-controlling Shareholders or their designated third party; (Article 3.1 of the 4.28 Agreement)

(2)    Order that the First Respondent or the Respondents to cause its designated third party to sign the A2-type villas' "Shanghai Commercial Real Estate Presale Contract" with SJHC and complete the relevant presale registration procedures; (Article 3.2 of the 4.28 Agreement)

(3)    Order that the Respondents to settle and pay the debts of SJHC and the First Respondent to the Applicants based on the current account checklist of the Applicants (i.e. Appendix 1 of the arbitration petition) (within 4 weeks from the date of the arbitration award); (Article 3.6 of the 4.28 Agreement)

(4)    Order that the First Respondent to arrange for and cause Shibang Company to acquire the 80% equity of SJHC held by Greencourt Properties, a subsidiary of the First Respondent; (Article 2.3.1 of the 4.28 Agreement)[8]

---

[8]    The board of directors of Shibang Company has four directors, and the parties concerned have the right to appoint two directors. The Articles of Association of Shibang Company stipulates that a resolution is effective as long as it is signed by two directors.

AP_Legal – 104494610.1

(5)     Order that the First Respondent and the Controlling Shareholders to sign and cause their subsidiary, Greencourt Properties, to co-sign the Equity Purchase Option Agreement and the entrustment agreement concerning Shibang Company; (Articles 2.3.1 and 2.3.2 of the 4.28 Agreement)[9]

(6)     Order that the Respondents or the First Respondent to cause Oasis Kechuang to transfer its 20% equity of SJHC to Luhao Trading;[10]

(7)     Order that the Respondents or the First Respondent to cause Greencourt Property Development to repay all mortgage, loans or guarantees (including interests) of the Jiuting Stores and to remove all existing mortgage, guarantees on the Jiuting Stores;

(8)     As an alternative to Item (7), order that the Respondents to compensate the Applicants for the total amount required for the repayment of all existing mortgage guarantees on Jiuting Stores by the Applicants;[11]

(9)     Order that the Respondents to pay the balance of the cash consideration for the repurchase of equity, i.e. Hong Kong dollars equivalent to RMB 150 million and the final amount shall be adjusted in accordance with Article 2.2.1(4) of the 4.28 Agreement.

## Counter-claims of the Respondents

221.    The Respondents put forward four counterclaims in Paragraphs 79 - 83 of their Statement of Defence and Counterclaim:

(A)     Counterclaim on equity consideration

---

[9]     According to the provisions of the 4.28 Agreement, after Shibang Company has acquired the 80% equity of SJHC, Greencourt Properties should entrust Cheergain International and Focus Town to manage the 80% equity on behalf of Shibang Company. Therefore, the entrustment agreement should be signed by Greencourt Properties, Cheergain International and Focus Town. After the 3 years of entrustment management, the 80% equity will be transferred from Shibang Company to Cheergain International and Focus Town at a consideration of HKD 1.The relevant Equity Purchase Option Agreement should be signed by Oasis Investment, Cheergain International and Focus Town.

[10]    There is no need for the word "third party" because the Applicant has already designated Luhao Trading.

[11]    When the hearing was held on August 8, 2017, the Applicants stated that because the mortgage was canceled, two items, namely Item (g) and Item (h), were no longer needed: fair copy (Day 9), Lines 22 - 27 on Page 26.

AP_Legal – 104494610.1

Due to the behavior of the Applicants, the equity consideration was not paid, and the rights and interests of the Respondents were damaged. The Respondents requested the arbitral tribunal to rule and/or declare that:

(1)      The Applicants violated Article 2.3.4 of the 4.28 Agreement;

(2)      The Applicants should immediately take care of the procedures (and/or cause the handling of the relevant procedures) related to the offshore transfer of equity to Shibang Company and the onshore transfer of equity to Luhao Trading, including but not limited to: (i) to conduct audit/evaluation on SJHC to obtain the reasonable equity transfer price; (ii) to prepare the equity transfer agreement and other relevant transaction documents for the Respondents to read and use as a basis to conduct negotiation with the parties concerned; (iii) to contact the relevant government review and approval authority to obtain the materials to be submitted for review and approval, communicate with the Respondents and prepare materials for submission (seek assistance from the Respondents whenever necessary); (iv) to submit the necessary review and approval materials to the relevant government review and approval authority and to supplement the materials according to its needs (if any); and (v) to pay close attention to the review and approval process, and to notify the Respondents of the updated review and approval status in a timely manner;

(3)      The Applicants should jointly and/or individually bear any taxes and expenses (including but not limited to the possible Chinese taxes and fees arising from the offshore transfer of equity to Shibang Company) that may arise from the offshore transfer of equity to Shibang Company (i.e. the transfer of SJHC's 80% equity from Greencourt Properties to Shibang Company). Or, alternatively, the Applicants should negotiate with the Respondents about the assumption of taxes and expenses (including but not limited to the possible Chinese taxes and expenses arising from the offshore transfer of equity to Shibang Company) that may arise from the offshore transfer of equity to Shibang Company.

(B)    Counterclaim on exchange between Jiuting Stores and A2-type villas

The two <u>A2</u>-type villas that the Applicants intended to deliver to the Respondents were defective, resulting in damage to the Respondents' rights and interests. The Respondents requested the arbitral tribunal to rule and/or declare:

(1)     The Applicants violated Article 3.2 of the 4.28 Agreement;

(2)     The Respondents suffered losses (including but not limited to loss of value) due to the breach of contract by the Applicants and are entitled to compensation. The Applicants should jointly and/or individually pay the losses suffered by the Respondents. The amount of compensation for such losses to be evaluated.

(C)     <u>Counterclaim on debt settlement for other contractual obligations</u>

As the Applicants made an unreasonable request and failed to carry out the settlement of the relevant debts and claims with the Respondents in good faith, the debt settlement cannot be completed. The rights and interests of the Respondents are damaged. The Respondents requested the arbitral tribunal to rule and/or declare:

(1)     The Applicants violated Article 3.6 of the 4.28 Agreement;

(2)     The Applicants should complete the settlement of debts and claims based on (i) the Fourth Draft of the Checklist of the Current Account of Flower-City Property prepared by the Respondents; or (ii) on such basis that the arbitral tribunal should consider otherwise appropriate.

(D)     <u>Counterclaim on cash consideration</u>

The Applicants' actions resulted in the failure to meet certain prerequisites for the third payment, causing the rights and interests of the Respondents to be damaged. The Respondents requested the arbitral tribunal to rule and/or declare:

(1)     The Applicants violated Articles 2.3.4, 2.1.3, 2.2.1(4) and/or 3.2 of the 4.28 Agreement;

(2)     Under the premise that all the prerequisites for the third payment are met (including the realization of the abovementioned claims in A(2) and A(3), and the completion of the exchange between Jiuting Stores and the A2-type villas as specified in Article 2.2.1(3)(e) of the 4.28 Agreement), the Respondents should pay the adjusted third payment.

(3)     As an adjustment to the third payment, the Respondents can deduct or offset (i) any taxes and expenses that may arise from the offshore transfer of equity to Shibang Company (including the possible Chinese taxes and expenses arising from the offshore transfer of equity to Shibang Company) from the third payment; and/or (ii) the amount of compensation for the loss claimed in B(2);

(4)     Alternatively, the Respondents can deduct or offset (i) any taxes and expenses that may arise from offshore transfer of equity to Shibang Company (including the possible Chinese taxes and expenses arising from the offshore transfer of equity to Shibang Company) from the amount awarded to the Applicants; and/or (ii) the amount of compensation for the loss claimed in B(2);

222.    The Respondents' counterclaim is based on the fact that the Applicants were the breaching parties. In view of the arbitral tribunal's analysis and ruling of the disputed issues in this case, the arbitral tribunal held that the parties that had violated the 4.28 Agreement were the Respondents. Therefore, the Respondents' counterclaims were all rejected.

## VII.   Analysis and Reasons of Arbitral Tribunal

223.    The arbitral tribunal made the following analysis after carefully reviewing and evaluating the evidence, witness statements, written statements and other documents provided by the parties concerned.

### Equity consideration (transfer of SJHC's equity)

224.    The 4.28 agreement is a continuation of the matters related to the repurchase of equity negotiated between the Controlling Shareholders and the Non-controlling Shareholders from 2009 onwards - see Point 1 of the Introduction to the 4.28 Agreement:

"Whereas: 1. The Controlling Shareholders and the Non-controlling Shareholders had adopted the "Shareholder Resolutions" regarding share restructuring on 24 March 2009, and signed the "Meeting Minutes" on 4 September 2009 and the "Preliminary Share Restructuring Agreement" (the "Restructuring Agreement") on 9 November 2009. The above three documents set out the basic principles and transaction framework for Oasis Investment's repurchase of shares held by the Non-controlling Shareholders."

225.  Point 3 of the Introduction to the 4.28 Agreement clarifies the purpose of the agreement:

226.  "Whereas: 3. In order to address the issues relating specifically to the repurchase, complete all the transactions specified in the Restructuring Agreement as soon as possible, and to reduce the transaction cost as well as time cost for all the Parties involved, the Parties agree to sign this agreement to specify the repurchase price, the payment schedule, the payment method and any other issues involved."

227.  In view of this, the arbitral tribunal held that the main purpose of the signing the 4.28 Agreement by the parties concerned was to complete all the transactions as stipulated in the Restructuring Agreement as soon as possible.

228.  The arbitral tribunal held that if there are omissions or ambiguity in the content of the 4.28 Agreement, it may refer to the contents of the above three documents. In fact, Article 4.1 of the 4.28 Agreement also expressly states:

"For matters not addressed in this Agreement, the stipulations of the Restructuring Agreement shall prevail. For matters not addressed in the Restructuring Agreement and this Agreement, the parties concerned shall enter into supplementary agreements through friendly negotiations, and those supplementary agreements and this Agreement shall have the same effect."

229.  The first article of the 4.28 Agreement specifies the "equity transfer before repurchase". Article 1.1 defines two steps: (1) Mr. Ke Zhengguang was to transferr his equity interest in Oasis Investment to Cheergain International and Mr. Xu Hongbiao was to transfer his equity interest in Oasis Investment to Focus Town; (2) Oasis Investment was to repurchase the equity of Oasis Investment from Cheergain International and Focus Town, respectively. Article 1.2 also clarifies that the abovementioned taxes resulting from the equity transfer before the repurchase and its fees shall be borne by the Non-controlling Shareholders.

230.  The parties concerned did not dispute that the first equity transfer before the repurchase had been completed.

231.  Article 2 of the 4.28 Agreement specifies the "Oasis Investment's repurchase consideration", which is also the cash consideration. The parties concerned did not dispute that the cash payment portion of Oasis Investment's repurchase consideration was foreign currency equivalent to RMB 250 million ("cash

61

consideration"):(Article 2.1). The parties concerned also agree that, during the actual payment, the amount of cash consideration should be adjusted as follows:

"2.1.1 An amount of approximately RMB 41 million resulting from previous transactions for which the Non-controlling Shareholders shall be held liable shall be deducted from the Cash Consideration;[12]

2.1.2 A conditional payment of a one-off additional compensation in the amount of RMB 30 million ("Additional Compensation") that Oasis Investment and the Controlling Shareholders are willing to pay shall be added to the Cash Consideration. The condition for this Additional Compensation is that Oasis Investment's share repurchase and payment of consideration will be completed pursuant to the provisions of the Restructuring Agreement and this supplemental agreement, and there is no major dispute between the Parties.

2.1.3 All parties agreed that, following the signing of this Agreement, when the payment of the relevant equity consideration is to be made and when the amount of Cash Consideration is to adjusted, the parties would then sign a supplementary agreement.

2.1.4 All parties agreed that the cash portion of the repurchase consideration shall be divided into two equal portions in Hong Kong dollars in Hong Kong and paid in full and on time to the bank accounts of Cheergain International and Focus Town Limited provided by the Non-controlling Shareholders at the time as determined in the article below (Article 2.2)."

232.    Article 2.2 specifies the payment conditions and payment period of the cash consideration (Article 2.2.1). The parties concerned agreed that the payment time of the cash consideration for the repurchase is as follows:

"(1)      Hong Kong dollars equivalent to RMB 80 million ("**1st Payment**")...

(2)      Hong Kong dollars equivalent to RMB 20 million ("**2nd Payment**") should be paid before 30 June 2011.[13]

---

[12]    this amount of more than RMB 41 million was mentioned in the minutes of the meeting on February 3, 2010 (D2/723).

[13]    The first and second payments had been paid.

(3) The remaining amount equivalent to RMB 150 million in Hong Kong dollars ("**3rd payment** "), <u>being the final payment subject to those adjustments agreed to or confirmed by all Parties under provisions of Article (4) below</u>) is to be paid by 31 December 2012 <u>once the following prerequisites are met</u>:

   (a) SJHC's equity transfer being approved by the government and the registration of the transfer being completed;

   (b) Oasis Investment completing the registration for the change of shareholders that is necessary for the repurchase of the Non-controlling Shareholders' equity;

   (c) Non-controlling Shareholders and Controlling Shareholders reaching an agreement on the payment arrangement in respect of the Cash Consideration and various adjustments to the amount specified in the aforementioned Article 2.1；

   (d) Non-controlling Shareholders confirm that the payment of equity consideration specified in Article 2.3.5 below being completed and there being no dispute among all parties;

   (e) Both of the Shanghai Real Estate Sale and Purchase Contract mentioned in Article 3.1 and the Shanghai Real Estate Presale Contract mentioned in Article 3.2 being signed and the registration of transfer [of ownership] or the registration of presale with the Real Estate Registration Authority being completed.

(4) <u>Adjustments to the Amount of Cash Consideration</u>. All Parties agree that, before the payment of the 3rd Payment, under provisions of the following Articles, all parties shall calculate and determine the adjustments to the amount of Cash Consideration, and take the adjusted amount as the final amount for purposes of the 3rd Payment:

   (a) Under the provisions of the Restructuring Agreement and this agreement, Oasis Investment and Controlling Shareholders shall use 100% of SJHC's equity as part of share repurchase consideration ("Equity Consideration"). If under any laws and regulations, such equity transfer must indicate a price of

equity and that this price must actually be paid, the actual amount (net amount after deduction of tax and fees) paid by the Non-Controlling Shareholders to Oasis Investment and the Controlling Shareholders for the equity transfer shall be added to the Cash Consideration;

1. The arbitral tribunal held that Item (a) above should be interpreted as if the Respondents are required by the laws and regulations to provide a fixed price for the transfer of SJHC's 100% equity, and the said requirement causes the Applicants to have to pay the actual amount for the above transfer of equity to the Respondents, the actual amount of such payment (after deducting the tax incurred) should be added into the cash consideration to be paid by the Respondents to the Applicants. The implication is that, if the parties concerned must set a price for the transfer of SJHC's equity, the Applicants should bear the tax.

(b) The sharing of the amount stipulated in Articles 2.1.1 and 2.1.2 above shall be reflected in the final amount of the 3rd Payment;

2. The arbitral tribunal held that, according to Article 2.1.1, the Applicants should bear the total amount of RMB 41,224,613.21 [14], and according to Article 2.1.2, the Applicants should receive RMB 30 million from the Respondents. After the two are offset, the Applicants will only need to pay approximately RMB 11,224,613.21, and the amount will be deducted from the third payment (i.e. RMB 150 million).

(c) Under provisions of <u>other Articles</u> of this agreement, all <u>tax and expenses</u> that shall be <u>paid</u> by the parties shall be reflected in the final amount of the 3rd Payment.

---

[14]   LYP-l [Dl/253]: LYP-2 [D3/1199].

3. The arbitral tribunal held that this means that the third payment must be adjusted with reference to the tax burden that the parties concerned are required to bear under the other terms in the 4.28 Agreement. These other terms include, for example, Article 2.3.4. This article specifies that the taxes and expenses arising from the payment of <u>onshore</u> equity consideration, and the taxes and fees arising from <u>offshore</u> entrustment arrangement with Shibang Company and the transfer of equity to Cheergain International and Focus Town, shall be borne by the Non-controlling Shareholders. Apart from this, the <u>sharing of the taxes and expenses</u> related to the payment of equity consideration shall be separately negotiated by all parties at the appointed time. Matters that arise due to the equity transfer procedures related to the payment of onshore and offshore equity considerations, i.e. application, registration, government procedures etc., shall be handled by the Non-controlling Shareholders, and the Controlling Shareholders and Oasis Investment shall provide the necessary assistance. Based on the above reasons, the arbitral tribunal held that Article 2.3.4 does not apply to this case.

233. A comprehensive analysis of the above indicated that the final amount of the third payment should be adjusted based on Article 2.2.1(4), with RMB 150 million as the base amount.

234. As for the payment deadline of the third payment, Article 2.2.1(3) specifies it to be December 31, 2012, but prerequisites (a) to (e) must also be met.

235. There is no dispute between the two parties that the prerequisite (b) has been met.

236. As for prerequisite (a), the parties have been alleging that the other party is the reason for the unmet prerequisites. Therefore, the arbitral tribunal must make a ruling on this issue.

237. As for prerequisite (c), both parties have reached an agreement on the payment arrangements for the cash consideration specified in Article 2.1, but no

agreement has been reached on various adjustments. Therefore, the arbitral tribunal must make a ruling on this issue.

238.  As for prerequisite (d), the payment of equity consideration by both parties as specified in Article 2.3.5 has been completed, and the parties concerned have no disputes over this and have not reached an agreement. Therefore, the arbitral tribunal must make a ruling on this issue.

239.  As for prerequisite (e), both parties have different opinions on the reasons why the contracts mentioned in Articles 3.1 and 3.2 have not been signed. Therefore, the arbitral tribunal must make a ruling on this issue.

240.  As for prerequisite (a) (i.e. the government review and approval and registration procedures for the transfer of SJHC's equity had been completed), the arbitral tribunal first analyzed the content of Article 2.3 of the 4.28 Agreement. Article 2.3 specifies the payment method of equity consideration:

"According to the Restructuring Agreement, the equity portion of Oasis Investment's repurchase consideration is calculated as 100% equity of [SJHC] ("Equity Consideration")."

241. The payment method of the equity consideration includes both offshore and onshore components. The offshore component is specified in Articles 2.3.1 and 2.3.2, and the onshore component is specified in Article 2.3.3.

242. Article 2.3.1 specifies that:

"Oasis Investment has newly incorporated Shibang Company Ltd ("Shibang Company") in Hong Kong and has arranged for Shibang Company to acquire 80% of the equity interest in SJHC held by Greencourt Properties Limited, a subsidiary of Oasis Investment in Hong Kong. After the completion of the said equity acquisition, Oasis Investment shall sign the "Equity Purchase Option Agreement" with Cheergain International and Focus Town Limited and agree that upon the expiration of the entrustment period mentioned in Article 2.3.2 below, 100% of the equity of Shibang Company shall be transferred to Cheergain International and Focus Town Limited at a consideration of HKD 1." (underlines added later)

243. Article 2.3.2 specifies that:

"All Parties Agree That:  After Oasis Investment's signing of the Equity Purchase Option Agreement for the equity transfer of Shibang Company to Cheergain International and Focus Town Limited, Greencourt Properties is to sign the relevant Entrustment Agreement with Cheergain International and Focus Town Limited. This agreement shall stipulate that:  (1) Cheergain International Group Limited and Focus Town Limited are entrusted by Greencourt Properties to manage Shibang Company and to exercise the shareholders' rights on its behalf for three years (the "**entrustment period**"); (2) during the entrustment period, the Non-controlling Shareholders are responsible for all the debts and claims, risks and liabilities of Shibang Company and SJHC. If for any reason the Controlling Shareholders, Oasis Investment or Greencourt Properties are required to bear the debts and claims, risks and liabilities of Shibang Company or SJHC during the entrustment term, the Non-controlling Shareholders are required to fully compensate the Controlling Shareholders, Oasis Investment and Greencourt Properties."

67

244.   Article 2.3.3 specifies that:

"The remaining 20% of the equity of SJHC currently held by Oasis Kechuang Shengtai Limited, a subsidiary of Oasis Investment, is to be transferred to a domestic company in China appointed by the Non-controlling Shareholders ("**Onshore Payment of Equity Consideration**"). If under the laws of the People's Republic of China, an actual payment of consideration is required to be made for such equity transfer, the provisions of the abovementioned Article 2.2.1(4)(a) shall apply."

245.   Regarding Articles 2.3.1 to 2.3.3, the arbitral tribunal held that the transfer of SJHC included the following three steps that must be performed:

(1)      **First**, Shibang Company, established by Oasis Investment, should acquire 80% equity interest of SJHC held by Greencourt Properties (hereinafter referred to as the "<u>**first step of the 80% equity transfer**</u>"). Article 2.3.1 expressly states that Oasis Investment <u>has</u> established Shibang Company in Hong Kong and <u>has arranged for</u> Shibang Company to <u>acquire</u> 80% of equity of SJHC held by Greencourt Properties, a subsidiary invested by Oasis Investment in Hong Kong. In other words, the first step in the 80% equity transfer ought to have been completed when the 4.28 Agreement was signed. However, in fact, this first step has not been completed yet.

(2)      **Second**, Oasis Investment should transfer the equity of Shibang Company to Cheergain International and Focus Town owned by the First Applicant and Second Applicant respectively (referred to as "<u>**step 2 of the 80% equity transfer**</u>").

(3)      After the first step of the 80% equity transfer and before the second step of the 80% equity transfer, the 4.28 Agreement also stipulates that the Non-controlling Shareholders and the Controlling Shareholders must sign two agreements: One would be the "Equity Purchase Option Agreement" signed by Oasis Investment and Cheergain International and Focus Town; the other would be the relevant entrustment agreement signed by Greencourt Properties and Cheergain International and Focus Town.

AP_Legal – 104494610.1

(4)     The other 20% equity of SJHC would be transferred from Oasis Kechuang to an onshore company in China designated by the Non-controlling Shareholders (referred to as the "**20% equity transfer**"). According to Article 2.3.3, the Chinese onshore company designated by the Non-controlling Shareholders is Luhao Trading. According to Article 2.3.3, the Non-controlling Shareholders designated Luhao Trading as the transferee of the 20% equity of SJHC in the letter issued on March 15, 2011 [D3/901-903].

246.    It can be clearly seen from the content of Article 2.3.4 that this Article deals with the procedures and tax liability of the second step of the 80% equity transfer (i.e. the offshore entrustment arrangement with Shibang Company and the transfer of equity to Cheergain International and Focus Town) and the 20% equity transfer (i.e. payment of onshore equity consideration). This article does not cover the first step of the 80% equity transfer (i.e. Shibang Company's acquisition of 80% equity of SJHC held by Greencourt Properties). This is because, according to Article 2.3.1, the Respondents clearly confirmed that Oasis Investment had completed the first step of the 80% equity transfer upon the signing of the 4.28 Agreement. In other words, the responsibility of Oasis Investment in fulfilling the first step of the 80% equity transfer is not within the scope of Article 2.3.4.

247.    There was still a small episode about the transfer of SJHC's equity. Oasis Investment held 100% equity of SJHC through its two subsidiaries: Greencourt Properties held 69% and Oasis Kechuang held 31%. In order to comply with the 4.28 Agreement, SJHC must increase its capital, so that Greencourt Properties could increase its shareholding ratio to 80%, and Oasis Kechuang could lower its shareholding ratio to 20%.

248.    On November 12, 2009, Greencourt Properties and Oasis Kechuang signed an agreement [D2/628-629] to reach an agreement on the increase of registered capital in SJHC. Under this Agreement, both parties agreed to adjust the shareholding ratio of the two parties to 80%:20% through the giving up of the limited subscription rights of newly added registered capital by Oasis Kechuang and the unilateral capital increase by Greencourt Properties. On the same day, SJHC also passed the board resolution [D2/631-632], reflecting the above equity adjustment.

AP_Legal – 104494610.1

249. The Shanghai Municipal Commission of Commerce consented and approved the capital increase of SJHC on December 21, 2009 [D2/705-706]. However, the Shanghai Branch of the State Administration of Foreign Exchange issued a decision to not grant an administrative license [D2/728] on March 23, 2010.

250. The application for capital increase was finally approved on July 27, 2011 [D3/980], and both parties had no dispute over this.

251. Both parties had different interpretations and positions on whether the two audit reports in the evidence were the documents that had to be submitted during the first phase of review and approval for the transfer of SJHC's equity. The first audit report [D2/729] was issued by Shanghai Xuri Certified Public Accountant Firm on April 14, 2010. Another audit report [D2/766-781] was issued by Crowe Howarth on April 28, 2010.

252. The First Applicant's claim was: The evidence shows that the Applicants provided the two audit reports to the Respondents to use for capital increase or settlement [D1/255,257 Point 5 - Li Shuping's witness statement attached to LYP-3 "Issues Regarding the Settlement of Claims and Debts between SJHC and Oasis Investment and Its Subsidiaries"].

253. The Respondents claimed that the two audit reports supported the Respondents' view, i.e.: The applicant must hire an appraiser to evaluate the value of 100% equity of SJHC and provide the 2016 annual audit report of SJHC to the Respondents for review.

254. In summary, the arbitral tribunal held that the First Applicant's explanation of the two audit reports was more persuasive, and the dates coincided with the final approval date of the capital increase application (i.e. July 27, 2011). Therefore, the arbitral tribunal endorsed the claim of the First Applicant.

**Expert opinion of various expert witnesses (Ma Beiyi, Ye Yongqing, Ji Nuo) - review and approval procedures must be carried out for the transfer of SJHC's equity**

255. With regard to the issue of equity consideration, the parties concerned have summoned Chinese legal expert witnesses to make expert reports on the review and approval procedures, documents required for the review and approval, and taxes. The First Applicant's expert witness was Ma Beiyi; the Second

70

Applicant's expert witness was Ye Yongqing; the Respondents' expert witness was Ji Nuo.

256. The joint opinion of the three expert witnesses on the issue of equity transfer ("**Joint Opinion**") is in C/438. In Paragraph 6 of the Joint Opinion, three experts pointed out that SJHC was a sino-foreign equity joint venture established under the "Law of the People's Republic of China on Sino-Foreign Equity Joint Ventures", and it had two shareholders: Greencourt Properties (Hong Kong company, 80% equity) and Oasis Kechuang (Chinese company, 20% equity).

257. Three experts pointed out in Paragraph 8 of the Joint Opinion that the Regulations for the Implementation of "Regulations for the Implementation of the Law on Sino-Foreign Equity Joint Ventures" was applicable to the transfer of SJHC's equity. Article 20, Paragraph 1 of the Regulations specifies that: "When a joint venture party transfers all or part of its equity to a third party, it must be approved by the other joint venture party and shall be submitted to the review and approval agency for approval, and shall complete the procedures for change registration with the registration management agency."Article 3 of the "Several Provisions on Changes in Equity Interest of Investors in Foreign-invested Enterprises" also specifies that: "Changes in the equity interest of corporate investors shall comply with relevant Chinese laws and regulations, and shall be approved by the review and approval authority and registered by the registration authority in accordance with this provision. Changes in equity are invalid without the approval of the review and approval authority."Therefore, as a sino-foreign equity joint venture, the two equity transfers of SJHC should be approved by the review and approval authority, and the corresponding procedures for change registration shall be subsequently carried out with the registration authority.

258. The three experts pointed out in Paragraph 9 of the "Joint Opinion" that the transfer of SJHC's equity would require three stages of administrative procedures: (1) After collecting and preparing the documents required by law, the joint venture should submit the application documents to the review and approval authority for the approval of the equity transfer. Taking into account the total investment amount of SJHC and its type of industry, the specific review and approval of its equity transfer should be the responsibility of the local competent commerce department of Shanghai; (2) after obtaining the approval, the joint venture should apply for the change with the registration management

71

agency, i.e. complete the change registration with the local industry and commerce department of Shanghai; and (3) the joint venture should, in accordance with the requirements of relevant laws and regulations, further complete the registration of changes in terms of taxation, foreign exchange and other aspects.

259. Regarding the first phase (SJHC should submit application documents to the commerce department for review and approval), the three experts listed in Paragraph 10 of the "Joint Opinion" that SJHC, as an applicant for the review and approval of equity transfer, must submit the application documents to the review and approval authority, and there was no need to repeat it here. In addition, Paragraph 12 of the "Joint Opinion" mentioned the division of labor between the parties concerned in the preparation of the documents.

260. Regarding the second phase (SJHC should apply for change registration with the administration for industry and commerce), the three experts set out the documents to be submitted in Paragraph 15 of the "Joint Opinion", and there was also no need to repeat them here. The three experts agreed that the change documents received by the administration for industry and commerce were similar to the application documents submitted to the commerce department in the first phase. The experts also added their opinions in Paragraphs 36-38 of the Joint Opinion.

261. Regarding the third phase (SJHC further completes the registration of changes in terms of taxation, foreign exchange and other aspects), the three experts unanimously agreed that after the completion of the industrial and commercial registration of changes, the joint venture could specifically complete the procedures for registration of changes in terms of tax, foreign exchange and other aspects of the enterprise based on the review and approval, as well as on the change registration results of the equity transfer.

262. In Paragraphs 19 and 20 of the "Joint Opinion", the three experts unanimously agreed that, regarding the review and approval of the transfer of SJHC's equity (i.e. the first phase mentioned above), the materials (listed below) that the transferor and the transferee had prepared were not enough to complete the review and approval and registration of SJHC:

(1)     The shareholders of Greencourt Properties had issued the "Shareholder Resolution of Greencourt Properties Limited, Hong Kong"

dated November 21, 2011, agreeing to transfer its 80% equity in SJHC to Shibang Company and to give up its pre-emptive rights when Oasis Kechuang transferred its 20% equity in SJHC to Luhao Trading.

(2)     The shareholders of Oasis Kechuang had issued the "Shareholder Resolution of Oasis Kechuang Ecological Technology Co., Ltd., Hong Kong" dated November 21, 2011, agreeing to transfer its 20% equity in SJHC to Luhao Trading and to give up its pre-emptive rights when Greencourt Properties transferred its 80% equity in SJHC to Shibang Company

(3)     The shareholders of Greencourt Properties had issued the "Shareholder Resolution of Greencourt Properties Limited, Hong Kong" agreeing to transfer its 50% equity to Cheergain International at the price of USD 1 (*sic*) and transfer its another 50% equity to Focus Town at the price of USD 1 (*sic*).

263.   The three experts did not reach a consensus on the following two issues:

(1)     Should the right to review and approve the transfer of SJHC's equity belong to the municipal commission of commerce or Fengxian District Economic Committee?

(2)     Is the audit report or evaluation report of SJHC required for the review and approval of the equity transfer?

264.   Regarding Question (1), Ma Beiyi believed that SJHC was a foreign-invested real estate development and management company, and its approval authority for equity transfer should be the municipal commission of commerce. However, Ji Nuo believed that the authority to review and approve the transfer of SJHC's equity belonged to the local competent commerce department of Shanghai Municipality prior to the implementation date (April 10, 2015) of the "Catalogue for the Guidance of Foreign Investment Industries" (Amended in 2015), but the authority to review and approve belonged to the local competent commerce department at the district level (Fengxian) after April 10, 2015. Ye Yongqing believed that since this equity transfer transaction should have occurred before April 10, 2015, i.e. before the review and approval agency was changed, the competent commerce department of Fengxian District is not the competent authority for this equity transfer.

AP_Legal – 104494610.1

265.  Regarding Question (2), Ma Beiyi believed that there was no information to indicate that the evaluation report was related to the review and approval application and the completion of change registration and other administrative procedures for the equity transfer. Therefore, the evaluation report was not considered an application document that the joint venture had to prepare. As for the audit report, it was because the website of the Fengxian District Economic Committee showed that the previous year's audit report of the joint venture issued by an accounting firm has to be provided to apply for review and approval for equity transfer with the committee. But Ma Beiyi believed that this requirement would not constitute an obstacle for the joint venture to apply for the review and approval of the equity transfer, nor did it belong to the application documents that had to be prepared by the joint venture. Ye Yongqing believed that, regarding the issues on whether the audit report of SJHC had to be provided and who should be responsible to prepare it, on one hand, the "Provisions on Changes in Equity Interest of Investors in Foreign-invested Enterprises" did not expressly require that an audit report had to be submitted, and taking into account the total investment amount of SJHC and the type of industry that it was involved in, the local competent commerce department of Shanghai should be responsible for the specific review and approval of its equity transfer. Furthermore, the list of documents in the service guide published by the commerce department of Shanghai Municipality did not include the audit report. On the other hand, since this equity transfer transaction should have occurred on April 10, 2015, i.e. before the review and approval agency was changed, the competent commerce department of Fengxian District was not the competent authority for this equity transfer, thus its document requirements would not constitute a substantial obstacle to the approval of the commerce commission. In addition, Ye Yongqing believed that, in practice, the commerce department of Shanghai Municipality did not have the practice of requesting for audit report or evaluation report, and enterprises could just submit their financial statements for the previous year or the most recent month. Therefore, even if an audit report had to be submitted in accordance with the requirements of the competent commerce department of Fengxian District, in practice, enterprises could often submit their financial statements for the previous year or the most recent month instead. In addition, regarding whether it was necessary to perform evaluation on SJHC, Ye Yongqing believed that the evaluation had no effect on the obtaining of commerce review and approval for this equity transfer, as well as the registration of changes in industry and commerce, and taxation. It may be necessary only if the taxation authority questioned the price of this equity

transfer when Greencourt Properties filed tax returns. In particular, the transfer of SJHC's equity had already been realized after the completion of review and approval by the commerce commission and the changes in industrial and commercial, and SJHC's equity would be under Shibang Company's name after the completion of changes in industrial and commercial. Although, the subsequent tax procedures had to be completed by Shibang Company for the acquisition, it would not affect the realization of the equity transfer. Although a valuation may be one of the methods that the subsequent taxation authority may use to determine the equity transfer price, the taxation authority may also use the agreed price in the equity transfer agreement, the net asset price of SJHC, the long-term equity investment amount in the account book of Greencourt Properties, or the registered capital amount of SJHC to determine the equity transfer price, and the above prices or amounts were information that could be obtained. Hence, Ye Yongqing believed that the valuation of SJHC was not a necessary process for the completion of equity transfer under the premise that it was not expressly prescribed by the Chinese tax laws and regulations and local regulations.

266.    Ji Nuo believed that the competent commerce department of Fengxian District was the review and approval agency of the transfer of SJHC's equity in this case. The list of documents published on the Internet clearly required an audit report, and SJHC should meet this requirement. (The question of when this equity transfer transaction should take place, and which party should bear the consequences of the failure to complete the transaction on time should be decided by the arbitral tribunal, thus Ji Nuo did not discuss this in the expert opinion.) In practice, the review and approval authority would often require the joint venture to provide audit report or evaluation report as an important reference for reviewing the reasonableness of the equity transfer price (for example, when the agreed price deviates significantly from the circumstances reflected in the audit report and other materials, it may constitute as an obstacle to approval). Ji Nuo believed that, according to the above analysis, in this case, the audit report should be prepared for the review and approval process, and the preparation of the audit report should be based on financial information provided by the joint venture (i.e. SJHC). Therefore, SJHC should usually be responsible for the preparation. If SJHC failed to provide an audit report, it would constitute an obstacle to obtaining approval. As for the review and approval authority's specific requirements for the form and content of the audit report, whether it could be replaced by other similar documents (such as evaluation report,

unaudited financial statement, etc.) and other issues, it would depend on the discretion of the review and approval authority according to case-specific circumstances.

267.   The arbitral tribunal held that: (1) The question of which competent authority would have the right to review and approve the transfer of SJHC's equity should be considered from the time point at which the review and approval application was submitted. All three experts agreed that, after April 10, 2015, the right of approval would belong to the competent commerce department of Fengxian District, Shanghai. However, the 4.28 Agreement was signed at the end of April 2010, and the consensus of the parties concerned in Article 2.2.1(3) was that the balance should be paid before December 31, 2012 (on condition that the prerequisites were satisfied). In other words, the parties concerned believed that the prerequisites of the 4.28 Agreement should be fully satisfied within two years and eight months. Therefore, the arbitral tribunal held that the key time point was before April 10, 2015, and the review and approval authority at that time was the municipal commission of commerce instead of the competent commerce department of Fengxian District.

268.   As for the audit report or evaluation report, the arbitral tribunal accepted the opinions of the Applicants' expert witnesses Ma Beiyi and Ye Yongqing, i.e.: The audit report or evaluation report would not be needed for the application for the review and approval of equity transfer. Moreover, this issue was in fact irrelevant to determine which party was breaching the contract. As the first step of the equity transfer, that is, Shibang Company's acquisition of 80% of SJHC held by Greencourt Properties was not yet completed, the documents required for approval was not available.

269.   At the time of the commencement of the arbitration proceeding (i.e. February 22, 2013), both parties had not yet begun the first phase (SJHC submitted the application documents to the commerce department for review and approval). What were the reasons? The Controlling Shareholders and the Non-controlling Shareholders blamed each other, alleging that each other did not bear its share of responsibility. However, it is an indisputable fact that the Controlling Shareholders had not fulfilled the contractual obligations under Article 2.3.1 of the 4.28 Agreement and arranged for Shibang Company to acquire 80% of equity in SJHC held by Greencourt Properties. This resulted in the failure to complete the transfer of SJHC's equity, let alone the review and approval and registration procedures for the transfer of SJHC's equity, which was one of the

76

prerequisites (i.e. the prerequisites set out in Article 2.2.1(3)(a) of the 4.28 Agreement).

270.   Evidence shows that the Controlling Shareholders' lawyer (attorney Tao Xudong of JunHe LLP) sent an e-mail to the lawyer of the Non-controlling Shareholders (attorney Jeremy Wong of King & Wood Mallesons) on May 13, 2010, mentioning some legal issues regarding the transfer of SJHC's equity and requested discussion by telephone conference [D2/826]. On the same day, King & Wood Mallesons responded to the email to JunHe, mentioning that it had received the Chinese manuscripts of Equity Purchase Option Agreement and Entrustment Agreement from Xu Hongbiao's office, and it had some ideas and agreed to discuss the matter via telephone [D2/825]. On May 24, 2010, King & Wood Mallesons sent an email to JunHe with its amendment recommendations regarding to the "Equity Purchase Option Agreement" and Entrustment Agreement, and also reminded the Controlling Shareholders to ensure that the 20% equity in SJHC held by Oasis Kechuang should also be transferred at the same time according to Article 2.3.3 of the 4.28 Agreement. The e-mail also mentioned that King & Wood Mallesons was drafting the "Equity Pledge Agreement of Shibang Company" and "Shareholder Voting Rights Proxy Agreement of Shibang Company" to cooperate with the performance of the above two agreements; after the agreements were drafted, they would be sent to JunHe for review [D2/824]. On June 1, 2010, JunHe sent an email to King & Wood Mallesons to ask when it could provide a copy of the equity pledge agreement and voting rights proxy agreement, and said that it hoped to see all the documents and send feedback to King & Wood Mallesons [D2/ 830]. On June 9, 2010, King & Wood Mallesons sent an email to JunHe with the drafts of "Shareholder Voting Rights Proxy Agreement" and "Equity Pledge Agreement" for JunHe to review and give feedback [D2/829]. On August 31, 2010, King & Wood Mallesons sent an email to JunHe, pointing out that they did not receive JunHe's feedback after sending the drafts of "Shareholder Voting Rights Proxy Agreement" and "Equity Pledge Agreement" on June 9, 2010, and requesting for a response [D2/829]. However, according to Paragraph 23 [B/14] of Xu Hongbiao's witness statement, a violation of the 4.28 Agreement was that Oasis Investment and its Controlling Shareholders had not yet returned their signed "Equity Purchase Option Agreement" and/or "Escrow Agreement", or provide a response regarding its content to the Non-controlling Shareholders or put forward any suggestions.

271.   In summary, the arbitral tribunal held that the Controlling Shareholders were in breach.

272.   All three expert witnesses agreed that, in the first phase, SJHC, as an applicant for review and approval of equity transfer, must submit several documents to the review and approval authority (see Paragraphs 10 - 13 of the "Joint Opinion"). One of the key documents is the 80% and 20% equity transfer agreement of SJHC. Regarding Paragraphs 29 - 35 of the "Joint Opinion", three expert witnesses expressed their different opinions. Among them, Ji Nuo believed that the equity transfer agreement was one of the indispensable application documents, just like other documents required for review and approval and registration. Any equity transfer must be based on the premise that the relevant parties had reached an agreement. However, as compared to general equity transfer, this case was special. If the actual control rights, various licenses and official seals of SJHC had been transferred to the Applicants by the Respondents before the equity transfer occurred, the review and approval and registration of the equity transfer would not only depend on the direct parties to the transfer, i.e. Greencourt Properties, Oasis Kechuang, Shibang Company and Luhao Company, but also depend on the Applicants' approval of such equity transfer, especially the key terms such as the price, because the Applicants had actual control over SJHC, and it was not that they had no control over Shibang Company. If the actual controllers of SJHC did not recognize the terms and conditions of the equity transfer (especially the price terms), even if the parties concerned had signed the equity transfer agreement, SJHC would still be able to refuse or passively push forward the review and approval and registration applications. On the other hand, the review and approval authority may consider the reasonableness of the equity transfer consideration and usually require the company to provide an audit report. Therefore, for the sake of caution, the conclusion of the equity transfer agreement required that the joint venture (i.e. SJHC) cooperate with the provision of audit report and other materials to the parties concerned as references to determine the specific content of the agreement.

273.   After considering the opinions of the Respondents' expert, the arbitral tribunal believes that the opinions of the Respondents' expert are highly speculative. As HKD 150 million (the third installment) can only be paid to the Applicants after the various prerequisites are met, and one of the prerequisites would be the completion of procedures for government approval and registration of the

transfer of SJHC's equity, obviously, the Applicants would have no reason to refuse or to passively go about the approval and registration application. Therefore, the arbitral tribunal does not endorse the opinions of the Respondents' expert. The arbitral tribunal believes that the Respondents can fully prepare the equity transfer agreement, in the name of Greencourt Properties and Oasis Kechuang, for Shibang Company's and Luhao Trading's perusal. However, the Respondents did not kick start this process at all; rather, they delayed the process using various excuses.

274.    In summary, the arbitral tribunal believes that the Respondents have clearly violated the contractual obligations in Articles 2.3.1, 2.3.2 and 2.3.3 of the 4.28 Agreement.

275.    With regard to the audit report, all parties unanimously agreed in the hearing (especially on August 8, 2017 when the closing oral statement was given) that, at this current stage (and not when the arbitration started), there is a need to submit the latest audit report of SJHC to the approval unit, and this report is one of the documents to be reviewed during the approval process; Transcription (Day 9), Lines 28-29 on Page 32.

**Expert opinions of the expert witnesses of all parties - opinions on taxation issues** [C/451-454]

276.    The three experts reached the following consensus on the tax obligations that might have arisen from the equity transfer under the law of China:

(1)     According to the tax law of China, as the equity transferor in the acquisition of Shibang Company, Greencourt Properties would be subjected to corporate income tax, but the law of China does not prohibit the parties involved in the transaction to agree on the actual bearing of the financial tax burden;

(2)     There are two ways to handle the tax basis for corporate income tax payable by Greencourt Properties;

(3)     In practice, the tax authorities are stricter with the review of various conditions in Document No. 59 (that is, the "Notice on Several Issues Concerning Corporate Income Tax Treatment of Enterprise Restructurings promulgated by the Ministry of Finance and the State

Administration of Taxation"), and there is a relatively low possibility of special tax treatment in this case;

(4) The equity transferor and transferee have the obligation to pay stamp duty.

277. With regard to the agreement in Article 2.3.4 of the 4.28 Agreement: "Apart from this, the sharing of the tax and expenses relating to the payment of Equity Consideration is to be negotiated by all the Parties in due course", the arbitral tribunal believes that, the meaning of this sentence should be interpreted by the arbitral tribunal based on the law of Hong Kong (the substantive law of the contract), and the opinions of experts have no bearing on this issue.

278. The first half of the first sentence of Article 2.3.4 in the 4.28 Agreement stipulates that "The Non-controlling Shareholders shall be responsible for all the tax and expenses incurred due to the Onshore Payment of Equity Consideration …". This refers to the taxes and expenses arising from Oasis Kechuang's transfer of 20% equity of SJHC to Luhao Trading. Both parties had no dispute concerning this matter.

279. The second half of the first sentence of Article 2.3.4 in 4.28 Agreement is: "The Non-controlling Shareholders shall be responsible for …   the tax and expenses incurred offshore due to the entrustment arrangement made by Shibang Company and the equity transfer of Shibang Company to Cheergain International Group Limited and Focus Town Limited". The meaning of this sentence is also clear.

280. The second sentence of Article 2.3.4 in 4.28 Agreement is: "Apart from this, the sharing of the tax and expenses relating to the payment of Equity Consideration is to be negotiated by all the Parties in due course."[Underlines added after]

281. Both parties had a dispute on the taxes related to Greencourt Properties' transfer of 80% equity interest of SJHC to Shibang Company. The Respondents' position was that, the first sentence only covered Oasis Kechuang's transfer of 20% equity of SJHC to Luhao Trading and Shibang Company's entrustment agreement with Cheergain International and Focus Town, but it did not cover the agreement of Greencourt Properties' transfer of 80% equity of SJHC to Shibang Company. The Applicant's position was that: As it was clearly expressed in Article 2.3.1 of 4.28 Agreement that Oasis Investment had established Shibang

80

Company in Hong Kong and had arranged for Shibang Company to acquire 80% equity of SJHC held by Greencourt Properties, which was the Hong Kong subsidiary of Oasis Investment, this transaction should not be considered a situation that was "apart from these items" or a situation to be separately discussed by both parties. The arbitral tribunal agrees with the Applicant's standpoint.

282.   With regard to item (2) of the consensus of the three expert witnesses (that is, "the tax basis for corporate income tax payable by Greencourt Properties"), the arbitral tribunal believes that, the application and interpretation of "Document No. 59" are of no direct relationship to the interpretation of the 4.28 Agreement. As mentioned in the 29th paragraph of the witness statement of Yu Naifen Stephany, all parties did not discuss about who should bear the taxes arising from the transaction under "Document No. 59" in the event Shibang Company's offshore equity transfer would be entitled to "special tax treatment" based on "Document No. 59"[B/46]. The first Applicant's evidence denied that the Applicants had discussed with the Controlling Shareholder about the "special treatment" of "Document No. 59" when signing the 4.28 Agreement (see Xu [B/100, §§12-15]. The position of both the Applicants and the Respondents was that, all parties did not discuss about who should bear the taxes arising from the transaction under "Document No. 59" when signing the 4.28 Agreement. Therefore, the arbitral tribunal believes that no ruling is required for this issue. Moreover, the arbitral tribunal has interpreted Article 2.3.1 of 4.28 Agreement, hence it would not be necessary to discuss if "Document No. 59" is applicable.

**Property exchange (exchange of Jiuting Stores and A2-type villas)**

283.   The clause related to property exchange is Article 3 "Other agreements relating to Oasis Investment's repurchase and repurchase consideration" of 4.28 Agreement:

*"3.1 Within 30 days of the signing of this agreement, Oasis Investment and the Controlling Shareholders shall procure a subsidiary, namely, Shanghai Greencourt Real Estate Development Limited to sign the "Shanghai Real Estate Sale and Purchase Contract" with the Non-controlling Shareholders or their nominated third party, and undertake to transfer approximate 8000 m2 of commercial space which shall meet the appropriate delivery standards (specifically, the property includes approximately 6000 m2 of commercial space*

81

on the third level along the streetside of Phase 1 of Greencourt Sun City Commercial Building, and all the commercial space of approximately 2000 m2 of the west side of the Central Plaza of Phase 2 of Greencourt Sun City) at the Jiuting Greencourt Sun City Real Estate Project in Songjiang District, to the Non-controlling Shareholders or their nominated third party. For the avoidance of doubt, (1) when the Shanghai Real Estate Sale and Purchase Contract is signed, Oasis Investment and the Controlling Shareholders shall transfer the right to use such commercial space to the Non-controlling Shareholders or their nominated third party, and the Non-controlling Shareholders or their nominated third party are to receive rental income and other earnings after the transfer; and (2) by 30 June 2011, Oasis Investment and the Controlling Shareholders shall transfer the ownership of such commercial space to the Non-controlling Shareholders or their nominated third party.

3.2 At the time of signing the aforementioned "Shanghai Real Estate Sale and Purchase Contract", SJHC shall sign the "Villa Order Contract" with Oasis Investment and the Controlling Shareholders, to transfer the SJHC-developed two A2-type villas (building area of approximately 1200 m2 each as set out on a building plan, which building plan Oasis Investment and the Controlling Shareholders have received and have been notified of the delivery standards, and both confirmed the actual price as stated below) located on the Central Island, Peninsula Villa Project, Fengpu Industrial Area, Fengxian District, Shanghai City, to Oasis Investment or their nominated third party once the villas meet the delivery standards. For the avoidance of doubt, the Non-controlling Shareholders shall procure SJHC to sign the "Shanghai Real Estate Presale Contract" with Oasis Investment or the third party nominated by the Controlling Shareholders on 30 June 2011 and to complete the presale registration of such villas..

3.3 All Parties Confirm: the properties involved in the aforementioned "Shanghai Real Estate Sale and Purchase Contract" and the "Villa Order Contract" (or the Shanghai Real Estate Presale Contract) are all priced at RMB 72 million. Because the prices of the properties involved are equal, for the purposes of this agreement, the considerations under the contracts are to be set off against each other (whether or not such offset is plausible from an accounting perspective, and that the Parties agree that no actual payment is to be made)."

82

284. According to Article 3.2 of the 4.28 Agreement, the A2-type villas have "*building area of approximately 1200 m² each as set out on a building plan, which building plan Oasis Investment and the Controlling Shareholders have received and have been notified of the delivery standards, and both confirmed the actual price as stated below*". "The actual price as stated below" refers to RMB 72 million in Article 3.3.

285. The Applicants pointed out that, the aforementioned construction drawings were prepared and approved by the government when SJHC was still controlled by the Controlling Shareholder, and they were implemented and completed with the knowledge and authorization of the Controlling Shareholder. Moreover, the drawings were always kept and controlled by the Controlling Shareholder, and they were only handed over to the Non-controlling Shareholders together with other documents on November 18, 2009. According to the "Acceptance Certificate for Completed Construction Project and Planning" for A2-type villas issued by the Planning, Land and Resources Administration of Fengxian District, Shanghai City on January 15, 2012, the gross floor area stated on the certificate was bigger than the gross floor area in the original drawings.

286. Moreover, even if the gross floor area on the construction drawings was inconsistent with the drawings specified in the 4.28 Agreement, the Respondents were clearly aware of that and had not raised any objection within the relevant period of time. With regard to the clause on construction drawings in Article 3.2 and its effect, the Second Applicant cited the principle of "contractual estoppel" and the principle of "estoppel by convention".

287. The Respondents denied that the Controlling Shareholder knew about circumstances regarding the villa project and gave the drawings to the Non-controlling Shareholders. The Respondents pointed out that the Non-controlling Shareholders only submitted a copy of the villa design drawing to the Controlling Shareholder on June 2, 2010, and the Respondents informed verbally that the drawing was inconsistent with the agreement and returned it. Although the Applicants had adequate time thereafter, it did not alter the drawing. The Respondents only received the "Shanghai Commercial Housing Presale Contract" for the first time through the Applicants' lawyer letter on February 4, 2013, and knew about the area of the villas to be provided by the Applicants.

288. The Respondents claimed that the villas provided by the Applicants had the following defects and did not meet the requirements of "customized" villas as agreed by them: (1) the saleable area of the villas was much lower than 1,200 square meters; (2) even if basement area, which should not be included in the saleable area, were to be added to the total area, the villas still did not meet the required area stated in the 4.28 Agreement. As mentioned above, the requirements of "customized" villa stated by the Respondents are clearly inconsistent with the clauses of the agreement.

**Related written correspondence**

289. The written correspondence between the Non-controlling Shareholders and the Controlling Shareholder reveals that the Controlling Shareholder sent a letter to the Non-controlling Shareholders on March 25, 2011 requesting the Non-controlling Shareholders to provide the "design drawings of the involved villas, which should show the villas' location, area and construction quality meeting the provisions in the 4.28 Agreement and the usual requirements of a villa".

290. The Non-controlling Shareholders replied in a letter on April 25, 2011 and pointed out that:

   *"You have repeatedly delayed signing the Villa Order Contract for the two A2-type Villas located on Central Island with us on many occasions by claiming that we have not provided the drawings of the Central Island A2-type Villas to you; but in reality, Article 3.2 of the 4.28 Agreement has specified that the gross floor area on the drawings of the Central Island A2-type Villas is about 1,200 square meters each, and Oasis Investment and the Controlling Shareholder have received the drawings and are aware of the delivery criteria, and they have confirmed the actual price as stated". Moreover, our side had re-submitted the relevant drawings of Central Island A2-type Villas to you on June 2, 2010 in response to your request after the 4.28 Agreement took effect. You received and signed for the receipt of the drawings. Therefore, there is no factual basis for your refusal to sign the Villa Order Contract by stating that we have not furnished the drawings of the Central Island A2-type Villas."*

291. In the reply letter of the Controlling Shareholder dated April 28, 2011, they claimed that "we have not received the drawings of Central Island A2-type Villas with the 'gross floor area of about 1,200 square meters each' as mentioned

by you, have they been sent wrongly? For the sake of caution, please resend them again for our verification". The Controlling Shareholders' position then was not that there was a problem with the drawings provided by the Non-controlling Shareholders, but that they did not receive the drawings at all.

292.    The Non-controlling Shareholders replied in a letter on May 3, 2011 and reiterated that "we have responded to your request on June 2, 2010 and sent the relevant drawings of Central Island A2-type Villas to you, and we have your signed acknowledgment to prove this. If you have any doubt about the construction drawings, you can check with us".

293.    The Controlling Shareholder only gave a reply concerning the construction drawings on July 15, 2011. In this reply, they finally acknowledged that the Non-controlling Shareholders had given the drawings to them, but they then said that the drawings were not in compliance with the requirements: "you have indeed given the drawings to us, but the drawings showed a huge discrepancy between the gross floor area of the Villas and that agreed in the 4.28 Agreement, and we had also raised this issue to you when we received the drawings".

**Jiuting Stores**

294.    The Applicants said that the Respondents had so far been unable or refused to appoint and cause Greencourt Property Development and the Non-controlling Shareholders or a third party appointed by them to sign the "Shanghai Real Estate Sale and Purchase Contract" for the transfer of the Jiuting Stores, and this caused them to suffer losses.   However, the Respondents said that the Applicants failed to meet the requirements for the Villas, hence the Respondents did not have the obligation to sign the "Shanghai Commercial Housing Presale Contract" for the Jiuting Stores and transfer the ownership of the stores to the Applicants or the party appointed by them. This shows that the main issue of dispute between the parties is whether the Villas provided by the Applicants met the requirements in the 4.28 Agreement.

295.    The Respondents also pointed out that, regardless, the Controlling Shareholder had allowed the Applicants to use and rent the store through an authorization letter, and the Applicants were actually entitled to the revenue from the stores. Both parties had a dispute over the scope and deadline of the authorization. The Second Applicant pointed out that, the Respondents were still occupying 2,000

square meters of commercial property at the west wing of the Phase 2 Central Square up to the current day.

296.   The arbitral tribunal believes that, under Article 3 of the 4.28 Agreement, the agreement of the parties is for the property exchange, and the value of RMB 72 million of the involved property is only an estimation (this is the meaning of the word "pricing"); it is not an actual price calculated accurately by multiplying the price per square meter with the area of 1,200 square meters. In addition, the phrase "gross floor area on drawings of the about 1,200 square meters each", which was used to describe the A2-type villas, should also be understood in this contect. The Respondents also claimed that the pricing of RMB 72 million for the A2-type villas was calculated based on (1) the saleable gross floor area of two villas, which was 2,400 square meters in total, and (2) an average price of no less than RMB 31,500 per square meter of gross floor area. The Respondents claimed that this was the basis for Article 3.3 of the 4.28 Agreement between the parties, but the arbitral tribunal believes that this claim is obviously inconsistent with the stipulations that have been expressly stated in the 4.28 Agreement. Therefore, the arbitral tribunal has accepted the claims of the Applicants and ruled that the Respondents violated the obligations under Article 3.1.

### The Second Applicant's claim for losses of Jiuting Stores

297.   The Second Applicant listed the following calculation of losses in appendix 1 of its written concluding statement (the original appendix 1 of the written concluding statement was replaced by the new appendix 1 on August 8, 2017, and the parties did not have any objection to that):

| Calculation of rent losses of Jiuting Stores (revised version dated August 8, 2017) | | |
| --- | --- | --- |
| **Total rent losses (includes the office area and store) (RMB)** | 10,346,211 | |
| *Office area with balcony (over 2,000 square meters)* | | |
| | | |
| Total area (square meters) | 2,140.30 | |
| Area occupied by SJHC (square meters) | 424.35 | |
| **Leasable area (square meters)** | **1,715.95** | |
| | | Witness statement of Ke Yeying: B/7/94, Paragraph 46: The supermarket is the third party mentioned in the |

86

|  |  | paragraph. |
|---|---|---|
| Area of supermarket (square meters) | 860.85 | Supplementary witness statement of Gu Yong: B/12/129, Paragraph 4.3 |
| Area occupied by the Controlling Shareholder (square meters) | 855.10 | Witness statement of Ke Yeying: B/7/94, Paragraph 45 |
| Market rent price (RMB/square meters/day) | 2.50 | Gu Yong's statement: Day 5 [44(22-27)] |

|  |  |  |
|---|---|---|
| Date on which the Non-controlling Shareholders should be entitled to the right of use and rent of the stores under Article 3.1(1) of the 4.28 Agreement | 5/28/2010 | Revision of the Further Reply to the Applicants' Reply and Defence to Counterclaim: A/6/97, Paragraph 10.4 |
| Date of lease to supermarket: | 6/1/2016 | |
| Reference date for calculation of losses | 8/8/2017 | |
| **Number of days whereby the supermarket area was vacant due to the Controlling Shareholder's refusal to provide authorization** | **2,196** | |
| Losses arising from vacant supermarket area (RMB) | 4,726,067 | |
|  |  | |
| Number of days whereby the Controlling Shareholder occupied the store in breach of Article 3.1(1) | 2,629 | |
| Losses arising from occupation by the Controlling Shareholder (RMB) | 5,620,145 | |
|  |  | |
| **Total rent losses of the office area with balcony (RMB)** | **10,346,211** | |

298.   Claims of the Second Applicant: Although the A2-type villas were completed in 2011, the Controlling Shareholder unduly refused to accept the A2-type villas and refused to execute the transfer of the Jiuting Stores, and these caused the Non-controlling Shareholders to suffer heavy losses. The reasons are as follows:

   (1)   According to Article 3.1 of the 4.28 Agreement, the commercial property of the Jiuting Stores project is about 8,000 square meters, and this specifically included (i) about 6,000 square meters of the level three commercial space of the Greencourt Sun City Phase 1 along the

streetside; and (ii) about 2,000 square meters of all commercial space at the west wing of the Phase 2 Central Plaza.

(2)    The rent of the 2,000 square meters [of commercial property] in Phase 2 was most probably higher than RMB 2.5 per day per square meter. Mr. Gu Yong, who is the Controlling Shareholder's witness, also agreed with this point.

(3)    As the Controlling Shareholder prevented the transfer of Jiuting Stores and did not grant the controlling rights of the 2,000 square meters [of commercial property] to the Non-controlling Shareholders, the Non-controlling Shareholders could not rent out this portion [of commercial property].

(4)    Although the Non-controlling Shareholders rented a portion of the office with balcony in the 2,000 square meters [of commercial property] to a third party who is related to Mdm. Ke in July 2016, that was a special arrangement (based on the third party's trust in Mdm. Ke).

(5)    The Controlling Shareholder granted the controlling rights of the 6,000 square meters [of commercial property] in Phase 1 to the Non-controlling Shareholders through the authorization letter, but the controlling rights of the 2,000 square meters [of commercial property] in Phase 2 have not been granted so far. Mr. Gu Yong, who was the Controlling Shareholder's witness, also agreed with this point.

299.    According to Article 3.1 of the 4.28 Agreement: "Within 30 days of the signing of this agreement, Oasis Investment and the Controlling Shareholders shall procure a subsidiary, namely, Shanghai Greencourt Real Estate Development Limited to sign the "Shanghai Real Estate Sale and Purchase Contract" with the Non-controlling Shareholders or their nominated third party, and undertake to transfer approximate 8000 m2 of commercial space which shall meet the appropriate delivery standards (specifically, the property includes approximately 6000 m2 of commercial space on the third level along the streetside of Phase 1 of Greencourt Sun City Commercial Building, and all the commercial space of approximately 2000 m2 of the west side of the Central Plaza of Phase 2 of Greencourt Sun City) at the Jiuting Greencourt Sun City Real Estate Project in Songjiang District, to the Non-controlling Shareholders or their nominated third party. For the avoidance of doubt, (1) when the Shanghai

Real Estate Sale and Purchase Contract is signed, Oasis Investment and the Controlling Shareholders shall transfer the right to use such commercial space to the Non-controlling Shareholders or their nominated third party, and the Non-controlling Shareholders or their nominated third party are to receive rental income and other earnings after the transfer; and (2) by 30 June 2011, Oasis Investment and the Controlling Shareholders shall transfer the ownership of such commercial space to the Non-controlling Shareholders or their nominated third party."

300.  Article 3.1(1) shows that the Respondents are required to fulfill their obligations (that is, to deliver the right of use) within 30 days after signing the 4.28 Agreement, and this was to be no later than May 28, 2010. Article 3.1(2) shows that the Respondents were required to fulfill their obligations (that is, transfer the ownership) before June 30, 2011.

301.  Article 3.1 is linked to Articles 3.2 and 3.3, which means that the commercial property of Jiuting Green Court Sun City Real Estate Project at Songjiang District, which covers an area of about 8,000 square meters, had the same pricing as the 2 Central Island A2-type villas of the Peninsula Villa Project at Fengpu Industrial Area, Fengxian District (that is, RMB 72 million). This point has been stated in Paragraph 296 above.

302.  In Appendix 1 submitted by the Second Applicant, the claims are divided into two portions: (1) areas occupied by the Controlling Shareholder; (2) number of days that the supermarket area was being controlled due to the Controlling Shareholder's refusal to grant authorization. If August 8, 2017 is used as the reference date for calculation of losses, the total losses would be RMB 10,346,211 (RMB 5,620,145 plus RMB 4,726,067).

303.  As the arbitral tribunal has ruled, in Paragraph 271, the Respondents breached of its obligations under Article 3.1 of the 4.28 Agreement, the arbitral tribunal therefore accepts the Second Applicant's claims and rules that the Controlling Shareholder should compensate the Applicants for their losses of RMB 10,346,211 (using August 8, 2017 as the reference date for calculation of losses).

**Settlement of pre-existing debts and claims between SJHC and Oasis Investment and their subsidiaries**

304. According to Article 3.6 of the 4.28 Agreement: "Related party transactions: With effect from the signing of this agreement, the related party transactions between SJHC and Oasis Investment and their subsidiaries shall be terminated; all pre-existing debts and claims shall be settled within one month. This excludes situations that are otherwise stipulated in this agreement.."

305. All parties had made effort to negotiate and agreed to reduce the original scope of dispute to the few items listed in Bundle E, Tab 5.

306. Article 3.6 of the 4.28 Agreement is an independent clause, and it is not related to the above clauses on pricing of the equity transfer. The arbitral tribunal believes that the parties cannot hold any other party responsible for the failure to settle the pre-existing debts and claims within the time frame prescribed by the agreement, and the main reason is that the parties have different views concerning the issues involved. Therefore, with regard to this issue, the arbitral tribunal role is to pass a ruling on this issue, and it will not hold any party liable for the breach of agreement.

307. Under Article 3.6, all the pre-existing debts and claims between SJHC and Oasis Investment and their subsidiaries are to be settled. This is unrelated to the equity transfer or the repurchase. Therefore, the outcome of the settlement shall not contribute to the adjustment of the 3rd Payment. See Article 2.2.1(4) of 4.28 Agreement.

308. All parties have reached an agreement on most of the disputed settlement items, and the remaining disputed items that require ruling by the arbitral tribunal can be found in the list in E/5/15-19, which are: Items 1, 1a, 7, 8, 22, 23 and 28.

## 1, 1a. Balance of reserves during transfer in November 2009

309. According to Paragraph 4a of the witness statement of Mr. Qi Chiyang, who was the Applicants' factual witness: "Both parties have no objection to the debit balance of RMB 41,224,613.21 stated in prepayments - prepaid reserves - item 1." According to Paragraph 11 of the witness statement of Madam Li Shuping, who was the Respondents' factual witness: "Based on the financial information submitted to SJHC, my calculations show that, as of November 2009, the balance of the category 1 current account is RMB 41,224,613.21, which is the balance of current account between SJHC and [Oasis] Kechuang as of November 2009." Therefore, the parties had no dispute on this value.

310. However, both parties had a dispute on whether the RMB 15 million paid by the Controlling Shareholder to Shengyuan on January 29, 2016 (item 1a) could offset the current account debit amount.

311. The evidence shows that Oasis Investment, Greencourt Kechuang and SJHC signed a copy of the "Current Account Prepayment Agreement" on January 29, 2016 [D3/1207]. On the same day, SJHC, Shanghai Shengyuan Construction Engineering Co., Ltd. and Greencourt Kechuang also signed a copy of the "Tripartite Agreement" [D3/1213]. These two agreements were signed for the "Agreement Letter" signed by SJHC and Shengyuan on January 10, 2015 (for the arrears of two project amounts of the "Lekang Park Phase 2", which added up to RMB 26,198,239). As SJHC did not have sufficient funds to pay the project amount, it requested for Greencourt Kechuang, which is a subsidiary of Oasis Investment, to pay the amount on its behalf. [Oasis] Kechuang paid RMB 15 million directly to Shengyuan as the first installment of the project amount on behalf of SJHC.

312. The Second Applicant and the Respondents agreed that, the amount of RMB 15 million paid by the Respondents to Shengyuan on January 29, 2016 should be considered as prepayment of the current account of RMB 15 million by the First Respondent on behalf of SJHC based on the agreement in the "Current Account Prepayment Agreement". However, the First Applicant did not agree with the aforementioned position.

313. The arbitral tribunal also noticed that the First Applicant was not involved in the negotiation and the signing of the two agreements. [Paragraph 12 of Xu Hongbiao's non-religious affidavit]

314. The arbitral tribunal believes that the meaning of Article 3.6 in the 4.28 Agreement is very clear, which is: all the pre-existing debts and claims between SJHC and Oasis Investment and their subsidiaries must be settled within one month of the 4.28 Agreement (May 28, 2010). Although [Oasis] Kechuang paid RMB 15 million directly to Shengyuan on behalf of SJHC, the said amount was paid only in 2016, which was far beyond the deadline stated in the 4.28 Agreement. Therefore, the arbitral tribunal believes that this amount of RMB 15 million does not fall under the scope of pre-existing debts and claims stated in Article 3.6 of the 4.28 Agreement. The issue of whether this amount of RMB 15 million can offset the current account debit of RMB 41,224,613.21 is not related

91

to the terms of the 4.28 Agreement. This issue is not within the jurisdiction of the arbitral tribunal, hence it shall not be ruled upon by the arbitral tribunal.

## 7, 8. Renumerations and expenses of Ke Zhengguang and Xu Hongbiao from January - November 2009

315.   The First Applicant and the Second Applicant received renumerations, expenses and social security contribution amounting to RMB 3,127,591.77 from Oasis Investment in 2009. This amount was confirmed by both parties (see Paragraph 9a of Qi Chiyang's witness statement; Paragraph 12.3.1 of Li Shuping's witness statement). The dispute was whether this sum should be borne by Oasis Investment or SJHC. The Respondents' position was that, the Non-controllilng Shareholders agreed in the "First Draft Checklist of the Non-controlling Shareholders" that SJHC should bear this amount, but in the subsequent reconciliation process and the correspondences between the parties, [the Non-controlling Shareholders] did not agree for SJHC to bear the amount. The Controlling Shareholder asserted that, based on the principles in respect of the share repurchase, as the Non-controlling Shareholders only rendered services to SJHC since the start of 2009, the amount should be borne solely by SJHC. The Applicants claimed that their renumerations, expenses and social security contributions received from Oasis Investment in 2009 were based on the employment relationship between Oasis Investment and Ke [Zhengguang] and Xu [Hongbiao], and that relationship was not related to the pre-existing debts and claims between SJHC and Oasis Investment and their subsidiaries, hence these amounts were not under the scope of settlement of pre-existing debts and claims as stated in Article 3.6 of the 4.28 Agreement, and they were not related to the 4.28 Agreement.

316.   In Paragraph 12.2 of Li Shuping's witness statement, she introduced the background in which expenses were adjusted or apportioned due to staff remuneration and social security contribution. She explained: This adjustment or apportionment was based mainly on these factors: (a) some employees of the Chinese subsidiaries of Oasis Investment had a labor relationship with a certain subsidiary, and they received remuneration and social security contribution from that subsidiary while primarily serving another subsidiary. Therefore, when SJHC executed a staff takeover in November 2009, the Controlling Shareholder should have arranged for Oasis Investment's subsidiaries (excluding SJHC) to return to SJHC the remuneration and social security contribution paid to

employees who did not serve SJHC in 2009; (b) as the Non-controlling Shareholders refused to pay the remuneration for all employees of SJHC in the second half of November 2009 after signing the restructuring agreement, and the subsidiaries of Oasis Investment then had to pay them in cash first, therefore, the corresponding expenses for employees who served SJHC should be returned to the subsidiaries of Oasis Investment by SJHC.

317. The arbitral tribunal believes that, from November 2009 onward, Ke [Zhengguang] and Xu [Hongbiao] only served SJHC (and not Oasis Investment or subsidiaries other than SJHC), and based on this logic, even though their remunerations and expenses were still paid by Oasis Investment, this amount should also be borne by SJHC. Moreover, the First Applicant and the Second Applicant had agreed in the "First Draft Checklist of the Non-controlling Shareholders" that SJHC should bear this amount, and they only disagreed with this later.

318. In summary, the arbitral tribunal endorses the Respondents' claim and ordered SJHC to bear and return RMB 3,127,591.77 to the First Respondent.

## 22. Outstanding amount of Lekang Greening Engineering (RMB 1,136,313.42)

319. According to the statement of Li Shuping, who was the Respondents' factual witness, SJHC should pay RMB 1,136,313.42 as the greening project amount for Xiaotang Lekang Park Phase 2 to Oasis Investment' subsidiary Yijing Company (this amount was the project amount of RMB 1,136,313.42 paid by Yijing for the greening of Xiaotang Lekang Park Phase 2, and this amount was not claimed from SJHC) [Paragraph 28.4 of Li Shuping's witness statement [B/72]]. Li Shuping also explained that this sum was only added to the "Checklist of Current Account as of December 31, 2015" file prepared by her in January 2016 after she knew about the communication between the Controlling Shareholder and the Non-controlling Shareholders about the project amount of Shengyuan Company. Qi Chiyang, who was the Applicants' factual witness, said that there was no record of this sum of project amount during delivery, and the engineering department said that Yijing Company and SJHC had settled the project amount for Lekang Park Phase 2. The construction price was RMB 3.5 million in the construction contract that was concluded at that time, and the amount actually paid for the project was RMB 4.22 million. An excess of RMB 1.22 million was already paid, and this was 35% more than the construction price under the

contract [see Paragraph 9d of Qi Chiyang's witness statement [B/37]]. In Paragraph 15 of her supplementary witness statement, Li Shuping replied: "After the repurchase reference date, a project cost of RMB 1,136,313.42 for SJHC's Lekang Park Phase 2 was eventually formulated in Yijing Company's books. At that time, I thought that all the parties had carried out the split based on their assets during the repurchase reference date, hence this cost became Yijing Company's deficit and I added it into the account checklist." [B/125]

320.    The arbitral tribunal believes that, there is insufficient evidence to show that Yijing Company took over the payment of the project amount in response to SJHC's request, and the Respondents' witness also said that this amount was only formed after the repurchase reference date. Therefore, the arbitral tribunal has no evidence-based reason to ask SJHC to pay this sum to Yijing Company. In summary, the arbitral tribunal does not endorse the Respondents' request.

## 23. Apportioned investment cost for the 10 kV switch station (RMB 47(*sic*) million)

321.    In Paragraph 28.3 of her witness statement, Li Shuping said that she only added this sum (SJHC should share the investment cost of RMB 4.7 million for the switch station of Shanghai Four Seasons Ecological Technology Co., Ltd.) to the "Checklist of Current Account as of December 31, 2015" prepared by her in January 2016 after she knew about the communication between the Controlling Shareholder and the Non-controlling Shareholders about the project amount of Shengyuan Company [B/72]. Qi Chiyang said that this apportioned amount came from an agreement on apportionment of investment cost of the relevant distribution development station concluded with Four Seasons Ecological Technology Co., Ltd. when SJHC built the villas and developed neighboring projects in 2012. The payment responsibilities or disputes on the payments were controlled by the 2012 apportionment agreement, and they were neither related to the 4.28 Agreement nor were they under the scope of settlement of the debts and claims stated in Article 3.6 of the 4.28 Agreement because Article 3.6 of the 4.28 Agreement says that the debts and claims between SJHC and Oasis Investment and their subsidiaries were to be settled on the signing date of the Agreement (April 28, 2010) [B/37]. In Paragraph 16 of her supplementary witness statement, Li Shuping said that, after reviewing the 4.28 Agreement and the 11.9 Agreement comprehensively, [she considered that] no restriction was imposed on the time whereby the debts and claims were to be settled. Based on

94

common sense, the debts and claims that further arised during the equity repurchase process should also be settled accordingly [B/125].

322.   The arbitral tribunal believes that, Article 3.6 has a deadline for the settlement of the debts and claims, that is, within one month after the signing of the 4.28 Agreement (May 28, 2010). Therefore, this shared amount of RMB 4.7 million is not covered by Article 3.6 of the 4.28 Agreement. This matter is not to be decided upon by the arbitral tribunal.

## 28.   For the interest arising from Oasis Investment and its subsidiaries' retaining of the funds of SJHC, the Controlling Shareholder has yet paid the interest [back to SJHC/Non-controlling Shareholders]

323.   The Applicants' position was that interest clearing should form part of Article 3.6.   Prior to the split [by way of share restructuring], the Group had centralized use of funds to bear the costs of the corresponding units and projects financial costs as needed, so as to maximize the Group's overall profits. Such a model is understandable. However, following SJHC's split on December 31, 2008 as the reference date, Oasis Investment's controlling party continued to adopt this model on SJHC and freely transferred funds [out of SJHC] without consideration.   By adopting a management accounting model of apportioning financial costs, this went against the spirit of the relevant agreement: See Paragraph 7e of Qi Chiyang's witness statement. Li Shuping explained about the group funds allocation in Paragraph 10 of his witness statement.

324.   The arbitral tribunal believes that, regardless of whether SJHC was split on December 31, 2008 as the reference date, the 4.28 Agreement was only signed in about one and a half years later, hence there existed a "custodian" relationship between the Group and SJHC during this period of time. Therefore, it is practically very challenging to identify clearly which party was utilizing or occupying which party's funds. In summary, the arbitral tribunal does not support the Applicants' request.

## VIII.   Ruling and Order of the Arbitral Tribunal

Based on the aforementioned reasons, the arbitral tribunal ordered as follows:

1.   (Within 4 weeks from the day this ruling is passed) The Respondents are to to cause Greencourt Real Estate to sign a "Shanghai Real Estate Sale and Purchase Contract" for the Jiuting Stores with the Applicants or a third party appointed by

95

the Applicants, and transfer the ownership of the Jiuting Stores to the Non-controlling Shareholders or a third party appointed by them. (Article 3.1 of 4.28 Agreement)

2.    (Within 4 weeks from the day this ruling is passed) The Respondents are to cause the First Respondent to appoint a third party to sign the "Shanghai Commercial Housing Presale Contract" for A2-type villas with SJHC, and complete the relevant presale registration procedures. (Article 3.2 of 4.28 Agreement)

3.    All parties are ordered to settle and pay the debts of SJHC and the First Respondent within 4 weeks from the day the ruling is passed based on Paragraphs 304 to 324 of this ruling. (Article 3.6 of 4.28 Agreement)

4.    The Applicants are ordered to submit an audit report to the relevant approval authorities within 2 months from the day the ruling is passed.

5.    (Within 2 months from the day this ruling is passed) The First Respondent is ordered to arrange for and cause Shibang Company to acquire the 80% equity interest of SJHC held by the First Respondent's subsidiary Greencourt Properties. (Article 2.3.1 of 4.28 Agreement)

6.    (Within 2 weeks from the day this ruling is passed) The First Respondent and Non-controlling Shareholders are to sign, and the First Respondent is to cause their subsidiary, Greencourt Properties, to jointly sign, the Equity Purchase Option Agreement and Entrustment Agreement concerning Shibang Company. (Articles 2.3.1 and 2.3.2 of 4.28 Agreement)

7.    (Within 2 months from the day this ruling is passed) The First Respondent is ordered to cause Oasis Kechuang to transfer its 20% equity in SJHC to Luhao Trading.

8.    (Within 4 weeks after the execution of the orders numbered 1-6 above) The Respondents are to pay the final amount after making the adjustments set out in Article 2.2.1(4) of the 4.28 Agreement and in Paragraphs 232(4)(a)(b)(c) and 233 of this ruling.

9.    The second respondent, third respondent and fourth respondent are jointly and severally ordered to pay RMB10,346,211 to the applicants as compensation for their losses (using August 8, 2017 as reference date for calculation of losses).

AP_Legal – 104494610.1

## IX.    Arbitration Fee

325.    With regard to the arbitration fee, all parties agreed during the closing that it would not need to be decided by the arbitral tribunal at this stage, hence the arbitral tribunal will pass the ruling on arbitration fee after all the parties have submitted the relevant supporting documents.

Date: February 28, 2018

Arbitration venue: Hong Kong

_____
[signature]
Teresa Cheng Yeuk-Wah,
Senior Counsel
Arbitrator

_____
[signature]
Horace Wong Yuk-Lun,
Senior Counsel
Arbitrator

_____
[signature]
Yang Ing Loong
Chief Arbitrator
on behalf of arbitral tribunal

[stamp]
Hong Kong International
Arbitration Centre
HONG KONG
INTERNATIONAL
ARBITRATION CENTRE

# EXHIBIT 9

UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

ESTATE OF KEZHENGGUANG,

                                          Petitioner,

         —*against*—

YU NAIFEN STEPHANY
(a/k/a/ STEPHANY YU,
a/k/a/ STEPHANY NAIFEN YU
a/k/a/ STEPHANY N. DOMBROWSKI),

                                          Respondent.

8:18-cv-03546-PWG

**DECLARATION OF RICHARD K. WAGNER**

I, Richard K. Wagner, declare as follows:

1.     I am a partner with the law firm of Steptoe & Johnson LLP, based in Beijing, People's Republic of China ("PRC" or "China"), with an office in Chicago.   I make this declaration, further to Rule 44.1 of the Federal Rules of Civil Procedure, in support of the underlying litigation before the U.S. District Court for the District of Maryland.   If called to testify to the matters set forth in this declaration, I would be competent to do so.

2.     I have been asked to opine on certain issues relating to the law of the PRC.   The opinions set forth in this Declaration are my own and are based on my review of certain Chinese legal and policy documents, my experience handling matters related to Chinese law and practice, and the results of inquiries conducted with various PRC regulators.   Exhibits provided are true copies of the originals.   English translations are provided for reference; the original language of these documents is Chinese.

## I.     SUMMARY OF QUALIFICATIONS

3.     I have had a China-facing law practice since the beginning of my legal career in 2002 in Hong Kong as an associate attorney with the China Practice Group of Baker & McKenzie.   I practiced in a China-related law practice with Baker & McKenzie until August 2015 (Hong Kong, Chicago, Beijing), after which, I took up a partner position with Steptoe & Johnson LLP in Beijing and Chicago in September of 2015.   Before law school, I worked as a Mandarin Chinese linguist with the U.S. Army.   I have had extensive experience with Chinese regulatory law, particularly as it relates to issues in a cross-border dispute resolution context.

4.     I received my Juris Doctor (JD) degree from the George Washington University School of Law in 2002 and received an LLM in Chinese law from the School of Oriental &

African Studies, University of London in 2008. I am licensed in Illinois and Wisconsin and am registered as a foreign lawyer with China's Ministry of Justice.

5.      I have published articles on topics related to Chinese law and frequently present on Chinese law and Chinese regulatory issues. I am reasonably fluent with Chinese-language documents. My CV is attached at Ex. 1.

## II.      CHINA'S LEGAL SYSTEM AND ITS SOURCES OF LAW

6.      In terms of legal taxonomy, the PRC legal system is a civil law jurisdiction, predominantly code based. The PRC Legislation Law identifies laws (法律), promulgated by the National People's Congress, regulations (行政法规), promulgated by China's State Council, local regulations (地方性法规) issued by provincial governments and ministry rules (部门规章), issued by government ministries, as the primary sources of law in China.[1] In my experience, there are also internal rules and regulations binding on ministry officials which assist and guide Chinese officials in their regulatory work, but these internal (内部, *neibu*, in Chinese) rules and regulations are by definition restricted, and not publicly disseminated.[2]

7.      While judicial interpretations (司法解释) issued by China's Supreme People's Court are binding on the courts,[3] case decisions do not, with very limited exception, provide

---

[1] *See Legislation Law of the People's Republic of China*, promulgated by the National People's Congress on Mar. 15, 2000, last amended on Mar. 15, 2015. (Ex. 2.)

[2] *Cf.* 2016 White Paper, AmCham China. p.54 ("Although the risk of falling foul of 'internal' unpublished regulations has diminished considerably in recent years, some foreign companies still encounter policies disseminated and enforced on the strength of unpublished internal measures."). (Ex. 3.)

[3] *See, e.g., Provisions of the Supreme People's Court on the Work Concerning Judicial Interpretation,* promulgated by the Supreme People's Court on Mar. 9, 2007, effective as from Apr. 1, 2007, *Fa Fa* [2007] No. 12. Art. 5. (Ex. 4.)

primary law source authority in China.[4]   China is not a "case law" jurisdiction.   Moreover, case

collections and compendiums in China are not comprehensive.   There is no unified, authoritative

case collection database in China.   China's Supreme Court maintains a case database that may be

searched online, but the database is limited to those cases which have been selected for

inclusion.[5]   One popular commercial case database in China is Chinalawinfo, but this too is a

limited case database, a developing commercial product.[6]   Not being able to locate a specific

case in a Chinese case database or compendium with a fact pattern matching your particular

situation does not mean a Chinese court has not addressed the issue before.   Put another way, the

absence in case collections of cases with specific fact patterns does not allow one to draw any

conclusions as to how a Chinese administrative agency or a court may view an actual situation—

it just means no cases with that fact pattern have been included in that particular case collection.


## III.   CHINA'S FOREIGN EXCHANGE CONTROL REGIME

8.      The Renminbi (RMB) is China's official currency.   It is not a fully convertible

currency and China has had in place a strict foreign exchange control regime for decades.   China

has a complex foreign exchange control regime in place, comprising of a labyrinth of rules and

regulations[7] with some rules being "internal rules" not publicly available.   The cornerstone

administrative legal document in this area is the *Regulations of the People's Republic of China*

---

[4] One example is so-called Guiding Cases (指导性案例, in Chinese).   There are presently only 106 Guiding Cases
in China.   *See generally* Stanford Law School China Guiding Cases Project, *available at*
https://cgc.law.stanford.edu/ (last visited on Jan. 24, 2019).

[5] *See generally, Provisions of the Supreme People's Court on the Publication of Judgment Documents by the
People's Courts on the Internet*, promulgated by the Supreme People's Court on Aug. 29, 2016, effective as from
Oct. 1, 2016, *Fa Shi* [2016] No. 19. (Ex. 5.)

[6] Product Introduction: Judicial Cases Database, *available at* http://www.pkulaw.cn/help/index.html?item=BLAJ
(last visited on Jan. 24, 2019).

[7] *See, e.g.*, Thomas Hall, Controlling for risk: An Analysis of China's System of Foreign Exchange and Exchange
Rate Management, 17 Colum. J. Asian L. 433, 456-57 (2004) (describing China's "foreign exchange regime" as a
veritable labyrinth of rules and regulations" that is "inconveniently complex and opaque").

*on Foreign Exchange Control* issued by the State Council of China.  (Ex. 8.)  In addition, China's Criminal Code criminalizes schemes that seek to circumvent or evade the foreign exchange control regime.[8]

9.    In recent years, since around the 2016 time frame, China has taken additional measures and issued new policies enhancing restrictions on outbound currency remittances and investments.  By way of some examples, on December 28, 2016, the People's Bank of China issued the *Administrative Measures for the Reporting of Large-sum Transactions and Suspicious Transactions by Financial Institutions*, lowering the overseas transfer threshold for reporting by banks to the State Administration of Foreign Exchange ("SAFE"), which together with the People's Bank of China are China's main regulators of foreign exchange. (Ex. 6.)  Since February 2017, SAFE has published a series of reports on administrative enforcement actions on forex violations.  In December 2017, China issued a new rule setting an annual cap on overseas withdrawals by a single individual using Chinese bank cards.  (Ex. 7.)

10.    The purchase and remittance of foreign exchange by PRC nationals (including both domestic entities and individuals) is highly regulated and closely controlled under the PRC foreign exchange control regime, requiring strict review and approval procedures by PRC regulators.  Persons seeking to remit foreign exchange must provide supporting documents to prove the purpose of the transfer and the bank will review applications to verify the authenticity and consistency of the transaction documents.[9]  If a PRC national wants to remit foreign exchange that exceeds his/her annual quota (currently set at USD 50,000), he or she needs to apply for special approval from the banks.  In such circumstances, the documentary requirements

---

[8] *Criminal Code of the People's Republic of China*, promulgated by the National People's Congress on Jul. 1, 1979, last amended on Nov. 4, 2017 ("PRC Criminal Code").

[9] *Regulations of the People's Republic of China on Foreign Exchange Control*, promulgated by the State Council on Aug. 5, 2008, effective as from Aug. 5, 2008. Art. 12. (Ex. 8.)

5

are more onerous and SAFE scrutiny may be involved in addition to bank scrutiny. If approval is not granted, the individual is not allowed to remit the funds.

11.     Foreign nationals in China are also subject to burdensome requirements on RMB conversion and foreign exchange remittance.  There are rules governing such transactions that are internal and the process can be opaque.[10]  While there do not appear to be published rules expressly setting quota restrictions for foreign nationals, banks and financial institutions are required to approve forex transactions and report prospective remittance transactions of more than RMB 50,000 (approximately USD 7,250) to the People's Bank of China ("PBOC"), and possibly also to the SAFE.[11]  While the review procedures of PBOC and SAFE have not been made publicly available, generally I understand there to be internal rules utilized by these regulators that set restrictions on such remittances.  Despite the lack of an express publicly notified quota, remittance of foreign exchange by non-PRC nationals is highly regulated.  Under current law and policy, Chinese banks scrutinize foreign exchange purchases and remittance applications very closely to ensure that currency outflows strictly comply with state requirements.

***Administrative Fines and Penalties***

12.     Chinese law expressly prohibits paying or receiving foreign exchange for obligations that are to be paid or collected in RMB.

---

[10] *See, e.g., Administrative Measures for the Reporting of Large-sum Transactions and Suspicious Transactions by Financial Institutions*, Art. 19. (Ex. 6.)

[11] *See Administrative Measures for the Reporting of Large-sum Transactions and Suspicious Transactions by Financial Institutions*, Art. 5. (Ex. 6.)

13.     Article 40 of the State Council's *Regulations of the People's Republic of China on Foreign Exchange Control*, the highest published administrative document on foreign exchange control, provides in English translation from the original Chinese:

> "***If anyone commits any act of acquiring foreign exchange illegally, such as <u>receiving or paying funds in foreign exchange in violation of prescriptions where such funds should be collected or paid in Renminbi</u>...***, the relevant foreign exchange control authority shall order the conversion of the foreign exchange illegally acquired into RMB and shall impose a fine of no more than 30% of the amount of the illegally acquired foreign exchange. In serious cases, the relevant foreign exchange control authority shall impose a fine of more than 30% of the amount of the illegally acquired foreign exchange, but not more than the equivalent amount of the illegally acquired foreign exchange.  If the act constitutes a criminal offense, it shall be subject to criminal liability."  [Emphasis added.]

(*Cf.* West Law Translation, Ex. 8, at Art. 40 (pg. 10).)

14.     The phrase used in the section of Article 40 bolded above (in original Chinese – "有违反规定以外汇收付应当以人民币收付的款项") is unambiguous.   Using foreign exchange (以外汇) to pay (付) or receive/collect (收) an amount that is supposed to be paid or received/collected in RMB (应当以人民币收付的款项) is illegal under Chinese law and subjects both the payor and the recipient to administrative fines and penalties, and possibly to criminal liability.

15.     China's SAFE is the primary administrative enforcer of its currency regulations and can impose severe fines on anyone who violates the PRC's foreign exchange control regime. Using these broad powers, SAFE has repeatedly fined Chinese firms who have attempted, via a wide range of creative means, to evade the currency restrictions.  For example, SAFE has sanctioned companies and individuals that have evaded the cap on overseas remittances by

routing the money in smaller bundles through others, or that have used doctored invoices or bills

of lading to conceal the true nature of the payments.   *See, e.g.*, SAFE's Notice on Foreign

Exchange Violation Cases dated December 1, 2017 (Ex. 9.); SAFE's Notice on Foreign

Exchange Violation Cases dated August 16, 2018. (Ex. 10.)


***Criminal Liability***

16.     Evasion of the foreign exchange control regime is subject to criminal liability

under Chinese law.   Such activity is criminalized in China as being disruptive of the PRC market

order.   Chapter 3 of Part II of the PRC Criminal Code lists the evasion of the PRC foreign

exchange control regime among other market order crimes, such as the crimes of counterfeiting

financial bills (Article 177), loan fraud (Article 175), insider trading (Article 180), and money

laundering (Article 191), among others.   (Ex. 11.)

17.     Article 190 of the PRC Criminal Code is broadly drafted and sets out the basic

contours for the crime of evading the PRC foreign exchange control regime as such relates to

companies and entities:   As translated to English, it provides:

> Companies, enterprises, and other entities, which in violation of
> national regulations, and without authorization take and deposit
> foreign exchange out of China or who take foreign exchange in
> China and illegally transfer it out of China, if the amount is
> relatively large, shall be imposed with a fine whose amount shall
> range from 5% to 30% of the amount of evaded foreign exchange,
> and the directly responsible personnel and other directly
> responsible individuals shall be sentenced to a fixed term
> imprisonment or detention of no more than five years. If the
> amount is large or there are other serious circumstances, the entity
> shall be fined by an amount ranging from 5% to 30% of the
> amount of evaded foreign exchange, and the directly responsible
> persons and/or other directly responsible individuals sentenced to a
> term of fixed imprisonment of more than 5 years.

(*Cf.* PKU Law Translation, Ex. 11, at Art. 190 (pg. 25).)

18.     As to individuals, the crime of evading the foreign exchange control regime is further supplemented by the National People's Congress Standing Committee's *Decision Concerning Punishment of Crimes Involving Fraudulent Purchase, Evasion and Illegal Sales of Foreign Exchange*, which states that "[w]hoever fraudulently purchases foreign exchange" by various specified means or (in the catch-all provision) "*by any other means*" has committed a crime. (Ex. 12 (emphasis added).)

19.     In addition to possible criminal sanction and administrative fines, violators of the foreign exchange control regime can be placed on the SAFE's "special watch list," and given a negative record in People's Bank of China's credit system.  *See, e.g., Notice of the State Administration of Foreign Exchange on Issues Concerning Further Improving the Personal Foreign Exchange Administration.*[12]; *SAFE's Notice on Foreign Exchange Violation Cases, dated December 6, 2018.*

## IV.     DECEDENT KE'S CHINESE ASSETS

20.     I understand and am instructed that Mr. Ke Zhengguang died intestate in China during the course of the arbitration and at the time of his death was a PRC citizen (*see id.* at 1 (¶ 1)) (identifying Mr. Ke as a PRC citizen)) domiciled in the PRC.  The arbitral award at issue in this case (Order 9) states that "[t]he second respondent [Stephany Yu], third respondent and fourth respondent are jointly ordered to pay RMB10,346,211 to the applicants [one of whom was the decedent Mr. Ke] as compensation for their losses  . . . ."  (Petition Ex. D at 96 (¶ 9).)  This

---

[12] *Notice of the State Administration of Foreign Exchange on Issues Concerning Further Improving the Personal Foreign Exchange Administration*, promulgated by the State Administration of Foreign Exchange Administration on Dec. 25, 2015, effective as from Jan. 1, 2016, *Hui Fa* [2015] No. 49. (Ex. 13.)

payment is fundamentally centered on events and transactions in China and would be considered a Chinese asset governed by Chinese law.

21.     The amount awarded represents compensation for lost rent associated with certain Shanghai real estate. (*Id.* at 81-89.) I understand and am instructed that the real estate was owned by a Chinese company, Shanghai Greencourt Real Estate Development Co. Ltd. (上海绿庭房地产开发有限公司), and that the arbitral tribunal found the compensation for lost rent was incurred by two individuals (Messrs. Ke Zhengguang and Xu Hongbiao), both of whom are identified in the award as Chinese citizens. (*Id.* at 1 (¶ 1); 81 (¶ 283).) The arbitration panel recognized that this payment was to be made in China and in RMB and the award is denominated in RMB. (*Id.* at 96 (¶ 9).) Rental payments for Shanghai properties in RMB would ordinarily have to be made onshore. As discussed above, to convert RMB into foreign exchange for payment offshore would require SAFE approval. Moreover, value added taxes (VAT) are also levied on rental payments in China under Chinese law.[13] It appears that the petitioner in this case is trying to circumvent SAFE, and possibly also trying to avoid having to pay VAT.

## V.     IMPLICATIONS OF THE CHINESE FOREIGN EXCHANGE CONTROL REGIME FOR THIS CASE

22.     As mentioned, the award expressly calls for compensation tied to rental payments in RMB. (*Id.* at 96 (¶ 9).) As discussed above, I believe this scenario is expressly envisioned and covered by Article 40 of the *Regulations of the People's Republic of China on Foreign Exchange Control,* which strictly prohibits making or collecting payment in foreign exchange when payment is due in RMB. Thus, a PRC national, such as Mr. Ke Zhengguang, would be

---

[13] *Provisional Regulations of the People's Republic of China on Value-added Tax*, promulgated by the State Council of PRC on Dec. 13, 1993, last amended on Nov. 19, 2017. Art. 2. (Ex. 14.)

prohibited under China's foreign exchange control regime to be paid in USD for rent connected to real estate in Shanghai without special approvals by Chinese regulators, and Ms. Yu would be prohibited from making such an illegal payment.

23.    In my opinion, the attempt that has been made here to have the RMB compensation called for by Order 9 paid outside of China *in USD* directly implicates Chinese law and interests.  A scheme to demand payment in USD for rental payments tied to Shanghai real estate that is to be paid in RMB would be illegal under Chinese law.  Further, I am of the view that in addition to the individuals orchestrating the scheme, there is a not inconsequential risk that others (such as Ms. Yu here) could also be implicated in administrative and possible criminal investigations conducted by the PRC authorities.  If tax evasion is also part of the motivation for avoiding receipt of payment in China, the risk increases in my view.  Pulling a RMB revenue stream out of China without authorization by having it deposited in USD outside of China in violation of Article 40 of the *Regulations of the People's Republic of China on Foreign Exchange Control* would likely be viewed as circumvention, if not an evasion, of the Chinese foreign exchange control currency regime, risking administrative and criminal sanction under the authorities cited above.  The intent by the petitioner to evade Chinese law would be further evidenced if the petitioner did not accept payment in RMB for the amounts called for in Order 9.  In other words, the petitioner's insistence on payment in a non-RMB currency, while refusing to accept RMB, would reinforce the conclusion that the petitioner's actions in this proceeding are motivated specifically by a desire to gain the benefit of evading the PRC's currency control laws.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 15, 2019.

Richard K. Wagner

# EXHIBIT 10

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

ESTATE OF KE ZHENGGUANG,

Petitioner,

—*against*—

YU NAIFEN STEPHANY
(a/k/a/ STEPHANY YU,
a/k/a/ STEPHANY NAIFEN YU
a/k/a/ STEPHANY N. DOMBROWSKI),

Respondent.

8:18-cv-03546-PWG

**REPLY DECLARATION OF RICHARD K. WAGNER**

I, Richard K. Wagner, declare as follows:

1.    I have reviewed the Yuan Gao Declaration of May 6, 2019 ("Gao Decl.") and the Ke Yeying Declaration of May 6, 2019 ("Ke Decl.") and submit this declaration in reply to several points that have been raised and further to Rule 44.1 of the Federal Rules of Civil Procedure in support of the underlying litigation before the U.S. District Court for the District of Maryland.   If called forth to testify to the matters set forth in this declaration, I would be competent to do so.

2.    In the first part of ¶13 of the Gao Decl., Mr. Zhang's English translation provides: "because [Stephany Yu] is an American citizen, Chinese law has no personal jurisdiction over her."   However, the original Chinese of the Gao Decl. is somewhat different.   It provides, in relevant part:  "因第二被申请人是美国公民，除非她进入中国内地，中国法律对她个人没有任何管辖权" ("Since [Ms. Yu] is an American Citizen, unless she enters China, Chinese law would not have any jurisdictional power over her as an individual.").   Nonetheless and regardless of which version of the Gao Decl. is considered (the original Chinese or the English translation by Mr. Zhang), I see no jurisdictional issue with an arbitral enforcement action against Ms. Yu in China.[1]  Foreign individuals and companies are subject to lawsuits in China all the time.  I've been involved in numerous cases involving American defendants in Chinese courts.   Foreign defendants also do not have to be physically present in China for a Chinese court to adjudicate a

---

[1] In Chinese civil procedure, there are two types of jurisdiction articulated in the PRC Civil Procedure Law, "hierarchy/grade" jurisdiction (级别管辖, in Chinese) and "place" jurisdiction (地域管辖, in Chinese). Hierarchy/grade jurisdiction refers to the level or rank of court that may hear a particular dispute, often tied to the amount in controversy or the subject matter of the dispute—i.e., the Supreme Court versus a High Court or an Intermediate or District Court.  Place jurisdiction generally refers to the location of the particular court, and, in some respects, is similar to venue in the U.S.  The basic rules on jurisdiction applicable to civil actions are set out in the PRC Civil Procedure Law.  These are supplemented by judicial interpretations issued by China's Supreme People's Court.  "Personal jurisdiction" as that term is understood in U.S. civil practice is not a developed concept in China.

case in which they have been named.[2]  Moreover, arbitral enforcement matters with foreign defendants are very common in China.  Chinese courts have the authority to recognize and enforce foreign arbitral awards, such as the HKIAC award that has been issued here, pursuant to Article 283 of the PRC Civil Procedure Law. I see no basis for a Chinese court refusing to exercise jurisdiction over this case.

3.      I disagree with Ms. Gao's characterization in ¶5 regarding the state of arbitration enforcement law in China.  Contrary to what is suggested by the Gao Decl., there is in fact a robust arbitration practice in China.  Foreign arbitral awards are routinely enforced by Chinese courts.[3]  A recent survey of foreign arbitral awards found that, from 2011 to 2015, 86.4% of foreign arbitral awards were enforced, while the unsuccessful cases were generally denied based on grounds allowed by the Convention.[4]  China became a member of the New York Convention in 1987 and entered an agreement with Hong Kong in 2000 on the mutual enforcement of arbitral awards.[5]  Ms. Gao speculates that Ms. Yu may "refuse[] to enter mainland China" (Gao Decl. ¶13) to frustrate carrying out the award.  And yet Ms. Gao offers no specifics to support these accusations.  Quite to the contrary, Ms. Yu has already confirmed that she will submit to proceedings in China (Yu Decl. ¶50), and as discussed above, Chinese courts would have jurisdiction over Ms. Yu and an arbitral enforcement action.

---

[2] *Civil Procedure Law of the People's Republic of China*, promulgated on Apr. 9, 1991, last amended on Jun. 27, 2017. Art. 265. (**Ex. 1.**)

[3] *See*, .e.g., *Comments on Judicial Practice of China's Recognition and Enforcement of Foreign Arbitral Award*, Beijing Arbitration (No. 79), Liu Guixiang, Shen Hongyu, Sept. 23, 2013, *available at* https://www.ixueshu.com/document/cdacbce210912eeb318947a18e7f9386.html (PRC Supreme People's Court survey concluding that the  recognition rate among seventeen Chinese provinces from 2002 to 2006 was approximately 93%).

[4] Meg Utterback, et al., *Enforcing Foreign Arbitral Awards in China – A Review of the Past Twenty Years*, King & Wood Mallesons - Insights (Sept. 15, 2016)  (**Ex. 2.**)

[5] *See Arrangement Concerning Mutual Enforcement of Arbitral Awards Between the Mainland and Hong Kong*, *available at* https://www.doj.gov.hk/eng/topical/pdf/mainlandmutual2e.pdf.

4.      Moreover, I understand that Ms. Yu is already taking affirmative steps in the Chinese courts to carry out the award.  Specifically, I understand that Greencourt HK filed a civil action in the Fengxian District Court in Shanghai on April 22 seeking to effectuate one of the key implementation problems so far; namely, transferring 80% of the ownership of the Chinese joint venture subsidiary, SJHC, from Greencourt HK to Shibang and having this change officially approved and registered with the PRC authorities (Yu Reply Decl. ¶ 10 & Exs. B, C.)  I understand this case was accepted by the Fengxian district court on May 5.  (*Id.* Ex. B.)

5.      In China, the PRC regulatory authorities must effect changes in the ownership of joint venture companies of the nature of SJHC for those changes to be official.[6]  This requires the submission of various forms and papers, some of which must be sealed by the local Chinese company, here that would be SJHC.  I understand that Mdms. Ke and Zhang, who control SJHC, are not cooperating in having the majority owner in SJHC changed from Greencourt HK to Shibang (as provided in the 2010 Agreement and which is required by the award), with the PRC authorities (Gu Decl. ¶¶9-13).  Consequently, Ms. Yu has initiated a lawsuit in China to help to implement that aspect of the award.  (Yu Reply Decl. ¶10.)  Such actions are well suited for the Chinese courts.  Chinese courts have the power to issue orders that the local authorities will respect and implement, changing the registered ownership in Chinese companies at the direction of the court.[7]  On the other hand, while there are now two U.S. court commercial judgments that have been recognized and enforced in China (one by a Chinese court in Wuhan and one by a Chinese court in Shanghai), I am not aware of their having been a U.S. court judgment enforced in

---

[6] *See Company Law of the People's Republic of China*, promulgated on Dec. 29, 1993, last amended on Oct. 26, 2018. Art. 32. (**Ex. 3**.)

[7] *See Guidance on the Handling of Enforcement Cases by the People's Courts*, issued by the Supreme People's Court in Apr. 2017, Art. 593.  (**Ex. 10**.)

China in which the relief granted was injunctive.[8]  In any event, I do not believe a PRC company registry authority would give much, if any, credence to a U.S. court judgment that ordered the Chinese authorities to change and register the change in ownership of a Chinese joint venture company like SJHC.

6.     Ms. Gao states in ¶9 of her Decl. that the PRC foreign exchange control regime is not implicated in this case.  I disagree.  The arbitration award expressly calls for payment in RMB and expressly ties this payment to lost rent in China for commercial properties in Shanghai. (Award, at 86-89 (¶¶ 296-303).)  The arbitrators determined that Messrs. Ke and Xu were entitled to RMB for the loss rent they would have collected had the property transactions been implemented under the 2010 Agreement.  Among the Chinese law provisions implicated here (discussed in more detail in my prior declaration at ¶¶8-19, 22, 23), Article 40 of the Foreign Exchange Control Regulations prohibits paying funds in foreign exchange where such funds should be collected or paid in RMB.

7.     Ms. Ke has suggested that the estate of decedent Ke Zhengguang is a legal entity (Ke Decl., ¶¶4, 16-18).  However, by reviewing the Letters of Administration that were issued by the Hong Kong High Court (Yu Decl., Ex. H), the Hong Kong probate code, and the arbitration submissions and other documents that have been submitted in this dispute, I don't believe the so-named "Estate of Ke Zhengguang" is properly considered a legal entity.  It would appear to me that the use of "estate" was simply an artifice for the arbitration so that the dispute could be adjudicated by the arbitrators in the HKIAC proceedings.  The Hong Kong probate law, the basis for the issuance of the Letters of Administration, unambiguously defines an estate as "the movable

---

[8] *Liu Li v. Tao Li and Tong Wu,* (2015) Yue Wuhan Zhong Min Shang Wai Chu Zi No. 00026, the Intermediate People's Court of Wuhan City, Hubei Province, Jun. 30, 2017; *Nalco Company v. David Chen*, (2017) Hu 01 Xie Wai Ren No. 16, the 1st Intermediate People's Court of Shanghai, Sep. 17, 2018.

and immovable property passing on the death of [a deceased person]."[9]  The "estate" here is not properly viewed as a separate and distinct legal entity with standing to engage in or transact business, or, for that matter, initiate litigation, in my opinion.

8.      The position under Chinese law is very similar.  Under Chinese law, an estate is not a legal entity.  Ms. Gao apparently concedes this point.  (Gao Decl. ¶8.)  Under Chinese law, if a decedent dies intestate (as I understand Mr. Ke Zhengguang did here), heirs take the assets/property of the deceased in accordance with a hierarchy of familial relations.[10]  Under Chinese law, there is no concept of an "estate" as having independent legal existence or personality.  The Chinese characters "遗产" that can be translated into English as "estate" mean simply the assets/property of someone who has died.

9.      In her declaration, Ms. Ke represents that the petitioner is a Hong Kong entity that has a bank account at the Standard Chartered Bank Hong Kong ("Standard Chartered").  (Ke Decl. ¶¶16-17.)  Given these representations, my colleague, Lin Yang, a native speaker of Cantonese, at my direction, made inquiries with Standard Chartered on May 9, 2019.  In response to her queries, the Standard Chartered representative indicated that administrators for someone who has died cannot open a bank account at Standard Chartered in the name of an estate.  Moreover, according to the representative from Standard Chartered, if someone who has a bank account at Standard Chartered has died and the bank becomes aware of it, the bank account is frozen — meaning that it cannot accept deposits or payments from outside.  Based on the information provided by the Standard Chartered representative, Ms. Ke and her mother, Ms. Zhang, could not have opened an account in the name of the estate of the late Mr. Ke in Hong Kong.

---

[9] *Hong Kong Probate and Administration Ordinance*, Sec. 2. (Cap. 10), (**Ex. 4, at 1-2.**)

[10] Article 10, *Law of Succession of the People's Republic of China*, Nat'l. People's Cong., promulgated on Apr. 10, 1985 and effective from Oct. 1, 1985. (**Ex. 5.**)

10.     As to the citizenship of Ms. Ke and her mother, in paragraph 4 of her declaration, Ms. Ke states "[w]e are not Chinese citizens, Chinese nationals, nor Chinese residents.  While my mother and I were both born in China, we both became Australian Citizens in September 2007.  China does not allow dual citizenship, so when we obtained Australian Citizenship, we gave up our Chinese citizenship at the same time." (Ke Decl. ¶4.)   These unqualified statements are questionable and raise questions of fact warranting further review in my opinion.

11.     Ms. Ke describes the relinquishment of PRC citizenship as automatic upon obtaining a foreign citizenship.[11]   However, in practice, it's a more complicated process, as outlined below.

12.     I understand that renouncing Chinese citizenship involves a process of citizenship withdrawal and residence relinquishment, in which an application is made to a local public security bureau or to the Chinese embassy or consulate if the applicant resides abroad, and a renunciation certificate, is obtained.[12]   The Ministry of Public Security is responsible for reviewing and approving these sorts of applications, as well as issuing renunciation certificates.[13]  This certificate is an official document proving renunciation of Chinese citizenship.  I am not aware of Ms. Ke or Ms. Zhang having provided these certificates.

13.     Ms. Ke's statement about relinquishing her Chinese citizenship would also appear to be contradicted by her use of her PRC citizen ID card in various arbitration submissions after 2007, and in connection with her businesses in the PRC.  In order to participate in the arbitration

---

[11] The issue of dual citizenship is also referenced by the U.S. Department of State, which provides certain travel guidance for individuals who are dual nationals of the U.S. and China. China International Travel Information, the U.S. Dept. of State, *available at* https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/China.html

[12] Articles 10, 11 and 16 of the *Nationality Law of the People's Republic of China* provide the basis for such process.  *The Nationality Law of the People's Republic of China*, promulgated on Sept. 10, 1980.  **(Ex. 6.)**

[13] The PRC government publishes certain guidance for the renunciation process, *available at* http://www.gov.cn/fuwu/2015-11/17/content_5013454.htm.

proceedings, it appears as if Ms. Ke used her PRC citizen ID card to obtain several notarial certificates in China in 2014 and subsequently submitted these documents to the arbitration panel. (Yu Decl., Exs. E and F.)   These documents, with Ms. Ke's PRC citizen ID information listed, show Ms. Ke used her Chinese citizen identification document in 2014.   Renunciation of PRC citizenship leads to cancellation of Chinese residence (户口, in Chinese), which at the same time revokes two identification documents:   household registration record (户口本, in Chinese) and PRC citizen ID card (中国人民共和国居民身份证, in Chinese).   If Ms. Ke had given up her PRC citizenship documents in 2007, she would not have been able to use her PRC citizen ID card, or any Chinese identification documents, in 2014. [14]

14.     In China, the notarization process is much different than in the U.S.   In the U.S., it is a very simple process.   But in China, it is much more involved, as I know from my own personal experience.   Anyone who wants to notarize a specific document must submit an application form, along with copies of their identification documents to obtain a notarial certificate.   In my experience, when the submission of application documents is made, the public notary office must see the applicant's original identification document to make sure that they are identical with the submitted copies.   The public notary office, after reviewing and confirming the authenticity of submitted documents, issues notarial certificates within a specified period of time. For PRC nationals, PRC citizens must present their PRC citizen ID card to the public notary office for verification.   Foreign nationals use their passports for identification verification. [15]   From the

---

[14] For example, the U.K. Government, in its official guidance about "Nationality of China", warns its citizens that "If you have formally renounced Chinese citizenship, we advise you to carry clear evidence that you have done so.  If you still hold 'Hukou' (household registration) in China, you may be regarded as a Chinese citizen." Nationality of China, U.K. Foreign and Commonwealth Office, *available at* https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/553225/CSG_Nationality_advice_in_China_201609.pdf.

[15] *See, e.g.*, The *Exit-Entry Administration Law of the People's Republic* of China, promulgated on Jun. 30, 2012, effective on Jul. 1, 2013. Art. 14. (**Ex. 7.**).

PRC notarial certificates that Ms. Ke obtained (Yu Decl. Exs. E and F.), her PRC Citizen ID card numbers appears on the notarial certificate, highly suggestive that Ms. Ke provided the notary official her PRC Citizen ID card for verification.   In other words, during the notarization application process in 2014, Ms. Ke looks to have represented herself as a PRC citizen to the public notary office.

15.     Publicly available corporation records in China ("AIC records") also suggest that Ms. Ke continues to hold herself out as a PRC citizen.   The AIC records indicate that two companies co-owned by Ms. Ke and Mr. Xu Hongbiao are registered and operated as domestic companies.[16]   Under Chinese corporate law, a domestic company must be owned by either PRC citizens and/or by other domestic Chinese companies.[17]   With Ms. Ke's 50% ownership in both companies, respectively, I do not believe these companies could be operated as domestic companies if Ms. Ke had identified herself as an Australian citizen.[18]   Since both of these domestic companies continue to be registered and operated as domestic companies, this suggests to me that Ms. Ke is still using her PRC identification documents in corporate filings to the relevant PRC government authorities.   The same applies to Ms. Zhang, who solely owns and operates a domestic company in China.  (Yu Decl. ¶48 & Ex. I.)

16.     In conclusion, I suspect that both Ms. Ke and Ms. Zhang retain their PRC citizen documents and continue to hold themselves out as PRC citizens when there are in Mainland China. I also strongly suspect that they have the ability to receive payments in RMB.

---

[16] Ms. Ke's ownership in two Chinese companies, Shanghai Bolei Industries Co., Ltd. (上海博磊实业有限公司) and Shanghai Lvhao Trading Co., Ltd (上海绿豪贸易有限公司), were originally held by Mr. Ke Zhengguang. The ownership was transferred to Ms. Ke in 2015.  Both companies filed annual reports with the relevant government authorities.  **(Ex. 8.)**

[17] *See*, *supra* note 7.

[18] *See., e.g.,* Article 1, *Law of the People's Republic of China on Chinese-Foreign Equity Joint Ventures,* Standing Comm. Of Nat'l. People's Cong., promulgated and effective on Jul. 1, 1979, last amended on Oct 1, 2016.  **(Ex. 9**.)

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 19, 2019.

_____
Richard K. Wagner

# EXHIBIT 11



**中国农业银行**
AGRICULTURAL BANK OF CHINA

付款业务类—单笔支付

2018年11月01日

网银流水号：2018110110508320719

录入日期：2018-11-01

| 付款方信息 | 账号 | ▓▓▓▓▓▓ | 收款方信息 | 账号 | ▓▓▓▓▓▓ |
|---|---|---|---|---|---|
| | 户名 | 上海绿庭房地产开发有限公司 | | 户名 | Cheergain International Group Ltd |
| | 开户行 | 上海分行 | | 开户行 | HSBC Hong Kong Central, Hong Kong |
| | 账户性质 | 支票户 | | 账户性质 | |

| 金额 | 小写 | ¥5,173,105.50 | | |
|---|---|---|---|---|
| | 大写 | 伍佰壹拾柒万叁仟壹佰零伍元伍角零分 | 用途 | 商铺赔偿款 |

| 网银客户号 | ▓▓▓▓▓ | 业务种类 | 单笔转账 |
|---|---|---|---|
| 是否加急 | | 预约日期 | |
| 联系人 | 陈红 | 联系电话 | 13564506669 |

录入员：0003　录入时间：10:51:12　复核员：0004　复核日期：2018-11-01

交易状态：交易失败

# EXHIBIT 12

Charles Michael
212 378 7604
cmichael@steptoe.com

1114 Avenue of the Americas
New York, NY 10036
212 506 3900 main
www.steptoe.com



December 31, 2018

Eva Yao
DLA Piper
36/F, Shanghai World Financial Center 100 Century Avenue, Pudong
Shanghai  200120
China

**Re:     HKIAC / A13028**
**Your Reference: EMY/EY/KNC/402610/1 / ASIAM/23775730.2)**

Dear Ms. Yao:

Our firm represents respondent Stephany Yu in the above arbitration.

On behalf of Ms. Yu, I enclose a check for RMB5,173,105.5 in full satisfaction of the remaining unpaid amount under Order No. 9 of the award dated February 28, 2018. The code to deposit the check is █████████████████

Please do not hesitate to call or email me with any questions.

Sincerely,

/s/ Charles Michael

Charles Michael

cc:     Ernest Yang (ernest.yang@dlapiper.com)
Andrew Chin (andrew.chin@dlapiper.com)



# 中国农业银行 支 票

**10303130**
**32361895**

出票日期（大写） 贰零壹捌年 壹拾贰 贰拾 日　　付款行名称：农行长宁区定西路支行

收款人：张跃进和柯烨颖　　　出票人账号：▇▇▇▇

人民币
（大写） 佰佰壹拾柒万柒仟叁佰零伍拾陆佰伍整　　亿 千 百 十 万 千 百 十 元 角 分
　　　　　　　　　　　　　　　　　　　　　　　　 ￥ 1 7 7 3 0 5 5 0

用途：执行《最终裁决HKIAC/A18028》命令9　　　密码　▇▇▇▇

上列款项请从　　　　　　　　　　　　　　　　　行号　▇▇▇▇

我账户内支付

出票人签章

付款期限自出票之日起十天

复核　　记账　　加验密码

| 附加信息： | 被背书人 | 被背书人 |
|---|---|---|
| | | |
| | 背书人签章<br>年　月　日 | 背书人签章<br>年　月　日 |

身份证件名称：　　　　发证机关：

号码

（贴粘单处）

浙江省桦印刷股份有限公司·2017年印制

# EXHIBIT 13

[handwritten text indicated in italic]

# Civil Complaint

| | |
|---|---|
| **Plaintiff:** | **Greencourt Properties Limited** |
| Registered Address: | FLAT/RM 12,10/F, WING ON PLAZA, 62 MODY ROAD, TSIM SHA TSUI, KOWLOON, HONG KONG |
| | |
| **Defendant 1:** | **Shanghai Luting Real Estate Development Co., Ltd** |
| Registered Address: | No. 12, Lane 218, Baziqiao Road, Fengxian District, Shanghai City |
| Legal Representative: | Xu Liangyan |
| | |
| **Defendant 2:** | **Xu Liangyan, male, born on November 17, 1938, ethnic Han** |
| ID Card Number: | 31011019381117507X |
| Domicile: | Room 1605, No. 2, Lane 92, Yude Road, Xuhui District, Shanghai City |
| | |
| **Third Party:** | **Shibang Company Ltd.** |
| Place of Registration: | FlAT/RM 05-08 12F HING YIP COMMERCIAL CENTRE 272-284 DES VOEUX ROAD CENTRAL HK |

**Claims:**

1. ~~To confirm that 80% equity of the Defendant 1 under the name of the Plaintiff belongs to the Third Party;~~ *Delete this claim. [signature] 04/22/2019*

~~2~~*1*. To request that the Defendant 1 to handle the filing of and registration procedures related to equity changes in the Administration Committee of Shanghai Fengxian District Industrial Park, Shanghai Fengxian District Commission of Commerce and Shanghai Fengxian District Market Supervision & Administration Bureau, and to change the 80% equity belonging to Defendant 1 originally recorded in the name of the Plaintiff to the name of the Third Party;

~~3~~*2*. To request that the Defendant 2 carries out the relevant assistance and cooperation obligations on Defendant 1's handling of filing and registration procedures regarding the equity changes;

~~4~~*3*. To request that Defendant 1 and Defendant 2 jointly bear any and all the litigation costs such as the case acceptance fee.

**Facts and Reasons:**

Defendant 1 was a subsidiary jointly established by the Plaintiff and the outsider Shanghai Oasis Kechuang Ecological Technology Co., Ltd.. (hereinafter referred to as "Oasis Kechuang Ecological Technology"). The Plaintiff holds 80% equity belonging to Defendant 1 and Oasis Kechuang Ecological Technology holds 20% equity belonging to Defendant 1. Defendant 2 is the chairman and legal representative of Defendant 1. **(see Exhibit I)**

*I hereby certify that the document attached (8) appears on the aforementioned certificate. The ~~copy of the~~ document is ~~consistent with~~ the original document/~~affirmed copy and the original document/affirmed copy~~ are confirmed to be authentic upon my verification.*

*China-appointed attesting officer: [signature]*
*Date: April 10, 2019*
*A4*

On July 18, 2018, the Plaintiff signed and entered into an *Equity Transfer Agreement* with the Third Party, stipulating that the Plaintiff would transfer all 80% equity belonging to the Defendant 1 held by the Plaintiff to the Third Party. In order to sign and perform the aforementioned *Equity Transfer Agreement*, from the shareholder's meeting with Defendant 1 a resolution was issued, and Oasis Kechuang Ecological Technology agreed that the Plaintiff would transfer the 80% equity belonging to Defendant 1 to the Third Party and waive their preemption rights. **(see Exhibit II-V)**

In accordance with the relevant laws and regulations, Defendant 1 is obliged to handle the corresponding filing and registration procedures for the equity transfer between the Plaintiff and the Third Party. However, despite the fact that the Plaintiff has repeatedly communicated with Defendant 1 with regard to the filing and registration of the equity transfer, Defendant 1 has never fulfilled the corresponding filing and registration obligations. **(see Exhibit VI)**

Defendant 2, acting as the chairman and legal representative of Defendant 1, holds an unavoidable responsibility for Defendant 1's negligence in fulfilling its statutory obligations. In addition, Defendant 2 holds the official seal and licenses of Defendant 1, who is unable to perform the relevant filing and registration obligations without the cooperation of Defendant 2. Therefore, Defendant 2 shall perform the corresponding coordination and assistance obligations with regard to the filing and registration of the equity transfer.

For these reasons, in accordance with Articles 119 as set forth in the *Civil Procedure Law of the People's Republic of China* and other applicable laws and regulations, the Plaintiff hereby files this case to the Court for your adjudication.

To: Fengxian People's Court of Shanghai

**Plaintiff: Greencourt Properties Limited (seal)**
Authorized representative: [signature]
Date: April 3, 2019
[seal:] Greencourt Properties Limited


TRANSPERFECT

STATE OF NEW YORK
CITY OF NEW YORK
COUNTY OF NEW YORK

### CERTIFICATION

I, Aurora Landman, as an employee of TransPerfect Translations, Inc., do hereby certify, to the best of my knowledge and belief, that the provided Chinese into English translation(s) of the source document(s) listed below are true and accurate:

- *Civil Complaint (80% Share Transfer)-190422*

TransPerfect Translations, Inc., a translation organization with over 90 offices on six continents, is a leader in professional translations. TransPerfect Translations, Inc. has over twenty years experience translating into the above language pair, its work being accepted by business organizations, governmental authorities and courts throughout the United States and internationally.

TransPerfect Translations, Inc. affirms that the provided translation was produced in according to our ISO 9001:2015 and ISO 17100:2015 certified quality management system, and also that the agents responsible for said translation(s) are qualified to translate and review documents for the above language pair, and are not a relation to any of the parties named in the source document(s).

Aurora Landman, Project Assistant

Sworn to before me this
Monday, May 13, 2019

Signature, Notary Public

ANDERS MIKAEL EKHOLM
NOTARY PUBLIC-STATE OF NEW YORK
No. 01EK6378373
Qualified in New York County
My Commission Expires 07-23-2022

Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS

THREE PARK AVENUE, 40TH FLOOR, NEW YORK, NY 10016 | T 212.689.5555 | F 212.689.1059 | WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

# 民事起诉状

原　　告：　绿庭置业有限公司
注 册 地址：　FLAT/RM 12, 10/F, WING ON PLAZA, 62 MODY ROAD, TSIM
　　　　　　SHA TSUI, KOWLOON, HONG KONG(香港九龙尖沙咀么地道 62
　　　　　　号永安广场 10 楼 12 室)

被 告 一：　上海绿庭四季花城房地产开发有限公司
注 册 地址：　上海市奉贤区八字桥路 218 弄 12 号
法定代表人：　许良彦

被 告 二：　许良彦，男，1938 年 11 月 17 日生，汉族
身份证号码：　31011019381117507X
住 所 地：　上海市徐汇区裕德路 92 弄 2 号 1605 室

第 三 人：　世邦有限公司
注 册 地址：　FIAT/RM 05-08 12F HING YIP COMMERCIAL CENTRE 272-284
　　　　　　DES VOEUX ROAD CENTRAL HK

**诉讼请求：**

1、请求确认原告名下被告一 80%的股权归第三人所有； 删除该项诉请. 刘敏 2019.4.22

2、请求判令被告一至上海市奉贤区工业综合开发区管委会、上海市奉贤区商务
委员会及上海市奉贤区市场监督管理局办理股权变更备案及登记手续，将原
记载于原告名下的被告一 80%股权变更登记至第三人名下；

3、请求判令被告二就被告一办理股权变更备案及登记手续履行相应的协助及配
合义务；

4、请求判令被告一及被告二共同承担案件受理费等所有诉讼费用。

**事实与理由：**

　　被告一是原告与案外人上海绿庭科创生态科技有限公司（下称"绿庭科创"）
共同设立的子公司。原告持有被告一 80%的股权，绿庭科创持有被告一 20%的
股权。被告二是被告一的董事长及法定代表人。（详见证据 1）

兹证明此文件即前面证明书内所提及的附件( 8 ).
此证印本与该文件原本/缮记本相符·其原本/缮记本
经本人查证属实.

中国委托公证人：
日期　　　　：　10 APR 2019
A4

1

2018 年 7 月 18 日，原告与第三人签署《股权转让合同》，约定原告将其持有的被告一 80%股权全部转让给第三人。为签署及履行上述《股权转让合同》，被告一股东会出具股东会决议，绿庭科创同意原告将其持有的被告一 80%股权全部转让给第三人，并放弃其优先购买权。（**详见证据 2 至证据 5**）

根据相关法律规定，被告一有义务就原告与第三人之间的股权转让办理相应的备案及登记手续。然而，尽管原告已多次就办理股权转让备案及登记事宜与被告一进行沟通，被告一始终未能履行相应的备案及登记义务。（**详见证据六**）

被告二为被告一的董事长及法定代表人，对于被告一怠于履行法定义务负有不可推卸的责任。并且，被告二掌握被告一的公章及证照，在被告二不配合的情形下，被告一也无法履行相应的备案及登记义务，因此，被告二应当对该等股权转让备案及变更登记履行相应的配合及协助义务。

有鉴于此，原告现根据《中国人民共和国民事诉讼法》第一百一十九条等相关法律规定，向贵院提起诉讼，请求贵院判如所请。

此致

上海市奉贤区人民法院

原告：绿庭置业有限公司（盖章）

授权代表：

日期： 2019年 4月 0 3日

2

# EXHIBIT 14

# List of Evidence Provided by Greencourt Properties Limited

MM/DD/2019

| S.N. | Name of Evidence | Page No. | Content of Evidence |
|------|------------------|----------|---------------------|
| 1 | Articles of Association and Amendments to Shanghai Luting Real Estate Development Co., Ltd. (hereafter referred to as "**Luting**") | 1-20 | Greencourt Properties Limited and Shanghai Oasis Kechuang Ecological Technology Co., Ltd. (hereafter referred to as "**Oasis Kechuang Ecological Technology**") are shareholders of Luting, holding 80% and 20% equity of Luting respectively. |
| 2 | Shibang Company Ltd *Registration Certificate* | 21 | 1. Greencourt Properties and Shibang reached an agreement on 80% equity transfer from Greencourt Properties to Shibang. |
| 3 | On July 18, 2018, Greencourt Properties Limited (hereafter referred to as "**Greencourt Properties**") signed and entered into an *Equity Transfer Agreement* with Shibang Company Ltd (hereafter referred to as "**Shibang**"). | 22-24 | 2. The aforementioned equity transfer has been approved by the Shareholders' Meeting of Luting, and Oasis Kechuang Ecological Technology has already waived its pre-emption right; |
| 4 | *Resolutions of the Shareholders' Meeting* passed by Luting on July 18, 2018 | 25-26 | 3. The *Equity Transfer Contract* reached and concluded between Greencourt Properties and Shibang shall be legal and valid, and Luting shall cooperate in the handling of the corresponding registration changing procedures from administrative authorities for industry and commerce. |
| 5 | *Statement on Waiver of the Pre-emption Right* by Oasis Kechuang Ecological Technology on July 18, 2018 | 27-28 | |
| 6 | E-mails, correspondences and attachments sent by the Plaintiff's mandatory lawyer to Luting and the actual controllers of Luting on July 19, 2018. | 29-69 | 1. On July 19, 2018, Greencourt Properties submitted an application to Luting, requesting them to cooperate in the relevant equity transfer registration changing procedures; <br><br> 2. Luting has not cooperated in the handling of the corresponding registration changing procedures, and there is a dangerous delay in the handling of the aforementioned procedures. |

**Greencourt Properties Limited**

**Entrusted agent:_____**

**April 1, 2019**


TRANSPERFECT

STATE OF NEW YORK
CITY OF NEW YORK
COUNTY OF NEW YORK

CERTIFICATION

I, Aurora Landman, as an employee of TransPerfect Translations, Inc., do hereby certify, to the best of my knowledge and belief, that the provided Chinese into English translation(s) of the source document(s) listed below are true and accurate:

- *Evidence (80% Share Transfer)-190422*

TransPerfect Translations, Inc., a translation organization with over 90 offices on six continents, is a leader in professional translations. TransPerfect Translations, Inc. has over twenty years experience translating into the above language pair, its work being accepted by business organizations, governmental authorities and courts throughout the United States and internationally.

TransPerfect Translations, Inc. affirms that the provided translation was produced in according to our ISO 9001:2015 and ISO 17100:2015 certified quality management system, and also that the agents responsible for said translation(s) are qualified to translate and review documents for the above language pair, and are not a relation to any of the parties named in the source document(s).

Aurora Landman, Project Assistant

Sworn to before me this
Monday, May 13, 2019

Signature, Notary Public

ANDERS MIKAEL EKHOLM
NOTARY PUBLIC-STATE OF NEW YORK
No. 01EK6378373
Qualified in New York County
My Commission Expires 07-23-2022

Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS

THREE PARK AVENUE, 40TH FLOOR, NEW YORK, NY 10016 | T 212.689.5555 | F 212.689.1059 | WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

# 绿庭置业有限公司提交之证据清单

2019 年[　]月[　]日

| 序号 | 证据名称 | 页码 | 证明内容 |
|---|---|---|---|
| 1 | 上海绿庭四季花城房地产开发有限公司（下称"四季花城"）章程及历次修正案 | 1-20 | 绿庭置业与上海绿庭科创生态科技有限公司（下称"绿庭科创"）为四季花城的股东，分别持有四季花城 80%股权、20%股权。 |
| 2 | 世邦公司《公司注册证书》 | 21 | 1、 绿庭置业与世邦公司达成协议，由绿庭置业将其持有的四季花城 80%股权转让至世邦有限公司； |
| 3 | 2018 年 7 月 18 日，绿庭置业有限公司（下称"绿庭置业"）与世邦有限公司（下称"世邦公司"）签署的《股权转让合同》 | 22-24 | 2、 上述股权转让已经得到四季花城股东会通过，且绿庭科创已经放弃优先购买权； |
| 4 | 2018 年 7 月 18 日，四季花城公司《股东会决定》 | 25-26 | 3、 绿庭置业与世邦公司之间的《股权转让合同》合法有效，四季花城应当配合完成相应的工商变更登记手续。 |
| 5 | 2018 年 7 月 18 日，绿庭科创《放弃优先受让权声明》 | 27-28 | |
| 6 | 2018 年 7 月 19 日，原告委托律师向四季花城及四季花城实际控制人发送的电子邮件、函件及附件 | 29-69 | 1、 绿庭置业于 2018 年 7 月 19 日向四季花城提出申请，要求其配合办理相应的股权转让登记变更手续； 2、 四季花城至今未能配合完成相应的变更登记手续，存在拖延办理上述手续的恶意。 |

**绿庭置业有限公司**


代理人：_____

2019 年 4 月 1 日

# EXHIBIT 15

**No.** 1388207

No.



# CERTIFICATE OF INCORPORATION

## 公 司 註 冊 證 書

———————— * * * ————————

**I hereby certify that**
本 人 謹 此 證 明

GLOBAL STATE LIMITED
世邦有限公司

**is this day incorporated in Hong Kong under the Companies Ordinance**
於 本 日 在 香 港 根 據 《 公 司 條 例 》 (第 32 章)

**(Chapter 32) and that this company is limited.**
註 冊 成 為 有 限 公 司 。

**Issued on** 5 November 2009.

本 證 書 於 二 〇 〇 九 年 十 一 月 五 日 發 出 。

[signature]
Ms. Fanny Wing-chi LAM
**for** *Registrar of Companies*
*Hong Kong*
Director of Hong Kong Company
Registration Department
(Lin Yongzhi,      Acting Director)

Note 註：

Registration of a company name with the Companies Registry does not confer any trade mark rights or any other intellectual property rights in respect of the company name or any part thereof.
公司名稱獲公司註冊處註冊，並不表示獲授予該公司名稱或其任何部分的商標權或任何其他知識產權。



TRANSPERFECT

City of New York, State of New York, County of New York

I, Jacqueline Yorke, hereby certify that the document "**2009.11.5 世邦登记证书**
**Certificate of Incorporation**" is, to the best of my knowledge and belief, a true and
accurate translation from Chinese into English.

Jacqueline Yorke
(Currently situated in the County of New York)

Sworn to before me remotely this
August 27, 2020

Signature, Notary Public
(Currently situated in the County of New York)

WENDY POON
NOTARY
NO. 01PO6356754
QUALIFIED IN
QUEENS COUNTY
COMM. EXP.
04-03-2021
PUBLIC
STATE OF NEW YORK

Stamp, Notary Public

**No.** 1388207
編號



# CERTIFICATE OF INCORPORATION

## 公 司 註 冊 證 書

——————— * * * ———————

**I hereby certify that**
本 人 謹 此 證 明

GLOBAL STATE LIMITED
世邦有限公司

**is this day incorporated in Hong Kong under the Companies Ordinance**
於 本 日 在 香 港 根 據 《 公 司 條 例 》（ 第 32 章 ）

**(Chapter 32) and that this company is limited.**
註 冊 成 為 有 限 公 司 。

**Issued on**  5 November 2009 .
本 證 書 於 二 〇 〇 九 年 十 一 月 五 日 發 出 。

Ms. Fanny Wing-chi LAM
................................................
**for _Registrar of Companies_**
**_Hong Kong_**
香港公司註冊處處長
（ 林詠芝 代行 ）

Note 註 :
Registration of a company name with the Companies Registry does not confer any trade mark rights
or any other intellectual property rights in respect of the company name or any part thereof.
公司名稱獲公司註冊處註冊，並不表示獲授予該公司名稱或其任何部分的商標權或任何
其他知識產權。

# EXHIBIT 16

Letter of Resignation


To      Greencourt Properties Co., Ltd.:


The undersigned, Xu Hongbiao, hereby resigns from the office of director and all other positions which I have held with the above company. As of the date of this letter, I shall no longer bear and shall not be entitled to perform any of the duties and/or exercise powers corresponding to the above positions in your company.


This letter of resignation shall become effective and irrevocable upon my signature.




Resigning person: [signature]_____
                        Xu Hongbiao


Date: April 29, 2010

Letter of Resignation

To      Greencourt Properties Co., Ltd. :


The undersigned, Ke Zhengguang, hereby resigns from the office of director and all other positions which I have held with the company. As of the date of this letter, I shall no longer bear and shall not be entitled to perform any of the duties and/ or exercise powers corresponding to the above positions in your company.


This letter of resignation shall become effective and irrevocable upon my signature.



Resigning person: <u>April 29, 2010</u>

Ke Zhengguang

[signature]

Date: _____


TRANSPERFECT

City of New York, State of New York, County of New York

I, Jacqueline Yorke, hereby certify that the document "**2 2010.4.29 柯徐辞职书（绿庭置
业）(1)-c2-c2**" is, to the best of my knowledge and belief, a true and accurate translation
from Chinese into English.

Jacqueline Yorke
(Currently situated in the County of New York)

Sworn to before me remotely this
August 27, 2020

Signature, Notary Public
(Currently situated in the County of New York)

WENDY POON
NOTARY
NO. 01PO6356754
QUALIFIED IN
QUEENS COUNTY
COMM. EXP.
04-03-2021
PUBLIC
STATE OF NEW YORK

Stamp, Notary Public

# 辞职函

致　绿庭置业有限公司：

本人，徐宏标，现特向贵司辞去本人于贵司所担任的董事及其他一切职务。自本函签署之日起，本人将不再亦无权再履行本人在贵司的上述职务相应的职责及/或职权。

本辞职函自本人签署时起立即生效，并不可撤销。

辞职人：＿＿＿＿＿＿＿＿＿＿＿

徐宏标

日　期：2010 年 4 月 29 日

辞职函

致　绿庭置业有限公司：

本人，柯铮光，现特向贵司辞去本人于贵司所担任的董事及其他一切职务。自本函签署之日起，本人将不再亦无权再履行本人在贵司的上述职务相应的职责及/或职权。

本辞职函自本人签署时起立即生效，并不可撤销。

辞职人：<u>2010 年 4 月 29 日</u>
柯铮光

日　期：_____

# EXHIBIT 17



No. 288, First Shimen Road, Shanghai, China
26/F, Building 1, Hong Kong Xingye Center, Xingye Taikoo Hui
Postal code: 200041
Tel: (86-21) 5298 5488
Fax: (86-21) 5298 5492
junhesh@junhe.com

The Plaintiff -- Greencourt Properties Co., Ltd. vs. Defendant 1 -- Shanghai Luting Sijihuacheng
Real Estate Development Co., Ltd.,
Defendant 2 -- Xu Liangyan, and Third Person Shibang Co., Ltd.
Dispute Case over Company Registration
Written Agent Opinion Submitted by the Plaintiff

(2019) Hu 0120 Min Chu No. 10021

Dear Judicial Panel,

The Shanghai Branch of Junhe Law Firm has accepted the entrustment of Greencourt Properties Co., Ltd. (hereinafter referred to as "**Plaintiff**" or "**Greencourt Properties** "), and appointed lawyers Gu Yi and Liu Jiadi to act as the plaintiff's agents in the case accepted by your court of dispute over the company registration between the Plaintiff and the Defendant 1-Shanghai Luting Sijihuacheng Real Estate Development Co., Ltd. (hereinafter referred to as "**Defendant 1** " or "**Sijihuacheng** "), the Defendant 2- Xu Liangyan (hereinafter referred to as "**Defendant 2** "), and the Third Party Shibang Co., Ltd. (hereinafter referred to as "**the Third Party**" or "**Shibang Company**" [Case No.: (2019) Hu 0120 Min Chu No. 8611, hereinafter referred to as "**this case**". On the basis of the relevant opinion expressed in the evidence exchange and trial organized by your court, we hereby submit the following written agent opinion to your court for reference when the Judicial Panel deliberates.

The plaintiff believes that the Equity Transfer Agreement signed between the Plaintiff and the Third Party on July 18, 2018 (hereinafter referred to as the "**Equity Transfer Agreement**") has been established and come into effect, and there is no case of statutory invalidity. Sijihuacheng should go through the corresponding registration and information reporting procedures for equity transfer changes according to the requirements of laws and regulations. The specific reasons are as follows:

**I.        The Equity Transfer Agreement involved in the case has been legally established and effective.**

**1、    Other shareholders of Sijihuacheng have given up their preemptive rights.**

Sijihuacheng is a foreign-invested enterprise with a total investment of USD 12.5 million and a registered capital of 7.75 million yuan (unit: RMB, the same below). Before signing the Equity Transfer Agreement between Greencourt Properties and Shibang Company, Greencourt Properties had invested USD 6.2 million and held 80% equity of Sijihuacheng, while Shanghai Oasis Ecological Technology Co., Ltd. (hereinafter referred to as "**Oasis Technology**") invested USD 1.55 million and held a 20% equity.

Beijing Headquarters
Tel: (86-10) 8519-1300
Fax: (86-10) 8519-1350
Dalian Branch
Tel: (86-411) 8250-7578
Fax: (86-411) 8250-7579
Chengdu Branch
Tel: (86-28) 6739-8000
Fax: (86-28) 6739 8001

Shanghai Branch
Tel: (86-21) 5298-5488
Fax: (86-21) 5298-5492
Haikou Branch
Tel: (86-898) 6851-2544
Fax: (86-898) 6851-3514
Hong Kong Branch
Tel: (852) 2167-0000
Fax: (852) 2167-0050

Shenzhen Branch
Tel: (86-755) 2587-0765
Fax: (86-755) 2587-0780
Tianjin Branch
Tel: (86-22) 5990-1301
Fax: (86-22) 5990-1302
New York Branch
Tel: (1-212) 703-8702
Fax: (1-212) 703-8720

Guangzhou Branch
Tel: (86-20) 2805-9088
Fax: (86-20) 2805-9099
Qingdao Branch
Tel: (86-532) 6869-5000
Fax: (86-532) 6869-5010
Silicon Valley Branch
Tel: (1-888) 886-8168
Fax: (1-888) 808-2168
www.junhe.com

Before the signing of the Equity Transfer Agreement involved in the case, Greencourt Properties had obtained the consent of another shareholder of Sijihuacheng, Oasis Technology. On the same day, Oasis Technology and Greencourt Properties jointly issued the "Resolution of the Shareholders' Meeting", which clearly stated that they would give up the preemptive right of 80% equity. Therefore, all shareholders of Sijihuacheng have clearly agreed to the equity transfer transaction involved in the case.

**2、 The Equity Transfer Agreement involved in the case did not need to be approved and became effective immediately.**

Before 2016, China's laws applied the license examination and approval system to the supervision of foreign-invested enterprises. Therefore, before 2016, equity transfer contracts involving foreign-invested enterprises needed to be approved by the examination and approval authorities before they take effect. As of September 3, 2016, the NPC Standing Committee passed the Decision on Amending the Foreign-funded Enterprises Law and other four laws, which canceled the examination and approval requirements for the establishment and change of foreign-funded enterprises that did not involve the implementation of access management measures as stipulated by the state. Subsequently, the Ministry of Commerce promulgated the Measures for the Administration of Filing the Establishment and Change of Foreign-funded Enterprises, and changed the examination and approval system to the filing system. Therefore, since September 2016, industries outside the negative list of foreign investment have implemented the filing system, and the equity transfer agreements involving such foreign-invested enterprises have become effective without examination and approval, and filing is only a procedural requirement, which does not affect the validity of the equity transfer agreements.

China implements a negative list system for the management of foreign-invested enterprises. The industry where Sijihuacheng belongs to is the real estate industry. According to the Special Management Measures for Foreign Investment Access (Negative List) (2018 Edition) and Special Management Measures for Foreign Investment Access (Negative List) (2019 Edition) issued by the National Development and Reform Commission and the Ministry of Commerce, real estate enterprises are not included in the negative list. Therefore, the Equity Transfer Agreement involved in the case does not belong to the scope of special access management measures and does not need to be approved by any department.

According to Article 32 of the Contract Law of the People's Republic of China (hereinafter referred to as "**Contract Law**"): "If the parties conclude a contract in the form of a contract, the contract shall be established when both parties sign it or affix their seals on it." In view of the fact that the Equity Transfer Agreement involved in the case did not involve approval-based validation as stipulated by laws and administrative regulations, the Equity Transfer Agreement involved in the case came into legal effect when both parties signed it on July 18, 2018.

**3、 Whether there is a resolution of the board of directors does not affect the validity of the Equity Transfer Agreement involved in the case.**

（1） The board of directors is no longer the highest authority of the Sijihuacheng

Although according to the Articles of Association of Sijihuacheng, equity transfer matters are within the decision authority of the board of directors. However, the above stipulations in the Articles of Association of the Sijihuacheng have a special background. The Articles of Association of the Sijihuacheng were formulated in accordance with the Law of the People's Republic of China on Sino-foreign Joint Ventures (hereinafter referred to as "**Joint Venture Law**"). According to the Joint Venture Law, the board of directors is the highest authority of foreign-invested enterprises. However, since the Foreign Investment Law of the People's Republic of China (hereinafter referred to as "**Foreign Investment Law**") came into effect, the board of directors has been no longer the highest authority of foreign-invested enterprises:

As of January 1, 2020, the Foreign Investment Law came into effect. According to the provisions of Article 42, the Joint Venture Law has been abolished according to law; according to Article 31, "The organization form, organization structure and activity standards of foreign-invested enterprises shall be governed by the Company Law of the People's Republic of China and the Partnership Enterprise Law of the People's Republic of China"; meanwhile, according to Article 36 of the Company Law of the People's Republic of China (hereinafter referred to as "**Company Law**"), the shareholders' meeting is the highest authority of a company. Therefore, at present, the highest authority in Sijihuacheng is no longer the board of directors, but the shareholders' meeting.

（2） <u>The resolution of the board of directors is only a procedural requirement and does not affect the validity of the equity transfer agreement.</u>

Even according to the original Joint Venture Law, the power and function scope of the board of directors does not cover the approval of the equity transfer agreement. Article 6 of the Joint Venture Law stipulates that "The functions and powers of the board of directors are to discuss and decide all major issues of the joint venture according to the Articles of Association of the joint venture: Enterprise development planning, production and business activities plan, revenue and expenditure budget, profit distribution, labor wage plan, business suspension, and appointment or employment of general manager, deputy general manager, chief engineer, chief accountant and auditor, as well as their powers and treatment, etc." The above statutory power scope does not cover equity transfer matters. Moreover, the disposition of shareholders' equity in the joint venture belongs to the disposition scope of shareholders' own property, which does not belong to the major issues of the joint venture, and obviously does not belong to the category of "all major issues of the joint venture".

Moreover, according to Article 6 (1) of the Joint Venture Law, "A joint venture shall have a board of directors, the composition of which shall be negotiated by the parties to the joint venture, determined in the contract and Articles of Association, and appointed and replaced by the parties to the joint venture". It can be seen from the above that the directors of Sino-foreign joint ventures are appointed by the "parties to the joint venture", that is, the shareholders. Therefore, the directors essentially execute the will of the shareholders. Although it is clearly stated in the Articles of Association of Sijihuacheng that the board of directors decides the transfer of the company's equity, these provisions are only procedural elements, aiming at improving the procedures for industrial and commercial change registration. Actually, according to Article 3 of the Joint Venture Law, the Articles of Association of Sino-foreign joint ventures should be signed by all parties (shareholders). Therefore, the Articles of Association were originally the expression of shareholders' intention, and all shareholders of Sijihuacheng had expressed their clear intention on the equity transfer involved in the case. The agreement among shareholders has proved that the power of the board of directors on equity transfer in the Articles of Association are only procedural requirements, which cannot affect the true expression of shareholders.

In judicial practice, in cases related to disputes over equity transfer agreements, the court also agrees: The resolution of the board of directors in the Articles of Association of Sino-foreign joint ventures is only a procedural requirement, and the resolution of the board of directors cannot determine the validity of the equity transfer agreement. For example, the Shanghai No. 2 Intermediate People's Court heard the appeal case of equity transfer dispute between Rand Wales United Co., Ltd. and RAW Environmental Technology (Shanghai) Co., Ltd. [Case No.: (2016) Hu 02 Min Zhong No. 10017, hereinafter referred to as "**Rand Wales case**" (**see Annex 1**). The court held that:

"Although the joint venture contract and Articles of Association of RAW Company stipulate that the transfer of the registered capital of the company must be unanimously approved by the resolution of the board of directors. However, according to the Share Transfer Agreement and Commitment and Guarantee provided by Chengbang Company, it shows that all three shareholders of RAW Company had no objection to the equity transfer in this case, and all three shareholders were aware of the joint venture contract and the Articles of Association. According to the normal process of RAW Company, after the former legal representative Jiang Zhipeng left office, his new legal representative should convene the board of directors to make a resolution on this matter. Therefore, it was not due to Chengbang Company that the equity transfer involved in this case did not have the resolution of the board of directors. **Although the highest authority of RAW Company was the board of directors, the board of directors was composed of members appointed by shareholders of all parties. Therefore, regarding the major issues of changes in equity within the company, shareholders are the ultimate deciders, and the resolutions of the board of directors are only procedural provisions, which do not hinder the effectiveness of the Share Transfer Agreement involved in this case.**"

Therefore, no matter based on the source of the authority of the board of directors, the original intention agreed in the Articles of Association of Sijihuacheng, the existing legal provisions or the existing judicial practice, whether the board of directors of Sijihuacheng issued a resolution on the equity transfer matters involved in the case would not affect the validity of the Equity Transfer Agreement involved in the case.

（3） <u>The board of directors of Sijihuacheng has always been lazy to perform its duties, and the resolutions of the board of directors are impossible to be formed.</u>

The board of directors of Sijihuacheng is composed of four members, but the board of directors of Sijihuacheng does not actually have the possibility of issuing a unanimous board resolution on the Equity Transfer Agreement involved in the case. Existing directors of Sijihuacheng include Chairman Xu Liangyan, Director Ke Yeying, Director Ke Zhengfu and Director Xu Hongbiao. Among them, Ke Zhengfu is Ke Yeying's uncle; Ke Yeying became a director of Sijihuacheng on March 31, 2014 after the death of his father Ke Zhengguang. According to Article 24 of the Articles of Association of Sijihuacheng, "The increase and transfer of registered capital" shall be unanimously approved by the board of directors. As far as this case is concerned, what Greencourt Properties transferred to Shibang Company is the entire equity of Sijihuacheng held by it, which corresponds to the total registered capital of USD 6.2 million contributed by it. According to the Articles of Association, it needs unanimous approval by the board of directors. However, as far as the objective situation of this case is concerned, it is completely impossible for the board of directors of Sijihuacheng to issue a unanimous resolution:

First of all, the four directors have different opinions on the equity transfer. According to the trial statement of Shibang Company, Xu Hongbiao does not actually hold the official seal and license of Sijihuacheng, and he has a long-term contradiction and conflict with Ke Yeying; at the same time, Xu Hongbiao is the legal representative of Shibang Company in this case. Shibang Company agrees with the plaintiff's claim in this case, and thinks that the Equity Transfer Agreement involved in the case is legal and valid, and Sijihuacheng should go through the corresponding registration change procedures. Therefore, Xu Hongbiao is in favor of the equity transfer involved in the case, which is obviously inconsistent with the attitudes of the three directors Ke Yeying, Xu Liangyan and Ke Zhengfu on the equity transfer involved in the case: Combined with the relevant opinions expressed by the two defendants in this case, the three directors Xu Liangyan, Ke Yeying and Ke Zhengfu did not agree with the transfer, while Xu Hongbiao agreed with the transfer. Therefore, it is impossible for the four directors to form a unanimous resolution.

Secondly, the actions of the chairman of Sijihuacheng show that he will not call the board of directors to vote on the equity transfer involved in the case. According to Article 19 of the Articles of Association of Sijihuacheng, the board meeting is convened and presided over by the chairman. In this case, Xu Liangyan, the chairman of the board, is the defendant in this case, and his agent has clearly stated that he does not recognize the validity of the Equity Transfer Agreement involved in this case. Therefore, it is impossible for him to convene the board of directors to vote on the Equity Transfer Agreement involved in this case. In fact, regarding the equity transfer involved in the case, Greencourt Properties and relevant actual controllers sent letters to Sijihuacheng and its directors/actual controllers on July 19, 2018, August 25, 2018 and November 8, 2019, urging relevant directors to perform their duties. However, in the past two years, the board of directors of Sijihuacheng has not voted on the equity transfer.

The above is sufficient to show that Sijihuacheng and its three directors Xu Liangyan, Ke Yeying and Ke Zhengfu are actually preventing the performance of the equity transfer involved in the case in various ways. It is impossible for the board of directors of Sijihuacheng to vote in any form on the equity transfer involved in the case; to take a step back, even if a vote is held, the voting mechanism of the board of directors of Sijihuacheng determines that the Equity Transfer Agreement involved in the case will not be recognized by the board of directors under any circumstances. Therefore, under such circumstance, the shareholders' rights to equity transfer have been substantially deprived. If the procedural requirement of the Articles of Association of Sijihuacheng (i.e., the resolution of the board of directors) is taken as one of the important elements to determine the validity of the Equity Transfer Agreement involved in the case, the interests of shareholders will be substantially damaged, and the existing shareholders of Sijihuacheng will in fact be unable to dispose of the equity they hold at all, thus damaging the interests of shareholders.

Based on the above, the Equity Transfer Agreement involved in the case became legally effective on the day of signing, and whether the board of directors of Sijihuacheng expresses its intention on the equity transfer matters involved in the case will not affect the validity of the Equity Transfer Agreement involved in the case. The defendants in this case argued that the defense that the Equity Transfer Agreement involved in the case was not legally effective without the approval of the board of directors should not be adopted.

**II.    There is no statutory invalidity in the Equity Transfer Agreement involved in the case**

1.    **The Equity Transfer Agreement involved in the case does not violate the mandatory legal provisions of effectiveness.**

（1）  The defendant did not explain what mandatory provisions are violated by the Equity Transfer Agreement involved in the case.

The defendant argued that according to Article 153 of General Principles of Civil Law of the People's Republic of China (hereinafter referred to as "**General Principles of Civil Law**"), "A civil legal act that violates the mandatory provisions of laws and administrative regulations is invalid, except that the mandatory provisions do not cause the civil legal act to be invalid", and accordingly claimed that the Equity Transfer Agreement involved in the case was invalid. However, the premise of Article 153 of the General Principles of Civil Law is "violation of mandatory provisions of laws and administrative regulations", and the defendant has never been able to explain to the court which mandatory provisions of laws and administrative regulations are violated by the Equity Transfer Agreement involved in the case.

According to Article 52 (5) of the Contract Law, a contract that violates the mandatory provisions of laws and administrative regulations is invalid; at the same time, according to Article 14 of the Interpretation of the Supreme People's Court on Several Issues Concerning the Application of the Contract Law of the People's Republic of China (II): "Article 52 (5) of the Contract Law stipulates that 'mandatory provisions' refer to effective mandatory provisions." Combined with Article 30 of the Notice of the Supreme People's Court on Printing and Distributing the Minutes of the Civil and Commercial Trial Work Conference of National Courts (hereinafter referred to as "**Ninth Minutes of Civil Meeting"**): "When people's courts try contract disputes, they should carefully judge the nature of "mandatory provisions" according to Article 153 (1) of the General Principles of Civil Law and Article 14 of Judicial Interpretation (II) of Contract Law, especially considering the types of legal interests protected by mandatory provisions, legal consequences of illegal acts and transaction security protection."

It can be seen that whether it is based on the General Principles of Civil Law, Contract Law or Ninth Minutes of Civil Meeting, the premise that a contract is invalid due to violation of laws and regulations is to have corresponding "mandatory provisions" first, and the legal interests protected by these mandatory provisions belong to the scope that the state should protect compulsorily, such as involving public order and good customs, e.g., national security, market order, national macro policies, etc. However, as far as this case is concerned, the defendant has never been able to explain to the court what mandatory provisions the equity transfer transaction involved in this case violates.

As for the so-called special tax treatment claimed by the defendant, the corresponding specification is the Notice of the Ministry of Finance and the State Administration of Taxation on Several Issues Concerning the Treatment of Enterprise Income Tax in Enterprise Restructuring Business (hereinafter referred to as "**No. 59 Document**"). No. 59 Document does not prohibit special tax treatment transactions, but provides corresponding guidelines for applying special tax treatment arrangements to enterprise restructuring transactions. That is, the relevant tax treatment arrangements may apply to any transactions that comply with the special tax treatment arrangements specified in "No. 59 Document". Therefore, "No. 59 Document" does not deal with the validity of transactions related to enterprise restructuring, but is a guiding document for applying special tax treatment to enterprise restructuring transactions. Transactions that meet the corresponding requirements of "No. 59 Document" will not be deemed invalid, but will enjoy corresponding special tax treatment policies because they meet the conditions of "No. 59 Document". Therefore, there is no correlation between "No. 59 Document" and the effectiveness of the Equity Transfer Agreement involved in the case.

In addition, it is particularly important to note that although Greencourt Properties and Oasis Technology are nominal shareholders of Sijihuacheng, the control of Sijihuacheng has already been handed over to Ke Zhengguang and Xu Hongbiao, two participating shareholders before the signing of the April 28 Agreement, which has been confirmed by all parties in Article 2.3.5 of the April 28 Agreement; at the same time, the parties also made an agreement on equity transfer and custody arrangements, and agreed on a three-year transition period of equity transfer. The considerations of all parties at that time were: Participating shareholders would take over the Sijihuacheng in an all-round way first, and obtain revenue through good operation of the Sijihuacheng Company, thus distributing dividends to participating shareholders. Even if special tax restructuring applied to the equity transfer transaction involved in the case, the tax burden incurred by participating shareholders when they dispose of the equity of Sijihuacheng after the expiration of the three-year custody period would be sufficiently covered by the dividends collected in the previous period, and the interests of participating shareholders would not be impaired in any way. However, in fact, after Ke Zhengguang's death, Sijihuacheng fell into a dispute over control rights. Ke Yeying and his mother who inherited Ke Zhengguang's legacy took over Sijihuacheng completely. As the original shareholder, Xu Hongbiao could not control Sijihuacheng. There were long-term contradictions and conflicts between the two parties, and they could not jointly operate Sijihuacheng, which led to the failure of the original vision agreed by all parties under the April 28 Agreement. This was entirely caused by Ke Yeying's refusal to recognize and implement the April 28 Agreement and refuse to implement the Hong Kong arbitration award. Even if special tax treatment is applied to the equity transfer transaction involved in the case in the future, the resulting tax increase is the result of Ke Yeying's own fault, which is not related to the transaction arrangement under the Equity Transfer Agreement involved in the case.

（2） The issue of tax payment arose only after the Equity Transfer Agreement came into effect, and whether the tax payment is paid has nothing to do with the validity of the agreement.

The defendant claimed that the Equity Transfer Agreement involved in the case failed to take legal effect due to the failure of tax declaration, and such defense was putting the cart before the horse and could not be established at all:

First of all, the tax verification occurred after the Equity Transfer Agreement came into effect and when the registration change was handled. According to Article 3 of the Notice of the State Administration of Taxation on Several Tax Issues Concerning the Implementation of the Enterprise Income Tax Law (Guo Shui Han [2010] No. 79): "With respect to the confirmation and calculation of equity transfer income, when an enterprise transfers its equity, the realization of income from equity transfer shall be confirmed when the transfer agreement comes into effect and the formalities of equity change are completed. The income from the transfer of equity is the income from the transfer of equity after deducting the cost incurred for obtaining the equity. When calculating the income from equity transfer, an enterprise shall not deduct the amount that may be distributed according to the equity in the retained earnings of shareholders such as undistributed profits of the invested enterprise." Therefore, according to tax practice, the entry into force of the equity transfer agreement comes first, and the income from equity transfer is confirmed (i.e., tax verification) comes later. Moreover, only when the equity transfer agreement is registered for transfer will the tax amount be confirmed. Therefore, whether the equity transfer transaction is tax-paid or not has nothing to do with the effectiveness of the equity transfer agreement. On the contrary, only when the equity transfer agreement becomes effective according to law and changes are registered, the tax verification issue will arise.

Secondly, the amount of tax verification depends on the tax authorities' determination of the actual value of the target company's equity, and does not depend on the agreement on equity transfer price in the parties' transfer agreement. The equity transfer transaction involved in the case is an internal reorganization of the enterprise. During the trial, the defendant also acknowledged that the equity transfer transaction involved in the case was part of the reorganization of the whole Oasis Investment enterprise. Such equity transfer transaction is special. Whether the special tax treatment in Document No. 59 can be applied, and how and how much the tax incurred should be borne do not depend on the provisions of the Equity Transfer Agreement involved in the case. The verification of tax amount by Chinese tax authorities is not affected by the transaction price agreed in the contract between the parties, and the tax authorities usually verify the tax income from the transaction according to the fair value.

To give a simple example, there are a large number of "one yuan" consideration transactions in practice, but when the tax authorities actually verify the tax, they will never recognize "one yuan" as the taxable income, but will determine it according to the fair value. The "one yuan" transfer transaction between the parties does not violate any tax laws and regulations, nor will it of course be recognized as invalid. Similarly, as far as the equity transfer transaction involved in the case is concerned, the value of the equity transfer transaction determined by the parties is USD 6.2 million, and the consideration for the equity transfer is only the agreement reached between the parties on the equity value of Sijihuacheng, and is not equivalent to the actual value of the equity of Sijihuacheng.

Furthermore, at this stage, only Sijihuacheng has mastered the actual value of its equity, and neither Greencourt Properties nor Shibang Company has mastered it, so it is impossible to confirm the equity transfer price according to its actual equity value. In fact, according to Paragraph 4 of the Hong Kong Arbitration Award, the arbitral tribunal ordered the applicants (i.e. the heir to Ke Zhengguang's legacy and Xu Hongbiao) to provide an audit report (i.e. the audit report of Sijihuacheng) to the relevant examination and approval authority within 2 months from the date of the award. The purpose of the award order is to determine the equity value of Sijihuacheng for the examination and approval authority to approve the tax accordingly. However, up to now the actual controller of Sijihuacheng still has failed to provide the corresponding audit report according to the ruling content, leading to the failure to complete the tax verification for the equity transfer transaction involved in the case, the responsibility of which should be borne by Sijihuacheng and its actual controller.

Finally, it should be emphasized that: In any case, the tax verification of the equity transfer transaction by the tax authorities has never been an effective element of the equity transfer contract, and the fact that the tax for the equity transfer transaction involved in the case has not been paid does not affect the legal validity of the equity transfer transaction involved in the case. The defendant's claim that the equity transfer transaction is invalid is based on the fact that the tax verification has not been completed, which not only has no legal basis, but also does not conform to the basic business logic.

2. **The equity transfer transaction involved in the case does not harm the legitimate interests of any party**

The defendant claimed that the equity transfer transaction involved in the case harmed the legitimate interests of Sijihuacheng and its actual controller, which led to invalidity, and his claim could not be established at all:

（1） <u>Participating shareholders never proposed that the establishment of Shibang Company was inconsistent with the agreement at the arbitration stage.</u>

Shibang Company was established on November 5, 2009, earlier than April 28, 2010, the signing date of the April 28 Agreement. Moreover, when Shibang Company was founded, Xu Hongbiao and Ke Zhengguang were both directors of Shibang Company. When the April 28 Agreement was signed, both Ke Zhengguang and Xu Hongbiao knew clearly that subject establishing Shibang Company was Greencourt Properties, not Oasis Investment.

The defendant stated in the trial that Ke Zhengguang was only a director, not a shareholder, and could not prove that Ke Zhengguang knew the subject of the establishment of Shibang Company. However, the defendant's defense could not be established at all, and violated the basic business logic—Shibang Company is an important part of 80% equity transfer, so Ke Zhengguang could not confirm the corresponding transaction structure in the April 28 Agreement without even knowing the shareholders of Shibang Company. Moreover, neither Sijihuacheng nor Ke Yeying are the signatories of the April 28 Agreement, so obviously there is no reasonable basis to infer that Ke Zhengguang was not clear about the true shareholders of Shibang Company.

In fact, Order No. 6 of the Hong Kong Arbitration Award requires the controlling shareholder to urge Greencourt Properties to transfer 80% equity of Sijihuacheng to Shibang Company, which is in line with the arbitration request put forward by the participating shareholders and consistent with the April 28 Agreement. If the participating shareholders think that the establishment of Shibang Company does not conform to the April 28 Agreement and that such equity transfer matters do not conform to the interests of participating shareholders, they should have raised them in the process of arbitration. Moreover, judging from the opinions expressed by Shibang Company in the trial, Xu Hongbiao, its legal representative in this case, never thought that Shibang Company's establishment did not conform to the April 28 Agreement, and Ke Yeying was not a party to the April 28 Agreement, so his opinions are inconsistent with both logic and facts, and obviously should not be accepted.

Moreover, the arbitration case in Hong Kong lasted for more than five years, with the case filed in 2013 and an award made in 2018. During the five-year arbitration process, Ke Yeying never put forward that the establishment of Shibang Company did not comply with the April 28 Agreement, and it was not until the controlling shareholder executed the arbitration award order that he put forward this opinion, trying to create obstacles to the implementation of the Equity Transfer Agreement involved in the case. On the one hand, Ke Yeying argued in this case that the establishment of Shibang Company did not conform to the agreement, on the other hand, he tried to apply for enforcement of Hong Kong arbitration award in the United States, and his behaviors are obviously contradictory.

In view of the fact that the Hong Kong arbitration award has made a binding award on the equity transfer involved in the case, all parties should implement it. The transfer of 80% equity of Sijihuacheng by Greencourt Properties to Shibang Company complies with the April 28 Agreement and the requirements of the Hong Kong arbitration award, and will not cause damage to the interests of any party.

（2） <u>Sijihuacheng does not have the subject qualification to claim that the Equity Transfer Agreement involved in the case is invalid.</u>

As the defendants confirmed in the trial, the equity transfer transaction involved in the case is one of the transaction arrangements by the controlling shareholders (Yu Naifen, Yu Naijun and Yu Naiwen) and the participating shareholders (Ke Zhengguang and Xu Hongbiao) of Oasis Investment Group (hereinafter referred to as "**Oasis Investment**") to carry out enterprise restructuring. The equity transfer transaction in this case belongs to the Agreement on Implementing the Preliminary Agreement on Share Restructuring (hereinafter referred to as **April 28 Agreement**) signed by the parties on 28 April 2010. In fact, the establishment of Shibang Company, Xiying International Group Co., Ltd. and Focus Town Limited are all part of the whole debt restructuring transaction, and they are inseparable.

It is worth noting that Sijihuacheng is not a party under the April 28 Agreement. Therefore, in this case, Sijihuacheng' claim that the equity transfer transaction involved in the case harms the interests of Sijihuacheng and violates the April 28 Agreement cannot be established. Since it is not a party to the April 28 Agreement, it obviously should not have the right to explain the meaning of the terms of the April 28 Agreement, nor should it have the qualification to review and put forward an opinion on the performance of all parties. Sijihuacheng is only the subject of transactions between the shareholders of all parties, and the content of the disposition of the shareholders' own assets. As a target company, there is no interest relationship between Sijihuacheng and its shareholders' equity transfer agreement. Sijihuacheng will not suffer any interest damage due to equity transfer between the shareholders, and it has no right to claim that the Equity Transfer Agreement involved in the case is invalid or violates the April 28 Agreement.

（3） Xu Hongbiao is also a participating shareholder, but he does not thinks that the Equity Transfer Agreement involved in the case harms his interests.

Xu Hongbiao is also a participating shareholder, but he does not thinks that the Equity Transfer Agreement involved in the case harms his interests. During the trial of this case, the Plaintiff asked the agent of Shibang Company whether Xu Hongbiao, the legal representative of Shibang Company in this case, thought that the equity transfer involved in the case harmed his interests. The agent of Shibang Company replied that Xu Hongbiao did not think that the Equity Transfer Agreement involved in the case harmed his interests. Moreover, even without considering the reply from the agent of Shibang Company, from an objective point of view, if Xu Hongbiao thinks that the Equity Transfer Agreement involved in the case harms his interests, Shibang Company will not bring a lawsuit or sign the Equity Transfer Agreement involved in the case at all.

In the Hong Kong arbitration case, Xu Hongbiao and Ke Zhengguang were both applicants in the arbitration case, which is sufficient to show that Ke Zhengguang and Hong Xu's position and interests are generally consistent. However, Xu Hongbiao, as the legal representative of Shibang Company, obviously holds the same position as Shibang Company, that is, he recognizes the legal validity of the equity transfer transaction, and does not think that the equity transfer transaction damages any of his interests. As a participating shareholder, Xu Hongbiao's position expressed by Shibang Company in this case is sufficient to prove: Ke Yeying's so-called defense that the Equity Transfer Agreement damages the interests of participating shareholders can't represent the positions and interests of all participating shareholders.

（4） <u>Ke Yeying does not have the qualification to put forward relevant claims in this case.</u>

Sijihuacheng claims that the equity transfer transaction involved in the case is invalid because it damages Ke Yeying's interests and causes Ke Yeying's future tax increase. However, Ke Yeying is not a party to this case at all, and Sijihuacheng does not have the basis for putting forward relevant claims on behalf of Ke Yeying in this case.

Moreover, Ke Yeying is not even a party under the April 28 Agreement. Ke Yeying is only the estate administrator of Ke Zhengguang, and does not of course replace Ke Zhengguang as a party under the April 28 Agreement. Proceeding from his own interests, Ke Yeying maliciously interpreted the April 28 Agreement, refused to recognize the relevant transaction arrangements confirmed by his father under the April 28 Agreement, and tried to change his father's intention under the April 28 Agreement. In fact, he tries to harm the legitimate interests of all other shareholders in order to realize his private interests.

Therefore, Ke Yeying is not a party under the April 28 Agreement, and has not participated in the signing and implementation of the April 28 Agreement, but only participated in arbitration as Ke Zhengguang's estate administrator, who does not of course inherit Ke Zhengguang's subject position under the April 28 Agreement, and has no right to change Ke Zhengguang's expression of intention, explain the contents of the April 28 Agreement, and challenge the controlling shareholder's implementation of the April 28 Agreement.

**III.    The equity transfer transaction involved in the case is in full compliance with Article 2.3.1 of the April 28 Agreement and the arbitral award order.**

Essentially, it was to execute the fifth order of the arbitral award that the Plaintiff brought this lawsuit. According to the fifth order of the arbitral award, the arbitral tribunal "ordered the first respondent (i.e., Oasis Investment and its controlling shareholder) to arrange and urge Shibang Company (within 2 months from the date of the award) to acquire 80% of the equity of Sijihuacheng held by Greencourt Properties, a subsidiary of the first respondent. (Article 2.3.1 of the April 28 Agreement)".

According to article 2.3.1 of the April 28 Agreement: "Oasis Investment has newly established Shibang Co., Ltd. in Hong Kong, and has arranged Shibang Company to acquire 80% equity of Shanghai Luting Sijihuacheng Real Estate Development Co., Ltd. (hereinafter referred to as 'Sijihuacheng') held by Greencourt Properties Co., Ltd., a Hong Kong subsidiary of Oasis Investment. After the completion of such equity acquisition, Oasis Investment shall sign an Equity Purchase Right Agreement with Xiying International Group and Focus Town Limited, to stipulate that after the expiration of the custody period agreed in the following paragraph 2.3.2, 100% equity of Shibang Company will be transferred to Xiying International Group Co., Ltd. and Focus Town Limited at a consideration of HK\$ 1."

In the above clause, "Oasis Investment has newly established Shibang Co., Ltd. (Shibang Company) in Hong Kong" does not mean that Oasis Investment directly established Shibang Company. In fact, Oasis Investment newly established Shibang Company through its 100% shareholding in Greencourt Properties. Under such circumstance, Oasis Investment indirectly holds 100% equity of Shibang Company. Therefore, according to the facts, the statement in the April 28 Agreement that "Oasis Investment has newly established Shibang Co., Ltd. (Shibang Company) in Hong Kong is not contrary to the actual situation.

What's more, the evidence submitted by the Plaintiff shows that Shibang Company was established on November 5, 2009, earlier than the signing date of the April 28 Agreement on April 28, 2010; moreover, when Shibang Company was founded, Xu Hongbiao and Ke Zhengguang were both directors of Shibang Company. When the April 28 Agreement was signed, both Ke Zhengguang and Xu Hongbiao knew clearly that the subject establishing Shibang Company was Greencourt Properties, not Oasis Investment. During the trial, the defendant stated that Ke Zhengguang was only a director, not a shareholder, and could not prove that Ke Zhengguang knew the subject establishing Shibang Company. However, the defendant's defense could not be established at all, and violated the basic business logic-Shibang Company is an important part of 80% equity transfer, so Ke Zhengguang could not confirm the corresponding transaction structure in the April 28 Agreement without even knowing the shareholders of Shibang Company. Moreover, neither Sijihuacheng nor Ke Yeying are the signatories of the April 28 Agreement, so obviously there is no reasonable basis to infer that Ke Zhengguang was not clear about the true shareholders of Shibang Company.

Moreover, Xu Hongbiao, who is also a director and shareholder of Shibang Company and a signing subject of the April 28 Agreement, does not deny this fact. He agrees with the plaintiff's claim in this case, that is, at the beginning of the signing of the April 28 Agreement, he certainly knew that Shibang Company was established by Greencourt Properties. Therefore, Xu Hongbiao's confirmation made by Shibang Company can fully prove that the establishment of Shibang Company does not violate the April 28 Agreement.

In fact, when Ke Zhengguang and Xu Hongbiao applied for arbitration, they specifically claimed in the fourth arbitration request that Shibang Company should acquire 80% equity of Sijihuacheng held by Greencourt Properties. In particular, Ke Zhengguang (changed to his estate administrator after his death) entrusted a Hong Kong barrister to participate in the whole trial in the Hong Kong arbitration case. The 80% equity transfer involved in the case was an important controversial focus in the arbitration case. Whether the establishment of Shibang Company is in line with the interests of participating shareholders and whether the equity transfer can realize the rights and interests of participating shareholders under the April 28 Agreement is obviously related to the vital interests of participating shareholders. Neither Ke Zhengguang nor his lawyers could require the equity transfer as agreed in 2.3.1 without even finding out the subject establishing Shibang Company.

Therefore, the defendant's claim that Ke Zhengguang didn't know about the establishment of Shibang Company and the establishment of Shibang Company didn't conform to the April 28 Agreement is obviously inconsistent with the objective facts and basic business logic, and it is also contrary to the arbitration request put forward by Ke Zhengguang in arbitration cases, which obviously violates the principle of good faith.

**IV.     The US litigation procedure should not prevent the equity transfer transaction in this case from completing the change registration.**

The Memorandum Opinion of the American Court submitted by the defendant has no legal effect. Moreover, any rulings and orders of American courts do not of course have legal effect in China. What's more, judging from the contents of the Memorandum Opinion, the content discussed in the full text of the document is only Paragraph 9 of the arbitral award on whether the monetary payment obligation can be implemented, and does not involve the equity transfer of Sijihuacheng. Moreover, judging from the content of the Memorandum Opinion, the US court only expresses the opinion that the arbitration award involved in the case is enforceable in the United States. However, this cannot be equated with the US court denying the enforcement of the arbitration award in other jurisdictions. In fact, according to our understanding, American judges have clearly indicated to all parties that Hong Kong arbitral award can of course be enforced in other jurisdictions.

In fact, the Plaintiff and its actual controller have always actively promoted the follow-up enforcement of the Hong Kong arbitral award in China, and the American court's order has no right to interfere with the jurisdiction of Chinese courts in this case. China and the United States are both members of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (hereinafter referred to as "**New York Convention**"), and Chinese courts are also entitled to accept applications for enforcement of Hong Kong arbitral awards. Under such circumstance, after the signing of the Equity Transfer Agreement and the refusal of Sijihuacheng to perform the corresponding change registration obligations, Greencourt Properties chose to file a lawsuit with the court to require Sijihuacheng to perform the corresponding change registration procedures, which is not contrary to the Hong Kong arbitration award and does not conflict with the legal procedures in the United States. Moreover, even if Hong Kong arbitration award is not considered, after equity transfer among the shareholders of the target company, the target company originally has the responsibility to perform the change registration. When the dispute arises due to non-cooperation of the target company, the Chinese courts certainly have the jurisdiction to decide on the registered items of equity change.

As for the relevant procedures in the American court, it is completely the relevant legal action put forward by Ke Yeying for creating obstacles to the performance of the Hong Kong arbitral award. The purpose is to create the illusion that controlling shareholders such as Oasis Investment and Yu Naifen do not perform the arbitral award, and to seek corresponding monetary compensation from or corresponding punishment for Oasis Investment and Yu Naifen in the American court. This obviously violates the principles of fairness, honesty and credit, and should not be supported by your court. In addition, objectively speaking, the American court obviously don't understand Chinese laws. If equity transfer matters involving Chinese companies are implemented in the United States, unnecessary conflicts such as law application and tax supervision will inevitably arise, and the equity transfer transactions involved in this case are not suitable for implementation in the United States.

In addition, objectively speaking, the target of the equity transfer transaction involved in the case is a foreign-invested enterprise in China, and the corresponding industrial and commercial change registration procedures can only be completed in China. This case is a company change registration dispute. Even if the American court holds that the arbitral award is enforceable, the corresponding company change registration procedure obviously cannot be completed in the United States. For example, Ke Yeying does not recognize the Equity Transfer Agreement involved in the case, refuses to arrange Sijihuacheng under his control to handle the corresponding change registration, and seeks to solve the corresponding problems in the US court, which will lead to the vicious circle of the equity transfer involved in the case-the US court cannot implement the industrial and commercial change registration of Sijihuacheng, which will also cause the equity transfer transaction involved in the case never to be completed, which obviously violates the original intention of the April 28 Agreement: According to the April 28 Agreement, 100% equity of Sijihuacheng is one of the consideration paid by the controlling shareholder to the participating shareholders, and taking these equity as one of the transaction considerations is also the requirement of the participating shareholders, which meets the interests of the participating shareholders. However, after Ke Zhengguang's death, Ke Yeying tries to change the agreement reached by all parties and force the implementation of the Sijihuacheng equity transfer transaction in the United States, which is an "impossible task". Ke Yeying's mentality of trying to obstruct the implementation of the April 28 Agreement and refusing to recognize the Hong Kong arbitration award

is obvious, and his actions obviously should not be supported by the court.

**V.     The defendant's defense of the order of performance of the award cannot be established.**

According to Order No. 5 of the Hong Kong arbitration award, Oasis Investment should urge and arrange Shibang Company to acquire 80% equity of Sijihuacheng held by Greencourt Properties within 2 months from the date of the award; according to Order No. 6, Oasis Investment and its participating shareholders should sign and urge its subsidiary Greencourt Properties to jointly sign the equity purchase right agreement and custody agreement of Shibang Company within 2 weeks from the date of the award.

Although there are corresponding time limit requirements in the above award, these time limit requirements are not the order of performance of the award obligations. The equity transfer of Sijihuacheng is a foreign-related equity transfer, and involves the registration and filing procedures for industrial and commercial changes (the filing system is still applicable when the arbitral award was made), which will take a relatively long time, so the arbitral tribunal set a two-month period; however, as far as the signing of the equity purchase right agreement and the custody agreement is concerned, its performance is relatively simple, and it can be completed only by completing the agreement and sealing it by all parties. Therefore, the arbitration tribunal set a time limit of 2 weeks. Therefore, the above-mentioned time requirement is not the order of performance of the award, but a reasonable time limit based on the difficulty of performance of the award obligations and for the purpose of urging the performance of the award obligations as soon as possible.

In addition, paragraph 245 of the arbitral award clearly identifies the signing sequence of the relevant equity transfer, equity purchase right agreement and custody agreement involved in the award. According to paragraph 245:

"With regard to Articles 2.3.1 to 2.3.3, the arbitral tribunal believes that the equity transfer of Sijihuacheng includes the following three steps to be performed:
"(1) Firstly, Shibang Company established by Oasis Investment will acquire 80% equity of Sijihuacheng held by Greencourt Properties (referred to as "**the first step of 80% equity transfer**")
(2) Secondly, Oasis Investment will transfer the equity of Shibang Company to Xiying International and Focus Town owned by the first and second applicants respectively (referred to as "**the second step of 80% equity transfer**")".

In view of this, it can be seen from the above paragraph 245 that the time requirements in the orders of the arbitral tribunal are not to create the order of performance of the award, only the content of paragraph 245 is the requirement of the order of performance of the corresponding obligations of the award, that is, 80% of the equity transfer of Sijihuacheng should be completed in the first step.

In addition, in fact, the controlling shareholder had already sent the purchase right agreement and custody agreement to the participating shareholders for their review, which is also recognized by Shibang Company and its legal representative. However, because Ke Yeying has always refused to express his opinions on the signing of the purchase right agreement and custody agreement, the purchase right agreement and custody agreement cannot be promoted. On the one hand, Ke Yeying argued that this case did not meet the execution conditions because it did not sign the purchase right agreement and custody agreement, on the other hand, he refused to cooperate with the signing of the purchase right agreement and custody agreement, and implemented "double standards", which further proved Ke Yeying's intention of refusing to perform the April 28 Agreement and not executing the Hong Kong arbitration award.

**VI.** **The two defendants have the legal obligation to complete the change registration.**

**1、** **The Defendant 1 has the legal obligation to handle the change registration.**

According to Article 32 (3) of the Company Law: "The company shall register the names of shareholders with the company registration authority; if the registered items are changed, the change registration shall be handled. In the absence of registration or change registration, no action may be taken against a third party." Therefore, after the change of shareholders, the company has the legal obligation to register the change. Meanwhile, according to Article 26 of the Regulations of the People's Republic of China on the Administration of Company Registration: "If a company changes its registered items, it shall apply to the original company registration authority for change registration." As far as this case is concerned, the registration authority of Sijihuacheng is Shanghai Fengxian District Market Supervision Administration (hereinafter referred to as "**Fengxian District Supervision Administration**"). Therefore, the Defendant 1 should handle the corresponding change registration with Fengxian District Supervision Administration regarding the equity transfer involved in the case.

In addition, according to the above-mentioned Article 32 (3) of the Company Law, "In the absence of registration or change registration, no action may be taken against a third party", the Plaintiff is now no longer a shareholder of Sijihuacheng. However, the Plaintiff has always been mistakenly registered as a shareholder of Sijihuacheng, and the defendant has been slow to fulfill the corresponding change registration obligation, leading to the Plaintiff facing corresponding legal risks (such as being investigated for corresponding shareholder responsibilities by creditors of Sijihuacheng) and causing damage to the plaintiff's interests.

**2、** **The Defendant 1 shall fulfill the obligation of information reporting.**

According to Article 34 of the Foreign Investment Law which came into effect on January 1, 2020: The state establishes an information reporting system for foreign investments. Foreign investors or enterprises with foreign investments shall submit investment information to the competent commercial department through the enterprise registration system and the enterprise credit information publicity system.

Meanwhile, according to Article 11 of the Measures for Reporting Foreign Investment Information, which came into effect on the same day, after the initial information of foreign-invested enterprises has changed, "foreign-invested enterprises should submit change reports through the enterprise registration system when they apply for enterprise change registration (filing)"; according to Article 12: "When a foreign-invested enterprise submits a change report, it shall submit the changes in the basic information of the enterprise, the information of investors and their actual controllers, and the information of investment transactions."

In view of the fact that the shareholders of the Defendant 1 have changed, the Defendant 1 should go through the information reporting procedures according to the above requirements, that is, submit the change report through the enterprise registration system when registering (filing) the enterprise change.

**3、 The Defendant 2 has the corresponding obligation of assistance and cooperation.**

（1） Regarding the cooperation and assistance obligation in the enterprise change registration

According to Article 27 of the Regulations of the People's Republic of China on the Administration of Company Registration: When applying for change registration, a company shall submit the following documents to the company registration authority: (1) **the application for change registration signed by the legal representative of the company**; (2) the change resolution or decision made in accordance with the Company Law;(3) other documents required by the State Administration for Industry and Commerce. **If the company change registration items involve revisions of the articles of association, the revised articles of Association or amendments to the articles of Association signed by the legal representative of the company shall be submitted**. If the change registration items are subject to approval before registration in accordance with laws, administrative regulations or decisions of the State Council, relevant approval documents shall also be submitted to the company registration authority. In addition, in the process of enterprise change registration, the registration authority will also require the enterprise to submit a power of attorney and an application for registration with the official seal of the company. Meanwhile, if the shareholder change registration of a foreign-invested enterprise also involves the change of business license, it should also submit the original business license.

In view of the fact that the Defendant 2 Xu Liangyan is the legal representative of Sijihuacheng, and has expressed his intention on behalf of Sijihuacheng, he should hold the corresponding original business license and official seal of Sijihuacheng. When handling the industrial and commercial change registration of Sijihuacheng, Sijihuacheng should submit the corresponding application registration documents signed by the legal representative or stamped with the official seal of Sijihuacheng, and provide the original business license. If the Defendant 2 fails to perform the corresponding assistance and cooperation obligations, Sijihuacheng will not be able to complete the corresponding industrial and commercial change registration. In view of this, the Defendant 2 should fulfill the corresponding obligation of assistance and cooperation in handling enterprise change registration of Sijihuacheng.

（2） Regarding the obligation of cooperation and assistance in information reporting

As mentioned earlier, according to Article 11 of the Measures for Reporting Foreign Investment Information, foreign-invested enterprises should submit change reports through the enterprise registration system when they register (file) the changes of enterprises.

The registration system for enterprises in Shanghai to handle such information reports is "Shanghai Unified Online Government Service" (website: http://yct.sh.gov.cn/netdzhy/login/loginSww.do ). According to the information displayed on the home page of the system, to handle the information reporting, it is necessary "for the target enterprise to log in to the reporting interface using the legal person-certificate, electronic business license, enterprise identity verification, etc., and submit the change report.

As the Defendant 2 is the legal representative of Sijihuacheng, he should hold the necessary documents such as legal person certificate and electronic business license. If the Defendant 2 fails to fulfill the corresponding obligation of assistance and cooperation, Sijihuacheng will not be able to fulfill the corresponding obligation of information reporting. In view of this, the Defendant 2 should handle the corresponding information reporting on Sijihuacheng and fulfill the corresponding obligation of cooperation and assistance.

*******************

To sum up, the plaintiff's claim has sufficient factual basis and legal basis, and the Plaintiff requests your court to support all the plaintiff's claims according to law on the basis of finding out the facts, so as to safeguard the legitimate rights and interests of the plaintiff.

To
Shanghai Fengxian District People's Court

**Greencourt Properties Co., Ltd.**

_____
Lawyer Gu Yi/Lawyer Liu Jiadi
May 28, 2020



TRANSPERFECT

City of New York, State of New York, County of New York

I, Jacqueline Yorke, hereby certify that the document "**1-1 Post Hearing Brief（First Submission）-20200526 -final-JUNHE-c2**" is, to the best of my knowledge and belief, a true and accurate translation from Chinese into English.

Jacqueline Yorke
(Currently situated in the County of New York)

Sworn to before me remotely this
August 27, 2020

Signature, Notary Public
(Currently situated in the County of New York)

WENDY POON
NOTARY
NO. 01PO6356754
QUALIFIED IN
QUEENS COUNTY
COMM. EXP.
04-03-2021
PUBLIC
STATE OF NEW YORK

Stamp, Notary Public



中国上海石门一路 288 号
兴业太古汇香港兴业中心一座 26 层
邮编：200041
电话：(86-21) 5298 5488
传真：(86-21) 5298 5492
iunhesh@iunhe.com

**原告绿庭置业有限公司与被告一上海绿庭四季花城房地产开发有限公司、**
**被告二许良彦、第三人世邦有限公司**
**公司登记纠纷案件**
**原告提交之书面代理意见**

（2019）沪 0120 民初 10021 号

尊敬的合议庭，

　　君合律师事务所上海分所接受绿庭置业有限公司（下称"**原告**"或"**绿庭置业**"）的委托，指派本所顾依律师及刘佳迪律师，在贵院受理的原告与被告一上海绿庭四季花城房地产开发有限公司（下称"**被告一**"或"**四季花城**"）、被告二许良彦（下称"**被告二**"）、第三人世邦有限公司（下称"**第三人**"或"**世邦公司**"）之间的公司登记纠纷案件[案号：（2019）沪 0120 民初 8611 号，下称"**本案**"]中，作为原告的代理人。在我们于贵院组织的证据交换及庭审中发表的相关意见基础上，我们向贵院提交如下书面代理意见，供合议庭评议时参考。

　　原告认为，原告与第三人之间于 2018 年 7 月 18 日签署的《股权转让协议》（下称"**案涉股权转让协议**"）已经成立并生效，且不具备法定无效情形，四季花城应当按照法律法规的要求，依法办理相应的股权转让变更登记及信息报告手续。具体理由如下：

**一、案涉股权转让协议已经合法成立且生效**

**1、四季花城其他股东已经放弃优先购买权**

　　四季花城为外商投资企业，投资总额共计 1250 万美元，注册资本为 775 万

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 北京总部 | 电话：(86-10) 8519-1300 | 上海分所 | 电话：(86-21) 5298-5488 | 深圳分所 | 电话：(86-755) 2587-0765 | 广州分所 | 电话：(86-20) 2805-9088 |
| | 传真：(86-10) 8519-1350 | | 传真：(86-21) 5298-5492 | | 传真：(86-755) 2587-0780 | | 传真：(86-20) 2805-9099 |
| 大连分所 | 电话：(86-411) 8250-7578 | 海口分所 | 电话：(86-898) 6851-2544 | 天津分所 | 电话：(86-22) 5990-1301 | 青岛分所 | 电话：(86-532) 6869-5000 |
| | 传真：(86-411) 8250-7579 | | 传真：(86-898) 6851-3514 | | 传真：(86-22) 5990-1302 | | 传真：(86-532) 6869-5010 |
| 成都分所 | 电话：(86-28) 6739-8000 | 香港分所 | 电话：(852) 2167-0000 | 纽约分所 | 电话：(1-212) 703-8702 | 硅谷分所 | 电话：(1-888) 886-8168 |
| | 传真：(86-28) 6739 8001 | | 传真：(852) 2167-0050 | | 传真：(1-212) 703-8720 | | 传真：(1-888) 808-2168 |

www.junhe.com

元（单位：人民币，下同）。绿庭置业与世邦公司签署《股权转让协议》之前，绿庭置业出资 620 万美元，持有四季花城 80%股权，上海绿庭科创生态科技有限公司（下称"绿庭科创"）出资 155 万美元，持股 20%。

案涉股权转让协议签署之前，绿庭置业已经就该等股权转让事宜取得四季花城另一股东绿庭科创的同意，绿庭科创也已于同日与绿庭置业共同出具《股东会决定》，明确表示放弃 80%股权的优先购买权。因此，四季花城的全部股东对于案涉股权转让交易均已经明确表示同意。

**2、案涉股权转让协议无需审批，成立即生效**

2016 年之前，我国法律对于外商投资企业的监管适用许可审批制，因此，在 2016 年之前，涉及外商投资企业的股权转让合同需要经审批机关批准后才生效。至 2016 年 9 月 3 日，全国人大常务委员会通过了《关于修改<外资企业法>等四部法律的决定》，将不涉及国家规定实施准入管理措施的外商投资企业设立及变更事项取消审批要求，随后，商务部公布《外商投资企业设立及变更备案管理办法》，将审批制改为备案制。因此，2016 年 9 月后，外商投资负面清单之外的行业执行备案制，涉及该等外商投资企业的股权转让协议不再是经审批生效，备案仅为程序性要求，不影响股权转让协议的效力。

中国对于外商投资企业的管理执行负面清单制度，四季花城所在行业为房地产行业，根据国家发展和改革委员会及商务部发布的《外商投资准入特别管理措施(负面清单)(2018 年版)》及《外商投资准入特别管理措施(负面清单)(2019 年版)》，房地产企业均不属于负面清单之列。因此，案涉股权转让协议并不属于特别准入管理措施范畴，不需要取得任何部门的审批。

根据《中华人民共和国合同法》（下称"《合同法》"）第三十二条规定："当事人采用合同书形式订立合同的，自双方当事人签字或者盖章时合同成立。"鉴于案涉股权转让协议并不存在法律行政法规规定的审批生效情形，因此，案涉股权转让协议已于 2018 年 7 月 18 日双方签署时发生法律效力。

**3、有无董事会决议均不影响案涉股权转让协议的效力**

（1）董事会已不是四季花城的最高权力机构

尽管根据四季花城章程，股权转让事项属于董事会的决定权限范围。然而，四季花城章程的上述约定具有特殊的背景。四季花城章程依据《中华人民共和国

2

中外合资经营企业法》（下称"**《合资企业法》**"）制定，根据《合资企业法》，董事会是外商投资企业的最高权力机构。然而，《中华人民共和国外商投资法》（下称"**《外商投资法》**"）生效后，董事会已经不再是外商投资企业的最高权力机构：

2020 年 1 月 1 日起，《外商投资法》生效。根据第四十二条规定，《合资企业法》已经被依法废止；根据第三十一条规定"外商投资企业的组织形式、组织机构及其活动准则，适用《中华人民共和国公司法》、《中华人民共和国合伙企业法》等法律的规定"；同时，根据《中华人民共和国公司法》（下称"**《公司法》**"）第三十六条规定，股东会是公司最高权力机构。因此，目前，四季花城的最高权力机构已经不再是董事会，而是股东会。

（2） 董事会的决议仅为程序要件，不影响股权转让协议的有效性

即使依据原《合资企业法》，董事会的职权范围也并不包括对于股权转让协议的批准。《合资企业法》第六条规定"董事会的职权是按合营企业章程规定，讨论决定合营企业的一切重大问题：企业发展规划、生产经营活动方案、收支预算、利润分配、劳动工资计划、停业，以及总经理、副总经理、总工程师、总会计师、审计师的任命或聘请及其职权和待遇等"，以上法定职权范围并不包括股权转让事项。并且，股东对于其持有的合资企业股权的处分，属于股东对于其自有财产的处分范围，并不属于合营企业的重大问题，显然不属于"合营企业一切重大问题"的范畴。

并且，根据《合资企业法》第六条第一款"合营企业设董事会，其人数组成由合营各方协商，在合同、章程中确定，并由合营各方委派和撤换"。以上可见，中外合资企业的董事是由"合营各方"，即股东方委派，因此，董事本质上是执行股东的意志，四季花城章程中尽管明确董事会决定公司股权转让事项，然而，该等约定仅为程序性要件，目的在于完善工商变更登记的程序。实际上，根据《合资企业法》第三条规定，中外合资企业的章程应由合营各方（股东方）签署，因此，公司章程原本就是公司股东的意思表示，四季花城全部股东均已经就案涉股权转让作出明确的意思表示，股东之间的合意已经足以说明，公司章程中有关董事会之于股权转让事项的职权约定，仅为程序要求，不足以影响股东的真实意思表示。

司法实践中，股权转让协议纠纷相关案件中，法院也认同：中外合资企业章程中对于董事会决议的要求仅为程序性要求，董事会决议并不能够决定股权转让协议的效力。例如，上海第二中级人民法院审理的蓝德威尔士联合有限公司与洛尔环境科技（上海）有限公司股权转让纠纷上诉案[案号：（2016）沪 02 民终 10017

号，下称"蓝德威尔案"]中（**详见附件 1**），法院认为：

"虽然洛尔公司合资合同及章程约定公司注册资本进行转让须经董事会决议一致通过。但根据城邦公司提供的《股份转让协议》及《承诺及担保书》，表明洛尔公司的三名股东对本案股权转让均不持异议，而三名股东对合资合同及公司章程的约定都是明知的。按照洛尔公司正常流程，在原法定代表人蒋志鹏卸任后，其新任法定代表人应当召集董事会就此事项进行决议。故造成本案所涉股权转让未经董事会决议并非城邦公司所致。**虽然洛尔公司的最高权力机构是董事会，但董事会系由各方股东委派组成，故就公司内部股权变动的重大事项，股东作为直接的权利主体才是最终的决定者，董事会决议仅仅是程序性的规定，并不妨碍本案所涉的《股份转让协议》的效力。**"

因此，无论是基于董事会职权的来源、四季花城章程中约定的本意，还是基于现有法律规定以及已有司法实践，无论四季花城董事会是否就案涉股权转让事项出具决议，均不影响案涉股权转让协议的效力。

（3） **四季花城董事会始终怠于履行职责，董事会决议不具备形成可能性**

四季花城董事由四名成员组成，但是四季花城董事会实际上不具备就案涉股权转让协议出具一致董事会决议的可能性。四季花城现有董事包括董事长许良彦、董事柯烨颖、董事柯铮夫及董事徐宏标。其中，柯铮夫是柯烨颖的叔叔；柯烨颖是在其父亲柯铮光去世后、于 2014 年 3 月 31 日成为四季花城的董事。根据四季花城章程第二十四条规定"注册资本的增加、转让"需要由董事会一致通过。就本案而言，绿庭置业向世邦公司转让的是其持有的四季花城全部股权，对应其出资的全部 620 万美元注册资本，根据章程约定，属于需要董事会一致通过的情形。然而，就本案客观情况来看，四季花城董事会完全不可能出具一致决议：

首先，四位董事就案涉股权转让事项意见不一致。根据世邦公司的庭审陈述，徐宏标并不实际掌握四季花城公章及证照，且与柯烨颖存在长期矛盾、冲突；同时，徐宏标是世邦公司在本案中的法定代表人，世邦公司在本案中表示认同原告提出的诉讼请求，认为案涉股权转让协议合法有效、四季花城应当办理相应的变更登记手续。因此，徐宏标对于案涉股权转让事项持有赞成态度，其与柯烨颖、许良彦及柯铮夫三位董事的对于案涉股权转让的态度显然不一致；结合两被告在本案中发表的相关意见，就案涉股权转让事项，三位董事许良彦、柯烨颖和柯铮夫均不赞同转让，而徐宏标则赞同转让，因此，四位董事根本不可能形成一致决议。

其次，四季花城董事长的行动表明，其并不会就案涉股权转让事项召集董事会进行表决。根据四季花城章程第十九条，董事会会议由董事长召集并主持，就本案而言，董事长许良彦即为本案被告，其代理人在本案中已经明确表明不认可案涉股权转让协议的效力，因此，其根本不可能就案涉股权转让协议事项召集董事会进行表决。事实上，就案涉股权转让事项，绿庭置业及相关实际控制人先后于 2018 年 7 月 19 日、2018 年 8 月 25 日、2019 年 11 月 8 日多次向四季花城及其董事/实际控制人发送函件，督促相关董事履行职责。然而，至今已经近两年，四季花城董事会仍然未就案涉股权转让事项进行表决。

以上足以说明，四季花城及其三位董事许良彦、柯烨颖及柯铮夫，事实上均在以各种方式阻止案涉股权转让的履行，四季花城董事会根本不可能就案涉股权转让事项进行任何形式的表决；退一步而言，即使进行表决，四季花城董事会的表决机制也决定了案涉股权转让协议在任何情形下也不会得到董事会的认可。因此，该等情形下，股东对于股权转让事项的权利已经实质上被剥夺，如按被告的主张，将四季花城章程的程序要求（即董事会决议）作为认定案涉股权转让协议的效力的要件之一，将导致股东的利益被实质上损害并导致四季花城的现有股东事实上根本无法处置持有的股权，损害股东的利益。

基于上述，案涉股权转让协议已经于签署当日依法发生法律效力，无论四季花城董事会是否就案涉股权转让事项作出意思表示，均不影响案涉股权转让协议的效力。本案被告主张案涉股权转让协议未经董事会批准因而未发生法律效力的抗辩，不应得到采纳。

**二、案涉股权转让协议并不存在法定无效情形**

**1、案涉股权转让协议不存在违反效力强制性法律规定的情形**

（1）被告并未说明案涉股权转让协议违反何等强制性规定

被告主张，根据《中华人民共和国民法总则》（下称"《民法总则》"）第一百五十三条规定"违反法律、行政法规的强制性规定的民事法律行为无效，但是该强制性规定不导致该民事法律行为无效的除外"，并据此主张案涉股权转让协议无效。然而，《民法总则》第一百五十三条适用的前提是"违反法律、行政法规的强制性规定"，被告始终未能向法院说明，案涉股权转让协议到底违反哪条法律、行政法规的强制性规定。

根据《合同法》第五十二条第（五）款规定，违反法律、行政法规强制性规

定的合同无效；同时，根据《最高人民法院关于适用<中华人民共和国合同法>若干问题的解释（二）》第十四条规定："合同法第五十二条第（五）项规定'强制性规定'，是指效力性强制性规定。"结合《最高人民法院关于印发<全国法院民商事审判工作会议纪要>的通知》（下称"《九民纪要》"）第 30 条："人民法院在审理合同纠纷案件时，要依据<民法总则>第 153 条第 1 款和合同法司法解释（二）第 14 条的规定慎重判断"强制性规定"的性质，特别是要在考量强制性规定所保护的法益类型、违法行为的法律后果以及交易安全保护等因素的基础上认定其性质。"

可见，无论是基于《民法总则》、《合同法》还是《九民纪要》，合同因违反法律法规而无效的前提，都是首先要有相应的"强制性规定"，并且，该等强制性规定所保护的法益属于国家应予强制性保护的范围，如涉及国家安全、市场秩序、国家宏观政策等公序良俗。然而，就本案而言，被告始终未能向法庭说明，案涉股权转让交易到底违反何等强制性规定。

至于被告主张的所谓特殊税务处理的问题，相应的规范为《财政部、国家税务总局关于企业重组业务企业所得税处理若干问题的通知》（下称"《59 号文》"），《59 号文》并未禁止特殊税务处理交易，而是对企业重组交易适用特殊税务处理安排提供了相应的指引，即，只要符合《59 号文》要求的特殊税务处理安排之交易，均可以适用相应的税务处理安排。因此，《59 号文》并不涉及企业重组相关交易的效力问题，是企业重组交易适用特殊税务处理的指引性文件，符合《59 号文》相应要求的交易，不仅不会被认定为无效，反而会因符合《59 号文》的条件而享受相应的特殊的税务处理政策。因此，《59 号文》与案涉股权转让协议的效力之间并无任何关联关系。

此外，特别需要说明的是，尽管绿庭置业及绿庭科创为四季花城名义上的股东，然而，四季花城的控制权早已在 428 协议签署之前就已经移交给柯铮光及徐宏标两位参股股东，这一点在 428 协议第 2.3.5 条中已经由各方确认；同时各方还对股权转让及托管安排作出约定，约定三年的股权转让过渡期。各方当时的考虑是：参股股东先全面接管四季花城，并通过良好经营四季花城公司获得营收、从而向参股股东分配红利，那么即使案涉股权转让交易适用特殊税务重组，参股股东将来在三年托管期届满后对外处分四季花城股权时产生的税负也足以通过前期的收取的红利覆盖，参股股东的利益并不会有任何减损。然而，事实上，柯铮光去世后，四季花城即陷入控制权争议，继承柯铮光之遗产的柯烨颖及其母亲全盘接管四季花城，徐宏标作为原始的参股股东无法控制四季花城，双方之间存在长期的矛盾和冲突，无法共同运营四季花城，导致各方 428 协议项下原有约定的愿景无法实现，这完全是柯烨颖拒绝认可及执行 428 协议、拒绝执行香港仲

裁裁决所导致。即使案涉股权转让交易将来适用特殊税务处理，由此产生的税款增加也是柯烨颖咎由自取的结果，与案涉股权转让协议项下的交易安排不存在任何关联性。

（2）　股权转让协议生效后才产生完税问题，是否完税与协议效力无关

被告主张涉案股权转让协议因未进行税务申报而未能发生合法效力，该等抗辩系本末倒置，根本无法成立：

首先，税收核定发生于股权转让协议生效后、办理变更登记之时。根据《国家税务总局关于贯彻落实企业所得税法若干税收问题的通知》(国税函[2010]79 号)第三条规定："关于股权转让所得确认和计算问题　**企业转让股权收入，应于转让协议生效、且完成股权变更手续时，确认收入的实现**。转让股权收入扣除为取得该股权所发生的成本后，为股权转让所得。企业在计算股权转让所得时，不得扣除被投资企业未分配利润等股东留存收益中按该项股权所可能分配的金额。"因此，根据税务实践，股权转让协议的生效在先、股权转让收入确认（即税务核定）在后，并且，只有股权转让协议办理转让登记时，才会产生税款额确认问题。因此，股权转让交易是否完税与股权转让协议效力无关，恰恰相反，只有股权转让协议依法发生效力并办理变更登记，才会产生税务核定问题。

其次，税务核定金额取决于税务机关对于目标公司股权实际价值的认定，而不取决于当事人转让协议中对于股权转让价格的约定。案涉股权转让交易为企业内部的重组。庭审中，被告也认可，案涉股权转让交易是整个绿洲投资企业重组的一部分。该等股权转让交易存在特殊性，至于是否能够适用《59 号文》的特殊税务处理，以及由此产生的税款应当如何承担、承担多少金额，均不取决于案涉股权转让协议的约定。中国的税务机关对于税款金额的核定，不受当事人之间在合同中约定的交易价格影响，税务机关通常会按照公允价值核定交易所得税款。

举个简单的例子，实践中存在大量的"一元"对价交易，但税务机关在实际核定税款时，绝对不会将"一元"认定为应纳税所得额，反而会按照公允价值确定，当事人之间的"一元"转让交易也并不因此而违反任何税收法规，也不会当然被认定为无效。同样，就案涉股权转让交易而言，当事人之间确定的股权转让交易价值为 620 万元美金，该等股权转让对价仅为当事人之间对于四季花城股权价值达成的合意，并不等同于四季花城股权的实际价值。

再者，现阶段仅有四季花城才掌握其股权的实际价值，无论是绿庭置业还是世邦公司均不掌握，无法按照其实际股权价值确认股权转让价格。事实上，根据

香港仲裁裁决第 4 项，仲裁庭判令申请人（即柯铮光之遗产、徐宏标）于裁决作出之日起的 2 个月内向相关的审批机关提供一份审计报告（即四季花城的审计报告），该等裁决命令的用意即在于确定四季花城的股权价值，以供审批机关相应核定税款。然而，四季花城的实际控制人至今仍然未能按裁决内容提供相应的审计报告，由此导致案涉股权转让交易至今无法完成税款核定的责任，应当由四季花城及其实际控制人承担。

最后，需要强调的是：无论如何，税务机关对于股权转让交易的税款核定，从来都不是股权转让合同的生效要件，案涉股权转让交易尚未完税，并不影响案涉股权转让交易的合法效力。被告以案涉股权转让交易尚未完成核税作为其主张案涉股权转让交易无效的理由，不仅没有任何法律依据，更是不符合基本的商业逻辑。

**2、案涉股权转让交易并未损害任何一方的合法利益**

被告主张案涉股权转让交易损害四季花城及其实际控制人的合法利益，因而导致无效，其主张完全不能成立：

**（1） 参股股东从未在仲裁阶段提出世邦公司的设立与约定不符**

世邦公司设立于 2009 年 11 月 5 日，早于 428 协议签署日 2010 年 4 月 28 日。并且，世邦公司成立之时，徐宏标及柯铮光都是世邦公司的董事，在 428 协议签署时，柯铮光及徐宏标均清楚知悉世邦公司的设立主体是绿庭置业而非绿洲投资。

被告在庭审中表示，柯铮光仅为董事而不是股东、无法证明柯铮光知悉世邦公司的设立主体，然而，被告的该等抗辩根本无法成立，且违背基本的商业逻辑——世邦公司是 80%股权转让的重要一环，柯铮光不可能在连世邦公司的股东都搞不清楚的情况下就在 428 协议中确认相应的交易结构。并且，四季花城及柯烨颖均非 428 协议的签署主体，其显然没有任何合理依据推断柯铮光不清楚世邦公司的真实股东。

事实上，香港仲裁裁决第 6 项命令要求控股股东促使绿庭置业向世邦公司转让四季花城 80%股权，符合参股股东提出的仲裁裁决，也与 428 协议约定一致。如果参股股东认为世邦公司的成立不符合 428 协议、认为该等股权转让事项不符合参股股东的利益，其理应在仲裁案件过程中提出。并且，从世邦公司在庭审中发表的意见来看，其在本案中的法定代表人徐宏标也从来不认为世邦公司的设立不符合 428 协议，而柯烨颖并非 428 协议当事人，其提出的意见，既与逻辑不符

合，也与事实不符，显然不应得到采信。

并且，香港仲裁案件历时 5 年多，2013 年立案、2018 年作出裁决，在长达五年的仲裁过程中，柯烨颖一方从未提出世邦公司的成立不符合 428 协议，而直到控股股东按照仲裁裁决命令执行时，其才提出该项意见，试图为案涉股权转让协议的执行制造阻碍。柯烨颖一方面在本案中主张世邦公司的成立不符合协议约定，另一方面又试图在美国申请执行香港仲裁裁决，其行为显然也自相矛盾。

鉴于香港仲裁裁决已经就案涉股权转让事宜作出有约束力的裁决，各方均应当按照香港仲裁裁决予以执行，绿庭置业向世邦公司转让四季花城 80%的股权，符合 428 协议，也符合香港仲裁裁决要求，并不会导致任何一方的利益受到损害。

（2） 四季花城不具有主张案涉股权转让协议无效的主体资格

如被告在庭审中确认，案涉股权转让交易是绿洲投资集团（下称"**绿洲投资**"）控股股东（俞乃奋、俞乃筠、俞乃雯）及参股股东（柯铮光、徐宏标）进行企业重组的交易安排之一，案涉股权转让交易属于各方在 2010 年 4 月 28 日签署的《关于执行<股份重组初步协议>的协议书》（下称"**428 协议**"）项下之一部分；事实上，世邦公司、喜盈国际集团有限公司及 Focus Town Limited 的设立，都是整个债务重组交易的一部分，三者不可分割。

值得注意的是，四季花城并非 428 协议项下的当事人。因此，四季花城在本案中主张所谓案涉股权转让交易损害四季花城的利益、所谓违反 428 协议，并不能够成立，其既然并非 428 协议的当事人，显然不应具备对 428 协议条款的意思进行解释的权利，也不具备对各方履行情况进行审查、提出意见的资格。四季花城仅为各方股东之间的交易标的，是股东对于自有资产的处分内容，作为目标公司，四季花城与其各股东间的股权转让协议之间并无利害关系，四季花城并不会因股东之间就股权的转让而受到任何利益损害，其无权主张案涉股权转让协议无效或违反 428 协议。

（3） 徐宏标同为参股股东，但其并不认为案涉股权转让协议损害其利益

徐宏标同样是参股股东，但其并不认为案涉股权转让协议损害其利益。在本案审理过程中，原告向世邦公司代理人发问，询问世邦公司在本案中的法定代表人徐宏标是否认为案涉股权转让损害其利益，世邦公司的代理人回答是，徐宏标并不认为案涉股权转让协议损害其利益。并且，即使不考虑世邦公司代理人的答复，从客观看，如果徐宏标认为案涉股权转让协议损害其利益，世邦公司根本

不会提出本案诉讼，也不会签署案涉股权转让协议。

在香港仲裁案件中，徐宏标与柯铮光同为仲裁案件申请人，由此足以说明，柯铮光与徐宏标的立场及利益大体是一致的。然而，对于案涉股权转让交易，徐宏标作为世邦公司的法定代表人，其与世邦公司显然持有相同立场，即其认可案涉股权转让交易的合法有效性，而并不认为案涉股权转让交易损害其任何利益。徐宏标作为参股股东，其在本案中通过世邦公司表达的立场足以证明：柯烨颖提出的所谓案涉股权转让协议损害参股股东利益的抗辩理由并不能够代表全体参股股东的立场和利益。

（4）柯烨颖不具有在本案中提出相关权利主张的资格

四季花城主张，案涉股权转让交易因损害柯烨颖的利益、导致柯烨颖将来的税费增加而无效。然而，柯烨颖根本不是本案当事人，四季花城也不具有代表柯烨颖在本案中提出相关权利主张的依据。

并且，柯烨颖甚至都不是 428 协议项下的当事人。柯烨颖仅是柯铮光的遗产管理人，并不当然取代柯铮光成为 428 协议项下的当事人。柯烨颖从其自身利益出发，对于 428 协议作出恶意解读、拒绝认可其父亲在 428 协议项下确认的相关交易安排，试图改变其父亲在 428 协议项下的意思表示，实则是以欲实现其私人利益而试图损害全体其他股东的合法利益。

因此，柯烨颖并非 428 协议项下当事人，其并未参与 428 协议的签署及履行，而仅是作为柯铮光的遗产管理人参与仲裁，并不当然继承柯铮光在 428 协议项下的主体地位，更是无权改变柯铮光的意思表示、无权对 428 协议的内容作出解释，更是无权对于控股股东对于 428 协议的履行情况提出挑战。

**三、案涉股权转让交易完全符合 428 协议 2.3.1 条及仲裁裁决命令**

原告之所以提出本案诉讼，其实质即为履行仲裁裁决第 5 项命令。根据仲裁裁决第 5 项命令，仲裁庭"命令第一被申请人（即绿洲投资及控股股东）安排及促使世邦公司（从裁决作出之日起的 2 个月内）收购第一被申请人的子公司绿庭置业所持有的四季花城 80%的股权。（4.28 协议第 2.3.1 条）"。

根据 428 协议第 2.3.1 条："绿洲投资已在香港新设立了世邦有限公司（世邦公司），并已经安排世邦公司收购了绿洲投资香港子公司绿庭置业有限公司所持有之上海绿庭四季花城房地产开发有限公司（以下简称'四季花城'）80%的股权。

该等股权收购完成后，绿洲投资应与喜盈国际集团和 Focus Town Limited 签署一份《股权购买权协议》，约定在下述第 2.3.2 款约定的托管期限届满后，将世邦公司 100%的股权以港币一元对价转让给喜盈国际集团有限公司和 Focus Town Limited。"

上述条款中"绿洲投资已在香港新设立了世邦有限公司（世邦公司）"，并不等同于绿洲投资直接设立世邦公司。事实上，绿洲投资是通过其 100%持股的绿庭置业新设世邦公司，该等情形下，绿洲投资间接持有世邦公司 100%的股权。因此，从事实情况来看，428 协议中表述为"绿洲投资已在香港新设立了世邦有限公司（世邦公司）"与实际情况并不相悖。

更何况，原告提交的证据显示，世邦公司设立于 2009 年 11 月 5 日，早于 428 协议签署日 2010 年 4 月 28 日；并且，世邦公司成立之时，徐宏标及柯铮光都是世邦公司的董事，在 428 协议签署时，柯铮光及徐宏标均清楚知悉世邦公司的设立主体是绿庭置业而非绿洲投资。被告在庭审中表示，柯铮光仅为董事而不是股东、无法证明柯铮光知悉世邦公司的设立主体，然而，被告的该等抗辩根本无法成立，且违背基本的商业逻辑——世邦公司是 80%股权转让的重要一环，柯铮光不可能在连世邦公司的股东都搞不清楚的情况下就在 428 协议中确认相应的交易结构。并且，四季花城及柯烨颖均非 428 协议的签署主体，其显然没有任何合理依据推断柯铮光不清楚世邦公司的真实股东。

并且，同为世邦公司的董事及参股股东、428 协议的签署主体，徐宏标对此事实并不予以否认，其认可原告在本案中的主张，即在 428 协议签署之初，其当然知晓世邦公司是绿庭置业设立。因此，徐宏标通过世邦公司做出的确认已经能够充分证明，世邦公司的设立并不违反 428 协议。

事实上，在柯铮光及徐宏标提出仲裁申请时，其特别在第四项仲裁请求中明确主张要求由世邦公司收购绿庭置业持有的四季花城 80%股权。特别是，柯铮光（去世后变更为其遗产管理人）在香港仲裁案件中均委托香港大律师全程参与案件审理，案涉 80%的股权转让是仲裁案件中的重要争议焦点，世邦公司的成立是否符合参股股东的利益、该等股权转让能否实现参股股东在 428 协议项下的权益，显然是关系参股股东切身利益的问题，无论是柯铮光还是其律师，都不可能连世邦公司的设立主体都没查明清楚就要求按照 2.3.1 条的约定进行股权转让。

因此，被告主张的，所谓柯铮光不知悉世邦公司的设立情况、世邦公司的设立不符合 428 协议的主张，显然与客观事实不符，且不符合基本的商业逻辑，更是与柯铮光在仲裁案件中提出的仲裁请求相违背，显然有违诚信原则。

**四、美国诉讼程序不应阻碍本案股权转让交易完成变更登记**

被告提交的美国法院《备忘意见书》并未发生法律效力。并且，美国法院的任何裁决、命令在中国均不当然具有合法效力。更何况，从《备忘意见书》内容来看，该文件全文讨论的内容也只有仲裁裁决第 9 项关于金钱给付义务是否可以执行，而不涉及四季花城股权转让。并且，从《备忘意见书》内容来看，美国法院也仅是表明案涉仲裁裁决在美国具有可执行力，然而，这不能等同于美国法院否定了其他法域对于仲裁裁决的执行。事实上，根据我们了解的情况，美国法官已经明确向各方当事人表示，香港仲裁裁决当然也可以在其他法域申请执行。

事实上，原告及其实际控制人始终积极推动香港仲裁裁决在国内的后续执行，美国法院的命令无权干涉中国法院对本案的管辖权。中国及美国均是《承认及执行外国仲裁裁决公约》（下称"《纽约公约》"）的成员国，中国法院同样有权受理有关香港仲裁裁决的执行申请。该等情况下，在案涉股权转让协议签署后、四季花城拒不履行相应的变更登记义务的情况下，绿庭置业选择向法院提起诉讼，要求四季花城履行相应变更登记手续，与香港仲裁裁决并不相悖，也与美国的法律程序并不冲突。并且，即使不考虑香港仲裁裁决，目标公司股东之间进行股权转让后，目标公司原本也具有履行变更登记的责任，在目标公司不予配合导致发生争议时，中国法院当然享有就股权变更登记事项进行裁决的管辖权。

至于美国法院的相关程序，完全是柯烨颖为制造香港仲裁裁决的履行障碍而别有用意提出的相关法律行动，其目的是为制造绿洲投资、俞乃奋等控股股东不履行仲裁裁决的假象，而在美国法院寻求相应的金钱赔偿或对绿洲投资、俞乃奋的相应处罚，此举显然违反公平原则及诚实信用原则，不应得到贵院的支持。并且，从客观上而言，美国法院显然对于中国的法律并不了解，涉及中国境内公司的股权转让事项如在美国执行，将不可避免产生法律适用、税收监管等不必要的冲突，本案所涉股权转让交易也并不是适合在美国执行。

此外，客观上而言，案涉股权转让交易的标的为中国的外商投资企业，相应的工商变更登记程序等仅能在中国境内完成。本案为公司变更登记纠纷，即使美国法院认为仲裁裁决具有可执行性，但相应的公司变更登记程序显然不可能在美国相应完成。如柯烨颖不认可案涉股权转让协议、拒绝安排其控制的四季花城办理相应的变更登记，而寻求在美国法院解决相应的问题，将导致案涉股权转让陷入恶性循环——美国法院无法执行四季花城的工商变更登记，也由此导致案涉股权转让交易永远无法完成，这显然违背 428 协议的初衷：根据 428 协议，四季花城 100%的股权是控股股东向参股股东支付的对价之一，并且，将该等股权作为

交易对价之一也是参股股东提出的要求，且符合参股股东的利益需求。然而，柯烨颖在柯铮光去世后却试图改变各方达成的协议约定，强行要求在美国执行四季花城股权转让交易这一"不可能完成的任务"，柯烨颖试图阻碍 428 协议的履行、拒绝认可香港仲裁裁决的心态昭然若揭，其该等行为显然不应得到法庭的支持。

**五、被告主张的裁决履行顺序之抗辩不能成立**

根据香港仲裁裁决第 5 项命令，绿洲投资促使和安排世邦公司从裁决作出之日起 2 个月内收购绿庭置业所持有的四季花城 80%股权；第 6 项命令，绿洲投资与参股股东从裁决作出之日起的 2 周内签署及促使其子公司绿庭置业共同签署有关世邦公司的股权购买权协议及托管协议。

尽管上述裁决内容中有相应的期限要求，但该等期限要求并非裁决义务之履行顺序。四季花城的股权转让事项为涉外股权转让，且涉及工商变更登记及备案程序（仲裁裁决作出时仍然适用备案制），所耗费的时间相对较久，故仲裁庭设定 2 个月期限；然而，就股权购买权协议及托管协议的签署而言，其履行相对简单，仅需要完成协议并由各方盖章即能够完成，故仲裁庭设定 2 个星期的期限。因此，上述时间要求，并非裁决履行顺序，而是基于裁决义务履行的难易程度、为督促裁决义务的尽快履行之目的而设定的合理期限要求。

此外，仲裁裁决第 245 段对于裁决所涉相关股权转让、股权购买权协议及托管协议的签署顺序已经做出非常明确的认定。根据第 245 段：

"关于第 2.3.1 至 2.3.3 条，仲裁庭认为，有关四季花城的转让包括以下三个需要履行的步骤：
'(1) 首先，由绿洲投资成立的世邦公司收购绿庭置业持有的四季花城 80%股权（简称为 '**80%股权转让第一步**'）......
(2) 其次，由绿洲投资把世邦公司的股权转让给第一及第二申请人分别拥有的喜盈国际和 Focus Town（简称为 '**80%股权转让第二步**'）'"。

鉴于此，从上述第 245 段内容即可见，仲裁庭各项命令中的时间要求，并非创设裁决履行顺序，第 245 段的内容才是对裁决相应义务履行顺序的要求，即四季花城 80%的股权转让应当于第一步完成。

并且，事实上，控股股东早已将购买权协议及托管协议发送给参股股东方供其审阅，对此，世邦公司及其法定代表人也予以认可，然而，由于柯烨颖一方始终拒绝就购买权协议及托管协议的签署发表意见，故导致购买权协议及托管协议

也无法推进。柯烨颖一方面主张本案因未签署购权协议及托管协议而不符合执行条件，另一方面又拒不配合购权协议及托管协议的签署，执行"双重标准"，更进一步证明柯烨颖拒不履行 428 协议、不执行香港仲裁裁决的意图。

**六、两被告具有完成变更登记的法定义务**

**1、被告一具有办理变更登记的法定义务**

根据《公司法》第三十二条第三款规定："公司应当将股东的姓名或者名称向公司登记机关登记；登记事项发生变更的，应当办理变更登记。未经登记或者变更登记的，不得对抗第三人。"因此，公司股东发生变更后，公司负有办理变更登记的法定义务。同时，根据《中华人民共和国公司登记管理条例》第二十六条规定："公司变更登记事项，应当向原公司登记机关申请变更登记。"就本案而言，四季花城的注册登记机关为上海市奉贤区市场监督管理局（下称"**奉贤监督管理局**"），因此，被告一应当就案涉股权转让事宜向奉贤监督管理局办理相应的变更登记。

并且，根据上述《公司法》第三十二条第三款"未经登记或者变更登记的，不得对抗第三人"，原告现已经不再是四季花城的股东，然而，原告却始终被错误登记为四季花城股东，被告迟迟不履行相应的变更登记义务，由此导致原告面临相应的法律风险（如被四季花城的债权人追究相应的股东责任）、对原告的利益造成损害。

**2、被告一应当履行信息报告义务**

根据 2020 年 1 月 1 日生效的《外商投资法》第三十四条：国家建立外商投资信息报告制度。外国投资者或者外商投资企业应当通过企业登记系统以及企业信用信息公示系统向商务主管部门报送投资信息。

同时，根据同日生效的《外商投资信息报告办法》第十一条规定，外商投资企业的初始信息发生变化后，"涉及企业变更登记（备案）的，外商投资企业应于办理企业变更登记（备案）时通过企业登记系统提交变更报告"；根据第十二条规定："外商投资企业提交变更报告，应当报送企业基本信息、投资者及其实际控制人信息、投资交易信息等信息的变更情况。"

鉴于被告一的股东已经发生变化，被告一理应按照上述规定的要求，相应办理信息报告手续，即于办理企业变更登记（备案）时通过企业登记系统提交变更

报告。

**3、被告二负有相应的协助及配合义务**

（1） 关于企业变更登记的配合及协助义务

根据《中华人民共和国公司登记管理条例》第二十七条：公司申请变更登记，应当向公司登记机关提交下列文件：（一）**公司法定代表人**签署的变更登记申请书；（二）依照《公司法》作出的变更决议或者决定；（三）国家工商行政管理总局规定要求提交的其他文件。**公司变更登记事项涉及修改公司章程的，应当提交由公司法定代表人签署的修改后的公司章程或者公司章程修正案。**变更登记事项依照法律、行政法规或者国务院决定规定在登记前须经批准的，还应当向公司登记机关提交有关批准文件。此外，企业变更登记过程中，登记机关会要求企业提交加盖公司公章的授权委托书、登记备案申请书，同时：由于外商投资企业的股东变更登记还涉及营业执照的变更，由此也需要提交营业执照原件。

鉴于被告二许良彦是四季花城的法定代表人，代表四季花城对外作出意思表示，其应当持有相应的营业执照原件及四季花城公章，在四季花城办理工商变更登记过程中，四季花城应当提交由法定代表人签署或加盖四季花城公章的相应申请变更登记文件，并提供营业执照原件，如被告二不履行相应的协助及配合义务，四季花城将无法完成相应的工商变更登记。鉴于此，被告二应当就四季花城办理企业变更登记履行相应的协助及配合义务。

（2） 关于信息报告的配合及协助义务

如前所述，根据《外商投资信息报告办法》第十一条，外商投资企业应于办理企业变更登记（备案）时通过企业登记系统提交变更报告。

上海地区的企业办理该等信息报告的登记系统为"上海一网通办"（网址：http://yct.sh.gov.cn/netdzhy/login/loginSww.do）。根据该系统首页显示的信息，办理信息报告，需要"目标企业使用法人一证通、电子营业执照、企业身份验证等登入填报界面，提交变更报告。"

鉴于被告二是四季花城的法定代表人，其应当持有法人一证通、电子营业执照等必备文件，如被告二不履行相应的协助及配合义务，四季花城也将无法完成相应的信息报告义务。有鉴于此，被告二应当就四季花城办理相应的信息报告履行相应的配合及协助义务。

**********************

综上所述，原告提出的诉讼请求具有充分的事实依据及法律依据，原告请求贵院在查明事实的基础上，依法支持原告的全部诉讼请求，以维护原告的合法权益。

此致
上海市奉贤区人民法院

**绿庭置业有限公司**

_____
顾依律师/刘佳迪律师
二零二〇年五月二十八日

# EXHIBIT 18



No. 288, First Shimen Road, Shanghai, China
26/F, Building 1, Hong Kong Xingye Center, Xingye Taikoo Hui
Postal code: 200041
Tel: (86-21) 5298 5488
Fax: (86-21) 5298 5492
junhesh@junhe.com

The Plaintiff -- Greencourt Properties Co., Ltd. vs.
Defendant 1 -- Shanghai Luting Sijihuacheng Real Estate Development Co., Ltd.,
Defendant 2 -- Xu Liangyan, and Third Person Shibang Co., Ltd.
Dispute Case over Company Registration
Supplementary Agency Opinions Submitted by the Plaintiff

(2019) Hu 0120 Min Chu No. 10021

**Dear Judicial Panel,**

Regarding the case accepted by your court of dispute over the company registration between the plaintiff and the defendant 1 - Shanghai Luting Sijihuacheng Real Estate Development Co., Ltd. (hereinafter referred to as "**defendant 1**" or "**Sijihuacheng**"), the defendant 2 - Xu Liangyan (hereinafter referred to as " **defendant 2**"), and the third party Shibang Co., Ltd. (hereinafter referred to as " **the third party**" [Case No.: (2019) Hu 0120 Min Chu No. 8611, hereinafter referred to as "**this case**"], the plaintiff submitted the written agency opinions to your court on May 26, 2020 (see the appendix of the agent opinions for details). On the basis of the above written agent opinions, the plaintiff further gives the following supplementary agent opinions on the validity of the equity transfer agreement involved in the case, which can be used as reference for your court to hear the case.

The plaintiff believes that the equity transfer agreement involved in the case is legal and valid, and does not constitute damage to the interests of any party. The main reasons are summarized as follows:

1.    **Shibang Company was established before the signing of the 428 Agreement. Xu Hongbiao and Ke Zhengguang, two minority shareholders, were both directors appointed by Greencourt Properties to Shibang Company at the beginning of Shibang Company's establishment. When the 428 Agreement was signed, they knew clearly that Shibang Company was 100% owned by Greencourt Properties and 100% indirectly owned by Oasis Investment. Sijihuacheng and its actual controller Ke Yeying have no right to deny the objective facts recognized by Ke Zhengguang and Xu Hongbiao at that time with their own understanding;**

2.    **Sijihuacheng is not a party to the 428 Agreement at all, and has no right to interpret the contents of the 428 Agreement. Moreover, Article 2.3.1 of the 428 Agreement, "Oasis Investment has established Shibang Co., Ltd. in Hong Kong", is only a statement of facts, not the contractual obligations of the parties under the contract; in addition, the contents of these factual statements are consistent with the objective situation. Oasis Investment directly holds 100% equity of the Greencourt Properties and indirectly holds 100% equity of the Shibang Company. Oasis Investment is the actual controller and actual founder of Shibang Company. The 428 Agreement stated that Oasis Investment established Shibang Company in full compliance with the objective situation and more in line with the**

Beijing Headquarters
    Tel: (86-10) 8519-1300
    Fax: (86-10) 8519-1350
Dalian Branch
    Tel: (86-411) 8250-7578
    Fax: (86-411) 8250-7579
Chengdu Branch
    Tel: (86-28) 6739-8000
    Fax: (86-28) 6739 8001

Shanghai Branch
    Tel: (86-21) 5298-5488
    Fax: (86-21) 5298-5492
Haikou Branch
    Tel: (86-898) 6851-2544
    Fax: (86-898) 6851-3514
Hong Kong Branch
    Tel: (852) 2167-0000
    Fax: (852) 2167-0050

Shenzhen Branch
    Tel: (86-755) 2587-0765
    Fax: (86-755) 2587-0780
Tianjin Branch
    Tel: (86-22) 5990-1301
    Fax: (86-22) 5990-1302
New York Branch
    Tel: (1-212) 703-8702
    Fax: (1-212) 703-8720

Guangzhou Branch
    Tel: (86-20) 2805-9088
    Fax: (86-20) 2805-9099
Qingdao Branch
    Tel: (86-532) 6869-5000
    Fax: (86-532) 6869-5010
Silicon Valley Branch
    Tel: (1-888) 886-8168
    Fax: (1-888) 808-2168

www.junhe.com

logic of commercial transactions.

3. **The equity transfer price and payment method of Shibang Company will not affect the tax verification results. The tax bureau's verification of the income tax payable by the equity transferor does not depend on the agreement of the parties on the equity transfer consideration in the equity transfer contract, let alone the payment method of the equity transfer price between the parties. What's more, Sijihuacheng has never submitted its annual audit report, and is insufficient to determine that the equity transfer price involved in the case is lower than its equity market value.**

4. **Even if the equity transfer in this case can be subject to special tax treatment, it is also the parties to the 428 agreement, including the true intention expressed by Ke Zhengguang and Xu Hongbiao. The equity transfer agreement involved in this case does not harm the interests of any party.**

5. **Ke Zhengguang and Xu Hongbiao are both minority shareholders under the 428 agreement, and their interests are consistent. If the signing of the 428 Agreement will cause Ke Yeying, the successor of Ke Zhengguang, to bear more taxes, so will Xu Hongbiao. However, Xu Hongbiao's position in this case is obviously different from Ke Yeying's. Xu Hongbiao recognizes the legal validity of the equity transfer agreement involved in this case, which can be known from his being the legal representative of Shibang Company in this case and authorizing Shibang Company to make an independent request under this case.**

6. **The essence of this case is caused by Ke Yeying's unilateral refusal to recognize his father Ke Zhengguang's intention under the 428 Agreement after inheriting his father's heritage. The court cannot condone the heir's arbitrary change of the intention of the decedent and the unilateral malicious interpretation of the previous agreement. Otherwise, this is an abuse of inheritance rules and a violation of the principle of good faith.**

The specific reasons are as follows:

**I. When the 428 Agreement was signed in 2010, the participating shareholders were clearly aware that Shibang Company was established by Greencourt Properties in 2009, and during the arbitration stage in 2013, none of the parties raised any objection to the establishment of Shibang Company**

Shibang Company was established on November 5, 2009, and the 428 Agreement was signed on April 28, 2010.

When Shibang Company was founded, Xu Hongbiao and Ke Zhengguang were both directors of the Shibang Company, appointed by the shareholder Greencourt Properties. Therefore, when the 428 Agreement was signed, both Ke Zhengguang and Xu Hongbiao knew clearly that the main body of the Shibang Company was Greencourt Properties, not Oasis Investment. In this regard, Xu Hongbiao, the legal representative of Shibang Company, also confirmed his knowledge of this fact through Shibang Company in the trial.

Order No. 6 of the Hong Kong Arbitration Award required the controlling shareholder to urge Greencourt Properties to transfer 80% of the shares of Sijihuacheng to Shibang Company, which is in line with the arbitration award put forward by the participating shareholders and consistent with the 428 Agreement. If the participating shareholders think that the establishment of Shibang Company does not conform to the April 28 Agreement and that such equity transfer matters do not conform to the interests of participating shareholders, they should have raised them in the process of arbitration. Moreover, judging from the opinions expressed by Shibang Company in the trial, Xu Hongbiao, its legal representative in this case, never thought that Shibang Company's establishment did not conform to the April 28 Agreement, and Ke Yeying was not a party to the April 28 Agreement, so his opinions are inconsistent with both logic and facts, and obviously should not be accepted.

## II. The statement in Article 2.3.1 of the 428 Agreement conforms to the objective situation, and this article is not the contractual obligation of the parties.

It is stated in Article 2.3.1 of the 428 Agreement that "Oasis Investment has established Shibang Co., Ltd. in Hong Kong, and has arranged Shibang Company to acquire 80% equity of Shanghai Luting Sijihuacheng Real Estate Development Co., Ltd. (hereinafter referred to as " Sijihuacheng") held by Greencourt Properties Co., Ltd., a subsidiary of Oasis Investment Hong Kong", which is only a statement of facts, and is a confirmation of objective conditions, but not the contractual obligations of the parties under the contract.

The contents of these factual statements are also consistent with the objective situation. Oasis Investment directly holds 100% equity of Greencourt Properties and indirectly holds 100% equity of Shibang Company. Oasis Investment is the actual controller and the actual founder of Shibang Company. The 428 Agreement stated that Oasis Investment established Shibang Company in full compliance with the objective situation and the logic of commercial transactions.

According to Article 2.3.1, the acquisition of 80% equity of Sijihuacheng by Shibang Company is an additional goal of all parties, which is the reason why the equity transfer agreement involved in the case was signed and the fifth order of the Hong Kong Arbitration Award was made.

## III. The equity transfer price and payment method will not affect the tax verification results, nor will the tax verification results affect the validity of the equity transfer agreement. The Sijihuacheng failed to provide the annual audit reports, which led to the failure of tax declaration for the equity transfer transaction involved in the case.

The defendant claimed that the Equity Transfer Agreement involved in the case failed to take legal effect due to the failure of tax declaration, and such defense was putting the cart before the horse and could not be established at all:

**First of all, the tax verification occurred after the equity transfer agreement came into effect and when the change registration was being handled.** According to Article 3 of the Notice of the State Administration of Taxation on Several Tax Issues Concerning the Implementation of the Enterprise Income Tax Law (Guo Shui Han [2010] No. 79): "With respect to the confirmation and calculation of equity transfer income**, when an enterprise transfers its equity, the realization of income from equity transfer shall be confirmed when the transfer agreement comes into effect and the formalities of equity change are completed.** The income from the transfer of equity is the income from the transfer of equity after deducting the cost incurred for obtaining the equity. When calculating the income from equity transfer, an enterprise shall not deduct the amount that may be distributed according to the equity in the retained earnings of shareholders such as undistributed profits of the invested enterprise."

Therefore, according to tax practice, the entry into force of the equity transfer agreement comes first, and the income from equity transfer is confirmed (i.e., tax verification) comes later. Moreover, only when the equity transfer agreement is registered for transfer will the tax amount be confirmed. Therefore, whether the equity transfer transaction is tax-paid or not has nothing to do with the effectiveness of the equity transfer agreement. On the contrary, only when the equity transfer agreement becomes effective according to law and changes are registered, the tax verification issue will arise.

**Secondly, the taxable income approved by taxation bureau depended on the tax authorities' determination of the actual value of the target company's equity, and did not depend on the agreement on equity transfer price in the parties' transfer agreement.** The equity transfer transaction involved in the case is an internal reorganization of the enterprise. During the trial, the defendant also acknowledged that the equity transfer transaction involved in the case was part of the reorganization of the whole Oasis Investment enterprise. Such equity transfer transaction is special. Whether the special tax treatment in Document No. 59 can be applied, and how and how much the tax incurred should be borne do not depend on the provisions of the Equity Transfer Agreement involved in the case. The verification of tax amount by Chinese tax authorities is not affected by the transaction price agreed in the contract between the parties, and the tax authorities usually verify the tax income from the transaction according to the fair value.

**Furthermore, at this stage, only Sijihuacheng knows the actual value of its equity, and neither Greencourt Properties nor Shibang Company would know it, so it is impossible to confirm the equity transfer price according to its actual equity value.** In fact, according to Paragraph 4 of the Hong Kong Arbitration Award, the arbitral tribunal ordered the applicants (i.e. the heir to Ke Zhengguang's legacy and Xu Hongbiao) to provide an audit report (i.e. the audit report of Sijihuacheng) to the relevant examination and approval authority within 2 months from the date of the award. The purpose of the award order is to determine the equity value of Sijihuacheng for the examination and approval authority to approve the tax accordingly. However, Ke Yeying, the actual controller of Sijihuacheng, still failed to provide the corresponding audit reports according to the ruling content, which led to the failure to complete the tax verification for the equity transfer transaction involved in the case, the responsibility of which should be borne by Sijihuacheng and its actual controller.

### IV. If special tax treatment can be applied, it is also the true intention of all parties under the 428 Agreement.

The special tax restructuring legal norm claimed by the plaintiff is the Notice of the Ministry of Finance and the State Administration of Taxation on Several Issues Concerning the Treatment of Enterprise Income Tax in Enterprise Restructuring Business (Cai Shui [2009] No.59) (hereinafter referred to as " No.59 Document").

According to No.59 Document:

Article 1: "The term **enterprise restructuring** as mentioned in this notice refers to transactions that have undergone major changes in the legal structure or economic structure of enterprises outside the daily business activities, including changes in the legal form of enterprises, debt restructuring, equity acquisition, asset acquisition, merger, division, etc. (3) Equity acquisition refers to an enterprise (hereinafter referred to as the acquiring enterprise) purchasing the equity of another enterprise (hereinafter referred to as the acquired enterprise) in order to achieve transaction of controlling the acquired enterprise. **The forms of paying consideration by the acquiring enterprise include equity payment, non-equity payment or a combination of the two.**"

Article 5 "V. If the enterprise restructuring meets the following conditions at the same time, the special tax treatment provisions shall apply: (1) It has a reasonable commercial purpose, and its main purpose is not to reduce, exempt or delay the payment of taxes. **(2) The proportion of assets or equity of the acquired, merged or divided parts conforms to the proportion stipulated in this notice.** (3) The original substantive business activities of the restructured assets shall not be changed within 12 consecutive months after the reorganization of the enterprise. (4) The proportion of the amount of equity payment involved in the consideration of the restructuring transaction is in accordance with the provisions of this notice. (5) The original major shareholders who have obtained equity payment in the reorganization of the enterprise shall not transfer the acquired equity within 12 consecutive months after the reorganization."

Article 6 "If the enterprise restructuring meets the conditions stipulated in Article 5 of this notice, the parties to the transaction may make special tax treatment for the **equity payment part** in their transaction according to the following provisions: ... (2) Equity acquisition: **the equity purchased by the acquiring enterprise is not less than 75% of the total equity of the acquired enterprise,** and the amount paid by the acquiring enterprise in the acquisition when it happens **is not less than 85% of the total transaction payment,** which can be handled according to the following provisions ...."

Article 7 "When an enterprise has **an equity and asset acquisition transaction between China and overseas (including Hong Kong, Macao and Taiwan), it should not only meet the conditions stipulated in Article 5 of this notice, but also meet the following conditions before it can choose to apply special tax treatment regulations:** (I) **Non-resident enterprise transfers its equity of an resident enterprise to another non-resident enterprise directly and 100% controlled by it,** which does not cause any change in the withholding tax burden of the income from the equity transfer in the future, and **the transferor's non-resident enterprise promises in writing to the competent tax authorities that it will not transfer its equity of the transferee's non-resident enterprise within 3 years (including 3 years)** ;"

As far as this case is concerned, the transaction arrangement under the 428 Agreement meets the requirements of the above-mentioned special tax restructuring, including:

(1)     Conformity with Article 1: 428 Agreement is an internal reorganization transaction, that is, the rearrangement of relevant legal entities held by the participating shareholders and the controlling shareholders;

(2)     Conformity with Article 5 and Article 6: The proportion of assets or equity of the acquired, merged or separated parts meets the requirement of not less than 75%, and the 80% equity of Sijihuacheng held by Greencourt Properties meets this requirement;

(3)     Conformity with Article 5 and Article 6: The consideration of the acquiring enterprise includes equity payment, which is not less than 85% of the total transaction payment. The payment method of the equity transfer transaction is 100% equity payment, which also meets this requirement;

(4)     Conformity with Article 7: The transferor Greencourt Properties will not transfer the equity of Shibang Company within three years. This is the reason for the "three-year" custody period stipulated in Article 2.3.3 of 428 Agreement.

It can be seen that even if the tax authorities think that the equity transfer transaction involved in the case can be subject to special tax treatment after approval, this is also the true intention of all parties, including Ke Zhengguang and Xu Hongbiao, under the 428 Agreement. Otherwise, it is not necessary for all parties to agree on the equity payment method and the three-year custody method under the 428 Agreement. Therefore, even if special tax treatment can be applied to the equity transfer transaction, it is consistent with the expectations of all parties when

signing the 428 Agreement in 2010, and will not harm the legitimate rights and interests of any party.

**5. Ke Zhengguang and Xu Hongbiao are both participating shareholders with the same interests. Xu Hongbiao recognizes the equity transfer transaction involved in the case, which is sufficient for judging that the equity transfer transaction involved in the case complies with the 428 Agreement and will not harm the interests of participating shareholders.**

Xu Hongbiao is also a participating shareholder, but he does not thinks that the Equity Transfer Agreement involved in the case harms his interests. During the trial of this case, the Plaintiff asked the agent of Shibang Company whether Xu Hongbiao, the legal representative of Shibang Company in this case, thought that the equity transfer involved in the case harmed his interests. The agent of Shibang Company replied that Xu Hongbiao did not think that the Equity Transfer Agreement involved in the case harmed his interests. Moreover, even without considering the reply from the agent of Shibang Company, from an objective point of view, if Xu Hongbiao thinks that the Equity Transfer Agreement involved in the case harms his interests, Shibang Company will not bring a lawsuit or sign the Equity Transfer Agreement involved in the case at all.

In the Hong Kong arbitration case, Xu Hongbiao and Ke Zhengguang were both applicants in the arbitration case, which is sufficient to show that Ke Zhengguang and Hong Xu's position and interests are generally consistent. However, Xu Hongbiao, as the legal representative of Shibang Company, obviously holds the same position as Shibang Company, that is, he recognizes the legal validity of the equity transfer transaction, and does not think that the equity transfer transaction damages any of his interests. As a participating shareholder, Xu Hongbiao's position expressed by Shibang Company in this case is sufficient to prove: Ke Yeying's so-called defense that the Equity Transfer Agreement damages the interests of participating shareholders can't represent the positions and interests of all participating shareholders.

**Before the trial of this case, the plaintiff submitted an application for adding a third person to your court, including adding Xu Hongbiao and Ke Yeying as the third persons in this case, so that your company can find out the facts. However, your court has never agreed. If the court does not recognize Xu Hongbiao's expression of intention in this case through Shibang Company, Xu Hongbiao should be added to participate in the lawsuit in this case.**

**VI. Ke Yuying unilaterally denied his father's intention, which is an abuse of inheritance rules and violation of the principle of good faith, and should not be supported**

Sijihuacheng claims that the equity transfer transaction involved in the case is invalid because it damages Ke Yeying's interests and causes Ke Yeying's future tax increase. However, Ke Yeying is neither a party to the case nor a party to the 428 agreement, and he has no right to change the contents confirmed and the meaning expressed by her father under the 428 agreement.

Ke Yeying is not even a party in any of the clauses under the 428 agreement. Ke Yeying is only the estate administrator of Ke Zhengguang, and does not of course replace Ke Zhengguang as a party under the April 28 Agreement. Proceeding from his own interests, Ke Yeying maliciously interpreted the April 28 Agreement, refused to recognize the relevant transaction arrangements confirmed by his father under the April 28 Agreement, and tried to change his father's intention under the April 28 Agreement. In fact, he tries to harm the legitimate interests of all other shareholders in order to realize his private interests.

Therefore, Ke Yeying is not a party under the April 28 Agreement, and has not participated

in the signing and implementation of the April 28 Agreement, but only participated in arbitration as Ke Zhengguang's estate administrator, who does not of course inherit Ke Zhengguang's subject position under the April 28 Agreement, and has no right to change Ke Zhengguang's expression of intention, explain the contents of the April 28 Agreement, and challenge the controlling shareholder's implementation of the April 28 Agreement.

*******************

To sum up, the plaintiff's claim has sufficient factual basis and legal basis, and the Plaintiff requests your court to support all the plaintiff's claims according to law on the basis of finding out the facts, so as to safeguard the legitimate rights and interests of the plaintiff.

To
Shanghai Fengxian District People's Court

**Greencourt Properties Co., Ltd.**

_____
Lawyer Gu Yi/Lawyer Liu Jiadi
June 25, 2020



TRANSPERFECT

City of New York, State of New York, County of New York

I, Jacqueline Yorke, hereby certify that the document "**1-2 Post Hearing Brief(Second Submission)_final_补充代理意见-c2**" is, to the best of my knowledge and belief, a true and accurate translation from Chinese into English.

Jacqueline Yorke
(Currently situated in the County of New York)

Sworn to before me remotely this
August 27, 2020

Signature, Notary Public
(Currently situated in the County of New York)

WENDY POON
NOTARY
NO. 01PO6356754
QUALIFIED IN
QUEENS COUNTY
COMM. EXP.
04-03-2021
PUBLIC
STATE OF NEW YORK

Stamp, Notary Public



君合律师事务所

中国上海石门一路 288 号
兴业太古汇香港兴业中心一座 26 层
邮编：200041
电话：(86-21) 5298 5488
传真：(86-21) 5298 5492
iunhesh@iunhe.com

**原告绿庭置业有限公司与被告一上海绿庭四季花城房地产开发有限公司、**
**被告二许良彦、第三人世邦有限公司**
**公司登记纠纷案件**
**原告提交之补充代理意见**

（2019）沪 0120 民初 10021 号

**尊敬的合议庭，**

就贵院受理的原告与被告一上海绿庭四季花城房地产开发有限公司(下称"**被
告一**"或"**四季花城**")、被告二许良彦（下称"**被告二**"）、第三人世邦有限公司（下
称"**第三人**"或"**世邦公司**"）之间的公司登记纠纷案件[案号：（2019）沪 0120 民初
8611 号，下称"**本案**"]中，原告已经于 2020 年 5 月 26 日向贵院递交书面代理意
见（详见本代理意见附件）。在上述书面代理意见的基础上，原告就案涉股权转让
协议效力问题进一步发表如下补充代理意见，供贵院审理本案时参考。

原告认为，案涉股权转让协议合法有效，并不构成对任何一方利益的损害，
主要理由概括如下：

1、**世邦公司成立在先、428 协议签署在后，徐宏标及柯铮光两位小股东均是**
**世邦公司成立之初由绿庭置业委派至世邦公司的董事，在 428 协议签署时，其清**
**楚知悉世邦公司是绿庭置业 100%持股、绿洲投资间接 100%持股。四季花城及其**
**实际控制人柯烨颖，无权以其自行理解的内容，否认当时的柯铮光及徐宏标认知**
**的客观事实；**

2、**四季花城根本不是 428 协议的当事人，无权对 428 协议条款内容作出限**
**缩解释。并且，428 协议第 2.3.1 条"绿洲投资已在香港设立了世邦有限公司"内容，**

| 北京总部 | 电话：(86-10) 8519-1300 | 上海分所 | 电话：(86-21) 5298-5488 | 深圳分所 | 电话：(86-755) 2587-0765 | 广州分所 | 电话：(86-20) 2805-9088 |
| | 传真：(86-10) 8519-1350 | | 传真：(86-21) 5298-5492 | | 传真：(86-755) 2587-0780 | | 传真：(86-20) 2805-9099 |
| 大连分所 | 电话：(86-411) 8250-7578 | 海口分所 | 电话：(86-898) 6851-2544 | 天津分所 | 电话：(86-22) 5990-1301 | 青岛分所 | 电话：(86-532) 6869-5000 |
| | 传真：(86-411) 8250-7579 | | 传真：(86-898) 6851-3514 | | 传真：(86-22) 5990-1302 | | 传真：(86-532) 6869-5010 |
| 成都分所 | 电话：(86-28) 6739-8000 | 香港分所 | 电话：(852) 2167-0000 | 纽约分所 | 电话：(1-212) 703-8702 | 硅谷分所 | 电话：(1-888) 886-8168 |
| | 传真：(86-28) 6739 8001 | | 传真：(852) 2167-0050 | | 传真：(1-212) 703-8720 | | 传真：(1-888) 808-2168 |

www.junhe.com

仅为事实陈述，而非合同项下当事人的合同义务；并且，该等事实陈述内容也与客观情况一致，绿洲投资直接持有绿庭置业 100%股权，间接持有世邦公司 100%股权，绿洲投资就是世邦公司的实际控制人及实际设立者，428 协议表述为绿洲投资设立世邦公司完全符合客观情况，更符合商业交易逻辑。

3、世邦公司股权转让价款及其支付方式并不会影响税务核定结果。税务局对于股权转让方的应缴纳所得税的核定并不取决于当事人在股权转让合同中对于股权转让对价的约定，更不取决于当事人之间的股权转让价款支付方式。更何况，四季花城从未提交其审计报告，不足以认定案涉股权转让价款低于其股权市场价值。

4、即使本案股权转让能够适用特殊税务处理，也是 428 协议当事人，包括柯铮光及徐宏标的真实意思表示，案涉股权转让协议不构成对任何一方利益的损害。

5、柯铮光及徐宏标同为 428 协议项下的小股东，其利益一致。如果 428 协议的签署将导致柯铮光的继承人柯烨颖承受更多税款，那么对徐宏标也一样。然而，徐宏标在本案中明显呈现与柯烨颖不同的立场，徐宏标认可案涉股权转让协议的合法效力，从其作为世邦公司在本案中的法定代表人、授权世邦公司在本案项下提出独立请求即可得知。

6、本案实质是柯烨颖继承其父亲遗产后，单方拒绝认可其父亲柯铮光在 428 协议项下的意思表示所引发，法院不能纵容继承人任意改变被继承人的意思表示、单方恶意对于在先协议作出恶意解读的行为，否则，这是对继承规则的滥用，更是对诚实信用原则的违反。

具体理由如下：

**一、428 协议于 2010 年签署时，参股股东均明确知悉世邦公司是绿庭置业在 2009 年设立，且 2013 年仲裁阶段，没有任何一方对于世邦公司的设立提出异议**

世邦公司设立于 2009 年 11 月 5 日，而 428 协议签署于 2010 年 4 月 28 日。

世邦公司成立之时，徐宏标及柯铮光都是世邦公司的董事，系股东绿庭置业委派，因此，在 428 协议签署时，柯铮光及徐宏标均清楚知悉世邦公司的设立主体是绿庭置业而非绿洲投资。对此，世邦公司的法定代表人徐宏标也通过世邦公司在庭审中确认其知悉这一事实。

香港仲裁裁决第 6 项命令要求控股股东促使绿庭置业向世邦公司转让四季花城 80%股权，符合参股股东提出的仲裁裁决，也与 428 协议约定一致。如果参股股东认为世邦公司的成立不符合 428 协议、认为该等股权转让事项不符合参股股东的利益，其理应在仲裁案件过程中提出。并且，从世邦公司在庭审中发表的意见来看，其在本案中的法定代表人徐宏标也从来不认为世邦公司的设立不符合 428 协议，而柯烨颖并非 428 协议当事人，其提出的意见，既与逻辑不符合，也与事实不符，显然不应得到采信。

**二、428 协议第 2.3.1 条陈述符合客观情况，且该条不是当事人的合同义务**

428 协议第 2.3.1 条 "绿洲投资已在香港设立了世邦有限公司，并已安排世邦公司收购了绿洲投资香港子公司绿庭置业有限公司所持有之上海绿庭四季花城房地产开发有限公司（以下称"**四季花城**"）80%的股权"内容，仅为事实陈述，是对客观情况的确认，而非合同项下当事人的合同义务。

该等事实陈述内容也与客观情况一致，绿洲投资直接持有绿庭置业 100%股权，间接持有世邦公司 100%股权，绿洲投资就是世邦公司的实际控制人及实际设立者，428 协议表述为绿洲投资设立世邦公司完全符合客观情况，也符合商业交易逻辑。

从第 2.3.1 条来看，由世邦公司收购四季花城 80%股权是各方追加的目标，这也正是案涉股权转让协议签署的原因、也是香港仲裁裁决第 5 项命令作出的原因。

**三、股权转让价款及支付方式不会影响税收核定结果，税收核定结果也不会影响股权转让协议效力，四季花城怠于提供审计报告才导致案涉股权转让交易无法进行税务申报**

被告主张涉案股权转让协议因未进行税务申报而未能发生合法效力，该等抗辩系本末倒置，根本无法成立：

**首先，税收核定发生于股权转让协议生效后、办理变更登记之时。**根据《国家税务总局关于贯彻落实企业所得税法若干税收问题的通知》(国税函[2010]79 号)第三条规定："关于股权转让所得确认和计算问题　**企业转让股权收入，应于转让协议生效、且完成股权变更手续时，确认收入的实现。**转让股权收入扣除为取得该股权所发生的成本后，为股权转让所得。企业在计算股权转让所得时，不得扣除被投资企业未分配利润等股东留存收益中按该项股权所可能分配的金额。"因

此，根据税务实践，股权转让协议的生效在先、股权转让收入确认（即税务核定）在后，并且，只有股权转让协议办理转让登记时，才会产生税款确认问题。因此，股权转让交易是否完税与股权转让协议效力无关，恰恰相反，只有股权转让协议依法发生效力并办理变更登记，才会产生税务核定问题。

**其次，税务核定的应纳税所得额，取决于税务机关对于目标公司股权实际价值的认定，而不取决于当事人转让协议中对于股权转让价格的约定。**案涉股权转让交易为企业内部的重组。庭审中，被告也认可，案涉股权转让交易是整个绿洲投资企业重组的一部分。该等股权转让交易存在特殊性，至于是否能够适用《59号文》的特殊税务处理，以及由此产生的税款应当如何承担、承担多少金额，均不取决于案涉股权转让协议的约定。中国的税务机关对于税款金额的核定，不受当事人之间在合同中约定的交易价格影响，税务机关通常会按照公允价值核定交易所得税款。

**再者，现阶段仅有四季花城才掌握其股权的实际价值，无论是绿庭置业还是世邦公司均不掌握，无法按照其实际股权价值确认股权转让价格。**事实上，根据香港仲裁裁决第4项，仲裁庭判令申请人（即柯铮光之遗产、徐宏标）于裁决作出之日起的2个月内向相关的审批机关提供一份审计报告（即四季花城的审计报告），该等裁决命令的用意即在于确定四季花城的股权价值，以供审批机关相应核定税款。然而，四季花城的实际控制人柯烨颖至今仍然未能按裁决内容提供相应的审计报告，由此导致案涉股权转让交易至今无法完成税款核定的责任，应当由四季花城及其实际控制人承担。

**四、如果能够适用特殊税务处理，也是各方在428协议项下的真实意思表示**

原告主张的特殊税务重组法律规范为，《财政部、国家税务总局关于企业重组业务企业所得税处理若干问题的通知》（财税[2009]59号）（下称"**59号文**"）。

根据《59号文》：

第一条："本通知所称**企业重组**，是指企业在日常经营活动以外发生的法律结构或经济结构重大改变的交易，包括企业法律形式改变、债务重组、股权收购、资产收购、合并、分立等......（三）股权收购，是指一家企业（以下称为收购企业）购买另一家企业（以下称为被收购企业）的股权，以实现对被收购企业控制的交易。**收购企业支付对价的形式包括股权支付、非股权支付或两者的组合。**"

第五条 "五、企业重组同时符合下列条件的，适用特殊性税务处理规定：

（一）具有合理的商业目的，且不以减少、免除或者推迟缴纳税款为主要目的。**（二）被收购、合并或分立部分的资产或股权比例符合本通知规定的比例。**（三）企业重组后的连续 12 个月内不改变重组资产原来的实质性经营活动。（四）重组交易对价中涉及股权支付金额符合本通知规定比例。（五）企业重组中取得股权支付的原主要股东，在重组后连续 12 个月内，不得转让所取得的股权。"

第六条 "企业重组符合本通知第五条规定条件的，交易各方对其交易中的**股权支付部分**，可以按以下规定进行特殊性税务处理：...（二）股权收购，**收购企业购买的股权不低于被收购企业全部股权的 75%**，且收购企业在该股权收购发生时的**股权支付金额不低于其交易支付总额的 85%**，可以选择按以下规定处理......"

第七条 "企业发生**涉及中国境内与境外之间（包括港澳台地区）的股权和资产收购交易**，除应符合本通知第五条规定的条件外，还应同时符合下列条件，才可选择适用特殊性税务处理规定：（一）**非居民企业向其 100%直接控股的另一非居民企业转让其拥有的居民企业股权**，没有因此造成以后该项股权转让所得预提税负担变化，且**转让方非居民企业向主管税务机关书面承诺在 3 年（含 3 年）内不转让其拥有受让方非居民企业的股权**；"

就本案而言，428 协议项下的交易安排符合上述特殊税务重组的要求，包括：

(1) 符合第一条：428 协议是企业内部重组交易，即参股股东与控股股东对于各自持有的相关法律实体的重新安排；

(2) 符合第五条及第六条：被收购、合并或分立部分的资产或股权比例符合不低于 75%的要求，绿庭置业持有的四季花城股权为 80%正是满足这一要求；

(3) 符合第五条及第六条：收购企业的对价包括股权支付，且不低于不低于其交易支付总额的 85%，案涉股权转让交易的支付方式为 100%股权支付，也正是满足这一要求；

(4) 符合第七条：转让方绿庭置业三年内不转让世邦公司股权。这正是 428 协议第 2.3.3 条约定的"三年"托管期的原因。

可见，即使税务机关核定后认为案涉股权转让交易可以适用特殊税务处理，这也是各方，包括柯铮光、徐宏标在 428 协议项下的真实意思表示，否则，各方根本没有必要在 428 协议项下约定股权支付方式及三年托管方式。因此，即使案涉股权转让交易能够适用特殊税务处理，也与各方在 2010 年签署 428 协议之时的预期一致，并不会损害任何一方的合法权益。

**五、柯铮光与徐宏标同为参股股东，利益一致，徐宏标认可案涉股权转让交易，足以判断案涉股权转让交易符合 428 协议、不会损害参股股东利益**

徐宏标同样是参股股东，但其并不认为案涉股权转让协议损害其利益。在本案审理过程中，原告向世邦公司代理人发问，询问世邦公司在本案中的法定代表人徐宏标是否认为案涉股权转让损害其利益，世邦公司的代理人回答是，徐宏标并不认为案涉股权转让协议损害其利益。并且，即使不考虑世邦公司代理人的答复，从客观来看，如果徐宏标认为案涉股权转让协议损害其利益，世邦公司根本不会提出本案诉讼，也不会签署案涉股权转让协议。

在香港仲裁案件中，徐宏标与柯铮光同为仲裁案件申请人，由此足以说明，柯铮光与徐宏标的立场及利益大体是一致的。然而，对于案涉股权转让交易，徐宏标作为世邦公司的法定代表人，其与世邦公司显然持有相同立场，即其认可案涉股权转让交易的合法有效性，而并不认为案涉股权转让交易损害其任何利益。徐宏标作为参股股东，其在本案中通过世邦公司表达的立场足以证明：柯烨颖提出的所谓案涉股权转让协议损害参股股东利益的抗辩理由并不能够代表全体参股股东的立场和利益。

**本案开庭前，原告已经向贵院递交追加第三人申请，包括追加徐宏标及柯烨颖为本案第三人，以便于贵司查明事实，然而，贵院始终未能同意。如法院不认可徐宏标通过世邦公司在本案中作出的意思表示，应当追加徐宏标参加本案诉讼。**

**六、柯烨颖单方否认其父亲的意思表示，滥用继承规则，违反诚实信用原则，不应当得到支持**

四季花城主张，案涉股权转让交易因损害柯烨颖的利益、导致柯烨颖将来的税费增加而无效。然而，柯烨颖根本不是本案当事人，也不是 428 协议当事人，其无权改变其父亲在 428 协议项下确认的内容及作出的意思表示。

柯烨颖甚至都不是 428 协议项下的当事人。柯烨颖仅是柯铮光的遗产管理人，并不当然取代柯铮光成为 428 协议项下的当事人。柯烨颖从其自身利益出发，对于 428 协议作出恶意解读、拒绝认可其父亲在 428 协议项下确认的相关交易安排，试图改变其父亲在 428 协议项下的意思表示，实则是以欲实现其私人利益而试图损害全体其他股东的合法利益。

因此，柯烨颖并非 428 协议项下当事人，其并未参与 428 协议的签署及履行，而仅是作为柯铮光的遗产管理人参与仲裁，并不当然继承柯铮光在 428 协议项下

的主体地位,更是无权改变柯铮光的意思表示、无权对 428 协议的内容作出解释,更是无权对于控股股东对于 428 协议的履行情况提出挑战。

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

综上所述,原告提出的诉讼请求具有充分的事实依据及法律依据,原告请求贵院在查明事实的基础上,依法支持原告的全部诉讼请求,以维护原告的合法权益。

此致
上海市奉贤区人民法院

**绿庭置业有限公司**

_____
顾依律师/刘佳迪律师
二零二〇年六月二十五日

# EXHIBIT 19

**Morningside**
Translations

# TRANSLATION CERTIFICATION

Date: July 29, 2020

To whom it may concern:

This is to certify that the attached translation is an accurate representation of the documents received by this office. The translation was completed from:

- Chinese (PRC)

To:

- English (USA)

The documents are designated as:
- 20200316 A13028 Final Award

Eugene Li, Project Manager in this company, attests to the following:

"To the best of my knowledge, the aforementioned documents are a true, full and accurate translation of the specified documents."

_____
Signature of Eugene Li

Arbitration under the *2008 Hong Kong International Arbitration Centre Administered Arbitration Rules*

Case No.: HKIAC/A13028

| | |
|---|---|
| **Xu Hongbiao** | **First Claimant** |
| **Estate of Ke Zhengguang** | **Second Claimant** |
| | **(Collectively referred to as the "Claimants")** |
| | |
| **Oasis Investment Group Limited** | **First Respondent** |
| **(Oasis Investment Group Limited)** | |
| **Yu Stephany Naifen** | **Second Respondent** |
| **Yu Naiwen** | **Third Respondent** |
| **Yu Naijun** | **Fourth Respondent** |
| | **(Collectively referred to as the "Respondents")** |

---

### Final Award on Arbitration fees and Interest

---

### A. Preamble

1.      On February 28, 2018, the arbitral tribunal made a final award on the case (excluding the arbitration fees and interest). The final award was delivered to the parties by HKIAC on March 7, 2018.

2.      On December 19, 2018, the arbitration tribunal issued their decision on Interpretation, Correction and Supplementation to the Arbitration Award based on the *Second Claimant's Application for Interpretation/Correction/Supplementation* submitted by the second Claimant. The decision was delivered by HKIAC to the parties on January 9, 2019.

1

3.      According to the email of the arbitration tribunal on September 21, 2018, the parties were directed to deal with the issues related to arbitration fees and interest after the arbitration tribunal made decisions on the application for interpretation, correction and supplementation.

4.      On February 11, 2019, the first Claimant sent an email to the arbitration tribunal, attaching again the statements for the arbitration fees and interest submitted by the first Claimant to the arbitration tribunal on April 21, 2018.

5.      The first Claimant requests the arbitration tribunal to make the following directions on the issues related to the arbitration fees and interest:

(1)      The second Claimant and the Respondents shall, within 14 days, submit a written submission to the arbitral tribunal on the issues related to the arbitration fees and interest.
(2)      The first Claimant requests to submit a response to the second Claimant's and Respondents' submissions to the arbitral tribunal within 14 days.

6. On February 15, 2019, the second Claimant informed the arbitration tribunal regarding the schedule on issues related to the arbitration fees and interest which were proposed by the first Claimant on February 11, 2019. The second Claimant and the Respondents had carried out negotiations and reached a unanimous agreement on the following views, which they hoped to be adopted by the arbitration tribunal.

(1)      Within 21 days from the date when the arbitration tribunal directs the parties to start negotiations for issues related to the arbitration fees and interest, the parties shall firstly carry out negotiations for issues related to the arbitration fees and interest on a without prejudice basis and try to reach settlement.

(2)      If the parties fail to reach settlements on all the issues related to the arbitration fees and interest at the end of the 21 days, the parties shall, within 35 days thereafter, submit their respective statements to the arbitral tribunal for the issues related to the arbitration fees and interest that have not been settled. The statements shall include the liabilities of the parties on the issues related to the arbitration fees and interest, the amount claimed, and the evidentiary materials and legal basis for the statements of the parties.

2

(3)     There is no need to provide information other than each bill amount in the bill of attorney's fees and those protected by privilege in other evidentiary materials.

(4)     Each party shall submit its own response to the other party's statements within 21 days after submitting the statements for the issues related to the arbitration fees and interest.

7. On February 19, 2019, the arbitral tribunal gave the following directions for the parties to follow:

(1)     The parties shall carry out negotiations for the issues related to the arbitration fees and interest within 14 days from the same day (i.e. February 19, 2019), and the parties shall firstly carry out negotiations for issues related to the arbitration fees and interest on a without prejudice basis and try to reach settlements.

(2)     If the parties fail to reach settlements on all the issues related to the arbitration fees and interest by March 5, 2019, the parties shall, within 21 days thereafter (i.e. March 26, 2019), submit their respective statements for the issues related to the arbitration fees and interest that have not been settled to the arbitral tribunal. The statements shall include the liabilities of the parties on the issues related to the arbitration fees and interest, the amount claimed, and the evidentiary materials and legal basis for the statements of the parties.

(3)     There is no need to provide information other than each bill amount in the bill of attorney's fees and those protected by privilege in other evidentiary materials.

(4)     Each party shall submit its own response to the other party's statements within 14 days (i.e. April 9, 2019) after submitting the statements for the issues related to the arbitration fees and interest.

8.     On March 24, 2019, the arbitration tribunal, at the joint request of the parties, approved the extension of the statements for the issues related to the arbitration fees and interest submitted by the parties to April 4, 2019, and the extension of the time for the parties to submit their responses to April 18, 2019 accordingly.

3

9.      On April 4, 2019, the arbitration tribunal, at the joint request of the parties, approved the Respondents to apply for a short-term extension for the parties to submit their statements for the arbitration fees and interest to April 8, 2019, and the time for the parties to submit their responses to April 23, 2019 accordingly (taking into account that April 22 is the Easter holiday).

10.     On April 8, 2019, the first Claimant submitted the claimed amount for the arbitration fees of the first Claimant and the statements for the arbitration fees and interest of the first Claimant. On the same day, the second Claimant submitted the statements for the fees and interest and the regulations of legal basis. In the early morning on April 9, 2019, the Respondents submitted the statements for the issues related to the arbitration fees and interest of the Respondents.

11.     On April 24, 2019, at the joint request of the parties, the arbitration tribunal approved the extension for two weeks, and the parties submitted the responses to the arbitration fees and interest on May 7, 2019.

12.     On May 8, 2019, after hearing the objections of the second Claimant and the Respondents against the application for extension made by the first Claimant on May 7, the arbitration tribunal approved the parties to submit the responses to the arbitration fees and interest on May 10, 2019. The arbitral tribunal emphasized that it would not approve any application for extension again unless there were some very special reasons.

13.     On May 10, 2019, the parties submitted their statements for their responses to the arbitration fees and interest.

14.     The arbitration tribunal has carefully and fully read and considered the written statements submitted by the parties, and made the *Final Award on Arbitration fees and interest* after collegial discussions. As the statements submitted by the parties were quite detailed and lengthy, the arbitral tribunal does not list all the views and claims of the parties in this award, but this does not mean that the arbitral tribunal has not fully considered those views or claims.

**B. <u>Statements of the first Claimant</u>**

15. The first Claimant relied on the S*tatements for Arbitration fees and interest* submitted on April 21, 2018. In the statements, the first Claimant indicated that, two points were indicated by the Respondents in the statements for the arbitration fees in Part F in the closing statements on July 13, 2017:

(1)      The arbitration fees shall be apportioned proportionally depending on the liabilities in the result of the award;

(2)      If the Respondents are required to pay the arbitration fees, the arbitration fees of the second Claimant shall not be paid.

16. The first Claimant claims that the arbitration fees (including the attorney's fees of the first Claimant) shall be borne by the Respondents for the following reasons:

(1)      Unless under special circumstances, the arbitration fees shall be borne by the unsuccessful party in principle: Article 36.4 in the Hong Kong International Arbitration Centre Administered Arbitration Rules (effective from September 1, 2008);

(2)      Under the arbitration award, the arbitral tribunal obviously accepted the positions of the first Claimant with respect to most of the disputes and ruled that the Respondents lost in the case. The first Claimant listed the paragraphs and decisions in the final award: Paragraphs 246, 254, 267, 268, 269, 271, 274, 281 (on equity considerations); 274 (on property swap); 314, 318, 320, 322, 324 (on settlement of the bonds and debts of Si Ji Hua Cheng).

17.      The first Claimant also indicates that, the Respondents have expressly indicated that the Respondents are willing to pay the arbitration fees of the first Claimant if required to pay the arbitration fees for the arbitration: See Paragraph 161 of the Respondents' closing statement.

18.      The total amount of the first Claimant's claim for the arbitration fees is HK$ 28,000,000, including the first Claimant's expenses on lawyer, barrister and arbitration center and arbitration tribunal. However, the arbitral tribunal noted that the first Claimant did not provide evidentiary support for the amount, which was not in line with the directions made by the arbitral tribunal on February 19, 2019, and also made it impossible for the arbitral tribunal to know whether the amount was accurate.

19.     With respect to the interest, the first Claimant claims that the Respondents shall pay interest for the period from December 31, 2012 to the actual payment date for the delayed payment of the final installment of the consideration of RMB 150 million.

20.     The first Claimant suggested that the arbitral tribunal should adopt an appropriate interest rate of 8% for the ruled debts as shown by the Hong Kong court. Alternatively, if the arbitral tribunal considers that the interest rate for the ruled debt is applicable to the period after the award is issued, the first Claimant proposes to adopt the appropriate interest rate from December 31, 2012 to the effective date of the award, which is the most preferential interest rate of HSBC's Hong Kong dollar plus 1%: See Hong Kong Civil Procedure 2018 Vol. 1, Pages 99-105.

21.     Finally, the first Claimant requested the arbitral tribunal to clarify the effective date of the award, because the date of the award was February 28, 2018, but the parties did not receive the documents until March 7, 2018.

## C. Statements of the second Claimant

22.     The second Claimant indicated that the arbitration tribunal decided on April 6, 2016 to allow the counsel of the second Claimant at that time (Baker McKenzie) to participate in the arbitration on behalf of the second Claimant for the administration of the estate. Based on the fact that the second Claimant, as the successful party of the arbitration, won for all the disputes and provided intellectual cooperation and assistance to the work of the arbitration tribunal in the whole arbitration process, the second Claimant claims that the arbitration tribunal shall rule that the second Claimant shall be awarded the fees incurred in the arbitration.

23.     The second Claimant has prepared a list of summary of the arbitral tribunal in the final award and the correction award, and intends to prove that the second Claimant is the successful party.

24.     In addition, the second Claimant indicated that the arbitration tribunal accepted the second Claimant's claims, ruled that the Respondents should compensate the Claimants for the loss of RMB 10,346,211 (Paragraph 303 and Order No.9 in the final award), and rejected all the counterclaims of the Respondents in Paragraph 222 in the final award. Therefore, the second Claimant claims that the Respondents shall bear the fees incurred by the second Claimant for arbitration.

25.     The second Claimant cited and relied on Section 74 in the Hong Kong Arbitration Ordinance (Chapter 609 of the Laws of Hong Kong) which provides for the right of the arbitral tribunal to make an award on arbitration fees, and the provisions in Article 36 in the *2008 Hong Kong International Arbitration Centre Administered Arbitration Rules.*

26.     Section 74 in the Hong Kong Arbitration Ordinance (Chapter 609 of the Laws of Hong Kong) provides for the right of the arbitral tribunal to award the arbitration fees:

*"74. Arbitral tribunal may award costs of arbitral proceedings*

*(1) An arbitral tribunal may include in an award directions with respect to the costs of arbitral proceedings (including the fees and fees of the tribunal).*

*(2) The arbitral tribunal may, having regard to all relevant circumstances (including the fact, if appropriate, that a written offer of settlement of the dispute concerned has been made), direct in the award under subsection (1) to whom and by whom and in what manner the costs are to be paid.*

7

*(3) The arbitral tribunal may also, in its discretion, order costs (including the fees and fees of the tribunal) to be paid by a party in respect of a request made by any of the parties for an order or direction (including an interim measure).*

*(4) The arbitral tribunal may direct that the costs ordered under subsection (1) are to be paid forthwith or at the time that the tribunal may otherwise specify.*

*(5) Subject to Section 75, the arbitral tribunal must –*

*(a) assess the amount of costs to be awarded or ordered to be paid under this section (other than the fees and fees of the tribunal); and*

*(b) award or order those costs (including the fees and fees of the tribunal).*

*(6) Subject to subsection (7), the arbitral tribunal is not obliged to follow the scales and practices adopted by the court on taxation when assessing the amount of costs (other than the fees and fees of the tribunal) under subsection (5).*

*(7) The Arbitral tribunal –*

*(a) must only allow costs that are reasonable having regard to all the circumstances; and*

*(b) unless otherwise agreed by the parties, may allow costs incurred in the preparation of the arbitral proceedings prior to the commencement of the arbitration.*

8

*(8)      A provision of an arbitration agreement to the effect that the parties, or any of the parties, must pay their own costs in respect of arbitral proceedings arising under the agreement is void.*

*(9)      A provision referred to in subsection (8) is not void if it is part of an agreement to submit to arbitration a dispute that had arisen before the agreement was made."*

27. In addition, Article 36 in the 2008 Hong Kong International Arbitration Centre Administered Arbitration Rules (the "2008 Arbitration Rules") provides as follows:

*"36.4 Except as provided in Article 36.5, the costs of arbitration shall in principle be borne by the unsuccessful party. However, the arbitral tribunal may apportion all or part of such costs between the parties if it determines that apportionment is reasonable, taking into account the circumstances of the case.*

*36.5 With respect to the costs of legal representation and assistance referred to in Article 36.1(5), the arbitral tribunal, taking into account the circumstances of the case, shall be free to determine which party shall bear such costs or may apportion such costs between the parties if it determines that apportionment is reasonable."*

28. In addition, the second Claimant also cited the following documents and cases:

(1) Arbitration in Hong Kong, A Practical Guide, Fourth Edition 2017, § 15.223-15.226;

(2) **Re Eligndata Ltd No.2** [1992] 1 WLR 1207;

(3) **Kwan Siu Wa Becky v. Cathay Pacific Airways Ltd** (CACV 92/2010, 19/04/2011)

9

29. Based on the above legal arguments, the second Claimant claims that the successful party should not be deprived of its costs generally unless the unsuccessful party can prove that the issues or accusations raised by the successful party lead to significant extension of the arbitration procedures or significant increase of the arbitration fees.

30. The second Claimant itemized the legal fees incurred in the arbitration as follows:

| Serial No. | Content | Estimation of Amount (HK$) |
|---|---|---|
| 1. | Prepare and review the documents to defend in the arbitration (including but not limited to the Notice of Arbitration, reply to the Notice of Arbitration, Application for Arbitration, Statement of Defense, counterclaim, etc.) | Half of the fees claimed by the first Claimant |
| 2. | Prepare and respond to the witness testimony | 1,920,000.00 |
| 3. | Assist in the preparation of expert reports | 915,000.00 |
| 4. | Prepare trial files | 620,000.00 |
| 5. | Prepare opening statement, relationships and events | 450,000.00 |
| 6. | Attend the session | 1,800,000.00 |

10

| 7. | Prepare the closing statement for two rounds | 510,000.00 |
| 8. | Participate in the closing session | 200,000.00 |
| 9. | Provide general legal advice for arbitration, and contact the arbitration tribunal, barrister, parties and third parties | 1,938,367.23 |
| | Total | 8,353,367.23 |

The main third party expenses and miscellaneous expenses incurred by the second Claimant in the arbitration are shown as follows (see [Attachment-2] for the relevant bills):

| No. | Content | Amount (HK$) |
|-----|---------|--------------|
| 1. | Barrister fees<br><br>Fees for senior Barrister Xu Weiqiang     810,000 to participate in pretrial meeting and fees for engagement to attend the session<br><br>Fees for Barrister Zheng Xinqi to     282,000 participate in pretrial meeting and fees for engagement to attend the session | 2,084,000.00 |

11

| | | | |
|---|---|---|---|
| | Fees for Senior Barrister Xu Weiqiang to prepare the closing statements in two rounds | 324,000 | |
| | Fees for Barrister Zheng Xinqi to prepare the closing statements in two rounds | 108,000 | |
| | Fees for renewal of engagement of Senior Barrier Xu Weiqiang | 270,000 | |
| | Fees for renewal of engagement of Barrier Zheng Xinqi | 90,000 | |
| | Fees for Senior Barrister Xu Weiqiang to prepare an application for corrections of the award | 140,000 | |
| | Fees for Barrister Zheng Xinqi to prepare an application for corrections of the award | 60,000 | |
| 2. | Expert fees for Ye Yongqing | | 396,953.00 |
| 3. | Fees for the arbitration tribunal | | 2,136,542.52 |
| 4. | Fees for Hong Kong International Arbitration Centre | | 41,120.50 |

12

| 5. | DTI costs | 75,475.00 |
| 6. | Fees for session room | 89,898 |
| 7. | Total | 4,823,989.02 |

Total amount: HK$ 13,177,356.20

31. As for the claim of the Respondents in Paragraph 161 of their closing statement, namely, even if the Respondents are required to pay the costs for this arbitration, they only need to pay the costs of the first Claimant. The second Claimant cited the reference given by the Hong Kong Court in Eric Edward Hotung v. Ho Yuen ki (HCA 857/2011, 18/05/2017). In this case, when the court decided the necessity of the second and third defendants to be represented respectively by different teams of attorneys, it cited the representation of the court in **Xiamen XinJingDi Group Co., Ltd. formerly known as** v. Eton properties Ltd & ors (HCCL 13/2011, 20/11/2012), and put forward the following analysis:

*"29 Accordingly if, as Mr Barlow strongly pressed, 'necessity' indeed is the appropriate benchmark when considering the separate representation of multiple defendants, then it seems to me that this must be qualified in terms of the 'necessity' of such separate representation being* ***reasonably apparently when viewed through the factual prism existing at the time of the retention of such representation, and not simply as a post-facto conclusion based upon that which did, or did not, occur at trial****.*

13

*30 In the present case thereof, at the time of retention of the representation in question - and as we know in this case eventually there were four 'clusters of defendants and four legal teams - was it reasonable or unreasonable to have taken the view that separate representation was 'necessary" in order to guard against the possibility of conflicts of interest arising between the multiple defendants?"*

*5. It would appear that the learned judge considered the applicable test to be whether it was reasonably necessary for two (or more) legal teams to be engaged for a number of defendants **when viewed at the time of retention of such representation, and not as a matter of hindsight."***

32. Therefore, in order to determine whether the joint plaintiffs have the reasonable and obvious necessity to engage different attorneys, it must be based on the facts at the time of engaging the attorneys.

33. The second Claimant stated why the original acting attorneys of the second Claimant, Zhou Zhuoli, Chen Qiqiu and Chen Yili, could not continue to represent the administrator of Mr. Ke Zhengguang's estate after the death of the second Claimant, Mr. Ke, on or about December 15, 2013, and why the arbitral tribunal decided on April 6, 2016 to allow Baker McKenzie Law Firm to represent the administrator of Mr. Ke's estate to participate in the arbitration.

34. The second Claimant also stated that the team of attorneys did their best to assist and cooperate with the work of the arbitral tribunal.

35. In addition to the main procedures and documents in the general arbitration process, the second Claimant also claimed in Paragraphs 36-58 of the statement that the second Claimant has the right to recover the fees from the Respondents or the first Claimant for the ten intermediate procedures of the arbitration. The relevant statements have been considered in detail by the arbitration tribunal and it is unnecessary to reiterate them here.

36. With respect to the interest, the second Claimant's statement is divided into two parts:

(1) Interest before the issuance of the final award; and

(2) Interest after the issuance of the final award.

37.   With respect to Part (1) (i.e., the interest before issuance of the final award), the second Claimant cited the relevant provisions of Section 79 of the Hong Kong Arbitration Ordinance on the right of the arbitral tribunal to make an award on the interest.

38.   As for the applicable principal for the interest, the second Claimant claims that the Respondents shall pay the sum awarded to the second Claimant under the final award, which is the interest generated by one half of the amounts in Order No.8 (RMB 150 million minus RMB 41,244,613.21 plus RMB 30 million) and Order No.9 (RMB 10,346,211) respectively.

39.   As for the period of interest, the second Claimant claims that it shall be the period from the expiration of the performance period under the *4.28 Agreement* to the date when the arbitral tribunal makes an award. For Order No.8 of the final award, according to Article 2.2.1 (3) of the *4.28 Agreement*, the calculation shall start from December 31, 2012 and end on February 28, 2018 which is the date of the final award. For Order No.9 of the final award, the calculation shall start from August 8, 2017 and end on February 28, 2018 which is the date of the final award.

40.   With respect to the interest rate, the second Claimant claims that the traditional interest rate of Hong Kong Court shall apply, that is, the annual interest rate shall be the most preferential loan interest rate of HSBC, which is often applicable, plus 1%. The second Claimant cited the cases of Hong Kong Court - **Komala Deccof & Co. S.A. and Others v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara (Pertamina)** [1984] HKLR 219 and **Waddington Ltd. v. Chan Chun Hoo Thomas** CACV 10/2014, 20.2.2016).

15

41.     The second Claimant also claims that the interest of Order No.8 of the final award shall be calculated at the compound interest rate, so as to actually reflect the loss of the Claimants being deprived of the relevant funds as a result of the Respondents' breach, and the legal basis is **A-G v. Shimizu Corp** [1996] HKLY 88.

42.     With respect to Part (2) (i.e., the interest after issuance of the final award), the second Claimant cited the provisions of Article 80 of the Hong Kong Arbitration Ordinance on the right of the arbitral tribunal to make an award on interest.

43.     The second Claimant claims that the Respondents shall pay to the second Claimant the interest under Orders No.8 and No.9 of the final award at the interest rate of 8%. The time of interest calculation shall start from the payment deadline stipulated in the final award; that is, for Order No.8, it shall start from the date of reaching 3 months from the date of making the award and end when the appropriate amount is paid. For Order No.9, it shall start from the date of making the award until the appropriate amount is paid.

### D. Statements of the Respondents

44. In the summary of the Respondents' statements, it is indicated that:

*"In the Respondents' opinion, the arbitral tribunal has full discretion with respect to the apportionment of fees and interest. In this case, the parties have their claims that are supported. The position of the Respondents in the procedure of this case is reasonable. Respondents's position had always been that Respondents agree to fulfill the 4.28 Agreement. The Respondents have never objected the implementation of the agreement, but the implementation of the agreement requires the cooperation of all the parties. The current implementation situation just proves the view the Respondents have been holding. The implementation by "division" cannot move forward because of failure in cooperation arising from different opinions of the parties. The biggest dispute among the parties in this case is the apportionment of the liabilities of taxes in China arising from the transfer of 80% of equities of Si Ji Hua Cheng when performing the "division" in the agreement, and in this regard, the position of the Respondents is supported by the arbitral tribunal.*

*After considering the comprehensive situations of this case, the Respondents claim that, in this case, except for the costs that the arbitral tribunal has already decided to be borne by one party (for example, the costs incurred when the first Claimant requested to revise the pleadings in 2016 shall be borne by the first Claimant), the arbitration tribunal shall decide that the parties shall bear their own arbitration fees.*

*To make a concession, alternatively, if the arbitration tribunal deems it necessary to make other decisions on the arbitration fees, then the Respondents claim that, in this case, the time and costs of the proceedings are significantly increased due to the conflicts between the Claimants and other reasons, and the Respondents shall not bear the following expenses: (1) The expenses that have been decided by the arbitration tribunal to be borne by the first Claimant; (2) The expenses related to the Claimants' multiple counsels; (3) The expenses incurred in handling with the conflicts between the Claimants; and (4) The expenses incurred for the Respondents to gain support (including the Claimants' objection and question to the substitute arbitrator, the Claimants' interpretation, correction and supplementation, etc.). These expenses shall be borne by the Claimants. Please refer to Attachment I (Summary of Attorney's fees for the Related Matters of the Respondents).*

*With regards to interest, the Respondents consider that they are not required to pay the interest. To make a concession, alternatively, if, in the opinion of the arbitration tribunal, the Respondents are required to pay interest for the third installment of the payment, the principal of the interest shall be calculated in accordance with the amount in Paragraph 57 herein, and the interest period and interest rate shall be adjusted and calculated in accordance with Paragraphs 59-65."*

ASIA-DOCS\10768653.6

45.     The Respondents cited Subsection 36.1 of the Arbitration Rules, Article 74 (2) of the Hong Kong Administered Arbitration Ordinance (Chapter 609 of the Laws of Hong Kong), Articles 36.4 and 36.5 of the Arbitration Rules and believed that the principle of "costs follows the event" was not the only way for the arbitration tribunal to apportion the arbitration costs. The other guiding principles include the one that the arbitral tribunal exercises its discretion to determine the apportionment of the expenses if it "decides what kind of expenses is reasonable after considering the circumstances of the case".

46.     The Respondents also cited two British cases: **In re Elgindata Ltd (No. 2)** [1992] 1 WLR 1207 and **AEI Rediffusion Music Ltd v. Phonographic Performance Ltd** [1999] 1 WLR 1507, PP. 1523-1524.

47.     In the opinion of the Respondents, for example, in the analysis of the case for **AEI Rediffusion Music Ltd v Phonographic Performance Ltd**, the arbitral tribunal should not overemphasize that a party was the ultimate successful party in determining the apportionment of expenses, without distinguishing between good and bad opinions, or considering whether they would cause excessive expenses. On the contrary, the arbitral tribunal should consider the reasonableness of the costs as a whole. If a party causes unreasonable time and expenses, resulting in significant increase of the length or costs of the proceedings, it may be deprived of all or part of the expenses, and it shall pay all or part of the expenses of other parties.

48.     The Respondents indicated that its position in the procedures of this case was reasonable. The Respondents' position have always that the respondents are willing to perform the *4.28 Agreement*, and agreed to request all the parties to push forward all matters in accordance with the provisions of the *4.28 Agreement*. However, the parties had different understandings of the provisions of the *4.28 Agreement* (mainly some steps and understanding of the liabilities of the parties for "division"), which requires the instructions of the arbitration tribunal. In this case, although the arbitration tribunal ruled that the Respondent had breaches, the final order was to request the parties to move forward with all matters in accordance with the provisions of the *4.28 Agreement*, which was essentially consistent with the Respondents' claim. A detailed analysis was made from the four disputes concerning the perspective of equity consideration, cash consideration, debt settlement and property swap:

18

(1)       With regards to equity consideration, this can be reflected in the following three points. Firstly, the biggest dispute in this case is the apportionment of the liabilities for taxes in China arising from transfer of 80% of the equities in Si Ji Hua Cheng. It is the disagreement on this point that leads to the delay of the whole "division" procedure of the parties, which is also the cause for the disputes among the parties. With regards to this, the Respondents' position is supported by the arbitration tribunal: Paragraphs 232 and 233 of the Final Award indicate that, in accordance with the provisions of Article 2.2.1 (4) (a) of the *4.28 Agreement*, if a price must be defined for the equity transfer of Si Ji Hua Cheng, the relevant taxes shall also be borne by the Claimants and shall be deducted from the cash consideration to be paid by the Respondents. Furthermore, the arbitration tribunal also supported the position of the Respondents in the *Interpretation, Correction and Supplementation for the Arbitration Award*, i.e., it is agreed that Paragraphs 232 and 233 of the *Final Award* had made a clear representation on this issue, so there was no need to make correction or supplementation. Secondly, although the arbitration tribunal deems that the Respondents are in breach when determining the liabilities for the equity transfer, the order given by the arbitration tribunal is not in conflict with the Respondents' claim. The arbitration tribunal requests the parties to move forward the transfer as agreed in the agreement, which is also the result the Respondents hoped to see (especially considering the legal and tax risks that may exist in the many years of operation of the other party). Thirdly, the implementation of Order No.5 of the *Final Award* shows that the cooperation among the parties is indeed required in order to complete the equity transfer. The lack of cooperation from the Claimants made it difficult for the equity transfer to move forward. This proves the view put forward by the Respondents in the arbitration process: The precondition for the performance of equity consideration is that the Claimants must cooperate, but the Claimants are not willing to cooperate with the Respondents to implement the relevant matters. Therefore, the Claimants and the Respondents shall bear their own arbitration costs related to the equity transfer.

19

(2)     With respect to the cash consideration, Order No.8 of the *Final Award* of the arbitration tribunal expressly indicates that the parties shall make adjustments (including tax deduction) and then payment in accordance with Article 2.2.1 (4) (a) of the *4.28 Agreement* and Paragraphs 232 (4) and 233 of the *Final Award* after completing the equity transfer, property swap, debt settlement and other matters. The position of the Respondents has always been that the Respondents agree to pay the adjusted third installment of the payment in the condition that all the preconditions for the third installment of the payment are met. It shows that the position of the Respondents is reasonable, and the steps for the parties to make final implementation of the cash consideration are as requested by the Respondents, that the preconditions must be met and the adjustments shall be made.

(3)     With respect to the debt settlement, not all claims of the Claimants received approval from the arbitration tribunal. With regards to the six disputes, the arbitration tribunal supported the claims of the Respondents for two disputes (for example, the salary expenses from January to November 2009 for Ke Zhengguang and Xu Hongbiao should be returned to the first Respondent; the Respondents do not need to pay any interest for the use of Sij Ji Hua Cheng fund by Oasis Investment and its subordinate companies as well as the current accounts that were not paid to the Claimants), and the arbitration tribunal held that two disputes were beyond its jurisdiction and did not handle them.

(4)     With respect to the property swap, the Respondents do not object the property swap, but only considers that the villa does not comply with the agreement. Although the arbitral tribunal ruled that the villa was in conformity with the agreement, it ruled in Orders No.1 and No.2 of the *Final Award* that the relevant documents of Jiuting Shop and the villa were signed at the same time, which was consistent with the requests of the Respondents. The amount of rent loss (RMB 10,346,211) that the arbitration tribunal requests the Respondents to pay has also been reduced compared to the amount claimed by the Claimants in Attachment I of the *Closing Statements of the Second Claimant* on July 11, 2017.

49. In contrast, many of the positions and costs of the two Claimants in this case are unreasonable. The specific analysis is as follows:

(1)     Although the two Claimants took the same position in the end, disputes arose between the two Claimants since 2015. The second Claimant engaged a lawyer and a barrister separately and actively participated in the trial of the case, and the parties spent a lot of time and work to deal with the disputes between the two Claimants. In fact, this changed the arbitration case for disputes between two parties to disputes among three parties.

(2)     In addition, the Claimants have taken unreasonable positions in this case in many occasions. For example, the Claimants insisted that the arbitration tribunal take the place of the court to appoint Ms. Zhang as the representative of Mr. Ke's estate, and the first Claimant put forward the request to "remove the second Claimant and make the estate the fifth Respondent", but was objected by the second Claimant, and still made challenges after the Hong Kong High Court appointed the personal representative of the estate of the second Claimant, and so on. These positions did not have legal basis and were not supported by the arbitration tribunal. They also wasted a lot of time and work of the parties and the arbitration tribunal.

(3)     To sum up, in this case, the "reasonable" result is that the parties shall bear their own arbitration costs respectively.

50. In addition, the Respondents also propose an alternative claim, that is, if the arbitral tribunal deems that other decisions should be made regarding the arbitration fees, then in this case, due to the significant increase of the time and costs of the procedures arising from the disputes between the Claimants and other reasons, the Respondents shall not bear the following expenses:

21

(1) The expenses decided by the arbitration tribunal to be borne by one party or to be retained for apportionment;

(2) Unreasonable and unnecessary expenses incurred by the two Claimants for using multiple counsels;

(3) Expenses incurred due to conflicts between the Claimants;

(4) The relevant expenses incurred in the outcome of the award that the Respondents won or expected to be consistent with the Respondents' request in the case.

51.     In view of the above four major items, the Respondents provided the expenses for handling each item, and also requested the arbitral tribunal to determine the amount of relevant expenses of the arbitral tribunal.

52.     As for the issue regarding interest, the Respondents indicated that the parties did not reach any agreement on the interest in the *4.28 Agreement* or the reorganization agreement.

53.     Under such circumstances, under the Article 79.1 of the Hong Kong Arbitration Ordinance, the arbitral tribunal has full discretion on the issues regarding the interest. The Respondents also cited the *High Court Ordinance* of Hong Kong (Chapter 4 of the Laws of Hong Kong), claiming that this principle also applies in Hong Kong civil cases. The Respondents also cited two British cases: **Business Computers Ltd v. Anglo-African Leasing Ltd** [1977] 1 WLR 578 and **Claymore Services Limited v. Nautilus Properties Limited** [2007] EWHC 805 (TCC).

54.     The Respondents holds that the arbitration tribunal shall rule that the Respondents are not required to pay interest to the Claimants for the following reasons:

(1)     In the consideration in the "division", apart from the payment for the third installment of the cash consideration, the Claimants have obtained economic benefits from the other considerations.

22

(2)     The *4.28 Agreement* stipulates that preconditions have been established for the third installment payment. The parties have no dispute that such preconditions are not yet mature. Order No.8 of the *Final Award* of the arbitration tribunal also indicates that the payment shall be made after the equity transfer, property swap, debt settlement and other matters have been completed by the parties and adjustments (including tax deduction) are made in accordance with Article 2.2.1 (4) (a) of the *4.28 Agreement* and Paragraphs 232 (4) and 233 of the *Final Award*.

55.     On May 4, 2010 and June 27, 2011, the Respondents paid RMB 100 million out of the RMB 250 million in the cash consideration;

56.     Although the ownership of Si Ji Hua Cheng and Jiuting shops has not been formally transferred, the Claimants have already been enjoying the economic benefits therefrom. Moreover, before signing the *4.28 Agreement*, the control of Si Ji Hua Cheng had been fully handed over to the Claimants, and the shops had been handed over to the Claimants for management through the power of attorney. All the profits from the development and sale of Ban Dao Jun Wang Villas under Si Ji Huang Cheng belong to the Claimants. According to the court statements of Miss Ke, the personal representative of the estate of the second Claimant, 29 units of the villas had been sold at that time, and Si Ji Hua Cheng/the Claimants obtained at least RMB 1 billion of total sales amount. Moreover, the arbitral tribunal has determined the amount of the loss of the shop rent paid by the Respondents to the Claimants.

57.     On the contrary, the Respondents have not yet acquired the ownership of the villas or moved into the villas, and have no way to use the villas or realize their economic value. However, the Claimants, in fact, are controlling some Jiuting shops and gain benefits therefrom. Obviously, this is not consistent with the original intention of the swap of the parties and is unfair to the Respondents. In addition, the total market value of the two villas was about RMB 94.17 million (the time of valuation was September 30, 2016). During the trial, Miss Ke Yeying stated that the value of the shops exceeded RMB 100. Mr. Xu Hongbiao also said that the value of the villas was much lower than that of the shops when inquired.

23

58.     The arbitration procedures were delayed due to the contradictions and conflicts between the two Claimants and other reasons. The liabilities did not lie with the Respondents, so the Respondents should not be punished for this.

59.     To make a concession, alternatively, if the arbitration tribunal considers that the Respondents should pay interest for the third installment of the payment, the Respondents consider that the principal amount for the interest to be paid should be RMB 22,289,896, and the following corresponding adjustments shall be made for the interest period, and the interest rate for the second installment shall be calculated on the basis of the Hong Kong Association of Banks Hong Kong Dollars Interest Settlement Rates (HKAB HKD Interest Settlement Rates) (also known as the "Hong Kong InterBank Offered Rate "HIBOR") + 2%.

60.     With regards to the calculation of principal for the interest, first of all, the Respondents consider that the total principal for the interest to be paid to the Claimants should be RMB 22,289,896 (i.e., RMB 150 million - RMB 41.224613 million - RMB 3.127591 million - RMB 42.0664 million - RMB 26.2915 million - RMB 15 million). The reasons are as follows:

(1)     According to Article 2.1 of the *4.28 Agreement*, the final settlement amount shall be RMB 150 million less the carryover current accounts undertaken by the Claimants which was more than RMB 41 million. In view of the fact that the parties have no dispute about such amount and the arbitral tribunal supports this view, RMB 41.224613 million shall be deducted from the final settlement.

(2)     RMB 3,127,591.77 was the salary expenses for Ke Zhengguang and Xu Hongbiao from January to November 2009. The arbitration tribunal supported the position of the Respondents and ruled that Si Ji Hua Cheng (the Claimants) shall pay the first Respondent such amount. Therefore, this amount should be deducted from the principal.

(3)     According to the net assets reflected in the accounting reports of Si Ji Hua Cheng in 2009 and the possible profits generated by the villa project, the income tax payable from transfer of 80% equities of Si Ji Hua Cheng held by Greencourt Property is about RMB 42.0664 million (experts in the parties agree that, according to the *Law on Enterprise Income Tax* and its implementation regulations, the enterprise income tax is calculated at the special tax rate applicable to non-resident enterprise, i.e., 10% of the income from equity transfer); the income tax payable from the transfer of 20% equities of Si Ji Hua Cheng held by Greencourt Science and Technology Innovation is about RMB 26.2915 million (for the transfer for residential enterprises, the tax rate of 25% is based on for calculation).

24

(4)     On January 29, 2016, the Respondents paid RMB 15 million to Sheng Yuan through the related party on behalf of Si Ji Hua Cheng. Both the Respondents and the second Claimant agree that such RMB 15 million "shall be deemed that the first Respondent has paid the current account of RMB 15 million in advance on behalf of Si Ji Hua Cheng according to the provisions in the *Agreement on Advance Payment of Current Accounts*", which can be used to offset the current accounts. For this matter, although the arbitration tribunal holds the opinion that the issue of "whether the amount can be used to offset RMB 41.224613 million for the current accounts" falls beyond the jurisdiction of the arbitration tribunal, it does not deny that the amount had been paid. Therefore, the amount should be deducted from the principal for interest in calculation.

(5)     Article 2.1.2 of the *4.28 Agreement* expressly indicates that RMB 30 million is the "conditional payment" for "one-off additional compensation", and the payment condition is that "the payment of the consideration for the share repurchase by Oasis Investment has been completed and there is no major dispute between the two parties". However, the parties have major disputes on the consideration payment during the performance of the *4.28 Agreement* and the consideration payment for share repurchase has not been completed, so the additional compensation of RMB 30 million shall not be included in the scope of calculation for interest.

61. With regards to the applicable period of interest calculation and the applicable interest rate, the Respondents consider that appropriate adjustments should be made for the following reasons:

(1)      It shall start from January 1, 2013 and end on March 7, 2018, lasting about 62 months. During which, the period of suspension of arbitration proceedings not caused by the Respondents shall be deducted.

(2)      Unfortunately, Mr. Ke, the second Claimant, died in December 2013. From January 2014 to April 2015, the procedures were suspended while waiting for the appointment of the personal representative of the estate by the Hong Kong High Court. However, during the period between April and August 2015 and the period between January and July 2016, conflicts arose between the two Claimants. The first Claimant tried to remove the second Claimant, and questioned the qualifications of the estate administrator of the second Claimant, resulting in the delay of the procedures. Such delay was not caused by the Respondents, so the Respondents consider that the period (26 months in total) should not be included in the period for interest calculation. Therefore, the total period for interest calculation should be 36 months (i.e., 62 months minus 26 months).

62. With regards to the interest rate, based on the analysis in Paragraphs 51-56 above, the arbitral tribunal shall also exercise its discretion to determine the reasonable interest rate. The Respondents claim that the reasonable interest rate in this case is the Hong Kong Association of Banks Hong Kong Dollars Interest Settlement Rates (HKAB HKD Interest Settlement Rates) (also known as the "Hong Kong InterBank Offered Rate (HIBOR)") + 2% in the corresponding period. There were also precedents in the cases in Hong Kong:

(1)      In the case of Waddington Ltd v. Chan Chun Hoo Thomas & ORS (No 2), the court held the opinion that the interest rate in Hong Kong had been stable at a low level in the past ten years or for a longer time, so the traditional interest rate (the most preferential interest rate + 1%) was not used to calculate the pre-judgment interest rate. In the end, the court used a 2.5% interest rate in the case to calculate the interest.

(2)      Furthermore, in the case of Tadjudin Sunny v. Bank of America, NA (No. 2), when determining the interest rate that should be applied before judgment, the court indicated, "for many years, Hong Kong has been in an environment of continuous low interest rate, with sufficient fund supply. Both the savings rate and the fixed deposit rate are extremely low. In such environment, the most preferential interest rate seems not to be favored. The Hong Kong Interbank Offered Rate (especially for 12-month period) seems to better reflect the situations of the money market and serve as a more realistic index to assess the cost of money. It is used as the base rate for a large number of borrowings. Many mortgage loans and commercial loans bear interest at the Hong Kong Interbank Offered Rate plus a cap indicating whether an addition or subtraction is made based on the most preferential interest rate. This fixed percentage is determined as a result of negotiations, depending on the bargaining power of the borrower, the scale of the loan and the state of the money market. "In view of this consideration, the court finally adopted the interest rate of 2.85% (i.e., 0.85% of the Hong Kong Interbank Offered Rate plus 2% for 12-month period) to calculate the interest.

63. The Respondents consider that the Respondents shall not bear the interest incurred from the time the award was issued until now. The reasons are as follows:

(1) In the implementation stage of the arbitration award, either because the two Claimants put forward contradictory directions many times, or Si Ji Hua Cheng, which was under the actual control of the two Claimants, refused to cooperate and provide the relevant necessary documents or cooperate (for example, the Claimants have yet to fulfill Order No.4 and provide the audit report of Si Ji Hua Cheng so far), so the Respondents cannot actually move forward the implementation of the *Final Award*. Therefore, the interest of this period shall not be borne by the Respondents.

64. The contradictory directions of the two Claimants made after the award is shown in the summary of the Respondents' letter to the arbitral tribunal on October 29, 2018. The current performance of each order sorted out by the Respondents is as follows:

(1)      Order No.1 of the *Final Award*: (1) The second Claimant appointed Shanghai Qingxuan Enterprise Management Consulting Co., Ltd. on September 11, 2018 to accept 50% of the equities of Jiuting shops, which also differs from the provisions of Order No.1 of the *Final Award*. In this respect, the first Claimant did not indicate whether he agreed with or objected to it. (2) On September 19, 2018, the first Claimant changed the transferee of Jiuting shops (i.e., Shanghai Suquan Culture Development Co., Ltd.) previously designated by the first Claimant to Xu Hongbiao, i.e., the first Claimant, on the ground that the ownership of the shops cannot be jointly owned by two or more legal person companies in specific operations. In this respect, the second Claimant did not indicate whether it agreed with or objected to it. However, so far, the Respondents have not received the confirmation from the transferee of Jiuting shops jointly designated by the two Claimants, or from the two Claimants on how to divide the shops. Under such circumstances, the Respondents are unable to carry out the transfer of Jiuting shops.

(2)      With regards to Order No.2 of the *Final Award*, the arbitral tribunal makes corrections in accordance with the consensus reached by the parties. At present, the Claimants have not transferred the villas to the Respondents.

(3)      With regards to Order No.3 of the *Final Award*, the first Claimant wrote to the Respondents on May 25, 2018, claiming, "*the personal financial seal of Si Ji Hua Cheng of the first Claimant has been illegally cancelled which made the first Claimant unable monitor the financial situations of Si Ji Hua Cheng, so the first Claimant solemnly requests that **the Respondents can only make the payment determined in Order No.3 into the jointly monitored account of Si Ji Hua Cheng after the Claimants jointly provide the Respondents with a bank account of Si Ji Hua Cheng under the joint supervision of the first Claimant and the second Claimant**...If the Respondents make payment to the account provided by the second Claimant without the consent of the first Claimant, the first Claimant states that the first Claimant reserves the right to hold the Respondents liable.* "[Emphasis added] The second Claimant disagrees with such claim. So far, the Respondents have not received the account information or further directions about Si Ji Hua Cheng jointly given by the two Claimants.

(4)     With regards to Order No.4 of the *Final Award*, to the knowledge of the Respondents, the Claimants have not fulfilled the Order so far to provide the audit report of Si Ji Hua Cheng.

(5)     With regards to Orders No.5, No.6 and No.7 of the *Final Award*, the first Claimant wrote to the Respondents many times from May to October 2018, requesting that the equity transfer of Si Ji Hua Cheng can only be carried out after the board members, legal representative and general manager of Si Ji Hua Cheng have been changed. For this reason, the first Claimant repeatedly requested the Respondents to change the governance structure and management personnel of Si Ji Hua Cheng (although the Respondents already handed over the control of Si Ji Hua Cheng to the two Claimants about eight years ago). From May to September 2018, the second Claimant repeatedly objected the first Claimant's proposal to change the directors and legal representative of Si Ji Hua Cheng. It shows that the equity transfer of Si Ji Hua Cheng cannot be advanced because of the different opinions and directions of the two Claimants and the failure of the two Claimants and Si Ji Hua Cheng to fulfill their cooperation obligations in time.

(6)     With regards to Order No.8 of the *Final Award*, the Order itself expressly indicates that the payment is to be made within 4 weeks after the implementation of Orders No.1-6, and therefore it has not been implemented.

(7)     With regards to Order No.9 of the *Final Award*, the Respondents have paid 50% of the amount to the first Claimant. Although the Respondents have made many requests to the second Claimant to provide a valid RMB account in China, the second Claimant has refused to provide a RMB account in China.

ASIA-DOCS\10768653.6

E. **Response statements of the first Claimant**

65.     In the response statements of the first Claimant, the first Claimant adopted the general statements of the second Claimant that the successful party should be paid the arbitration fees, and denied the claim of the Respondents that the arbitration fees should be bore by each party respectively.

66.     The claims of the first Claimant, and more importantly, some of the claims indicated by Respondents and recognized and supported by the arbitration tribunal, are in fact not the main factors leading to and triggering the commencement of this arbitration. Paragraphs 271 and 274 of the *Award* state that the arbitration tribunal finally determines that the Respondents have obviously violated the contractual obligations of Articles 2.3.1, 2.3.2 and 2.3.3 of the *4.28 Agreement*, so the Respondents are the breaching party. On the contrary, the arbitral tribunal has not ruled that the acts of so-called failure in cooperation or recognition of the Claimants, as indicated by the Respondents, were the breaches. The first Claimant holds the view that, as a result of this prejudice, the only reasonable award must be that the Respondents bear the arbitration fees as a consequence of losing.

67.     With regards to the four main points of the Respondents' alternative claims (see Paragraph 50 above), the first Claimant's responses to each point are as follows:-

(1) The expenses decided by the arbitration tribunal to be borne by one party or to be retained for apportionment

The first Claimant does not object to the basic claim that the relevant orders issued by the arbitral tribunal for the first Claimant to bear the expenses should be maintained; the first Claimant agrees that there is no reason the final award will be overturned or cause the need to re-process the order that the arbitration fees have been issued in respect of the intermediate application. On the contrary, the first Claimant objects the claim that the Respondents shall be entitled to the costs retained by the arbitral tribunal in respect of the expenses incurred by the second Claimant's application for the estate administrator. This application was the prelude to the final accession of the second Claimant's estate to this arbitration, and shall be handled together with the subsequent application and related matters.

(2) Expenses incurred by the two Claimants for using multiple counsels

The positions and claims of the first Claimant and his legal team in the arbitration from the very beginning have been confirmed in the final award; any so-called extra expenses can only be attributed to the representation expenses derived from the second Claimant's engagement of another legal team after the arbitration started. Therefore, the first Claimant holds that all the arbitration fees of one party should be borne by the Respondents. As mentioned above, the first Claimant keeps a neutral position about whether the legal team of the second Claimant should obtain the arbitration fees at the same time; however, this action has been approved by the arbitration tribunal, which does affect the arbitration fees that the first Claimant needs to continuously engage the same legal team from the start of court to handle entire arbitration. If necessary, the first Claimant alternately indicates that the first Claimant and the second Claimant, prior to his death, held mutual trust and had no conflicts. The legal team of the first Claimant was also initially commissioned by the second Claimant to represent the Claimants in the arbitration. The unfortunate death of the second Claimant was not the wish of the first Claimant, and the first Claimant has no control over the fact that the surviving spouse and daughter of the second Claimant did not cooperate with and did not trust the first Claimant. Throughout the development of the matter, the first Claimant had no inappropriate conducts that hold the first Claimant liable.

(3) Expenses incurred due to conflicts between the Claimants

ASIA-DOCS\10768653.6

With regards to the second Claimant's engagement of another legal team after the commencement of the arbitration, the Respondents only stated that the Respondents keep a neutral position or do not oppose regarding the applications by the Claimants. In essence, the Respondents did not and need not participate in it, far from needing special arbitration fees. The first Claimant objects the need to pay the Respondents the so-called expenses for this issue.

(4) <u>The relevant expenses incurred in the outcome of the award that the Respondents won or expected to be consistent with the Respondents' request in the case</u>

It is mainly divided into three items. (i) The replacement of the arbitrator was actually a matter of the arbitration procedures. The first Claimant has no control over the fact that one of the arbitrators left after the final award was issued, and the objection claimed by the first Claimant also had evidentiary basis. The first Claimant considers that the appropriate arbitration fees are attributed to the case through the order. (ii) With regards to the application for interpretation, correction and supplementation, the arbitral tribunal did accept some of the requests of the Claimants and also confirmed the needs of the application; however, the position of the Respondents in each objection was the main factor that made the application complicated. The first Claimant also considers that the appropriate arbitration fees are attributed to the case through the order. (iii) Finally, the first Claimant also reiterates the above statements to refute the claim that the Respondents was so-called recognized and supported by the arbitral tribunal and that each Claimant shall bear their own expenses. The Respondents failed to provide any special reason for the arbitral tribunal to divide the arbitration fees for these individual claims.

68. With regards to the claim of the second Claimant for the arbitration fees of some intermediate procedures, the basic position of the first Claimant is that since the second Claimant insisted on continuing to participate in the arbitration at the beginning together with the first Claimant as the Claimants, in principle, the second Claimant waived the right to recover the arbitration fees from the first Claimant. The first Claimant also refuted each of the second Claimant's claims for the intermediate procedure expenses.

**F. Response statements of the second Claimant to arbitration fees and interest**

69. Key points of the second Claimant in the response statements are as follows:

(1)      The case of the principle for the arbitration fees cited by the Respondents (i.e., **AEI Rediffusion Music Ltd v. Phonographic Performance Ltd**) does not apply to this case at all, because the case was about the exercise of special discretion granted by law by the UK Intellectual Property Office. There is a clear case in Hong Kong that the special discretion mentioned in the **Rediffusion** case does not apply to ordinary civil and commercial disputes;

(2)      The claims that the positions taken by the Respondents in this arbitration are reasonable are not consistent with the facts at all. It is shown in the evidence and statements presented by the parties during the arbitration and in the final award that the Respondents have always raised objections to the important items in the *4.28 Agreement*, such as the equity consideration, debt settlement and audit report, and none of their arguments and evidence have been accepted by the arbitration tribunal;

(3)      The Respondents claim that the first and second Claimants caused additional costs to arise from their conflicts and engagement of legal representation teams by phases, which shall be borne by the Claimants. This argument completely ignores the fact that the arbitral tribunal has made appropriate orders on the engagements of attorneys by the first and second Claimants, respectively. Before and after the orders were issued, no objection was raised by the Respondents. Therefore, it is unfair to the Claimants and contradictory to the Respondents' position that the Respondents request the Claimants to bear the arbitration fees for the above reasons after losing the case. In addition, the second Claimant has clearly stated in the statements for the arbitration fees and interest that the second Claimant has been making efforts to provide reasonable, effective and appropriate assistance to the arbitral tribunal under the representation of the attorneys, with the arguments and evidence thereof accepted by the arbitral tribunal, so the arbitration fees shall be granted;

(4)      With regards to the interest, the Respondents refuse to perform the *4.28 Agreement*, so the Claimants have not been able to enjoy the money and rights and interest under the agreement. As the unsuccessful party, the Respondents shall undoubtedly pay the interest to the Claimants to compensate the loss of the Claimants.

70. The second Claimant discussed the above four key points in the other parts of his response statements. The arbitration tribunal has read them carefully, so there is no need to repeat here.

**G. Response statements of the Respondents to arbitration fees and interest**

71. In the response statements of the Respondents, the key points are as follows:

(1)      The first Claimant fails to comply with the order of the arbitration tribunal to submit a list of the costs as the evidence for the arbitration fees, which makes it impossible for the arbitration tribunal to assess the reasonableness of the costs. Obviously, in the amount of RMB 28 million claimed by the first Claimant, at least the expenses to be borne by the first Claimant as determined by the arbitral tribunal has not been deducted, which shows that the claim of the first Claimant is unreasonable. Therefore, the arbitration tribunal shall reject the claim of the first Claimant for the costs, support the claim of the Respondents, and rule that each party shall bear their own arbitration fees.

(2)      To make a concession, alternatively, if the arbitration tribunal considers that it is necessary to make other decisions regarding the arbitration fees, then the Respondents claim that, in this case, the time and costs of the proceedings are significantly increased due to reasons such as the conflicts between the Claimants, and the Respondents shall not bear the following expenses:

(i)      The expenses that have been decided by the arbitration tribunal to be borne by the first Claimant;

(ii)     The expenses incurred by the first Claimant to resolve the conflicts between the Claimants;

(iii)    The expenses incurred by the first Claimant in the matters that the Respondents obtained support (including the Claimant's objection and question to the substitute arbitrator, the Claimant's interpretation, correction and supplementation, etc.); and

(iv)    Half of the costs incurred during the period before the second Claimant engaged another counsel

72. With regards to the claim of the first Claimant for interest, the Respondents claim that the interest shall not be supported for the reasons in Paragraphs 51-55 of the *Statements of the Respondents for Arbitration fees and interest*. To make a concession, if the arbitration tribunal considers that the Respondents need to pay interest for the third installment payment, then (1) the principal in the interest calculation shall be adjusted to RMB 22,289,896, (2) the interest shall be simple interest (the interest rate shall be HKBOR + 2%), and (3) the applicable period shall be 36 months.

73. With regards to the *Statements of the Second Claimant for Arbitration fees and interest*, the Respondents hold the opinions that:

(1)     Firstly, with respect to the costs claimed by the second Claimant, the Respondents consider that it is unnecessary for the second Claimant to engage a counsel, and the second Claimant has no right to request the Respondents to bear such costs.

(2)     To make a concession, even if it is necessary and/or reasonable for the second Claimant to engage an agent (denied by the Respondents), the Respondents shall not bear all the costs arising therefrom. The arbitral tribunal shall consider the additional costs incurred from the one counsel if the two Claimants engaged only one counsel and only support such additional costs (for example, referring to the case of Eric Edward, 10% of the costs reasonably incurred by the second Claimant is supported).

(3)      Secondly, with regards to the claim of the second Claimant for calculation of interest (especially the claim for compound interest), the Respondents consider that the claim shall not be supported. For the reasons stated in Paragraphs 51-55 of the *Statements of the Respondents for Arbitration fees and interest*, the Respondents claim that the arbitral tribunal shall rule that the Respondents are not required to pay interest to the Claimants.

(4)      To make a further concession, if the arbitration tribunal considers that the Respondents are required to pay interest for the third installment payment, the interest shall not be calculated by the compound interest claimed by the second Claimant. If the arbitration tribunal considers that the Respondents are required to pay interest for the third installment payment, then (1) the principal for calculating the interest shall be adjusted to RMB 22,289,896, (2) the interest shall be simple interest (the interest rate shall be HKBOR + 2%), and (3) the applicable period shall be 36 months.

## H. Analysis and grounds of the arbitration tribunal

## Apportionment of arbitration fees

74.      With regards to the issues related to the arbitration fees and interest, the parties have made a lot of written statements, which involved many details and disputes. In the opinions of the arbitral tribunal, injustice may arise if the issues related to the arbitration fees and interest are dealt with in a microscopic way, and it is more appropriate and fair to determine the way to apportion the arbitration fees and the interest from a macroscopic perspective.

75.      In the opinion of the arbitration tribunal, it is impractical in the claim of the second Claimant and the Respondents to list the intermediate procedures one by one and request the arbitration tribunal to confirm the expenses incurred from the intermediate procedures and to order the apportionment of the expenses incurred.

76.      From a macroscopic perspective, the arbitral tribunal classifies the arbitration fees into the following three categories:

(1) Fees for the arbitral tribunal;

(2) Fees for HKIAC; and

ASIA-DOCS\10768653.6

(3) The attorney's fees for the parties (including fees for attorneys and barristers).

77. After reviewing to the statements of the parties and the cases cited, the arbitral tribunal holds the opinion that there are several principles applicable to this case in terms of the arbitration fees, namely:

(1) The arbitration tribunal has a high level of discretion to decide how to apportion the costs;

(2) The exercise of the discretion must be in accordance with the justice of laws rather than random or arbitrary;

(3) Generally speaking, the unsuccessful party shall bear the costs of the successful party. The right to costs cannot be denied simply because some claims made by the successful party are not supported.

78.     In this case, the claims of the Respondents have been supported by the arbitration tribunal for some issues (for example, the issue of salary expenses between January and November 2009 for Ke Zhengguang and Xu Hongbiao, the interest generated by Oasis Investment and its subordinate companies for occupying the funds of Si Ji Hua Cheng, and the interest for the unpaid items of the controlling shareholders), but the Respondents is the unsuccessful party in the procedure as a whole.

79.     Therefore, the arbitration tribunal holds the opinion that the Respondents shall bear the arbitration costs of the Claimants.

80.     However, the arbitration tribunal has to further consider whether the Respondents should bear the arbitration fees of one or two Claimants.

81.     Under the laws of Hong Kong, the general legal principle is that if there are joint plaintiffs in a case, the joint plaintiffs shall be represented by the same counsel in the absence of conflicts of interest and differences of opinions. See **Lewis v. Daily Telegraph (No 2)** [1964] 2 QB 601 and **Ong v. Ping** [2015] 6 Costs LR 997. In this case, the first Claimant and the second Claimant are represented by different law firms (and barristers), respectively. The reasons have been described and explained in the final award (excluding the arbitration fees and interest).

82.     Under such circumstances, the arbitral tribunal allowed the two Claimants to engage different attorneys. At that time, the position of the second Claimant was that the counsel of the second Claimant would attend the court session as an observer. However, in the actual court session, the attorney of the second Claimant participated in the whole session. Moreover, there was no substantive difference between the positions of the second Claimant and that of the first Claimant at the session. In fact, the reason that the two parties could not engage the same law firm previously stated no longer existed.

83.     In addition, the position of the second Claimant in the case in the session was to a large extent the same as that of the first Claimant.

84.     Taking these factors into account, the arbitral tribunal holds the opinion that it was inappropriate and unreasonable to request the Respondents to bear the attorney's fees of two Claimants. The arbitral tribunal also holds the opinion that most of the work of the teams of attorneys of the first Claimant and the second Claimant was repeated.

85.     Therefore, a more equitable approach is to give an appropriate discount for attorneys' fees for the first Claimant and the second Claimant. After comprehensive considerations, the arbitral tribunal holds the opinion that the reasonable discount rate is 40%. In other words, the Respondents only need to bear 60% of the attorney's fees of the first Claimant and 60% of the attorney's fees of the second Claimant.

86.     With regards to the fees for the arbitration tribunal and HKIAC, there are no issue of repeated work like the attorney's fees. However, taking into account during the applications in some intermediate procedures, the arbitral tribunal ordered the Claimants to bear the expenses of the Respondents. After comprehensive considerations, the arbitration tribunal considers that the Respondents shall bear 80% of the total fees for the arbitration tribunal and HKIAC, while the first and second Claimants shall bear 20% of the fees for the arbitration tribunal and HKIAC.

87.     Paragraphs 81 to 83 above reflect not only the general principle of apportionment of costs, but also the individual directions previously made by the arbitral tribunal for the apportionment of fees for certain applications.

ASIA-DOCS\10768653.6

88.     As for the amount of the attorney's fees, the first Claimant only claimed the total amount of HK$ 28,000,000 in the *Statements of the First Claimant for Arbitration fees and interest*, but did not provide any details or evidentiary supports. Later, in the response statements of the first Claimant, Attachment I was provided, but Attachment I only listed the expenses, and the bills or other evidence were not attached.

89.     In view of this situation, the arbitral tribunal is unable to determine whether the total amount reported by the first Claimant is reasonable. The arbitral tribunal can only make references to the attorney's fees of the second Claimant for evaluation. The total amount of the attorney's fees of the second Claimant (including the fees of the barrister) is HK$ 13,177,356.20. Judging by the amount of the attorney's fees provided by the second Claimant, the amount of the attorney's fees of the first Claimant seems to be twice that of the second Claimant. Although the attorneys of the first Claimant started involvement in the arbitration earlier than the attorneys of the second Claimant, the arbitral tribunal holds the opinion that the amount should not exceed twice of the attorney's fees of second Claimant.

90.     Based on a more conservative estimation, the amount of reasonable attorneys' fees assessed by the arbitral tribunal for the first Claimant should not exceed HK$ 15,000,000.

91.     By analogy, the amount of attorney's fees of the first and second Claimant to be borne by the Respondents is HK$ 9,000,000 and HK$ 7,800,000 respectively.

92.     The second Claimant also made another claim that the first Claimant must bear the arbitration fees of the second Claimant for certain issues, as stated in Paragraph 35 above. The arbitration tribunal holds the opinion that the main reason for these issues was the unfortunate death of Mr. Ke Zhengguang after the commencement of the arbitration, after which his surviving spouse and daughter had opinions on handling the case different from Xu Hongbiao, the first Claimant. The arbitral tribunal did not have enough evidence to determine which party should be responsible for the issue (also, this issue was not related to the case involved), so it did not support this claim of the second Claimant.

**Interest**

39

93. With regards to the interest, the parties have the following differences:

(1) Calculation of the principal;

(2) Calculation of the period;

(3) Issues about the interest rate;

(4) Simple interest or compound interest.

94. With regards to the principal, the amount claimed by the first Claimant should be RMB 150 million.

95. The amount claimed by the second Claimant is the interest generated by one half of RMB 150 million less RMB 41,244,613.21 plus RMB 30 million and the amount in Order No.9 (RMB 10,346,211), respectively. According to the method for calculation claimed by the second Claimant, one-half of RMB 149,101,597.79 is obtained, that is, RMB 74,550,798.89.

96. The principal claimed by the Respondents should be RMB 22,289,896 (refer to Paragraph 56 above).

97. The arbitration tribunal holds the opinion that except for the deduction of RMB 41,244,613.21 (the undisputed amount of the carryover current accounts that the Claimants should bear) and RMB 3,127,591.77 (the salary expenses of Mr. Ke Zhengguang and Mr. Xu Hongbiao from January to November 2009), the remaining amount claimed by the Respondents that should be deducted and RMB 30,000,000 should not be included in the scope of interest calculation could not be supported.

98. Therefore, the amount of the principal should be RMB 149,101,597.79 less RMB 3,127,591.77 = RMB 145,974,006.

99. With regards to the period for interest, the first Claimant claims that the interest from December 31, 2012 to the date of actual payment shall be paid.

100. With regards to the period for interest, the second Claimant claims that the period shall be from the date of expiration of performance under the *4.28 Agreement* to the date when the arbitral tribunal made an award. With regards to Order No.8, under the Article 2.2.1 (3) of the 4.28 Agreement, the calculation shall start from December 31, 2012 and end on February 28, 2018, which was the date of final award. With regards to Order No.9, the calculation shall start from August 8, 2017 and end on February 28, 2018, which was the date of the final award.

101. The period claimed by the Respondents is 36 months (See Paragraph 58 above).

102. The arbitration tribunal holds the opinion that the method of calculation of the Respondents is reasonable and adopted.

103. With regards to the interest rate, the arbitration tribunal holds the opinion that the most appropriate interest rate is the most preferential loan interest rate of HSBC plus 1%. The interest rate is applicable before and after the arbitration award until the Respondent makes payment. The amount of principal for calculating the interest is RMB 145,974,006. Under the Article 80 (1) of the Arbitration Ordinance, the interest is payable on money awarded by an arbitral tribunal from the date of the award at the judgment rate, except when the award otherwise provides. This means that the arbitral tribunal may, at its discretion, determine the interest to be paid for the amount awarded not at the judgment rate (currently 8% per annum). In this case, considering the relatively long time from the date of the award to the final award for the arbitration fees and interest, the arbitration tribunal decided that a more reasonable approach should be to adopt the most preferential loan interest rate of Hong Kong HSBC plus 1% as the applicable interest rate after the arbitration award until the Respondents pay off the money.

104. With regards to whether the interest should be calculated by simple interest or compound interest, the claim of the second Claimant is that it should be calculated by compound interest. In the opinion of the arbitral tribunal, the interest shall not be calculated by way of compound interest unless under special circumstances. There is no special circumstance in this case, so the arbitration tribunal does not support the claim of the second Claimant.

**I. Orders of the arbitral tribunal for arbitration fees and interest**

105. The arbitral tribunal makes the following orders:

106. The Respondents shall pay the first Claimant HK$ 9,000,000 for attorney's fees and HK$ 4,961,030 for arbitration fees (including the fees for the arbitral tribunal and the fees for HKIAC).

107. The Respondents shall pay the second Claimant HK$ 7,800,000 for attorney's fees and HK$ 4,961,030 for arbitration fees (including the fees for the arbitral tribunal and the fees for HKIAC).

108. With regards to Orders No.8 and No.9 in the final award of the arbitral tribunal (excluding the arbitration fees and interest), the Respondents shall pay the interest. The method to calculate the interest is as follows: Simple interest with the principal amount of RMB 145,974,006 multiplied by the interest rate which is the most preferential loan interest rate of HSBC in Hong Kong plus 1%.

109. All other claims of the parties are rejected.

Issued on March 16, 2020

Seat of the Arbitration: Hong Kong

42

[Signature of Huang Xulun]                      [Signature of Wang Xuehua]

_____                _____

Huang Xulun, Senior Barrister                        Mr. Wang Xuehua
Arbitrator                                                Arbitrator


[Signature of Yang Yanlong]                     [Official Seal]:

_____

Mr. Yang Yanlong                             Hong Kong International Arbitration Centre
Chief Arbitrator on behalf of the Arbitral Tribunal

43

# EXHIBIT 20

# TRANSLATION CERTIFICATION

Date: July 31, 2020

To whom it may concern:

This is to certify that the attached translation is an accurate representation of the documents received by this office. The translation was completed from:

- Chinese (PRC)

To:

- English (USA)

The documents are designated as:
- 20200626 A13028 Award on Interpretation and Clarification

Eugene Li, Project Manager in this company, attests to the following:

"To the best of my knowledge, the aforementioned documents are a true, full and accurate translation of the specified documents."

_____
Signature of Eugene Li

## Arbitration in accordance with *Hong Kong International Arbitration Centre Administered Arbitration Rules 2018*
## Case No.: HKIAC/A13028

Xu Hongbiao                                                          the first claimant

Ke  Zhengguang' s estate                                       the second claimant

(collectively referred to as "claimants")

&

Oasis Investment Group Limited                          the first respondent

Yu Stephany Naifen                                           the second respondent

Yu Naiwen                                                        the third respondent

Yu Naijun                                                         the fourth respondent

(collectively referred to as "respondents")

**Decision of the Arbitral Tribunal on the *Application of the Respondents for Correcting/Explaining "Final Award on Arbitration Fees and Interest"***

1.   The arbitral tribunal issued the *Final Award (Except Interest and Arbitration Fees* ("***Final Award***") on 28 February 2018.

2.   The arbitral tribunal issued the *Final Award on Arbitration Fees and Interest* ("***Fee Award***") on 16 March 2020.

3.   The respondents submitted the *Application of the Respondents for Correcting/Explaining "Final Award on Arbitration Fees and Interest"* ("***Application***") on 15 April 2020.

4.   In the *Application*, the respondents mentioned the emails of Hong Kong International Arbitration Centre dated 10 March 2020 and 17 March 2020 as well as the *Fee Award* of the arbitral tribunal dated 16 March 2020, and confirmed that the *Fee Award* was received in form of an email on 17 March 2020.

5.   The arbitral tribunal confirmed reception of the *Application of the Respondents for Correcting/Explaining "Final Award on Arbitration Fees and Interest"* and annexes

1

thereof on 15 April 2020. In accordance with Article 33.1 of the *Hong Kong International Arbitration Centre Administered Arbitration Rules 2018*, the arbitral tribunal required the first claimant and the second claimant to provide opinions on this application of the respondents to the arbitral tribunal not later than 15 May 2020.

6. The first claimant submitted a reply on 13 May 2020.

7. The second claimant submitted a reply on 15 May 2020.

8. Without the approval of the arbitral tribunal, the respondents responded to the replies of the first claimant and the second claimant on 26 May 2020.

9. On the same date, the first claimant opposed the arbitral tribunal to consider the response of the respondents.

10. On 27 May 2020, the second claimant opposed the arbitral tribunal to consider the response of the respondents.

11. The arbitral tribunal informed the parties on 29 May 2020 that it intends to consider the issue of whether to accept the respondents' response dated May 26 in the decision of the arbitral tribunal on the *Application*, so the parties do not need to debate this issue any further.

**Initial question: Should the arbitral tribunal consider the content of the email of the respondents dated 26 May 2020?**

12. In response to this question, the arbitral tribunal believes that the email of the respondents dated 26 May 2020 should be divided into two parts to discuss: The first part is the response of the respondents to the reply opinions of the first claimant and the second claimant; the second part is a new request made by the respondents regarding Paragraph 108 of the *Fee Award* (see Point 7 of the email of the respondent dated May 26).

13. With regard to the first part, the arbitral tribunal believes that it has the discretion to allow the respondents to respond to the opinions of the first and the second claimants. Since the *Application* was filed by the respondents, the applicant has the final say in accordance with the arbitration procedure in Hong Kong law. Although the respondents have not officially filed an application for response to the arbitral tribunal, the arbitral tribunal can handle this issue as appropriate in consideration of the above

2

principles.

14.    With regard to the second part, the arbitral tribunal believes that the request of the respondents has exceeded the time limit under Article 33.1 of the *Arbitration Rules* and therefore will not be considered.

15.    In order to avoid doubts, the arbitral tribunal considered the response of the respondents dated May 26 (except Point 7), and believed that the response has no substantial impact on the decision of the arbitral tribunal on the *Application*.

### *Content of the Application*

16.    The *Application* consists of two parts:

    (I)    Request the arbitral tribunal to correct the instructions in Paragraphs 106 and 107 of the *Fee Award*;

    (II)    Request the arbitral tribunal to correct and/or explain the interest period in Paragraph 108 of the *Fee Award*.

## (I)    Request the arbitral tribunal to correct the instructions in Paragraphs 106 and 107 of the *Fee Award*

17.    The respondents request arbitral tribunal to correct Paragraph 106 of the *Fee Award* [original text: "The respondents must pay the first claimant HK$ 9,000,000 of lawyer fee and HK$ 4,961,030 of arbitration fee (including the fee of the arbitral tribunal and the fee of the HKIAC)"] <u>as</u> "*the respondents must pay the first claimant HK$ 7,800,000 of lawyer fee and HK$ 1,377,978.55 of arbitration fee (including the fee of the arbitral tribunal and the fee of the HKIAC)."*

18.    The respondents request the arbitral tribunal to correct Paragraph 107 of the *Fee Award* [original text: "The respondents must pay the second claimant HK$ 7,800,000 of lawyer fee and HK$ 4,961,030 of arbitration fee (including the fee of the arbitral tribunal and the fee of the HKIAC)"] <u>as</u>: "*the respondents must pay the second claimant HK$ 6,599,822 of lawyer fee and HK$ 1,377,978.55 of arbitration fee (including the fee of the arbitral tribunal and the fee of the HKIAC)*."

### Reasons of the respondents

19.    The main reason of the respondents: The arbitral tribunal elaborates the analysis and determination of the arbitral tribunal on the sharing of lawyer fees in Paragraphs 82 to

3

92 of the *Fee Award*. The respondents believe that the arbitral tribunal has calculation errors in the sharing of the lawyer fees of the first claimant and the second claimant, that is: the arbitration fee was incorrectly included in the lawyer fee of the second claimant (which also led to the problem of repeated sharing of the arbitration fee).

**Reply opinions of the first claimant on 13 May 2020**

20.   Opinions of the first claimant: According to the award in Paragraph 106 of the *Fee Award*, the total arbitration fee awarded to the first claimant by the arbitral tribunal is approximately HK\$ 14,000,000, less than half of the amount claimed by the first claimant, which is approximately HK\$ 28,200,000. This judgment amount is absolutely consistent and has no  contradiction and conflict with the judgments in Paragraph 85 of the *Fee Award* "the respondents only need to bear 60% of the lawyer fee of the first claimant" and Paragraph 86 "the arbitral tribunal believes that the respondents must bear 80% of the total fees of the arbitral tribunal and the HKIAC". Moreover, the arbitral tribunal emphasized in the court verdict time and time again that the judgment of the arbitral tribunal on fees and interest applies the principle of "a high degree of discretion" from the "macroscopic direction". According to the analysis and reasons of the arbitral tribunal in the court verdict cited above, the arbitral tribunal is obviously in line with the legal justice rather than arbitrary or dogmatical when exercising this discretion, so there is not "calculation error, any clerical error, printing error or any errors of a similar nature"

**Reply opinions of the second claimant on 15 May 2020**

21.   Opinions of the second claimant: The second claimant has no objection in principle to the request of the respondents for correction of Paragraphs 106 and 107 of the *Fee Award*. However, the second claimant pointed out that the respondents certainly could and should discuss the above correction request with the claimants first and solicit the consent of the claimants in advance rather than took great pains to file a detailed correction application to the arbitral tribunal without prior notice to the second claimant, causing unnecessary expenses.

22.   The second claimant also stated that the arbitral tribunal clearly indicates in Paragraph 77 of the *Fee Award* that one of the principles on which the arbitral tribunal is based when making a decision is "the arbitral tribunal has a high degree of discretion to determine how to share legal costs", so if the arbitral tribunal agrees to the claim of the

4

first claimant and rejects the application of the respondents regarding Paragraphs 106 and 107 of the *Fee Award*, the decision of the arbitral tribunal on the arbitration fees is in line with the principle of the arbitral tribunal exercising a high degree of discretion.

**Decision of the arbitral tribunal**

23.  First of all, the arbitral tribunal has noticed that the second claimant has no objection in principle to the request of the respondents for correction of Paragraphs 106 and 107 of the *Fee Award*. However, because the content of Paragraph 106 of the *Fee Award* is linked to the first claimant, while Paragraph 107 of the *Fee Award* is linked to the fees of the second claimant, the consent of the second claimant in principle cannot bind on the first claimant (i.e.: Paragraph 106 of the *Fee Award*). The first claimant objects to the application for correction of Paragraph 106 of the *Fee Award*.

24.  Next, the arbitral tribunal considered the statement of the respondents in Paragraph 9 of the *Application*. The content is as follows:

"9.   The respondents think that the arbitral tribunal has the following calculation errors regarding the sharing of the lawyer fees of the first claimant and the second claimant:

9.1   The arbitration fee was incorrectly included in the lawyer fee of the second claimant (which also led to the problem of repeated sharing of the arbitration fee) by the arbitral tribunal. Paragraph 30 of the *Fee Award* lists all the details of the fees of the second claimant in the arbitration and the total amount is HK\$ 13,177,356.20, which includes both the lawyer fee, and the Hong Kong International Arbitration Centre fee of HK\$ 41,120.50 and the arbitral tribunal fee of HK\$ 2,136,542.52. The arbitral tribunal did not deduct the Hong Kong International Arbitration Centre fee of HK\$ 41,120.50 and the arbitral tribunal fee of HK\$ 2,136,542.52 from the total fee amount submitted by the second claimant when calculating the lawyer fee of the second claimant. After deduction of the above two arbitration fees, the lawyer fee claimed by the second claimant should be HK\$ 10,999,703. In view of the arbitral tribunal's decision that the respondents only need to bear 60% of the lawyer fee of the second claimant, the respondents need to bear: 6,599,822 Hong Kong dollars (10,999,703 Hong Kong dollars *60% = 6,599,822 Hong Kong dollars) of

5

the lawyer fee of the second claimant.

9.2    Correspondingly, the basis (i.e., the lawyer fee of the second claimant) that the arbitral tribunal uses to analogize the reasonable lawyer fee of the first claimant is incorrect, resulting in incorrect calculation of the lawyer fee of the first claimant that should be shared by the respondents. It can be seen from Paragraphs 88 to 90 of the *Fee Award* that the arbitral tribunal was based on the lawyer fee of the second claimant when it estimated the lawyer fee of the first claimant. On the basis of HK$ 13,177,356.20 of the lawyer fee of the second claimant, the arbitral tribunal estimated that the reasonable lawyer fee of the first claimant is HK$ 15,000,000. Given that the lawyer fee of the second claimant actually needs to be corrected to HK$ 10,999,703 (a decrease of approximately 2.17 million Hong Kong dollars), the lawyer fee of the first claimant should be reduced to HK$ 13,000,000 (a decrease of 2 million Hong Kong dollars) according to the estimation method of the arbitral tribunal. Therefore, the respondents should share 7,800,000 Hong Kong dollars (13,000,000 Hong Kong dollars * 60% = 7,800,000 Hong Kong dollars) of the lawyer fee of the first claimant."

25.    The arbitral tribunal agrees to the statement of the respondents in Paragraph 9.1 of the *Application*, i.e.: the arbitral tribunal did not deduct the Hong Kong International Arbitration Centre fee of HK$ 41,120.50 and the arbitral tribunal fee of HK$ 2,136,542.52 from the total fee amount submitted by the second claimant when calculating the lawyer fee of the second claimant. After deduction of the above two arbitration fees, the lawyer fee claimed by the second claimant should be HK$ 10,999,703. In view of the arbitral tribunal's decision that the respondents only need to bear 60% of the lawyer fee of the second claimant, the respondents need to bear: 6,599,822 Hong Kong dollars (10,999,703 Hong Kong dollars *60%＝ 6,599,822 Hong Kong dollars) of the lawyer fee of the second claimant.

26.    However, the arbitral tribunal does not accept the statement of the respondents in Paragraph 9.2 of the *Application*. Although the arbitral tribunal considered the lawyer fee of the second claimant in the process of evaluating the reasonable lawyer fee of the first claimant, the arbitral tribunal reached its conclusion from the macroscopic

6

direction and the use of its discretion, rather than calculated the reasonable lawyer fee of the first claimant by a fixed equation on the basis of the lawyer fee of the second claimant.

27.  In addition, the arbitral tribunal also agrees to the statements of the respondents in Paragraphs 12, 13 and 14 of the *Application*. The content is as follows:

"12.  From the arbitral tribunal and HKIAC fee schedule of HKIAC dated 9 March 2020, it can be seen that up till this date, the total amount of arbitration fees is HK$ 9,922,059.51 (including HK$ 164,252.80 of the HKIAC fee, HK$ 9,711,566.71 of the arbitral tribunal fee incurred and HK$ 46,240 of fees to be paid to Arbitrator Wang). After rounding, the total amount is HK$ 9,922,060. At the same time, the fourth column of the last row of the schedule also clearly shows that the respondents have paid HK$ 5,181,690.90 in the total amount of the above arbitration fees.

13.  Based on Paragraph 86 of the *Fee Award*, the respondents need to bear 80% of the arbitral tribunal and HKIAC fees (i.e., total arbitration fee), i.e., 7,937,648 Hong Kong dollars (9,922,060 Hong Kong dollars * 80%＝7,937,648 Hong Kong dollars). Therefore, when issuing a payment order, the arbitral tribunal needs to deduct the arbitration fee that has been paid by the respondents, i.e., HK$ 5,181,690.90.  Therefore, the total amount of arbitration fees that the respondents need to pay to the two claimants is 2,755,957.1 Hong Kong dollars (7,937,648 Hong Kong dollars - 5,181,690.90 Hong Kong dollars = 2,755,957.1 Hong Kong dollars). In other words, the respondents need to pay the first claimant and the second claimant HK$ 1,377,978.55 of arbitration fees respectively.

14.  According to Paragraphs 106 and 107 of the *Fee Award*: The arbitral tribunal ordered the respondents to pay the first claimant and the second claimant HK$ 4,961,030 of arbitration fees respectively, in total of HK$ 9,922,060. This amount is not deducted by the amount of arbitration fees that has already been paid by the respondents. It can be seen that the instruction of the arbitral tribunal has an error in the calculation of the shared amount of arbitration fees."

28.  Therefore, the arbitral tribunal can only partially support respondents' application regarding Paragraph 106 of the *Fee Award*, that is: the arbitral tribunal will only

7

correct the arbitration fee of the first claimant payable by the respondents, and does not need to correct the lawyer fee of the first claimant payable by the respondents.

29. As for the application of the respondents regarding Paragraph 107 of the *Fee Award*, since the second claimant has no objection to it in principle, the arbitral tribunal supports it.

**(II)   Request the arbitral tribunal to correct and/or explain the interest period in Paragraph 108 of the *Fee Award***

30. The respondents request the arbitral tribunal to correct and/or explain Paragraph 108 of the *Fee Award* [original text: "According to the 8th and 9th orders of the arbitral tribunal in the *Final Award (Except Interest and Arbitration fees)*, the respondents must pay interest. The calculation method of the interest is: RMB 145,974,006 of the principal $\times$ simple interest (HSBC prime rate + 1%)"] as:

"According to the 8th and 9th orders of the arbitral tribunal in the *Final Award (Except Interest and Arbitration fees)*, the respondents must pay interest. The calculation method of the interest is:  (i) RMB 135,627,795 of the principal  $\times$ simple interest (HSBC prime rate + 1%)  $\times$ 36 months of interest period , +  (ii) RMB 10,346,211 of the principal  $\times$ simple interest (HSBC prime rate + 1%)  $\times$ 204 days of interest period (from 8 August 2017 to 28 February 2018)."

**Reasons of the respondents**

31. The reasons provided by the respondents are included in Paragraph 22 of the *Application*. The respondents believe that the language in Paragraph 108 of the *Fee Award* is ambiguous, and is misunderstood that the interest period applicable to the entire RMB 145,974,006 is 36 months. This ambiguity is inconsistent with the original intention of the arbitral tribunal (as reflected in the following paragraph of the *Fee Award*).

32. The following is the statement of the respondent, which refines this claim in Paragraphs 22.1 to 22.6 of the *Application*:

"22.1 Firstly, the arbitral tribunal provides the relevant principal amount for interest calculation of the 8th and 9th orders in Paragraph 98 of the *Fee Award*, i.e., "the principal amount should be RMB 149,101,597.79 - RMB 3,127,591.77 = RMB

145,974,006".

22.2  At the same time, regarding the calculation of the principal amount, the arbitral tribunal is based on the amount claimed by the second claimant, which is RMB 149,101,597.79 (see Paragraph 95 of the *Fee Award* for details).  It can be seen that this amount includes both RMB 135,627,795 related to the 8th order and RMB 10,346,211 related to the 9th order, which are interest bearable and determined by the arbitral tribunal.

22.3  At the same time, the arbitral tribunal supports the claim of the respondents for the interest period, which is 36 months (see Paragraph 101 of the *Fee Award* for details).

22.4  But in fact, the RMB 10,346,211 related to the 9th order and the RMB 135,627,795 related to the 8th order are different in the interest calculation time. It is relevant to the different natures of the 8th and 9th orders: The 9th order is the award of damages, which becomes effective after the *Final Award* comes into force, and the 8th order is the Obligatio ex contractu under the *4.28 Agreement*.

22.5  Because of this, the original intention of the arbitral tribunal should be that the interest-bearing time of compensation related to the 9th order is from 8 August 2017 to 28 February 2018, which is 204 days (not 36 months). This has been confirmed in Paragraph 303 of the *Final Award* and also explained in Paragraph 100 of the *Fee Award*. Moreover, it is the own claim of the second claimant (see Paragraph 39 of the *Fee Award*), the second claimant does not claim that the interest-bearing time of compensation related to the 9th order is 36 months, and neither does the first claimant claim for interest of the compensation related to the 9th order (see Paragraphs 19 to 20 of the *Fee Award*), so it is impossible for the arbitral tribunal to make a ruling beyond the claims of the parties.

22.6  The respondents sincerely speculate that the above ambiguity may be because the arbitral tribunal, when calculating the principal, mistakenly added up the amount related to the 9th order to the amount related to the 8th order. If so, the respondents request the arbitral tribunal to correct it."

**Reply opinions raised by the first claimant on 13 May 2020**

33.   The first claimant claims in Paragraph 10 of his written opinion that the award of the

9

arbitral tribunal does not have any ambiguity in the content, so no correction is needed.

**Reply opinions raised by the second claimant on 15 May 2020**

34.   The second claimant claims in Paragraph 36 of his written opinion as follows: The decision of the arbitral tribunal on interest calculation in the 8th order and 9th order is clear and definite, that is, the principal applicable to interest is RMB 145,974,006 and the interest rate is the simple interest (HSBC prime rate + 1%) and the payer is the respondents. As for the period that the interest rate is applicable to, the arbitral tribunal has given clear instructions in Paragraphs 101 to 103:

> "101.   The period that the respondents claim is 36 months (see Paragraph 58 above).
>
> 102.   The arbitral tribunal believes that the period calculation method of the respondents is reasonable and adopted.
>
> 103.   With regard to the interest rate, the arbitral tribunal believes that the most suitable interest rate is HSBC prime rate + 1%. This interest rate applies to before and after issuance of the arbitral award until the respondents have settled all payments." (Emphasize an addition)

35.   According to Paragraph 61 of the *Statement of the Respondents on Issues Concerning Arbitration fees and Interest*,  the claim of the respondents for a 36-month interest period is specific to the 8th order of the *Final Award*. Therefore, based on the natural and objective understanding on Paragraphs 101 to 103 of the *Fee Award*, the interest period before issuance of the 8th order of the *Final Award* is 36 months. In addition, Paragraph 103 of the *Fee Award* of the arbitral tribunal definitely specifies that the respondents shall also pay interest at HSBC prime rate + 1% after the award is issued in the 8th and 9th orders of the *Final Award* until the respondents have settled all payments. The above statement does not have any room for ambiguity or different understandings.

36.   Therefore, the so-called ambiguity pointed out by the respondents and the speculation in Paragraph 22.6 are obviously inconsistent with the original intention of the arbitral tribunal. The respondents raised the current claim, apparently hoping to overturn the award of the arbitral tribunal.

**Decision of the arbitral tribunal**

10

37. After careful and full consideration of the opinions of all the parties, the arbitral tribunal believes that Paragraph 108 of the *Fee Award* does not have any calculation error, or clerical error, or any understanding ambiguity, or any substantive error. However, the arbitral tribunal also considers that it clearly distinguishes the 8th order and the 9th order of the *Fee Award* regarding the interest period in Paragraph 100 of the *Fee Award*. In order to avoid any doubt, the arbitral tribunal can make appropriate explanation in accordance with Article 33.2 of the *Arbitration Rules*. The arbitral tribunal believes that if Paragraph 108 of the *Fee Award* is corrected/explained as:

"According to the 8th and 9th orders of the arbitral tribunal in the *Final Award (Except Interest and Arbitration Fees)*, the respondents must pay interest. The calculation method of the interest is: (i) RMB 135,627,795 of the principal $\times$ simple interest (HSBC prime rate + 1%) $\times$ 36 months of interest period (applicable to the 8th order of the *Final Award*); + (ii) RMB 10,346,211 of the principal $\times$ simple interest (HSBC prime rate + 1%) $\times$ 204 days of interest period (from 8 August 2017 to 28 February 2018) (applicable to the order of the *Final Award)*."

it will express the original intention of the arbitral tribunal more clearly and avoid unnecessary misunderstanding. In view of this, the arbitral tribunal supports the request of the respondent regarding Paragraph 108 and adds supplementary words.

**Fee allocation of the application**

38. The arbitral tribunal has noticed that the first claimant and the second claimant claimed that the respondents should bear the lawyer fee incurred to the second claimant in dealing with the *Application*.

39. The second claimant stated that: the respondents certainly could and should discuss the above correction request with the claimants first and solicit the consent of the claimants in advance rather than took great pains to file a detailed correction application to the arbitral tribunal without prior notice to the second claimant, causing unnecessary expenses.

40. The arbitral tribunal believes that Articles 33 and 34 of the *Arbitration Rules* grant "the applicant" (i.e., the respondents in this case) the right to apply to the arbitral tribunal for correction and explanation of the award, but this does not impose an obligation of consulting with other parties before such application on the respondents.

11

41.   The *Application* of the respondents is partially supported by the arbitral tribunal, and the rest is rejected, so from a macroscopic perspective, the arbitral tribunal believes that it is fair for each party to bear their respective lawyer fees.

**Conclusion**

42.   The arbitral tribunal agrees to correct Paragraph 106 of the *Fee Award* [original text: "The respondents must pay the first claimant HK$ 9,000,000 of lawyer fee and HK$ 4,961,030 of arbitration fee (including the fee of the arbitral tribunal and the fee of the HKIAC)"] <u>as</u>:

**"The respondents must pay the first claimant HK$ 9,000,000 of lawyer fee and HK$ 1,377,978.55 of arbitration fee (including the fee of the arbitral tribunal and the fee of the HKIAC)."**

43.   The arbitral tribunal agrees to correct Paragraph 107 of the *Fee Award* [original text: "The respondents must pay the second claimant HK$ 7,800,000 of lawyer fee and HK$ 4,961,030 of arbitration fee (including the fee of the arbitral tribunal and the fee of the HKIAC)"] <u>as</u>:

**"The respondents must pay the second claimant HK$ 6,599,822 of lawyer fee and HK$ 1,377,978.55 of arbitration fee (including the fee of the arbitral tribunal and the fee of the HKIAC)."**

44.   The arbitral tribunal agrees to correct and/or explain Paragraph 108 of the *Fee Award* [original text: "According to the 8th and 9th orders of the arbitral tribunal in the *Final Award (Except Interest and Arbitration fees)*, the respondents must pay interest. The calculation method of the interest is: RMB 145,974,006 of the principal $\times$ simple interest (HSBC prime rate + 1%)"] as:

"According to the 8th and 9th orders of the arbitral tribunal in the *Final Award (Except Interest and Arbitration fees)*, the respondents must pay interest. The calculation method of the interest is:  (i) RMB 135,627,795 of the principal $\times$ simple interest (HSBC prime rate + 1%) $\times$ 36 months of interest period (applicable to the 8th order of the *Final Award*); + (ii) RMB 10,346,211 of the principal $\times$ simple interest (HSBC prime rate + 1%) $\times$ 204 days of interest period (from 8 August 2017 to 28 February 2018) (applicable to the   order of the *Final Award)*."

12

Date: 26 June 2020

13

Seat of arbitration: Hong Kong

[Signature] [Wang Xuehua]

_____                    _____

Wang Xuehua                                   Huang Xulun

Arbitrator                                    Arbitrator

_____

Yang Yanlong

Chief Arbitrator


[Seal: HONG KONG INTERNATIONAL ARBITRATION CENTRE]

14

Seat of arbitration: Hong Kong

[Signature] [Illegible]

_____          _____

Wang Xuehua                              Huang Xulun

Arbitrator                               Arbitrator

[Signature] [Illegible]

_____

Arbitrator

Chief Arbitrator

[Seal: HONG KONG INTERNATIONAL ARBITRATION CENTRE]

11

# EXHIBIT 21

# Shanghai Fengxian District People's Court
# Civil Judgment

(2019) Hu 0120 Min Chu No. 10021

Plaintiff: Greencourt Properties Limited., located at Room 12, 10/F, Wing On Plaza, 62 Mody Road, Tsim Sha Tsui, Kowloon, Hong Kong SAR, China

Legal representative: Yu Naifen, director.

Agent ad litem: Gu Yi, a lawyer of Junhe Law Firm Shanghai Branch

Agent ad litem: Liu Jiadi, a lawyer of Junhe Law Firm Shanghai Branch

Defendants: Shanghai Luting Sijihuacheng Real Estate Development Co., Ltd., located at No. 12, Lane 218, Baziqiao Road, Fengxian District, Shanghai, People's Republic of China.

Legal representative: Xu Liangyan, chairman of the board

Defendants: Xu Liangyan, male, born on November 17, 1938, Han nationality, living at Room 1605, No. 2, Lane 92, Yude Road, Xuhui District, Shanghai, People's Republic of China.

Common agent and litem of the above two defendants Zhang Yusheng, a lawyer of Shanghai Zhengce Law Firm.

Third Party: Shibang Co., Ltd., located at Room 1205-1208, 12/F, Xingye Commercial Center, No. 272-284 Des Voeux Road Central, Sheung Wan, Hong Kong SAR, People's Republic of China.

Legal representative: Xu Hongbiao, director.

Agent ad litem: Liu Hongliang, a lawyer of Shanghai Huili Law Firm.

With respect to the case of dispute over company registration change between the plaintiff Greencourt Properties Limited (hereinafter referred to as: "Greencourt Properties") and the defendants Shanghai Luting Sijihuacheng Real Estate Development Co., Ltd. (hereinafter referred to as: "Sijihuacheng Company"), Xu Liangyan, third party Shibang Co., Ltd. (hereinafter referred to as: "Shibang Company"), after the case was filed on May 5, 2019, the court applied ordinary procedures according to law and held a public hearing on May 20, 2020. Gu Yi and Liu Jiadi, agents and litem of the plaintiff, Zhang Yusheng, agent ad litem of the two defendants, and Liu Hongliang, agent ad litem of the third party, all attended the proceedings. This case has now been concluded.

The plaintiff Greencourt Properties filed the litigation requests with our court: 1. The defendant Sijihuacheng Company should go to Fengxian District Market Supervision Administration of Shanghai for registration (filing) of equity change, change the registration of 80% equity of the defendant Sijihuacheng Company originally registered under the plaintiff's name to the third party, and submit a change report through the enterprise registration system when handling this enterprise change registration (filing); 2. The defendant Xu Liangyan should perform the corresponding obligation of assistance and cooperation in handling the registration (filing) and information reporting procedures by the defendant Sijihuacheng Company as stated in the foregoing paragraph 1. Facts and Reasons: The defendant Sijihuacheng Company is a subsidiary jointly established by the plaintiff and an outsider Shanghai Oasis Biological Technology Co., Ltd. (hereinafter referred to as: "Oasis Technology"). The plaintiff holds 80% equity of Sijihuacheng Company, and Oasis Technology holds 20% equity of Sijihuacheng Company. The defendant Xu Liangyan is the chairman and legal representative of Sijihuacheng Company. On July 18, 2018, the plaintiff signed the Equity Transfer Contract with the third party, which stipulated that the plaintiff would transfer all the 80% equity of Sijihuacheng Company held to the third party. In order to sign and perform the above-mentioned Equity Transfer Contract, the shareholders' meeting of Sijihuacheng Company issued a resolution of the shareholders' meeting, and Oasis Technology agreed that the plaintiff would transfer all the 80% equity of Sijihuacheng Company held by it to the third party and to give up its preemptive right. According to relevant laws and regulations, Sijihuacheng Company has the obligation to handle the corresponding filing and registration procedures for the equity transfer between the plaintiff and the third party. However, although the plaintiff has communicated with Sijihuacheng Company on the filing and registration of equity transfer for many times, Sijihuacheng Company has never fulfilled the corresponding filing and registration obligations. Xu Liangyan is the chairman and legal representative of Sijihuacheng Company, and has an unshakable responsibility for failing to fulfill its legal obligations. In addition, Xu Liangyan holds the official seal and business license of Sijihuacheng Company, and without Xu Liangyan's cooperation, the Sijihuacheng Company cannot fulfill the corresponding filing and registration obligations. Therefore, Xu Liangyan should fulfill the corresponding cooperation and assistance obligations for such equity transfer filing and change registration. In accordance with Article 119 of the Civil Procedure Law of the People's Republic of China and other relevant laws, the plaintiff filed a lawsuit in our court, requesting the judgment as its requests.

The Third Party Shibang Company filed the litigation requests with our court: 1. If the defendants, Sijihuacheng Company and Xu Liangyan, fail to go through the filing formalities for the change of 80% equity of Sijihuacheng Company within the time specified in the judgment of this case, the third party will go through the filing formalities with the competent government department in its own name; 2. To confirm that the third party is a shareholder of the Sijihuacheng Company and owns 80% of the registered capital of the Sijihuacheng Company; 3. Sijihuacheng Company should issue a certificate to the third party and records the third party in the register of shareholders. Facts and Reasons: According to the Equity Transfer Contract and its supplementary agreement concluded between the plaintiff and the third party, the third party has already been admitted to have 80% of the equity of Sijihuacheng Company without violating the mandatory provisions of laws and regulations. According to the Company Law, the company should issue a capital contribution certificate and prepare a register of shareholders. Therefore, in order to protect its own legal rights, the third party specially filed an application, hoping that the judgment can be as requested.

The defendants Sijihuacheng Company and Xu Liangyan jointly argued that they disagreed with the claims of the plaintiff and the third party. According to the "Agreement on Implementing the Preliminary Agreement on Share Restructuring" signed by all parties on April 28, 2010 (i.e., "April 28 Agreement"), Oasis Investment Group Co., Ltd. (i.e., Oasis Company), the parent company of the plaintiff, shall repurchase the equity of Oasis Company held by Ke Zhengguang (heirs Zhang Yuejin and Ke Yeying) and Xu Hongbiao. The consideration shall be cash and 100% equity and real estate of Sijihuacheng Company. Therefore, this case is not an independent legal relationship of equity transfer contract, but a part of equity repurchase, which cannot be tried separately. The plaintiff, the third party and the defendants in this case are all trading subjects of the April 28 Agreement, and are bound by the content of the agreement. According to the "April 28 Agreement", Oasis Company newly established a third party company, and the third party shall acquire 80% equity of Sijihuacheng Company held by the plaintiff. Oasis Company shall then transfer 100% equity of the third party to Xiying International Group and Focus Town Limited at the price of HK$ 1. However, in fact, the third party was established by the plaintiff, and now the plaintiff and the third party have changed the transaction structure of the "April 28 Agreement", and Article 5 of the Equity Transfer Contract promises, under the condition of applying special tax treatment, to ultimately reduce the tax payable by Oasis, transferring the tax to the participating shareholders. To sum up, the Equity Transfer Contract and supplementary agreements signed by

the plaintiff and the third party are invalid contracts because of false expression of will, damage to national tax interests, and damage to the interests of the participating shareholders and the defendant company. According to the articles of association of Sijihuacheng Company, the company is a foreign-invested enterprise, and its highest authority is the board of directors, but the board of directors of the company has not passed a resolution on this equity transfer. As the legal representative, the defendant Xu Liangyan should perform his duties according to the company's articles of association and laws, so there is no factual and legal basis for the claim that Xu Liangyan should bear the responsibilities.

The parties submitted evidence according to law around the litigation requests, and the court organized the parties to exchange evidences and conduct cross-examination. Evidences to which the parties have no objection, such as the articles of association of Sijihuacheng Company and previous amendments provided by the plaintiff, are recognized, filed and supported by the court. The court confirms the facts to which the parties have no objection. For disputed evidences and facts, this court recognizes as follows: 1. The third party has no objection to the Company Registration Certificate of Shibang Company, the Resolution of Shareholders' Meeting of Sijihuacheng Company, and the Statement of Waiver of Preemption Right of Oasis Technology provided by the plaintiff, and the two defendants have no objection to their authenticity, but raise objections to their relevance and legality. The court believes that this group of evidences is related to this case and involves no illegality, so the court recognizes this group of evidence. 2. The third party has no objection to three groups of e-mails and attachments provided by the plaintiff, and the two defendants have no objection to their authenticity, but do not recognize the purpose of proof. The court confirms the authenticity of the three groups of evidence. 3. The third party has no objection to the letters and express delivery forms provided by the plaintiff, and the two defendants do not recognize their authenticity and relevance due to no receipt record. In view of the plaintiff's failure to provide a receipt record, the court does not recognize its authenticity. 4. The third party has no objection to the business registration documents of Shibang Company provided by the plaintiff, and the two defendants do not recognize their authenticity for no notarization certification. The court adopts the view of the two defendants and does not recognize their authenticity. 5. The plaintiff has no objection to the supplementary agreement and certificate of equity transfer provided by the third party, and neither defendant approves it. As the certificate has been notarized, the court confirms its authenticity; the supplementary agreement is an agreement signed between the plaintiff and the third party, which is confirmed by both the plaintiff and the third party, and the court also confirms its authenticity. 6. The defendant Xu Liangyan has no objection to the arbitral

award provided by the defendant Sijihuacheng Company, the plaintiff has no objections to its authenticity and legality, but does not recognize its purpose of proof, and the third party has no objection to its authenticity but does not recognize its relevance and purpose of proof. The court believes that the evidence has a certain relevance to the case and therefor, recognizes it. 7. The defendant Xu Liangyan has no objection to the materials provided by the defendant Sijihuacheng Company for executing the Hong Kong arbitration award in the United and the memorandum opinion of the US Federal District Court. Both the plaintiff and the third party have objections to their authenticity for not being notarized. The court adopts the opinions of the plaintiff and the third party and does not recognize their authenticity. 8. The defendant Xu Liangyan has no objection to the Agreement on Implementing the Preliminary Agreement on Equity Restructuring and the registration information of Shibang Company provided by the defendant Sijihuacheng Company, the plaintiff has no objection to their authenticity and legality, but does not recognize the purpose of proof, and the third party has no objection to their authenticity, but does not recognized their relevance and proof content. The court believes that the evidence has a certain relevance to the case, and therefore, recognize it. 9. To the Notice of the State Administration of Taxation on the Collection and Management of Enterprise Income Tax on Non-monetary Assets Investment provided by the defendant Sijihuacheng Company, the defendant Xu Liangyan has no objection, the plaintiff has no objection to its authenticity and legality, but does not recognize the purpose of proof, and the third party thinks that it belongs to the normative documents in form but does not belong to the category of evidence. The court recognizes the third party's point of view and makes no recognition. 10. To the comparative structure table provided by the defendant Sijihuacheng Company, the defendant Xu Liangyan has no objection, and the plaintiff and the third party think that it was produced unilaterally by the defendant, so do not recognize their authenticity. The court does not recognize its authenticity.

Upon trial, the court found the facts as follows: The defendant Sijihuacheng Company is a Sino-foreign joint venture, and the current shareholder is the plaintiff, who holds 80% equity of the company; Shanghai Oasis Ecological Technology Co., Ltd. (hereinafter referred to as: "Oasis Technology"), which holds 20% equity of the company. According to the articles of association of the company, the company has a board of directors, which is the highest authority of the company and decides all major matters of the company. Its main functions and powers include: To decide the increase of registered capital and the transfer of equity, except for major matters such as the revision of the articles of association, other matters shall be adopted by a simple majority at the board meeting. The board of directors of the company is composed of Ke Yeying, Xu Liangyan, Ke Zhengfu and Xu Hongbiao.

On July 18, 2018, the plaintiff signed the "Equity Transfer Contract" with the third party, which was a wholly-owned subsidiary of the plaintiff, to transfer 80% of the equity of Sijihuacheng Company it held to the third party; the transfer price was USD 6.2 million, and the payment method was that the third party would issue shares to the plaintiff in exchange for 80% of the equity of the Sijihuacheng Company held by the plaintiff; the plaintiff promised that it would not transfer the third party's equity within 3 years (including 3 years) after the completion of this equity transfer. On the same day, the plaintiff and Oasis Technology reached a resolution of the shareholders' meeting, agreeing that the plaintiff would transfer 80% equity of Sijihuacheng Company to the third party. On the same day, Oasis Technology made a Statement of Waiver of Preemption Right, saying that it gave up the preemption right in the plaintiff transferring 80% equity of Sijihuacheng Company. However, the Equity Transfer Contract was not approved by the board meeting of Sijihuacheng.

It was also found that on April 28, 2010, Oasis Investment Group Co., Ltd. (hereinafter referred to as: "Oasis Investment Company"), the participating shareholders (referring to Ke Zhengguang and Xu Hongbiao), the controlling shareholders (referring to Yu Naifen, Yu Naiwen and Yu Naijun), Xiying International Group Co., Ltd. (hereinafter referred to as: "Xiying Company") and Focus Town Limited (hereinafter referred to as: "Focus Town"), the plaintiff and Shanghai Oasis Ecological Technology Co., Ltd. (later renamed to "Oasis Technology Company") signed the Agreement on Implementing the Preliminary Agreement on Equity Restructuring (hereinafter referred to as: "April 28 Agreement"), negotiated on the repurchase of equity held by the participating shareholders by Oasis Investment Company, made it clear that the consideration for equity purchase was foreign exchange equivalent to 250 million yuan and 100% equity of Sijihuacheng Company, and further agreed: …Article 2 Consideration of Repurchase by Oasis Investment Company… 2.3.1 Oasis Investment Company has newly established Shibang Company in Hong Kong, and has arranged Shibang Company to acquire 80% equity of Sijihuacheng Company held by Greencourt Properties Company, a subsidiary of Oasis Investment Company. After the completion of such equity acquisition, Oasis Investment Company shall sign an Equity Purchase Right Agreement with Xiying Company and Focus Town to stipulate that after the expiration of the custody period agreed in the following paragraph 2.3.2, 100% equity of Shibang Company shall be transferred to Xiying Company and Focus Town at a consideration of HK$ 1. …2.3.5 In view that Oasis Investment and the controlling shareholders had transferred the effective control of the defendant to the participating shareholders prior to the signing of this Agreement,

On February 22, 2013, the participating shareholders applied to Hong Kong International Arbitration Center for arbitration on the performance of April 28 Agreement.

On February 28, 2018, the Hong Kong International Arbitration Center issued an award (with the applicant being the participating shareholders, and the respondent being Oasis Investment Company and the controlling shareholder), stating: VII. Analysis and reasons of the arbitral tribunal…245…. The equity transfer of the Sijihuacheng Company shall include the following three steps to be performed: (1) Firstly, Shibang Company established by Oasis Investment Company shall acquire 80% equity of Sijihuacheng Company held by Greencourt Properties Company (simply called "the first step of the 80% equity transfer"). Article 2.3.1 clearly states that Oasis Investment Company has established Shibang Company in Hong Kong and has arranged Shibang Company to acquire 80% equity of Sijihuacheng Company held by Greencourt Properties Company. In other words, the first step of 80% equity transfer should have been completed when

the April 28 Agreement was signed. But in fact, the first step has not yet been completed. ……VIII. The award and order of the arbitral tribunal …5. Order the first respondent (i.e. Oasis Investment Company) to arrange and urge Shibang Company (within 2 months from the date of the award) to acquire 80% equity of Sijihuacheng Company held by Greencourt Properties, a subsidiary of the first respondent (Article 2.3.1 of April 28 Agreement).

It is found that Greencourt Properties Company is a one-person limited liability company and its shareholder is the Oasis Investment Company. Shibang Company is a one-person limited liability company and its shareholder is the Greencourt Properties Company. Oasis Technology Company is a one-person limited liability company, and its shareholder is the Greencourt Properties Company.

According to the facts found out by our court, the court holds that the disputed Equity Transfer Contract in this case is actually a middle link of the April 28 Agreement, which is an Equity Restructuring Agreement signed by the controlling shareholder and the participating shareholders of Oasis Investment Company. Therefore, the request of the plaintiff and the third party to confirm the performance of the above-mentioned Equity Transfer Contract is not just a trial of the transfer contract, but must be comprehensively considered in combination with the provisions concerning the equity transfer contract in the April 28 Agreement between the controlling shareholder and the participating shareholders of Oasis Investment Company.

According to the April 28 Agreement, Oasis Investment Company has newly established Shibang Company in Hong Kong, and has arranged Shibang Company to acquire 80% equity of Sijihuacheng Company held by Oasis Properties Company, a subsidiary of Oasis Investment Company. However, the actual situation is that Shibang Company is a wholly-owned subsidiary established by the Oasis Properties Company, not by the Oasis Investment Company. This change is mainly reflected in Article 7 of the Notice of the Ministry of Finance and the State Administration of Taxation on Several Issues Concerning the Treatment of Enterprise Income Tax in Enterprise Restructuring Business: "Enterprises involved in the acquisition of equity and assets between China and overseas (including Hong Kong, Macao and Taiwan regions) should not only meet the conditions stipulated in Article 5 of this Notice, but also meet the following conditions before they can choose to apply special tax treatment regulations: (1) The non-resident enterprise transfers the equity of the resident enterprise owned by it to another non-resident enterprise directly 100% controlled by it, which does not cause any change in the withholding tax burden of the income from the equity transfer in the future, and the non-resident enterprise of the transferor

promises in writing to the competent tax authorities that it will not transfer the equity of the non-resident enterprise of the transferee within 3 years (including 3 years)…; according to this article, if Greencourt Properties transfers its owned equity of Sijihuacheng Company to Shibang Company, which is 100% directly controlled by it, and Greencourt Properties promises to the competent tax authorities in writing that it will not transfer its equity of Shibang Company within 3 years (including 3 years), the special tax treatment may apply. But, according to the April 28 Agreement, Shibang Company is a wholly-owned company of Oasis Investment Company, and in this case, the special tax treatment cannot apply. The biggest difference in whether the special tax treatment applies lies in Article 6 of the Circular of the Ministry of Finance and the State Administration of Taxation on Several Issues Concerning the Treatment of Enterprise Income Tax in Enterprise Restructuring Business: "If the enterprise restructuring meets the conditions stipulated in Article 5 of this Notice, the parties to the transaction may apply special tax treatment for the equity payment part in their transactions according to the following provisions: …(2) For and equity acquisition, in which the equity purchased by the acquiring enterprise is not less than 75% of the total equity of the acquired enterprise, and the equity payment amount of the acquiring enterprise at equity purchase is not less than 85% of the total transaction payment, it can choose to handle it according to the following provisions: 1. The tax basis for the acquired enterprise's shareholders to obtain the acquiring enterprise's equity shall be determined by the original tax basis of the acquired equity. 2. The tax basis for the acquiring enterprise to obtain the acquired enterprise's equity shall be determined by the original tax basis of the acquired equity. 3. The tax basis and other related income tax items of the original assets and liabilities of the acquired enterprise and the acquired enterprise remain unchanged. …According to this provision, if special tax treatment is applied, which is different from general tax treatment, it may have tax impact on the transferee, i.e., the participating shareholders, of 100% equity of Shibang Company. Of course, before the relevant tax authority makes a decision, the equity transfer involved may not necessarily be subject to special tax treatment, but even if it may increase the extra tax burden that the participating shareholders could not foresee when signing the April 28 Agreement, this is contrary to the commercial arrangement between the controlling shareholder and the participating shareholders when signing the April 28 Agreement. In view of the above reasons, the court holds that the controlling shareholder and the participating shareholders should negotiate on the tax burden under the circumstance that special tax treatment may be applied to the equity transfer involved in the case, in order to reach a new agreement, and the plaintiff may not separately request the equity transfer before a new agreement is formed.

As for the defendant Sijihuacheng Company's claim that the company's articles of association stipulates that the resolution of the board of directors is a must, the court believes that according to the articles of association of Sijihuacheng Company, the board of directors is the highest authority of the company, and the decision on the transfer of the company's equity should be passed by a simple majority at the board meeting, but the equity transfer contract involved has not been passed by the board meeting of the company with a resolution. Although the general view is that the board of directors is appointed by shareholders of all parties, and shareholders are the ultimate deciders as direct rights subjects, so the board meeting is only a procedural regulation. But the shareholders of Sijihuacheng Company are the plaintiff and Oasis Technology Company, both of which are controlled by the controlling shareholder of Oasis Investment Company, while the board of directors of the company mainly represents the interests of the participating shareholders, and according to the April 28 Agreement, the controlling shareholder has transferred the actual control of Sijihuacheng Company to the participating shareholders. This complex composition balances the interests of the participating shareholders and the controlling shareholders and is reflected in the company's articles of association. Therefore, the shareholders' decision cannot be simply taken as the company's final decision. For example, matters such as the transfer of equity still need to comply with the provisions of the company's articles of association, which should be approved by a simple majority of the board meeting. Now the equity transfer between the plaintiff and the third party has not been approved by the majority of the board meeting, so it is difficult for the court to support the claims of the plaintiff and the third party.

To sum up, the plaintiff's and the third party's claims have no corresponding factual and legal basis, so this court does not support them. According to Article 90 of the Interpretation of the Supreme People's Court on the Application of the Civil Procedure Law of the People's Republic of China, the court rules as follows:

I. Reject all claims of the plaintiff Greencourt Properties Co., Ltd.

II. Reject all claims of the third party Shibang Co., Ltd.

The case acceptance fee of 40 yuan shall be borne by the plaintiff Greencourt Properties Co., Ltd.

If you refuse to accept this judgment, you can submit an appeal to our court within 15 days from the date of service of the judgment, and make copies according to the number of the opposite parties, and appeal to Shanghai No. 1 Intermediate People's Court.

|                  |                |
|------------------|----------------|
| Presiding judge  | Gao Lei        |
| Judge            | Fei Zhengquan  |
| People's Juror   | Huang Shunkun  |

[seal:] Shanghai Fengxian District People's Court

June 30, 2020

[stamp:] This document is the same as the original one.

Clerk     Li Yiliu

# EMS® Worldwide Express Mail Service
WORLDWIDE EXPRESS MAIL SERVICE

## Details Sheet of Court Courier Mail

1 0 3 3 5 9 2 6 5 2 1 9 4

| | | |
|---|---|---|
| Receiving and sending office
ORIGINAL OFFICE | Date of receipt and delivery: June 30, 2020
MM/DD/YYYY HH
ACCEPTED DATE | |
| Sender's unit name:
Shanghai Fengxian Court | Customer code: | |

*The completed EMS details sheet is posted in the blank space of this envelope.*

Address:

Contact number:

Case No. ((2019) Hu 0120 Min Chu No. 10021)

- ☐ Notice of Case Acceptance
- ☐ Notice of Responding to Litigation (Notice of Participating in Litigation)
- ☐ Copy of Bill of Complaint (Counterclaim)
- ☐ Copy of Application
- ☐ Copy of Bill of Defense
- ☐ Notice to Produce Evidence
- ☐ Notice of Litigation Rights and Obligations
- ☐ Notice of Members of Collegiate

- ☐ Summons
- ☐ Notice of Appearance in Court
- ☐ Notice
- ☐ Notice of Enforcement
- ☐ Order of Property Reporting
- ☐ Notice of Paying Litigation Fees
- ☐ Mediation Document
- ☐ Ruling
- ☐ Judgment

*Do not carry cash, dangerous goods and any*

Signature of Sender (required) Li Yibiu
Confirmation of Service Address
Integrity Supervision Card

Signature of handler: Commercial Tribunal

| Name of addressee | Greencourt Properties | Mobile: 13524669012
Home phone:
Office phone: [signature] |
|---|---|---|
| Unit name
COMPANY NAME | | |
| Address
ADDRESS | 25/F, Building 1, Xingye Taikoo Hui, No. 288 First Shimen Road, Jing'an District, Shanghai | |
| | | Postal Code |

| Weight (kg) 0.1 | Fee (yuan) |
|---|---|

| Signature of recipient or agent | | Name of certificate | ☐ ID card | ☐ Other |
|---|---|---|---|---|
| Relationship between the receiver and the recipient | | Certificate number | | |

- ☐ Spouse ☐ Parents ☐ Adult children
- ☐ Brothers and sisters ☐ Mailroom ☐ Legal representative
- ☐ Front desk ☐ Other

Seal of recipient

Mail received on: MM DD YY

Signature of the courier on MM DD YY

Reasons for improper delivery and return of "Court Courier" mail

| | Unknown refusal/no answer for long | | | |
|---|---|---|---|---|
| No such person/unit found at the receiving address | ☐ | ☐ Refused by the recipient | ☐ | ☐ |
| No person/not at home for long at the receiving address | ☐ | ☐ The recipient requested a change of address | ☐ | ☐ |
| Undetailed /incorrect /relocated receiving address | ☐ | ☐ The recipient asked self-pick up but did not pick it up after a long time | ☐ | ☐ |
| No contact number/wrong number/suspended number | | Shut down after a long time of suspension | | |
| Other | | | | |

1033592652194

Signature of handler:

Supervised Preparation Certificate No. 31-07-79

Reminder: This legal document has legal effect and must be filled out truthfully, otherwise, the legal responsibility shall be borne by you.
This form can only be used when delivering the court courier mail. Please fill it out clearly.
WeChat enquiry public number: EMS-CNPL        service phone: 11183

Postal
□ A POST
📞 11183

⑤ for recipient

1. If the recipient signs for it himself, he/she must show his/her valid ID card, sign and fill in the ID number.
2. If the recipient is a unit, the recipient must show a valid ID card, sign and fill in the ID number, and must indicate the relationship with the recipient.
3. If an agent signs for it, he/she shall present a valid ID card, sign and fill in the ID number, and at the same time, must indicate the relationship with the recipient (only for adult family members living with the recipient).
4. If the delivery is successful, the receipt should be returned in time; if the delivery is unsuccessful, the reason should be marked on the details sheet.

♻

Envelope code: B-FT-100
Printing unit: Ningbo Hongda Printing Co., Ltd.
Print volume: 1 million
Production date: March 2019
Prepared under Supervision of Market Supervision Department of State Post Bureau
Supervised Preparation Certificate No. 31-07-79


TRANSPERFECT

City of New York, State of New York, County of New York

I, Jacqueline Yorke, hereby certify that the document "**2 Decision of First Court_**四季花城股权转让案一审判决**-20200702-c2**" is, to the best of my knowledge and belief, a true and accurate translation from Chinese into English.

Jacqueline Yorke
(Currently situated in the County of New York)

Sworn to before me remotely this
August 27, 2020

Signature, Notary Public
(Currently situated in the County of New York)

WENDY POON
NOTARY
NO. 01PO6356754
QUALIFIED IN
QUEENS COUNTY
COMM. EXP.
04-03-2021
PUBLIC
STATE OF NEW YORK

Stamp, Notary Public

# 上海市奉贤区人民法院
# 民 事 判 决 书

（2019）沪 0120 民初 10021 号

原告：绿庭置业有限公司，住所地中华人民共和国香港特别行政区九龙尖沙咀么地道 62 号永安广场 10 楼 12 室。

法定代表人：俞乃奋，董事。

委托诉讼代理人：顾依，君合律师事务所上海分所律师。

委托诉讼代理人：刘佳迪，君合律师事务所上海分所律师。

被告：上海绿庭四季花城房地产开发有限公司，住所地中华人民共和国上海市奉贤区八字桥路 218 弄 12 号。

法定代表人：许良彦，董事长。

被告：许良彦，男，1938 年 11 月 17 日生，汉族，住中华人民共和国上海市徐汇区裕德路 92 弄 2 号 1605 室。

上述两被告的共同委托诉讼代理人：张宇晟，上海正策律师事务所律师。

第三人：世邦有限公司，住所地中华人民共和国香港特别行政区上环德辅道中 272-284 号兴业商业中心 12 楼 1205-1208 室。

法定代表人：徐宏标，董事。

委托诉讼代理人：刘鸿亮，上海市汇理律师事务所律师。

原告绿庭置业有限公司（以下简称：绿庭置业公司）诉被告上海绿庭四季花城房地产开发有限公司（以下简称：四季花城公

司）、许良彦、第三人世邦有限公司（以下简称：世邦公司）请求变更公司登记纠纷一案，本院于2019年5月5日立案后，依法适用普通程序，并于2020年5月20日公开开庭进行了审理。原告的委托诉讼代理人顾依、刘佳迪，两被告的共同委托诉讼代理人张宇晟，第三人的委托诉讼代理人刘鸿亮均到庭参加诉讼。本案现已审理终结。

原告绿庭置业公司向本院提出诉讼请求：1、被告四季花城公司至上海市奉贤区市场监督管理局办理股权变更登记（备案）手续，将原记载于原告名下的被告四季花城公司80%股权变更登记至第三人名下，并于办理企业变更登记（备案）时通过企业登记系统提交变更报告；2、被告许良彦就被告四季花城公司办理前述第一项股权变更登记（备案）及信息报送手续履行相应的协助及配合义务。事实和理由：被告四季花城公司是原告与案外人上海绿庭科创生态科技有限公司（以下简称：绿庭科创）共同设立的子公司。原告持有四季花城公司80%的股权，绿庭科创持有四季花城公司20%的股权。被告许良彦是四季花城公司的董事长及法定代表人。2018年7月18日，原告与第三人签署《股权转让合同》，约定原告将其持有的四季花城公司80%股权全部转让给第三人。为签署及履行上述《股权转让合同》，四季花城公司股东会出具股东会决议，绿庭科创同意原告将其持有的四季花城公司80%股权全部转让给第三人，并放弃其优先购买权。根据相关法律规定，四季花城公司有义务就原告与第三人之间的股权转让办理相应的备案及登记手续。然而，尽管原告已多次就办理股权转让备案及登记事宜与四季花城公司进行沟通，四季花城公司始终未能

履行相应的备案及登记义务。许良彦为四季花城公司的董事长及法定代表人，对于四季花城公司怠于履行法定义务负有不可推卸的责任。并且，许良彦掌握四季花城公司的公章及证照，在许良彦不配合的情形下，四季花城公司也无法履行相应的备案及登记义务，因此，许良彦应当对该等股权转让备案及变更登记履行相应的配合及协助义务。原告现根据《中华人民共和国民事诉讼法》第一百一十九条等相关法律规定，向本院提起诉讼，请求判如所请。

第三人世邦有限公司向本院提出诉讼请求：1、被告四季花城公司、许良彦在本案判决指定的时间内，就四季花城公司80%股权变更事宜不履行备案手续的，由第三人以自己的名义向政府主管部门办理备案手续；2、确认第三人为四季花城公司的股东，拥有占四季花城公司注册资本80%的股权；3、四季花城公司向第三人签发证明书，并将第三人记载于股东名册。事实与理由：根据原告与第三人订立的《股权转让合同》及其补充协议，第三人已经受让四季花城公司80%的股权，且不违反法律法规的强制性规定。根据《公司法》规定，公司应当签发出资证明书、置备股东名册，因此，为保护其合法权利，第三人特提起申请，望判如所请。

被告四季花城公司、许良彦共同辩称，不同意原告及第三人的诉讼请求。根据2010年4月28日各方签署的《关于执行〈股份重组初步协议〉的协议书》（即《428协议》），由原告的母公司绿洲投资集团有限公司（即绿洲公司）回购参股股东一方即柯铮光（继承人张跃进、柯烨颖）、徐宏标所持有的绿洲公司股份，对价

为现金及四季花城公司100%的股权、房产等，故本案并非独立的股权转让合同法律关系，而是股权回购的一部分，不可单独审理，本案原告、第三人、被告均是《428协议》的交易主体，受到协议内容的约束。根据《428协议》，绿洲公司新设第三人公司，第三人收购原告持有的四季花城公司80%股权，绿洲公司再将第三人100%股权以1港元价格转让给喜盈国际集团和Focus Town Limited，但实际上第三人系由原告设立，现原告与第三人改变了《428协议》交易结构，且其股权转让协议第5条承诺即在套用特殊性税务处理的条件，最终减少了绿洲公司应缴纳的税款，将该税款转嫁给了参股股东一方。综上，原告与第三人签订的《股权转让协议》及补充协议因虚假意思表示、损害国家税收利益、损害参股股东和被告公司利益，为无效合同。根据四季花城公司章程规定，该公司属于外商投资企业，其最高权力机构为董事会，但公司董事会未对本次股权转让作出决议。被告许良彦作为法定代表人，其履行职务应根据公司章程和法律规定，故要求许良彦承担责任的诉讼请求无事实与法律依据。

当事人围绕诉讼请求依法提交了证据，本院组织当事人进行了证据交换和质证。对当事人无异议的证据如原告提供的四季花城公司的章程及历次修正案等，本院均予以认定并在卷佐证。对当事人无异议的事实，本院予以确认。对有争议的证据和事实，本院认定如下：1、原告提供的世邦公司《公司注册证书》、四季花城公司《股东会决议》、绿庭科创公司的《放弃优先受让权声明》，第三人无异议，两被告对其真实性无异议，但对其关联性、合法性提出异议，本院认为该组证据与本案有关，且无违法之处，本

院对该组证据予以认定；2、原告提供的电子邮件及附件，第三人无异议三组，两被告对其真实性均无异议，但对其证明目的不认可，本院对此三组证据的真实性予以认定；3、原告提供的函件及快递面单，第三人无异议，两被告对其真实性、关联性不予认可，认为无签收记录，鉴于原告未提供签收记录，本院对其真实性不予认定；4、原告提供的世邦公司的商业登记文件，第三人无异议，两被告对其真实性不予认可，认为无公证认证，本院采纳两被告的观点，对其真实性不予认定；5、第三人提供的股权转让补充协议、证明书，原告无异议，两被告均不予认可，本院认为证明书已经过公证证明，对其真实性予以认定，补充协议系原告与第三人之间签订的协议，原告与第三人均予以确认，本院对其真实性亦予以认定；6、被告四季花城公司提供的仲裁裁决书，被告许良彦无异议，原告对其真实性、合法性无异议，但不认可其证明目的，第三人对其真实性无异议，但不认可其关联性及证明目的。本院认为，该证据与本案具有一定的关联性，故对其予以认定；7、被告四季花城公司提供的美国执行香港仲裁的材料及美国联邦地区法院的备忘意见书，被告许良彦无异议，原告及第三人对其真实性均有异议，认为未经过公证认证，本院采纳原告与第三人的观点，对其真实性不予认定；8、被告四季花城公司提供的《关于执行<股份重组初步协议>的协议书》、世邦公司登记信息，被告许良彦无异议，原告对其真实性、合法性无异议，但对证明目的不认可，第三人对真实性无异议，但对关联性与证明内容。本院认为，该证据与本案具有一定的关联性，故对其予以认定；9、被告四季花城公司提供的《国家税务总局关于非货币性资产投资企业

所得税有关征管问题的公告》，被告许良彦无异议，原告对真实性、合法性无异议，不认可证明目的，第三人认为形式上属于规范性文件，不属于证据的范畴，本院认可第三人的观点，不作认定；10、被告四季花城公司提供的对比结构表，被告许良彦无异议，原告与第三人认为系被告单方制作，对其真实性不予认定，本院对其真实性不予认定。

本院经审理认定事实如下：被告四季花城公司系中外合资企业，现股东为原告，占股比例为80%；上海绿庭科创生态科技有限公司（以下简称：绿庭科创公司），占股20%。该公司章程规定，公司设董事会，董事会是公司的最高权力机构，决定公司的一切重大事宜，主要职权包括：决定公司注册资本的增加与股权的转让，除公司章程的修改等重大事项外，其他事宜由董事会会议采取简单多数通过。该公司的董事会组成是柯烨颖、许良彦、柯铮夫、徐宏标。

2018年7月18日，原告与第三人签订《股权转让合同》约定，第三人是原告的全资子公司，原告将其持有的四季花城公司80%股权转让给第三人；转让价格为620万美元，支付方式为第三人向原告发行股票的方式等额换取原告所持有的四季花城公司80%的股权；原告承诺，本股权转让完成后3年（含3年）内不转让其拥有的第三人的股权。同日，原告与绿庭科创公司达成股东会决议，同意原告将持有的四季花城公司80%股权转让给第三人。同日，绿庭科创公司作出《放弃优先受让权声明》称，其放弃对原告出让四季花城公司的80%股权所享有的优先受让权。但该《股权转让合同》未经四季花城董事会会议通过。

又查明，2010 年 4 月 28 日，绿洲投资集团有限公司（以下简称：绿洲投资公司）、参股股东（指柯铮光及徐宏标）、控股股东（指俞乃奋、俞乃雯、俞乃筠）、喜盈国际集团有限公司（以下简称：喜盈公司）、FOCUS TOWN LIMITED（以下简称：FOCUS TOWN）、原告、上海绿洲科创生态科技有限公司（后更名为绿庭科创公司）签署《关于执行〈股份重组初步协议〉的协议书》（以下简称：428 协议）一份，就绿洲投资公司回购参股股东持有的股权事宜进行协商，明确股权收购对价为相当于 2.5 亿元等额外汇及四季花城公司 100%的股权，并约定：……第二条绿洲投资公司的回购对价……2.3.1 绿洲投资公司已在香港新设立了世邦公司，并已经安排世邦公司收购了绿洲投资公司子公司绿庭置业公司所持有之四季花城公司 80%的股权。该等股权收购完成后，绿洲投资公司应与喜盈公司和 FOCUS TOWN 签署一份《股权购买权协议》，约定在下述第 2.3.2 款约定的托管期限届满后，将世邦公司 100%的股权以港元一元对价转让给喜盈公司和 FOCUS TOWN。……2.3.5 鉴于绿洲投资公司及控股股东已经在本协议签署前将被告的实际控制权移交给参股股东。

2013 年 2 月 22 日，参股股东就 428 协议的履行向香港国际仲裁中心申请仲裁。

2018 年 2 月 28 日，香港国际仲裁中心出具裁决书（申请人为参股股东，被申请人为绿洲投资公司及控股股东），载明：VII.仲裁庭的分析和理由……245.……有关四季花城公司的转让包括以下三个需要履行的步骤：(1) 首先，由绿洲投资公司成立的世邦公司收购绿庭置业公司持有的四季花城公司 80%股权（简称为

"80 股权转让第一步")。第 2.3.1 条明确表述，绿洲投资公司已在香港设立了世邦公司，并已经安排世邦公司收购了绿庭置业公司所持有之四季花城公司 80%的股权。换句话说，80%股权转让第一步在 428 协议签署时已经完成。但是事实上，这第一步还未完成。……Ⅷ.仲裁庭的裁决和命令……5、命令第一被申请人（即绿洲投资公司）安排及促使世邦公司（从裁决作出之日起的 2 个月内）收购第一被申请人的子公司绿庭置业公司所持有的四季花城公司 80%的股权（428 协议第 2.3.1 条）。

再查明，绿庭置业公司是一人有限公司，股东为绿洲投资公司；世邦公司是一人有限公司，股东为绿庭置业公司；绿庭科创公司是一人有限公司，股东为绿庭置业公司。

本院认为，根据本院查明的事实，本案系争的《股权转让合同》实际是绿洲投资公司的控股股东与参股股东签署的股份重组协议即 428 协议的中间一环，因此，对于原告与第三人要求确认上述股权转让合同内容履行的请求，并不是单单审理该份转让合同，必须要结合绿洲投资公司的控股股东与参股股东双方在 428 协议中与系争股权转让合同有关的约定综合考虑。

根据 428 协议约定，绿洲投资公司已在香港新设立了世邦公司，并已经安排世邦公司收购了绿洲投资公司子公司绿庭置业公司所持有之四季花城公司 80%的股权。但实际情况是，世邦公司是由绿庭置业公司设立的全资子公司，并非是绿洲投资公司设立的。而该项变化最主要体现在《财政部、国家税务总局关于企业重组业务企业所得税处理若干问题的通知》第七条之规定："企业发生涉及中国境内与境外之间（包括港澳台地区）的股权和资产

收购交易，除应符合本通知第五条规定的条件外，还应同时符合下列条件，才可选择适用特殊性税务处理规定：（一）非居民企业向其100%直接控股的另一非居民企业转让其拥有的居民企业股权，没有因此造成以后该项股权转让所得预提税负担变化，且转让方非居民企业向主管税务机关书面承诺在3年（含3年）内不转让其拥有受让方非居民企业的股权；……"，根据该条规定，绿庭置业公司向其100%直接控股的世邦公司转让其拥有的四季花城公司股权，且绿庭置业公司向主管税务机关书面承诺在3年（含3年）内不转让其拥有世邦公司的股权的情况下，有可能会适用特殊性税务处理，而按照428协议的约定，在世邦公司是绿洲投资公司的全资在公司的情况下，是无法适用特殊性税务处理的。是否适用特殊性税务处理最大的区别在于《财政部、国家税务总局关于企业重组业务企业所得税处理若干问题的通知》第六条之规定："企业重组符合本通知第五条规定条件的，交易各方对其交易中的股权支付部分，可以按以下规定进行特殊性税务处理：……（二）股权收购，收购企业购买的股权不低于被收购企业全部股权的75%，且收购企业在该股权收购发生时的股权支付金额不低于其交易支付总额的85%，可以选择按以下规定处理：1.被收购企业的股东取得收购企业股权的计税基础，以被收购股权的原有计税基础确定。2.收购企业取得被收购企业股权的计税基础，以被收购股权的原有计税基础确定。3.收购企业、被收购企业的原有各项资产和负债的计税基础和其他相关所得税事项保持不变。……"，根据该项规定，如适用特殊性税务处理，与适用一般性税务处理不同，将有可能会对于参股股东一方受让世邦公司100%的股权在税务上

造成影响。当然，在相关税务机关作出决定前，涉案股权转让未必一定会适用特殊性税务处理，但即使可能会增加参股股东一方在订立 428 协议时所无法预见的额外税务负担，这就与控股股东与参股股东在签署 428 协议时的商业安排相背。鉴于以上原因，本院认为，控股股东与参股股东应对涉案股权转让可能适用特殊性税务处理情况下的税务负担问题进行协商，以期能达成新的约定，在未形成新的合意之前，原告不得单独要求进行股权转让。

至于被告四季花城公司提出公司章程规定的必须经过董事会决议的主张，本院认为，根据四季花城公司的章程规定，董事会是公司的最高权力机构，决定公司股权的转让应由董事会会议采取简单多数通过，但涉案股权转让合同未经公司董事会会议通过。虽然一般观点认为，董事会是由各方股东委派组成，股东作为直接的权利主体才是最终的决定者，故董事会会议仅是程序性的规定，但四季花城公司的股东是原告及绿庭科创公司，均是属于绿洲投资公司控股股东控制的一方，而该公司的董事会却是主要代表了参股股东的利益，同时根据 428 协议约定，控股股东已经将四季花城公司的实际控制权移交给了参股股东，这样复杂的构成平衡了参股股东与控股股东的利益，并在公司章程中得到体现，所以不能简单的以股东的决定作为公司最终决定，如转让股权等事项仍需遵从公司章程的约定，即应该由董事会会议简单多数通过。现原告及第三人的股权转让未经董事会会议多数通过，故对原告及第三人的诉讼请求本院亦难以支持。

综上所述，原告及第三人的诉讼请求无相应的事实与法律依据，本院不予支持。依照《最高人民法院关于适用<中华人民共和

国民事诉讼法>的解释》第九十条规定，判决如下：

一、驳回原告绿庭置业有限公司的全部诉讼请求。

二、驳回第三人世邦有限公司的全部诉讼请求。

案件受理费40元，由原告绿庭置业有限公司负担。

如不服本判决，可在判决书送达之日起十五日内向本院递交上诉状，并按对方当事人的人数提出副本，上诉于上海市第一中级人民法院。

审　判　长　　高　磊

审　判　员　　费正权

人民陪审员　　黄顺昆

二〇二〇年六月三十日

本件与原本核对无异

书　记　员　　李翼浏

法院专递邮件详单

全球邮政 速 特 快 专 递
WORLDWIDE EXPRESS MAIL SERVICE

中国邮政
A POST

1183

邮政速递物流
http://www.ems.com.cn

收件人姓名
收件人地址

单位名称
COMPANY NAME 上海市静安区石门一路288号兴业太古汇一座25层

地址
ADDRESS

邮政编码 POSTAL CODE

重量(千克) 0.1

资费(元)

收件人及代收人签名

代收件人与收件人关系
□配偶 □父母 □收发室
□子女 □其他亲属 □收发员
□同事 □其他 □物业代收人

邮件妥投时间 年 月 日 时

证件名称 □身份证 □其他
证件号码

收件单位盖章

收件人及代收人签名
□本人签字
□父母 □收发室
□配偶 □其他亲属 □收发员

移交他人签名

邮政速递员签名

收寄局
ORIGINAL OFFICE 上海专递

收寄日期 2020年06月13日 时间
ACCEPTED DATE

客户代码

联系电话

收件人单位名称:
上海专递

地址:

寄语 (2019) 沪01民终10021号

电子封装:
completed EMS hull waybill issued

10335926521 94

危险品及违禁寄递物品

"法院专递"勿投
收件地址本栏及主体填写人
收件地址长期无人接收
收件人长期外出/搬迁/已注销
收件人不在/本栏无法投递
无有效人/电话号/电话号长期无人接听

主栏人签字:

# EXHIBIT 22

**Civil Petition for Appeal**

Appellant (plaintiff in the first instance trial): GreenCourt Properties Limited.
Domicile: Room 12, 10/F, Wing On Plaza, No.62 Mody Road, Tsim Sha Tsui, Kowloon, Hong Kong Special Administrative Region
Legal representative: Yu Naifen, director

Appellee (defendant in the first instance trial): Shanghai Luting Sijihuacheng Real Estate Development Co., Ltd.
Domicile: No.12, Lane 218, Baziqiao Road, Fengxian District, Shanghai
Legal representative: Xu Liangyan, Chairman

Appellee (defendant in the first instance trial): Xu Liangyan, male, born on November 17, 1938, Han nationality
ID number: 31011019381117507X
Domicile: Room 1605, No.2, Lane 92, Yude Road, Xuhui District, Shanghai

Appellee (the third party in the first instance trial): Shibang Co., Ltd.
Domicile: Room 1205-1208, 12/F, Xingye Commercial Center, No. 272-284 Des Voeux Road Central, Sheung Wan, Hong Kong, China
Legal representative: Xu Hongbiao, director

      With respect to the dispute between the appellant Greencourt Properties Co., Ltd. (hereinafter referred to as "Greencourt Properties") and the appellees Shanghai Luting Sijihuacheng Real Estate Development Co., Ltd. (hereinafter referred to as "Sijihuacheng"), Xu Liangyan, and Shibang Co., Ltd. (hereinafter referred to as the "Shibang Company") over the change of company registration (hereinafter referred to as "this case"), Greencourt Properties refuses to accept the civil judgment ([2019] Hu 0120 Min Chu No. 10021 (hereinafter referred to as the "first-instance judgment") made by Fengxian District People's Court of Shanghai (hereinafter referred to as the " first-instance court"), and now files an appeal according to law.

Appeal request:

1. Request your court to cancel the civil judgment (2019) Hu 0120 Min Chu No. 10021 made by Fengxian District People's Court of Shanghai according to law, and change the judgment according to law to support all the claims of Greencourt Properties in the first instance trial:
   （1）Request ordering Sijihuacheng to go through the formalities of equity change registration (filing) with Fengxian District Market Supervision Administration of Shanghai, register the change of the 80% equity of Sijihuacheng originally recorded under the name of Greencourt Properties to the Shibang Company, and submit the change report through the enterprise registration system when going through the enterprise change registration (filing);
   （2）Request Xu Liangyan to fulfill the corresponding obligation of assistance and cooperation in handling the registration (filing) and information submission procedures of the equity change mentioned in the preceding paragraph for Greencourt Properties;
2. Request ordering Sijihuacheng and Xu Liangyan to bear all the court costs of the first and second instance trials of this case.

Facts and Reasons:

Greencourt Properties holds that there were major flaws in the first-instance legal procedure, and there were errors in fact finding and law application in the judgment content. The specific facts and reasons are as follows:

I.      Background description of the facts involved in the case

The purpose of the lawsuit filed by Greencourt Properties is to cooperate with the execution of the final award HKIAC/A13028 of Hong Kong International Arbitration Center (hereinafter referred to as "Hong Kong Arbitration Award"). On March 22, 2013, Xu Hongbiao and Ke Zhengguang (hereinafter collectively referred to as "participating shareholders") as arbitration applicants, and Yu Naifen, Yu Naijun and Yu Naiwen (hereinafter referred to as "controlling shareholders") as arbitration respondents, initiated arbitration proceedings in Hong Kong, requesting resolving the dispute among the controlling shareholders, the participating shareholders and their related entities, which arose from "Agreement on Implementing the Preliminary Agreement on Equity Restructuring" (hereinafter referred to as **April 28 Agreement**" signed by all parties on April 28, 2010. In this case, the Shibang Company was to acquire 80% equity of Sijihuacheng held by Greencourt Properties (hereinafter referred to as the "case-involved equity transfer arrangement"), which is one of the arbitration requests of the participating shareholders (*see the first instance trial evidence of Sijihuacheng 1.1, page 34*). Finally, Hong Kong International Arbitration Center supported this arbitration request *of the participating shareholders (see the first instance trial evidence of Sijihuacheng 1.1, page 59). According to Item 5 of the arbitration order, the arbitration tribunal requested the first respondent in the case, namely Oasis Investment Co., Ltd. (hereinafter referred to as "Oasis Investment"), to urge the Shibang Company to acquire 80% equity of Sijihuacheng held by Greencourt Properties.*

Therefore, the transfer of the equity of Sijihuacheng held by Greencourt Properties to Shibang Company is the requirement of the arbitral award order and also the arbitration request put forward by the participating shareholders. According to the requirements of the arbitration award, Greencourt Properties signed an equity transfer agreement with Shibang Company and sent several letters to Sijihuacheng, asking it to cooperate with the company's change registration.

Because Sijihuacheng had delayed fulfilling its obligation to register the change of the company, Greencourt Properties filed a lawsuit in accordance with law in order to fulfill the obligation determined by the Hong Kong arbitration award, which is legal and well-founded.

II.      According to the trial idea of the court of first instance, there were major flaws in the trial procedure of first instance.

The court of first instance associated the April 28 Agreement with the registered items of the change of equity transfer involved in the case. On one hand, it took the interests of the participating shareholders under the April 28 Agreement as a factor to be considered in its judgment, and on the other hand, it did not allow the participating shareholders to participate in litigation and be added as the defendant or the third party in this case. The judgment is contradictory. According to the judgment logic of the court of first instance, there were serious flaws in the trial procedure of first instance:

**1.**      Sijihuacheng has no right to put forward corresponding claims on behalf of the participating shareholders.

Sijihuacheng and the actual controller of Sijihuacheng, Ke Yeying, are neither signatories nor the participating shareholders of the April 28 Agreement, and have no right to interpret the meaning of the terms under the April 28 Agreement.

According to the April 28 Agreement, Sijihuacheng is only one of the consideration for equity transfer delivered by the controlling shareholder to the participating shareholders in the whole internal restructuring transaction of Oasis Investment. Sijihuacheng has no right to interfere with the restructuring arrangements between the controlling shareholders and the participating shareholders and the equity transfer arrangement among the shareholders of Sijihuacheng. In fact, such restructuring arrangements

and equity transfer arrangements will not infringe any interests of Sijihuacheng.

However, in this case, Sijihuacheng put forward relevant claims on behalf of some participating shareholders, claiming that the equity transfer agreement involved in the case was suspected of damaging the interests of participating shareholders, which was obviously to replace others, and there was no evidence that Sijihuacheng was authorized by the participating shareholders to put forward corresponding claims.

2. The participating shareholders did not participate in this lawsuit case, and they were not parties to this case. The first-instance judgment violated the basic principle of "no trial without complaint" in the Civil Procedure Law.

At the trial stage of the first instance, in order to help the court find out the facts of the case, Greencourt Properties submitted a request to the court of first instance to add Ke Yeying, the heir of Ke Zhengguang, another shareholder Xu Hongbiao and another director Ke Zhengfu of Sijihuacheng, as co-defendants in this case. However, Greencourt Properties never received a reply from the court of first instance. After that, Greencourt Properties again applied to the court of first instance for adding Ke Yeying, Xu Hongbiao and Ke Zhengfu as the third parties in this case, but still received no reply from the court of first instance. The court of first instance even made no mention of the request of Greencourt Properties to add defendants and third parties in the judgment of first instance!

However, according to the judgment of the first instance, in the view of the court, the equity transfer agreement involved in the case was a part of the transaction under the April 28 Agreement, which might involve damage to the interests of the participating shareholders. However, on the one hand, the court of first instance paid attention to the interests of the participating shareholders, but on the other hand, it did not allow the participating shareholders or their representatives to participate in the litigation, which was obviously contradictory. In fact, whether the equity transfer transaction involved in the case harms the interests of the participating shareholders could have been fully ascertained in the first-instance procedure of this case. However, the court of first instance deliberately ignored the corresponding evidence and the statements of the parties, and selectively accepted the opinions involving the private interests of Ke Yeying, representative of Sijihuacheng.

(1) Although Xu Hongbiao, one of the participating shareholders, was not approved by the court of first instance to participate in the lawsuit as a party to the case, Xu Hongbiao, as the authorized representative of the Shibang Company, explicitly agreed to the lawsuit on equity transfer put forward by Greencourt Properties when Shibang Company filed an independent lawsuit on the equity transfer arrangement involved in the case. If Xu Hongbiao also held that the equity transfer transaction involved in the case might harm his interests, Shibang Company could not agree at all with the claim of Greencourt Properties;

(2) In the questioning session of the second hearing of the case, the appellant's agent asked Shibang Company whether its designated authorized representative (i.e. Xu Hongbiao, a participating shareholder) thought that the equity transfer transaction involved in the case harmed its interests, and Shibang Company's reply was no damage. Otherwise Shibang Company would not have filed an independent claim in the first-instance procedure. However, the court of first instance did not pay attention to the facts of this section;

(3) The interests that the court of first instance actually paid attention to were the interests of Ke Yeying, not the interests of the participating shareholders. After Ke Zhengguang's death, his daughter Ke Yeying, as one of the inheritors of the estate, did not of course obtain the contract subject status under the April 28 Agreement, and had no right to change his father Ke Zhengguang's true intention when signing the April 28 Agreement without authorization. Ke Yeying made a malicious interpretation of the April 28 Agreement through Sijihuacheng she actually controlled, trying to change the true meaning expressed by Ke Zhengguang under the April 28 Agreement, and denying the consensus already reached by all parties under the April 28 Agreement, the essence of which was to realize her personal interests.

To sum up, when the participating shareholders did not participate in the litigation nor they claimed that the equity transfer agreement involved in the case would harmed their interests, the court of first instance made a judgment against the registration of change of Sijihuacheng based on the subjective inference that "the equity transfer agreement involved in the case might harm the interests of the participating shareholders", which seriously violated the basic trial rules set forth in the Civil Procedure Law, such as "no trial without complaint" and "taking the facts as the basis and the law as the criterion".

        3.       The court of first instance has no jurisdiction over the disputes under April 28 Agreement.

April 28 Agreement is an agreement on implementing the Supplementary Agreement on Equity Restructuring signed by the controlling shareholders and the participating shareholders on November 9, 2009 (hereinafter referred to as "Restructuring Agreement", see Evidence **1** of Second Instance for details), and April 28 Agreement is a part of Restructuring Agreement. According to Article 4.1 of the April 28 Agreement, all matters not covered by the April 28 Agreement shall be subject to the provisions in the Restructuring Agreement. According to the Restructuring Agreement, the applicable law of the Restructuring Agreement and the April 28 Agreement is Hong Kong law. This is also the basis of Hong Kong's arbitration award.

According to Article 4.2 of the April 28 Agreement, any and all disputes arising from the April 28 Agreement shall be settled by arbitration by Hong Kong International Arbitration Center. As a matter of fact, the dispute arising from the April 28 Agreement has been decided by the Hong Kong International Arbitration Center. As the applicant of the arbitration procedure, the participating shareholders recognized the contents of the April 28 Agreement and the equity transfer arrangement involved in the case, and the aforesaid expression of intention was also recorded in the Hong Kong arbitration award, which is binding on both the participating shareholders and the controlling shareholders.

However, the court of first instance accepted the wrong view of Sijihuacheng while having no right to review and not making substantial review of the contents of the April 28 Agreement, and made interpretation the terms under the April 28 Agreement, which was not conducive to the relevant subjects. In the case that Xu Hongbiao, the participating shareholder, had explicitly recognized the validity of the equity transfer agreement involved in the case, the court arbitrarily determined that the equity transfer transaction involved in the case might increase the tax burden of the participating shareholders, which was contrary to the commercial arrangement between the controlling shareholder and the participating shareholders when signing the April 28 Agreement, and made an adverse judgment to Greencourt Properties based on the aforementioned behavior.

It can be seen from the above that the court of first instance broke through the agreement of the parties to the April 28 Agreement on the applicable law and arbitration jurisdiction, and improperly interpreted the April 28 Agreement without making substantial review of its contents, abusing judicial power and seriously violating the basic rules of civil litigation.

III. The court of first instance omitted finding out the important facts of the case, and there was an error in finding out the facts.

**1.** The first-instance judgment omitted finding out the relevant facts of the establishment time of the Shibang Company.

The court of first instance omitted finding out the establishment time of the Shibang Company, and the key fact that its shareholders Xu Hongbiao and Ke Zhengguang who served as directors of the Shibang Company at the beginning of its establishment fully knew that Shibang Company was 100% owned by Greencourt Properties, thus leading to errors in ascertaining facts in the judgment of first instance.
    Greencourt Properties established the Shibang Company on November 5, 2009, and its participating shareholders Xu Hongbiao and Ke Zhengguang had served as directors since the establishment of the Shibang Company *(see Shibang Company's business registration document and pages 130 and 131 of the first instance trial evidence of Greencourt Properties for details; the Shibang Company also submitted this registration document in the trial of first instance)*. Therefore, the participating shareholders, Xu Hongbiao and Ke Zhengguang knew clearly at the beginning of the establishment of the Shibang Company that the shareholder of the Shibang Company was Greencourt

Properties, not Oasis Investment Group Co., Ltd.. The participating shareholders Xu Hongbiao and Ke Zhengguang, while knowing the equity relationship between Shibang Company and Greencourt Properties, signed the April 28 Agreement on April 28, 2010, indicating that all parties were fully aware of and recognized the fact that Shibang Company equity was 100% held by Greencourt Properties.

In the first-instance procedure, Greencourt Properties, Sijihuacheng and Xu Liangyan respectively submitted the business registration documents of the Shibang Company (none of which were notarized) as evidence. However, under the condition that the contents of the aforementioned documents were consistent, the court of first instance recognized only the version of the business registration documents submitted by Sijihuacheng and Xu Liangyan, but did not recognize the version submitted by Greencourt Properties, which was obviously biased towards Sijihuacheng and Xu Liangyan, which is obviously incredible!

**2.** The court of first instance omitted finding out Article 2.3.2 of the April 28 Agreement, the fifth arbitration request of the participating shareholders and the sixth order of the arbitral award, and made a one-sided, mechanical and erroneous interpretation of the contents of Article 2.3.1 of the April 28 Agreement.

According to Article 2.3.2 of the April 28 Agreement, "After Oasis Investment signs the Equity Purchase Right Agreement for transferring the equity of the Shibang Company to Xiying International Group Co., Ltd. and Focus Town Limited, Greencourt Properties shall sign the relevant custody agreement with Xiying International Group Co., Ltd. and Focus Town Limited, which shall stipulate that: (1) Xiying International Group Co., Ltd. and Focus Town Limited shall be entrusted by Greencourt Properties to manage the Shibang Company and exercise shareholder rights for three years (custody period)". (*See page 5 of April 28 Agreement, page 82 of the first instance evidence of Sijihuacheng and Xu Liangyan* )

What needs special attention is that the content of the custody agreement is that Greencourt Properties entrusts its shareholder rights to Shibang Company to third parties for three years. This proves that the shareholder of the Shibang Company is Greencourt Properties, not Oasis Investment, and this fact was clearly known by all parties when signing the April 28 Agreement.

Furthermore, the fifth arbitration request put forward by the participating shareholders and the sixth order of the Hong Kong arbitration award also prove that the participating shareholders and the arbitral tribunal knew and recognized the objective fact that Shibang Company was established by Greencourt Properties:

(1)     The fifth arbitration request of the participating shareholders (paragraph 220 of the arbitral award, page 34 of the arbitral award) is: "To order the first respondent (Oasis Investment) to sign and urge its subsidiary, Greencourt Properties , to jointly sign the equity purchase right agreement and the custody agreement concerning the Shibang Company; (Article 2.3.1 and Article 2.3.2 of the April 28 Agreement) ";( *see page 34 of the Hong Kong Arbitration Award, page 36 of the first instance trial evidence of Sijihuacheng and Xu Liangyan*).

(2)     Paragraph 201 of the arbitral award also makes it clear that after the signing of the Equity Purchase Agreement concerning Shibang Company: "In the Custody Agreement signed by Greencourt Properties, Xiying International and Focus Town, the parties will agree that (a) Xiying International and Focus Town will be entrusted by Greencourt Properties to manage the Shibang Company and exercise shareholders' rights for three years". Therefore, if the Shibang Company was not established by Greencourt Properties, then the parties and the arbitration tribunal would not have reached the above consensus;

(3)     According to Article 6 of the arbitration order: "To order the first respondent (Oasis Investment) to sign and urge its subsidiary, Greencourt Properties, to jointly sign the equity purchase right agreement and custody agreement concerning the Shibang Company";( *see page 59 of the Hong Kong Arbitration Award, page 61 of the first instance trial evidence of Sijihuacheng and Xu Liangyan*)

The above-mentioned arbitration requests of the participating shareholders and the above-mentioned arbitration orders of the Hong Kong arbitration award clearly put Greencourt Properties in the equity purchase and custody arrangements of the Shibang Company, which indicates: The participating shareholders and the arbitral tribunal were fully aware of the fact that Shibang Company was established by Greencourt Properties. Otherwise, if Shibang Company was not established by Greencourt Properties, the signing of the Shibang Company's equity purchase right agreement and custody agreement should not have been related to Greencourt Properties. It would have been illogical for both the participating shareholders and the arbitral tribunal to require Greencourt Properties to sign the corresponding equity purchase right agreement and custody agreement.

It is particularly noteworthy that Ke Yeying, the actual controller of Sijihuacheng, has applied for enforcement of the arbitral award in the United States, and his request also includes the sixth order of the arbitral award. This behavior also fully shows that Ke Yeying, the actual controller of Sijihuacheng, confirmed the fact that the equity purchase right agreement and the custody agreement should be signed by Greencourt Properties. In this case, Ke Yeying put forward her claim through Sijihuacheng that the establishing subject of the Shibang Company was inconsistent, which obviously contradicted her claim when applying for enforcement of arbitration award. The determination of the facts in this section by the court of first instance completely contradicts the contents of the Hong Kong arbitration award.

**3.** The court of first instance based its judgment on the so-called "extra tax burden" to outsiders that did not actually happen, which lacked basis.

On page 10 of the first-instance judgment, in the view of the court, the equity transfer involved in the case may increase the additional tax burden that the participating shareholders could not foresee when entering into the April 28 Agreement, and accordingly it is contrary to the commercial arrangement of the April 28 Agreement, and therefore, the court does not support the request of Greencourt Properties.

However, the first-instance judgment simply failed to find out what the "extra tax burden" was and whether the "extra tax burden" was real and reasonable, including the corresponding tax base, tax rate and the amount of tax incurred.

During the trial of the case, Sijihuacheng once claimed that its actual equity value was higher than the equity value agreed in the equity transfer agreement, and accordingly claimed that the equity transfer involved in the case would lead to additional tax burden for the participating shareholders in the future. However, Sijihuacheng failed to submit relevant evidence of the actual value of its equity. When the equity value of Sijihuacheng was not clear, how could there be "extra tax burden"? In the case that the so-called "extra tax burden" for outsiders was not actually occurred, the judgment made in the first instance is completely without basis.

In addition, the court of first instance added a new obligation without contract and legal basis for the outsider, requiring the participating shareholders and controlling shareholders who did not participate in the lawsuit to reach a new agreement on special tax treatment, and indicated that the equity transfer could not be carried out before the new agreement was reached, which obviously had no basis.

**4.** The court of first instance made an error in finding out the authority of the board of directors of Sijihuacheng.

The fact-finding content in the second paragraph of page 6 of the first-instance judgment mechanically copies the statement in the articles of association of Sijihuacheng, and holds that the equity transfer transaction involved in the case should be approved by a simple majority of the board of directors of Sijihuacheng, which is a mistake in finding out the facts. In fact, according to the articles of association of the company, the equity transfer involved in the case must be unanimously agreed by the board of directors of Sijihuacheng.

According to Article 16 (6) of the articles of association of Sijihuacheng, the terms of reference of the board of directors include "deciding the increase of the registered capital and the equity transfer of the company". Meanwhile, according to Article 24, "the following major issues must be unanimously passed by all members of the board of directors before a resolution can be formed: ... 4. Increase and transfer of the registered capital of the company". *(See the Articles of Association of Sijihuacheng 2005 for details, and pages 11, 12 of the first instance trial evidence of Greencourt Properties.)*

It is important to note that under the legal environment at that time, the registered capital of Sino-foreign joint ventures corresponded to the total investment of the company, and the registered capital was the capital contribution registered by all shareholders. The registered capital transfer in Article 24 (4) of the Articles of Association of Sijihuacheng Company is the concept of equity transfer. Therefore, according to the Articles of Association of Sijihuacheng, the board of directors shall form a unanimous resolution on the equity transfer transaction.

**5.** The voting mechanism of the board of directors of Sijihuacheng is out of control

Since the court of first instance thought that the indication of the board of directors of Sijihuacheng played a decisive role in the change registration of the equity transfer involved in the case, it should have found out whether the board of directors of Sijihuacheng could make a legal and effective resolution on the equity transfer involved in the case.

In fact, it is an obvious fact that the four directors of Sijihuacheng disagree on the equity transfer involved in the case. According to the trial statement of the Shibang Company, Xu Hongbiao did not actually master the official seal and business license of the Sijihuacheng, and there was a long-term contradiction and conflict between him and Ke Yuying; meanwhile, Xu Hongbiao, as the authorized representative of the Shibang Company in this case, agreed with the litigation request put forward by Greencourt Properties, and thought that the equity transfer agreement involved in the case was legal and valid, and Sijihuacheng should go through the corresponding change registration procedures. Therefore, Xu Hongbiao is in favor of the equity transfer involved in the case, which is obviously inconsistent with the attitudes of other three directors, namely Ke Yeying, Xu Liangyan and Ke Zhengfu. Therefore, regarding the equity transfer involved in the case, the three directors Xu Liangyan, Ke Yeying and Ke Zhengfu did not agree with the transfer, while Xu Hongbiao agreed with the transfer. Therefore, it is impossible for the four directors to form a unanimous resolution.

Secondly, the actions of the chairman of Sijihuacheng show that he will not call the board of directors to vote on the equity transfer involved in the case. According to Article 19 of the Articles of Association of Sijihuacheng, the board meeting is convened and presided over by the chairman. As far as this case is concerned, Xu Liangyan, the chairman of the board of directors, is the defendant in this case, and his agent has clearly stated that he does not recognize the validity of the equity transfer agreement involved in this case. Therefore, it is impossible for him to call the board of directors to vote on the equity transfer agreement involved in this case. In fact, regarding the equity transfer involved in the case, Greencourt Properties and its relevant actual controllers sent letters to Sijihuacheng and its directors/actual controllers on July 19, 2018, August 25, 2018 and November 8, 2019, urging relevant directors to perform their duties. However, in the past two years, the board of directors of Sijihuacheng has not voted on the equity transfer.

The above facts are enough to show that Sijihuacheng and its three directors Xu Liangyan, Ke Yeying and Ke Zhengfu are actually preventing the performance of the equity transfer involved in the case in various ways. It is impossible for the board of directors of Sijihuacheng to vote in any form on the equity transfer involved in the case; to take a step back, even if a vote is held, the voting mechanism of the board of directors of Sijihuacheng determines that the equity transfer agreement involved in the case will not be recognized by the board of directors under any circumstances. Therefore, under these circumstances, the shareholders' rights to equity transfer have been substantially deprived. If, according to the opinions of Sijihuacheng and Xu Liangyan, the procedural requirements of the Sijihuacheng Articles of Association (i.e., the resolution of the board of directors) are taken as one of the important elements to determine the validity of the equity transfer agreement involved in the case, the interests of shareholders will be substantially damaged, resulting in the fact that the existing shareholders of Sijihuacheng cannot dispose of the equity they hold at all, which will seriously damage the legitimate interests of the shareholders.

IV. Wrong application of law in first-instance judgment

1.      The first-instance judgment takes the tax issue involved in equity transfer as the precondition for the registration of equity transfer change,
which has no legal basis

The equity transfer agreement involved in the case is legal and valid, and Sijihuacheng has the legal obligation to handle the change registration. The equity transfer agreement involved in this case is legal and valid, and there is no invalid or revocable situation. Although Sijihuacheng claimed that the equity transfer agreement involved in the case was invalid, the court of first instance did not determine that the equity transfer agreement involved in the case was invalid, indicating that the court of first instance also confirmed its validity. Article 32 (3) of the Company Law stipulates: "The company shall register the names of shareholders with the company registration authority; if the registered items are changed, the change registration shall be handled. In the absence of registration or change registration, no action may be taken against a third party." Therefore, after the signing of the equity transfer contract involved in the case, Greencourt Properties was no longer a shareholder of Sijihuacheng, and Shibang Company has become a shareholder holding 80% equity of Sijihuacheng. Failure to register the change of Sijihuacheng will have legal effect against the third party.

There is no tax-precondition problem in the registration of change of equity transfer, and it lacks legal basis for the court of first instance to judge that tax problem should be solved first. According to Article 3 of the Notice of the State Administration of Taxation on Several Tax Issues Concerning the Implementation of the Enterprise Income Tax Law (Guo Shui Han [2010] No. 79): "With respect to the confirmation and calculation of equity transfer income, when an enterprise transfers its equity, the realization of income from equity transfer shall be confirmed when the transfer agreement comes into effect and the formalities of equity change are completed." Therefore, according to tax practice, the entry into force of the equity transfer agreement comes first, and the confirmation of income from equity transfer is confirmed (i.e., tax verification) comes later. Moreover, only when the equity transfer agreement is registered for transfer will the tax amount be confirmed. Therefore, whether the equity transfer transaction is tax-paid or not has nothing to do with the effectiveness of the equity transfer agreement. On the contrary, only when the equity transfer agreement becomes effective according to law and changes are registered, the tax verification issue will arise. On the contrary, only when the equity transfer agreement becomes effective according to law and changes are registered, the tax verification issue will arise. The court of first instance regards tax treatment as the precondition for handling the registration of change of equity transfer, which obviously puts the cart before the horse, has no basis in law, and runs counter to the practice.

The amount of tax verification depends on the tax authorities' determination of the actual value of the target company's equity, and does not depend on the agreement on equity transfer price in the parties' transfer agreement. The equity transfer transaction involved in the case is a part of the reorganization of the whole Oasis investment enterprise. Such equity transfer transaction is special. Whether the special tax treatment in the Notice of the Ministry of Finance and the State Administration of Taxation on Several Issues Concerning the Treatment of Enterprise Income Tax in Enterprise Restructuring Business (hereinafter referred to as "**No. 59 Document**") can be applied, and how and how much the resulting tax should be borne does not depend on the agreement of the equity transfer agreement involved in the case. The verification of tax amount by Chinese tax authorities is not affected by the transaction price agreed

in the contract between the parties, and the tax authorities usually verify the tax income from the transaction according to the fair value.

To take "ten thousand steps" back, even if special tax treatment can be applied to the equity transfer arrangement involved in the case, this is the true intention of all parties under the **April 28** Agreement. The arrangements for the equity transfer transactions under the April 28 Agreement can show that both the participating shareholders and the controlling shareholders expect to solve the tax problems arising from the equity transfer transactions through special tax treatment arrangements. Specifically:

(1) The equity transaction involved in the case conforms to the applicable scope of Article 1 of **No. 59** Document and the subject requirements of Article 7: April 28 Agreement is an internal reorganization transaction of enterprise, that is, the rearrangement of relevant legal entities held respectively by the participating shareholders and the controlling shareholders; meanwhile, the equity transfer transaction involved in the case occurs between Greencourt Properties and Shibang Company, which is in line with the subject requirements of Article 7 "A resident enterprise transfers the equity of an resident enterprise it holds to another non-resident enterprise directly and 100% controlled by it";

(2) The equity transaction involved in the case complies with the acquisition ratio requirements of Articles 5 and 6 of **No. 59** Document: That is, the assets or equity ratio of the acquired, merged or split part meets the requirement of not less than 75% (the equity of Sijihuacheng held by Greencourt Properties is 80%);

(3) The equity transaction involved in the case complies with the equity payment ratio requirements of Articles 5 and 6 of **No. 59** Document: The consideration for acquiring an enterprise includes equity payment, which is not less than 85% of the total transaction payment. The payment method of the equity transfer transaction involved in the case is 100% equity payment, which also meets this requirement;

(4) The equity transaction involved in the case complies with the three-year non-transfer requirement stipulated in Article 7 of **No. 59** Document: Article 2.3.2 of the April 28 Agreement stipulates that Greencourt Properties has made it clear that the transferor Greencourt Properties will not transfer the equity of the Shibang Company within three years. This is the reason why Article 2.3.3 of April 28 Agreement stipulates a "three-year" custody period.

It can be seen that no matter whether the tax authority determines that the equity transfer transaction involved in the case can be subject to special tax treatment after review, this arrangement is the true intention of all parties including Ke Zhengguang and Xu Hongbiao under the April 28 Agreement. Otherwise, it was not necessary for all parties to agree on the equity payment method and the three-year custody method under the April 28 Agreement. In particular, paragraphs 281 and 282 of the Hong Kong Arbitration Award also made it clear that the parties did not explicitly specify the tax undertaker in the case of No.59 Document in the April 28 Agreement, that is, in the transaction structure arrangement under the April 28 Agreement, since No. 59 Document would be applicable to the stage where 80% of the equity would be transferred to Shibang Company by Greencourt Properties, no tax would be incurred at this stage. This was also the reason that the parties did not make special provisions on the tax undertaker in the case where No. 59 Document was applicable in the April 28 Agreement.

Therefore, even if the equity transfer transaction involved in the case can be subject to special tax treatment, it is completely consistent with the expectations of all parties when signing the April 28 Agreement in 2010, and will not harm the legitimate rights and interests of any party at all. The court of first instance held that the equity transfer transaction involved in the case should not be executed because it might increase the tax burden of the participating shareholders than expected in signing the April 28 Agreement, so it did not support the request of Greencourt Properties for change registration, which is unfounded in law.

2. The court of first instance held that the equity transfer contract involved in the case should be approved by the board of directors, and that the equity transfer involved in the case was a matter that should be passed by a simple majority of the board of directors of Sijihuacheng, which is an error in applicable law.

**(1)** The equity transfer contract will take effect immediately without the approval of the board of directors.

According to Article 32 of the Contract Law of the People's Republic of China (hereinafter referred to as the "Contract Law"): "If the parties conclude a contract in the form of a contract, the contract shall be established when both parties sign it or affix their seals on it." The equity transfer contract involved in the case is not a contract that can take effect only after examination and approval as stipulated by laws and regulations, so the equity transfer agreement involved in the case came into legal effect when both parties signed it on July 18, 2018.

As for the agreement of the Articles of Association of Sijihuacheng on the voting of the board of directors on equity transfer matters, the resolution authority of the board of directors is limited to whether to approve the transfer, and does not include the approval of the equity transfer contract itself. As mentioned earlier, the equity transfer transaction involved in the case is the requirement of Hong Kong arbitration award, the requirement of April 28 Agreement, and the enforcement requirement put forward by Ke Yeying, the actual controller of Sijihuacheng, in American courts. Then, regarding the equity transfer involved in the case, whether Greencourt Properties, Ke Yeying, the actual controller of Sijihuacheng, Xu Hongbiao, the shareholding shareholder, or the Hong Kong arbitration award, the opinions of all parties are consistent, that is, the equity must be transferred.

However, both the Sijihuacheng and the court of first instance, their consistent position is to steal the concept, replace the equity transfer itself with the equity transfer contract, and require the board of directors to approve the equity transfer contract, which is obviously inconsistent with the Articles of Association of the Sijihuacheng, especially with the legal logic. Does the content of the equity transfer contract in which shareholders dispose of their own assets need to be approved by the directors appointed by shareholders?

**(2)** The voting mechanism of the board of directors has nothing to do with the control right of Sijihuacheng, and is not to balance the shareholders' interests.

The authority requirements and voting mechanism of the board of directors of Sijihuacheng were established as early as in the 2005 edition of the Articles of Association. At that time, Greencourt Properties was not a shareholder of Sijihuacheng (*see the Articles of Association of Sijihuacheng in 2005, page 11 of the first instance trial evidence of Greencourt Properties* ); since then, Sijihuacheng only filed two amendments to the Articles of Association when Greencourt Properties made equity investment in 2007 and the registered capital of Sijihuacheng increased on November 12, 2009, respectively. In the above amendments, the voting mechanism of Articles 16 and 24 of the Articles of Association was not changed ( *see the amendments to the Articles of Association of Sijihuacheng in 2007 and 2009, and page 4 of the first instance trial evidence of Greencourt Properties*)

Before the implementation of the Foreign Investment Law, the board of directors was the highest authority of a Sino-foreign joint venture, so the articles of association of Sino-foreign joint ventures generally stipulate broader terms of reference of the board of directors. Equity transfer is actually the behavior of shareholders to dispose of their own property, while the authority of the board of directors should be the management behavior of the company, and the disposition of property by shareholders and the management of the company by the board of directors are basically independent of each other.

As far as this case is concerned, the directors' voting on equity transfer is not a newly added term of reference of the board of directors after the participating shareholders took over the control of Sijihuacheng, but based on the legislative environment at that time, i.e., the legal background where the board of directors was the highest authority of Sino-foreign joint ventures. Therefore, the board of directors' decision-making power on shareholders' equity transfer is only a procedural arrangement, which reflects the procedural requirement that the board of directors is the highest authority, but not a substantive requirement.

In fact, before the signing of the April 28 Agreement, the controlling shareholder handed over the control of Sijihuacheng to the participating shareholders through the appointment of directors, the essence of which was the behavior that the controlling shareholder paid for the equity transfer to the participating shareholders. The management right of Sijihuacheng was handed over to the participating shareholders first, and the personnel appointed by the participating shareholders served as directors of Sijihuacheng, which does not mean that the participating shareholders have the right to interfere in the disposition of their own equities by the controlling shareholder. The directors of Sijihuacheng only have the right to make decisions on the operation and management of Sijihuacheng, but have no right to interfere with the equity disposition of the controlling shareholders. What's more, the disposition of the controlling shareholders' equities is in full compliance with the requirements of April 28 Agreement and Hong Kong Arbitration Award, and more in line with the true intention expressed by all parties at that time.

The wrong understanding of the terms of reference of the board of directors of Sijihuacheng in the first-instance judgment and the misunderstanding of the background of the voting mechanism of the board of directors led to the wrong judgment result.

**(3)** <u>According to judicial practice, the board of directors' right to decide on equity transfer is only a procedural requirement.</u>

In this case, the board of directors of Sijihuacheng fundamentally refused to issue a resolution on the equity transfer transaction involved in the case. If, according to the requirements of the court of first instance, the directors of Sijihuacheng do not vote or disagree, the company change registration for the transfer of equities from Greencourt Properties to Shibang Company will never be realized, which will seriously damage the legitimate interests of Greencourt Properties.

In the judicial practice cases related to disputes over equity transfer agreements, the courts also agree: The resolution of the board of directors in the articles of association of Sino-foreign joint ventures is only a procedural requirement, and the resolution of the board of directors cannot determine the validity of the equity transfer agreement. For example, the Shanghai No. 2 Intermediate People's Court heard the appeal case of equity transfer dispute between Rand Wales United Co., Ltd. and RAW Environmental Technology (Shanghai) Co., Ltd. [Case No.: (2016) Hu 02 Min Zhong No. 10017, hereinafter referred to as the "Landwell Case"], the court held that:

"Although the joint venture contract and Articles of Association of RAW Company stipulate that the transfer of the registered capital of the company must be unanimously approved by the resolution of the board of directors. However, according to the Share Transfer Agreement and Commitment and Guarantee provided by Chengbang Company, it shows that all three shareholders of RAW Company had no objection to the equity transfer in this case, and all three shareholders were aware of the joint venture contract and the Articles of Association. According to the normal process of RAW Company, after the former legal representative Jiang Zhipeng left office, his new legal representative should convene the board of directors to make a resolution on this matter. Therefore, it was not due to Chengbang Company that the equity transfer involved in this case did not have the resolution of the board of directors. <u>Although the highest authority of RAW Company was the board of directors, the board of directors was composed of members appointed by shareholders of all parties. Therefore, regarding the major issues of changes in equity within the company, shareholders are the ultimate deciders, and the resolutions of the board of directors are only procedural provisions, which do not hinder the effectiveness of the Share Transfer Agreement involved in this case.</u>"

V. Other problems existing in the judgment of first instance

The appellant Greencourt Properties is a company registered in Hong Kong. According to Article 269 [1] of the Civil Procedure Law, the appeal period of Greencourt Properties should be 30 days, while the court of first instance only gave 15 days for appeal, which is obviously an error in applicable law and violates legal procedures.

********************

To sum up, the litigation claims put forward by Greencourt Properties have sufficient factual basis and legal basis, and in the first-instance judgment, there are serious procedural flaws, omissions or wrong ascertaining of a number of important facts, and also wrong law applications. Greencourt Properties earnestly requests your court to revise the judgment according to law after finding out the facts, and support all the litigation claims put forward by Greencourt Properties in the first instance.

To

Shanghai No.1 Intermediate People's Court

Appellant: Greencourt Properties Co., Ltd. (Seal)
[stamp:] Greencourt Properties Co., Ltd.
GREEN COURT PROPERTIES LIMITED
Date: [hw:] *July 15, 2020*

[hw:] *Agent*: [signature]

---

[1] Article 269 of the Civil Procedure Law stipulates: If a party who has no domicile within the territory of the People's Republic of China refuses to accept the judgment or order of the people's court of first instance, he has the right to appeal within 30 days from the date of service of the judgment or order.

Domestic standard express
Customer service telephone: 11183
Website: www.ems.com.cn

**EMS** 全球邮政特快专递
WORLDWIDE EXPRESS MAIL SERVICE

1072369901534

Printed in November · Prepared under the · Wenzhou Cifang Security Printing Co., Ltd.

**❶ Sender information:**

Sender: [hw:] Lawyer Liu Jiadi

Telephone/cell phone: (very important) [stamp:] 021-52985488

Unit name: [hw:] Junhe Law Firm Shanghai Branch

Customer code: [stamp:] 04300135

Address: [hw:] 26/F, Building 1, Hong Kong Xingye Center, Xingye Taikoo Hui, No. 288 First Shimen Road, Shanghai

Customer number:

Zip code: [stamp:] 200040

**❷ Recipient information:**

Addressee: [hw:] Fei Zhengquan, Gao Lei

Telephone/cell phone: (very important) [hw:] 021-37190666 * 26121

Unit name: [hw:] Fengxian District People's Court of Shanghai

Customer code:

Address: [hw:] No. 199 East Jiefang Road, Fengxian District, Shanghai

Destination city: [hw:] Shanghai

Zip code: [hw:] 201499

**❸ Email details:**

| Total number of pieces | Actual weight (kg) | Billing weight (total weight kg) | Total volume length x width x height cm |
|---|---|---|---|
| | | | |

Name of internal item: [hw:] Bill of Civil Appeal of Greencourt Properties in quadruplicate

☑ letter ☐ document ☐ item

*Please make sure that the value of single item to be delivered does not exceed 50,000 yuan, and the valuables must be insured. The compensation for uninsured goods is 3 times of the postage paid.*

Insurance price: ☐ Yes ☐ No
Declared value: Ten thousand thousand hundred ten yuan ( ¥ yuan)

**❹ Additional service:**

☐ Return SMS ☐ Receipt return
☐ Electronic receipt return ☐ Other:
☐ Cash-on-delivery: yuan
ten thousand thousand hundred ten yuan

**❺ Delivery fee:**

Postage: Yuan Insurance fee: Yuan
Packaging fee: Yuan
Other expenses: Yuan

Total fee: Yuan
Delivery fee receivable: Yuan

**❻ Payment method:**

☐ Payable by the sender ☐ Payable by the addressee
☐ Card swiping ☐ Monthly settlement
☐ Payable by the third party ☐ Cash

**❼ Deliverable collector information:**

Deliverable accepting person: Delivered by:

**❽ Signed by sender**

*Please read the contract terms on the back carefully! The carrier has fulfilled the obligation of explanation, and your signature means that you understand and agree to accept all the terms and conditions.*

Signature: [signature]

[hw:] July 16, 2020 [hw:]

**❾ Recipient's receipt:**

Signature:

ID number:

MM DD YYYY Hour

Remarks:

10 72369901 5 34

② For receiving/sending office · ③ For sender

Please fill it out clearly!


TRANSPERFECT

City of New York, State of New York, County of New York

I, Jacqueline Yorke, hereby certify that the document "**3 Appeal_**上诉状-绿庭置业-**20200715-Junhe**-清洁版**-c2**" is, to the best of my knowledge and belief, a true and accurate translation from Chinese into English.

_(signature)_

Jacqueline Yorke
(Currently situated in the County of New York)

Sworn to before me remotely this
August 27, 2020

_(signature)_

Signature, Notary Public
(Currently situated in the County of New York)

WENDY POON
NOTARY
NO. 01PO6356754
QUALIFIED IN
QUEENS COUNTY
COMM. EXP.
04-03-2021
PUBLIC
STATE OF NEW YORK

Stamp, Notary Public

# 民事上诉状

上诉人（原审原告）：绿庭置业有限公司
住所地：香港特别行政区九龙尖沙咀么地道 62 号永安广场 10 楼 12 室
法定代表人：俞乃奋，董事

被上诉人（原审被告）：上海绿庭四季花城房地产开发有限公司
住所地：上海市奉贤区八字桥路 218 弄 12 号
法定代表人：许良彦，董事长

被上诉人（原审被告）：许良彦，男，**1938 年 11 月 17 日生**，汉族
身份证号码：31011019381117507X
住所地：上海市徐汇区裕德路 92 弄 2 号 1605 室

被上诉人（原审第三人）：世邦有限公司
住所地：香港特别行政区上环德辅道 272-284 号兴业商业中心 12 楼 1205-1208
室
法定代表人：徐宏标，董事

　　上诉人绿庭置业有限公司（下称"绿庭置业"）与被上诉人上海绿庭四季
花城房地产开发有限公司（下称"四季花城"）、许良彦、世邦有限公司（下
称"世邦公司"）之间请求变更公司登记纠纷一案（下称"本案"），绿庭置业不
服上海市奉贤区人民法院（下称"一审法院"）作出的（2019）沪 0120 民初
10021 号民事判决（下称"一审判决"），现依法提起上诉。

**上诉请求：**

1、请求贵院依法撤销上海市奉贤区人民法院作出的（2019）沪 0120 民初 10021
号民事判决，依法改判支持绿庭置业原审中的全部诉讼请求：

　　（1）　请求判令四季花城至上海市奉贤区市场监督管理局办理股权变更登记
　　　　　（备案）手续，将原记载于绿庭置业名下的四季花城 80%股权变更登
　　　　　记至世邦公司名下，并于办理企业变更登记（备案）时通过企业登记
　　　　　系统提交变更报告；

　　（2）　请求判令许良彦就绿庭置业办理前述第一项股权变更登记（备案）及
　　　　　信息报送手续履行相应的协助及配合义务；

2、请求判令由四季花城和许良彦承担本案一审和二审的全部案件受理费。

事实与理由：

　　绿庭置业认为，一审程序存在重大瑕疵、判决内容存在事实认定和法律适用错误。具体事实和理由如下：

　　一、　案涉事实背景说明

　　**绿庭置业提起本案诉讼的目的是为了配合香港国际仲裁中心 HKIAC/A13028 最终裁决（下称"香港仲裁裁决"）的执行**。2013 年 3 月 22 日，徐宏标与柯铮光（以下统称"参股股东"）作为仲裁申请人，以俞乃奋、俞乃筠、俞乃雯（下称"控股股东"）为仲裁被申请人，启动香港仲裁程序，请求解决控股股东、参股股东及其关联主体之间因各方在 2010 年 4 月 28 日签署的《关于执行 <股份重组初步协议>的协议书》（下称"428 协议"）而引发的争议。该案项下，世邦公司收购绿庭置业所持有的四季花城 80%股权（下称"案涉股转安排"）即是参股股东的仲裁请求之一（*详见四季花城原审证据1.1，第34 页*），最终，香港国际仲裁中心支持了参股股东的该项仲裁请求（*详见四季花城原审证据1.1，第59 页*），根据仲裁命令第 5 项，仲裁庭要求该案第一被申请人，即绿洲投资有限公司（下称"绿洲投资"）促使世邦公司收购绿庭置业持有的四季花城 80%股权。

　　因此，由绿庭置业将其持有的四季花城的股权转让给世邦公司，是仲裁裁决命令的要求，也是参股股东提出的仲裁请求事项。根据仲裁裁决的要求，绿庭置业与世邦公司签署了股权转让协议并多次发函给四季花城，要求其配合办理公司变更登记事宜。

　　由于四季花城迟迟不履行办理公司变更登记的义务，故绿庭置业依法提起本案诉讼，以履行香港仲裁裁决确定的义务，合法有据。

　　二、　如按照一审法院的审判思路，则一审审理程序存在重大瑕疵

　　一审法院将 428 协议与案涉股权转让变更登记事项相关联，一方面将 428 协议项下的参股股东利益作为其判决考虑的因素，另一方面又未予准许参股股东参加诉讼、追加为本案被告或第三人，该判决自相矛盾，如按照一审法院的判决逻辑，则一审审理程序存在严重的瑕疵：

　　1、　四季花城无权代表参股股东提出相应的主张

　　四季花城及四季花城的实际控制人柯烨颖均不是 428 协议的签署方，也不是参股股东，均无权对 428 协议项下条款的意思作出任何解读。

　　根据 428 协议，四季花城仅为整个绿洲投资内部重组交易中，控股股东向参股股东交付的股权转让对价之一。对于控股股东及参股股东之间的重组安排，以

2

及四季花城股东之间的股权转让安排，四季花城均无权干涉，该等重组安排及股权转让安排事实上也并不会侵害四季花城的任何利益。

然而，四季花城在本案中却代表部分参股股东提出相关主张，主张案涉股权转让协议涉嫌损害参股股东的利益，显然是越俎代庖，且并无任何证据显示四季花城得到参股股东的授权提出相应的权利主张。

**2、 参股股东未参加本案诉讼，并非本案当事人，一审判决违反了民诉法关于"不告不理"的基本原则**

在一审审理阶段，为有利于法院查清本案事实，绿庭置业曾向一审法院提出追加参股股东柯铮光的遗产继承人柯烨颖、另一参股股东徐宏标及四季花城另一董事柯铮夫为本案共同被告的请求。然而，绿庭置业始终未得到一审法院是否同意的回复。此后，绿庭置业又向一审法院申请追加柯烨颖、徐宏标、柯铮夫为本案第三人，然而，也未得到一审法院的回复。一审法院甚至在一审判决书中对于绿庭置业提出申请追加被告及追加第三人的请求只字未提！

然而，根据一审判决，法院认为案涉股权转让协议是428协议项下交易的一部分，可能涉及对参股股东利益的损害。然而，一审法院一方面关注参股股东利益，另一方面又未准许参股股东或其代表参加本案诉讼，显然自相矛盾。事实上，案涉股权转让交易是否损害参股股东利益，在本案一审程序中，完全能够查明，然而，一审法院却有意忽略相应的证据及当事人陈述，而有选择地接受四季花城代表柯烨颖私人利益提出的意见，显失公平：

（1） 尽管参股股东之一徐宏标未被一审法院同意追加为本案当事人参加诉讼，但徐宏标作为世邦公司的授权代表，在世邦公司就案涉股转安排提出独立诉讼请求时，明确同意绿庭置业提出的关于股权转让的诉讼请求。如徐宏标也认为案涉股权转让交易可能损害其利益，世邦公司根本不可能认同绿庭置业的主张；

（2） 本案第二次开庭的提问环节，上诉人的代理人向世邦公司发问，询问其指定的授权代表人（即参股股东徐宏标）是否认为案涉股权转让交易损害其利益，世邦公司答复未损害，否则世邦公司也不会在一审程序中提出独立的诉请。然而，一审法院并未对于该节事实予以关注；

（3） 一审法院实际关注的利益，是柯烨颖的利益，而非参股股东的利益。柯铮光去世后，其女柯烨颖作为遗产继承人之一，并不当然取得428协议项下的合同主体地位，更无权擅自改变其父亲柯铮光在428协议签订时的真实意思表示。柯烨颖通过其实际控制的四季花城，对428协议作出恶意解读，试图改变柯铮光在428协议项下作

出的真实意思表示，否认各方早已在 428 协议项下达成的共识，其实质是为实现其个人利益。

综上，一审法院在参股股东未参加诉讼也从未主张案涉股权转让协议损害参股股东利益的情形下，以"案涉股权转让协议可能损害参股股东利益"这一毫无事实根据的主观推论，作出不同意四季花城办理变更登记的判决，严重违反了民事诉讼法有关"不告不理"以及"以事实为依据，以法律为准绳"的基本审判规则。

**3、 一审法院对 428 协议项下的争议没有管辖权**

428 协议是控股股东与参股股东在 2009 年 11 月 9 日签署的《股份重组补充协议》（下称"《重组协议》"，详见二审证据 1）的执行协议，428 协议是《重组协议》的一部分。根据 428 协议第 4.1 条，就 428 协议未涉及之事项，均以《重组协议》约定为准。根据《重组协议》，重组协议及 428 协议的准据法均为香港法。这也是香港仲裁裁决的依据。

根据 428 协议第 4.2 条，因 428 协议引发之任何及所有争议，均应由香港国际仲裁中心通过仲裁方式解决。事实上，各方因 428 协议引发的争议已经由香港国际仲裁中心作出裁决，参股股东作为仲裁程序的申请方，认可 428 协议内容以及案涉股转安排，其前述意思表示也被记载在香港仲裁裁决中，对参股股东以及控股股东均有约束力。

然而，一审法院却在无权审查且也未实质审查 428 协议内容的情形下，偏听偏信地接受四季花城的错误观点，擅自对于 428 协议项下的条款作出不利于相关主体的解读，在参股股东徐宏标已经明确认可案涉股权转让协议效力的情形下，擅自认定案涉股权转让交易可能会增加参股股东的税务负担、与控股股东与参股股东在签署 428 协议时的商业安排相背，并基于此作出对绿庭置业不利的判决。

以上可见，一审法院突破 428 协议各方当事人对于准据法适用及仲裁管辖的约定，在未实质审查协议内容的情况下擅自对 428 协议进行不当解释，滥用司法权力，严重违反民事诉讼基本规则。

**三、 一审法院遗漏查明本案重要事实，且存在事实查明错误**

**1. 一审判决遗漏查明世邦公司成立时间的相关事实**

一审法院遗漏查明世邦公司的成立时间，以及参股股东徐宏标及柯铮光在世邦公司成立之初即担任世邦公司董事、完全知晓世邦公司系绿庭置业 100%持股这一关键事实，导致一审判决认定事实错误。

绿庭置业于 2009 年 11 月 5 日设立世邦公司，而参股股东徐宏标及柯铮光自世邦公司设立之初就担任董事职位（*详见世邦公司商业登记文件，绿庭置业原审证据第 130、131 页，世邦公司在原审中也提交了此份登记文件*）。因此，参股股东徐宏标及柯铮光早在世邦公司成立之初就清楚知悉世邦公司的股东是绿庭置业而非绿洲投资集团有限公司。参股股东徐宏标及柯铮光明知世邦公司与绿庭置业之间的股权关系，仍然于 2010 年 4 月 28 日签署 428 协议，说明各方对于世邦公司为绿庭置业 100%持股这一事实是完全知晓并认可的。

在一审程序中，绿庭置业、四季花城和许良彦分别提交了世邦公司的商业登记文件（均未进行公证认证）作为证据。然而，在前述文件内容一致的情况下，一审法院却仅认可四季花城和许良彦提交的世邦公司商业登记文件版本，却不予认可绿庭置业提交的版本，如此明显偏颇四季花城和许良彦的处理，显然令人匪夷所思！

**2. 一审法院遗漏查明 428 协议第 2.3.2 条、参股股东第 5 项仲裁请求以及仲裁裁决第 6 项命令，对 428 协议第 2.3.1 条内容作出片面、机械及错误解读**

根据 428 协议第 2.3.2 条"绿洲投资在世邦公司股权转让给喜盈国际集团有限公司和 Focus Town Limited 的《股权购买协议》签署后，由绿庭置业与喜盈国际集团有限公司和 Focus Town Limited 签署相关托管协议，该协议约定：（1）喜盈国际集团有限公司和 Focus Town Limited 受绿庭置业委托管理世邦公司并代为行使股东权利三年（托管期限）"。（*详见 428 协议第 5 页，四季花城和许良彦原审证据第 82 页*）

需要特别提请注意的是，托管协议的内容是，绿庭置业将其对世邦公司的股东权利委托给第三方行使三年。这足以证明，世邦公司的股东是绿庭置业，而非绿洲投资，而这一事实是为各方在签署 428 协议就明确知晓的。

并且，参股股东提出的第 5 项仲裁请求，以及香港仲裁裁决第 6 项命令，也足以印证，参股股东及仲裁庭对于世邦公司是由绿庭置业设立的客观事实是明知且认可的：

（1）参股股东第 5 项仲裁请求（仲裁裁决第 220 段，仲裁裁决书第 34 页）为："命令第一被申请人（绿洲投资）与参股股东（从裁决作出之日起的 2 周内）签署及促使其子公司绿庭置业共同签署有关世邦公司的股权购买协议及托管协议；（428 协议第 2.3.1 条、第 2.3.2 条）"；（*详见香港仲裁裁决第 34 页，四季花城和许良彦原审证据第 36 页*）

（2）仲裁裁决第 201 段也明确，有关世邦公司的《股权购买协议》签署后："由绿庭置业与喜盈国际和 Focus Town 签署的《托管协议》，在该协议中各方会约定（a）喜盈国际和 Focus Town 受绿庭置业委托管理世

邦公司并代为行使股东权利三年"，因此，如果世邦公司不是绿庭置业设立，那么各方及仲裁庭也不会达成上述共识；

(3) 根据仲裁命令第 6 条："命令第一被申请人（绿洲投资）与参股股东（从裁决作出之日起的 2 周内）签署及促使其*子公司绿庭置业*共同签署有关*世邦公司的股权购买权协议及托管协议*"；（*详见香港仲裁裁决第 59 页，四季花城和许良彦原审证据第 61 页*）

以上参股股东的仲裁请求，以及香港仲裁裁决的上述仲裁命令均明确将绿庭置业置于世邦公司的股权购买及托管安排之中，由此能够说明：参股股东及仲裁庭对于世邦公司由绿庭置业设立的事实是完全知悉的，<u>否则，如世邦公司不是绿庭置业设立，那么世邦公司股权购买权协议及托管协议的签署与绿庭置业不应有任何关联，参股股东及仲裁庭均要求绿庭置业签署相应股权购买权协议及托管协议就是不符合逻辑的。</u>

特别值得注意的是，四季花城的实际控制人柯烨颖已经在美国申请执行仲裁裁决，其请求事项中也包括仲裁裁决第 6 项命令。该行为也充分说明，四季花城的实际控制人柯烨颖对于股权购买权协议及托管协议应由绿庭置业签署的事实是确认的。柯烨颖通过四季花城在本案中提出有关世邦公司设立主体不符的主张，与其申请执行仲裁裁决时的主张显然存在矛盾。一审法院就该节事实的认定，完全与香港仲裁裁决的内容相矛盾。

**3. 一审法院以并未实际发生的所谓对案外人的"额外税务负担"作为判决基础，缺乏依据。**

一审判决第 10 页认定，案涉股权转让可能会增加参股股东在订立 428 协议时所无法预见的额外的税务负担，据此认定与 428 协议的商业安排相背，进而不支持绿庭置业的诉请。

然而，一审判决根本未能查明，何为"额外税务负担"以及该等"额外税务负担"是否真实存在、是否合理，包括相应的税基、计税比例、由此产生的税款金额等。

在案件审理过程中，四季花城曾主张其实际股权价值高于股权转让合同中约定的股权价值，据此主张案涉股权转让会导致参股股东在将来承担额外的税务负担。然而，四季花城未能提交其股权实际价值的相关证据。在四季花城股权价值尚不明确的情况下，又何来"额外税务负担"？在所谓对案外人的"额外税务负担"根本未实际发生的情况下，一审所作判决完全缺乏依据。

此外，一审法院为案外人增设新的、毫无合同及法律依据的义务，要求根本未参加本案诉讼的参股股东及控股股东就特殊税务处理问题达成新的合意，且表明在达成新的合意前不能进行股权转让，显然没有任何依据。

**4. 一审法院对四季花城董事会权限查明错误**

一审判决第 6 页第二段事实查明内容机械复制四季花城章程表述，认为案涉股权转让交易应由四季花城董事会简单多数通过，系查明事实错误。事实上，根据公司章程，案涉股权转让事项须经四季花城董事会形成一致意见。

根据四季花城公司章程第十六条第 6 项，董事会的职权范围包括"决定公司注册资本的增加与股份的转让"，同时，根据第二十四条规定"下列重大事项须董事会全体成员一致通过方可形成决议：……4、公司注册资本的增加、转让"。*（详见四季花城 2005 年公司章程，绿庭置业原审证据第 11、12 页）*

需要特别说明的是，在当时的法律环境下，中外合资企业的注册资本是与公司投资总额相对应的，注册资本即全体股东登记的出资额。四季花城公司章程第二十四条第 4 款的注册资本转让，即股权转让概念。因此，根据四季花城章程约定，案涉股权转让交易应当由董事会形成一致决议。

**5. 四季花城董事会表决机制失控**

一审法院既然认为四季花城董事会的意思表示对于案涉股权转让是否能够进行变更登记具有决定作用，那么本应查明四季花城董事会是否可能就案涉股权转让事项作出合法有效的决议。

实际上，四季花城四位董事就案涉股权转让事项意见不一致是显然易见的事实。根据世邦公司的庭审陈述，徐宏标并不实际掌握四季花城的公章及证照，且与柯烨颖存在长期矛盾、冲突；同时，徐宏标作为世邦公司在本案诉讼中的授权代表，世邦公司在本案中表示认同绿庭置业提出的诉讼请求，认为案涉股权转让协议合法有效、四季花城应当办理相应的变更登记手续。因此，徐宏标对于案涉股权转让事项持赞成态度，其与柯烨颖、许良彦及柯铮夫三位董事对于案涉股权转让的态度显然不一致。因此，就案涉股权转让事项，三位董事许良彦、柯烨颖及柯铮夫均不赞同转让，而徐宏标则赞同转让。因此，四位董事根本不可能形成一致决议。

其次，四季花城董事长的行动表明，其并不会就案涉股权转让事项召集董事会进行表决。根据四季花城章程第十九条，董事会会议由董事长召集并主持。就本案而言，董事长许良彦即为本案被告，其代理人在本案中已经明确表明不认可案涉股权转让协议的效力，因此，其根本不可能就案涉股权转让协议事项召集董事会进行表决。事实上，就案涉股权转让事项，绿庭置业及相关实际控制人先后

7

于 2018 年 7 月 19 日、2018 年 8 月 25 日、2019 年 11 月 8 日多次向四季花城及其董事/实际控制人发送函件，督促相关董事履行职责。然而，至今已经近两年，四季花城董事会仍然未就案涉股权转让事项进行过表决。

以上事实足以说明，四季花城及其三位董事许良彦、柯烨颖及柯铮夫，事实上均在以各种方式阻止案涉股权转让的履行，四季花城董事会根本不可能就案涉股权转让事项进行任何形式的表决；退一步而言，即使进行表决，四季花城董事会的表决机制也决定了案涉股权转让协议在任何情形下也不会得到董事会的认可。因此，该等情形下，股东对于股权转让事项的权利已经实质上被剥夺。如按四季花城和许良彦的主张，将四季花城章程的程序要求（即董事会决议）作为认定案涉股权转让协议的效力的要件之一，股东的利益将被实质上损害并导致四季花城的现有股东事实上根本无法处置其所持有的股权，将严重损害股东的合法利益。

四、　一审判决法律适用错误

1、　一审判决将股权转让所涉税务问题作为股权转让变更登记的前置条件，没有法律依据

案涉股权转让协议合法有效，四季花城负有办理变更登记的法定义务。本案所涉股权转让协议合法有效，不存在任何无效、可撤销的情形。尽管四季花城主张案涉股权转让协议无效，但一审法院并未认定案涉股权转让协议无效，说明一审法院也确认其效力。根据《公司法》第三十二条第三款规定："公司应当将股东的姓名或者名称向公司登记机关登记；登记事项发生变更的，应当办理变更登记。未经登记或者变更登记的，不得对抗第三人。"因此，案涉股权转让合同签署后，绿庭置业已经不再是四季花城的股东，世邦公司成为四季花城 80% 的股东，四季花城未办理变更登记将产生不得对抗第三人的法律效力。

股权转让变更登记不存在税务前置问题，原审法院认定需先解决税务问题缺乏法律依据。根据《国家税务总局关于贯彻落实企业所得税法若干税收问题的通知》（国税函[2010]79 号）第三条规定："关于股权转让所得确认和计算问题企业转让股权收入，应于转让协议生效、且完成股权变更手续时，确认收入的实现。"因此，根据税务实践，股权转让协议的生效在先、股权转让收入确认（即税务核定）在后。并且，只有在办理股权转让登记时，才会产生税额确认问题。因此，股权转让交易是否完税根本无法影响股权转让协议的效力。恰恰相反，只有股权转让协议依法发生效力并在办理变更登记时，才会产生税务核定问题。一审法院将税务处理问题作为办理股权转让变更登记的前置条件，显然是本末倒置，于法无据，也与实践中的做法相悖。

税务核定金额取决于税务机关对于目标公司股权实际价值的认定，而不取决于当事人转让协议中对于股权转让价格的约定。案涉股权转让交易是整个绿洲

8

投资企业重组的一部分。该等股权转让交易存在特殊性，至于是否能够适用《财政部、国家税务总局关于企业重组业务企业所得税处理若干问题的通知》（下称"《59号文》"）的特殊税务处理，以及由此产生的税款应当如何承担、承担多少金额，均不取决于案涉股权转让协议的约定。中国的税务机关对于税款金额的核定，不受当事人之间在合同中约定的交易价格影响，税务机关通常会按照公允价值核定交易所得税款。

　　退一万步而言，即使案涉股权转让安排能够适用特殊税务处理，这也是各方在 428 协议项下的真实意思表示。428 协议项下关于案涉股权转让交易的安排均能够表明，参股股东及控股股东均期待通过特殊税务处理的安排解决案涉股权转让交易中产生的税务问题，具体而言：

(1) 案涉股权交易符合《59 号文》第一条的适用范围及第七条的主体要求：428 协议是企业内部重组交易，即参股股东与控股股东对于各自持有的相关法律实体的重新安排；同时，案涉股权转让交易发生在绿庭置业与世邦公司之间，即符合第七条"居民企业向其 100%直接控股的另一非居民企业转让其拥有的居民企业股权"的主体要求；

(2) 案涉股权交易符合《59 号文》第五条及第六条的收购比例要求：即，被收购、合并或分立部分的资产或股权比例符合不低于 75%的要求（绿庭置业持有的四季花城股权为 80%）；

(3) 案涉股权交易符合《59 号文》第五条及第六条的股权支付比例要求：收购企业的对价包括股权支付，且不低于其交易支付总额的 85%。案涉股权转让交易的支付方式为 100%股权支付，也正是满足这一要求；

(4) 案涉股权交易符合《59 号文》第七条规定的三年不转让要求：428 协议第 2.3.2 条约定，绿庭置业明确，转让方绿庭置业三年内不转让世邦公司股权。这正是 428 协议第 2.3.3 条约定"三年"托管期的原因。

　　可见，无论税务机关在核定后是否认定案涉股权转让交易可以适用特殊税务处理，这样的安排是包括柯铮光、徐宏标在内的各方在 428 协议项下的真实意思表示。否则，各方根本没有必要在 428 协议项下约定股权支付方式及三年托管方式。特别是，香港仲裁裁决第 281 段及第 282 段也明确，各方在 428 协议中并未明确适用 59 号文情形下的税务承担主体，即，通过 428 协议项下的交易结构安排，80%的股权转让在绿庭置业向世邦公司转让这一步，由于可以适用 59 号文，故该阶段不会产生税款，这也是各方未在 428 协议中对适用 59 号文情形下产生的税务承担作出特别约定的原因。

　　因此，即使案涉股权转让交易能够适用特殊税务处理，也与各方在 2010 年签署 428 协议之时的预期完全一致，根本不会损害任何一方的合法权益。一审法

院认为案涉股权转让交易因可能增加参股股东在签署 428 协议时的税务负担而不应予以执行，故不支持绿庭置业关于变更登记的请求，于法无据。

**2、** 一审法院认为案涉股权转让合同应当经过董事会的批准，且认为案涉股权转让事项属于四季花城董事会简单多数决通过的事项，属适用法律错误

**（1）股权转让合同成立即生效，不需要董事会批准**

根据《中华人民共和国合同法》（下称"《合同法》"）第三十二条规定："当事人采用合同书形式订立合同的，自双方当事人签字或者盖章时合同成立。"案涉股权转让合同不属于法律法规规定的经审批才能生效的合同，故案涉股权转让协议已于 2018 年 7 月 18 日双方签署时发生法律效力。

至于四季花城章程对于董事会关于股权转让事项进行的表决的约定，董事会决议权限仅限于是否同意转让，而不包括对股权转让合同本身的批准。如前所述，案涉股权转让交易是香港仲裁裁决的要求、是 428 协议的要求，也是四季花城实际控制人柯烨颖在美国法院提出的执行要求。那么就案涉股权转让本身，无论是绿庭置业、四季花城实际控制人柯烨颖、参股股东徐宏标还是香港仲裁裁决，各方意见都是一致的，即该等股权必须转让。

然而，无论是四季花城，还是一审法院，其一致的立场是偷换概念，将股权转让合同取代股权转让事项本身，要求董事会批准股权转让合同，这显然与四季花城章程约定不符，更是与法律逻辑不符。股东处分自身资产的股权转让合同内容本身，难道还需要股东委派的董事进行批准吗？

**（2）董事会的表决机制与四季花城控制权无关，并非股东利益平衡**

四季花城董事会的职权要求及表决机制，早在 2005 年的公司章程版本中已确立。当时，绿庭置业还不是四季花城的股东（*详见四季花城 2005 年公司章程，绿庭置业原审证据第 11 页*）；此后，四季花城仅在 2007 年绿庭置业投资入股以及 2009 年 11 月 12 日四季花城的注册资本增加时，进行两次公司章程修改的备案。上述修正案中，对于公司章程第十六条及第二十四条的表决机制并未作出变更（*详见四季花城 2007 年及 2009 年章程修正案,绿庭置业原审证据第 4 页*）。

《外商投资法》实施之前，董事会是中外合资经营企业的最高权力机构，故中外合资经营企业的公司章程中一般都将董事会的职权范围做较为宽泛的约定。股权转让事项，实际是股东处分自身财产的行为，而董事会的职权应当是公司经营管理行为，股东对于财产的处分与董事会管理公司根本是相互独立的。

就本案而言，董事对于股权转让事项的表决并非是参股股东控制四季花城后新增的董事会职权范围，而是基于当时的立法环境，即董事会是中外合资经营企

业的最高权力机构的法律背景。因此，董事对于股东股权转让专项的决定权，仅为程序上的安排、是体现董事为最高权力机构的程序要求，而并非实质要求。

实际上，428 协议签署前，控股股东通过董事委派安排将四季花城的控制权交付参股股东，其实质是控股股东向参股股东支付股权转让的行为。将四季花城的经营管理权先交由参股股东，由参股股东委派的人员担任四季花城董事，并不意味着参股股东就控股股东对于其自身股权的处分有权进行干涉。四季花城的董事仅有权就四季花城的经营管理事项作出决定，而无权干涉控股股东的股权处分。更何况，控股股东的股权处分完全符合 428 协议及香港仲裁裁决要求，更符合各方当时的真实意思表示。

一审判决对于四季花城董事会职权范围的错误理解，以及其对董事会表决机制形成背景的误解，均导致其作出错误的判决结果。

**（3） 根据司法实践，董事会对股权转让的决议权仅为程序要件**

本案中，四季花城董事会从根本上拒绝就案涉股权转让交易出具决议。如果按照一审法院的要求，在四季花城董事不表决或不同意情形下，绿庭置业向世邦公司转让股权的事项，将永远无法实现公司变更登记，由此将严重损害绿庭置业的合法利益。

在股权转让协议纠纷相关司法实践案件中，法院也认同：中外合资经营企业章程中对于董事会决议的要求仅为程序性要求，董事会决议并不能够决定股权转让协议的效力。例如，上海第二中级人民法院审理的蓝德威尔士联合有限公司与洛尔环境科技（上海）有限公司股权转让纠纷上诉案[案号：（2016）沪 02 民终 10017 号，下称"蓝德威尔案"]中，法院认为：

"虽然洛尔公司合资合同及章程约定公司注册资本进行转让须经董事会决议一致通过。但根据城邦公司提供的《股份转让协议》及《承诺及担保书》，表明洛尔公司的三名股东对本案股权转让均不持异议，而三名股东对合资合同及公司章程的约定都是明知的。按照洛尔公司正常流程，在原法定代表人蒋志鹏卸任后，其新任法定代表人应当召集董事会就此事项进行决议。故造成本案所涉股权转让未经董事会决议并非城邦公司所致。<u>虽然洛尔公司的最高权力机构是董事会，但董事会系由各方股东委派组成，故就公司内部股权变动的重大事项，股东作为直接的权利主体才是最终的决定者，董事会决议仅仅是程序性的规定，并不妨碍本案所涉的《股份转让协议》的效力。</u>"

**五、 一审判决存在的其他问题**

上诉人绿庭置业系注册在香港的公司，根据《民事诉讼法》第二百六十九条[1]的规定，绿庭置业的上诉期应为 30 天，而一审法院仅给 15 天上诉期，明显属于适用法律错误，且违反了法定程序。

*********************

综上所述，绿庭置业提出的诉讼请求具有充分的事实依据及法律依据，一审判决存在严重程序瑕疵，且遗漏查明、错误查明多项重要事实，同时存在法律适用错误。绿庭置业恳请贵院查明事实后依法改判，支持绿庭置业一审提出的全部诉讼请求。

此致

上海市第一中级人民法院

上诉人：绿庭置业有限公司（盖章）

日期：2020.7.15

代理人：

---

[1] 《民事诉讼法》第二百六十九条：在中华人民共和国领域内没有住所的当事人，不服第一审人民法院判决、裁定的，有权在判决书、裁定书送达之日起三十日内提起上诉。

**EMS** 全球邮政特快专递
WORLDWIDE EXPRESS MAIL SERVICE

1072369901534

国内标准快递
客服电话：11183
网站：www.ems.com.cn

① 寄件人信息：

寄件人：刘佳雯 律师　电话/手机：021-52985488

单位名称：君合律师事务所上海分所　客户代码：04300135

地址：上海市石门一路 288 号兴业太古汇香港兴业中心一座 26 层

客户单号：　　　　邮编：200040

② 收件人信息：

收件人：黄正权、商磊　电话/手机：021-37190666 米 26121

单位名称：上海市奉贤区人民法院　客户代码：

地址：上海市奉贤区解放东路 199 号

寄达城市：上海　邮编：201499

③ 邮件详细说明：

| 总件数 | 实际重量(千克) | 计费重量(总重量 千克) | 总体积　长×宽×高cm |
|---|---|---|---|

内件品名：绿庭置业民事上诉状 一式四份

☑信函　□文件资料　□物品　请确定寄递物品单件价值不超过5万元，贵重物品务必保价，未保价物品的赔偿额为所付邮费的3倍。

保价：□是 □否　声明价值：万 仟 佰 拾 元（¥　　元）

请用力填写！

④ 附加服务：

□ 妥投短信　□ 实物返单
□ 电子返单　□ 其它：
□ 代收货款：　　　　元
　万　仟　佰　拾　元

⑤ 寄递费用：

邮费：　元　保价费：　元
封装费：　元　其他费用：　元
费用合计：　　　元
投递应寄递费：　　　元

⑥ 付款方式：

□ 寄件人付　□ 收件人付
□ 刷卡　　　□ 月结
□ 第三方付费　□ 现金

⑦ 揽投信息：

收寄人员：　　　投递人员：

⑧ 寄件人签署：

请仔细阅读背面契约条款！承运人已尽说明义务，您的签名意味着您理解并同意接受条款的一切内容。

签名：武磊

2020年 7月 16日　时

⑨ 收件人签收：

签名：

证件号码：

年　月　日　时

备注：

10 72369901 5 34

① 投递局存　② 收寄局存　③ 寄件人存

# EXHIBIT 23

Civil Petition for Appeal

Appellant (a third party in the first instance): Shibang Co., Ltd.

Domicile: Room 1205-1208, 12/F, Xingye Commercial Center, No.272-284 Des Voeux Road Central, Sheung Wan, Hong Kong, China

Legal representative: Xu Hongbiao                    Position: Director

Appellee (plaintiff of the first instance): Greencourt Properties Limited.

Domicile: Room 12, 10/F, Wing On Plaza, No.62 Mody Road, Tsim Sha Tsui, Kowloon, Hong Kong, China

Legal representative: Yu Naifen                     Position: Director

Appellee (defendant of the first instance): Shanghai Luting Sijihuacheng Real Estate Development Co., Ltd.

Domicile: No.12, Lane 218, Baziqiao Road, Fengxian District, Shanghai, China

Legal representative: Xu Liangyan                   Position: Chairman

Appellee (defendant of the first instance): Xu Liangyan, male, born on November 17, 1938, Han nationality

Domicile: Room 1605, Lane 2, No.92 Yude Road, Xuhui District, Shanghai, China

The appellant refused to accept the civil judgment of Fengxian District People's Court of Shanghai (2019) 0120 Min Chu No.10021, and hereby appeals to your court.

Appeal request:

I. To revoke the civil judgment of Fengxian District People's Court of Shanghai (2019) 0120 Min Chu No.10021.

II. To support the appellant all claims in the first instance, namely: 1. Issue a judgement to confirm that the appellant is a shareholder of the appellee Shanghai Luting Sijihuacheng Real Estate Development Co., Ltd., and owns 80% of the registered capital of Shanghai Luting Sijihuacheng Real Estate Development Co., Ltd.; 2. To order the appellee Shanghai Luting Sijihuacheng Real Estate Development Co., Ltd. and Xu Liangyan to go through the filing formalities for the change of 80% equity of Shanghai Luting Sijihuacheng Real Estate Development Co., Ltd. within the time specified in the judgment of this case, and if they fail to do so, the appellee will go through the filing formalities with the competent government authority in his own name; 3. To order the appellee Shanghai Luting Sijihuacheng Real Estate Development Co., Ltd. to issue a capital contribution certificate to the appellant and record the appellant in the register of shareholders.

Facts and Reasons:

The appellant holds that the civil judgment (2019) 0120 Min Chu No.10021 made by Fengxian District People's Court of Shanghai (hereinafter referred to as the "first-instance judgment") has errors in fact-finding and determination, as well as in the application of law. The reasons are as follows:

1. The first-instance judgment decided that the appellee Greencourt Properties Co., Ltd. "shall not solely transfer the equity" on the grounds that "it is contrary to the "commercial arrangement" of the outsider in this case and "a new agreement has not been formed". The implication is that if there is no consensus among the outsiders (even the parties not-involved in this case) on the tax burden, even if the seller and the buyer reach an agreement, their legally owned shares cannot be transferred. This decision logic is tantamount to replacing others in other's affairs and violates the basic legal principles concerning property rights.

2. The legal relationship involved in this case is based on the "equity transfer contract" between the buyer and the seller, and not the "428 Agreement". Whether the equity transfer conforms to the "428 Agreement" is a problem to be dealt with separately, and it belongs to the scope of arbitration jurisdiction. The judgment of the first instance not only took the "428 Agreement", in which the signatory was even not the party to the case, as the basis for the judgement of the case, but also took the "commercial arrangement", rather than the "legality", as the basis, which was unbelievable.

3. The first-instance plaintiff filed a lawsuit based on the "Equity Transfer Contract", and the first-instance judgment rejected all the litigation claims while identifying and confirming the "Equity Transfer Contract" and its "Supplementary Agreement". Then, what is the nature of the "Equity Transfer Contract" and its "Supplementary Agreement": Are they invalid, ineffective, revoked, or is the original litigation claim in the first instance inconsistent with the "Equity Transfer Contract" or its "Supplementary Agreement"? The first-instance judgment did not make clear of the facts in this vital issue.

4. The first-instance judgment also referred to the section that the board of directors of Sijihuacheng "mainly represents the interests of participating shareholders" and that the transfer of competing shares "should be approved by a simple majority at the board meeting", which also belonged to errors in fact-finding and determination. There is more than one shareholder, but the board of directors of Sijihuacheng is actually controlled by one of them and does not represent all shareholders. There was no evidence in the first trial, proving that the outsiders agreed to "balance" the "interests" among the outsiders by the board of directors of Sijihuacheng. However, from the perspective of balance of interests of others, the first-instance judgment denied the legal rights and interests of the parties to the case in disposing of their own property.

5. The mistake of law application in the first-instance judgment is that the taxation laws and regulations were regarded as the main basis of judgment instead of those on foreign-invested enterprises and contracts, and relevant judicial interpretations.

To sum up, there are obvious mistakes in the first-instance judgment. The appellant's claims have sufficient factual and legal basis. On the basis of finding out the facts of the case, please apply the law correctly, revoke the first-instance judgment and support all the appellant's claims.

To

Shanghai No.1 Intermediate People's Court

Appellant: Shibang Co., Ltd.

Specially authorized agent:

Date: 15 July 2020



TRANSPERFECT

City of New York, State of New York, County of New York

I, Jacqueline Yorke, hereby certify that the document "**4 Shibang_民事上诉状-c2**" is, to the best of my knowledge and belief, a true and accurate translation from Chinese into English.

_(signature)_

---

Jacqueline Yorke
(Currently situated in the County of New York)

Sworn to before me remotely this
August 27, 2020

_(signature)_

---

Signature, Notary Public
(Currently situated in the County of New York)

_(notary stamp)_
WENDY POON
NOTARY
NO. 01PO6356754
QUALIFIED IN
QUEENS COUNTY
COMM. EXP.
04-03-2021
PUBLIC
STATE OF NEW YORK

---

Stamp, Notary Public

# 民事上诉状

上诉人（一审第三人）：世邦有限公司
住所：中国香港上环德辅道中 272-284 号兴业商业中心 12 楼 1205-1208 室
法定代表人：徐宏标　　　　　　职务：董事

被上诉人（一审原告）：绿庭置业有限公司
住所：中国香港九龙尖沙咀么地道 62 号永安广场 10 楼 12 室
法定代表人：俞乃奋　　　　　　职务：董事

被上诉人（一审被告）：上海绿庭四季花城房地产开发有限公司
住所：中国上海市奉贤区八字桥路 218 弄 12 号
法定代表人：许良彦　　　　　　职务：董事长

被上诉人（一审被告）：许良彦，男，1938 年 11 月 17 日出生，汉族
住所地：中国上海市徐汇区裕德路 92 弄 2 号 1605 室

上诉人因不服上海市奉贤区人民法院（2019）0120 民初 10021 号民事判决书，特向贵院提起上诉。

上诉请求：

一、　撤销上海市奉贤区人民法院（2019）0120 民初 10021 号民事判决书。

二、　改判支持上诉人一审中的全部诉讼请求，即：1、判令确认上诉人为被上诉人上海绿庭四季花城房地产开发有限公司的股东，拥有占上海绿庭四季花城房地产开发有限公司注册资本 80%的股权；2、判令被上诉人上海绿庭四季花城房地产开发有限公司和许良彦在本案判决指定的时间内、就上海绿庭四季花城房地产开发有限公司 80%股权变更事宜不履行备案手续的，由上诉人以自己的名义向政府主管部门办理备案手续；3、判令被上诉人上海绿庭四季花城房地产开发有限公司向上诉人签发出资证明书、并

将上诉人记载于股东名册。

事实和理由：

上诉人认为，上海市奉贤区人民法院作出的（2019）0120 民初 10021 号民事判决书（以下简称"一审判决"）存在事实查明和认定，以及法律适用方面的错误。理由如下：

1、 一审判决以与本案案外人的"商业安排相背"、尚"未形成新的合意"为由，认定被上诉人绿庭置业有限公司"不得单独进行股权转让"。言下之意，如果没有案外人相互之间（甚至不涉及本案当事人）就税负问题协商一致的话，卖方即使和买方达成一致，其合法拥有的股权也不能转让。这一认定逻辑，不啻越俎代庖，更是违背有关财产权的基本法律原则。

2、 本案所涉法律关系的基础依据是买卖双方的"股权转让合同"，不是"428 协议"。股权转让是否符合"428 协议"的约定，属于另案处理的问题，更是属于仲裁管辖的范畴。一审判决不仅以签约方甚至都不是本案当事人的"428协议"作为本案认定基础，还以是否符合"商业安排"为依据，而不是以"合法性"为依据，令人难以置信。

3、 一审原告基于"股权转让合同"提起诉讼，一审判决在查明和认定"股权转让合同"及其"补充协议"的同时，却驳回全部诉讼请求。那么，"股权转让合同"及其"补充协议"到底属于什么性质：是无效、未生效、被撤销，还是一审原告诉请不符合"股权转让合同"或其"补充协议"约定？一审判决对此关键问题事实不清。

4、 一审判决对四季花城董事会"主要代表了参股股东的利益"、系争股权转让"应该由董事会会议简单多数通过"一节，也属于查明和认定事实错误。参股股东不是只有一方，四季花城董事会只是被其中一方实际控制，并不代表所有参股股东。一审中不存在任何证据，证明案外人约定以四季花城董事会"平衡"案外人之间的"利益"。一审判决却从他人利益平衡角度，否定了本案当事人处置自己财产的合法权利和利益。

5、 一审判决适用法律的错误体现在本末倒置地将税务法规作为判决主要依据，而没有适用有关外商投资企业和合同的法律法规及相关司法解释。

综上所述，一审判决存在明显错误。而上诉人的诉讼请求具有充分的事实和法律依据。恳请贵院在查明案件事实的基础上，正确适用法律，撤销一审判决，支持上诉人的全部诉讼请求。

此致

上海市第一中级人民法院


上诉人：世邦有限公司

特别授权代理人：

日　期：2020 年 7 月 15 日